IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

MARKUS BLECHNER, Individually and on
Behalf of All Others Similarly Situated,

               Plaintiff,

      v.

DAIMLER-BENZ AG, DAIMLERCHRYSLER
AG, JÜRGEN SCHREMPP, ECKHARD
CORDES, MANFRED GENTZ, JÜRGEN
HUBBERT, MANFRED BISCHOFF, KURT
LAUK, KLAUS MANGOLD, HEINER
TROPITZSCH, KLAUS-DIETER
VOHRINGER, DIETER ZETSCHE and
THOMAS SONNENBERG,

               Defendants.

-------------------------------------------------------------x

:   Civil Action No. 04-331 (JJF)

**COMPENDIUM OF UNREPORTED AUTHORITIES CITED IN THE
OPENING BRIEF OF DAIMLERCHRYSLER AG AND DAIMLER-BENZ
AG IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT**

OF COUNSEL:
Jonathan J. Lerner
Lea Haber Kuck
Joseph N. Sacca
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

Dated: March 1, 2005

Thomas J. Allingham II (#0476)
Robert S. Saunders (#3027)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square, P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

Attorneys for Defendants DaimlerChrysler
AG and Daimler-Benz AG

# INDEX

In re Enron Corp. Sec., Derivative & ERISA Litig.,
  No. MDL-1446, Civ. A. H-01-3624,
  2004 WL 405886 (S.D. Tex. Feb. 25, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Lieberman v. Cambridge Partners, L.L.C.,
  No. Civ. A. 03-2317, 2004 WL 1396750 (E.D. Pa. June 21, 2004) . . . . . . . . . . 2

In re Vivendi Universal, S.A. Sec. Litig.,
  No. 02 Civ. 5571(HB), 2003 WL 22489764 (S.D.N.Y. Nov. 3, 2003) . . . . . . . . 3

Brief of the Federal Republic of Germany as Amicus Curiae in Support of Petition
  for Writ of Certiorari, F. Hoffman-La Roche Ltd. v. Empagran, S.A.,
  124 S. Ct. 2359 (No. 03-724) (2004), available at 2003 WL 22896686 . . . . . . . . 4

TAB 1

2004 WL 405886 (S.D.Tex.)

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas, Houston Division.
In re ENRON CORPORATION SECURITIES, DERIVATIVE & "ERISA" LITIGATION
Mark NEWBY, et al., Plaintiffs
v.
ENRON CORPORATION, et al., Defendants
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al., Individually and On Behalf
of All Others Similarly Situated, Plaintiffs,
v.
Kenneth L. LAY, et al., Defendants.
No. MDL-1446, Civ.A. H-01-3624.
Feb. 25, 2004.

Richard J. Zook, Cunningham Darlow et al., Houston, TX, Roger B. Greenberg, Schwartz Junell et al., Houston, TX, William S. Lerach, Keith F. Park, Milberg Weiss et al., San Diego, CA, G. Paul Howes, Milberg Weiss et al., Houston, TX, Earnest W. Wotring, Connelly Baker et al., Houston, TX, Ira M. Press, Attorney at Law, New York, NY, Michael I. Behn, Futterman & Howard Chtd., Chicago, IL, Charles R. Parker, Locke, Liddell and Sapp, Houston, TX, James M. Finberg, Richard M. Heimann, Melanie M. Piech, Elizabeth Cabraser, Lieff Cabraser et al., San Francisco, CA, Stephen Lowey, Neil L. Selinger, Lowey Dannenberg et al., White Plains, NY, Thomas W. Sankey, Sankey & Luck, Houston, TX, Sherrie Savett, Berger & Montague PC, Philadelphia, PA, Arthur Stock, Berger & Montague PC, Philadelphia, PA, Paul F. Bennett, Gold Bennett et al., San Francisco, CA, Thomas E. Bilek, Hoeffner & Bilek LLP, Houston, TX, Helen J. Hodges, Milberg Weiss et al., San Diego, CA, William B. Federman, Federman & Sherwood, Oklahoma City, OK, Richard A. Speirs, Zwerling Schachter et al., New York, NY, Jeffrey C. Zwerling, Zwerling Schachter et al., New York, NY, Jack Edward McGehee, McGehee & Pianelli, Houston, TX, Robert B. Weintraub, Wolf Haldenstein et al., New York, NY, Daniel W. Krasner, Wolf Haidenstein et al., New York, NY, Tom Alan Cunningham, Cunningham Darlow et al., Houston, TX, Martin D. Chitwood, Jeffrey H. Konis, Edward H. Nicholson, Jr., Chitwood & Harley, Atlanta, GA, Sidney S. Liebesman, Jay W. Eisenhofer, Grant & Eisenhofer PA, Wilmington, DE, Ronald Joseph Kormanik, Sydow Kormanik et al., Houston, TX, Gregory Sean Jez, Fleming & Associates, Houston, TX, David C. Mattax, Office of Attorney General, Austin, TX, Rose Ann Reeser, Texas Attorney General, Austin, TX, Stephen D. Oestreich, Entwistle & Cappuci LLP, New York, NY, Deborah R. Gross, Law Offices Bernard M. Bross PC, Philadelphia, PA, James F. Marshall, Attorney at Law, San Marino, CA, Meredith Cavallo, Larry E. Klayman, Washington, DC, Todd Wayne Hutton, Dallas, TX, Robin L. Harrison, Campbell Harrison et al., Houston, TX, Steven J. Toll, Cohen Milstein et al., Washington, DC, Theodore C. Anderson, Kilgore & Kilgore PLLC, Dallas, TX, David R. Scott, Neil Rothstein, James E. Miller, Scott & Scott, Colchester, CT, John A. Lowther, James I. Jaconette, Alexandra S. Bernay, Milberg Weiss et al., San Diego, CA, Hector G. Gancedo, Gancedo & Nieves LLP, Pasadena, CA, for Plaintiffs.

Robin D. Hosea, pro se, Seabrook, TX, for Plaintiff.

Stephen D. Susman, Susman Godfrey, Houston, TX, Scott David Lassetter, John B. Strasburger, Weil, Gotshal & Manges, Houston, TX, Kenneth S. Marks, Susman Godfrey LLP, Houston, TX, Craig Smyser, Jr., Smyser, Kaplan & Veselka, Houston, TX, Richard Bruce Drubel, Jr., Boies, Schiller et al., Hanover, NH, John W. Keker, Jan Nielsen Little, Christa M. Anderson, Kerker & Van Nest LLP, San Francisco, CA, Julia H. Cooper, Walston Wells et al., Birmingham, AL, James E. Coleman, Jr., Carrington Coleman et al., Dallas, TX, Robin C. Gibbs, Gibbs & Bruns, Houston, TX, Charles F. Richards, Jr., Richards Layton et al., Wilmington, DE, David Clarke, Jr., Keara M. Gordon, Piper Mabury et al., Washngton, DC, Brenda M. Hamilton, Rome McGuigan et al., Hartford, CT, David Carr Greer, Bieser Greer et al., Dayton, OH, Joseph C. Espy, III, Melton Espy et al., Montgomery, AL, Joseph F. Welborn, III, Walker Bryant et al., Nashville, TN, Glenn E. Coe, Rome McGuigan et al., Hartford, CT, Ronald Gene Woods, Attorney at Law, Houston, TX, Jeffrey Kilduff, O'Melveny & Myers, McLean, VA, Robert M. Stern, Bruce Hiler, O. Melveny Myers LLP, Washington, DC, William J. Melley, III, Attorney at Law, Hartford, CT, Salvador M. Hernandez, Bowen Riley et al., Nashville, TN, Robert K. Spotswood,

Attorney at Law, Birmingham, AL, Kenneth D. Sansom, Spotswood LLC, Birmingham, AL, Russell" Rusty" Hardin, Jr., Rusty, Hardin and Associates, Houston, TX, Daniel F. Kolb, Sharon Katz, Davis Polk et al., New York, NY, Theresa Ann Foudy, Curtis Mallett-Prevost et al., New York, NY, Benard V. Preziosi, Eliot Lauer, Curtis Maliet-Prevost et al., New York, NY, Warren B. Lightfoot, Lightfoot Franklin et al., Birmingham, AL, Catherine E. Palmer, Christopher R. Harris, Seth L. Friedman, Latham & Watkins, New York, NY, Miles N. Ruthberg, Charles W. Cox, III, James NMI Ferrell, Ethan J. Brown, Camille N. Tragos, Latham & Watkins, Los Angeles, CA, Peter Wald, Matthew D. Harrison, Gabriel G. Gregg, Latham & Watkins, San Francisco, CA, Stan G. Roman, Krieg Keller et al., San Francisco, CA, Turner P. Smith, Samuel Rosenthal, Curtis Mallet- Prevost et al., Washington, DC, Jeffrey S. Bagnell, Ethan A. Levin Epstein, Garrison, Levin, Epstein et al., New Haven, CT, Sharon Katz, Davis Polk et al., New York, NY, Myles Bartley, Curtis Mallett-Prevost et al., New York, NY, Barry G. Flynn, Attorney at Law, Houston, TX, Billy Jack Shepherd, George W. Billy Shepherd, III, Cruse, Scott et al., Houston, TX, Michael D. Warden, Luisa Caro, Sidley Austin et al., Washington, DC, Eric J. R. Nichols, Beck, Redden & Secrest, Houston, TX, Joseph D. Jamail, II, Jamail and Kolius, Houston, TX, John K. Villa, Williams & Connolly LLP, Washington, DC, Mary G. Clark, George A. Borden, Robert A. Van Kirk, Williams & Connolly LLP, Washington, DC, John Cooper McDonald, Schottenstein Zox et al., Columbus, OH, J. Daniel Sagarin, Hurwitz Sagarin, Milford, CT, Clayton C. Cannon, Stumpf Craddock et al., Houston, TX, Scott B. Schreiber, Arnold & Porter, Washington, DC, John C. Massaro, Justin S. Antonipillai, Arnold & Potter, Washington, DC, Mark K. Glasser, King & Spalding, Houston, TX, Charles G. King, III, King & Pennington LLP, Houston, TX, Gregory A. Markel, Cadwalader Wickersham et al., New York, NY, Paul R. Bessette, Akin Gump et al., Austin, TX, Gregory G. Ballard, Ronit Setton, Nancy I. Ruskin, Jason M. Halper, Cadwalader Wickersham et al., New York, NY, James C. Huckaby, Jr., Huckaby Scott et al., Birmingham, AL, Lawrence David Finder, Haynes & Boone LLP, Houston, TX, Richard W. Clary, Margaret K. Dooley, Rachel G. Skaistis, Julie Ann North, Melissa J. Baily, Joseph R. Wallin, Karin A. DeMasi, Cravath Swaine et al., New York, NY, William Chester Wilkinson, Thompson Hine LLP, Columbus, OH, Barry Abrams, Abrams Scott et al., Houston, TX, David H. Braff, Steven J. Purcell, Adam R. Brebner, Jeffrey T. Scott, Michael T. Tomaino, Jr., Sullivan & Cromwell LLP, New York, NY, William H. Knull, III, Mark Daniel Manela, Mayer Brown et al., Houston, TX, B. J. Rothbaum, Ryan S. Wilson, Drew Neville, Charles E. Geister, III, Hartzog Conger et al., Oklahoma City, OK, Alan N. Salpeter, Mayer Brown & Platt, Chicago, IL, Jordan M. Rudnick, Mark McLaughlin, Andrew D. Campbell, Michele L Odorizzi, Mayer Brown et al., Chicago, IL, Kurt M. Rupert, Attorney at Law, Oklahoma City, OK, Joel M. Androphy, Berg & Androphy, Houston, TX, Lawrence Byrne, Owen Pell, Johanna S. Wilson, Lance Croffoot-Suede, Timothy Pfeifer, White & Case LLP, New York, NY, Alan S. Madans, Rothschild Barry et al., Chicago, IL, Taylor M. Hicks, Jr., Hicks Thomas et al., Houston, TX, Robert F. Serio, Marshall R. King, Gibson, Dunn & Crutcher, New York, NY, Christopher M. Joralemon, Herbert S. Washer, James B. Weidner, James D. Miller, Ignatius Grande, Clifford Chance US LLP, New York, NY, John Wolcott Zeiger, Zeiger & Carpenter, Columbus, OH, Marc J. Kurzman, Madeleine F. Grossman, Levett Rockwood PC, Westport, CT, James L. Hallowell, Gibson Dunn et al., New York, NY, Alvin L. Fox, Jr., Maynard Cooper et al., Montgomery, AL, N. Lee Cooper, Maynard Cooper et al., Birmingham, AL, Timothy K. Roake, Gibson Dunn et al., Palo Alto, CA, Avidan J. Stern, Jenner Block LLC, Chicago, IL, Charles A. Gall, Jenkens & Gilchrist, Dallas, TX, Richard Warren Mithoff, Jr., Mithoff and Jacks, Houston, TX, John D. Roesser, David J. Woll, Thomas C. Rice, Jonathan K. Youngwood, Simpson, Thacher & Bartlett, New York, NY, Bruce D. Angiolillo, Christopher M. Caparelli, Jill M O'Toole, George S. Wang, William M. Tong, Nihara K. Choudhri, Pieter H. B. Van Tol, Bruce D. Angiolillo, Mary Elizabeth McGarry, Simpson Thacher et al., New York City, NY, Keith Carter Hannigan, Jenkins & Gilchrist, Chicago, IL, Mark Kingsley Merkle, Jr., Porter Wright et al., Columbus, OH, Mark S. Gregory, Kelley Drye et al., Stamford, CT, Crawford S. McGivaren, Jr., Cabaniss Johnston et al., Birmingham, AL, Charles B. Lewin, Attorney at Law, Chicago, IL, Ronald Earl Cook, Cook & Roach LLP, Houston, TX, James F. Moyle, Guy C. Quinlan, James N. Benedict, Mark A. Kirsch, Jason A. D'Angelo, Clifford Chance US LLP, New York, NY, Sean M. Murphy, Attorney at Law, New York, NY, Kelly M. Klaus, Ronald L. Olson, Dennis C. Brown, John W. Spiegel, Kristin L. Myles, Munger, Tolles, & Olson, LLP, San Francisco, CA, Kevin S. Allred, Munger Tolles et al., Los Angeles, CA, Anthony M. Fitzgerald, Carmody & Torrance, New Haven, CT, Jack C. Nickens, Nickens Keeton et al., Houston, TX, Michael Joseph Walsh, Moukawsher & Walsh, Hartford, CT, Jack C. Nickens, Nickens Keeton et al., Houston, TX, Elizabeth T. Parker, Stephen J. Crimmins, Matthew R. Skolnik, Kara L. Haberbush, Pepper Hamilton LLP, Philadelphia, PA, Antonia Apps, Attorney at Law, Washington, DC, David Schwarz, Reid M. Figel, Kellogg Huber et al., Washington, DC, Robert C. Micheletto, David L. Carden, Jones Day et al., New York, NY, Brian A. Troyer, Jones Day et al., Cleveland, OH, David Elliott Miller, Hugh R.

Whiting, Jones Day, Houston, TX, Fordham Eric Huffman, Jones Day et al., Columbus, OH, William Edward Matthews, Gardere Wynne et al., Houston, TX, William Edward Matthews, Gardere Wynne et al., Houston, TX, Harvey G. Brown, Jr, Wright & Brown, Houston, TX, Matthew D. Shaffer, Schechter McElwee et al., Houston, TX, Michael G. Davies, Hoguet Newman et al., New York, NY, R. Paul Yetter, Yetter and Warden, Houston, TX, Charles G. King, III, King & Pennington LLP, Houston, TX, Charles A. Gall, Jenkens & Gilchrist, Dallas, TX, Richard Warren Mithoff, Jr., Mithoff and Jacks, Houston, TX, David J. Woll, Simpson Thacher & Barlett, New York, NY, Thomas C. Rice, Bruce D. Angiolillo, Mary Elizabeth McGarry, Simpson Thacher et al., New York City, NY, Jonathan K. Youngwood, Simpson, Thacher & Bartlett, David W. Woll, Attorney at Law, Robyn F. Tarnofsky, Jonathan Hurwitz, Michael E. Gertzman, Brad S. Karp, Erez Liebermann, Paul Weiss et al., New York, NY, Lauren Ouziel, Paul Weiss et al., Washington, DC, Lawrence David Finder, Haynes & Boone LLP, Houston, TX, Richard W. Clary, Cravath Swaine et al., New York, NY, William H. Knull, III, Mark Daniel Manela, Mayer Brown et al., Houston, TX, Taylor M. Hicks, Jr., Hicks Thomas et al., Houston, TX, Marshall R. King, Gibson Dunn et al., New York, NY, James D. Miller, Clifford Chance US LLP New York, NY, Barry Abrams, Abrams Scott et al., Houston, TX, David H. Braff, Steven J. Purcell, Adam R. Brebner, Jeffrey T. Scott, Michael T. Tomaino, Jr., Sullivan & Cromwell LLP, New York, NY, Joel M. Androphy, Berg & Androphy, Houston, TX, for Defendants.

*MEMORANDUM AND ORDER*

HARMON, J.
    RE IMPERIAL COUNTY EMPLOYEES RETIREMENT SYSTEM'S MOTION TO INTERVENE
**\*1** Pending before the Court is Imperial County Employees Retirement System's ("ICERS" ') motion to intervene as plaintiff and as additional class representative for purchasers in nine offerings of Foreign Debt Securities [FN1] during the *Newby* Class Period, under Federal Rules of Civil Procedure 23(d)(2) and 24(b)(2) [FN2] (instrument # 1630).

> **FN1.** The Foreign Debt Securities were issued from September 1999 through July 2001, were sold in a series of offerings in Europe during 2000 and 2001, and were listed and traded upon the Luxembourg stock exchange. *See* First Amended Consolidated Complaint (# 1388) at ¶¶ 641.1-641.2. They are described in detail in the controlling complaint from pages 409-49, ¶¶ 641.1-641.44.

> **FN2.** Rule 23(d)(2) "empowers the court in any type of class action to encourage members of the class 'to intervene and present claims or defenses, or otherwise to come into the action....' ' *Vuyanich v. Republic Nat'l Bank of Dallas*, 82 F.R.D. 420, 436 (N.D.Tex.1979), quoting Rule 23(d)(2). Pursuant to this Rule, the court has great discretion to allow intervention for two purposes: " 'for the protection of the members of the class or otherwise for the fair conduct of the action....' *Id.* at 437. "These two purposes mirror the two types of intervention which Rule 24 allows intervention as of right and permissive intervention." *Id.*

> Rule 24(b)(2), relating to permissive intervention, provides in relevant part, "Upon timely application any one may be permitted to intervene in an action ... when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the

court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

As will be discussed, while ICERS requests intervention as both a named plaintiff and a class representative, the requirements for intervening as a plaintiff are distinct from those for intervening as a class representative.

The motion to intervene was initially filed with co-Movant IHC Health Plans, Inc. ("HPI") and joined by Deseret Mutual Benefit Administrators ("Deseret") (# 1680) in order to represent more broadly the interests of the class, but they have both since withdrawn (# 1724). Opposition to the motion has been filed by Conseco Annuity Assurance Company [FN3] ("Conseco") (# 1653, relating to its class action suit, H-03-2240, and # 1592, relating to H-03-860 and H-03-2240 [FN4]), Outside Directors (# 1681), [FN5] Bank Defendants [FN6] (# 1719), and Vinson & Elkins L.L.P. (simply adopting the former two) (# 1729).

     FN3. As will be explained, Conseco's claims against Citigroup and Citigroup subsidiaries are based on losses arising from the purchase of "Credit Linked Notes" ("CLNs") issued by, in the name of, and for the benefit of Citigroup.

     In # 1592 at 2 n.2, Conseco explains that the CLNs were issued by trusts created by Citigroup. They included the following securities:

     (a) Yosemite Securities Trust I 8.25% Series 1999-A Linked Enron Obligations maturing November 15, 2003, issued in the aggregate amount of $750,000,000 on or about November 4, 1999 ("Yosemite I Notes"); (b) Yosemite Securities Trust II 8.75% Series 2000 Linked Enron Obligations maturing February 2007, issued in the aggregate amount of 200,000,000 [English pounds] on or about February 23, 2000 ("Yosemite II Notes"); (c) Credit Linked Notes Trust 8% Notes maturing August 15, 2005, issued in the aggregate amount of 200,000,000 [English pounds] on or about August 25, 2000 ("ECLN Notes"); (d) Credit Linked Notes Trust II 7 3/8 % Notes maturing May 15, 20006, issued in the aggregate amount of $500,000,000 on or about May 24, 2001 ("ECLN II Notes"); (e) Enron Sterling Credit Linked Notes Trust 7 1/4% Notes maturing May 24, 2006, issued in the aggregate amount of 125,000,000 [English pounds] on or about May 24, 2001 ("Sterling CLN Notes"); and (f) Enron Euro Credit Linked Notes Trust 6 1/2% Notes maturing May 24, 2006, issued in the aggregate amount of 200,000,000 Euro on or about May 24, 2001 ("Euro CLN Notes").

     Together the Yosemite I Notes, the Yosemite II Notes, the Yosemite III Notes, the ECLN Notes, the ECLN II Notes, Sterling CLN Notes and the Euro CLN may be collectively referred to herein as "Citigroup CLNs."

     Conseco's opposition to ICERS' motion to intervene is directed at HPI, and not ICERS, which did not purchase CLNs. Both would-be intervenors sought to represent the interests of such purchasers in a larger class of all Foreign Debt Securities investors. As noted, HPI has withdrawn its request to intervene. Because ICERS and *Newby* Lead Plaintiff contend that ICERS would have standing to sue for violations relating to all Foreign Debt Securities offerings, the Court addresses Conseco's objections as if they were directed to ICERS as a potential representative of a subclass for Foreign Debt Securities.

     FN4. Hudson Soft Company, on July 22, 2002, filed a class action suit grounded in the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, against Credit Suisse First Boston Corporation, Credit Suisse First Boston International, CSFB Europe Ltd., Donaldson, Lufkin & Jenrette Securities Corporation, Citibank N.A., Salomon Smith Barney, Inc., Schroder Salomon Smith Barney, Salomon Brothers International Ltd., Arthur Andersen L.L.P., Vinson & Elkins L.L.P., and a number of bank employees and Enron Corporation officials in the Southern District of New York.

In an amended complaint filed on September 29, 2002, Hudson Soft added, as alternative causes of action, securities fraud claims under § 10(b); that same day it published notice on the *PR Newswire* as

required by the PSLRA. Subsequently it filed a motion for appointment as lead plaintiff. A month later it and Conseco jointly filed a motion to be appointed lead plaintiff. On February 28, 2003, Hudson Soft and Conseco moved to sever the claims based on CSFB's Enron-linked notes from claims based on the Citigroup CLNs, with Hudson Soft indicating that it was no longer pursuing class claims but only individual claims and withdrawing from seeking lead plaintiff status. That motion to sever was granted.

On March 5, 2003, Conseco then filed a class action complaint against Citigroup and its subsidiaries and employees for violations of § 10(b), § 20A, and 20(a) of the 1934 Act and § 12(a) and § 15 of the 1933 Act.

Both cases were transferred to this Court by the Judicial Panel for Multidistrict Litigation to be included in MDL 1446. Hudson Soft's suit was designated as H-03-860, while Conseco's class action against Citigroup entities and employees was designated as H-03-2240. The parties have recently filed a stipulation and order dismissing H-03-860 with prejudice pursuant to a Settlement and Release Agreement. H-03-2240 remains pending.

FN5. Outside Directors object to the intervention on limited grounds: "Though Movants do not specifically claim to do so, the Outside Directors object to the proposed intervention to the extent, if any, it purports to reassert § 10(b), Rule 10b-5, or any other claims [against

Outside Directors] previously dismissed by this Court." They quote this Court's order of July 11, 2003 at 4 ("IN ALL AMENDED PLEADINGS COUNSEL SHALL NOT REITERATE ALLEGATIONS OR ARGUMENTS PREVIOUSLY REJECTED BY THIS COURT IN RULINGS ON MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINTS.")

The would-be Intervenors have not responded to this objection or claimed that they are attempting to reinstate § 10(b) claims against Outside Directors. Moreover, the Court finds that the amended complaint does not assert such claims against the Outside Directors. Thus the objection is moot.

FN6. Bank Defendants are composed of Bank of America Corporation, Banc of America Securities LLC, Barclays PLC, Barclays Bank PLC, Barclays Capital, Inc., Canadian Imperial Bank of Commerce, CIBC World Markets, Corp (f/k/a CIBC Oppenheimer Corp.), CIBC World Markets plc, Credit Suisse First Boston LLC (f/k/a Credit Suisse First Boston Corporation), Credit Suisse First Boston (USA), Inc., Pershing LLC, J.P. Morgan Chase & Co., J.P. Morgan Securities Inc., J.P. Morgan Chase Bank, Lehman Brothers, Inc., Lehman Brothers Holdings Inc., Merrill Lynch & Co., Inc., and Merrill, Lynch, Pierce Fenner & Smith Incorporated.

The Court notes that pursuant to an unopposed motion, it recently dismissed Lead Plaintiff's § 10(b) and § 20(a) claims against the Lehman Brothers

entities. # 1969.


WOULD-BE INTERVENOR ICERS' CONTENTIONS

ICERS claims that it purchased certain Foreign Debt Securities [FN7] at artificially inflated prices within the *Newby* Class Period, i.e., October 19, 1998-November 27, 2001 according to the First Amended Consolidated Complaint (# 1388). Although ICERS, like the *Newby* Lead Plaintiff, asserts claims under § 10(b) of the Securities Exchange Act of 1934, ICERS explains that if the Court grants its motion, the intervention would cure any perceived defects relating to Lead Plaintiff's standing to assert the First Amended Consolidated Complaint's § 12(a)(2) claims [FN8] under the Securities Act of 1933 on behalf of all purchasers of all Foreign Debt Securities during the Class Period.


FN7. According to schedule A, attached to ICERS and HPI's motion to intervene, ICERS purchased Marlin Water Trust II notes at two different offerings: the first, an investment of $345,000 on July 12, 2001, and then another, also for $345,000 on December 10, 2001. Thus it purchased in only one of the nine Foreign Debt Securities Offerings listed in the complaint (# 1388 at 409, ¶ 641.2). There were a number of underwriters for the Marlin Water Trust II notes: Credit Suisse First Boston, Deutsche Bank

Securities, Inc. f/k/a Deutsche Bank Alex. Brown, Banc of America Securities LLc, CIBC World Markets plc, and J.P. Morgan. # 1388 at 410, ¶ 641.2. ICERS does not identify the underwriter from which it purchased its notes.


Although Defendants, in briefing related to their motions to dismiss, argue in detail that § 12(a)(2) does not govern the offering of the Marlin Water Trust II notes because the statute applies only to public offerings made pursuant to a prospectus under *Gustafson v. Alloyd Co.*, 513 U.S. 561, 577, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), the question is only conclusorily mentioned in the briefing related to the motion to intervene. The Court therefore defers ruling on the question until it addresses the Bank Defendants' motions to dismiss.


FN8. Section 12(a)(2), 15 U.S.C. § 77l(a)(2), which prior to recodification in 1995, was designated § 12(2), 15 U.S.C. § 77l(2), provides, "Any person ... who offers or sells ... shall be liable ... to the person purchasing such security from him ..." for false and misleading statements or omissions in or from prospectuses or other selling communications. 15 U.S.C. § 77l(a). *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1303 n. 1 (10th Cir.1998) (noting recodification of § 12(2) as § 12(a)(2) following the addition of another subsection under PSLRA). As

will be discussed later in greater depth, a § 12(a)(2) "seller" includes either the person who actually passes title to the buyer or "the person who successfully solicits the purchase, motivated in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 647, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).


Objections have been raised that ICERS lacks standing to assert claims on behalf of any class members who invested in Foreign Debt Securities other than the type and offering in which ICERS purchased, i.e., Marlin Water Trust II offered on 7/12/01. In its reply memorandum (# 1804 at 2), ICERS disagrees and cites *Sanders v. Robinson/Humphrey/American Express*, 634 F.Supp. 1048, 1057, on reconsideration on other grounds, 1986 WL 10096 (N.D.Ga.1986), aff'd in part and rev'd in

part on other grounds sub nom. *Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718* (11th Cir.1987), *cert. denied, 485 U.S. 959 (1988)* (where claims were raised under § 10(b) of the 1934 Act and §§ 11 and 12(a)(2) of the 1934 Act), in which the district court stated,

Even though class members purchased different Petro-Lewis limited partnership interests, the plaintiffs allege that Defendants engaged in a uniformly fraudulent course of conduct, disseminated virtually identical false prospectuses, false financial statements and other financial information, and failed to disclose material information regarding operations of Petro-Lewis to purchasers during the class period. When plaintiffs have alleged such a common course of conduct, courts have consistently found no bar to class certification even though members of a class may have purchased different types of securities.

**\*2** Moreover, "a class of plaintiffs who purchased different types of securities may properly be certified with a representative party who purchased only one type of security." *Endo v. Albertine, 147 F.R.D. 164, 167 (N.D.Ill.1993)* (in accord with "better-reasoned" view that where a proposed class representative's claims arise from same event or practice or course of conduct giving rise to other class members' claims, are based on same legal theory, and arise from issuance of prospectuses equally applicable to different types of securities purchased by different class members, proposed class representative may represent all such purchasers).

Contending that the objection to its standing to represent a Foreign Debt Securities class is premature, ICERS also points to and emphasizes this Court's order of August 7, 2002 at 6, stating that the Court would deal with issues regarding standing and the creation of classes or subclasses at class certification time. # 1804 at 1. Nevertheless, in response to Defendants' challenge that no currently named *Newby* plaintiff had bought Foreign Debt Securities, ICERS explains that "out of an abundance of caution, and in an effort to properly meet its mandate to control and direct the litigation, Lead Plaintiff has sought to intervene ICERS. Once intervention is approved, ICERS can properly serve as a representative for all purchasers of Foreign Debt Securities." # 1804 at 2. *See Trief v. Dun & Bradstreet, 144 F.R.D. 193, 203 (S.D.N.Y.1992)* (in a securities fraud class action where plaintiffs sought to intervene a later purchaser of shares, the court concluded that "important policy considerations support [intervenor's] inclusion because [his] presence will ensure that all interested plaintiffs are represented"); *Bromley v. Michigan Educ. Ass'n, 178 F.R.D. 148, 158-60 (E.D.Mich.1998)* (relying on *Trief* ). [FN9] ICERS underlines the fact that every Enron security investor "was defrauded by the very same scheme. And the statements at issue in the offering memoranda for the Foreign Debt Securities are the same as those in claims the Court has already upheld." # 1804 at 3 (listing examples of statements regarding which this Court has previously upheld claims). ICERS further contends that "because the § 12(a)(2) claims arise from the same illegal scheme, the purchaser of any one of the Foreign Debt Securities can represent the § 12(a)(2) claims of all classes of foreign debt securities." *Id., citing Longden v. Sunderman, 123 F.R.D. 547, 550, 553 (N.D.Tex.1988)* (investors in seven partnerships were certified to represent a class of investors in 121 separate partnership transactions over five-year period because complaint alleged a common course of fraudulent conduct by defendants employing the identical or similar misrepresentations); [FN10] *In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288(DLC), Order at 27-28 (S.D.N.Y. Oct. 24, 2003) (Ex. 1 to # 1804) (noting that lead plaintiff, which did not purchase in either of the two offerings forming the basis of the § 12(a)(2) claims, "has claims based on the same Registration Statements and will have an incentive to pursue and prove many of the facts that underlie the Sections 11 and 12(a)(2) claims."). *In accord Collins v. International Dairy Queen, Inc., 168 F.R.D. 668, 674 (M.D.Ga.1996), modified on other grounds, 169 F.R.D. 690 (M.D.Ga.1997); In re VMS Sec. Litig., 136 F.R.D. 466, 474 (N.D.Ill.1991); In re Prudential Sec. Inc. Ltd. Partnership Litig., 163 F.R.D., 200, 208 (S.D.N.Y.1995)* (and other cases cited therein). *See also In re American Continental Corp./Lincoln Sav. & Loan Sec. Litig ., 749 F.Supp. 1424, 1461 (D.Ariz.1992)* (in response to a challenge that plaintiff class "has no standing under Sections 10(b), 11 and 12 because there is not a named plaintiff representing each of the different securities at issue," the court concluded, "[P] laintiffs need not name a representative for each subgroup of securities where common issues predominate as to all securities.").

FN9. This Court notes that the claims in *Trief* were based on § 10(b) and § 20(a) of the 1934 Act and Rule 10b-5 and on common law fraud and negligent misrepresentation. Those in *Bromley* were based on the First and Fourteenth Amendments and 42 U.S.C. § 1983. Thus neither dealt

with § 12(2) of the 1933 Act.

FN10. The claims in *Longden* arose under § 10(b), RICO, and common law fraud, but not § 12(2).

*\*3* As additional authority for granting ICERS' request to intervene, ICERS cites decisions in two complex, federal securities class actions granting motions of lead plaintiffs to add named plaintiffs with standing to assert particular claims under the 1933 Act where the lead plaintiff's standing regarding such claims was challenged: *In re Initial Pub. Offering Sec. Litig.,* 214 F.R.D. 117, 122-23 (S.D.N.Y.2002) ("[I]n order for a claim to be asserted on behalf of a putative class, only the named plaintiffs--but not necessarily the lead plaintiff--must have standing"; "It stands to reason that in many cases ... the plaintiff with the largest financial interest [lead plaintiff under PSLRA [FN11] requirements] may not have standing to sue on all causes of action. There is nothing to suggest that, in those cases, Congress intended that plaintiffs must file an entirely separate class action suit, when in any other context, a subclass would suffice."); [FN12] *In re Northwestern Corp. Sec. Litig.,* No. 03-4049, Order at 6, 8 (noting that a lead plaintiff is selected by means of "the largest financial stake inquiry," the court stated, while it may be favorable, it is not a requirement that a lead plaintiff under the PSLRA suffer losses on each type of security that may be at issue in the class action. " 'The purpose of the lead plaintiff section of the PSLRA was never to do away with the notion of class representatives or named plaintiffs in securities class actions. Rather, the purpose was to ensure that the securities litigation was investor-driven, as opposed to lawyer driven." ' (*quoting In re Initial Public Offering,* 214 F.R.D. at 123, which held that a " 'named plaintiff' survives in securities class actions distinct from the PSLRA-defined 'lead plaintiff.' ") (D.S.D. Oct. 15.2003) (Ex. 2 to # 1804) and *In re WorldCom Inc. Sec. Litig.,* No. 02 CIV. 3288(DLC), 2003 WL 21219049, *27 (S.D.N.Y. May 19, 2003) ("The Underwriter Defendants have not shown there is any legal bar to a lead plaintiff asking other plaintiffs to join a lawsuit as named plaintiffs in order to represent more broadly the interests of the class at the time of the filing of the consolidated class complaint. Long before passage of the PSLRA, it was well established that named plaintiffs may jointly represent the class and it is their claims that determine whether there is standing to bring the claims alleged on behalf of the class." [FN13]). Thus if the lead plaintiff is not required to have standing, i.e., to have invested in and suffered a loss, for each type of security involved in the suit, it makes no sense to deny him the right to join named plaintiffs and class representatives who can fulfill that requirement, argues ICERS.

FN11. Private Securities Litigation Reform Act of 1995, which amended both the Securities Act of 1933 and the Securities Exchange Act of 1934. 15 U.S.C. § 78u-4.

FN12. Distinguishing a lead plaintiff under the PSLRA from a Class Representative under Federal Rule of Civil Procedure 23, United States District Court Judge Scheindlin noted that courts in the Second Circuit have repeatedly rejected as undermining the purpose of the PSLRA the view that a court must cobble together a lead plaintiff group that has standing to sue on all possible causes of action." 214 F.R.D. 117 at *123, citing *In re Razorfish, Inc. Sec. Litig.,* 143 F.Supp.2d 304, 308 (S.D.N.Y.2001) ("To allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing a lead plaintiff."); *In re Crayfish Co. Sec. Litig.,* No. 00 CIV. 6766, 2002 WL 1268013, *5 (S.D.N.Y. June 6, 2002) (and cases cited therein).

FN13. Citing *In re Initial Pub. Offering Litig.,* 214 F.R.D. at 123 & n. 8.

Furthermore, ICERS insists that its motion to intervene was timely. It was filed on August 27, 2003, a little more than three months after the First Amended Consolidated Complaint (# 1388) was filed on May 14, 2003. ICERS argues that its intervention will conserve judicial and litigant resources rather than create prejudice or delay. In support of the motion's timeliness, would-be Intervenor urges that discovery is only beginning, limiting any threat of duplication. Moreover, because would-be Intervenor has adopted the *Newby* complaint, and because it is represented by the same counsel as *Newby's* Lead Plaintiff, no delay or prejudice to the original parties will be caused by having to bring new counsel into the suit. *Davis v. Smith,* 431 F.Supp. 1206, 1209 (S.D.N.Y.1977) (No prejudice results from permitting interventions where the intervenor is represented by the same attorney as plaintiffs already in the action and counsel's participation facilitates efficient adjudication of the legal issues), *aff'd,* 607 F.2d 535 (2d Cir.1987); *Demeulanaere v. Rockwell Mfg. Co.,* 23 F.R.D. 689, 690 (S.D.N.Y.1957). ICERS further urges that because it seeks to intervene as an additional class representative, its claims clearly satisfy the Rule 23(b) requirement of common questions of law or fact for permissive intervention, even though the particular securities that ICERS purchased differ from those bought by other potential class members and *Newby* named plaintiffs, and it seeks the same relief as the *Newby* Plaintiffs. Thus intervention by ICERS as a class representative would permit the rights of the class to be more broadly represented without delaying or prejudicing the orderly process of the litigation or the rights of the existing parties. *See, e.g., Moe v. Dinkins,* 533 F.Supp. 623 (S.D.N.Y.1981), *aff'd,* 669 F.2d 67 (2d Cir.1982).

OBJECTIONS TO INTERVENTION

*\*4* There are two substantive challenges raised to ICERS' requested intervention, one by Conseco and one by the Bank Defendants. These objections raise two overlapping issues that require resolution before a decision can be made on ICERS' request for permissive intervention: (1) whether the addition of new Bank Defendants and new claims based on securities issued by Enron-related entities in the First Amended Consolidated Complaint, filed on May 14, 2003, is time-barred; (2) whether ICERS has standing to serve as a class representative for purchasers of securities in all nine Foreign Debt Securities offerings with respect to their claims under § 12(a)(2).

A. Conseco's Objections

The original complaint (# 1) in *Newby v. Enron* was filed on October 20, 2001 on behalf of "publicly traded debt and equity holders of Enron Corporation" who acquired their Enron securities from October 19, 1998 through November 27, 2001. [FN14] On April 8, 2002, the Consolidated Complaint for Violation of the Securities Laws was filed, on behalf of "purchasers of Enron Corporation's ... publicly traded equity and debt securities" during the same period. # 441 at 2, ¶ 1. On May 14, 2003 Lead Plaintiff filed the First Amended Consolidated Complaint for Violation of the Securities Laws (# 1388), with the same class definition in the text, but with a footnote that stated, "Enron's publicly-traded securities *include the publicly-traded securities of entities related to Enron,* the repayment of which was dependent upon Enron's credit, financial condition and ability to pay [emphasis added by the court]." 1388 at 3, ¶ 1 n. 1.

FN14. Citigroup conclusorily argues that the CLNs were not "publicly traded equity or debt securities of Enron." This issue will be fully addressed with respect to the Bank Defendants' motions to dismiss.

Conseco argues that this "surreptitiously" revised class definition, which would embrace investors previously outside the proposed class' perimeters, in particular the purchasers of Foreign Debt Securities, constitutes an "attempt [ ] to artificially broaden the definition ... [to] obtain standing through the 'back door' of this class action."

Furthermore Conseco is the named plaintiff in an independent class action grounded in § 10(b) of the 1934 Act, *Conseco Annuity Assurance Co. v. Citigroup, Inc. et al.,* transferred from the Southern District of New York by the Judicial Panel for Multidistrict Litigation to this Court on June 26, 2003, when it was designated H-03-2240, consolidated with *Newby,* and made a part of MDL 1446. *See* footnote 3 of this memorandum and order. Conseco brought the suit on behalf of purchasers of "Credit Linked Notes" ("CLNs") issued by, in the name of, and for the benefit of Citigroup, directly

against Citigroup, Citigroup subsidiaries, and Citigroup employees (*Conseco Annuity Assurance Co. v. Citigroup et al.*). [FN15] Purportedly the CLNs were issued to enable Citigroup to shift from Citigroup to the CLN investors the financial risk of loss associated with Citigroup's fraudulent transactions with Enron without disclosing Enron's actual financial condition; the investors claim they were fraudulently induced by Citigroup into purchasing the CLNs at artificially inflated prices between November 4, 1999 and December 3, 2001, at a loss to them of more than $2.4 billion. Conseco emphasizes that, unlike Lead Plaintiff in *Newby*, it has not sued Citigroup for its participation in the fraudulent Ponzi scheme alleged in *Newby*, nor for aiding and abetting Enron in that alleged misconduct, nor did it sue any Enron defendants. Instead it asserts "a 'direct' claim against Citigroup, who manufactures its own fraudulent scheme by which it defrauded purchasers of the Citigroup CLNs." [FN16]

FN15. Specifically the named Defendants in H-03-2240 are Citigroup, Inc., Citibank NA, Citigroup Global Markets, Inc., Schroder Salomon Smith Barney, Salomon Brothers International Ltd., and employees Rick Caplan, James Reilly, William J. Fox, and Maureen Hendricks.

FN16. The Court finds unpersuasive and spurious Conseco's tactical endeavor to distinguish the two suits by partitioning one part of the larger scheme asserted in *Newby* from the rest. The Court emphasizes that Conseco's "independent" action was transferred to this Court after careful consideration by the Multidistrict Litigation Panel for pre-trial consolidation with *Newby*, which was effected on June 26, 2003 by an order (# 6 in H-03-2240; # 1538 in *Newby* ) that also sent it to the mediation before Judge William Connor. Indeed, as Lead Plaintiff has contended in its Reply Memorandum in Response to Conseco Annuity Assurance Company's Opposition to Class Certification, # 1853 at 2,

Conseco's counsel is attempting to Balkanize this case by objecting to a unitary class seeking to carve out a "niche" class of purchasers, just one of the several types of debt securities that were sold by Enron and its bankers to investors during the Class Period. There is nothing unique about the legal and factual bases of the claims of the purchasers of any of the foreign debt securities that differentiates them from claims already asserted in this class action, not only for purchasers of those notes, but for purchasers of other of Enron's publicly traded debt securities. These [CLNs] were sold via offering circulars that contained the same misrepresentations and falsifications that permeated Enron's SEC filings

and financial statements. The same investment banks sued by Conseco ... are already defendants in [*Newby* ] and stand accused of participation in the scheme to defraud Enron's equity and debtor investors, in *inter alia,* selling these credit linked notes....

**\*5** Conseco complains that more than ten months after Conseco filed its class action, *Newby* Lead Plaintiff filed on May 14, 2003 its First Amended Consolidated Complaint, which Conseco charges "for the first time, buried in a footnote, purported to assert claims on behalf of purchasers of Citigroup CLNs." *See* First Amended Consolidated Complaint, # 1388 at 3, n.1 ("Enron's publicly-traded securities include the publicly-traded securities of entities related to Enron, the repayment of which was dependent upon Enron's credit, financial condition and ability to pay") and at 625 ("the Class includes purchasers of all securities identified herein issued by Enron-related entities during the Class Period, the value or repayment of which was dependent on the credit, financial condition or ability to pay of Enron") and n.20 (specifically identifying the Foreign Debt Securities, including Citigroup CLNs). Conseco emphasizes that "no plaintiff listed in the First Amended Consolidated Complaint was identified as ever having purchased Citigroup CLNs." Thus, maintains Conseco, the *Newby* plaintiffs lack standing to pursue these claims. Furthermore, because Conseco timely filed suit under the PSLRA, and is the only purchaser of the CLNs that has timely and fully complied with requirements of

the PSLRA, it has moved to dismiss the CLN claims that are now merely footnoted in the *Newby* amended complaint on the grounds that the *Newby* plaintiffs lack standing to assert them and because the claims are time-barred; neither defense can be asserted by Citigroup against Conseco in Conseco's independent class action, H-03-2240, because Conseco did purchase CLNs, has standing, and timely asserted its claims. Conseco charges that with ICERS' and HPI's motion to intervene, *Newby* Lead Plaintiff seeks "to improperly gain control of a completely separate and distinct class action ... and to collect any fees that might flow from such a recovery."

In sum Conseco argues that intervention should be denied for several reasons. First, it maintains that HPI/ICERS [FN17] cannot satisfy the requirements for permissive intervention under Rule 24(b)(2) to represent a class of purchasers of the CLNs. Second, as noted, Conseco has timely asserted claims on behalf of the CLN investors in its separate and earlier class action suit, as a CLN purchaser Conseco has standing to pursue these claims, and Conseco is represented by qualified counsel that have vigorously been pursuing such claims, so any intervention by ICERS is unnecessary. Moreover, it maintains, intervention by HPI [ICERS] would cause extreme prejudice to the CLN plaintiff class because its claims in *Newby* would be time-barred by limitations. Furthermore, the proposed Intervenor, unlike Conseco, has never complied with the particularized pleading and Lead-Plaintiff requirements of the PSLRA and appears to be attempting to circumvent them. Moreover, Conseco has suffered damages in nearly twice the amount as those incurred by HPI, and thus Conseco has the largest financial interest in representing the class of Citigroup CLN purchasers. [FN18]

> FN17. Even though HPI has withdrawn, because ICERS argues that any purchaser of any type of the Foreign Debt Securities can represent the interests of a class or purchasers of all types of the Foreign Debt Securities, the Court summarizes the arguments directed toward HPI.

> FN18. Presumably this argument relates to appointment of Lead Plaintiff, which is a separate issue from that of permissive intervention or of appointment as a class representative. This Court has chosen a single Lead Plaintiff for the entire *Newby* class action, into which ICERS seeks to intervene, and it will address particularized standing and class representation issues when class certification is ripe. There is no requirement that every named plaintiff, no less putative class member, must satisfy the PSLRA requirements for pleading and must move for appointment as Lead Plaintiff with appointment of Lead Counsel.

> Meanwhile, Conseco may choose to participate in *Newby*, pursue a role as a

> class or subclass representative in *Newby* to represent the purchasers of the CLNs, or it can choose to opt out of *Newby*, pursue its separate action (especially if it is convinced that the Foreign Securities Debt investors' claims in *Newby* are time-barred), and move for appointment as Lead Plaintiff in its independent class action. The Court finds there is no prejudice to Conseco's substantive rights from allowing intervention of ICERS as a named plaintiff to pursue its substantive rights under § 12(a)(2) and those of any class or subclass it is qualified to represent.

***6** Specifically with respect to timeliness, Conseco contends that HPI's [ICERS'] motion to intervene is untimely because HPI [or ICERS] knew or reasonably should have known (i.e., had inquiry notice) of HPI's interest in pursuing a case against Citigroup based on the CLNs by December 2, 2001, [FN19] when Enron declared bankruptcy, an occurrence expressly defined in the Indenture Agreements for the CLNs as an "event of default." Furthermore, the bankruptcy caused a sharp drop in the CLN price, which put the Foreign Debt Securities purchasers on actual notice of their injury. Conseco further contends that additional inquiry notice was given on July 23, 2002, the day after Conseco filed its independent class action complaint, when the United States Senate's Permanent

Subcommittee on Investigations started investigating the role of financial institutions, including Citigroup, in Enron's collapse. Finally, it emphasizes that the investors again received notice of their potential claims on September 29, 2002 when Conseco published notice, pursuant to the PSLRA requirement, announcing that litigation had commenced on behalf of CLN purchasers. Yet it only moved to intervene in *Newby* on August 27, 2003, nearly twenty-four months after Enron filed for bankruptcy and long after HPI had all these reasons to know of the existence of its claims against Citigroup. [FN20]

> FN19. In their motions to dismiss Bank Defendants have urged that plaintiffs were at the very least put on inquiry notice as early as October 16, 2001 with Enron's earnings release (including $1 billion in charges and $1.2 billion reduction of shareholder's equity), followed by Enron's announcement on November 8, 2001 that it was restating its financial reports from 1997-2000, that "shocked the markets." Also that fall the SEC announced it was investigating Enron. The original *Newby* complaint was filed on October 22, 2001, followed by many more lawsuits alleging fraud against Enron and its co-Defendants. These statute-of-limitations arguments will be addressed in more detail by this Court when it reaches the Bank Defendants' motions to dismiss.

> FN20. As noted, these arguments relating to HPI's failure to
>
> investigate need to be modified as applied to ICERS, which did not purchase CLNs and therefore could not have intervened, no less applied to be appointed as Lead Plaintiff, in Conseco's suit. Nevertheless, the factors identified by Conseco as providing "inquiry notice" to investors in Foreign Debt Securities need to be addressed as they relate to the timeliness of the claims in Lead Plaintiff's First Amended Consolidated Complaint with its class definition specifically including these investors, and ultimately, ICERS' motion to intervene.

In contrast to the prejudice to Conseco if intervention were permitted, insists Conseco, HPI would not be prejudiced if the intervention were denied because its interests are already being vigorously represented by Conseco in its class action suit. Once again, this argument does not address non-CLN Foreign Debt Securities investors like ICERS, which could not be a member of the class in Conseco's suit.

Last, Conseco urges, "unusual circumstances," based on the same facts described earlier, [FN21] militate against finding the motion to intervene timely. Furthermore, Conseco notes, in the Court's June 26, 2003 order (# 6 in H-03-2240; # 1538 in *Newby* ), consolidating Conseco's action with *Newby* following transfer by the Judicial Panel on Multidistrict Litigation, this Court ordered the parties in Conseco's action to participate in the mediation before Judge Connor. Conseco reports that during a hearing on July 10, 2003, Conseco's counsel raised the question of Lead Plaintiff's lack of standing in view of the revised *Newby* class definition, and counsel for Lead Plaintiff stated that CLN holders were covered under "foreign debt" and did not need a separate representative. Conseco charges that with the motion to intervene, filed August 27, 2003, Lead Plaintiff now seems to have changed its stance. [FN22]

> FN21. Specifically, (1) Lead Plaintiff filed the original *Newby* complaint on October 20, 2001, and the First Consolidated and Amended Complaint on April 8, 2002; (2) Conseco filed its independent class action suit on July 22, 2002; (3) ten months after Conseco had filed its complaint, Lead Plaintiff filed its First Amended Consolidated Complaint on May 14, 2003; (4) and according to Conseco, in that new pleading Lead Plaintiff "surreptitiously" redefined, or arguably clarified, the class to include the CLN purchasers, even though it did not have a plaintiff with standing to represent that class.

FN22. The Court observes that this issue is a grey area of the law and Lead Plaintiff's position is supported by authority, cited previously.


B. Bank Defendants' Objections

Bank Defendants also complain that Lead Plaintiff seeks "to sweep into this case nine so-called 'Foreign Debt Securities Offerings' that were not the basis of any claims in the prior Consolidated Complaint, filed on April 8, 2002," and that were not issued by Enron but by other entities, but that were purportedly dependent in other ways on Enron's credit rating, financial condition, and/or ability to pay.

*7 Bank Defendants are sued under § 10(b), [FN23] and derivatively § 20(a), of the 1934 Act and under § 12(a)(2), and derivatively § 15, of the Securities Act of 1933. Like Conseco, they have moved to dismiss the latest Amended Consolidated Complaint for lack of standing because no currently named *Newby* plaintiff is alleged to have purchased any of the Foreign Debt Securities. Bank Defendants contend that the motions to intervene cannot be used to cure such a jurisdictional defect. [FN24] Second, they argue that the proposed intervention should be denied as futile because the claims are time-barred by the one-year statute of limitations. Finally, even if the Court should grant the intervention, Bank Defendants request the dismissal of all claims relating to all Foreign Debt Securities Offerings in which the proposed intervenor ICERS did not purchase based on ICERS' lack of standing.

FN23. Only purchasers or sellers of the securities in dispute have

standing to bring claims under Section 10(b). *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 735, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).*


FN24. Bank Defendants cite, *inter alia, McClune v. Shamah, 593 F.2d 482, 486 (3d Cir.1979)* (A "motion for intervention under Rule 24 is not an appropriate device to cure a situation in which plaintiffs may have stated causes of action that they have no standing to litigate."); *Ruiz v. Estelle, 161 F.3d 814, 830 (5th Cir.1998)* (intervention is only permissible where it "is into a subsisting and continuing Article III case or controversy and the ultimate relief sought by the intervenors is also being sought by at least one subsisting party with standing to do so."), *cert. denied sub nom. Ruiz v. Culberson, 526 U.S. 1158, 119 S.Ct. 2046, 144 L.Fd.2d 213 (1999); Fleming v. Lind-Waldock & Co., 922 F.2d 20, 26 (1st Cir.1990)* (intervention is not available to "cure" standing deficiency); *In re Elscint Ltd. Sec. Litig., 674 F.Supp. 374, 382 (D.Mass.1987)* (denying intervention of actual purchasers of stock where nominal plaintiffs lacked standing to represent class); *Lidie v. State of Cal., 478 F.2d 552, 555 (9th Cir, 1973)* (intervention, when used where the original plaintiffs lacked standing to represent a class, as a "back-door attempt to begin the action anew," should be denied where original plaintiffs were unsuited to litigate the claims on behalf of the class).

The Court finds that these cases are distinguishable from the action before this Court or that Defendants' reading of these cases requires clarification and supplementation.


First, *McClune* was not a class action, a significant factor, as will be discussed. *Warden v. Crown American Realty Trust,* No. CIV. A. 96-25J, *1998 WL 725946, *5 (W.D.Pa.1998)* (*McClune* rule applies "outside the class action context"), *aff'd, 229 F.3d 1140 (3d Cir.2000); Bromley, 178 F.R.D. at 157* ("*McClune* does not hold that plaintiffs cannot intervene prior to class certification as party representatives in a class action to cure a

deficiency.").

Furthermore, generally the lawsuits cited by Defendants deal with situations where all the initiating plaintiffs' claims had been dismissed prior to class certification, so there was no existing cause of action into which a party might intervene. *See, e.g., McClune,* 593 F.2d 482; *Warden v. Crown American Realty Trust,* No. CIV. A. 96-25J, 1998 WL 725946, *7 (W.D.Pa.1998)(because original plaintiffs lacked standing and court had granted motion to dismiss the Securities Act claims, court denied motion for permissive intervention into "an otherwise defunct action" because there were no longer any common questions of law or fact between plaintiffs and intervenor), *aff'd,* 229 F.3d 1140 (3d Cir.2000); *Lidie,* 478 F.2d at 555; *Kendrick v. Kendrick,* 16 F.2d 744, 745 (5th Cir.1926) ("An existing

suit within the court's jurisdiction is a prerequisite of intervention.").

Indeed, this Court observes that the existing suit requirement has been modified in certain kinds of permissive intervention. The Third Circuit had previously held, in a case cited in *McClune* and whose rule is now accepted by most courts, that even though intervention "contemplates an existing suit in a court of competent jurisdiction," if the original claims have been dismissed for lack of jurisdiction, a court has the discretion to treat a pleading for intervention, where the intervenor has a separate and independent basis for jurisdiction and where the failure to adjudicate the claim will only result unnecessary delay, as a separate action that may continue the suit. *Fuller v. Volk,* 351 F.2d 323, 328-29 (3d Cir.1965) ( "By allowing the suit to continue with respect to the intervening party, the court can avoid the senseless 'delay and expense of a new suit, which at long last will merely bring the parties to the point where they now are." '), *citing Hacker v. Guaranty Trust Co.,* 117 F.2d 95, 98 (2d Cir.1941), *cert. denied,* 313 U.S. 559, 61 S.Ct. 835, 85 L.Ed. 1520 (1941). Furthermore the United States Supreme Court has even held that if a named class representative has standing at the time a class action suit is initiated, the class action may proceed even if the class representative's claim becomes moot where the issues were "capable of repetition, yet evading review". *Sosna v. Iowa,* 419 U.S. 393, 402, 95 S.Ct. 553, 42

L.Ed.2d 532 (1975) (holding that a "case or controversy" may still exist "between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot."); *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

APPLICABLE LAW AND ITS APPLICATION HERE
At issue here are several interrelated, complex issues which the Court addresses in what appears to it to be the logical order: (A) whether ICERS' and Lead Plaintiff's Foreign Debt Securities claims are timely asserted or time-barred; (B) whether ICERS has or needs to have standing for permissive intervention; (C) whether ICERS has standing and is qualified to serve as a representative plaintiff in this action on behalf of all purchasers of all Foreign Debt Securities during the Class Period; and (D) whether ICERS should be granted permissive intervention.
A. Statute of Limitations
The threshold question here is whether Lead Plaintiff has timely asserted claims relating to the Foreign Debt Securities investors. Because issues relating to the statute of limitations are raised in most of the *Newby* Defendants' motions to dismiss as well as here, to insure consistency and fairness the Court has reviewed all briefing relating to the limitations periods. It sets out its conclusions about the law applicable to the limitations issues here. [FN25]

FN25. The Court emphasizes that the concept of timeliness for purposes of a statute of limitations defense is distinct from the issue of timeliness for purposes of a motion for

leave to intervene.

A private right to bring claims under Section 10(b) of the Exchange Act is not explicit, but judicially implied, and there is no express statute of limitations directed to such a claim. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 358, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991)*. Prior to the passage of the Sarbanes-Oxley Act of 2002, [FN26] regarding a private right of action under Section 10(b) of the Exchange Act and Rule 10b-5, the Supreme Court has held that "no action shall be maintained to enforce any liability created under this statute unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." Section 9(e) of the 1934 Act, *15 U.S.C. § 78i(e); Lampf, 501 U.S. at 364* (analogizing to express statutes of limitations with a one year/three year structure elsewhere in the 1933 and 1934 Acts and holding that claims under § 10(b) are subject to the statute of limitations in § 9(e) of the Exchange Act of 1934).

> FN26. Public Company Accounting and Investor Protection Act of 2002 (popularly known as the "Sarbanes Oxley Act of 2002"), *Pub.L. 107-204, Title VIII, § 804*, 116 Stat. 745, 801, codified in part at *28 U.S.C. § 1658(b)*, was signed into law by President Bush on July 30, 2002.

*\*8* The language of section 9(e), "No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation," suggests that the one-year period requires actual discovery to trigger limitations. Compared with section 13 (suit must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence .... [emphasis added]"), which provides the limitations periods for claims under § 11 and § 12 of the 1933 Act, section 9 does not appear to trigger limitations when the plaintiff "should have" discovered the wrongdoing.
Nevertheless, to determine when the limitations period begins to run, most of the Circuit Courts of Appeals have applied some version of the doctrine of constructive or inquiry notice. [FN27] Under this doctrine, the statute begins to run when the plaintiff has actual knowledge of the facts giving rise to his claims or has notice of facts that in the exercise of reasonable diligence should have led to such knowledge. *See e.g., LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 154 (2d Cir.2003); In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1325-27 (3d Cir.2002); Young v.. Lepone, 305 F.3d 1, 8 (1st Cir.2002); Franze v. Equitable Assurance, 296 F.3d 1250, 1254 (11th Cir.2002)* ("Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself."); *Ritchey v. Horner, 244 F.3d 635, 638-39 (8th Cir.2001); Sterlin v. Bioimmune Sys., 154 F.3d 1191, 1201 (10th Cir.1998)* ("[I]nquiry notice ... triggers an investor's duty to exercise reasonable diligence, and ... the one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud."); *Marks v. CDW Computer Centers, Inc., 122 F.3d 363, 367 (7th Cir.1997)* ("[N]ot only must the investor be on notice of the need to conduct further inquiry, but the investor also must be able to learn the facts underlying the claim with the exercise of reasonable diligence."); *Ockerman v. May Zima & Co., 27 F.3d 1151, 1155 (6th Cir.1994). [FN28]*

> FN27. *See generally* Lewis D. Lowenfels and Alan R. Bromberg, *SEC Rule 10b-5 and its Statute of Limitations: The Circuits Defy the Supreme Court,* 51 Bus. Law. 309 (February 1996).

> FN28. In *Berry v. Valence Technology, Inc., 175 F.3d 699, 704 (9th Cir.1999), cert. denied, 528 U.S. 1019, 120 S.Ct. 528, 145 L.Ed.2d 409 (1999)*, the Ninth Circuit, which has not formally ruled on the question, stated,

If we were to adopt inquiry notice, we would agree with the Tenth Circuit's formulation of that standard. In *Sterlin,* the Tenth Circuit surveyed case law from other circuits and found that most circuits "generally apply an inquiry notice standard coupled with some form of reasonable diligence requirement [citation omitted]."

The Fifth Circuit has only conclusorily referred to and appeared to accept the inquiry notice/storm warning rule in securities cases, but has not addressed it in detail. *Jensen v. Snellings,* 841 F.3d 600, 607 (5th Cir.1988) ("Investors are not free to ignore 'storm warnings,' which would alert a reasonable investor to the possibility of fraudulent statements or omissions in his securities transactions.... Our emphasis on the duty of due diligence comports with the policy underlying statutes of limitations. They are intended to ensure fairness to defendants against 'claims that have been allowed to slumber .... the right to be free of stale claims in time comes to prevail over the right to prosecute them."); *Topalian v. Ehrman,* 954 F.2d 1125, 1143-35 (5th Cir.1992).

Some courts have applied the term "storm warnings" for circumstances which would suggest to an investor of ordinary intelligence that he had been defrauded and should trigger the duty of inquiry, although they do not agree on precisely what constitutes such storm warnings. *See, e.g., LC Capital, 318 F.3d at 154; NAHC, 306 F.3d at 1325; Ritchey, 244 F.3d at 639.* Whether the plaintiff was aware of sufficient facts to put him on inquiry notice is frequently inappropriate for resolution on a motion to dismiss under Rule 12(b)(6). *LC Capital, 318 F.3d at 156; NAHC, 306 F.3d at 1325* ("Whether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had 'sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings of culpable activity.' ... The test for 'storm warnings' is an objective one, based on whether a 'reasonable investor of ordinary intelligence would have discovered the information and recognize it as a storm warning." ' [citations omitted]; *Young v. Lepone,* 305 F.3d at 8-9; *Ritchey,* 244 F.3d at 640-41 ("But the facts relied upon to support inquiry notice must rise to the level of more than mere suspicion; they must instead be 'sufficiently confirmed or substantiated' to a point at which the victims are incited to investigate." [citations omitted] ).

*9 Moreover, to the question whether "limitations begins to accrue on the date that sufficient storm warnings first appear or the later date on which an investor, alerted by storm warnings and thereafter exercising reasonable diligence, would have discovered the fraud," the First Circuit has held that the later date controls because the purpose of a discovery rule is to protect plaintiffs who do exercise reasonable diligence regarding available information and because such a rule is fair to both plaintiffs and defendants since it prevents premature suits while still requiring that a suit be filed timely after the facts should have been discovered. *Young v. Lepone,* 305 F.3d at 9- 10. *See also LC Capital, 318 F.3d at 154* ("If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose.... However, if the investor makes some inquiry once the duty arises, we will impute knowledge of what an investor 'in the exercise of reasonable diligence, should have discovered' concerning the fraud, ... and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud." [citations omitted] ); *NAHC,* 306 F.3d at 1326 ("the period begins to run from 'the time at which the plaintiff should have discovered the general fraudulent scheme." ' [citations omitted] ); *Fujisawa Pharmaceutical Co. v. Kapoor,* 115 F.3d 332 (7th Cir.1997) (The statute of limitations "begins to run not when the fraud occurs, and not when the fraud is discovered, but when (often between the date of occurrence and the date of the discovery of the fraud) the plaintiff learns, or should have learned through the exercise of ordinary diligence in the protection of one's legal rights, enough facts to enable him by such further investigation as the facts would induce in a reasonable person to sue within a year."). This inquiry-notice or storm-warning rule (as opposed to actual notice) has become the majority view, *Young v. Lepone,* 305 F.3d at 10. Deciding when a claimant is on inquiry notice requires a fact-specific examination, and even then courts have weighed those facts differently. Among the circumstances found by some courts to constitute sufficient notice to be a storm warning are disclosures in the media, [FN29] a sudden drop in stock price, [FN30] filing for bankruptcy, [FN31] an investigation, or even warning in a prospectus.

[FN32]

FN29. *See, e.g., In re USEC Sec. Litig., 190 F.Supp.2d 808, 820- 21 (D.Md.2002); In re Merrill Lynch & Co. Research Reports Sec. Litig., 289 F.Supp.2d 416 (S.D.N.Y.2003)* (finding that extensive media coverage of alleged conflicts of interest of research analysts and brokers at Merrill Lynch put plaintiffs on inquiry notice more than two years before they filed suit); *but see In re WorldCom, Inc. Sec. Litig.,* 2003 LW 22790943 (press reports did not constitute storm warnings sufficient to put plaintiffs on inquiry notice where reports failed to discuss the particular corporation and were vague about the illegal relationship tainting the

corporation's financial reports).

FN30. *Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co., 129 F.3d 222, 224* (1st Cir.1997).

FN31. *See, e.g., Theoharous v. Fong, 256 F.3d 1219, 1228* (11th Cir.2001).

FN32. *See, e.g., Harner v. Prudential-Bache Sec. Inc., 35 F.3d 565 (Table), Nos. 92- 1353, 92-1910, 1994 WL 494871, *5-6* (6th Cir.1994) (warning of risks in prospectus coupled with letters from partnership reporting substantially lower returns than expected should have put plaintiffs on notice of potential fraud).

Until passage of the Sarbanes-Oxley Act, it was established law that Section 11 and Section 12(a)(2) claims, as well as a derivative claim under § 15, of the 1933 Act were governed by the express statute of limitations in § 13, 15 U.S.C. § 77m, which states,
No action shall be maintained to enforce any liability created under section 77k or 77l(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77l(a)(1) of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 77k or 77l(a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77l(a)(2) of this title more than three years after the sale.
**\*10** Section 804 (entitled, "Statute of Limitations for Securities Fraud") of the Sarbanes-Oxley Act of 2002 amended 28 U.S.C. § 1658 of Title 28 of the United States Code by lengthening the statute of limitations for private causes of action alleging fraud. [FN33] Pub.L. 107-204, Title VIII, § 804(a), 116 Stat. 745, 801 (July 30, 2002), amending § 1658 by adding a subsection (b). The statute now states in relevant part,

FN33. Before the amendment, Section 1658 set a four-year statute of limitations for civil causes of action arising under any Act of Congress enacted after December 1, 1990 that lacked an express statute of limitations.

(a) [ ] ... [A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance

in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a) (47) of the [Exchange Act, 15 U.S.C. §§ 98c(47) ], may be brought not later than the earlier of--
(1) 2 years after the discovery of the facts constituting the violation; or
(2) 5 years after such violation.
(b) EFFECTIVE DATE.--The limitations period provided by section 1658(b) to title 28, United State Code, as added by this section, shall apply to all proceedings addressed by this section that are commenced on or after the date of enactment of this Act.
(c) NO CREATION OF ACTIONS.-Nothing in this section shall create a new, private right of action. Public Company Accounting and Investor Protection Act of 2002, Pub.L. 107- 204, Title VIII, § 804, 116 Stat. 745, 801, codified in part at 28 U.S.C. § 1658(b). Furthermore, Section 3(a)(47), 15 U.S.C. § 78(c)(47), provides a pertinent definition: "The term 'securities laws' means the Securities Act of 1933, the Securities Exchange Act of 1934 ... [and others]."
ICERS' response to objections that intervention would be futile because ICERS's claims are time-barred [FN34] insists that even if the Court should find its § 12(a)(2) claims would be barred by a one-year limitations period, they are saved by the lengthened statute of limitations in the Sarbanes-Oxley Act or the relation-back doctrine. [FN35] ICERS contends that the "operative" pleading is Lead Plaintiff's First Amended Consolidated Complaint, filed on May 14, 2003, which added the subsidiaries to the original Bank Defendants as new defendants approximately eight months after the enactment of the Sarbanes-Oxley Act, July 30, 2002. In ICERS' view, the First Amended Consolidated Complaint is a "new proceeding commenced after the effective date" of the Act (July 30, 2002) and the Sarbanes-Oxley Act therefore applies; thus ICERS' claims are not time-barred by the shorter one-year statute of limitations.

> FN34. Objectors argue that would-be intervenors were put on "notice inquiry" as early as December 2002, when Enron filed for bankruptcy and the prices of Enron and Enron-related securities plunged. They contend that the "operative" complaint was the original *Newby* complaint, filed on October 20, 2001. The Court finds this argument lacks merit, as the first complaint was filed before Enron made most of its public disclosures prior to filing for bankruptcy and the nature of the alleged fraud is so complex and the banks' purported involvement initially less obvious than that of Enron officers and directors, that experts to this day have difficulty unraveling the intricacies.

> FN35. The briefing on the application of the relation-back defense to
>
> the statute of limitations was filed with respect to the Bank Defendants' motions to dismiss and will be dealt with in greater detail as it affects those entities when the Court addresses those motions.

The objectors maintain that Sarbanes-Oxley does not apply to Lead Plaintiff's claims (1) because they were pending at the time the Act was passed and (2) because the Sarbanes-Oxley Act does not extend limitations for § 11 and § 12(a)(2) claims under the 1933 Securities Act.
In construing a statute, a court should first address the plain language of the provision, although " 'plain' does not always mean 'indisputable' or 'pellucid." ' *Aviall Services, Inc. v. Cooper Industries, Inc.*, 312 F.3d 677, 680 (5th Cir.2002), *cert. granted on other grounds*, --- U.S. ----, 124 S.Ct. 981, 157 L.Ed.2d 811 (2004). The court must examine not only the text of the disputed provision, but also its relationship to the structure and the design of the statute as a whole to effect a harmonious construction. *Id.* & n. 3. Only if the statutory language is opaque or ambiguous should the court address the legislative history for guidance in construing a provision. *Id.* Indeed, "[l]egislative history should be consulted gingerly, if at all, in the aid of statutory construction." *Id.* at 684. "Policy considerations cannot change the interpretation of Congress's language, but they can contribute to an understanding of that language." *Id.* at 691. Employing these principles, a court should adopt the most reasonable interpretation of a provision. *Id.* at 681.
*11 A number of issues regarding the application of § 804 have arisen since its enactment that are

relevant to the instant action. As a threshold matter, this Court observes that § 804 has been criticized as hastily passed and "poorly drafted," as reflected, as one example, in its inconsistency with the express limitations periods in the federal securities statutes that is "likely to create significant interpretational difficulties for courts." Bruce Vanyo, Stuart Kagan, and John Classen, *The Sarbanes-Oxley Act of 2002: A Securities Litigation Perspective,* 1332 PLI/Corp 89, 119-20 (September-October 2002); *see also* Michael A. Perino, *Statute of Limitations Under the Newly Passed Sarbanes-Oxley Act,* N.Y.L.J. at 4 (Aug. 2, 2002) (Section 804 is "poorly drafted," "inconsistent with express statutes of limitation already contained in the federal securities laws and is likely to create significant interpretational difficulties for the courts"); Michael A. Perino, *Enron's Legislative Aftermath: Some Reflections on the Deterrence Aspects of the Sarbanes-Oxley Act of 2002,* 76 St. John's L.Rev. 671, 672 (Fall 2002) ("The SOA moved with lightening speed through the legislature and only seemed to pickup momentum with the revelation of each new accounting restatement. Unfortunately, the Act reflects that speed.... The result was, at a minimum, a disorganized law."); John C. Coffee, Jr., *A Brief Tour of the Major Reforms in the Sarbanes-Oxley Act,* SH097 ALI-ABA 151, 171-72 (2002) ("Passed quickly and containing important provisions that were added by floor amendments and without hearings, it was predictable that the Act would contain some ambiguities and yield some unintended consequences. Controversy appears to be developing around the following issues ....[including Statute of Limitations]").

For examples of uncertainties created by the new statute of limitations in § 804(b), unlike § 10(b) of the 1934 Act, Sections 11 and 12(a)(2) [and derivatively, § 15] of the 1933 Act cover claims of material nondisclosures that do not necessarily sound in fraud, but may sound in negligence or strict liability. Since Section 804(b) explicitly applies only to "a private right of action that involves a claim of fraud, deceit, manipulation or contrivance," application of the longer statute of limitations in § 804 to a claim under either Section 11 or Section 12(a)(2) appears to depend upon whether the particular claim involves "fraud, deceit, manipulation, or contrivance."

Another issue that has arisen is whether Section 804(b) applies to statutes that have express limitations periods, [FN36] which includes Sections 11 and 12(a)(2), which have been subject to time limitations imposed by Section 13. Significantly, when Congress passed the Sarbanes-Oxley Act, Congress did not repeal the express one-year/three-year statute of limitations in Section 13, 15 U.S.C. § 77m.

> FN36. As discussed earlier in this memorandum and order, a private cause of action under § 10(b) is not express, but judicially implied; the limitations period was established in *Lampf* by analogy to other express limitations provisions elsewhere in the securities statutes. Thus technically such a claim does not arise from an "Act of Congress," as was required for the application of the general statute of limitations for causes of action without express statutes of limitations, 28 U.S.C. § 1658, amended by Sarbanes-Oxley Act. The new § 804(b) does not appear to rely on a distinction between express and implied causes of action but addresses only the former, perhaps another reflection of the haste and poor drafting characterizing the new legislation.

Furthermore, Section 804(b)'s statute of limitations (which begins to run "(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation") omits certain language found in § 13 (expressly providing that limitations begins to run "after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence"), raising the question whether actual notice, as opposed to inquiry notice, is required to trigger limitations for §§ 11 and 12(a)(2) claims. Nevertheless, that same language omission is found in *Lampf,* and, as discussed, all the Circuit Courts of Appeals that have addressed the issue have applied the inquiry notice rule, i.e., that limitations for § 10(b) claims begins to run on the date that a plaintiff acquires either actual or sufficient inquiry notice of the facts giving rise to the claim. *See, e.g., Topalian v. Ehrman,* 954 F.2d 1125, 1134-35 (5th Cir.1992); *Tregenza v. Great American Communications Co.,* 12 F.3d 717 (7th Cir.1993), *cert. denied,* 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994); *Howard v. Haddad,* 962 F.2d 328. 329-30 (4th Cir.1992); *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346 (2d Cir.1993); *Great Rivers Co-op. of SE Iowa v. Farmland Indus., Inc.,* 120 F.3d 893, 896-97 (8th Cir.1997); *Sterlin v. Biomune Sys.,* 154 F.3d 1191, 1202 (10th Cir.1998);

*New England Health Care Employees Pension Fund v. Ernst & Young, L.L.P., 336 F.3d 495, 500* (6th Cir.2003), *petition for cert. filed* (Dec. 29, 2003) (No. 03-937). A few courts have applied the principle of inquiry notice to the extended statute of limitations in the Sarbanes-Oxley Act. *See, e.g., In re WorldCom, Inc. Sec.* Litig., 2003 WL 227909942, at *265; *In re Enterprise Mortgage Acceptance Co., L.L.C. Sec. Litig.*, --- F.Supp.2d ----, No. 1:03-CV-3752-SWK, 1:02-MD-1495-SWK, 2003 WL 22955925, *3 (S.D.N.Y. Nov.14, 2003); *Taylor v. Prudential Ins. Co. of America*, No. 1:02-cv-1462-LJM-VSS, 2003 WL 21314254, *4-6 (S.D.Ind. May 7, 2003); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F.Supp.2d 243, 265 (S.D.N.Y.2003)*. In light of the treatment of that language in *Lampf,* this Court agrees that the majority rule that inquiry notice applies to and triggers the limitations period of § 804 for those § 11 and § 12(a)(2) claims that fall within its reach. *See generally* Eric Landau and Shaw Harpen, *The Discovery Rule Under Sarbanes-Oxley: Just How Much Does an Investor Really Need to Know to Trigger the New Two-Year Statute of Limitations,* 1386 PLI/Corp 113 (Sept.-Oct.2003).

**\*12** Nevertheless in the court decisions uncovered by this Court addressing the question regarding claims under § 11 and § 12(a)(2), all have held that based on the text of section 804 (extending limitations period for claims involving "fraud, deceit, manipulation or contrivance" in language mirroring that of § 10(b) and Rule 10b-5), where Section 11 and Section 12(a)(2) claims do not require a showing of fraudulent intent, but are based on negligence or strict liability, section 804's enlarged statute of limitations does not apply, but Section 13 governs. [FN37] *See, e.g., In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., No. 02 MDL 1484, 2003 WL 21518833, *19 (S.D.N.Y. July 2, 2003)* (holding that the one-year/three-year limitations period of Section 13, not the two-year/five-year limitations period of Section 804, applied to claims under Section 11 and 12(a)(2)); *In re Global Crossing Ltd. Sec. Litig.*, No. 02 CIV. 910(GEL), 2003 WL 22999478, *3 (S.D.N.Y. Dec.22, 2003); *In re WorldCom, Inc. Sec. Litig.*, Nos. 02 Civ. 3288(DLC), 03 Civ, 6592, 2003 WL 22738546, *6-8 (S.D.N.Y. Nov.21, 2003); [FN38] *Friedman v. Rayovac Corp.*, 2003 LEXIS 13135, *27-28 (W.D.Wis. May 29, 2003); *Taylor v. Prudential Ins. Co. of America*, No. 1:02-cv-1462-LJM-VSS, 2003 WL 21314254, *4-6 (S.D.Ind. May 7, 2003)*.

> FN37. As noted, the language of § 804 in extending the statute of limitations for "a claim of fraud, deceit, manipulation, or contrivance" in contravention of a regulatory requirement, reiterates the language of § 10(b). Thus the language reflects Congress' intent not to reach claims grounded in negligence or strict liability.

> FN38. Judge Cote in *WorldCom* also concluded that the legislative history of the debate regarding Section 804's lengthened limitations period reflected Congressional concern with fraud. She quotes the sponsor of that portion, Vermont Senator Patrick Leahy, the Chairman of the Senate Judiciary Committee, remarking that the provision was a response to "such enormous fraud." 2003 WL 22738546 at *8, *citing* 148 Cong. Rec. S6524, 6535 (July 10, 1002. She further quotes Representative Edward J. Markey's statement that "we should extend from 3 years to 5 years the time that people have to go in and do something about fraud...." *Id., citing* 148 Cong. Rec. H4838, 4836 (July 17, 2002). She also quotes Senator Leahy's lengthy comment directly under the caption, "Section 804--Statute of Limitations" relating to "securities fraud cases," not strict liability and

> negligence claims:

> This section would set the statute of limitations in private securities fraud cases to the earlier of two years after the discovery of the facts constituting the violation or five years after such violation. The current statute of limitations for most private securities fraud cases is the earlier of three years from the date of the fraud or one year from the date of discovery. This provision states that it is not meant to create any new private cause of action, but only to govern all the already existing private causes of action under the various federal securities laws that have been held to support private causes of action.

*Id.* at \*8-9. Judge Cote concluded,

> If Congress had intended to extend the statute of limitations for every private securities law claim, it could have done so. Section 804 does not, however, state that it extends the statute of limitations for all claims under the securities claims under the securities laws. Instead it includes limiting language that extends the time for private securities laws only for claims that involve "fraud, deceit, manipulation or contrivance." This language does not encompass Sections 11 and 12(a)(2) claims.

*Id.* at \*9.

ICERS has stated that it has adopted the *Newby* First Amended Consolidated Complaint which expressly disclaims that its allegations under § 11 and § 15 were grounded in fraud or intentional or reckless misconduct, but instead are based on strict liability and/or negligence. # 1388 at 631, ¶ 1005. The complaint also asserts that its § 12(a)(2) claims, including those relating to the Foreign Debt Securities, and related § 15 claims are "negligence claims." *Id.* at 637, ¶ 1016.3. Thus the longer statute of limitations in § 804 does not apply to ICERS' § 12(a)(2) claims. Perhaps the least difficult issue regarding the new statute is whether Section 804(b) extends the limitations period for claims that were pending at the time of its enactment. The new statutory provision clearly and unambiguously states that the two-year/five-year limitations period "shall apply to all proceedings addressed by this section that are *commenced on or after the date of Enactment of this Act* [emphasis added by this Court]," i.e., July 30, 2002. The express language of the statute does not include actions already pending on the date of enactment. Senator Patrick Leahy, the sponsor of Title VIII, stated, "The section, by its plain terms, applies to any and all cases *filed after* the effective date of the Act, regardless of when the underlying conduct occurred [emphasis added by this Court]." 148 Cong. Rec. S7418 (July 26, 2002). [FN39] This Court finds that the unambiguous text does not extend the new statute of limitations to claims in suits pending at the date of enactment. [FN40] It does apply to subsequently filed actions based on underlying conduct that occurred before the enactment of the Sarbanes-Oxley Act as long as such claims were not time-barred by the *Lampf* statute of limitations and/or repose controlling before July 30, 2001.

FN39. In *Roberts v. Dean Witter Reynolds, Inc.,* No. 8:02-CV-2115- T-26EAJ, 2003 WL 1936116, \*3-4 (M.D.Fla. Mar.31, 2003), which relied on the legislative history to find Congressional intent to apply the new statute of limitations retroactively, the court quoted several comments by Senator Leahy "referring to victims of Enron recovering damages." For example,

> When I look at places such as Washington State alone where the pension funds of firefighters and police lost $50 million because of the fraud of the leaders of Enron, I don't feel too sympathetic. We already have a very short statute of limitations in here anyway. *We ought to at least have that so people might be able to recover some of the money they have lost,* if it is at all possible, instead of just a few executives going up and building their $50 million mansions and hiding there. There ought to be some way for people who lost their pensions, lost their life savings, to get it....

> *These are people who would like, in these kinds of situations, at least to have a statute of limitations such that we can go after them.*

*Id.* at *3, *citing* 148 Cong. Rec. S6524-02, * S6534-35 (emphasis added by *Roberts* court). This Court agrees with the rejection of the

*Roberts* court's conclusions by the court in the Southern District of New York in *In re Enterprise Mortgage Acceptance Co.,* 2003 WL 22955925 at * 8:

> [N]one of Senator Leahy's statements refers to reviving time-barred claims nor did he make statements that clearly show the Act was intended for resurrection of time-barred claims. In fact, Mr. Leahy actually made one statement that indicated the Act was not intended to revive time-barred claims. During a hearing he stated: "[In the Act] [w]e extend the statute of limitations in security fraud cases--something that would have helped so many people who were defrauded by Enron and others." Conference Report on Corporate Responsibility Legislation: Hearing on H.R. 3763 before Conference Comm. 107th Cong. at 12 (2002)(statement of Senator Leahy). Additionally Senator Gramm made statements indicating that the Act does not revive time-barred claims. In response to Senator Durbin's assertion that the one-year/three-year statute of limitations permitted some corporate officers to "get off the hook," Mr Gramm said:

> When the Senator was talking about letting people off the hook, surely everybody understands that our system has no ex post facto laws. So if the provision raising the statute of limitations to 5 years became law, it would have no effect on anybody who has committed one of these violations about which we are talking.

> 148 *Cong. Rec.* S6537 (July 10, 2002).

> *In re Enterprise Mortgage,* 2003 WL 22955925 at *8. This Court agrees that it is unclear whether a number of Senator Leahy's remarks are directed toward alleged securities fraud generally, of which he makes Enron a notable example, or whether they were directed toward the charges of purported Enron victims regardless of how old their claims were.

FN40. In *dicta* one court has assumed that the lengthened Sarbanes-Oxley statute of limitations does not apply to claims pending on July 30, 2002. *See de la Fuente v. DCI Telecommunications, Inc.,* No. 01 CIV. 3365(CM), 2003 WL 832009 (S.D.N.Y. Mar.4, 2003)(amendment does not apply to claims pending at the time it was enacted).

**\*13** Moreover, in the suit *sub judice,* there is an additional factor: ICERS has emphasized that it has adopted the *Newby* complaint. There is an important technical distinction relevant here between amendment of a pleading under Fed. R. of Civ. P. 15(a) and supplementation of a pleading under Fed. Rule of Civ. P. 15(d). Supplementation is used to "set[ ] forth 'transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented," ' relating to events that " 'have transpired since the date of the party's most recent pleading." ' *United States v. Hicks,* 283 F.3d 380, 385 (D.C.Cir.2002). In contrast, amendment under Rule 15(a) is used to modify the previous pleading's allegations about events that occurred before the pleading was filed. The factual occurrences and transactions from which ICERS' claims arose did not happen after the filing of the First Consolidated Complaint. Rule 15(a) allows the party to amend "to assert matters that were overlooked or were unknown at the time" he filed his earlier pleading, as was the case here. *See* 6A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice and Procedure: Civil 2D* § 1504 at 185-86 and Vol. 6, § 1473 at 520 (2d ed. 1990)("Amended pleadings "relate to matters that

occurred prior to the filing of the original pleading and entirely replace the earlier pleading; [supplemental pleadings] deal with events subsequent to the pleading to be altered and merely represent additions or continuations of earlier pleadings.").

*Newby* Lead Plaintiff moved for leave to "amend" (# 1351) and filed its First Amended Consolidated Complaint (# 1388). The claims alleged are based on wrongdoing that occurred prior to the filing of the First Consolidated Complaint, which, in accordance with ICERS' own arguments, encompassed the same wrongdoing, material misrepresentations and omissions, asserted against defendants that were substantially the same as the original defendants and their subsidiaries based on substantially the same facts, all pending months before the Sarbanes-Oxley Act was enacted. While the amended pleading first identified investors in the Foreign Debt Securities issued by Enron-related entities as putative class members, the creation and exploitation of these Enron-related entities by Defendants in the alleged Ponzi scheme were described in the First Consolidated Complaint, but not their concurrent role as issuers of securities that were sold based on the same alleged material misrepresentations and omissions regarding Enron's financial condition. Therefore, because the latest complaint is technically an amendment of the previous consolidated complaint, relating to matters that occurred prior to the filing of the previous consolidated pleading, this Court does not construe the newly defined related-Enron entity claims in the last *Newby* complaint as a "new proceeding" and concludes that its claims are not governed by the lengthened statute of limitations also on these grounds.

**\*14** Another related area of contention is whether, and/or to what extent, the longer limitations period of § 804(b) applies retroactively and revives claims that would have been time-barred under *Lampf* at the time § 804(b) was enacted, but which were not filed until after July 30, 2002. The problematic language of § 804(b) states that the "limitations period ... shall apply to all proceedings ... commenced on or after" the date of the Act's enactment. Because the text focuses on the date that litigation is commenced rather than the date the statute was violated by wrongful conduct, it appears to apply to suits that allege misconduct that occurred before July 30, 2002, but that were not filed until after that date. As mentioned, Senator Leahy, whose comments comprise much of the minimal legislative history of the Sarbanes-Oxley Act, stated, "This provision is intended to lengthen any statute of limitations under federal securities law, and to shorten none. The section, by its plain terms, applies to any and all cases filed after the effective date of the Act, regardless of when the underlying conduct occurred." 148 Cong. Rec. S7418 (July 26, 2002). Such a principle of limitations based on when suit was filed rather than the underlying misconduct would reward those plaintiffs who delayed filing their suits, clearly not the purpose of a limitations period. Moreover § 804 (c), "Nothing in this section shall create a new, private right of action," undermines the argument that § 804 revives time-barred claims. *Hughes Aircraft Co. v. United States,* 520 U.S. 939, 950, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (retroactive application of the 1986 amendment to False Claims Act in essence impermissibly creates a new cause of action just as "extending a statute of limitations after a preexisting period of limitations has expired impermissibly revives a moribund cause of action"). While clearly a response to widespread corporate scandals like WorldCom and Enron, the language of the new provision is unclear as to whether the Act's extended limitations constituted Congress' attempt to remedy future problems or whether it was intended to reach Enron victims with expired claims. No court has found that in § 804 Congress was not ambiguous or that it expressly prescribed the temporal reach of the statute. [FN41] Furthermore, as noted *supra,* several commentators have remarked that the Sarbanes-Oxley Act was passed in such haste that inconsistencies and ambiguities are the result. Thus because language of the Act is not clear and certain and because permitting the tardy plaintiff an extended statute of limitations if it waits to sue after July 30, 2000, while denying an extended period to the diligent plaintiffs who filed suit quickly, but before that date, makes little sense, the Court finds that it is appropriate to turn for guidance to the general law regarding retroactive application of new statutes of limitations.

FN41. For example, the district court of the Southern District of New York *In re Enterprise Mortgage,* 2003 WL 22955925, at \*9, has observed,

[T]here is no clear language of revival in either of these two sentences.... The first sentence may be read to mean that Congress only applied the Act's extended statute of limitations to existing claims not already time-barred. The second sentence may be

interpreted to state that even if a claim is brought after the Act is effective, the expanded statute of limitations can reach conduct that happened not only after the enactment, but also before its enactment. [T]he language and the legislative history of the Sarbanes-Oxley Act [do] not show Congress clearly intended to apply the lengthened statute of limitations in Section

804 to already time-barred claims....

Deciding whether a statute should be applied retroactively is not always a ministerial matter because a statute does not have a retroactive effect merely because it is applied to conduct occurring prior to its enactment; rather it has a retroactive effect if it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." _Landgraf v. USI Film Products, 511 U.S. 244, 269 (1994)._ The court must make a commonsense, functional judgment whether the new statutory provision "attaches new legal consequences to events completed before its enactment" and be informed and guided by "considerations of fair notice, reasonable reliance, and settled expectations." _Id._ at 269; _Martin v. Hadix, 527 U.S. 343, 357-58, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999)._ "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and conform their conduct accordingly; settled expectations should not lightly be disrupted." _Landgraf,_ 511 U.S. at 265.
*15 In _Landgraf,_ the United States Supreme Court set out a three-step analysis for determining whether a new statute should apply to conduct occurring before the statute's enactment. First, the court should ask whether Congress "expressly proscribed the statute's proper reach." _Id._ at 264, 280. If so, that directive regarding the statute's temporal reach controls and the inquiry stops. If not, the court must examine whether application of the statute would have an impermissible retroactive effect, i.e., whether it would "impair the rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions." _Id._ If so, a traditional judicial presumption against retroactive application of the new statute to acts occurring prior to the statute's enactment applies. _Id._ at 265. Although courts originally distinguished between procedural and substantive statutes, applying a lower standard to the former, the Supreme Court has since indicated that such categorization is not definitive. _Martin, 527 U.S. at 358._ Finally, if the court determines that Congress has not expressly indicated the statute's proper temporal reach and finds that the retroactive application of the statute impairs the rights of the party, the statute will not apply to events occurring prior to its enactment unless Congress expresses a clear intention that the statute have retroactive application or revives stale claims. _Landgraf,_ 511 U.S. at 280. If the court finds that Congress clearly intended to apply the statute retrospectively, that intent overcomes the judicial default rule.
In _Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 948- 50, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997),_ the Supreme Court held that a 1986 amendment to the False Claims Act that allowed private _qui tam_ suits to proceed could not be applied retroactively to revive previously barred claims because it increased the number of potential plaintiffs and thus the likelihood that a defendant would be subject to suit regarding past transactions, undermining basic notions of fair notice, reasonable reliance, and settled expectations.
Several federal Circuits Courts of Appeals, including the Fifth Circuit, in determining whether a statute that enlarges a period of limitations will be deemed to revive a claim that was time-barred before the new statute was enacted, have followed this doctrine of clear statement, i.e., the new federal statute must expressly state that the legislative intent was to apply a newly enlarged limitations period retroactively and thus to revive otherwise time-barred claims. See, e.g., _Resolution Trust Corp. v. Seale,_ 13 F.3d 850 (5th Cir.1994) (addressing the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") and holding that claims time-barred by the Texas state two-year statute of limitations were not revived by FIRREA's new three-year limitations for the United States to bring a tort action when the RTC was appointed as conservator because there was no clear statement of congressional intent to do so); _FDIC v. Belli, 981 F.2d 838, 842 (5th Cir.1993)_ (holding that FIRREA's statute of limitations providing that a contractual claim held by the FDIC runs from the later date on which the FDIC was appointed conservator or receiver, or the date on which the cause of action

accrued, does not apply retroactively to revive claims that expired before FIRREA's effective date). The panel in *Seale* paid lip service to the competing policies in interpreting statutes of limitations with respect to FIRREA: "promot[ing the value of repose by protecting citizens from stale and vexatious government claims" and "protect[ing] governmental claims by keeping the courthouse doors open." 13 F.3d at 852. The panel "follow[ing] the plain language of the FIRREA limitations provision understood in light of congressional intent," announced,

**\*16** Put simply, we need not look to general policy considerations where particular policy decisions, found in the text of the statute and the history of its enactment, dispose of the case. *Belli* accommodates the competing policies by invoking the doctrine of clear statement--Congress can revive stale claims but must do so clearly.

13 F.3d at 853. Other Circuit Courts of Appeals have also held that for retroactive application of a new, enlarged statute of limitations and revival of otherwise stale claims, there must be clear expression of Congressional intent to do so or the retroactive application is impermissible. *See, e.g., Million v. Frank, 47 F.3d 385, 390* (10th Cir.1995) (Without clear expression of Congressional intent for retroactive application, "[a]pplying the new time limit would alter the substantive rights of both the plaintiff and the defendant. Plaintiff would be afforded relief where previously there was none to be gained. The defendant would be stripped of his right to raise a valid defense and would be forced to defend an action previously time-barred: defendant's liability would be substantially increased."); *Chenault v. United States Postal Serv., 37 F.3d 535, 539* (9th Cir.1994) ("[A] newly enacted statute that lengthens the applicable statute of limitations may not be applied retroactively to revive a plaintiff's claim that was otherwise barred under the old statutory scheme because to do so would 'alter the substantive rights' of a party and 'increase a party's liability.' In this case the rights of the defendant would be altered and its liability increased because it would be forced to defend an action that was previously time-barred."); *Brown v. Hot, Sexy and Safer Productions, Inc., 68 F.3d 525, 538* (1st Cir.1995) (holding that the Religious Freedom Restoration Act did not create a retroactive cause of action for monetary damages because of absence of "clear, strong and imperative" language showing Congressional intent to do so), *cert. denied, 516 U.S. 1159, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996). See also Hughes Aircraft, 520 U.S. at 950* ("extending a statute of limitations after the pre-existing period of limitation has expired impermissibly revives a moribund cause of action.").
A few district courts have addressed the new, enlarged statute of limitations under § 804 to determine whether it applies retroactively and revives claims that would have been time-barred under the *Lampf* limitations period. *See, e.g., Roberts v. Dean Witter Reynold, Inc.*, No. 8:02-CV-2115-T-26EA], 2003 WL 1936116 (M.D.Fla. Mar.31, 2003) (finding that although Congress did not expressly use the term, "retroactive application," or prescribe the temporal reach of the statute, "Congress intended to lengthen the statute of limitations to enable people who lost their life-savings to companies like Enron to recover some of their investments. To do so, the amendment must be given retroactive application"; and holding that the amendment revives expired claims); [FN42] *Glaser v. Enzo Biochem, Inc.* No. CIV.A. 02-1242-A, 2003 WL 21960613, *5 (E.D.Va. July 16, 2003) (concluding that (1) "Congress did not unambiguously provide" that § 804(b)'s two-year limitations period applies retroactively, (2) the court previously concluded the claims were time-barred under *Lampf's* one-year limitations period, (3) the presumption against retroactive application of the new provision favored Defendants, (4) the provision that § 804(b) "applies to all proceedings commenced on or after July 30, 3003" applies only to actions that may have accrued but that were not time-barred under the previous one-year limitations period," and (5) "Congress did not specifically intend ... to revive moribund actions" with the Sarbanes-Oxley Act); *In re Heritage Bond Litigation, 289 F.Supp.2d 1132, 1148 (C.D.Cal.2003)* (finding the Sarbanes-Oxley Act unclear, relying on *Chenault v. United States Postal Service, 37 F.3d 535, 539 (9th Cir.1994)* ("a newly enacted statute that lengthens the applicable statute of limitations may not be applied retroactively to revive a plaintiff's claim that was otherwise barred under the old statutory scheme because to do so would 'alter the substantive rights' of a party and 'increase a party's liability.' "), and holding that the Sarbanes-Oxley Act does not apply to any claim time-barred at the time of its enactment regardless of when the suit was filed); *In re Enterprise Mortgage Acceptance Co., L.L.C. Sec. Litig.*, --- F.Supp.2d ----, No. 1:03-CV-3752-SWK, 1:02-MD-1495-SWK, 2003 WL 22955925, *4-9 (S.D.N.Y. Nov.14, 2003) (holding that the language and the legislative history of § 804 do not show clearly that Congress intended to apply the new statute of limitations to time-barred claims, regardless of the filing date, and dismissing the claims before it as untimely). Commentators demonstrate similar uncertainty about the propriety and/or extent of refractivity. *See, e.g.,* Harold S. Bloomenthal, *Sarbanes-Oxley in Perspective,* Part X, § 74 (2002) ( [Section 804] has retroactive applications, at

least for a period of time, in that for actions filed after the date of the Act it permits an action to be brought within a period of time that at the date of the Act would have been barred under the statute of limitations as it existed prior to the adoption of the Act.").

> FN42. Objectors point to an unpublished opinion, *Friedman v. Rayovac Corp.,* No. 02-C-308-C, Order at 23 (W.D.Wis. May 29, 2003) (attached as exhibit 2 to # 1575), which held that the Sarbanes-Oxley
>
> limitations period applies to all proceedings commenced after July 31, 2002, that an amended complaint that adds new parties commences a "new proceeding" even if the claim was part of the previously filed lawsuit, and that the date of the amended complaint, not the date that the initial complaint was filed, determines whether the Sarbanes-Oxley longer limitations period applies. The judge also opined that since the plaintiffs could have simply filed a separate new suit to be governed by the new statute of limitations, it made no sense and would create judicial inefficiency to create a rule requiring plaintiffs to file separate actions for claims against different defendants arising out of the same conduct. *Id.*
>
> This Court disagrees with the *Friedman* court's reasoning and finds its conclusions contrary to established law, as will be discussed. To permit a plaintiff to file a new second suit or a new claim or add a new party in order to circumvent a statute of limitations and expand his legal rights, especially where the clear language of the statute reflects Congress' intent not to permit such expansion, as here, would create legal chaos.

**\*17** Defendants have contended, and the Court finds the argument persuasive, that the Second Circuit's reasoning regarding application of § 108 of the PSLRA, defining its temporal reach by the effective date of the Act in similar language to that of the Sarbanes Oxley Act (the Act does not apply "to any private action ... commenced before and pending on" the date of enactment of the statute), can serve as an analogous guide here. *Gerber v. MTC Electronic Technologies Co., Ltd.,* 329 F.3d 297, 309-10 (2d Cir.2003), *cert. denied sub nom. Daiwa Securities America Inc. v. Kayne,* 540 U.S. 966, 124 S.Ct. 432, 157 L.Ed.2d 311 (2003). The Second Circuit affirmed the district court's holding that where the action was filed before the date of the enactment of the PSLRA, because the statute refers to "actions," not to "parties" or "claims," the Act did not apply to parties and claims added after the enactment to a pre-existing suit. *Id.* The *Gerber* panel observed, "In the absence of any indication to the contrary, we doubt that Congress intended that courts would apply different sets of substantive and procedural rules to groups of plaintiffs asserting identical claims in a single action, depending on when those plaintiffs were added to the complaint." *Id.* at 310. In the case of the Sarbanes-Oxley Act, the extended limitations provision refers to "proceedings," not to claims or parties.

With regard to claims that were time-barred by the shorter one-year statute of limitations under *Lampf* prior to the enactment of the Sarbanes-Oxley Act, this Court agrees with *Glaser* that in what this Court finds is an absence of any expression of specific intent that Sarbanes-Oxley should apply retroactively, either in the Act or the legislative history, the Sarbanes-Oxley Act's extended limitations period cannot revive stale claims. Where plaintiffs file a second complaint after the enactment of the Sarbanes-Oxley Act in order to revive otherwise time-barred claims, the *Glaser* court observed, While Congress may enlarge a limitations period, Congress' acts do not revive a cause of action that has become time-barred unless Congress specifically provides for retroactive application. *See Hughes Aircraft Co. v. United States,* 520 U.S. 939, 950, 117 S.Ct. 1871, 138 L.Ed.2d 135 ... (1997) ( "extending a statute of limitations after the pre-existing period of limitations has expired impermissibly revives a moribund cause of action ... a newly enacted statute of limitations that lengthens the applicable statute of limitations may not be applied retroactively to revive a plaintiff's claim that was otherwise barred under the old statutory scheme"); *INS v. St. Cyr,* 533 U.S. 289, 317, 316, 121 S.Ct. 2271, 150 L.Ed.2d 347 ... (2001) ("a statement that a statute will become effective on a certain date does not even arguably support that it has any application to conduct that occurred at an earlier date") (stating that while Congress has the power to enact laws with retroactive effects, it

must clearly and unambiguously state that the law applies retroactively).

**\*18** 2003 WL 21960613 at \*5.

Where the limitations period of Section 804 has been found applicable, courts have also applied the inquiry notice rule to trigger the running of the statute of limitations for Section 10(b) claims. See, e.g., Taylor v. Prudential Ins. Co. of America. No. 1:02-cv-1462-LJM-VSS, 2003 WL 21314254, \*4-6 (S.D.Ind. May 7, 2003); In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig. ., 289 F.Supp.2d 416, 423 (S.D.N.Y.2003) ("Even if the Court assumes that the actions filed after July 30, 2002 are subject to a two year statute of limitations under the Sarbanes-Oxley Act, there was clearly enough publicly available information to put the plaintiffs on inquiry notice of their claims more than two years before the commencement of these actions.").

The parties have raised the issue of the equitable tolling doctrine to stop the running of the statute of limitations. As discussed supra, in Lampf, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), the Supreme Court applied as a statute of limitations to an implied private right of action under § 10(b) and Rule 10b-5 a uniform federal statute of limitations by turning to other limitations periods in express provisions in the 1933 and 1934 Acts, especially section 9(e) of the Exchange Act ("must be commenced within one year after the discovery of the facts constituting the purchase or sale of securities and within three years after such violation"). The Supreme Court's language in Lampf appears to require actual notice rather than inquiry notice to trigger the one-year period. Nevertheless, as noted previously, [FN43] swayed by Congress' enactment around the same time of section 13 of the 1933 Act with its express standard of inquiry, have applied the latter approach and held that the running of the one-year statute of limitations may be stayed if, and as long as, the plaintiff exercises reasonable care and diligence in investigating the facts what would disclose fraud, while concluding that the doctrine of equitable tolling does not apply to the three-year period of repose in securities fraud cases. Lampf, 501 U.S. at 363-64 ("[T]he equitable tolling doctrine is fundamentally inconsistent with the 1-and 3-year structure [of the statute of limitations].... The 3-year limit is a period of repose inconsistent with tolling.... Because the purpose of the 3- year limitation is clearly to serve as a cutoff, we hold that tolling principles do not apply to that period."); Rothman v. Gregor, 220 F.3d 81 (2d Cir.2000); In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 289 F.Supp.2d 416, 426 (S.D.N.Y.2003) ("Equitable tolling is inconsistent with the discovery period because if a defendant actively conceals a fraud, then plaintiff will not discover the facts suggesting the violation and the statute will not begin to run, making tolling unnecessary.... Equitable tolling is also fundamentally inconsistent with the repose period because that limit is 'clearly to serve as a cutoff' and it would have no significance as an outside limit if it could be tolled." '); In re Heritage, 289 F.Supp.2d at 1149-50 (class action tolling doctrine established in American Pipe & Construction Co. v. Utah, 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) (filing of a class action tolls statute of limitations for all potential class members who subsequently seek to intervene after denial of class certification to avoid multiplicity and judicial inefficiency); and Crown, Cork & Seal Co., Inc. v. Parker, 462 U.S. 350 (1983) (extending tolling doctrine to all putative class members who file individual actions after denial of class certification does not apply).

> FN43. See, e.g., Topalian v. Ehrman, 954 F.2d 1125, 1134-35 (5th Cir.1992); Tregenza v. Great American Communications Co., 12 F.3d 717 (7 th Cir.1993), cert. denied, 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994); Howard v. Haddad, 962 F.2d 328. 329-30 (4th Cir.1992); Dodds v. Cigna Sec., Inc., 12 F.3d 346 (2d Cir.1993); Great Rivers Co-op. of SE Iowa v. Farmland Indus., Inc., 120 F.3d 893, 896-97 (8th Cir.1997); Sterlin v. Biomune Sys., 154 F.3d 1191, 1202 (10th Cir.1998); New England Health Care Employees Pension Fund v. Ernst & Young, L.L.P., 336 F.3d 495, 500 (6th Cir.2003), petition for cert. filed (Dec. 29, 2003) (No. 03-937). See generally Lewis D. Lowenfels and Alan R. Bromberg, SEC Rule 10b-5 and its Statute of Limitations: The Circuits Defy the Supreme Court, 51 Bus. Law. 309 (February 1996).

**\*19** Courts have also held that equitable tolling not only does not apply to the three-year period of repose for claims under § 10(b) in § 9(e) of the 1934 Act, but also to the three-year statute of repose in § 13 for claims under §§ 11 and 12(a)(2) [FN44] of the 1933 Act. See Thomas Lee Hazen, 1 Law of Securities Regulation § 7.10[2] (2d ed. 2004 Supp.) ("[T]he courts have almost uniformly agreed that

the three year statute of repose in sections 11 and 12 is absolute and thus equitable tolling principles will not be invoked to extend the period further.") (and cases cited therein). Indeed Hazen clearly states,

> FN44. The three-year period for claims under § 12(a)(2) begins to run at the time of the sale, when the investor executes a subscription agreement and tenders his payment.

Section 13 is not only a statute of limitations but also operates as a statute or repose. There is an absolute maximum of three years to prevent stale claims. Actions brought under section 12(a)(2) must be brought within three years of the sale forming the basis for the alleged violation. *Id.* at § 7.10[4]. To compute the three-year repose period, the courts construe limitations as running from the date of sale, which is generally from the last of three occurrences; the date the security was offered for sale, the date it was sold, or the date it was delivered. *Id.* at § 7.10[1]. § 7.10[4].

Thus the Court finds that the one-year/three-year limitations structure identified in *Lampf* applies to claims under the 1934 Act, and that § 13 applies to the negligence-based claims under § 12(a)(2) of the 1933 Act here. The claims were clearly filed within the three-year period of repose, so the issue is when Lead Plaintiff had actual or inquiry notice that should have triggered a reasonable person to discover its claims for purposes of the one-year period.

When a plaintiff moves to amend to add a new defendant to a pending suit, the date of the filing of the motion for leave to amend, here instrument # 1351 on April 15, 2003, constitutes the date the action was commenced for purposes of the statute of limitations. *Northwestern National Ins. Co. v. Alberts,* 769 F.Supp. 498, 510 (S.D.N.Y.1991); J. William Hicks, 17 Civil Liabilities: Enforcement and Litigation under the 1933 Act § 6:152, *Statute of Limitation-- Determining When Diligence is Needed--Stating the Problem* (2001, updated Oct. 2003).

Defendants have argued that a number of facts should have alerted Lead Plaintiff to assert its § 12(a)(2) claims on behalf of the CLN investors, and, by extension, all Foreign Debt Securities investors, much earlier. For example, Conseco first emphasizes that Enron filed for bankruptcy in December 2001, an occurrence expressly defined in the Indenture Agreements for the CLNs as an "event of default." Moreover, argues Conseco, the bankruptcy caused a sharp drop in the CLN price, which put the Foreign Debt Securities purchasers on actual notice of their injury and interest in bringing suit. This Court disagrees. A bankruptcy, a default in payment, and a related drop in price of a security do not necessarily or even probably indicate that the selling communications regarding the securities at issue contained material misrepresentations and omissions to give rise to a claim under § 12(a)(2).

*20 Furthermore, the § 12(a)(2) claims asserted here are not against Enron and its officers, but against the more attenuated Bank entities whose alleged involvement and fraudulent acts in the concerted scheme made them far less obvious wrongdoers at the start of the investigation of Enron's collapse. In addition the fact that the claims arise out of securities issued not by Enron, but by the SPEs and other Enron-related entities made early discovery even less likely. For instance, in *Levitt v. Bear Stearns & Co.,* 340 F.3d 94 (2d Cir.2003), in which the Second Circuit reversed the district court's dismissal on limitations grounds of complaint of securities fraud under § 10(b) against Bear Stearns, the clearing brokerage firm for the corporation, ML Direct, whose securities were at the heart of the alleged fraud. *Id.* at 103. The *Levitt* panel noted that the complaint at issue contained allegations not in another complaint filed earlier by other plaintiffs, and that the district court had failed to examine the new assertions to see if they were necessary to state a claim. More significantly, Judge Miner, writing for the panel emphasized,

[T]his is not a typical storm warnings case, as it was not brought against ML Direct or its officers or directors but instead against ML Direct's clearing agent. This is, therefore, not a case where Plaintiffs could allege a prima facie case against Bear Stearns simply by examining ML Direct's financial statements and media coverage of the company.... Instead, this is a case involving the liability of a secondary wrongdoer-the clearing agent.

*Id.* at 103.

In sum, the Court is not persuaded that the Enron bankruptcy was sufficient to trigger a duty of reasonable investigation by these investors.

As a second storm warning, Conseco maintains that additional notice was given on July 23, 2002, the day after Conseco filed its independent class action complaint, when the United States Senate's

Permanent Subcommittee on Investigations started investigating the role of financial institutions, including Citigroup, in Enron's collapse. Conseco argues that the testimony at the hearings showed that Citigroup issued the notes "(i) with full knowledge of the false and misleading nature of Enron's reported financial results, and (ii) in order to fraudulently transfer $2.4 billion worth of its Enron credit risk from itself to third-party investors, such as HPI." Nevertheless the Court does not find the initiation of an investigation sufficient to constitute inquiry notice because the information uncovered by that investigation was not disseminated on the day the investigation *began;* instead the ultimate report of the Senate Subcommittee, the issuance date of which Conseco does not provide, might constitute inquiry notice.

Finally, according to Conseco, the investors again received notice of their potential claims on September 29, 2002 when Conseco published notice, pursuant to the PSLRA requirement, announcing that litigation had commenced on behalf of CLN purchasers. The Court agrees that September 29, 2002 publication notice might suffice to trigger inquiry notice to at least CLN investors, but not necessarily the other Enron-related-entity investors, including ICERS, that they had an interest in pursuing litigation against the sellers. By the time of that publication, media were reporting alleged fraudulent misconduct by more than Enron officials, employees, outside directors. Like a rock thrown into the water, increasing disclosure of the involvement of numerous parties expanded ever outward to embrace accountants, law firms, and banks. The notable complexity of the schemes involving Enron-related entities in which ICERS, HPI, Deseret and others invested, were only gradually unraveled and their alleged connections to each other and the Ponzi scheme exposed. Under all of the circumstances, even if it accepts the publication date of the litigation based on the CLNs as the time the one-year period began to run for all Foreign Debt Securities purchases, the Court finds that Lead Plaintiff did timely investigate and assert, within one year of that notice by publication of the litigation on behalf of CLN purchasers, the claims of the Foreign Debt Securities investors.

B. Standing and Rule 24 Intervention in a Class Action

**\*21** Article III, Section 2 of the United States Constitution restricts federal court jurisdiction to resolving "cases" and controversies." U.S. Const. art. III, § 2, cl. 1. This "judicially developed doctrine" " 'ensures the presence of the 'concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' " Ruiz, 161 F.3d at 829, citing Diamond v. Charles, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). Moreover the "case or controversy requirement" relates to the properly limited role of the unelected, unrepresentative judiciary in a democratic society based on a separation of powers doctrine. Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

To satisfy the constitutional requirements of standing under Article III, the party invoking federal jurisdiction has the burden at minimum to demonstrate three elements. First, he must have "suffered an 'injury in fact,'--an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." James v. City of Dallas, Tex., 254 F.3d 551, 563 (5th Cir.2001) (quoting United States v. Hays, 515 U.S. 737, 742-43, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (in turn quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)), cert. denied, 534 U.S. 1113 (2002). To show causation, a plaintiff must demonstrate that his injury is " 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party." ' Id. at 564. The district court must examine standing and class certification on a claim-by-claim basis. James, 254 F.3d at 563. [FN45]

> FN45. As described by Judge Benavides in Ford v. NYLCare Health Plans of the Gulf Coast, Inc., 301 F.3d 329 334 (5th Cir.2002) (concurring), cert. denied sub nom. Ford v. Aetna U.S. Healthcare, Inc., 538 U.S. 923, 123 S.Ct. 1574, 155 L.Ed.2d 313 (2003),
>
> ... [T]he jurisdictional issue of standing may be raised *sua sponte* despite the parties' failure to raise it. Henderson v. Stalder, 287 F.3d 374, 379 n. 5 (5th Cir.2002). The burden of establishing standing, which rests on the party invoking federal court jurisdiction, varies depending upon the stage at which standing becomes an issue. Lujuan, ... 504 U.S ..., [at] 561.... At the pleading stage, we look only to the sufficiency

of the allegations. *Id.* "In response to a summary judgment, however, the plaintiff can no longer rest on such 'mere allegations,' ' but must adduce evidence in support of the elements of standing. *Id.* (quoting Fed.R.Civ.P.

56(e)). At the final stage of the litigation, standing must be supported adequately by the evidence offered at trial. *Id.*

In addition to constitutional limitations, there are judge-crafted prudential limitations to the standing doctrine and the court's exercise of jurisdiction, such as the general prohibition on raising a third party's legal rights, preclusion of the adjudication of generalized grievances or abstract issues of substantial public significance that should more appropriately be addressed by the legislative branch, and the rule that a plaintiff's claims fall within the zone of interests protected by the law the plaintiff invokes. *Allen v. Wright*, 468 U.S. at 751; *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

As has been pointed out by Conseco, a modification of the general rule is necessary where a Lead Plaintiff, preferably an institution with the largest financial interest in the action selected pursuant to the criteria of the PSLRA of 1995, is authorized by statute to bring suit on behalf of the whole class even though it may not have purchased every type of security that others in the class hold, as long as a representative plaintiff with standing to sue on each class or subclass can be designated at class certification time. *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. at 122-23 ("[I]n order for a claim to be asserted on behalf of a putative class, only the named plaintiffs-- but not necessarily the lead plaintiff--must have standing"; "It stands to reason that in many cases ... the plaintiff with the largest financial interest [lead plaintiff under PSLRA requirements] may not have standing to sue on all causes of action. There is nothing to suggest that, in those cases, Congress intended that plaintiffs must file an entirely separate class action suit, when in any other context, a subclass would suffice."); and *In re WorldCom Inc. Sec. Litig.*, 2003 WL 21219049, at *27 ("The Underwriter Defendants have not shown there is any legal bar to a lead plaintiff asking other plaintiffs to join a lawsuit as named plaintiffs in order to represent more broadly the interests of the class at the time of the filing of the consolidated class complaint. Long before passage of the PSLRA, it was well established that named plaintiffs may jointly represent the class and it is their claims that determine whether there is standing to bring the claims alleged on behalf of the class."). *See also* footnote 12 of the memorandum and order.

**\*22** Furthermore, there is a split among the Circuits regarding the relationship of the Article III standing requirement and permissive intervention into a class action under Fed.R.Civ.P. 24(b). [FN46] *See generally* Amy M. Gardner, *An Attempt to Intervene in the Confusion: Standing Requirements For Rule 24 Intervenors*, 69 U. Chi. L.Rev. 681 (Spring 2002); [FN47] Tyler R. Stradling and Doyle S. Byers, *Intervening in the Case (Or Controversy): Article III Standing, Rule 24 Intervention, and the Conflict in the Federal Courts*, 2003 B.Y.U.L.Rev. 419 (2003). [FN48] Traditionally only the party initiating a suit was required to have standing, which in turn gave the court jurisdiction over that party's claims/suit. *Ruiz v. Estelle*, 161 F.3d at 839, quoting *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("[A]t an irreducible minimum Art. III requires the party who invokes the court's authority to [show standing]"). The majority of federal appellate courts, including the Fifth Circuit, have concluded that once a court has jurisdiction over subsisting claims and parties, an intervenor without standing may intervene in that suit. For example, the Fifth Circuit in *Ruiz*, 161 F.3d at 830, held that "Article III does not require intervenors to independently possess standing where the intervention is into a subsisting and continuing Article III case or controversy and the ultimate relief sought by the intervenors is also being sought by at least one subsisting party with standing to do so."). Similarly, in *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir.1989), the Eleventh Circuit Court of Appeals concluded that "a party seeking to intervene need not demonstrate that he has standing in addition to meeting the requirements of Rule 24 as long as there exists a justiciable case and controversy between the parties already in the lawsuit."

FN46. Because intervention as of right under Rule 24(a) is not at issue here, the Court does not discuss the distinction under that provision except where necessary to explain

the law relating to permissive intervention.

FN47. Gardner concludes that the federal courts have taken three different approaches to the question whether a permissive intervenor need have standing:

(1) a separate showing of Article III standing is not required for intervention under Rule 24; (2) a separate showing of Article III standing requirements must be made; or (3) an Article III inquiry is not necessary because the Rule 24 requirements actually require a higher threshold than does Article III.

Id. at 684. She places the Fifth (Ruiz v. Estelle, 161 F.3d 814), Eleventh (Chiles v. Thornburgh, 865 F.2d 1197, 1213 (11th Cir.1989)), and Second Circuit Courts of Appeals (United States Postal Serv. v. Brennan, 579 F.2d 188, 190 (2d Cir.1978)), in the first group; the Eighth (Mausolf v. Babbitt, 85 F.3d 1295 (8th Cir.1996) (divided panel)), in the second category; and the Seventh (United States v. 36.96 Acres of Land, 754 F.2d 855, 859 (7th Cir.1985)) in the third classification. Id. at 693-97.

FN48. Stradling and Byers divide court decisions into two groups: (1) those "that do not require intervenors to have Article III standing view standing as a requirement imposed on all federal courts, that is, that at least one party must have standing before the court can maintain jurisdiction [emphasis added]"; and (2) those "that do require intervenors to have Article III standing view standing as a requirement imposed on all parties that come before a federal court [emphasis added]." Id. at 420. In the first category they place five of the eight federal circuits that have addressed the issue: the Fifth in Ruiz; the Second in United States Postal Serv. v. Brennan, 579 F.2d at 190 ("The existence of a case or controversy having been established between the Postal Service and the [couple that ran the mail business], there was no need to impose the standing requirement upon the proposed intervenor."); the Sixth Circuit based on dicta in Associated Builders & Contractors v. Perry, 16 F.3d 688, 689 (6th Cir.1994) ("An intervenor need not have the same standing necessary to initiate a lawsuit in order to intervene in an existing district court where the plaintiff has standing," but the intervenor must have standing to appeal); the Ninth Circuit in Yniguez v. Arizona, 939 F.2d 727, 731 (9th Cir.1991) (intervenor need only satisfy the four criteria (timeliness, interest in subject matter of suit, practical

impairment of intervenor's interest absent intervention, and inadequate representation of intervenor's interest by other parties) for intervention as of right under Rule 24(a)); Chiles v. Thornburgh, 865 F.2d 1214 (party seeking to intervene permissively need only show a timely application and that his claim or defense has a question of law or fact in common with the main action). Only three Circuits have concluded that all parties must meet the Article III standing requirement: Rio Grande Pipeline Co. v. Federal Energy Regulatory Commission, 178 F.3d 533, 538 (D.C.Cir.1999) ("[B]ecause a Rule 24 intervenor seeks to participate on an equal footing with the original parties to the suit he must satisfy the standing requirements imposed on those parties."); Mausolf v. Babbitt, 85 F.3d at 1300 (8th Cir.) ("[A]n Article III case or controversy, once joined by intervenors who lack standing, is--put bluntly--no longer an Article III case or controversy. An Article III case or controversy is one where all parties have standing and a would-be intervenor, because he seeks to participate as a party, must have standing as well"); and United States v. 36 .96 Acres of Land, 754 F.2d at 859 (7th Cir.1985) ( "the interest of a proposed intervenor must be greater than the interest sufficient to satisfy the standing requirement").

The Fifth Circuit has expressly rejected the Eighth Circuit's view in *Mausolf* that intervenors who lack standing destroy a court's jurisdiction over a case and the Seventh Circuit's view that intervenors must have standing because they seek to be on "equal footing" with the original litigants in a case. *Ruiz*, 161 F.3d at 831-32. Instead it concluded that "the better reasoning" is to be found in cases like *Yniguez, Chiles, and United States Postal Service v. Brennan*, which held that Article III does not require intervenors to possess standing because they "recognize that Article III standing serves primarily to guarantee the existence of a 'case' or 'controversy' appropriate for judicial determination" and that Article III does not require each and every party in the case to have such standing." *Id.* at 832. Rather, "[o]nce a valid Article III case-or-controversy is present, the court's jurisdiction vests. The presence of additional parties, although they alone could independently not satisfy Article III's requirements, does not of itself destroy jurisdiction already established." *Id.* Moreover, relevant to the arguments before this Court, in *Ruiz* it was argued that "even if standing is not required of all intervenors, it should be required in this case because [the intervenors] advance arguments not raised by either party ... [and thus] " 'seek to invoke' the district court's jurisdiction in order to decide the merits of their claims." *Id.* at 833. The Fifth Circuit's response rejected the argument: "This use of the term 'invoke' is misplaced. The court's jurisdiction in this case has already been invoked by the original parties. At the very least, there has been a case or controversy since [the plaintiff] filed its motion to terminate and defendants' their opposition, and there continues to be a case or controversy.... Instead [the intervenors] seek only to ask the district court to consider other possible grounds for granting the relief [plaintiff] has already requested." *Id.* [FN49]

> FN49. One commentator has observed,

> In addition, these circuits [following the majority rule that standing is not required of intervenors] support the view that Rule 24 represents a policy choice--how to streamline related issues into a single lawsuit without it becoming unwieldy--rather than a deep constitutional question. In fact, courts often fail to reach the standing-interest conundrum because pragmatic concerns--like the timeliness and inadequacy of representation-- are embodied in other prongs of Rule 24 and provide an easier basis for decisionmaking.

> Juliet Johnson Karastelev, Note, *On the Outside Seeking In: Must Intervenors Demonstrate Standing to Join a Lawsuit*, 52 Duke L.J. 455 (2002). Disagreeing with the minority view that all parties to a suit must have standing, she argues that under such a rule not only intervenors under Rule 24(a), but also "necessary parties joined under the

> identically phrased Rule 19 must also prove standing, or the case implodes, a consequence thus far ignored by both courts and legal commentators." *Id.* at 469.

**\*23** Nevertheless the Fifth Circuit, in concluding that "Article III does not require intervenors to have standing as a matter of constitutional law," nevertheless noted, "Whether intervention under Rule 24 (a)(2) requires such a showing we do not today consider." *Ruiz*, 161 F.3d at 832 n. 26. In the instant case ICERS, like the *Newby* plaintiffs, seeks recissionary money damages under § 12(a) (2) for investment losses caused by material misrepresentations and omissions about Enron's financial condition, on the grounds that the material misrepresentations and omissions made in the selling documents of the Enron-related entities' Foreign Debt Securities during the *Newby* Class Period were the same as those made in Enron-issued securities by many of the same underwriters involved in the *Newby* Ponzi scheme. This Court is bound by the Fifth Circuit's determination that standing is not required for permissive intervention and thus ICERS may intervene as a named plaintiff, if not as a class representative to assert § 12(a)(2) claims on behalf of all Foreign Debt Securities investors, as long as it meets the requirements of Rule 24(b).
C. Standing and Class Representation

The parties have argued, and cite an old Fifth Circuit case holding, *inter alia,* that if a plaintiff initiating a class action has no standing individually to sue on his personal claims, no "case or controversy" arises; therefore the constitutional requirements for standing must be met before the court considers the procedural requirements for class certification, including typicality of claims or commonality of issues, under Fed.R.Civ.P. 23. *Brown v. Sibley,* 650 F.2d 760, 771 (5th Cir.1981). *See also Bertulli v. Independent Ass'n of Continental Pilots,* 242 F.3d 290, 294 (5th Cir.2001) (standing implicates the constitutional power of this Court to entertain this action and is an "inherent prerequisite to the class representation inquiry," including typicality of claims, commonality of issues, and adequacy of representation of a proposed class representative). Once the court determines that a class action presents a constitutional "case or controversy" and the class representative has shown he has threshold individual standing, there is no further constitutional class standing requirement and the plaintiff must merely show compliance with the procedural rule. *In re Prudential Ins. Co. of America Sales Practices Litig.,* 148 F.3d 283, 306-07 (3d Cir.1998), *cert. denied,* 525 U.S. 1114 (1999), *citing Newberg on Class Actions* § 2.05 at 2-29 (3d ed.1992).

The Supreme Court, however, has indicated in several class action cases, *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 92, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), and *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 612, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (where class certification issues are dispositive, it is logical to reach them before Article III issues), that where statutory standing is at issue, as with claims under the federal securities statutes, "class certification issues are ... logically antecedent to Article III concerns, and themselves pertain to statutory standing, which may properly be treated before Article III standing." *Ortiz,* 527 U.S. at 831. *See also James,* 254 F.3d at 562 n. 9 "In cases in which statutory standing is involved, we may address statutory standing before Article III standing. To the extent that ICERS may not be qualified to serve as class representative for investors of those Foreign Debt Securities other than the Marlin Water Trust II notes in an initial public offering from a statutory "seller" under § 12(a)(2), the issue may be viewed as antecedent to and dealt with prior to the constitutional standing issues. [FN50]

> FN50. There is no dispute, however, that ICERS has constitutional standing to sue those entities qualifying as its statutory sellers under § 12(a)(2) relating to its purchases of Marlin Water Trust II notes and, for reasons indicated *supra,* may intervene in the existing class action regardless of whether it has standing to sue underwriters of other Foreign
>
> Debt Securities.

**\*24** Since class certification issues are premature in *Newby* because the Court must first address pending motions to dismiss and the motions to remand to determine which parties and claims remain in the litigation, and because a hearing and a proper record will be necessary to decide certification issues, the Court defers ruling on part of ICERS's motion, i.e., to intervene as a class representative. Nevertheless, to prepare for future resolution of class certification and standing and because ICERS' ability to serve as a class representative directly relates to part of its motion to intervene, the Court sets out relevant law, some of which has not been directly addressed by the parties, and weighs ICERS's potential to serve in such a role. Defendants have challenged ICERS' standing to represent absent investors in other types of Foreign Debt Securities than the Marlin Water Trust II securities that ICERS purchased. After careful review, this Court concludes that under § 12(a)(2), ICERS has standing to and may serve as a class or subclass representative only for Marlin Water Trust II investors.

Under Fed.R.Civ.P. 23(a), the prerequisites for class certification are "(1) numerosity (a class so large that joinder of all members is impracticable), (2) commonality (questions of law or fact common to the class), (3) typicality (named parties' claims or defenses are typical of the class), and (4) adequacy of representation (representative will fairly and adequately protect the interests of the class)." *Mullen v. Treasure Chest Casino, L.L.C.,* 186 F.3d 620, 623 (5th Cir.1999). Plaintiffs must also demonstrate that the class action may proceed under one of the categories of Rule 23(b), in this instance 23(b)(3) (class action is "superior to other available methods for fair and efficient

adjudication of the controversy" and predominance of issues of law and fact common to all members of the class over issues affecting only individual members).

Particularly at issue with respect to ICERS' intervention here are the commonality and typicality elements. The commonality, typicality, and adequacy-of-representation requirements tend to overlap and to merge because they "serve as guideposts for determining whether ... the named clamant and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence." *General Tel. Co. v. Falcon, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); AmchemProds. v. Windsor, 521 U.S. 591, 626 n. 20, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).*

The standard for commonality is not "high," but merely requires that "the resolution of common questions affect all or a substantial number of the class members." *Jenkins v. Raymark Indus., 782 F.2d 468, 472* (5th Cir.1986); *Mullen, 186 F.3d at 625* ("To demonstrate commonality, Plaintiffs must allege that there exist 'questions of law or fact common to the class.' '). Indeed,

All that is required for each class is that there is one common question of law or fact: "The interests and claims of the various plaintiffs need not be identical. Rather the commonality test is met when there is 'at least one issue whose resolution will affect all or a significant number of all putative class members.' ' [*Forbush v. J.C. Penney Co., Inc., 994 F.2d 1101, 1106* (5th Cir.1993) ] (quoting *Stewart v. Winter, 669 F.2d 328, 335* (5th Cir.1982).)) Therefore the fact that some of the Plaintiffs may have different claims or claims that may require some individualized analysis, is not fatal to commonality.

**\*25** *James, 254 F.3d at 570; see also In re Prudential Ins. Co. of America Sales Practices Litig., 148 F.3d at 310.*

A class representative must be a member of the class, possess the same interest, and suffer the same injury as class members. *Schlesinger v. Reservists Comm. To Stop The War, 418 U.S. 208, 216 (1974).* The typicality test also " 'is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *James, 254 F.3d at 571.* Most important here,

"Typicality does not require a complete identity of claims. Rather the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from the same course of conduct and share the same legal theory, factual differences will not defeat typicality."

*Id., quoting* 5 James Wm. Moore et al., *Moore's Federal Practice* ¶ 23.24 [4] (3d ed.2000). *See also Wilmington Firefighters Local 1590 v. City of Wilmington, 109 F.R.D. 89, 93 (D.Del.1985)* ("A representative's claim is typical if it arises from the same event, practice, or conduct that gives rise to the claim of the other class members, and it is based on the same legal theory."); *see also Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 58 (3d Cir.1994)* (" 'Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory [citations omitted]." '); 1 *Newberg on Class Actions* § 3.15, p. 3-78. Typicality thus involves the individual plaintiff's Article III standing to pursue his own personal claim and to raise the legal claims of the class. *Rector v. City and County of Denver, 348 F.3d 935, 949-50* (10th Cir.2003), citing *Wooden v. Bd. of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1287* (11th Cir.2001), and *Sample v. Aldi, Inc., 61 F.3d 544, 551* (7th Cir.1995). Typicality "focuses less on the relative strengths of the named and unnamed plaintiffs' cases than on the similarity of the legal and remedial theories behind their claims." *Jenkins,* 782 F.2d 472. "The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal, 43 F.3d at 57.* Neither commonality nor typicality requires that all putative class members share identical claims. *Id.* at 56.

As for adequacy of representation under Rule 23(a), " '[d]ifferences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." ' *James, 254 F.3d at 571, quoting Mullen, 186 F.3d at 625-26.*

**\*26** In the *Newby* securities fraud class action, some of the questions of law or fact that may be common to the proposed class include whether the class members allege that (1) Defendants violated the same statute(s), (2) Defendants made the same kinds of material misrepresentations or omissions of fact regarding the financial condition of Enron or accounting fraud, (3) Defendants acted knowingly, with severe recklessness, recklessly or negligently in or are strictly liable for (depending

on the relevant statute) making such material misrepresentations or omissions or in concealing Defendants' wrong doing, and (4) the market price of Enron securities and the Enron-related entities' Foreign Debt Securities was artificially inflated due to Defendants' wrongdoing. In addition to Lead Plaintiff's alleging a common scheme to defraud, minimizing the differences in the types of securities purchased by the Foreign Debt investors, ICERS focuses on material misrepresentations and omissions in the Foreign Debt Securities' offering memoranda and selling communications virtually identical to those already upheld as the bases for the Enron-securities investors' claims under the same legal theories by this Court: for example, the Osprey I offering memorandum incorporates Enron's 1998 10-K, Forms 10-Q for quarters ended March 31 and July 30, 2000 and included Enron's consolidated financial information for years ended 1997 and 1998; and the Marlin Water Trust offering memorandum incorporates Enron's 2000 10-K, Form 10-Q for the quarter ended March 31, 2000, Form 8-Ks filed January 31 and February 28, 2001, and includes Enron's consolidated financial information for years ended 1998-2000. # 1804 at 3.

Where there is a prominent thread through all plaintiffs' claims, e.g., a scheme to defraud where the plaintiffs have suffered the same generic type of harm as a result of the same common, wrongful conduct (material misrepresentations and omissions) and have suffered economic damage, some courts have found that the scheme may demonstrate that the claims of the named plaintiffs are typical of the class as a whole. *In re Prudential Ins. Co. of America Sales Practices Litig.*, 148 F.3d at 310-12, *citing Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 159, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). "The various forms which the injuries may take do not negate a finding of typicality, provided the cause of those injuries is some common wrong." *Id.* at 312, *citing Baby Neal*, 43 F.3d at 58, and *Falcon*, 457 U.S. at 157-59 ("Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all injuries are shown to result from the practice."). *In re Prudential Ins. Co. of America Sales Practices Litig.*, 148 F.3d at 312, a class action brought on behalf of more than eight million policy holders alleging that the life insurer employed a common and extensive scheme involving a variety of false and misleading sales and marketing materials to defraud them, the Third Circuit found, "Since all members of the class would need to demonstrate the existence of this scheme, their interests are sufficiently aligned that the class representatives can be expected to adequately pursue the interests of the absentee class members." *Id.*, *citing Amchem*, 117 S.Ct. at 2248 ("Rule 23 asks 'whether a proposed class has sufficient unity so that absent class members can fairly be bound by decisions of class representatives.' "). *See also Longden*, 123 F.R.D. 547 (holding that purported common course of conduct through a uniform distribution of substantially similar private placement memoranda to market real estate limited partnerships met the commonality requirement for class certification despite the fact that the private placement memoranda involved over 100 separate limited partnership transactions over a five-year period).

*27 There is, of course, contrary authority. For example, in *In re Taxable Municipal Bonds Litig.*, No. Civ. A. No. MDL 863, 1993 WL 302619 (E.D.La. Aug.5, 1993), the court pronounced, "It is settled law that a single plaintiff lacks standing to assert class claims against defendants with whom the plaintiff has not dealt, even though unnamed individuals that the plaintiff seeks to represent may have direct claims against those defendants." *Id.* at 3. In *Taxable*, a class action brought by multiple plaintiffs involving eight separate bond issues, the court concluded that a class has standing against multiple defendants as long as every defendant was charged with a claim by at least one named class representative. *Id.* at *4. The court noted,

Plaintiffs contend that there is an "alleged common scheme," ... that ties the eight master complaints together. Nevertheless, it does not appear from the record that plaintiffs are alleging that *all* named defendants, disregarding in which master complaint they are named, acted in concert such that every plaintiff has a direct claim against every defendant.... Rather, plaintiffs are alleging that the "same misrepresentations and omissions taint each of the bond issues," i.e., that the alleged schemes in the master complaints and the claims arising therefrom are very similar.

*Id.* at * n. 17.

Where a representative plaintiff in a class action suit has itself been injured by one or more, but not by all, of named multiple defendants, some courts have recognized an exception to the general rule that each class representative must have a plausible claim against each named defendant in a class or subclass. This exception is frequently designated the "juridical links" doctrine:

There is an exception to [the requirement that representative plaintiffs must have individual standing to assert colorable claims against all members of the defendant class] where the defendant members are related by a concerted scheme, conspiracy, or juridical link, that is some legal relationship which

relates all defendants in a way such single resolution of the dispute is preferred to a multiplicity of similar actions. A juridical link sufficient to confer standing generally must stem from an independent legal relationship. It must be some form of activity or association on the part of the defendants that warrants imposition of joint liability against the group even though the plaintiff may have dealt primarily with a single member. This link may be a conspiracy, partnership, joint enterprise, agreement, contract, or aiding and abetting, which acts to standardize the factual underpinnings of the claims and to insure the assertion of defenses common to the class. [footnotes omitted] 6A *Federal Procedure,* Lawyers Ed. § 12:44 (Database updated Oct. 2003). The doctrine is a powerful tool that can allow a plaintiff's lawyer to force many defendants (and what might otherwise be numerous class actions) into a single lawsuit at a substantially reduced cost. William D. Henderson, *Reconciling the Juridical Links Doctrine with the Federal Rules of Civil Procedure and Article III,* 67 U. Chi. L.Rev. 1347, 1348 (Fall 2000). Originally developed by the Ninth Circuit and initially applied only to governmental-entity defendant classes in bilateral class actions, the doctrine was gradually extended to reach private sector defendants involving individually named defendants joined by a common agreement, uniform practice, or common course of conduct (in securities cases, as alleged here, a common course of misrepresentations and omissions), for purposes of judicial efficiency. Id. at 1355-56, 1359. See, e.g., *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461, 466 (9th Cir.1973) (although a plaintiff may only recover on § 12(2) claims from the defendants that played a substantial role in selling the plaintiff the disputed securities, the panel recognized in dicta an exception where plaintiffs alleged they have been injured as a group by the same course of conduct by defendants in a conspiracy or concerted scheme or "juridically related in a manner that suggests a single resolution of the dispute would be expeditious."); *In re Computer Memories Sec. Litig.,* 111 F.R.D. 675 (N.D.Cal.1986) (applying juridical link exception where representative plaintiff did not have standing to sue all named defendant underwriters under § 12(2) of 1933 Act [FN51] because of limitation of liability to parties who were a substantial factor in causing the securities sale, but also where defendant underwriters had an agreement about the relevant underwriting and were bound to a common course of conduct relating to purposes of common stock offering); *In re Activision Sec. Litig. .,* 621 F.Supp. 415, 432 (N.D.Cal.1985) (finding that a juridical link in underwriters' Agreement); *Fallick v. Nationwide Mut. Ins. Co.,* 162 F.3d 410, 423-24 (6th Cir.1998) ( "Where, as here, the crux of an ERISA plaintiff's complaint concerns the methodology used to determine benefits, courts have recognized that the standing-related provisions of ERISA were not intended to limit a claimant's right to proceed under Rule 23 on behalf of all individuals affected by the challenged conduct regardless fo the representative's lack of participation in all the ERISA-governed plans involved.... [O]nce a potential ERISA class representative establishes his individual standing to sue his own ERISA-governed plan, there is no additional constitutional requirement related to his suitability to represent putative class members of other plans to which he does not belong."), *citing Forbush v. J.C. Penney Co., Inc.,* 994 F.2d 1101, 1106 (5th Cir.1993) (not employing juridical link terminology, but viewing the issue through Rule 23's commonality and typicality requirements for class certification, the majority of the panel reversed the district court's denial of class certification where plaintiff sought to represent members of four separate ERISA plans administered by same employer and challenged employer's general practice of over-estimating social security benefits in violation of ERISA's nonforfeiture provisions); [FN52] *In re Itel Sec. Litig.,* 89 F.R.D. 104, 119 (N.D.Cal.1981) ("In summary then, unless the proponent of the class action can allege a conspiracy or concerted action among the defendants, or unless juridical links exist that make class resolution of a dispute expeditious, class treatment is not proper unless each plaintiff class representative has a cause of action against each defendant, even though the plaintiffs were all injured by a method of dealing common to all defendants.").

FN51. As expressed in *In re Itel Sec. Litig.,* 89 F.R.D. 104, 121, 119 (N.D.Cal.1981), which defined a "juridical link" or "juridical relationship" as "some type of legal relationship which relates all defendants in a way that would make single resolution of a dispute preferable to a multiplicity of similar actions,"

[L]iability under § 12(2) is ordinarily restricted to the immediate seller of the defrauded purchaser. If none of the exceptions to this § 12(2) privity requirement are applicable, i.e., control, agency, aiding and abetting or conspiracy, each plaintiff member would have

a cause of action only against his or her immediate seller.... [U]nless an exception to § 12(2) is alleged or unless an exception recognized by the La Mar court is alleged, i.e., conspiracy or juridical relationship which suggests that class treatment of the underwriters would be expeditious, class certification as to the § 12(2) action would have to be denied pursuant to

La Mar because each plaintiff class representative does not have a § 12(2) cause of action against each defendant underwriter.

89 F.R.D. at 119. The *Itel* court found sufficient juridical links or legal relationships to permit a § 12(2) class of underwriters because these underwriters already comprised a class for § 11 claims based on the same registration statements and prospectuses ("with the same untruths or omissions which are materially misleading") and because class treatment "is clearly the most expedient way in which to try the claims." *Id.* at 121. "otherwise the district courts could conceivably be faced with having to determine this issue over one hundred separate times if the plaintiffs decide to pursue § 12(2) remedies against each 'immediate seller' underwriter." *Id.* at 121-22.

FN52. See also *Alves v. Harvard Pilgrim Health Care, Inc.*, 204 F.Supp.2d 198 (D.Mass.2002), aff'd, 316 F.3d 290 (1st Cir.), addressing a class action brought by former beneficiaries of ERISA health care plans against sponsors and medical services provider alleging that these defendants violated terms of plans and breached fiduciary duties by deciding to increase co-payments in excess of prescription drug costs and by failing to disclose material information and providing misleading information about these costs. The district court held that under *Fallick*,

*Forbush,* and *La Mar,* the plaintiffs' claims could not be dismissed for lack of standing because the defendants were wholly owned affiliate plans of the defendant sponsors in one of which each plaintiffs was a participant and which had substantially the same copayment provisions and for which a single resolution of the dispute would be expeditious. *Id.* at 205.

**\*28** A number of courts have warily admonished that "broad construction of the juridical link exception to *La Mar* obscures the confines of that doctrine." *Angel Music, Inc. v. ABC Sports, Inc.*, 112 F.R.D. 70, 75 (S.D.N.Y.1986) (concluding that the juridical link exception is only applicable where defendants' conduct "is standardized by a common link to an agreement, contract or enforced system which acts to standardize the factual underpinnings of the claims and to insure the assertion of defenses common to the class."); *Leer v. Washington Educ. Assoc.*, 172 F.R.D. 439, 448-49 (W.D.Wash.1997) (following *Angel Music*'s restrictive definition, finding no juridical link among two subclasses of defendants; *Akerman v. Oryx Communications, Inc.*, 609 F.Supp. 363, 376 (S.D.N.Y.1984).
Lead Plaintiff argues strenuously that it, through the intervention of ICERS, must have standing to sue for all investors, including the Foreign Debt Securities investors claims under § 12(a)(2), for pragmatic reasons:
If each of these claimants were separately certified [as a class representative] with its own class action and with lead plaintiff and counsel, this litigation would disintegrate into chaos, resulting in hugely wasteful duplicative activities and increased fees and expenses. It would also greatly increase the burden on the Court to administer and oversee the case and inevitably would delay the recovery ultimately obtained by the victims of this fraud.
# 1853 at 3. In *Ackerman,* the district court, disagreeing with *Itel's* conclusion that class certification of defendant class for § 11 claims was a sufficient juridical link to support class treatment of Section 12(2) claims, and insisting that "a juridical link sufficient to confer standing generally must stem from

an independent legal relationship," 609 F.Supp. at 375, made some incisive comments about bilateral classes and the dangers of the juridical link doctrine:

A defendant class may not be certified simply on the ground that underwriters distributed identical printed matter to securities purchasers. Nor does justice demand a lowering of the justiciability threshold in order to permit vindication of constitutional claims.... Finally as noted with respect to the section 11(e) damages issue, courts must be careful of expanding substantive rights conferred by the securities acts. Certification of a defendant class of underwriters for purposes of section 12(2) claims would effectively eliminate the privity requirement and subject any underwriter to suit by any purchaser.

.... [T]he fundamental requirement [is] that each plaintiff have standing to sue each defendant.... "[A] predicate to a plaintiff's] right to represent a class is his eligibility to sue in his own right. What he may not achieve himself, he may not accomplish as a representative of a class." ... The procedural expedient of plaintiff class certification should not be mistaken for the sort of legal relationship that confers standing on representative to litigate the claims of individual members.... [A] plaintiff "may not use the procedural device of a class action to boot strap himself into standing he lacks under the express terms of the substantive law.... The plaintiff's standing to bring an action against each defendant named in the Complaint must be established independently of Federal Rule of Civil Procedure 23. Only then is a plaintiff in a position to represent others having similar claims against those same defendants." [citations omitted]

**\*29** 609 F.Supp. at 376-77. [FN53]

> FN53. Indeed not only the juridical links doctrine or the "concerted scheme" approach have eroded the express privity requirement of § 12(a)(2), but also the lower courts' judicial expansion of the term "seller" beyond the plaintiff's immediate seller to include others actively soliciting and collaborating in the sale (including brokers, agents of the principal seller) and their application of secondary theories of liability like
>
> aiding and abetting and conspiracy. See, e.g., Patricia A. O'Hara, Erosion of the Privity Requirement in Section 12(2) of the Securities Act of 1933: The Expanded Meaning of Seller, 31 U.C.L.A. 923, 931-33 (June 1984). See discussion infra.

Henderson also critically comments that the case law on juridical links "contains a complex and often incoherent merger of procedural and jurisdictional issues," perhaps because "courts have uncritically relied on stare decisis to justify the doctrine and have incrementally extended it in cases where it might promote judicial economy." 67 U. Chi. L.Rev. at 1366. For instance it has been identified as an exception to both or either the Rule 23(a)(3) requirement of typicality for class certification and/or to Article III standing. Id. at 1361.

In the instant suit, there is no question that, if not barred by limitations, ICERS individually has standing to sue the underwriter that sold ICERS its debt securities under § 12(a)(2) for rescissory damages [FN54] arising from its personal investment in the Marlin Water Trust II debt securities during the Class Period.

> FN54. Section 12(a)(2) allows the prevailing plaintiff-purchaser "to recover the consideration paid [i.e., purchase price] for such security
>
> with interest thereon, less the amount of any income received thereon, upon tender of such security [i.e., to rescind his purchase] or for equivalent monetary damages if he no longer owns the security," unless the seller proves that it did not know, and in the exercise of reasonable care could not have known, of the alleged misstatement or omission in the written or oral communications used to sell the securities. 15 U.S.C. § 77l(a)(2).

Lead Plaintiff has alleged an actual monetary loss by investors arising from their purchase of Foreign

Debt Securities fairly traceable to and caused by the purported material misrepresentations and omissions of their various underwriter(s) Defendants in concealing Enron's actual financial condition that can be redressed by an award of damages in this action. The alleged injuries arise from the same purportedly fraudulent practice or course of conduct of identical material misrepresentations and omissions deceiving the *Newby* plaintiffs. According to ICERS, the offering memoranda of all nine types of Foreign Debt Securities incorporated the same misleading financial documents relied upon by investors in other securities at issue in *Newby*. The Foreign Debt Securities claims are based on the same legal theories and statutory, i.e., § 12(a)(2) violations.

Nevertheless, although *Newby* Lead Plaintiff has alleged a concerted scheme for purposes of its § 10 (b) claims, unlike in the ERISA cases or in the cases involving securities issued by a single corporation cited above, there are more than <u>Article III</u> and <u>Rule 23</u> criteria involved in establishing standing for class representation under § 12(a)(2). In some ways establishing a claim under § 12(a) is substantially easier for a disgruntled, defrauded plaintiff-investor than establishing one under § 10(b) and Rule 10b-5. Section 12(a) does not require a showing of reliance, in deciding to make his purchase, on the alleged misstatements or omissions the plaintiff targets, but only a demonstration that he lacked actual knowledge of them, nor does he have to show scienter. Nevertheless, the statute's privity requirement, not part of § 10(b), limits its imposition of liability.

With respect to the juridical links doctrine, other than the privity between each investor and his immediate seller expressly set out in § 12(a)(2), in this litigation there was no allegation of an agreement, such as one to share expenses or workload or a collective bargaining agreement or a partnership or joint venture among the various Bank Defendant underwriters here that would support a "legal relationship" beyond a plaintiff's privity with an underwriter in his individual purchase of securities. *See, e.g., Endo,* 14 F.R.D. at 172- 73.

***30** More significantly, unlike plaintiffs suing under § 10(b), which does not require privity, despite allegations of a concerted scheme or wrongful course of conduct, the express substantive statutory requirement of § 12(a)(2), that the defendant must be a "seller," [FN55] even under the judicial expansion of the definition of that word, to the plaintiff who sues that defendant, restricts the class of defendants whom or which a particular plaintiff has standing to sue individually and therefore also as a representative for a putative class of Foreign Debt Securities investors. "[A] plaintiff bringing suit under either Section 11 or Section 12 of the Securities Act at least must allege that he or she purchased or acquired the security at issue." *In re Paracelsus Corp. Sec. Litig.,* 6 F.Supp.2d 626, 631 (S.D.Tex.1998). Furthermore, for a claim under § 12(a)(2), which provides for liability against sellers or against parties that actively, directly and "successfully solicited the purchase" of the security in dispute, pursuant to a prospectus, absent an "allegation of direct contact between defendants and plaintiff-purchasers, as a matter of law the defendants are not statutory sellers." *Pinter v. Dahl,* 486 U.S. 622, 647, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988); *In re Azurix Corp. Sec. Litig.,* 198 F.Supp.2d 862, 892 (S.D.Tex.2002), aff'd sub nom. *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 871 (5th Cir.2003).

> FN55. Title 15 U.S.C. § 77l defines the class of defendants subject to liability in part as "Any person ... who offers or sells ... shall be liable ... to the person purchasing such security from him ..."
>
> Section 2(3) defines "sale" or "sell" as including "every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C. § 77b(3). The phrases "offer to sell," "offer for sale," or "offer," refer to "every attempt or offer to dispose of, or solicitation of an offer to buy a security or interest in a security, for value." *Id.* Thus even though a party is not an owner who passes title, he may be liable as a statutory "seller" if he successfully solicits a purchase involving the transfer of securities not gratuitously, but to serve his own financial interests or those of the securities' owner. *Pinter,* 486 U.S. at 647.

As noted previously, the lower courts developed a variety of theories to expand the definition of "seller" for increased liability under § 12 of the 1933 Act. For a time, the Fifth Circuit, using a proximate causation analysis, took a middle road between strict privity's limitation of liability to the

immediate party/owner/vendor in the transaction and the overly liberal approach that all who "participated in" the acts leading up to the sale transaction may be sued. Drawing on the "cause and effect" approach of *Lennerth v. Mendenhall, 234 F.Supp. 59 (N.D.Ohio 1964)*, derived from the law of negligence, for claims under §§ 12(a)(1) and 12(a)(2), the Fifth Circuit utilized a "substantial factor" test from torts. *Pharo v. Smith, 621 F.2d 656, 665-68 & nn. 6-8* (a "seller" is one "whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place."), *on rehearing in part on other grounds, 625 F.2d 1226* (5th Cir.1980). *See generally O'Hara, Erosion of the Privity Requirement,* 31 U.C.L.A. at 961-74.

Nevertheless in *Pinter v. Dahl, 486 U.S. 622, 630, 654, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)*, the United States Supreme Court, although addressing only § 12(1), [FN56] rejected this standard as well as other current theories of primary seller liability as too broad and held, "Being merely a "substantial factor" in causing a sale of unregistered securities is not sufficient in itself to render a defendant liable" as a "seller" under the statute. In "refinement" of that collateral participation test, 486 U.S. at 648, the Supreme Court concluded,

FN56. With respect to seller liability under § 12(2), the Supreme Court in *Pinter v. Dahl, 486 U.S. at 622 n. 20,* noted,

The "offers or sells" and the "purchasing such security from him" language that governs § 12(1) also governs § 12(2), which provides a securities purchaser with a similar rescissionary cause of action for misrepresentation. 15 U.S.C. § 77l. Most courts and commentators have not defined the defendant class differently for purposes of the two provisions. *See, e.g., Pharo v. Smith, 621 F.2d 656, 665-68 and nn. 6-8 (CA5 1980)....* The question whether anyone beyond the transferor of the

title, or immediate vendor, may be deemed a seller for purposes of § 12(1) and § 12(2). Decisions under § 12(2) addressing the "seller" question are thus relevant to the issue presented to us in this case, and, to that extent, we discuss them here. Nevertheless, this case does not present, nor do we take the position on, the scope of a statutory seller for purposes of 12(2).

Since *Pinter* was issued, other Courts of Appeals have held that *Pinter's* interpretation of "seller," i.e., persons who pass title or who "offer" securities, including those who successfully "solicit," applies to § 12(2) liability, too. *See, e.g., Ryder International Corporation v. First American National Bank, 943 F.2d 1521, 1526-27* (11th Cir.1991).

**\*31** There is no support in the statutory language or legislative history for expansion of § 12(1) liability beyond those who pass title and persons who "offer," including those who "solicit" offers. Indeed, § 12's failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that the section impose liability on participants' [*sic* ] collateral to the offer or sale. When Congress wished to create such liability, it had little trouble doing so. *Id.* at 650. [FN57] The high court sanctioned the inclusion of successful solicitation for value as "selling" under the statute; "Had Congress intended liability to be restricted to those who pass title, it could have effectuated its intent by not adding the phrase 'offers or' when it split the definition of 'sell' in § 2(3). *Id.* at 646. Therefore it recognized the established view that a broker acting as an agent of one of the principals to the transaction who successfully solicits a purchase is a "seller" with primary liability who may be sued by the plaintiff purchaser. 486 U.S. at 646-47 ("solicitation of a buyer is perhaps the most critical stage of the selling transaction" and "brokers and other solicitors are well positioned to control the flow of information to the purchaser").

FN57. In examining the role of § 12 in the statutory scheme, the Supreme Court observed,

Section 11 of the Securities Act, 15 U.S.C. § 77k, lends support to the conclusion that Congress did not intend to extend § 12 primary liability to collateral participants in the unlawful securities sales transaction. That section provides an express cause of action for damages to a person acquiring securities pursuant to a registration statement that misstates or omits a material fact. Section 11(a) explicitly enumerates the various categories of persons involved in the registration process who are subject to suit under that section, including many who are participant in the activities leading up to the sale. There are no similar provisions in § 12,

and therefore we may conclude that Congress did not intend such persons to be defendants in § 12 actions.

486 U.S. 650 n.26. The Court also admonished that the substantial participation test

would extend § 12(1) liability to participants only remotely related to the relevant aspects of the sales transaction. Indeed it might expose securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services, to § 12(1) strict liability for rescission. The buyer does not, in any meaningful sense, "purchas[e] the security" from such a person."

*Id.* at 651. The Supreme Court further emphasized that in light of the strict liability imposed on defendants by the statute, the substantial participation test

affords no guidelines for distinguishing between the defendant whose conduct rises to a level of significance sufficient to trigger seller status and the defendant whose conduct is not sufficiently integral to the sale.... None of the courts employing the approach has articulated what measure of participation qualifies a person for seller status, and logically sound limitations would be difficult to develop. As a result decisions are made on an ad hoc basis, offering little predictive value to participants in securities transactions."

*Id.* at 652.

This Court also finds relevant to requiring a plaintiff to restrict its claims to its substantive "seller" defendants is the fact that § 12(a)(2), unlike § 10(b), does not provide for joint and several liability. *Endo*, 147 F.R.D. at 172. Moreover, recovery under the statute is in the nature of rescission, a remedy arising from common law, suggesting it is limited to parties to a transaction/contract or the seller's direct agent. *See* O'Hara, *Erosion of the Privity Requirement*, 31 U.C.L.A. at 938-44 There is clearly dissension in the case law regarding class representation of § 12(a)(2) claims. As discussed, a few courts as a general rule recognize class representation in a securities suit where the class members have asserted a common course of conduct or the same illegal scheme by defendants and purportedly relied on the same material misrepresentation and omissions, including for claims under § 12(a)(2), even though the class representative and the class members have purchased different types of securities. This Court believes that such a common-course-of-conduct rule is properly applied in claims under § 10(b), [FN58] for which Rule 10b-5 makes it "unlawful for any person, directly or indirectly, ... [t]o employ any ... scheme ... to defraud ... or [t]o engage in any ... practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security," but not to claims under § 12(a)(2). 17 C.F.R. § 240.10b-5. The Court observes that with respect to § 12(a)(2), other courts have focused on the specific statutory restriction of § 12(a)(2), limiting a plaintiff's standing to sue to only the party from

which the plaintiff purchased the securities at issue or which successfully solicited the plaintiff's purchase, and they have found it to be a substantial obstacle to suit and class representation. *Azurix, 198 F.Supp.2d at 892* ("For potential § 12(a)(2) liability to exist, defendants must have passed title to plaintiffs as a 'direct seller' (such as an underwriter) or solicited the transaction in which title passed to them.... Absent any allegation of direct contact of any kind between defendants and plaintiff purchasers, as a matter of law the defendants are not statutory sellers."), *aff'd, 332 F.3d at 871* ("Liability does not extend to ... 'collateral participants.' ") The Court agrees with this construction.

> FN58. As well as for derivative claims under § 20 and § 20A.

**\*32** A named plaintiff must have standing to serve as a class representative. *In re Taxable Munic. Bond Sec. Litig., 51 F.3d 518, 522* (5th Cir.1995) ("It is well-established that to have standing to sue as a class representative it is essential that a plaintiff must be part of that class...."); *In re Initial Pub. Offering Sec. Litig., 214 F.R.D. at 122.* It is undisputed that ICERS, personally, has standing under § 12(a)(2) to assert claims against its own statutory seller(s) for its purchases of the Marlin Water Trust II securities. It would also have standing to represent purchasers of the same notes in the same offering from the same broker.

Thus because of the statutory privity/seller restriction, this Court concludes that as a matter of law while ICERS may intervene as a named plaintiff, under § 12(a)(2) ICERS, individually, can only sue, and therefore can only serve as a class representative for other purchasers for claims against, the entities that successfully sold to ICERS, or successfully solicited ICERS' purchase of, the Marlin Water Trust II notes in the July 12, 2001 offering. ICERS is not qualified to serve as a class representative for purchasers of the other eight types of Foreign Debt Securities in other offerings from other statutory sellers for claims under § 12(a)(2). Judicial economy and pragmatic concerns, underlying the juridical links doctrine and the concerted scheme theory, cannot manufacture standing for a class representative where the statutory language and the provision's role in the statute's structure expressly and impliedly mandate satisfaction of the substantive seller requirement.

Whether a class or subclass relating to § 12(a)(2) claims by purchasers in the other eight offerings of Foreign Debt Securities may be certified in this litigation will depend upon whether any eligible and willing class members, who have purchased any of each of the other eight types of securities, move to intervene and to be named a class representative.

D. Permissive Intervention under Fed.R.Civ.P. 24(b)(2)

As noted previously, Rule 24(b)(2), relating to permissive intervention, provides in relevant part, "Upon timely application any one may be permitted to intervene in an action ... when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *See also League of United Latin American Citizens, Council No. 4434 v. Clements, 884 F.2d 185, 189* (5th Cir.1989) (the court has discretion to grant a motion for permissive intervention where (1) timely application is made by the intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) intervention will not unduly delay or prejudice adjudication of the rights of the existing parties.). The "principal consideration" in a court's exercise of discretion under Rule 24(b) is " 'whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." ' C Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 1913, at 379 (West 1986). [FN59]

> FN59. This Court points out that the issue of timeliness of the filing of the motion to intervene is distinct from, and must be analyzed separately from, the question of timeliness relating to assertion of claims within the statute of limitations.

**\*33** In *Stallworth v. Monsanto Co., 558 F.2d 257, 263* (5th Cir.1977), the Fifth Circuit concluded that a motion for leave to intervene under Rule 24(a) (intervention by right) or (b) (permissive intervention) must be timely, [FN60] a determination committed to the Court's discretion. "[T]imeliness is not limited to chronological considerations, but 'is to be determined from all the

circumstances." ' *Id., citing United States v. United States Steel Corp.,* 548 F.2d 1232, 1235 (5th Cir.1977). The court must consider four factors in reviewing the timeliness of a motion for leave to intervene under Rule 23:(1) the length of time during which the would-be intervenors actually knew or should have known of their interest in the case before they filed their motion to intervene; [FN61] (2) the degree of prejudice that existing parties would suffer as a result of the would-be intervenors' failure to intervene as soon as they actually knew or reasonably should have known of their interest in the case; [FN62] (3) the degree of prejudice that the applicant-intervenors would suffer if their motion to intervene were denied; and (4) any unusual circumstances that would weigh for or against a determination that the motion was timely, i.e., a convincing justification for tardiness. *Id.* at 264-66.

      FN60. The Fifth Circuit earlier stated,

      "Timeliness" is not a word of exactitude or of precisely measurable dimensions. The requirement of timeliness must have accommodating flexibility toward both the court and the litigants if it is to be successfully employed to regulate intervention in the interest of justice.

      *McDonald v. E.J. Lavino Co.,* 430 F.3d 1065, 1074 (5th Cir.1970).

      FN61. Knowledge of the pendency of the litigation is not sufficient by itself to require immediate motion to intervene; "scarce judicial resources would be squandered, and the litigation costs of the parties would be increased" if such were the rule, causing premature filing, while "many individuals who excusably failed to appreciate the significance of a suit at the time it was filed would be barred from intervening to protect their interests when its importance became apparent to them later on." *Stallworth,* 558 F.2d at 265. Rather than the date when the would-be intervenor became aware of the litigation, the relevant circumstance would be when it became aware that its interest would no longer be adequately protected by the parties. *Legal Aid Soc. of Alameda Co. v. Dunlop,* 618

      F.2d 48, 50 (9th Cir.1980).

      FN62. The Fifth Circuit observed, "[T]he relevant issue is not how much prejudice would result from allowing intervention, but rather how much prejudice would result from the would-be intervenor's failure to request intervention as soon as he knew or should have known of his interest in the case." *Stallworth,* 558 F.3d at 267.

Furthermore a two-step analysis is applied to determine whether permissive intervention under Rule 24(b)(2) should be granted: (1) the court must determine whether "the applicant's claim or defense and the main action have a question of law or fact in common"; (2) if they do have a question of law or fact in common, the court must decide in its discretion whether the intervention should be allowed. *Id.* at 269.
Generally courts "appear to be particularly amenable to permissive intervention when no additional issues are presented to the case, when the intervenor's claims are 'virtually identical' to class claims, and when intervention would strengthen the adequacy of class representation." 3 Herbert Newberg & Alba Conta, *Newberg on Class Actions* §§ 16.08-.09 (3d ed.1992). Indeed, unlike Rule 24(a), intervention as of right, which allows a party to intervene only where its interests are not adequately

represented by current parties, Rule 24(b) contains no such restriction. *In re Lutheran Broth. Variable Ins. Products Co. Sales Practices Litig.*, No. 99-MD-1309 (PAM), 2002 WL 31371945, *4 (D.Minn. Oct.7, 2002) ("Intervention under Rule 24(b) is allowable in the context of class action to enhance or strengthen the representation of the class").

The Fifth Circuit Court of Appeals has approved the addition of plaintiffs to better represent potential subclasses where the named plaintiffs were not inadequate representatives. *Vuyanich*, 82 F.R.D. at 437, citing *Oatis v. Crown Zellerbach*, 398 F.2d 496 (5th Cir.1968). It stated that this principle should be applied to allow permissive intervention to make the class "representation even stronger and to protect the class members most completely." *Id.* The Fifth Circuit also pointed out that it has "extended the Oatis rule, which technically applied only to co-plaintiffs, to intervenors in Title VII cases." *Id.*, citing *Wheeler v. American Home Products Corp.*, 563 F.2d 1233 (5th Cir.1977); *Olivares v. Martin*, 555 F.2d 1192 (5th Cir.1977).

**\*34** With respect to the issue of timeliness of the motion to intervene, specifically the length of time during which ICERS actually knew or should have know of its interest in the case prior to filing it motion to intervene, as has been noted, there have been three *Newby* complaints filed: (1) the original on October 20, 2001; (2) the First Consolidated Complaint, filed on April 8, 2002,; and (3) the First Amended Consolidated Complaint on May 14, 2003. In the Court's eyes, the "operative" *Newby* complaint is the second, i.e., the First Consolidated Complaint, which was filed after the appointment of Lead Plaintiff and Lead Counsel and was the first intended to represent the entire class. Only in the subsequent, First Amended Consolidated Complaint, did Lead Plaintiff define the class specifically to include securities issued by Enron-related entities as well as by Enron, but securities that plaintiff-investors purchased, like investors in Enron-issued securities, based on the same allegedly false and misleading representations and omissions by Defendants about Enron's financial condition. Moreover the role of these Enron-related-entity issuers in the alleged *Ponzi* scheme was discussed in the First Consolidated Complaint.

Moreover, a major reason for any "delay" between the two consolidated complaints rests with the Court, which had numerous complex motions to dismiss to resolve and which ordered Lead Plaintiff not to amend piecemeal, but to wait until the Court had ruled on all parties' motions to file the amended pleading. With respect to the third, now superseding, *Newby* complaint, after ruling on the first round of all Defendants' motions to dismiss the second complaint, not until an order (# 1347) entered on April 24, 2003 did the Court order Lead Plaintiff within twenty days to amend or supplement to cure pleading deficiencies identified by the Court in various memoranda and orders. On April 25, 2003 Lead Plaintiff filed a motion for leave to file its first consolidated amended complaint, enlarging the time until June 16, 2003 (# 1351); in that motion Lead Plaintiff indicated that it was considering adding new parties. Given the volume of the second complaint and the implied request for an extension of time to draft the next, the Court did not expect a copy of the proposed amended pleading to be attached, as required by the Local Rules. Nevertheless, to give the parties enough information to be able to contest the motion for leave to amend, in an order entered on May 2, 2003 the Court ordered Lead Plaintiff to file "a brief but adequately informative summary of the parties Lead Plaintiff wishe[d] to add and the claims it wishe[d] to assert against them." # 1364 at 2. Instead, however, Lead Plaintiff submitted its amended complaint (# 1388) by the original due date, May 14, 2003, without technically obtaining leave, as was required because numerous answers had been filed by Defendants, [FN63] to add *inter alia* the Foreign Debt Securities claims and plaintiffs, which were beyond the scope of the Court's order. Nevertheless, the addition of these Foreign Debt Securities plaintiffs and defendants was effected before the docket control schedule's deadline for adding parties. Furthermore, the Court subsequently granted the motion for leave to amend on June 5, 2003 (# 1469), thus retroactively approving the filing. Moreover, the only objection to the motion for leave to amend was submitted by Deutsche Bank AG and its affiliates and subsidiaries (# 1436), in essence complaining that it had been renamed in the third complaint after being dismissed by the Court for claims against it in the second. Deutsche Bank AG also stated its intentions to file a motion to dismiss that would brief the objections that it had to the new pleading, as it has subsequently done. The Court will give that motion due consideration. Thus there was no substantial showing of prejudice by Defendants with respect to the filing of the 2003 amendment.

FN63. Under Fed.R.Civ.P. 15(a), once a response to a complaint has been filed, amendment of a pleading must be by leave of court. *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 595, 597 (5th Cir.1981). The rule limits the court's discretion by "directing that leave to amend 'shall be given freely when justice so requires,' " reflecting "a bias in

favor of granting leave to amend." *Id.* "The policy of federal rules is to permit liberal amendment to facilitate determination of claims on the merits and to prevent litigation from becoming a technical exercise in the fine points of pleading." *Id.* at 598. Reasons substantial enough to justify denial of leave to amend "include undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, and undue prejudice to the opposing party." *Id.* If such reasons exist, the court may also consider any prejudice that might

arise because of a denial of leave to amend. *Id.* It may also consider judicial economy and the most efficient means to resolve the merits of the suit. *Id.*

Here there was no undue delay by or dilatory motive by Lead Plaintiff; the substantial time required by the Court to resolve numerous complex motions to dismiss was largely responsible for time between the First Consolidated Complaint and the First Amended Consolidated complaint. "[M]ere passage of time need not result in refusal of leave to amend; on the contrary it is only undue delay that forecloses amendment." *Id.* Nor has there been anything but an indirect and conclusory allegation of bad faith, i.e., that Lead Plaintiff seeks "to improperly gain control of a completely separate and distinct class action ... and to collect any fees that might flow from such a recovery." Instead the Court finds Lead Plaintiff's aim is to serve judicial economy by adding additional factual allegations closely related to those made previously, as exposing an added facet of the alleged Ponzi scheme, and to cure pleading deficiencies cited by the Court. The Court finds no substantial prejudice from allowing the amendment because Defendants have had adequate notice of the challenged occurrences, which are part and parcel of the *Newby* scheme involving the identical conduct, the other parties have raised their objections to contents of the new pleading in responses to the motion to intervene and motions to dismiss the

latest complaint, the Court will give full consideration to such objections as statute of limitations and futility. Thus in the event there is any question, the Court reaffirms its decision granting the motion for leave to amend.

**\*35** Furthermore, the Court also granted the motion for leave to amend because the factual bases of the claims of this new group of investors are very similar to and have much in common those of the *Newby* Enron securities investors, minimizing any surprise or prejudice to Defendants. Moreover, the Enron-related entities that issued the Foreign Debt Securities were described in some detail in the earlier pleadings as the means by which Defendants effected the fraudulent Ponzi scheme. Thus Defendants were not totally without notice. Furthermore, as noted with respect to limitations issues, discovery of the alleged wrongdoing outside of Enron was more difficult and less obvious to a reasonable investor. *Levitt v. Bear Stearns,* 340 F.3d at 103-04. Recognizing the greater difficulty in discovering facts relating to secondary actors' roles, *inter alia* the Circuit Court found that not only had the district court failed to determine whether the factual allegations were sufficient to state a claim against secondary actor Bear Stearns for primary liability under § 10(b), but also whether "a reasonable investor of ordinary intelligence exercising reasonable diligence should have discover sufficient facts to support filing a securities fraud claim against Bear Stearns ... at least one year prior to the filing of the Plaintiff's complaint. *Id.* at 104. Therefore, "discovery should have been permitted on the question of what information was realistically available to Plaintiffs and when it was available." *Id.* Nor should Plaintiff be penalized or prejudiced for following the Court's orders to wait until it resolved all motions to dismiss before filing an amended pleading. In view of the fact that in the instant case Lead Plaintiff was following court orders to defer amendment until the Court had resolved all the motions to dismiss and ultimately to file an amended complaint by May 14, 2003 (# 1347), the Court finds that there was no undue delay or dilatory motive here.
Moreover, it was merely a matter of three months between the filing of the First Amended Consolidated Complaint and the motion to intervene, and only a few weeks between the hearing at

which counsel conferred about the standing issue and ICERS' motion. For these reasons also the Court finds that the motion was not untimely and that Defendants have not suffered substantial prejudice.

In addition, the Court concurs with Movant that participation by ICERS would serve to protect the class better by bolstering class representation. No class has yet been certified, there is an existing suit into which the intervenor can be admitted, and there is legal authority supporting this Court's discretionary right to permit such intervention.

Furthermore, the Court agrees with Movant that key legal issues in the two suits are virtually identical or significantly related and that there is clearly overlap on factual matters, although the particular securities purchased by investor/plaintiffs differ. Indeed, as noted, although investors in the Enron-related entities that issued the Foreign Debt Securities were not expressly included in the class in the original *Newby* complaint, those entities themselves were identified and described in the previous complaints as SPEs and partnerships illicitly created and exploited in transactions as part of the Ponzi scheme to provide Defendants with notice of their inclusion in the alleged fraud.

*36 In addition, as ICERS has highlighted, at the time the motion to intervene was filed, discovery in *Newby* had barely begun, and Movant's attorney was already involved in the litigation as counsel for *Newby* Lead Plaintiff. Movant has also adopted the *Newby* complaint, further demonstrating a lack of prejudice to existing parties because the parties have all had notice of the nature of the claims. Conseco has not made any convincing arguments that it is unduly prejudiced by the intervention or that the intervention would substantially delay this litigation. This Court can certify two class actions, and Conseco's independent class action can still go forward if it properly states a claim and if putative class members choose to join it. The purchasers of the Foreign Debt Securities are within the controlling *Newby* complaint's definition of the alleged victims of the same pattern of misconduct, the same fraudulent scheme charged in *Newby*, even though Conseco chose to limit its independent class action claims to those against Citigroup and its subsidiaries. Indeed, the purchasers of the Foreign Debt Securities may have viable claims against the Enron Defendants, Arthur Andersen, etc. for material misrepresentations and omissions under the same statutes and should be be offered the opportunity to pursue them as members of the *Newby* class. Putative class members should have the right to determine which suit and class they will join if their claims in both actions survive and classes are certified. Lead Plaintiff has not "improperly gained control of a completely separate and distinct class action." Surely the question of Conseco's attorney's fees should not be the determinative factor regarding which claims class members may bring.

The Court has carefully considered all the circumstances of the requested intervention and finds that ICERS' motion to intervene is timely, made within a reasonable time of discovery of the underwriters alleged statutory violations and within a reasonable period after Movant learned of possible problems in standing for a potential subclass[es] of Foreign Debt Securities investors that ICERS seeks to represent.

Accordingly, for the reasons stated above, the Court ORDERS that ICERS' motion to intervene as a named plaintiff is GRANTED, but, at this time ICERS' motion to intervene as a class representative is DENIED as premature, but without prejudice to its being reurged at the appropriate time since it would require the Court to define a potential class or subclass of Marlin Water Trust II investors. That decision will be made when the Court addresses class certification and determines what classes and/or subclasses shall go forward. The Court further ORDERS that Conseco is granted leave to refile its motion for appointment as Lead Plaintiff in H-03-2240, since it was filed timely in H-03-860 (# 51). [FN64]

> FN64. H-03-2240 was severed from H-03-860, and H-03-860 was subsequently settled. See footnote 4 of this memorandum and order.

S.D.Tex.,2004.
In re Enron Corp. Securities, Derivative & Erisa Litigation
2004 WL 405886 (S.D.Tex.)

### Motions, Pleadings and Filings (Back to top)

• 2005 WL 81178 (Trial Motion, Memorandum and Affidavit) Motion for Preliminary Approval of

Proposed Partial Settlement with the Outside Directors and Harrison and Memorandum in Support Thereof (Jan. 12, 2005)
• 2004 WL 3106447 (Trial Motion, Memorandum and Affidavit) Motion for Stay and Protective Order; and Memorandum in Support of Motion (Dec. 30, 2004)
• 2004 WL 2773053 (Trial Motion, Memorandum and Affidavit) Arthur Andersen LLP's and Andersen Individuals' Opposition to Lead Plaintiff's Motion to Compel (Nov. 24, 2004)
• 2004 WL 2656735 (Trial Motion, Memorandum and Affidavit) Kenneth L. Lay's Motion to Dismiss Third-Party Interpleader Counterclaim and Former Outside Directors' "Counterclaim," for Lack of Jurisdiction (Nov. 12, 2004)
• 2004 WL 2803998 (Trial Motion, Memorandum and Affidavit) Defendant Jeffrey K. Skilling's Motion to Dismiss or, in the Alternative, Stay the Interpleader Counterclaim and to Compel Arbitration (Nov. 12, 2004)
• 2004 WL 2773057 (Trial Motion, Memorandum and Affidavit) Lead Plaintiff's Motion to Compel (1) Andersen and the Individual Andersen Defendants' Good Faith Responses to Interrogatory No. 1 of Plaintiffs' First Set of Interrogatories and (2) Production of Andersen Deponents' Separation/Severance Agreements i n Response to Plaintiffs' Subpoenas (Nov. 03, 2004)
• 2004 WL 2495138 (Trial Motion, Memorandum and Affidavit) The Excess Insurers' Joint Response to Certain Insureds Oppositions to Application for Preliminary Injunctions and Motion to Dismiss or Stay Interpleader Based on Subject Matter Jurisdiction and Arbitration Provisions (Nov. 02, 2004)
• 2004 WL 2495139 (Trial Motion, Memorandum and Affidavit) Former Outside Directors' Brief in Support of Application for Preliminary Injunction Against All Persons Named as Party Defendants in the Interpleader Action (Nov. 02, 2004)
• 2004 WL 2495135 (Trial Motion, Memorandum and Affidavit) Original Answer to D&O Insurers' First Amended Action in Interpleader and Counterclaim for Declaratory Judgment (Nov. 01, 2004)
• 2004 WL 2495137 (Trial Motion, Memorandum and Affidavit) Third-Party Counterclaim Defendants Shelby, Yeager, Howard and Krautz's Opposition to Motion for Preliminary Injunction, Motion to Dismiss or Stay Interpleader, and Motion to Compel Arbitration, and Memorandum in Support (Oct. 27, 2004)
• 2004 WL 2386758 (Trial Motion, Memorandum and Affidavit) Application for Temporary Restraining Order Against Defendant Ken L. Harrison and Application for Preliminary Injunction Against All Persons Named as Party Defendants in the Interpleader Action (Oct. 22, 2004)
• 2004 WL 2386757 (Trial Pleading) Insurers' Answer to First Amended Third-Party Complaint for Contract Enforcement and Injunctive Relief Regarding D&O Policy Proceeds and Third-Party Counterclaim for Interpleader (Oct. 21, 2004)
• 2004 WL 2386756 (Trial Pleading) First Amended Third-Party Complaint for Contract Enforcement and Injunctive Relief Regarding D & O Policy Proceeds (Oct. 18, 2004)
• 2004 WL 2724790 (Trial Motion, Memorandum and Affidavit) Fitch, Inc.'s Reply Memorandum of Law in Support of Motion to Dismiss (Oct. 12, 2004)
• 2004 WL 2724794 (Trial Motion, Memorandum and Affidavit) Defendant Moody's Investors Service, Inc.'s Reply Memorandum in Further Support of Its Motion to Dismiss the Amended Complaint of Plaintiff al Rajhi Investment Corporation (Aric) BV (Oct. 12, 2004)
• 2004 WL 2724796 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law of Standard & Poor's Credit Market Services, a Division of the McGraw-Hill Companies, Inc. in Support of its Motion to Dismiss the Claims Asserted Against it in the Complaint of Plaintiff Aric, BV (Oct. 12, 2004)
• 2004 WL 2724786 (Trial Motion, Memorandum and Affidavit) Plaintiff's Consolidated Memorandum in Opposition to Fitch, Inc., Standard & Poor's Credit Market Services, and Moody's Investors Service, Inc.'s Motion to Dismiss (Sep. 16, 2004)
• 2004 WL 1800690 (Trial Motion, Memorandum and Affidavit) Lead Plaintiff's Opposition to Merrill Lynch's Notice of Supplemental Authority in Opposition to Lead Plaintiff's Amended Motion for Class Certification Docket # 2286 (Aug. 09, 2004)
• 2004 WL 1800691 (Trial Motion, Memorandum and Affidavit) Merrill Lynch's Notice of Supplemental Authority in Opposition to Lead Plaintiff's Amended Motion for Class Certification (Jul. 16, 2004)
• 2004 WL 1585857 (Trial Motion, Memorandum and Affidavit) Third-Party Blockbuster Inc.'s Response to Certain Officer Defendants' Motion to Compel Third-Party Blockbuster, Inc. to Respond to Subpoena Duces Tecum (Jul. 02, 2004)
• 2004 WL 1237497 () (May. 20, 2004)
• 2004 WL 1145864 (Trial Motion, Memorandum and Affidavit) Motion of Certain Officer Defendants to

Compel Third-Party Blockbuster, Inc. to Respond to Subpoena Duces Tecum (May. 07, 2004)
• 2004 WL 1778361 (Trial Motion, Memorandum and Affidavit) Motion of Certain Officer Defendants to Compel Third-Party Blockbuster, Inc. to Respond to Subpoena Duces Tecum (May. 07, 2004)
• 2004 WL 1432115 (Trial Pleading) Answer of Defendant Bank of America Corporation to the First Amended Consolidated Complaint and Cross-Complaint of Bank of America Corporation Against Arthur Andersen LLP (May. 06, 2004)
• 2004 WL 1432117 (Trial Pleading) Answer of Defendant Banc of America Securities LLC to the First Amended Consolidated Complaint and First Amended Cross-Complaint of Banc of America Securities LLC Against Arthur Andersen LLP (May. 06, 2004)
• 2004 WL 1432114 (Trial Pleading) Barclays PLC's, Barclays Bank PLC's and Barclays Capital Inc.'s Answer to the First Amended Consolidated Complaint (May. 05, 2004)
• 2004 WL 1432138 (Trial Pleading) Answer of Defendants Citigroup Inc., Citibank, N.A., Citigroup Global Markets Inc. and Citigroup Global Markets International Limited to First Amended Consolidated Complaint for Violation of Securities Laws (May. 05, 2004)
• 2004 WL 1103364 (Trial Pleading) Answer and Counterclaim of Defendants Citibank, N.A., Citigroup Inc., and Citigroup Global Markets Inc. (May. 03, 2004)
• 2004 WL 1103365 (Trial Pleading) Answer of Defendants JPMorgan Chase Bank, J.P. Morgan Chase & Co. and J.P. Morgan Securities, Inc. to the Third Amended Complaint, and Counterclaims of JPMorgan Chase Bank against Plaintiffs (May. 03, 2004)
• 2004 WL 1145862 (Trial Motion, Memorandum and Affidavit) CIBC's Opposition to Lead Plaintiff's Motion to Compel Deemed Admissions by Defendant CIBC (May. 03, 2004)
• 2004 WL 1432136 (Trial Pleading) Answer and Affirmative Defenses of the CIBC Defendants (May. 03, 2004)
• 2004 WL 764658 (Trial Motion, Memorandum and Affidavit) Supplemental Memorandum of Defendants Bank of America Corporation and Banc of America Securities LLC in Further Support of Their Motion to Dismiss the First Amended Consolidated Complaint (Apr. 01, 2004)
• 2004 WL 764662 (Trial Order) Order Re Citigroup Defendants' Motion to Dismiss (Apr. 01, 2004)
• 2004 WL 764660 (Trial Order) Order Re Barclays Defendants' Motion to Dismiss (Mar. 31, 2004)
• 2004 WL 764663 () (Mar. 31, 2004)
• 2004 WL 764664 () (Mar. 31, 2004)
• 2004 WL 764665 (Trial Order) Order Re Lehman Defendants' Motion to Dismiss (Mar. 31, 2004)
• 2004 WL 764657 (Trial Motion, Memorandum and Affidavit) The Bank Defendants' Second Notice of Supplemental Authority in Support of Their Motions to Dismiss the First Amended Consolidated Complaint (Mar. 30, 2004)
• 2004 WL 876072 (Trial Motion, Memorandum and Affidavit) Lead Plaintiff's Opposition to Motion to Dismiss Filed by Defendants the Royal Bank of Scotland Group PLC, the Royal Bank of Scotland PLC, National Westminster Bank PLC, Greenwich Natwest Structured Finance, Inc., Greenwich Natwest Ltd. and Campsie, Ltd. (Mar. 18, 2004)
• 2004 WL 613091 (Trial Motion, Memorandum and Affidavit) Order on Motions to Compel the Banks to Produce the Sworn Statements and Deposition Transcripts of Their Employees (Mar. 16, 2004)
• 2004 WL 876110 (Trial Order) Order (Mar. 10, 2004)
• 2004 WL 876074 (Trial Motion, Memorandum and Affidavit) Defendant Kenneth L. Lay's Reply in Support of Discovery of Examiner Transcripts (Feb. 25, 2004)
• 2004 WL 876075 (Trial Motion, Memorandum and Affidavit) Outside Directors' Reply Brief in Support of Regents' Motion to Compel Production of Examiner Transcripts (Feb. 25, 2004)
• 2004 WL 876076 (Trial Motion, Memorandum and Affidavit) Outside Directors' Reply Brief in Support of Regents' Motion to Compel Production of Examiner Transcripts (Feb. 25, 2004)
• 2004 WL 481756 (Trial Motion, Memorandum and Affidavit) Defendant Vinson & Elkins L.L.P.'s Memorandum Concerning Discovery of Examiner Transcripts (Feb. 20, 2004)
• 2004 WL 368794 (Trial Motion, Memorandum and Affidavit) Lead Plaintiff's Motion to Compel Production of Documents from Defendant Citigroup, Inc. (Feb. 11, 2004)
• 2004 WL 305814 (Trial Motion, Memorandum and Affidavit) Defendant Kenneth L. Lay's Memorandum Concerning Discovery of Examiner Transcripts (Feb. 05, 2004)
• 2004 WL 305819 (Trial Order) Order (Feb. 04, 2004)
• 2004 WL 305811 (Trial Motion, Memorandum and Affidavit) Motion to Dismiss and Memorandum in Support Thereof of Defendants: the Royal Bank of Scotland Group PLC, the Royal Bank of Scotland PLC, National Westminster Bank PLC, Greenwich Natwest Structured Finance, Inc., Greenwich Natwest Ltd., and Campsie, L td. (Feb. 03, 2004)

• 2004 WL 305812 (Trial Motion, Memorandum and Affidavit) Outside Directors' Memorandum Concerning Discovery of Examiner Transcripts (Feb. 02, 2004)

• 2004 WL 305810 (Trial Motion, Memorandum and Affidavit) Unopposed Motion of Defendants Lehman Brothers Holdings Inc. and Lehman Brothers Inc. to Dismiss the Section 10(b) and Section 20 (a) Claims Against Them in the First Amended Consolidated Complaint (Jan. 28, 2004)

• 2004 WL 305830 (Trial Pleading) Lead Plaintiff's Notice of Withdrawal of Opposition to Lehman Brothers Holdings Inc.'s and Lehman Brothers Inc.'s Motion to Dismiss §10(b) Claim (Jan. 27, 2004)

• 2004 WL 353910 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Defendant Goldman, Sachs & Co. in Further Support of its Motion for Clarification and Reconsideration of the Court's December 10, 2003 Memorandum and Order and in Opposition to Plaintiffs' Cross-Motion for Clarification (Jan. 21, 2004)

• 2004 WL 489105 (Trial Motion, Memorandum and Affidavit) Reply of Certain Office Defendants in Support of their Motion to Compel Deutsche Bank Entities (Jan. 21, 2004)

• 2004 WL 353913 (Trial Motion, Memorandum and Affidavit) Certain Defendants' Reply in Further Support of Their Motion for an Order Clarifying the Court's December 10, 2003 Memorandum and Order and Opposition to the Silvercreek Plaintiffs' Cross-Motion for Clarification (Jan. 15, 2004)

• 2004 WL 353911 (Trial Motion, Memorandum and Affidavit) Silvercreek Plaintiffs' Opposition to Defendants' Motions for Clarification and/or Reconsideration of the Court's December 10, 2003 Memorandum and Order and Cross-Motion for Clarification (Jan. 13, 2004)

• 2003 WL 23305553 (Trial Motion, Memorandum and Affidavit) Opposed Motion of Certain Defendants for an Order Clarifying the Court's December 10, 2003 Memorandum and Order (Dec. 24, 2003)

• 2003 WL 23305557 (Trial Motion, Memorandum and Affidavit) Opposed Motion of Defendant Goldman, Sachs & Co. for Clarification and Reconsideration of the Court's December 10, 2003 Memorandum and Order (Dec. 24, 2003)

• 2003 WL 23119774 (Trial Motion, Memorandum and Affidavit) Plaintiffs%7D Response to the Deutsche Bank Entities%7D Notice of Supplemental Authority in Support of Their Motion to Dismiss the First Amended Consolidated Complaint (Dec. 11, 2003)

• 2003 WL 23305555 (Trial Motion, Memorandum and Affidavit) Memorandum and Order of Partial Dismissal (Dec. 11, 2003)

• 2003 WL 23119771 (Trial Motion, Memorandum and Affidavit) Defendants the Deutsche Bank Entities%7D Notice of Supplemental Authority in Support of Their Motion to Dismiss the First Amended Consolidated Complaint (Dec. 09, 2003)

• 2003 WL 23194565 (Trial Motion, Memorandum and Affidavit) Financial Institutions' Supplemental Filing in Opposition to Lead Plaintiff's Motion to Compel Banks to Produce the Transcripts of the Sworn Statements of their Current and Former Employees (Dec. 09, 2003)

• 2003 WL 23119768 (Trial Motion, Memorandum and Affidavit) Opposition of the Deutsche Bank Entities to Certain Officer Defendants%7D Motion to Compel Deutsche Bank Entities to Respond to Request for Production (Dec. 08, 2003)

• 2003 WL 23119764 (Trial Motion, Memorandum and Affidavit) The Bank Defendants%7D Corrected Notice of Supplemental Authority in Support of Their Motions to Dismiss the First Amended Consolidated Complaint (Dec. 01, 2003)

• 2003 WL 23194566 (Trial Motion, Memorandum and Affidavit) Lead Plaintiff's Reply in Support of Motion to Compel the Banks to Produce the Transcripts of the Sworn Statements of their Current and Former Employees (Dec. 01, 2003)

• 2003 WL 23119757 (Trial Motion, Memorandum and Affidavit) The Bank Defendants%7D Notice of Supplemental Authority in Support of Their Motions to Dismiss the First Amended Consolidated Complaint (Nov. 26, 2003)

• 2003 WL 23119731 (Trial Motion, Memorandum and Affidavit) Lead Plaintiff%7Ds Reply Memorandum in Response to Conseco Annuity Assurance Co.%7Ds Opposition to Class Certification (Nov. 24, 2003)

• 2003 WL 23119790 (Trial Motion, Memorandum and Affidavit) Lead Plaintiff%7Ds Reply Memorandum in Response to Various Defendants%7D Oppositions to Class Certification (Nov. 24, 2003)

• 2003 WL 23109198 (Trial Motion, Memorandum and Affidavit) Opposition of Financial Institutions to Lead Plaintiff's Motion to Compel the Banks to Produce the Transcripts of the Sworn Statements of their Current and Former Employees (Nov. 20, 2003)

• 2003 WL 23325756 (Trial Motion, Memorandum and Affidavit) Motion to Compel Deutsche Bank