### 1.2.5 Direkt geführte industrielle Beteiligungen

Unter den direkt geführten industriellen Beteiligungen sind die drei Geschäftsbereiche Bahnsysteme (Joint Venture Adtranz), Automobil-Elektronik (bis 1997 Mikroelektronik) und MTU/Dieselantriebe zusammengefaßt.

ABB Daimler-Benz Transportation GmbH („Adtranz"), das Gemeinschaftsunternehmen der Daimler-Benz AG und der ABB Asea Brown Boveri AG, ist einer der weltweit führenden Anbieter von Bahnsystemen. Das Leistungsspektrum reicht von Schienenfahrzeugen und Bahnstromanlagen bis hin zu Signaltechnik und Customer Support.

Der Geschäftsbereich Automobil-Elektronik (Temic Telefunken Microelectronic GmbH) konzentriert sich nach der Veräußerung der Halbleiteraktivitäten Anfang 1998 ausschließlich auf den Bereich Automobil-Elektronik.

Der Geschäftsbereich MTU/Dieselantriebe in der MTU Motoren- und Turbinen-Union Friedrichshafen GmbH ist ein weltweit führender Anbieter von hochwertigen Antriebssystemen für Land-, Wasser- und Schienenfahrzeuge sowie für Anlagen zur Energieerzeugung mit den Komponenten Dieselmotor, Gasmotor, Gasturbine und den neuen Technologien Brennstoffzelle und Elektrolyse.

Der Umsatz der direkt geführten industriellen Beteiligungen in den Jahren 1997 und 1996 gliedert sich wie folgt:

Umsatz nach Geschäftsbereichen

| | 1997 in Mio. DM | 1996 in Mio. DM |
|---|---|---|
| Bahnsysteme (Adtranz)[1] | 6.379 | 5.670 |
| Mikroelektronik | 2.648 | 2.455 |
| MTU/Dieselantriebe | 1.717 | 1.614 |

[1] Davon im Daimler-Benz-Konzern anteilig 50% enthalten.

### 1.3 Ergebnissituation

Daimler-Benz konnte im Jahr 1997 den Operating Profit, die Kennzahl für die Ertragskraft der betrieblichen Tätigkeit, auf DM 4,3 (1996: 2,4) Mrd. steigern. Das Instrumentarium der wertorientierten Unternehmensführung hat Daimler-Benz auf allen Stufen des Konzerns weiter ausgebaut. Das nach US-amerikanischen Rechnungslegungsgrundsätzen (U.S. GAAP) ermittelte Konzernergebnis (Net Income) erreichte DM 8,0 (1996: 2,8) Mrd.; bereinigt um steuerliche Sondereffekte lag es bei DM 3,2 Mrd. Das Ergebnis je Aktie stieg von DM 5,37 auf DM 15,59; bereinigt um steuerliche Sondereffekte betrug es DM 6,15.

Operating Profit[1]

| | 1997 in Mio. DM | 1996 in Mio. DM |
|---|---|---|
| Daimler-Benz-Konzern | 4.328 | 2.423 |
| Personenwagen | 3.132 | 3.090 |
| Nutzfahrzeuge | 481 | – 354 |
| Luft- und Raumfahrt | 432 | – 196 |
| Dienstleistungen | 457 | 288 |
| Direkt geführte industrielle Beteiligungen | – 129 | – 585 |

[1] Operating Profit Daimler-Benz-Konzern konsolidiert und für Geschäftsfelder unkonsolidiert aus Sicht des jeweiligen Geschäftsfelds.

## 2. Chrysler Corporation

### 2.1 Geschichte und Entwicklung

Die Chrysler Corporation entstand nach dem Recht des U.S. Bundesstaates Delaware am 4. März 1986 durch die Verschmelzung mehrerer Gesellschaften, darunter der Chrysler Motors Corporation. Chrysler Motors Corporation wurde im Jahr 1925 als Nachfolgerin der Maxwell Motor Car Company gegründet. Im gleichen Jahr wurde Walter Chrysler erster Vorsitzender des Board und Präsident.

Bereits 1929 war Chrysler Motors Corporation zu einem der „Big Three" der Automobilhersteller in den USA aufgestiegen. Walter Chrysler führte das Unternehmen bis zum Jahr 1935.

Ende der 70er Jahre geriet das Unternehmen in eine Finanzkrise, die eine umfassende Sanierung notwendig machte. Chrysler senkte die Kosten und strukturierte die Führung des Unternehmens um. Trotz dieser Maßnahmen konnte Chrysler die notwendigen Finanzmittel für das Sanierungsprogramm nicht aufbringen. Nur durch eine Bundesbürgschaft und die Zugeständnisse seitens der durch die „United Automobile Workers" vertretenen Mitarbeiter sowie auch der Lieferanten, Gläubiger und Kreditgeber konnte der Geschäftsbetrieb von Chrysler aufrechterhalten werden. In dieser Zeit hat Chrysler die Rentabilitätsgrenze (break-even point) um 50% gesenkt und als erstes US-amerikanisches Automobilunternehmen benzinsparende Kleinwagen mit Frontantrieb im Markt eingeführt.

Im Jahr 1982 gewann Chrysler die einstige Ertragskraft zurück und zahlte bereits im August 1983 die durch die Bundesbürgschaft gesicherten Darlehen sieben Jahre vor Ablauf zurück.

Im November 1983 nahm Chrysler die Produktion von Minivans auf und schuf damit ein neues Marktsegment. Die Minivans wurden die bestverkauften Fahrzeuge von Chrysler. 1987 erwarb Chrysler die American Motors Corporation („AMC"), das bis dahin viertgrößte US-Automobilunternehmen. Der Erwerb schloß die weltberühmte Marke „Jeep"® mit ein.

Im Sommer 1989 startete Chrysler ein massives Kostensenkungsprogramm in Höhe von US$ 1 Mrd. und konzentrierte den Einsatz der Ressourcen auf das Automobilgeschäft. Gleichzeitig wurde bei Chrysler ein neues System für die Entwicklung und Herstellung von Personenwagen und Nutzfahrzeugen eingeführt: Es wurden sog. „Platform-Teams" gebildet, in denen verschiedene Abteilungen – wie z.B. Design, Konstruktion, Einkauf, Produktion und Vertrieb – an einer einzelnen Fahrzeugbaureihe über den gesamten Lebenszyklus hinweg zusammenarbeiten. Jedes Team trägt dabei eigene unternehmerische Verantwortung. Diese Methode senkt die Entwicklungszeiten und -kosten und führt zu einer weiteren Verbesserung der Produktqualität.

Im Jahr 1991 begann Chrysler, die technologischen Aktivitäten im neuen Chrysler Technology Center zu zentralisieren. Dadurch wurde es Chrysler möglich, Produkte unter einem Dach zu entwerfen, zu konstruieren und zu testen sowie Marketingpläne zu entwickeln. Dies hat dazu beigetragen, daß Chrysler in der nordamerikanischen Automobilindustrie zum Hersteller mit dem höchsten Gewinn pro Fahrzeug wurde.

### 2.2 Konzernstruktur

Chrysler ist in zwei Sparten tätig, nämlich im Automobilgeschäft und den Finanzdienstleistungen.

### 2.2.1 Automobilgeschäft

Im Automobilgeschäft entwickelt, produziert und verkauft Chrysler Personenwagen und Nutzfahrzeuge unter den Markenbezeichnungen Chrysler, Dodge, Plymouth und Jeep® vorrangig in den Vereinigten Staaten, in Kanada und in Mexiko („Nordamerika"). Personenwagen werden in verschiedenen Größen und Ausführungen angeboten. Bei den Nutzfahrzeugen reicht die Angebotspalette von Pickups über Geländewagen und Freizeitautos bis hin zu Vans, die den größten Anteil des Nutzfahrzeugabsatzes ausmachen. Weiterhin vertreibt Chrysler Personenwagen, die in den USA von Mitsubishi Motor Manufacturing of America, einer Tochtergesellschaft der Mitsubishi Motors Corporation, hergestellt werden.

Produktionsbetriebe von Chrysler für Aggregate und Komponenten befinden sich in den Vereinigten Staaten in Michigan sowie in Alabama, Indiana, New York, Ohio und Wisconsin. In den USA erfolgt die Montage von Pkw in den Werken in Sterling Heights und Detroit/Michigan sowie in Belvedere/Illinois. Die Montagewerke für Nutzfahrzeuge in den USA liegen in Warren und Detroit/Michigan, Fenton/Missouri, Toledo/Ohio und Newark/Delaware. Chryslers Hauptkonstruktions- und Forschungszentrum und die Hauptverwaltung befinden sich in Auburn Hills, Michigan.

Chrysler setzt derzeit den größten Teil seiner Fahrzeuge in Nordamerika ab. In anderen Märkten, wie z.B. in Argentinien, Brasilien, Venezuela, Taiwan, Japan, Thailand, Korea, Ägypten, Österreich, Italien, Frankreich, Belgien, den Niederlanden und Deutschland ist Chrysler über 100%ige Tochtergesellschaften tätig. In Österreich ist Chrysler an einem Joint Venture beteiligt; darüber hinaus hält Chrysler Minderheitsbeteiligungen an Gesellschaften in China und Ägypten.

Produktions- und/oder Montagewerke befinden sich außerhalb der Vereinigten Staaten hauptsächlich in Kanada und in Mexiko sowie in Österreich, Venezuela, Brasilien und Argentinien.

### 2.2.1.1 Vereinigte Staaten

Chrysler lieferte im Jahr 1997 in den USA 2.312.417 Fahrzeuge aus, das waren 80% der von Chrysler weltweit gelieferten Fahrzeuge von insgesamt 2.886.981 Einheiten. Gemessen an den Verkaufszahlen lag Chrysler im US-Automobilmarkt sowohl bei Personenwagen als auch bei Nutzfahrzeugen (einschließlich Pickups und Minivans) an dritter Stelle.

| Verkaufszahlen (Stückzahlen) USA | 1997 | 1996 |
|---|---|---|
| gesamt | 2.303.788 | 2.450.826 |
| Personenkraftwagen | 736.530 | 832.633 |
| Nutzfahrzeuge (einschl. Pickups und Minivans) | 1.567.258 | 1.618.193 |

Im ersten Halbjahr 1998 lieferte Chrysler in den USA 1.301.618 (1. Halbjahr 1997: 1.201.145) Fahrzeuge aus, das waren 78% der weltweiten Fahrzeuglieferungen in Höhe von insgesamt 1.675.089 Einheiten (1. Halbjahr 1997: 1.519.692). Davon entfielen 390.759 Einheiten auf Personenwagen (1. Halbjahr 1997: 418.315) und 910.859 Einheiten auf Nutzfahrzeuge einschließlich Pickups und Minivans (1. Halbjahr 1997: 782.830).

### 2.2.1.2 Chrysler Canada Ltd.

In Kanada besteht eine 100%ige Tochtergesellschaft von Chrysler, die Chrysler Canada Ltd. („Chrysler Canada"), die Herstellungs- und Montagewerke betreibt. Es besteht ein Vertriebsnetz, das die kanadischen Provinzen abdeckt. Chrysler Canada, die eng mit den Produktionsaktivitäten in den USA vernetzt ist, produziert Einzelteile und montiert Minivans, große Limousinen und große Vans. Im Jahr 1997 lieferte Chrysler Canada insgesamt 625.079 (1996: 690.948) Fahrzeuge aus.

1997 lag Chrysler Canada, gemessen an den Verkaufszahlen, im kanadischen Automobilmarkt sowohl bei Personenwagen als auch bei Nutzfahrzeugen an dritter Stelle.

| Verkaufszahlen (Stückzahlen) Kanada | 1997 | 1996 |
|---|---|---|
| Fahrzeuge insgesamt | 256.162 | 239.514 |

Im ersten Halbjahr 1998 verkaufte Chrysler Canada insgesamt 143.043 (1. Halbjahr 1997: 127.909) Fahrzeuge.

### 2.2.1.3 Chrysler de Mexico S.A.

In Mexiko besteht eine 100%ige Tochtergesellschaft von Chrysler, die Chrysler de Mexico S.A. („Chrysler Mexico"). Es werden Produktions- und Montagewerke betrieben, die sowohl den mexikanischen Markt als auch Exportmärkte beliefern. Insgesamt lieferte Chrysler Mexico 1997 347.739 (1996: 359.444) Fahrzeuge aus. Ferner liefert Chrysler Mexico Fahrzeugteile einschließlich Motoren und Getriebe an Chrysler in den USA.

Auf dem mexikanischen Markt lag Chrysler Mexico 1997 an fünfter Stelle bei den Personenwagen und an dritter Stelle bei den Nutzfahrzeugen.

Von den in Mexiko hergestellten Fahrzeugen wurden 50.294 Fahrzeuge (1996: 36.283) direkt in Mexiko verkauft. Zusätzlich wurden 1997 20.573 Fahrzeuge (1996: 17.221) nach Mexiko exportiert

| Verkaufszahlen (Stückzahlen) Mexiko | 1997 | 1996 |
|---|---|---|
| Fahrzeuge insgesamt | 70.867 | 53.504 |

### 2.2.1.4 Weitere internationale Aktivitäten

Auf europäischen Märkten wurden 1997 105.918 (1996: 102.139) Fahrzeuge an Kunden ausgeliefert. Die entsprechenden Verkäufe auf den anderen Märkten, vor allem Japan, Taiwan, Australien, Brasilien und dem Nahen Osten, betrugen 1997 131.142 Fahrzeuge, verglichen mit 119.896 Einheiten im Jahr 1996. Weiterhin exportierte Chrysler

42.780 Teilesätze an verbundene Unternehmen in Venezuela, China und Argentinien.

| Verkaufszahlen (Stückzahlen) international | 1997 | 1996 |
|---|---|---|
| Europa | 105.918 | 102.139 |
| Asien/Pazifik/Lateinamerika/ Naher Osten/Afrika | 131.142 | 119.896 |

Chryslers Produktion in Europa besteht hauptsächlich aus den Aktivitäten in Österreich. Dort werden bei Steyr-Daimler-Puch Fahrzeugtechnik Ges.m.b.H. („Steyr") Jeep Grand Cherokees in Lohnauftrag gefertigt und Chrysler Voyagers von Eurostar Automobilwerk Ges.m.b.H. & Co. KG, einem Joint Venture zwischen Chrysler und Steyr, montiert. Alle anderen in Europa verkauften Fahrzeuge werden in Nordamerika und Mexiko hergestellt.

In der Asien-Pazifik-Region werden Jeep Cherokees in China zum Vertrieb in China durch Beijing Jeep Corporation, Ltd., einem Joint Venture mit einer Minderheitsbeteiligung von Chrysler, montiert. Ferner bestehen Vereinbarungen für die Montage von Jeep-Fahrzeugen mit Rechtslenkung in Malaysia, Indonesien und Thailand. Chrysler verkauft in dieser Region außerdem Fahrzeuge über konzerneigene sowie unabhängige Vertrags- und Direkthändler.

Die Geschäftstätigkeiten in der Region Lateinamerika, Naher Osten, Afrika bestehen aus Produktionsstätten in Venezuela und Argentinien sowie 100%igen Vertriebsgesellschaften in Brasilien, Argentinien, Venezuela und Ägypten. Chrysler hält darüber hinaus eine Minderheitsbeteiligung an einer Montagegesellschaft in Ägypten. Im Januar 1997 schloß Chrysler eine Vereinbarung zur Gründung eines Joint Ventures mit der Bayerische Motoren Werke Aktiengesellschaft („BMW") zur Herstellung eines kleinen Benzinmotors in Brasilien ab. Dieser Motor soll sowohl in Fahrzeugen von Chrysler als auch von BMW eingesetzt werden. Außerdem stellte Chrysler im Juli 1998 eine Produktionsstätte in Brasilien fertig.

### 2.2.2 Finanzdienstleistungen

Die Finanzdienstleistungsaktivitäten von Chrysler sind bei der Chrysler Financial Company LLC („CFC"), einer 100%igen Tochtergesellschaft, zusammengefaßt. Die CFC bietet Finanzierung und Leasing für Kunden und Händler an. Darüber hinaus umfaßt das Leistungsspektrum der CFC auch Vermögens- und Schadensversicherungen für Händler sowie die Erschließung und Verwaltung von Niederlassungen von Chrysler.

Die gesamten Finanzforderungen, die am Ende der zwei letzten Jahre verwaltet wurden, stellen sich wie folgt dar:

| | 1997 in Mio. US$ | 1996 in Mio. US$ |
|---|---|---|
| Gesamtfinanzierung | 39.370 | 39.062 |
| Automotive | 36.655 | 36.858 |
| Nonautomotive | 2.715 | 2.204 |

Die Finanzierung erfolgt im wesentlichen durch die Begebung von Asset-Backed Securities.

Die CFC ist der größte Anbieter von Finanzierungen für Chrysler-Fahrzeuge in Nordamerika. Das Kraftfahrzeugfinanzierungsgeschäft von CFC wird über 29 Gebietsbüros in den Vereinigten Staaten und Kanada (Chrysler Credit Canada Ltd.) geführt. Außerhalb Nordamerikas bietet CFC auch Kraftfahrzeugfinanzierungen und -dienstleistungen in Europa und Asien an.

1997 finanzierte oder verleaste CFC ca. 870.000 neue und gebrauchte Fahrzeuge für Chrysler-Kunden in den USA; davon entfielen 611.000 auf neue Chrysler-Personenwagen und Nutzfahrzeuge, das waren 27% der Chrysler-Fahrzeuglieferungen in den Vereinigten Staaten. In Kanada finanzierte oder verleaste CFC 1997 ca. 114.000 Fahrzeuge, davon waren 102.000 neue Chrysler-Personenwagen und Nutzfahrzeuge (40% der Fahrzeuglieferungen).

Auf dem Gebiet der Kraftfahrzeugversicherung bieten die Chrysler Insurance Company und ihre Tochtergesellschaften („Chrysler Insurance") spezielle Versicherungsleistungen für Fahrzeughändler und ihre Kunden in den Vereinigten Staaten und Kanada an. Die Leistungen umfassen Versicherungen für Sach- und Personenschäden, die direkt den Händlern angeboten werden. Zum Portfolio von Chrysler Insurance gehören auch Fahrzeugversicherungen sowie Versicherungen zur Abdeckung von Risiken aus der Fahrzeugfinanzierung.

Die Chrysler Realty Corporation („Chrysler Realty") ist eine Immobilienbesitzgesellschaft, die Verkaufsstandorte an Chrysler-Händler verpachtet. Zum 31. Dezember 1997 verwaltete Chrysler Realty 776 Standorte.

Außerhalb des Kraftfahrzeuggeschäfts ist die CFC über ihre Tochtergesellschaft, die Chrysler Capital Corporation, im Finanzierungsgeschäft tätig. Zum 31. Dezember 1997 bestanden die in den USA außerhalb des Kraftfahrzeugbereichs verwalteten Forderungen vor allem aus Forderungen aus leveraged leases in Höhe von US$ 2,6 Mrd.

### 2.3 Ergebnissituation Chrysler-Konzern

| | 1997 in Mio. US$ [¹] | 1996 in Mio. US$ [¹] |
|---|---|---|
| Umsatzerlöse | 61.147 | 61.397 |
| Ergebnis vor Ertragsteuern, außerordentlichen Erträgen und Effekten aus einer Änderung der Bilanzierungsgrundsätze | 4.557 | 6.092 |
| Nettoergebnis | 2.805 | 3.529 |
| Ergebnis pro Aktie (voll verwässert) | US$ 4,09 | US$ 4,74 |
| Dividende pro Aktie | US$ 1,60 | US$ 1,40 |

[¹] Ausgenommen Beträge, die sich auf einzelne Aktien beziehen.

## III. Konzept für den Zusammenschluß und wesentlicher Inhalt des Business Combination Agreement

### 1. Gewähltes Konzept für den Zusammenschluß

Der Zusammenschluß der Daimler-Benz AG und der Chrysler Corporation in der DaimlerChrysler AG als zukünftiger Konzernobergesellschaft erfolgt in zwei Stufen:

- in der ersten Stufe durch zwei parallel bei der DaimlerChrysler AG durchzuführende Kapitalerhöhungen gegen Sacheinlagen, durch die die Daimler-Benz AG und Chrysler jeweils zu Tochtergesellschaften der DaimlerChrysler AG werden, sowie

- in der zweiten Stufe durch Verschmelzung der Daimler-Benz AG auf die DaimlerChrysler AG.

Zu den Einzelheiten des Konzepts für den Zusammenschluß mit Abbildungen der Struktur des Zusammenschlusses siehe oben unter Abschnitt „I. Einleitung".

### 2. Ermittlung der Umtauschverhältnisse

In den Verhandlungen zwischen der Daimler-Benz AG und der Chrysler Corporation war neben den Fragen einer angemessenen rechtlichen Struktur für den Zusammenschluß der Gesellschaften die Ermittlung und die Festlegung des Umtauschverhältnisses von entscheidender Bedeutung.

Bei der Bewertung der Daimler-Benz AG und der Chrysler Corporation sind die Parteien zunächst von der Börsenkapitalisierung beider Unternehmen auf der Basis der

Börsenkurse zum 15. April 1998 ausgegangen. Am 15. April 1998 betrug der Schlußkurs nach Datastream für die Daimler-Benz-Aktie DM 189,34 und für die Chrysler-Aktie US$ 45,88.

Diese Börsenwerte wurden sodann um zu erwartende Dividendenausschüttungen und Kapitalerhöhungen angepaßt und für Zwecke der Ermittlung und Festlegung des Umtauschverhältnisses den sich nach dem Ertragswertverfahren ergebenden und letztlich für den Zusammenschluß entscheidenden Unternehmenswerten gegenübergestellt. Dabei war neben weiteren Faktoren die Abgleichung der Planungen beider Unternehmen für die Jahre 1998, 1999 und 2000 wesentlich. Die ermittelten Ertragswerte ergaben, daß bei einem Vergleich der Börsenwerte Chrysler gegenüber Daimler-Benz um 28% unterbewertet gewesen wäre. Entsprechend mußte daher der Börsenkurs von Chrysler an den höheren Ertragswert angepaßt und diese Anpassung im Business Combination Agreement berücksichtigt werden.

Bei der Bewertung der Unternehmen gemäß den Ertragswerten wurden der Vorstand der Daimler-Benz AG und das Management der Chrysler Corporation von den Wirtschaftsprüfungsgesellschaften C&L Deutsche Revision Aktiengesellschaft, Wirtschaftsprüfungsgesellschaft, Frankfurt am Main, und Schitag Ernst & Young Deutsche Allgemeine Treuhand Aktiengesellschaft, Wirtschaftsprüfungsgesellschaft, Stuttgart, seit April 1998 beraten. Die Ertragswerte wurden nach den in Deutschland in Theorie und Praxis gesicherten und angewandten Grundsätzen der Unternehmensbewertungen (Stellungnahme des Hauptfachausschusses des Instituts der Wirtschaftsprüfer – HFA 2/1983 – „Grundsätze zur Durchführung von Unternehmensbewertungen" – Ertragswertmethode) ermittelt. Die Wirtschaftsprüfungsgesellschaften haben nach Unterzeichnung des Business Combination Agreement unter dem 7. Mai 1998 eine abschließende gutachterliche Bewertung durchgeführt; diese hat zum Ergebnis, daß die ermittelten Umtauschverhältnisse sachgerecht sind.

Darüber hinaus hat die Investmentbank Goldman, Sachs & Co. oHG, Frankfurt am Main, dem Vorstand der Daimler-Benz AG am 6. Mai 1998 mündlich und am 8. Mai 1998 schriftlich bestätigt, daß das Umtauschverhältnis fair und angemessen ist.

### 3. Business Combination Agreement

#### Einleitung

In dem Business Combination Agreement haben die Parteien den Gesamtplan des Zusammenschlusses der Daimler-Benz AG und der Chrysler Corporation in der DaimlerChrysler AG vereinbart.

Im folgenden wird eine kurze Erläuterung über den wesentlichen Inhalt des Business Combination Agreement gegeben.

#### 3.1 Daimler-Benz-Sachkapitalerhöhung (Umtauschangebot)

Bezüglich des wesentlichen Inhalts des Umtauschangebotes wird auf das Kapitel „III. Umtauschangebot" auf den Seiten 15 - 17 verwiesen.

#### 3.2 Chrysler-Sachkapitalerhöhung

Parallel zur Durchführung der Daimler-Benz-Sachkapitalerhöhung wird gemäß Art. 2 des Business Combination Agreement zum Zwecke des Tausches aller Chrysler-Aktien in DaimlerChrysler-Aktien die Chrysler-Sachkapitalerhöhung durchgeführt. Um die für diesen Tausch notwendige Einbringung aller Chrysler-Aktien zu ermöglichen, wird in den USA durch die Bank of New York, New York („U.S. Exchange Agent") zunächst ein sog. Reverse Triangular Merger nach dem Recht des US-Bundesstaates Delaware durchgeführt. Der Reverse Triangular Merger ermöglicht es dem U.S. Exchange Agent, alle Chrysler-Aktien im Wege einer Kapitalerhöhung gegen Sacheinlage der DaimlerChrysler AG in DaimlerChrysler-Aktien zu tauschen. Diese Maßnahme ist der zweite wesentliche Schritt zur erfolgreichen Durchführung des Zusammenschlusses.

Der Reverse Triangular Merger ist in den USA eine gebräuchliche Form bei der Gestaltung von Übernahmen. Mit Hilfe dieses gesellschaftsrechtlichen Organisationsaktes ist es möglich, die Verschmelzung einer Gesellschaft mit einer anderen Gesellschaft gegen Abfindung der Aktionäre der ersten Gesellschaft, die auch in Aktien einer dritten Gesellschaft bestehen kann, zu erreichen.

Die Gesellschaft (Erwerbsgesellschaft), die die andere Gesellschaft (Zielgesellschaft) übernehmen will, gründet eine Tochtergesellschaft, die auf die Zielgesellschaft verschmolzen wird. Sofern die Aktionäre der Zielgesellschaft mit der erforderlichen Mehrheit dem Zusammenschluß zustimmen, werden die Vermögen der Zielgesellschaft und der Tochtergesellschaft vereint, und die Zielgesellschaft wird eine Tochtergesellschaft der Erwerbsgesellschaft. Die Aktionäre erhalten als Abfindung für ihr Ausscheiden aus der Zielgesellschaft einen Anspruch auf die im Merger-Vertrag bezeichnete Gegenleistung.

Diese Gestaltungsform kann auch für die Zusammenführung einer US-amerikanischen Gesellschaft und einer deutschen Gesellschaft eingesetzt werden; sie bedarf jedoch

der Anpassung an die Erfordernisse des deutschen Rechts. Um nämlich den deutschen gesetzlichen Regeln der Kapitalerhöhung gegen Sacheinlage zu genügen, erfolgt die Gründung der Tochtergesellschaft bei dieser Gestaltung nicht direkt durch die Erwerbsgesellschaft, also die deutsche DaimlerChrysler AG, sondern durch einen Dritten, der als Treuhänder für die Chrysler-Aktionäre handelt (U.S. Exchange Agent). Der U.S. Exchange Agent wird durch den Reverse Triangular Merger Alleinaktionär der Zielgesellschaft, also der Chrysler Corporation. An die Stelle der Mitgliedschaftsrechte der früheren Aktionäre der Zielgesellschaft tritt ein Anspruch auf Anteile an der deutschen Gesellschaft, also der DaimlerChrysler AG. Der U.S. Exchange Agent ist verpflichtet, die von ihm durch den Reverse Triangular Merger erworbene Beteiligung an der Chrysler Corporation in die DaimlerChrysler AG im Wege einer Kapitalerhöhung gegen Sacheinlage einzubringen und die ihm dafür gewährten Aktien den ehemaligen Aktionären der US-Gesellschaft zu übertragen.

Die Daimler-Benz AG und die Chrysler Corporation haben sich auf diese Gestaltungsform geeinigt. Der Reverse Triangular Merger wird in den USA durch den U.S. Exchange Agent durchgeführt, der den Chrysler-Aktionären als Gegenleistung für den Verlust ihrer Chrysler-Aktien DaimlerChrysler-Aktien schuldet. Diese beschafft er sich durch Einlage der durch den Reverse Triangular Merger zu erwerbenden Beteiligung an der Chrysler Corporation im Rahmen der Chrysler-Sachkapitalerhöhung der DaimlerChrysler AG.

Gemäß Business Combination Agreement haben sich die Parteien für die Berechnung des Umtauschverhältnisses auf eine mathematische Umtauschformel geeinigt, die auf einer Bewertung beider Unternehmen mit Rücksicht auf die zum Zeitpunkt der Unterzeichnung des Business Combination Agreement von Daimler-Benz AG angekündigte, aber noch nicht beschlossene Sonderdividende und die nachfolgende Barkapitalerhöhung basiert. Aus technischen Gründen wurde dabei u.a. auf den Börsenkurs unter Berücksichtigung einer Korrektur zugunsten der Chrysler-Aktionäre zurückgegriffen. Die Formel kann jedoch nach deutschem Recht nur anwendbar sein, wenn das im Business Combination Agreement festgelegte Umtauschverhältnis auch im Falle einer Unternehmensbewertung nach der Ertragswertmethode angemessen ist. Nach der nach dem Abschluß des Business Combination Agreement unter dem 7. Mai 1998 erfolgten abschließenden gutachterlichen Bewertung und der Geschäftsentwicklung von Daimler-Benz AG und der Chrysler Corporation kann hiervon ausgegangen werden.

Nach Ausschüttung der Sonderdividende und Durchführung der Barkapitalerhöhung ergibt sich aus der vertraglich geregelten Umtauschformel ein Umtauschverhältnis von 0,6235 DaimlerChrysler-Aktie für eine Chrysler-Aktie. Die Rechnung stellt sich wie folgt dar:

$$\text{Umtauschverhältnis} = 103{,}4929 \text{ x } \frac{(DP^1 \text{ x } DAP^2) + SOP^3)}{(DAP \text{ x } DP) \text{ x } (DAP + SOP)}$$

[1] „DP" bezieht sich auf den herabgesetzten Preis des Bezugsangebots als Prozentsatz des gültigen Marktpreises und bedeutet diejenige Zahl mit vier Nachkommastellen (0,8009), die sich aus der Teilung (i) des Ausgabebetrages pro neuer Daimler-Benz-Aktie (DM 144) des Bezugsangebots durch (ii) den letzten festgestellten Aktienkurs (wie durch die Frankfurter Börse bekanntgegeben) der Daimler-Benz-Aktie an der Frankfurter Börse am letzten vollständigen Handelstag, der der öffentlichen Bekanntgabe des Ausgabebetrages, für den die Bezugsberechtigten Daimler-Benz-Aktien im Bezugsangebot kaufen konnten, voranging (DM 179,8), ergab.

[2] „DAP" bezieht sich auf den angepaßten Preis für Daimler-Benz-Aktien und bezeichnet einen Betrag von DM 190,80 abzüglich der Summe der (i) jährlichen Dividende für das Jahr 1997 pro Daimler-Benz-Aktie (DM 1,60) sowie (ii) der Sonderausschüttung pro Daimler-Benz-Aktie (DM 20).

[3] „SOP" bezieht sich auf die im Rahmen des Schütt-aus/Hol-zurück-Verfahrens von Daimler-Benz vereinnahmten Beträge und bezeichnet (i) den gesamten in Deutsche Mark ausgedrückten Nettoerlös, den Daimler-Benz aus dem Global Offering von Bezugsrechten zum Erwerb von Daimler-Benz-ADS zufloß (DM 7.482.673.200), geteilt durch (ii) 523.299.381.

In Art. 2.6 des Business Combination Agreement sind ferner die Modalitäten für die Abwicklung der laufenden Aktien-Optionspläne und anderer aktienorientierter Rechte von Chrysler festgelegt. Diese Rechte werden im Zuge der Chrysler-Sachkapitalerhöhung in Aktien der DaimlerChrysler AG („Stock Out") umgetauscht.

Art. 2.8 des Business Combination Agreement enthält entsprechend Art. 1.5 Verwässerungsschutzbestimmungen (Anpassung des Umtauschverhältnisses) zugunsten der Inhaber von Chrysler-Aktien für den Fall bestimmter Kapitalmaßnahmen der an dem Zusammenschluß beteiligten Gesellschaften.

### 3.3 Daimler-Benz-Verschmelzung

In Art. 3 ist die Verschmelzung der Daimler-Benz AG auf die DaimlerChrysler AG als zweite und letzte Stufe des Zusammenschlusses vereinbart (Daimler-Benz-Verschmelzung). Die Verschmelzung dient dem Zweck, den Daimler-Benz-Aktionären, die nicht das Umtauschangebot der DaimlerChrysler AG angenommen haben, DaimlerChrysler-Aktien zu gewähren und die durch die Bildung der DaimlerChrysler AG entstandene Konzernstufung wieder aufzuheben. Nur so kann das Ziel des Zusammenschlusses

in einer einzigen Gesellschaft erreicht werden. Die Verschmelzung erfolgt nach den Bestimmungen des Umwandlungsgesetzes.

Das Umtauschverhältnis für den Umtausch der Daimler-Benz-Aktien in DaimlerChrysler-Aktien entspricht demjenigen für das Umtauschangebot der DaimlerChrysler AG.

### 3.4 Verwaltung (Corporate Governance) der DaimlerChrysler AG

Siehe Kapitel „VII. Organe der Gesellschaft – Beabsichtigte Verwaltung (Corporate Governance) der DaimlerChrysler AG" auf Seite 35.

### 3.5 Vergütungsstruktur für Vorstand und Mitarbeiter

Siehe Kapitel „VI. Aktionäre, Mitarbeiterbeteiligungen, Vergütungsstruktur für Vorstand und Mitarbeiter der DaimlerChrysler AG, Mitteilungs- und Veröffentlichungspflichten" auf Seiten 32 – 33.

### 3.6 Weitere Vereinbarungen

In Art. 9 enthält das Business Combination Agreement weitere Bestimmungen, die US-amerikanischer Vertragspraxis entsprechen. In Art. 9.1 verpflichten sich die Parteien, sich nach Vertragsunterzeichnung nicht um Übernahmeangebote Dritter zu bemühen bzw. Übernahmeverhandlungen mit Dritten zu führen. Dies gilt nicht, soweit die Nichtbeachtung von Übernahmeangeboten, die von Dritten unaufgefordert vor den jeweiligen Zustimmungsbeschlüssen der Daimler-Benz-Aktionäre und Chrysler-Aktionäre unterbreitet werden, aus Sicht des Vorstands der Daimler-Benz AG bzw. des Board of Directors der Chrysler Corporation gegenüber den jeweiligen Anteilseignern treuwidrig sein kann.

Im Falle eines für die jeweiligen Anteilseigner „besseren Angebots" eines Dritten ist der Vorstand der Daimler-Benz AG bzw. das Board of Directors der Chrysler Corporation berechtigt, das Business Combination Agreement zu kündigen und einen Vertrag mit dem Dritten abzuschließen, wenn der Vorstand bzw. das Board anderenfalls seine ihm obliegenden Treuepflichten verletzen würde. Dabei handelt es sich um eine typische US-rechtliche Vertragsklausel.

Art. 9.3 regelt die Verpflichtung der Chrysler Corporation zum Verkauf eigener Aktien („Treasury Stock") in bestimmtem Umfang.

Ab Unterzeichnung des Business Combination Agreement haben sich die Daimler-Benz AG und die Chrysler Corporation gegenseitig Zugang zu ihren jeweiligen Geschäftsunterlagen und ihren Betriebsstätten gewährt. Insofern sind entsprechende Vertraulichkeitspflichten geregelt (Art. 9.6).

### 3.7 Bedingungen für den Vollzug

Für die Durchführung der verschiedenen in dem Business Combination Agreement geregelten Einzelschritte des Zusammenschlusses sind in Art. 10 eine Reihe von vertraglichen Bedingungen (Closing Conditions) vereinbart worden.

Dazu gehören unter anderem

*   der Ablauf oder die vorzeitige Beendigung aller nach dem Hart-Scott-Rodino Antitrust Improvements Act of 1976 für den Zusammenschluß einschlägigen Wartefristen und die Genehmigung des Zusammenschlusses durch die Kommission der Europäischen Union,

*   die Wirksamerklärung des Registration Statement der DaimlerChrysler AG auf Form F-4 durch die SEC,

*   Letter Ruling (verbindliche Auskunft) des IRS zur Steuerfreiheit des Tauschs der Chrysler-Aktien in DaimlerChrysler-Aktien durch die Chrysler-Aktionäre,

*   die Zulassung der DaimlerChrysler-Aktien zum Handel an der Frankfurter Börse und der New York Stock Exchange,

*   die Zustimmung der Aktionäre der Daimler-Benz AG zu dem Gesamtplan des Zusammenschlusses und zur Daimler-Benz-Verschmelzung und die Zustimmung der Chrysler-Aktionäre zum Gesamtplan des Zusammenschlusses und den erforderlichen Vollzugsmaßnahmen in den jeweiligen Hauptversammlungen,

*   die Einholung, Erteilung bzw. Durchführung aller für die Durchführung der im Business Combination Agreement vorgesehenen Transaktionen erforderlichen Zustimmungen, von Eingaben bei und Mitteilungen an Behörden und andere öffentliche Stellen, soweit eine Nichteinholung, -erteilung bzw. -durchführung wesentliche nachteilige Auswirkungen auf die DaimlerChrysler AG nach sich ziehen kann,

*   das Nichtvorliegen von gesetzlichen, behördlichen oder gerichtlichen Verboten, die die Durchführung der Daimler-Benz-Sachkapitalerhöhung (Umtauschangebot), der Chrysler-Sachkapitalerhöhung und des damit zusammenhängenden Reverse Triangular Merger oder der Daimler-Benz-Verschmelzung verhindern würden oder in anderer Weise eine wesentliche nachteilige Auswirkung auf Chrysler oder Daimler-Benz wahrscheinlich machen,

*   Erhalt der Comfort Letters und, soweit die Umtauschquote 90 % oder mehr beträgt, der entsprechenden Schreiben zur Anwendung der Pooling of Interests-

Methode durch Daimler-Benz AG und Chrysler Corporation von ihren jeweiligen Wirtschaftsprüfern,

- soweit die Umtauschquote 90 % oder mehr beträgt, der Abschluß der Plazierung der von der Chrysler Corporation gehaltenen eigenen Aktien (Treasury Stock), die gemäß den Erfordernissen für die Anwendbarkeit der Pooling of Interests-Methode verkauft werden müssen,

- Erfüllung aller Bedingungen des DaimlerChrysler-Umtauschangebots.

Ferner ist in Art. 10 geregelt, daß die Verpflichtung einer Partei, die ihr obliegenden Teilschritte der Gesamttransaktion vorzunehmen, entfällt, wenn die jeweils andere Partei ihre Gewährleistungen oder sonstigen Verpflichtungen in wesentlicher Hinsicht verletzt und die Verletzung nicht innerhalb von 45 Tagen behoben wurde bzw. nicht behoben werden kann.

### 3.8 Kündigung, Ergänzung und Verzicht

Die Daimler-Benz AG bzw. die Chrysler Corporation haben gemäß Art. 11.1 jeweils das Recht zur einseitigen Beendigung des Business Combination Agreement, wenn

- die Chrysler-Sachkapitalerhöhung und/oder die Daimler-Benz-Sachkapitalerhöhung nicht bis zum 31. Januar 1999 durchgeführt worden sind,

- die Aktionäre der Daimler-Benz AG dem Gesamtplan des Zusammenschlusses und der Daimler-Benz-Verschmelzung oder die Chrysler-Aktionäre dem Gesamtplan des Zusammenschlusses und den erforderlichen Vollzugsmaßnahmen in den jeweiligen Hauptversammlungen nicht mit den erforderlichen Mehrheiten zugestimmt haben,

- die Durchführung des Zusammenschlusses behördlich oder gerichtlich verboten wird,

- die Chrysler Corporation bzw. die Daimler-Benz AG die jeweils übernommenen Gewährleistungen bzw. Verpflichtungen in wesentlicher Hinsicht verletzt haben und eine Verletzung nicht innerhalb von 45 Tagen behoben wurde bzw. nicht behoben werden kann,

- im Falle eines „besseren" Angebots,

- der Aufsichtsrat der Daimler-Benz AG nicht bis zum 15. Mai 1998 zustimmt.

Zum Zeitpunkt der Fertigstellung dieses Prospekts waren keine Umstände bekannt, die eine einseitige Beendi-

gung des Business Combination Agreement rechtfertigen würden. Die zuständigen Kartellbehörden, insbesondere die Europäische Kommission und die Federal Trade Commission of the United States of America, haben am 22. bzw. 30. Juli 1998 mitgeteilt, daß sie keine Einwände gegen den Zusammenschluß haben. Der Aufsichtsrat der Daimler-Benz AG hat dem Zusammenschluß der Unternehmen am 14. Mai 1998 zugestimmt.

### 3.9 Verschiedenes

Art. 12 enthält größtenteils übliche Schlußbestimmungen. Hervorzuheben ist, daß für das Business Combination Agreement die Anwendbarkeit des Rechts des US-Bundesstaates Delaware sowie die Zuständigkeit der Gerichte dieses Staates vereinbart sind. Die zur Durchführung des Business Combination Agreement erforderlichen organisationsrechtlichen Maßnahmen bei der Daimler-Benz AG und der DaimlerChrysler AG sind jedoch zwingend nach deutschem Recht zu vollziehen.

Von Bedeutung ist weiterhin die Verpflichtung der Parteien, für den Fall, daß sich der Zusammenschluß in der vertraglich vorgesehenen Form nicht durchführen läßt, Alternativlösungen zu suchen, soweit diese nicht die Art und Höhe der Gegenleistung für die Daimler-Benz- und die Chrysler-Aktionäre für die Aufgabe ihrer Aktien, oder die bilanzielle oder steuerliche Behandlung der Transaktionen verschlechtern oder den zeitlichen Ablauf der Transaktionen wesentlich verzögern.

## IV. Wirtschaftliche Begründung und Erläuterung des Zusammenschlusses

### 1. Ausgangslage / Strukturelle Veränderungen in der internationalen Automobilindustrie

Die Veränderungen im weltwirtschaftlichen Umfeld, insbesondere die Globalisierung der Märkte, stellen international operierende Unternehmen wie Daimler-Benz und Chrysler vor neue Herausforderungen. Insbesondere Chrysler hat sich bisher sehr stark auf den nordamerikanischen Markt konzentriert. Um die Chancen vor allem in den schnell wachsenden Schwellenländern nutzen zu können, gehen in der Automobilindustrie die führenden Hersteller zunehmend dazu über, ihre Fahrzeuge in den jeweiligen lokalen Märkten zu produzieren und sogar zu entwickeln.

Als Folge dieses zusätzlichen Aufbaus an Fertigungskapazitäten wird der Wettbewerb in der internationalen Automobilindustrie an Härte und Intensität weiter zunehmen. Um in dieser Wettbewerbssituation die eigene Marktposition zu behaupten oder sogar auszubauen, müssen die

einzelnen Hersteller ihre Produktprogramme in immer kür-
zeren Abständen erneuern und gleichzeitig ihre Kosten-
strukturen permanent verbessern. Sowohl unter Kosten-
aspekten (economies of scale) als auch im Hinblick auf mög-
liche Synergien im Bereich Forschung und Entwicklung
wächst der Druck auf die Hersteller, sich zu größeren Unter-
nehmensverbänden zusammenzuschließen. Eine vergleich-
bare Entwicklung findet bzw. fand in der Luft- und Raum-
fahrtindustrie statt.

In der Automobilindustrie hat der internationale Konso-
lidierungsprozeß die Anzahl der Automobilhersteller in den
letzten 30 Jahren mehr als halbiert. Als Folge dieser Konso-
lidierung haben sich bis heute weniger als 20 freie Herstel-
ler behauptet. Diese Entwicklung wird sich aufgrund der
Markt- und Wettbewerbssituation voraussichtlich weiter
verstärken und dazu führen, daß sich langfristig nur noch
wenige Herstellergruppen den Weltmarkt aufteilen.

Die drei größten Hersteller (hinsichtlich Produktion
und Umsatz) sind weltweit Marktführer in den Bereichen
Personenkraftwagen, Geländewagen und Pickups. Insbeson-
dere diese Unternehmen können Skaleneffekte verwirk-
lichen und hierdurch ihre Marktposition noch weiter aus-
bauen.

## 2. Ausgangslage / Strategische Herausforderung für Daimler-Benz

### 2.1 Personenwagen

Daimler-Benz entwickelt, produziert und vertreibt Perso-
nenkraftwagen des Hochleistungs- bzw. Premiumsegments.
Obwohl in den letzten Jahren durch Steigerung der Effizienz
und Kosteneinsparungen die Wettbewerbsposition erheb-
lich verbessert wurde, beruht die eigentliche Stärke von
Daimler-Benz in erster Linie auf der Innovationskraft und
der damit verbundenen erfolgreichen Differenzierung zu
Produkten der Konkurrenten und nicht auf Kostenführer-
schaft.

Mit den angebotenen Personenwagen ist Daimler-Benz
in Europa und den USA gut positioniert. Lateinamerika und
Asien bieten ebenfalls gute Chancen für das obere Markt-
segment. Allerdings würde eine umfassende Erschließung
dieser schnell wachsenden Märkte, die eine preiswerte Ein-
stiegsmotorisierung fordern, die Einführung neuer, zusätz-
licher Produkte und gegebenenfalls auch die Einführung
weiterer Marken erforderlich machen.

Im Premiumbereich deckt die Produktpalette schon
jetzt fast alle Kundenwünsche ab. Die S-Klasse wird als
Luxuslimousine und Luxus-Coupé mit Sechs- bis Zwölf-
Zylinder-Motoren und einem Sechs-Zylinder-Turbodiesel an-

geboten. Eine neue S-Klasse wurde im Herbst 1998 einge-
führt. Die SL-Serie ist seit 1954 Mercedes-Benz Tradition
und wird 1998 in fünf Modellvarianten angeboten. Die
E-Klasse belegt in der Mittelklasse den Luxusbereich. Sie
wird als Limousine und T-Modell mit sechs Benzinmotoren
und drei Dieselmotoren – davon zwei Turbodiesel – angebo-
ten. In der kompakten Klasse ist Mercedes-Benz im Luxus-
bereich mit der C-Klasse vertreten, deren Varianten eben-
falls eine Limousine und ein T-Modell umfassen, die mit
sechs Benzin- und drei Dieselmotoren ausgerüstet werden
können.

Die Produktpalette wird ergänzt durch den im Jahr
1996 eingeführten Roadster, den SLK, das Coupé CLK sowie
das in Genf im Frühjahr 1998 vorgestellte CLK-Cabrio. Neu
eingeführt wurde die A-Klasse, die die Mercedes-Benz-Pro-
duktpalette im unteren Leistungsbereich abrundet. Weitere
Produkte des Geschäftsbereichs Personenwagen sind die
V-Klasse, die in den USA hergestellte M-Klasse als „all acti-
vity vehicle" sowie das G-Modell als Geländewagen. Mit
dem smart, der im Herbst 1998 eingeführt wurde, soll unter
Aufbau einer neuen eigenständigen Marke ein neues Markt-
segment erschlossen werden.

Die Möglichkeiten, im Premium-Marktsegment weitere
Wachstumspotentiale zu erschließen, scheinen begrenzt.
Die Aufnahmefähigkeit in diesem Marktsegment läßt eine
weitere wesentliche Volumensteigerung als Voraussetzung
für profitables Wachstum nicht zu. Gleichzeitig zeichnet
sich in diesen Bereichen ein sich verstärkender Marken-
wettbewerb ab, da auch andere Hersteller zunehmend in
das lukrative Premiumsegment hineindrängen.

Mittel- und langfristig ist es daher notwendig, neue
Wachstumspotentiale zu erschließen, und zwar sowohl re-
gional als auch durch neue Produkte vornehmlich in den Vo-
lumensegmenten.

Die Produktpalette von Chrysler ist nahezu komple-
mentär zu der von Daimler-Benz. Chrysler produziert fast
ausschließlich Fahrzeuge im Volumensegment. Chrysler ist
insbesondere führend in den in den USA noch wachstums-
trächtigen Bereichen Minivans und Gelände- bzw. Freizeit-
fahrzeuge mit dem Chrysler Voyager und dem Wrangler so-
wie dem Cherokee der Marke Jeep®. Einen Minivan hat
Daimler-Benz nicht im Angebot, und im Bereich der Ge-
lände- bzw. Freizeitfahrzeuge ist die M-Klasse gerade erst
eingeführt worden. Auch bei den Personenwagen greifen
die Programme von Daimler-Benz und Chrysler ineinander.
Chrysler führt mit Ausnahme der Viper keine Fahrzeuge
mit V8- oder größeren Motoren im Programm. Dieselfahr-
zeuge und Kombifahrzeuge werden von Chrysler nicht her-
gestellt.

### 2.2 Nutzfahrzeuge

Bei den Nutzfahrzeugen hat Daimler-Benz ein umfassendes Leistungsspektrum von leichten bis hin zu schweren Fahrzeugen und ist Weltmarktführer bei Lastwagen über 6 t und Bussen über 8 t. Das Unternehmen verfügt über wettbewerbsfähige Produktionsstandorte in Europa, in Nord- und Lateinamerika sowie in Asien. Auch das Nutzfahrzeuggeschäft ist durch einen harten Wettbewerb gekennzeichnet. Durch die zunehmende Globalisierung wird auch hier die Tendenz verstärkt, sich zu größeren Unternehmen zusammenzuschließen, um hierdurch Skaleneffekte zu verwirklichen.

In Europa hat Daimler-Benz in den letzten Jahren sein Produktionsprogramm nahezu komplett erneuert. Mit den im Geschäftsbereich Transporter Europa eingeführten neuen Produkten (Sprinter, Vito und Vario) konnten nicht nur die Marktanteile erheblich ausgeweitet werden, sondern auch die Ertragssituation aufgrund der verbesserten Kosteneffizienz nachhaltig verbessert werden.

Auch der Geschäftsbereich Lkw Europa konnte mit dem neuen Schwer-Lkw Actros und dem Anfang 1998 eingeführten neuen mittelschweren Lkw Atego die Kosten erheblich senken und seine Marktposition und Ertragskraft deutlich stärken.

In Nordamerika hat der Geschäftsbereich Nutzfahrzeuge NAFTA mit der Übernahme der Schwerlastwagensparte der Ford Motor Co. durch Freightliner seine strategische Position erheblich ausgebaut. Mit der Zweitmarke Sterling will Freightliner in den USA ein zusätzliches Absatzvolumen von ca. 20.000 Fahrzeugen erreichen und den Marktanteil im Segment der Klasse 8 auf nahezu 40% erhöhen.

In Lateinamerika kann nach der erfolgreichen Markteinführung des Transporters Sprinter zusätzliches Potential für die Marke Mercedes-Benz erschlossen werden.

Der asiatisch/pazifische Raum ist bereits heute der weltweit größte Nutzfahrzeugmarkt und wird in den kommenden Jahren auch das größte Wachstum aufweisen. Um seine Position in dieser Region auszubauen, wird der Daimler-Benz-Konzern künftig verstärkt lokal gefertigte und entwickelte Produkte anbieten, die auf die spezifischen Anforderungen dieser Märkte ausgerichtet sind. Zur Erreichung dieses Ziels führt Daimler-Benz mit dem japanischen Nutzfahrzeughersteller Nissan Diesel Verhandlungen über eine mögliche Zusammenarbeit bei der Entwicklung, der Produktion und dem Vertrieb von Nutzfahrzeugen und Komponenten. Eine mögliche Kapitalbeteiligung wird nicht ausgeschlossen. Durch die Verbindung mit Chrysler eröffnen sich

Daimler-Benz weitere Möglichkeiten, um am Wachstum dieser Märkte teilzunehmen.

### 3. Strategie, Ziele und strategische Optionen für Daimler-Benz

Daimler-Benz hat den Anspruch, ein weltweit führender Anbieter von hochqualitativen und innovativen Transport- und Verkehrsprodukten und -systemen sowie Dienstleistungen zu sein. Nachhaltiges Ziel des Daimler-Benz-Konzerns ist die Steigerung und Sicherung des Unternehmenswertes durch wertorientierte Führung, Innovationen und Globalisierung.

Durch wertorientierte Führung will Daimler-Benz profitabel wachsen und dadurch Werte schaffen. Für die Kunden durch auf ihre Bedürfnisse zugeschnittene Produkte, für die Mitarbeiter durch attraktive Entwicklungsmöglichkeiten und Arbeitsplätze sowie für die Aktionäre durch hervorragende Ergebnisse und überdurchschnittliche Renditen.

Dabei kann nur ein Unternehmen mit einer Kultur, die Raum für Kreativität gibt und Menschen über die Organisationsgrenzen hinweg miteinander verbindet, die Innovationen entstehen lassen, mit denen es sich von den Wettbewerbern abheben kann. Innovationen beziehen sich auf alle Bereiche und Prozesse der Daimler-Benz AG und schaffen die Möglichkeit, neue attraktive Produkte schneller am Markt zu plazieren.

Eine weitere wesentliche Voraussetzung für profitables Wachstum ist die Erschließung neuer Märkte. Dabei wird die Globalisierung sich nach der Bedeutung der einzelnen Märkte richten. Zu den Prioritäten gehört der asiatische Raum, wo der Umsatzanteil in den nächsten zehn Jahren von derzeit 8% auf 20 bis 25% gesteigert werden soll.

Neben dem globalen Wachstum, insbesondere in neuen Märkten, soll durch zusätzliche Produkte (A-Klasse, smart) der Eintritt in neue Marktsegmente erreicht werden.

Die oben genannten Ziele können nur verwirklicht werden, wenn es gelingt, neue Wachstumspotentiale zu erschließen.

Im Personenwagenbereich von Daimler-Benz können im bisherigen Premium-Segment langfristig nur bedingt weitere Wachstumspotentiale erschlossen werden. Hinzu kommt, daß in diesem Marktsegment mit einem zunehmenden Wettbewerb gerechnet wird. Eine Aufrechterhaltung der Premium-Verkaufspreise bei nennenswerter Volumensteigerung dürfte kaum möglich sein.

Die Erschließung neuer Marktsegmente, die bereits durch zusätzliche Produkte, wie beispielsweise die A-Klasse oder die Marke smart, begonnen wurde, kann aus eigener Kraft oder durch Akquisition bzw. einen Zusammenschluß

erreicht werden. Die unternehmenseigene Entwicklung neuer Produkte für ein bisher nicht bedientes Marktsegment bzw. der hierfür notwendige Aufbau einer zweiten Marke (Volumensegment) kann nachhaltige Auswirkungen auf bisher bestehende Marktsegmente haben und insbesondere zu einer „Verwässerung" des Markennamens Mercedes-Benz führen. Zudem ist der Eintritt in ein neues Marktsegment sowohl mit hohen Risiken als auch einer Vorlaufzeit verbunden, die zu einer Minderung bzw. Verschiebung des Return on Investment in spätere Perioden führen können.

Als Alternative zum Aufbau einer zweiten Marke bietet sich die Möglichkeit, mit einem anderen Hersteller zusammenzuarbeiten. Das mögliche Spektrum kann hier von einem Joint Venture über eine Akquisition bis hin zur Zusammenführung der jeweiligen Geschäftsaktivitäten oder einem vollständigen Zusammenschluß reichen. Die Vorteile dieser Alternative bestehen darin, das bisherige Produktportfolio durch etablierte Marken zu ergänzen, ohne die eigene Markenidentität und die damit verbundene Exklusivität zu gefährden. Ein so ergänztes Produktportfolio würde eine stärkere Marktdurchdringung in Asien, Lateinamerika und Osteuropa sowie den Eintritt in bisher nicht erschlossene Volumensegmente ermöglichen. Gleichzeitig würde das unternehmerische Risiko durch eine Verringerung der Abhängigkeit vom Premiumgeschäft reduziert und der drastisch ansteigende Kapitaleinsatz für neue Technologien/ Innovationen könnte auf eine höhere Stückzahl verteilt werden (economies of scale).

Unabhängig von der Art der Zusammenarbeit (Joint Venture, Akquisition, Zusammenführung von Geschäftsaktivitäten) kommen als strategische Partner nur Hersteller in Frage, die Daimler-Benz sowohl hinsichtlich der Produkte als auch der regionalen Präsenz ergänzen. Weiterhin sollte ein potentieller Partner weder die Markenidentität von Mercedes-Benz gefährden noch Daimler-Benz durch seine Größe dominieren.

Chrysler ist unter diesen Gesichtspunkten für Daimler-Benz der ideale Partner: Im Produktspektrum gibt es kaum Überschneidungen, und auch in regionaler Hinsicht ergänzen sich beide Unternehmen. Während Chrysler im NAFTA-Raum über eine starke Marktposition und hohe Ertragskraft verfügt, ist Daimler-Benz insbesondere im europäischen Raum gut positioniert und gehört im Personenwagenbereich zu den ertragstärksten Unternehmen.

## 4. Unternehmerische Ausrichtung und Ziele der DaimlerChrysler AG

Nur Automobilunternehmen, die den Konsolidierungsprozeß von Anfang an aktiv mitgestalten, haben eine Chance,

ihre Wettbewerbsposition langfristig zu stärken bzw. auszubauen. In Verbindung mit der aktiven Mitgestaltung des internationalen Konsolidierungsprozesses steht das Ziel, durch den globalen Ausbau der Marktposition eine führende Stellung im Markt einzunehmen bzw. zu stärken.

Durch den Zusammenschluß gehört DaimlerChrysler zu den führenden, global tätigen Automobilunternehmen und steht in der Umsatzrangfolge der Automobilindustrie auf Rang 3 (Chrysler bisher an 6./Daimler-Benz bisher an 4. Position). Gemessen am Absatz liegt DaimlerChrysler weltweit auf Rang 5 (Chrysler bisher an 6./Daimler-Benz bisher an 15. Position).

### 4.1 Personenwagen/Nutzfahrzeuge

Durch den Zusammenschluß der beiden Unternehmen und durch die Bündelung der Ressourcen können neue Wertsteigerungspotentiale erschlossen werden. Sowohl die Produktsortimente als auch die regionalen Schwerpunkte von Daimler-Benz und Chrysler ergänzen sich, so daß die Wettbewerbsposition des neuen Unternehmens insgesamt erheblich stärker sein wird, als wenn jedes der Unternehmen unabhängig geblieben wäre. DaimlerChrysler wird zu den wenigen Unternehmen in der Automobilindustrie gehören, die in zwei Triademärkten (Europa, NAFTA) über eine außerordentlich starke Marktposition verfügen.

Mit der Marke Mercedes-Benz kann DaimlerChrysler seine Position im Premiumsegment weiter ausbauen. Mit den Marken von Chrysler und den DaimlerChrysler zur Verfügung stehenden Ressourcen können das Potential im Volumensegment in den bestehenden Märkten ausgeschöpft und zugleich vielversprechende Wachstumsmärkte erschlossen werden, ohne dabei Gefahr zu laufen, das Markenimage von Mercedes-Benz zu verwässern. Durch die größere Vielfalt von Marken verringert sich die Abhängigkeit vom bisherigen Marktsegment und damit auch das unternehmerische Risiko. Zugleich können mit den neuen Marken marktkonforme Produkte für die wachstumsträchtigen Märkte in das Produkt-Portfolio aufgenommen werden.

Darüber hinaus eröffnet der Zusammenschluß den Eintritt in und die Erschließung von neuen Märkten. Insbesondere der asiatische Raum, Lateinamerika und Osteuropa bieten hier mittel- und langfristig ein erhebliches Potential. Economies of Scale, die durch den Zusammenschluß erreicht werden, führen zu Kostenreduzierungen auf allen Stufen der Wertschöpfungskette.

Durch die Bündelung seiner Ressourcen verfügt DaimlerChrysler über gute Voraussetzungen, neue Produkte noch schneller zur Serienreife zu entwickeln und dadurch einen Vorteil gegenüber den Wettbewerbern zu erzielen.

### 4.2 Geschäftsfelder Luft- und Raumfahrt, Dienstleistungen, direkt geführte industrielle Beteiligungen

Die Geschäftsfelder Luft- und Raumfahrt, Dienstleistungen und direkt geführte industrielle Beteiligungen werden im Unternehmen DaimlerChrysler als eigenständige Geschäftsfelder bzw. Geschäftsbereiche weitergeführt.

Als Folge des Zusammenschlusses der Daimler-Benz AG mit der Chrysler Corporation werden sich im Hinblick auf die strategischen Ausrichtungen der einzelnen Geschäftsfelder zunächst keine Änderungen ergeben. In Betracht kommen aber organisatorische Maßnahmen zur Verwirklichung von Synergieeffekten, insbesondere auf dem Gebiet von unterstützenden Dienstleistungen.

In der Luft- und Raumfahrt soll die Wettbewerbsfähigkeit insbesondere durch die Bildung europäischer Strukturen weiter vorangetrieben werden. Ein wesentliches Ziel besteht darin, das Airbus-Konsortium in eine voll integrierte europäische Kapitalgesellschaft umzuwandeln. Die „Airbus Single Company" soll bis Mitte 1999 realisiert werden.

Darüber hinaus hat sich die Daimler-Benz Aerospace AG in Übereinstimmung mit den europäischen Partnern und unterstützt von den Regierungen Großbritanniens, Frankreichs und Deutschlands für die Schaffung einer European Aerospace and Defence Company (EADC) ausgesprochen. Dazu werden intensive Gespräche mit allen europäischen Partnern über Wege zu diesem Ziel geführt. Abschließende Ergebnisse liegen bislang noch nicht vor, so daß Aussagen über die möglichen Modelle verfrüht wären.

Bei den Dienstleistungen geht es vorrangig darum, das Geschäft bei den Finanzdienstleistungen, den IT Services und den Telekommunikations- und Mediendiensten weiter auszubauen und zu internationalisieren.

Im Bereich der direkt geführten industriellen Beteiligungen verfügt Adtranz über gute Marktperspektiven und wird deshalb sein Restrukturierungsprogramm weiter gezielt vorantreiben.

Die Automobil-Elektronik wird vom Wachstum in der Automobilindustrie überproportional profitieren. Im Hinblick auf die Verbindung mit Chrysler vergrößert sich der konzerninterne Markt für diesen Geschäftsbereich.

MTU/Dieselantriebe verfügt über eine gute Marktposition und kann mit den neuen Motoren der Baureihen 2000 und 4000 weiter profitabel wachsen.

### 5. Möglichkeiten der Ergebnisverbesserung und Risiken / Vorteile für die Aktionäre

Durch den Zusammenschluß von Daimler-Benz und Chrysler entsteht ein Unternehmen, das über wettbewerbsfähige Produkte, eine starke Marktposition und effiziente Produktionsstrukturen verfügt.

Auch wenn der Schutz der Marken von Daimler-Benz und Chrysler oberstes Gebot für die zukünftige Führungsphilosophie der DaimlerChrysler AG ist, verbleibt trotzdem genügend Spielraum für die Nutzung von Synergien im Einkauf, bei der Konstruktion, in der Fertigung, im Vertrieb sowie im Bereich Forschung und Technologie; es können bereits kurzfristig erhebliche Kosteneinsparungen und spürbare Umsatzsteigerungen mit Synergieeffekten in Höhe von ca. DM 2,5 Mrd. realisiert werden. Insbesondere die Kapazitätserweiterungen durch effizientere Nutzung bestehender Anlagen, die Integration der Vertriebsnetz-Infrastruktur und die gemeinsame Marktbearbeitung schaffen Potentiale zur Absatzsteigerung.

Mittelfristig können durch die Optimierung des Einkaufs, durch die Nutzung von Integrationseffekten und durch ein gemeinsames Vorgehen im Bereich Forschung und Technologie Synergiepotentiale von über DM 5 Mrd. erschlossen werden.

#### Synergiepotentiale

| | 1999 in Mio. DM | ab 2001 in Mio. DM |
|---|---|---|
| Einkauf | 900 | 2.700 |
| Gesamtintegration, Finanzdienstleistungen | 360 | 900 |
| Forschung und Technologie, „Platform"-Integration | 180 | 900 |
| Vertriebsinfrastruktur | 540 | 540 |
| Höherer Absatz | 540 | 1.350 |
| Gesamt | 2.520 | 6.390 |

Langfristig kann DaimlerChrysler durch die Bündelung seiner Kräfte und auf der Basis seines breiten und wettbewerbsfähigen Produktprogramms gezielt die Wachstumsmärkte von morgen erschließen und gleichzeitig das Potential in den Triade-Märkten noch intensiver ausschöpfen, als es beiden Unternehmen auf sich allein gestellt möglich wäre.

Dies alles schafft gute Voraussetzungen für eine weitere nachhaltige Stärkung der Ertragskraft, von der dann auch die Aktionäre des Unternehmens entsprechend profitieren werden. Die neue DaimlerChrysler AG, die zu den ertragsstärksten Unternehmen weltweit zählen wird, wird auch hinsichtlich der Dividendenpolitik neue Standards setzen.

Die bisherigen Chrysler-Aktionäre haben die Erwartung, daß sie hinsichtlich der Ausschüttung durch den Zusammenschluß nicht schlechter gestellt werden. Da aber die Dividenden bei der Chrysler Corporation in der Vergangenheit deutlich höher lagen als bei der Daimler-Benz AG und höher als in Deutschland üblich, ist damit zu rechnen, daß die DaimlerChrysler AG eine neue Dividendenpolitik verabschieden wird, die den berechtigten Erwartungen der Aktionäre der neuen Gesellschaft entspricht. Unter der Voraussetzung, daß die Erwartungen für DaimlerChrysler eintreten, bedeutet dies, daß auch die bisherigen Daimler-Benz-Aktionäre künftig mit deutlich höheren Ausschüttungen rechnen können.

Durch den Zusammenschluß der Daimler-Benz AG und der Chrysler Corporation wird das übliche Maß an unternehmerischem Risiko grundsätzlich nicht vergrößert. Soweit sich marktabhängige Risiken verstärken, können diese durch gegenläufige Chancen relativiert werden. Das gemeinsame Unternehmen wird gegenüber dem bisherigen Daimler-Benz AG den Anteil seines Umsatzes in den USA erheblich vergrößern, so daß die Abhängigkeit von diesem Markt verbunden mit der Dollar-Umrechnung zu einem höheren Risiko führen kann. Dieser durch das verstärkte Amerika-Geschäft potentielle Nachteil kann jedoch durch das zyklische Verhalten des Automarktes in anderen Regionen ausgeglichen werden. Kraftfahrzeuge gehören zu den sogenannten dauerhaften Gebrauchsgütern; die Automobilindustrie ist deshalb eine Branche, die tendenziell unbeständiger als die Gesamtwirtschaft ist. Die Schwankungen auf den großen Weltmärkten finden jedoch nicht genau zur gleichen Zeit und in gleichem Umfang statt, so daß ein Unternehmen mit Präsenz in mehreren großen Märkten einen umfassenderen Schutz gegen zyklische Marktbewegungen hat.

### 6. Führungsphilosophie

Der Anspruch der DaimlerChrysler AG wird es sein, ein weltweit führender Anbieter von hochqualitativen und innovativen Transport- und Verkehrsprodukten, -systemen und Dienstleistungen zu sein. Die DaimlerChrysler AG will in all diesen Bereichen zu den Weltbesten gehören.

Das künftige Geschäftsportrait des DaimlerChrysler-Konzerns wird im Kern durch das Fahrzeuggeschäft und fahrzeugbezogene Geschäfte geprägt sein; die übrigen Aktivitäten teilen sich in Luft- und Raumfahrt, Dienstleistungen ohne direkten Bezug zum Fahrzeuggeschäft, Bahnsysteme und nicht fahrzeugbezogene Dieselmotoren auf.

Die Führungsphilosophie wird sich dazu bei allen unternehmerischen Aktivitäten an den daraus resultierenden

Potentialen zur Schaffung von Werten für die DaimlerChrysler-Aktionäre, die Kunden und Mitarbeiter orientieren. Im Mittelpunkt wird die dauerhafte und nachhaltige Verbesserung der Ertragskraft des durch den Zusammenschluß geschaffenen Unternehmens sein. Die Wahrung der Identität und der Schutz der Marken

*   Mercedes-Benz
*   Chrysler
*   Jeep®
*   Dodge
*   Plymouth
*   Freightliner
*   Sterling
*   SETRA
*   smart

ist weitere Aufgabe und Ziel der Führungsphilosophie.

Die Wachstumsstrategie der DaimlerChrysler AG wird aus drei Kernelementen bestehen. Es sind

*   Wertorientierte Führung
*   Innovation
*   Globalisierung

Bestandteil und Objekt der **wertorientierten Unternehmensführung** werden hervorragende, innovative Produkte und Dienstleistungen sein. Dies erfordert eine Führungsphilosophie, die auf unternehmerisches Denken und Handeln gründet. Im Mittelpunkt der wertorientierten Führung werden somit die Qualifikation, die Leistungsbereitschaft, die Zufriedenheit und damit insgesamt das Engagement der Mitarbeiter für das neue Unternehmen stehen. Die Erfolgs- und Mißerfolgsfaktoren, die den Unternehmenswert nachhaltig beeinflussen, werden in jeder Geschäftseinheit identifiziert. Die wichtigsten, vom Management direkt beeinflußbaren Wert- und Kostentreiber werden mit Anreizsystemen verknüpft. Die Beschäftigten des DaimlerChrysler-Konzerns werden weiterhin an der Wertentwicklung des Unternehmens teilhaben.

**Innovation** wird sich im DaimlerChrysler-Konzern nicht nur auf Forschung und Entwicklung beziehen. Innovation heißt auch, effizientere, kostengünstigere, produktivere Prozesse und vor allem neue Produkte schneller als die Wettbewerber auf den Markt zu bringen. Hierzu wird auch

der systemweite Ausbau des Intranet, die Vereinheitlichung der elektronischen Kommunikation sowie das Business TV beitragen; Effizienz, Kommunikation und Transparenz werden hierdurch gesteigert.

Die **Globalisierung** wird entsprechend der Bedeutung der wesentlichen Märkte weiter vorangetrieben. Die Erschließung neuer Märkte für die Produkte des DaimlerChrysler-Konzerns wird wesentliche Zielsetzung für profitables Wachstum sein. Dabei gehören Asien, Lateinamerika und Mittelosteuropa zu den Prioritäten.

### 7. Kosten des Zusammenschlusses

Die Kosten des Zusammenschlusses betragen insgesamt ca. DM 550 Mio. zuzüglich durch die Verschmelzung ausgelöste Grunderwerbsteuer in Höhe von etwa DM 160 Mio. Der für die Grunderwerbsteuer genannte Betrag beruht auf einer Schätzung der steuerlichen Bemessungsgrundlage.

Die Vergütung der Investmentbanken, die Kosten der Zulassung der DaimlerChrysler-Aktien zum Handel an den acht deutschen Wertpapierbörsen sowie zum Börsenhandel in New York (New York Stock Exchange), Chicago, Philadelphia, an der Pacific Stock Exchange, in Montreal, Toronto, London, Paris, Wien, Tokio und an der Schweizer Börse werden auf etwa DM 210 Mio. geschätzt. Die Kosten der Daimler-Benz-Sachkapitalerhöhung einschließlich der Durchführung des Umtauschangebots, der Chrysler-Sachkapitalerhöhung, der Daimler-Benz-Verschmelzung, Aufwendungen für Bewertungsgutachter, Prüfer sowie Rechtsberatung und Beurkundung werden sich auf DM 340 Mio. belaufen. Die Kosten wurden in der nachstehenden Aufgliederung, soweit sie nicht der ersten oder zweiten Stufe unmittelbar zuzurechnen sind, im Verhältnis 80 zu 20 auf die erste und zweite Stufe des Zusammenschlusses aufgeteilt.

### 7.1 Kosten der ersten Stufe des Zusammenschlusses – Daimler-Benz Sachkapitalerhöhung (Umtauschangebot)/Kosten der Chrysler-Sachkapitalerhöhung

Die der ersten Stufe des Zusammenschlusses zuzurechnenden Kosten betragen ca. DM 510 Mio.

### 7.2 Kosten Daimler-Benz-Verschmelzung

Die der Daimler-Benz-Verschmelzung zurechenbaren Kosten belaufen sich auf etwa DM 40 Mio.

## V. Bilanzielle und steuerliche Auswirkungen des Zusammenschlusses

### 1. Bilanzielle Folgen

#### Vorbemerkung

Die Darstellung der bilanziellen Auswirkungen der Zusammenführung folgt den einzelnen Stufen des Zusammenschlusses.

Die Bilanzen und Pro-forma-Bilanzen der **ersten Stufe sowie der zweiten Stufe** des Zusammenschlusses (Daimler-Benz-Sachkapitalerhöhung (Umtauschangebot) / Chrysler-Sachkapitalerhöhung / Daimler-Benz-Verschmelzung) sind nach den Grundsätzen ordnungsmäßiger Buchführung und Bilanzierung des Handelsgesetzbuches (HGB) aufgestellt. Die Pro-forma-Bilanzen und Gewinn- und Verlustrechnungen zur Darstellung der bilanziellen Folgen für den DaimlerChrysler-Konzern nach erfolgtem Zusammenschluß entsprechen der Konzernrechnungslegung der Daimler-Benz AG unter Zugrundelegung der U.S. GAAP. Dabei erfolgt die Darstellung für die DaimlerChrysler AG unter Zugrundelegung der Pooling of Interests-Methode (Interessenzusammenführungsmethode).

### 1.1 Bilanzielle Folgen Daimler-Benz-Sachkapitalerhöhung (Umtauschangebot) und Chrysler-Sachkapitalerhöhung

Bei der Darstellung der bilanziellen Folgen der Daimler-Benz-Sachkapitalerhöhung und der Chrysler-Sachkapitalerhöhung in einer Pro-forma-Bilanz der DaimlerChrysler AG zum 1. Juli 1998 wurde unterstellt, daß die Zielsetzung eines Tauschs von mindestens 90% der Daimler-Benz-Aktien in DaimlerChrysler-Aktien erfüllt wird und das Grundkapital der DaimlerChrysler AG dementsprechend erhöht wurde. Dies führte zu der weiteren Annahme, daß die Chrysler Corporation in einem Umfang von bis zu 30 Mio. Treasury Stock (eigene Aktien) vor Durchführung des Reverse Triangular Merger verkauft hat und dieser Treasury Stock somit Gegenstand der Chrysler-Sachkapitalerhöhung geworden ist.

Ebenso wurde unterstellt, daß der U.S. Exchange Agent sämtliche Aktien der Chrysler Corporation, die er aufgrund des Reverse Triangular Merger erworben hat, aufgrund eines Nachgründungs- und Einbringungsvertrags in die DaimlerChrysler AG eingebracht hat.

In der Bilanz der DaimlerChrysler AG werden die eingebrachten Beteiligungen unter Finanzanlagen ausgewiesen. Das Kapital vor Einbringung (DM 0,1 Mio.) ist, abgesehen

von einem Betrag in Höhe der durch die Gesellschaft getragenen Errichtungskosten, durch Vermögen gedeckt.

Die Pro-forma-Bilanz der DaimlerChrysler AG stellt sich nach durchgeführten Kapitalerhöhungen gegen Sacheinlagen und vor der Daimler-Benz-Verschmelzung wie folgt dar:

Pro-forma-Bilanz der DaimlerChrysler AG
(nach Daimler-Benz- und Chrysler-Sachkapitalerhöhung)
in Mio. DM

| Aktiva | |
|---|---|
| Anlagevermögen | |
| Immaterielle Vermögensgegenstände und Sachanlagen | |
| Finanzanlagen [1] | 25.489 [1] |
| Umlaufvermögen | |
| Forderungen gegen verbundene Unternehmen | |
| Übrige Forderungen und sonstige Vermögensgegenstände | |
| Wertpapiere | |
| Zahlungsmittel [2] | |
| Summe Aktiva | 25.489 |
| | |
| Passiva | |
| Eigenkapital | |
| Gezeichnetes Kapital [3] | 4.730 |
| Kapitalrücklage | 20.759 |
| Gewinnrücklagen | |
| Rückstellungen | |
| Rückstellungen für Pensionen und ähnliche Verpflichtungen | |
| Übrige Rückstellungen | |
| Verbindlichkeiten | |
| Verbindlichkeiten gegenüber verbundenen Unternehmen | |
| Übrige Verbindlichkeiten | |
| Rechnungsabgrenzungsposten | |
| Summe Passiva | 25.489 |

[1] Davon entfallen auf Daimler-Benz-Aktien DM 13.875 Mio. und auf Chrysler-Aktien DM 11.614 Mio.

[2] Bargründung DaimlerChrysler AG in Höhe von DM 100.000,- abzüglich Gründungskosten.

[3] Bei einer Umtauschquote von weniger als 90% Ausweis der Beteiligungsansätze und Grundkapital ohne Chrysler Treasury Stock.

Die Pro-forma-Bilanz der DaimlerChrysler AG nach Sachkapitalerhöhungen und vor der Verschmelzung der Daimler-Benz AG auf die DaimlerChrysler AG beinhaltet nur die Positionen Finanzanlagen (Anteile an der Daimler-Benz AG und an der Chrysler Corporation) sowie ein geringes Guthaben bei Kreditinstituten aus der Bargründung und Eigenkapital. Der den Nominalwert der als Gegenleistung für die Einbringung ausgegebenen DaimlerChrysler-Aktien übersteigende Betrag wird in die Kapitalrücklage eingestellt.

Das Wahlrecht zum handelsbilanziellen Wertansatz der Aktien der Daimler-Benz AG und der Beteiligung an der Chrysler Corporation in der Bilanz der DaimlerChrysler AG wird jeweils mit Werten ausgeübt, die höchstens dem Börsenkurs dieser Aktien entsprechen.

### Aufteilung Grundkapital/Kapitalrücklage DaimlerChrysler AG

| | Grundkapital in Mio. DM | Kapitalrücklage in Mio. DM |
|---|---|---|
| Daimler-Benz-Sach-kapitalerhöhung | 2.575 | 11.300 |
| Chrysler-Sach-kapitalerhöhung | 2.155 | 9.459 |

Der Wertansatz der Beteiligungen wurde mit dem Ziel gewählt, in der DaimlerChrysler AG das Eigenkapital zunächst in der Höhe auszuweisen, wie dies dem der Daimler-Benz AG entsprach. Infolgedessen wurde die Beteiligung an der Daimler-Benz AG nach Maßgabe der durch den Tausch erreichten Beteiligungsquote (90 %) mit dem Betrag angesetzt, der dem Eigenkapital der Daimler-Benz AG zum 30. Juni 1998, vermindert um das Ergebnis des 1. Halbjahres 1998 in Höhe von DM 8.025 Mio. sowie um Gewinnrücklagen in Höhe von DM 20.057 Mio., somit DM 13.875 Mio., entsprach. Der Wertansatz für die Anteile an der Chrysler Corporation wurde entsprechend dem Wertverhältnis von der Daimler-Benz AG zu der Chrysler Corporation (1.005 : 0,6235) errechnet und demzufolge mit DM 11.614 Mio. angesetzt.

Bei einer unterstellten Umtauschquote von 90 % für die Daimler-Benz-Aktien und einem Umtauschverhältnis von 1 (einer) Daimler-Benz-Aktie für 1,005 DaimlerChrysler-Aktien ergibt sich durch den Wertansatz der eingebrachten Aktien an der Daimler-Benz AG und der Chrysler Corporation eine Erhöhung des Grundkapitals um DM 4.730 Mio.; der über die Erhöhung des Grundkapitals hinausgehende Betrag von DM 20.759 Mio. wird in die Kapitalrücklage eingestellt.

### *1.2 Bilanzielle Folgen Verschmelzung Daimler-Benz AG / DaimlerChrysler AG*

#### Vorbemerkung

Die Verschmelzung der Daimler-Benz AG auf die DaimlerChrysler AG wird mit Ablauf des 30. Juni 1998 erfolgen. Ab dem 1. Juli 1998 („Verschmelzungsstichtag") gelten alle Geschäfte der Daimler-Benz AG als für Rechnung der DaimlerChrysler AG vorgenommen.

Mit dinglicher Wirkung erfolgt die Übertragung der Aktiva und Passiva der Daimler-Benz AG dagegen erst zum Zeitpunkt der Eintragung der Verschmelzung in das Handelsregister der DaimlerChrysler AG (als übernehmende Gesellschaft). Auf die DaimlerChrysler AG werden mit Eintragung der Daimler-Benz-Verschmelzung das gesamte Vermögen und die Schulden (Aktiva und Passiva) der Daimler-Benz AG übergehen.

### *1.2.1 Bilanz Daimler-Benz AG vor Verschmelzung zum 30. Juni 1998*

Zum 30. Juni 1998 stellt sich die Bilanz der Daimler-Benz AG wie folgt dar:

| | Daimler-Benz AG (Zwischen- und Schlußbilanz zum 30.6.98) in Mio. DM |
|---|---|
| **Aktiva** | |
| Anlagevermögen | |
| Immaterielle Vermögensgegenstände und Sachanlagen | 16 |
| Sachanlagen | 1.352 |
| Finanzanlagen | 40.123 |
| | 41.491 |
| | |
| Umlaufvermögen | |
| Vorräte | 6.745 |
| Forderungen aus Lieferungen und Leistungen | 3.280 |
| Forderungen gegen verbundene Unternehmen | 7.326 |
| Übrige Forderungen und sonstige Vermögensgegenstände | 2.918 |
| Wertpapiere | 11.512 |
| Zahlungsmittel | 900 |
| | 32.681 |
| | |
| Rechnungsabgrenzungsposten | 20 |
| | |
| **Summe Aktiva** | 74.192 |

Daimler-Benz AG
(Zwischen- und Schlußbilanz
zum 30.6.98)
in Mio. DM

| Passiva | |
|---|---:|
| Eigenkapital | |
| Gezeichnetes Kapital | 2.847 |
| Kapitalrücklage | 12.570 |
| Gewinnrücklagen | 2.057 |
| Halbjahresergebnis/i.Vj. Bilanzgewinn | 8.025 |
| | 25.499 |
| | |
| Rückstellungen | |
| Rückstellungen für Pensionen und ähnliche Verpflichtungen | 9.611 |
| Übrige Rückstellungen | 8.707 |
| | 18.318 |
| | |
| Verbindlichkeiten | |
| Verbindlichkeiten aus Lieferungen und Leistungen | 6.314 |
| Verbindlichkeiten gegenüber verbundenen Unternehmen | 19.616 |
| Übrige Verbindlichkeiten | 4.445 |
| | 30.375 |
| | |
| Rechnungsabgrenzungsposten | |
| Summe Passiva | 74.192 |

Diese Bilanz entspricht der am 24. Juli 1998 aufgestell-
ten und mit dem uneingeschränkten Bestätigungsvermerk
versehenen Schlußbilanz der Daimler-Benz AG zum 30. Juni
1998.

### 1.2.2 Kapitalerhöhung der DaimlerChrysler Aktien-
### gesellschaft zur Durchführung der Daimler-Benz-Ver-
### schmelzung

Soweit die DaimlerChrysler AG aufgrund der Daimler-Benz-
Sachkapitalerhöhung an der Daimler-Benz AG beteiligt ist,
darf bei der Daimler-Benz-Verschmelzung das Grundkapital
der DaimlerChrysler AG nicht erhöht werden (§ 68 Abs. 1
S.1 Nr. 1 UmwG).

Um jedoch den Daimler-Benz-Aktionären, die das Um-
tauschangebot nicht angenommen haben und die somit als
außenstehende Aktionäre an der Verschmelzung teilneh-
men, neue Aktien der DaimlerChrysler AG zu gewähren,
wurde bei der DaimlerChrysler AG eine Kapitalerhöhung be-
schlossen. Der Nominalbetrag der Kapitalerhöhung be-
stimmt sich nach dem Umtauschverhältnis und der Zahl der
tatsächlich getauschten Daimler-Benz-Aktien. Dabei ist zu
berücksichtigen, daß bei der Daimler-Benz-Verschmelzung
alternative Umtauschverhältnisse anzuwenden sind. Beläuft
sich die Umtauschquote entsprechend der Zielsetzung, die
Anwendung der Pooling of Interests-Methode zu erreichen,
auf 90% oder mehr, wird je 1 (eine) Daimler-Benz-Aktie ge-
gen je 1.005 DaimlerChrysler-Aktien getauscht. Erreicht die
Umtauschquote weniger als 90%, wird 1 (eine) Daimler-
Benz-Aktie gegen 1 (eine) DaimlerChrysler-Aktie getauscht.

Entsprechend der Pro-forma-Bilanz der DaimlerChrysler
AG nach Durchführung der Sachkapitalerhöhungen (siehe
Abschnitt V. 1.1) wurde bei der Darstellung der Pro-forma-
Bilanz der DaimlerChrysler AG nach Verschmelzung eine
Umtauschquote von 90% unterstellt. Hieraus folgt, daß bei
einer entsprechenden Differenz von 10% zu 100% das
Grundkapital um weitere DM 272 Mio. zu erhöhen ist und
DM 1.270 Mio. in die Kapitalrücklagen einzustellen sind.

*1.2.3 Pro-forma-Bilanz der DaimlerChrysler AG
nach der Daimler-Benz-Verschmelzung zum 1. Juli 1998*

### 1.2.3 Pro-forma-Bilanz der DaimlerChrysler AG nach der Daimler-Benz-Verschmelzung zum 1. Juli 1998

Nach Verschmelzung der Daimler-Benz AG auf die DaimlerChrysler AG ergibt sich folgende Pro-forma-Bilanz der DaimlerChrysler AG:

|  | Pro-forma-Bilanz der DaimlerChrysler AG nach Verschmelzung in Mio. DM |
|---|---|
| **Aktiva** | |
| **Anlagevermögen** | |
| Immaterielle Vermögensgegenstände | 16 |
| Sachanlagen | 1.352 |
| Finanzanlagen | 51.737 |
| | 53.105 |
| **Umlaufvermögen** | |
| Vorräte | 6.745 |
| Forderungen aus Lieferungen und Leistungen | 3.280 |
| Forderungen gegen verbundene Unternehmen | 7.326 |
| Übrige Forderungen und sonstige Vermögensgegenstände | 2.918 |
| Wertpapiere | 11.512 |
| Zahlungsmittel | 900 |
| | 32.681 |
| Rechnungsabgrenzungsposten | 20 |
| **Summe Aktiva** | 85.806 |

Pro-forma-Bilanz der DaimlerChrysler AG
nach Verschmelzung
in Mio. DM

| Passiva | |
|---|---|
| **Eigenkapital** | |
| Gezeichnetes Kapital | 5.016 |
| Kapitalrücklage | 22.015 |
| Gewinnrücklagen | |
| Verschmelzungsergebnis | 10.082 |
| | 37.113 |
| | |
| **Rückstellungen** | |
| Rückstellungen für Pensionen und ähnliche Verpflichtungen | 9.611 |
| Übrige Rückstellungen | 8.707 |
| | 18.318 |
| | |
| **Verbindlichkeiten** | |
| Verbindlichkeiten aus Lieferungen und Leistungen | 6.314 |
| Verbindlichkeiten gegenüber verbundenen Unternehmen | 19.616 |
| Übrige Verbindlichkeiten | 4.445 |
| | 30.375 |
| | |
| **Rechnungsabgrenzungsposten** | |
| **Summe Passiva** | 85.806 |

Die Übernahme der Vermögensgegenstände und der Schulden aus der Daimler-Benz AG in die DaimlerChrysler AG erfolgt zu Buchwerten der Daimler-Benz AG. Die Verrechnung dieser Buchwerte mit dem Beteiligungsansatz der Daimler-Benz-Aktien in der DaimlerChrysler AG führt zu einem Verschmelzungsgewinn in Höhe von DM 10.082 Mio. Der Verschmelzungsgewinn entspricht dem Halbjahresergebnis der Daimler-Benz AG zum 30. Juni 1998 zuzüglich des Betrages der Gewinnrücklagen.

### 1.3 Bilanzielle Folgen DaimlerChrysler-Konzern nach abgeschlossenem Zusammenschluß

Daimler-Benz und Chrysler gehen davon aus, daß der Zusammenschluß die Anforderungen für eine Kapitalkonsolidierung nach der Pooling of Interests-Methode gemäß den U.S. GAAP (APB No. 16) erfüllt. Die Rechnungslegung nach der Pooling of Interests-Methode kann jedoch nicht garantiert werden, da bestimmte Ereignisse, die sich der Kontrolle durch die Daimler-Benz AG und die Chrysler Corporation entziehen, der Anwendung dieser Methode entgegenstehen können. Die Pooling of Interests-Methode kann nur dann Anwendung auf den Zusammenschluß finden, wenn, wie dargestellt, bestimmte Bedingungen erfüllt werden, insbesondere (i) mindestens 90% der Daimler-Benz-Aktien (einschließlich derjenigen, die durch American Depositary Shares verbrieft sind) im Zuge des Umtauschangebots getauscht werden und (ii) die Chrysler Corporation vor Durchführung des Reverse Triangular Merger bis zu 30 Mio. Chrysler-Aktien aus dem Treasury Stock verkauft hat. Tatsächlich mußten nur 23,5 Mio. Chrysler-Aktien ausgegeben werden, die in den Chrysler Corporation Master Retirement Trust eingebracht worden sind. Im Abschnitt „XI. Finanzteil" des Prospekts sind die ungeprüften Pro-forma-Abschlußdaten nach der Pooling of Interests-Methode dargestellt.

### 2. Steuerliche Folgen

Die nachfolgende Darstellung der steuerlichen Folgen der Daimler-Benz-Sachkapitalerhöhung sowie der Chrysler-Sachkapitalerhöhung und der Daimler-Benz-Verschmelzung nach deutschem Recht beschränkt sich auf die hauptsächlich vorkommenden Besteuerungssachverhalte und beruht auf der derzeit bestehenden Rechtslage. Den Aktionären wird empfohlen, eine ihren persönlichen Verhältnisse berücksichtigende steuerliche Beratung einzuholen. Dies gilt auch für in der Bundesrepublik Deutschland beschränkt steuerpflichtige Aktionäre, da die Fragen der Besteuerung (z.B. Entstehen und/oder Höhe steuerpflichtiger Veräußerungsgewinne) von den Regelungen eines etwa bestehenden Abkommens zur Vermeidung der Doppelbesteuerung

und dem nationalen Steuerrecht des Ansässigkeitsstaats des jeweiligen Aktionärs abhängig sind. Die nachfolgenden steuerlichen Hinweise können nicht alle Sonderfälle berücksichtigen; u.a. sind die Fälle nicht berücksichtigt, in denen die Aktien der an der Zusammenführung beteiligten Unternehmen in einem Sondervermögen einer Kapitalanlagegesellschaft (Investmentfonds) oder in einem ausländischen Betriebsvermögen gehalten werden.

### 2.1 Folgen für die Daimler-Benz-Aktionäre und Chrysler-Aktionäre

### 2.1.1 Umtausch Daimler-Benz-Aktien / Umtausch Chrysler-Aktien

#### 2.1.1.1 Daimler-Benz-Aktionäre

Die steuerlichen Folgen des Tauschs der Daimler-Benz-Aktien gegen Aktien der DaimlerChrysler AG im Rahmen der ersten Stufe des Zusammenschlusses (Umtauschangebot/Daimler-Benz-Sachkapitalerhöhung) bestimmen sich für die Daimler-Benz-Aktionäre nach dem steuerlichen Status, der den Daimler-Benz-Aktien im Zeitpunkt des Tauschs zukommt, sowie nach dem Wert, mit dem die DaimlerChrysler AG die eingebrachten Aktien in ihrer Steuerbilanz ansetzt.

Gemäß § 20 Abs. 2 Satz 1 UmwStG darf die DaimlerChrysler AG die eingebrachten Aktien mit dem bisherigen Buchwert bzw. den Anschaffungskosten der Daimler-Benz-Aktionäre oder mit einem höheren Wert, höchstens dem steuerlichen Teilwert, ansetzen. Nach § 20 Abs. 4 UmwStG gilt der Wert, mit dem die DaimlerChrysler AG diese Aktien in ihrer Steuerbilanz ansetzt, für den Einbringenden als Veräußerungspreis der eingebrachten Daimler-Benz-Aktien und als Anschaffungskosten der im Gegenzug dafür erhaltenen DaimlerChrysler-Aktien. Einbringender im Sinne des § 20 UmwStG ist der Aktionär, dessen Aktien aufgrund des Tauschs in die DaimlerChrysler AG eingebracht werden.

Durch Ansatz des Buchwerts/der Anschaffungskosten des einbringenden Daimler-Benz-Aktionärs kann die DaimlerChrysler AG bei der Einbringung für die Daimler-Benz-Aktionäre das Entstehen von in Deutschland steuerpflichtigen Gewinnen vermeiden. Voraussetzung ist allerdings, daß die DaimlerChrysler AG aufgrund ihrer im Wege des Tauschs erworbenen Beteiligung nachweisbar unmittelbar die Mehrheit der Stimmrechte an Daimler-Benz AG hält und sich die Einbringung insgesamt als einheitlicher Vorgang darstellt. Dies wird durch den vorgesehenen Ablauf des Zusammenschlusses sichergestellt.

Bei der Abwicklung des Aktientauschs ist steuerlich zwischen Aktionären, die ihre Aktien im Zeitpunkt des Tauschs in einem inländischen Betriebsvermögen halten, und Aktionären, die die Aktien zu diesem Zeitpunkt in ihrem Privatvermögen halten, zu unterscheiden.

### a. Aktien im inländischen Betriebsvermögen

Für Daimler-Benz-Aktien im inländischen Betriebsvermögen des tauschenden Daimler-Benz-Aktionärs ist der Buchwert derjenige Wert, mit dem der tauschende Daimler-Benz-Aktionär die eingebrachten Aktien im Zeitpunkt des Tauschs in die DaimlerChrysler AG nach den steuerrechtlichen Vorschriften über die Gewinnermittlung anzusetzen hat. Die an die Stelle der Daimler-Benz-Aktien tretenden DaimlerChrysler-Aktien gehören wie bisher bei dem tauschenden Aktionär zu dessen Betriebsvermögen. Sie werden dort mit dem steuerlichen Wert erfaßt, mit dem die DaimlerChrysler AG die eingebrachten Daimler-Benz-Aktien des betreffenden Daimler-Benz-Aktionärs in ihrer Steuerbilanz ansetzt. Soll der Vorgang daher aus der Sicht des tauschenden Daimler-Benz-Aktionärs steuerneutral behandelt werden, muß dieser der DaimlerChrysler AG den bisherigen steuerlichen Buchwert der von ihm eingebrachten Daimler-Benz-Aktien mitteilen. Für diese Mitteilung wird dem tauschenden Aktionär ein von der DaimlerChrysler AG ein Formular nach der Annahme des Umtauschangebots zur Verfügung gestellt.

Werden die Buchwerte seitens des tauschenden Aktionärs der DaimlerChrysler AG nicht innerhalb der in dem vorgenannten Formular vorgesehenen Frist mitgeteilt, hat die DaimlerChrysler AG die eingebrachten Daimler-Benz-Aktien in ihrer Steuerbilanz mit deren Teilwert anzusetzen, mit der Folge, daß bei dem tauschenden Aktionär ein steuerpflichtiger Veräußerungsgewinn in Höhe der Differenz zwischen Teilwert und bisherigem Buchwert der Daimler-Benz-Aktien entsteht.

Als Teilwert wird der durch die Frankfurter Wertpapierbörse im amtlichen Handel festgestellte Kassakurs der Daimler-Benz-Aktie am letzten Handelstag vor dem Tag, an dem von der DaimlerChrysler AG bekanntgegeben wird, daß die nach den Bedingungen des Umtauschangebots der DaimlerChrysler AG erforderliche Anzahl an Daimler-Benz-Aktien zum Tausch eingereicht wurde, angesetzt (Teilwert). Der von der DaimlerChrysler AG angesetzte Teilwert wird durch Veröffentlichung im Bundesanzeiger, in der Frankfurter Allgemeinen Zeitung und in der Börsen-Zeitung bekanntgemacht.

### b. Aktien im Privatvermögen

Für in der Bundesrepublik Deutschland unbeschränkt Steuerpflichtige, die die Daimler-Benz-Aktien im Privatvermögen halten, ist nach der Vorbesitzzeit der Aktien zu unterscheiden. Nach § 22 Nr. 2 i. V. m. § 23 Abs. 1 Nr. 1 b) EStG ist ein Gewinn aus der Veräußerung von im Privatvermögen gehaltenen Daimler-Benz-Aktien nur dann steuerpflichtig, wenn der Zeitraum zwischen Anschaffung und Veräußerung dieser Aktien nicht mehr als sechs Monate beträgt. Der Tausch von Daimler-Benz-Aktien gegen DaimlerChrysler-Aktien gilt als Veräußerung im Sinne dieser Vorschrift.

Hat der Daimler-Benz-Aktionär die Daimler-Benz-Aktien länger als sechs Monate vor der Veräußerung in Form des Tauschs erworben, so löst der Tausch keine Einkommensteuer aus. Für die infolge des Tauschs erhaltenen DaimlerChrysler-Aktien beginnt mit dem Tausch eine neue Spekulationsfrist von sechs Monaten. Für diese Aktien ist eine Mitteilung der Anschaffungskosten nicht erforderlich.

Maßgeblicher Zeitpunkt für die Frage, ob die Spekulationsfrist abgelaufen ist, ist der Tag, an dem die DaimlerChrysler AG bekanntgibt, daß die nach den Bedingungen des Umtauschangebots der DaimlerChrysler AG erforderliche Anzahl von Daimler-Benz-Aktien zum Umtausch eingereicht werden sind (voraussichtlich frühestens 26. Oktober 1998, somit sind Anschaffungsvorgänge vor dem 26. April 1998 keinesfalls steuerlich betroffen; dies kann auch für nach diesem Zeitpunkt stattfindende Vorgänge gelten, soweit die Annahmefrist für das Umtauschangebot verlängert wird). Zu diesem Zeitpunkt kann bei wirtschaftlicher Betrachtungsweise, die für die steuerliche Beurteilung maßgeblich ist, von dem Wirksamwerden des Veräußerungsgeschäfts im Rahmen des Aktientausches im Sinne von § 23 Abs. 1 Nr. 1b) EStG ausgegangen werden.

Die DaimlerChrysler AG setzt in ihrer Steuerbilanz für diejenigen Daimler-Benz-Aktien, bei denen im Zeitpunkt des Tauschs, d. h. im Veräußerungszeitpunkt in dem oben erläuterten Sinne, mehr als sechs Monate seit Anschaffung verstrichen sind, in jedem Fall den Teilwert an. Für den Fall der Veräußerung der aus dem Tausch erhaltenen DaimlerChrysler-Aktien innerhalb der neuen Spekulationsfrist ermittelt sich ein möglicher Spekulationsgewinn/-verlust als Differenz zwischen Veräußerungspreis (abzüglich Veräußerungskosten) und dem Teilwert zum Zeitpunkt des Tauschs.

Hat der Daimler-Benz-Aktionär zum Tausch angebotene Daimler-Benz-Aktien innerhalb einer Frist von sechs Monaten vor dem Tausch erworben, so führt der Tausch dieser Aktien grundsätzlich zu einer Spekulationsbesteuerung

nach § 23 EStG. Hierzu gehören insbesondere die im Rahmen der Kapitalerhöhung bei der Daimler-Benz AG vom Juni 1998 gezeichneten neuen Daimler-Benz-Aktien.

Der steuerpflichtige Spekulationsgewinn/-verlust ergibt sich aus der Differenz zwischen Veräußerungspreis, hier dem Teilwert der Daimler-Benz-Aktie (abzüglich Veräußerungskosten) und deren Anschaffungskosten. Nähere Hinweise auf die Ermittlung dieser Anschaffungskosten sind einem dem Umtauschangebot beigefügten Merkblatt zu entnehmen. Gewinne aus Spekulationsgeschäften bleiben steuerfrei, wenn der aus Spekulationsgeschäften erzielte Gesamtgewinn im Kalenderjahr weniger als DM 1.000,– betragen hat.

Der Aktionär hat jedoch für den Fall der Annahme des Umtauschangebots hinsichtlich der der Spekulationsbesteuerung unterliegenden Daimler-Benz-Aktien die Möglichkeit, die Versteuerung eines Veräußerungsgewinns für diese Aktion dadurch zu vermeiden, daß er der DaimlerChrysler AG die ursprünglichen Anschaffungskosten dieser Aktien mitteilt. Die DaimlerChrysler AG setzt diese Aktien dann mit diesem Wert in ihrer Steuerbilanz an. Diese Vorgehensweise würde für einen unbeschränkt steuerpflichtigen Daimler-Benz-Aktionär allerdings bedeuten, daß bei einer späteren Veräußerung der im Wege des Tauschs erhaltenen DaimlerChrysler-Aktien unabhängig von der Haltedauer ein etwaiger Veräußerungsgewinn zu versteuern wäre (einbringungsgeborene Anteile im Sinne von § 21 UmwStG), der Veräußerungsgewinn unterliegt nach derzeitiger Rechtslage dem halben Einkommensteuersatz (§ 34 Abs. 1 EStG).

Unterbleibt eine Mitteilung der Anschaffungskosten der zum Tausch angebotenen Daimler-Benz-Aktien, wird die DaimlerChrysler AG deren Teilwert im Zeitpunkt des Tauschs ansetzen. Dieser gilt für den Aktionär als Veräußerungspreis bei der Ermittlung eines etwaigen Spekulationsgewinns/-verlusts. Für die im Rahmen des Tauschs erworbenen DaimlerChrysler-Aktien beginnt in diesem Fall eine neue Spekulationsfrist von sechs Monaten. Für den Fall der Veräußerung der aus dem Tausch erhaltenen DaimlerChrysler-Aktien innerhalb der neuen Spekulationsfrist ermittelt sich ein möglicher Spekulationsgewinn/-verlust als Differenz zwischen Veräußerungspreis (abzüglich Veräußerungskosten) und dem Teilwert zum Zeitpunkt des Tauschs.

*c. Aktien im Besitz beschränkt steuerpflichtiger Aktionäre*

aa. Steuersituation nach deutschem Steuerrecht
Für beschränkt steuerpflichtige Daimler-Benz-Aktionäre, die ihre Aktien nicht in einem inländischen Betriebsvermögen halten, ist der Tausch nach deutschem Steuerrecht einkommensteuerneutral. Da in diesem Fall die einzubringenden Aktien nach § 20 Abs. 1 Satz 2 UmwStG i.V.m. § 20 Abs. 3 UmwStG stets mit ihrem Teilwert anzusetzen sind, müssen die Anschaffungskosten der Aktien in diesem Fall der DaimlerChrysler AG nicht mitgeteilt werden.

bb. Steuersituation nach ausländischem Steuerrecht
Die steuerlichen Folgen des Tauschs richten sich bei beschränkt steuerpflichtigen Aktionären nach den steuerlichen Bestimmungen in deren Ansässigkeitsstaat. Eine Darstellung ist im Rahmen dieses Prospekts nicht möglich. Den betreffenden Aktionären wird empfohlen, sich wegen der steuerlichen Folgen an einen mit der Steuerrechtsordnung ihres Ansässigkeitsstaates vertrauten steuerlichen Berater zu wenden.

*2.1.1.2 Chrysler-Aktionäre*
Soweit Chrysler-Aktionäre der deutschen Besteuerung unterliegen, sei es, weil sie ihre Chrysler-Aktien in einem inländischen Betriebsvermögen halten oder weil sie im Inland ansässig sind, können sie die Besteuerung eines Veräußerungsgewinns bei der Durchführung des Tauschs im Rahmen der Chrysler-Sachkapitalerhöhung unter den gleichen Voraussetzungen vermeiden wie dies für die Daimler-Benz-Aktionäre in Ziff. 2.1.1.1 dargestellt ist. Dabei ist davon auszugehen, daß die DaimlerChrysler AG aufgrund des Tauschs die nach § 20 Abs. 1 Satz 2 UmwStG für die Steuerneutralität des Tauschs erforderliche Mehrheit der Stimmrechte bezüglich Chrysler im Rahmen eines einheitlichen Einbringungsvorgangs erwirbt.

*a. Aktien in einem inländischen Betriebsvermögen*
Soweit Chrysler-Aktionäre ihre Aktien in einem inländischen Betriebsvermögen halten, unterliegen sie mit einem etwaigen Veräußerungsgewinn aus dem Aktientausch der deutschen Einkommensteuerpflicht. Die steuerlichen Folgen sind identisch mit denen für die Daimler-Benz-Aktionäre dargestellten (siehe dazu im einzelnen unter Ziff. 2.1.1.1a).

*b. Aktien im Privatvermögen*
Unbeschränkt steuerpflichtige Chrysler-Aktionäre unterliegen mit ihren im Privatvermögen gehaltenen Chrysler-

72

Aktien der Spekulationsbesteuerung nach § 22 Nr. 2 EStG i. V.m. § 23 Abs. 1 Nr. 1 b) EStG, soweit zwischen Erwerb der Aktien und Aktientausch nicht mehr als sechs Monate verstrichen sind. Sie können einen steuerpflichtigen Veräußerungsgewinn unter den gleichen Voraussetzungen vermeiden, wie die Daimler-Benz-Aktionäre (siehe im einzelnen unter Ziff. 2.1.1.1.b).

### c. Aktien im Besitz beschränkt steuerpflichtiger Aktionäre

aa. Steuersituation nach deutschem Steuerrecht
Für beschränkt steuerpflichtige Chrysler-Aktionäre, die ihre Aktien nicht in einem inländischen Betriebsvermögen halten, ist der Tausch nach deutschem Steuerrecht einkommensteuerneutral. Da in diesem Fall die einzubringenden Aktien nach § 20 Abs. 1 Satz 2 UmwStG i.V.m. § 20 Abs. 3 UmwStG in der Steuerbilanz stets mit ihrem Teilwert anzusetzen sind, brauchen die Anschaffungskosten der Aktien in diesem Fall der DaimlerChrysler AG nicht mitgeteilt zu werden.

bb. Steuersituation nach ausländischem Steuerrecht
Die steuerlichen Folgen des Aktientauschs richten sich bei beschränkt steuerpflichtigen Aktionären nach den steuerlichen Bestimmungen in deren Ansässigkeitsstaat.

Für Zwecke der U.S. Federal Income Tax ist vorgesehen, daß der Chrysler-Merger und die Chrysler-Sachkapitalerhöhung als eine steuerfreie Übertragung von Chrysler-Aktien gegen DaimlerChrysler-Aktien behandelt werden. Dies gilt nicht, soweit der Chrysler-Aktionär einen Barausgleich für Ansprüche auf Bruchteile an DaimlerChrysler-Aktien erhält. Chrysler hat zu einigen speziellen Aspekten des Aktientausches ein sog. Private Letter Ruling (verbindliche Auskunft) des U.S. Internal Revenue Service ("IRS") erbeten und das erbetene Private Letter Ruling am 4. September 1998 erhalten. Aufgrund dieser Auskunft konnte die Mindestumtauschquote für das Umtauschangebot der DaimlerChrysler AG an die Daimler-Benz-Aktionäre auf 75% (auf tatsächlicher Basis) gesenkt werden.

### 2.1.2 Daimler-Benz-Verschmelzung

#### 2.1.2.1 Aktionäre der DaimlerChrysler AG
Für Aktionäre der Daimler-Benz AG sowie der Chrysler Corporation, die durch den Tausch bereits Aktionäre der DaimlerChrysler AG geworden sind, kommt es durch die Verschmelzung zu keinen steuerlichen Auswirkungen.

#### 2.1.2.2 Aktionäre der Daimler-Benz AG
Aktionäre der Daimler-Benz AG, die zum Zeitpunkt der Verschmelzung von dem Umtauschangebot der DaimlerChrysler AG keinen Gebrauch gemacht haben und somit noch Aktionäre der Daimler-Benz AG sind, erhalten für ihre aufgrund der Verschmelzung untergehenden Daimler-Benz-Aktien solche der DaimlerChrysler AG. Bezüglich dieses durch die Verschmelzung ausgelösten Aktientauschs ist wiederum zwischen Aktien in einem inländischen Betriebsvermögen und Aktien im Privatvermögen zu unterscheiden.

Soweit die Daimler-Benz-Aktien in einem inländischen Betriebsvermögen gehalten werden, bleibt ihre Eigenschaft als Wirtschaftsgut des Betriebsvermögens bestehen. Die bisherigen Buchwerte werden als Anschaffungskosten für die neuen DaimlerChrysler-Aktien fortgeführt (§ 13 Abs. 1 Satz 1 UmwStG).

Werden die Daimler-Benz-Aktien im Privatvermögen gehalten und wurden sie innerhalb der Spekulationsfrist von sechs Monaten vor der Verschmelzung angeschafft, gelten sie als zu Anschaffungskosten veräußert und die für die Vermögensübertragung gewährten Aktien an der DaimlerChrysler AG mit diesem Wert angeschafft (§ 13 Abs. 2 Satz 1 UmwStG i.V.m. § 13 Abs. 1 Satz 1 UmwStG). Hierzu gehören auch Daimler-Benz-Aktien, die aufgrund der Kapitalerhöhung vom Juni 1998 erworben wurden. Die Verschmelzung führt somit nicht zu einem steuerpflichtigen Spekulationsgewinn. Nach dem Erlaß der Finanzverwaltung zur Anwendung des Umwandlungssteuergesetzes soll jedoch für die an die Stelle der Daimler-Benz-Aktien tretenden DaimlerChrysler-Aktien die sechsmonatige Spekulationsfrist mit deren Erhalt neu zu laufen beginnen.

Für die Daimler-Benz-Aktien, die außerhalb der Spekulationsfrist angeschafft wurden, ergeben sich durch die Verschmelzung keine einkommensteuerlichen Folgen. Allerdings soll für DaimlerChrysler-Aktien, die an die Stelle der untergehenden Daimler-Benz-Aktien treten, ebenfalls eine neue Spekulationsfrist zu laufen beginnen.

Soweit sich Daimler-Benz-Aktien im Besitz beschränkt steuerpflichtiger Daimler-Benz-Aktionäre befinden und nicht in einem inländischen Betriebsvermögen gehalten werden, ist die Verschmelzung nach deutschem Steuerrecht steuerneutral.

Die steuerlichen Folgen nach ausländischem Steuerrecht richten sich für beschränkt steuerpflichtige Aktionäre nach dem Steuerrecht des Ansässigkeitsstaates. Hierzu sollte sich der jeweilige Aktionär an einen steuerlichen Berater in seinem Ansässigkeitsstaat wenden.

### 2.1.3 Verwertung von Teilrechten/Bruchteilen von Aktien

Soweit im Zuge der Daimler-Benz-Sachkapitalerhöhung und der Daimler-Benz-Verschmelzung bei dem Umtauschverhältnis von 1,005 DaimlerChrysler-Aktien für je 1 (eine) Daimler-Benz-Aktie den tauschenden Daimler-Benz-Aktionären aufgrund der Zahl der von ihnen getauschten Daimler-Benz-Aktien ein Anspruch auf volle Stücke nicht zusteht, sind die sich ergebenden Aktienspitzen zu verwerten. Ein sich hieraus ergebender Veräußerungsgewinn unterliegt nach Maßgabe des steuerlichen Status der Aktie der Besteuerung.

### 2.2 Folgen für die an dem Zusammenschluß beteiligten Unternehmen

### 2.2.1 Daimler-Benz AG/DaimlerChrysler AG

#### 2.2.1.1 Ertragsteuern

##### a. Daimler-Benz-Sachkapitalerhöhung

Die Durchführung des Tauschs der Daimler-Benz-Aktien in Aktien der DaimlerChrysler AG im Rahmen des Umtauschangebots der DaimlerChrysler AG stellt gesellschaftsrechtlich eine Kapitalerhöhung gegen Sacheinlagen dar, die bei den an dem Zusammenschluß beteiligten Unternehmen keine ertragsteuerlichen Belastungen auslöst. Die Gewährleistung einer steuerneutralen Behandlung des Aktientauschs bei den tauschenden Daimler-Benz-Aktionären (siehe oben Ziff. 2.1.1.1) setzt, je nach steuerlichem Status der zum Tausch angebotenen Aktien, voraus, daß die DaimlerChrysler AG nach Durchführung des Tauschs über die Stimmrechtsmehrheit bei der Daimler-Benz AG verfügt und die bisherigen steuerlichen Wertansätze der Aktionäre bei der Bewertung der getauschten Daimler-Benz-Aktien übernimmt (§ 20 Abs. 1 Satz 2 UmwStG i.V.m. Abs. 4 S. 1 UmwStG). Zusätzlich muß die Einbringung im Rahmen eines einheitlichen Kapitalerhöhungsvorganges erfolgen. Es ist sichergestellt, daß diese Voraussetzungen von Seiten der DaimlerChrysler AG ohne nachteilige Folgen für die beteiligten Unternehmen erfüllt werden können.

Der Steuerbilanzwert der von der DaimlerChrysler AG durch den Tausch erworbenen Daimler-Benz-Aktien setzt sich zusammen aus der Summe der Buchwerte, Zwischen- und Teilwerte sowie der Anschaffungskosten der Aktionäre.

Ein etwaiger steuerlicher Verlustvortrag der Daimler-Benz AG ist durch den Tausch nicht gefährdet, da die Daimler-Benz AG ihren Geschäftsbetrieb nach dem Tausch

nicht mit überwiegend neuem Betriebsvermögen fortführt (§ 8 Abs. 4 Satz 2 KStG).

##### b. Daimler-Benz-Verschmelzung

Die Daimler-Benz-Verschmelzung führt nicht zur Aufdeckung stiller Reserven, weil das Vermögen der Daimler-Benz AG zum in der steuerlichen Schlußbilanz ausgewiesenen Buchwert auf die DaimlerChrysler AG übergeht (§ 11 Abs. 2 UmwStG) und diese steuerlich als Gesamtrechtsnachfolgerin in die Rechtsposition der Daimler-Benz AG eintritt. Hiernach gehen auch alle bestehenden Beherrschungs- und Gewinnabführungsverträge der Daimler-Benz AG und die gewerbe- sowie körperschaftsteuerlichen Organschaftsverhältnisse auf die DaimlerChrysler AG über.

In Höhe des Unterschiedsbetrags zwischen dem nach Durchführung des Umtauschangebots der DaimlerChrysler AG bei diesem angesetzten steuerlichen Buchwert der Anteile an der Daimler-Benz AG und dem steuerlichen (anteiligen) Buchwert, mit dem die im Zuge der Verschmelzung übergehenden Wirtschaftsgüter der Daimler-Benz AG bei der DaimlerChrysler AG anzusetzen sind, entsteht ein Verschmelzungsgewinn (Verschmelzungsverlust), der gemäß § 12 Abs. 2 UmwStG bei der steuerlichen Gewinnermittlung der DaimlerChrysler AG außer Ansatz bleibt.

Die DaimlerChrysler AG tritt nach §§ 12 Abs. 3 Satz 2, 19 UmwStG grundsätzlich in einen etwaigen gewerbe- und körperschaftsteuerlichen Verlustvortrag der Daimler-Benz AG ein. Zu § 12 Abs. 3 Satz 2 UmwStG wird ein Erlaß der Finanzverwaltung erwartet, der Einzelheiten des Übergangs des körperschaftsteuerlichen Verlustvortrags regelt. Die Daimler-Benz AG hat vor dem Verschmelzungsstichtag Maßnahmen ergriffen, um die Verlustvorträge vor der Verschmelzung durch Realisierung stiller Reserven zu nutzen. Diese Maßnahmen bestehen in der Veräußerung von beweglichem Sachanlagevermögen der Daimler-Benz AG mit einem Buchwert in Höhe von DM 4 Mrd. an ihre 100%ige Tochtergesellschaft Daimler-Benz Mobilien GmbH zum Verkehrswert in Höhe von DM 10,5 Mrd. und der Zurückmietung dieser Vermögensgegenstände zu marktgerechten Bedingungen. Hieraus resultiert für die Daimler-Benz AG über die folgenden vier bis fünf Jahre ein Mehraufwand. Mit dieser Maßnahme werden die bei der Körperschaftsteuer bestehenden Unsicherheiten über die weitere Nutzbarkeit des Verlustvortrags nach der Verschmelzung beseitigt.

##### c. Chrysler-Sachkapitalerhöhung

Bei der Einbringung von Chrysler-Aktien in die DaimlerChrysler AG im Rahmen der Chrysler-Sachkapitalerhöhung handelt es sich um eine steuerneutrale Kapital-

erhöhung gegen Sacheinlagen. Auch hinsichtlich der Bewertung der als Sacheinlage eingebrachten Chrysler-Aktien bei der DaimlerChrysler AG gelten die Ausführungen in Ziff. 2.2.1.1 a entsprechend.

### 2.2.1.2 Grunderwerbsteuer

#### a. Daimler-Benz-Sachkapitalerhöhung
Grunderwerbsteuer fällt nicht an, da eine hundertprozentige Einbringung der Daimler-Benz-Aktien praktisch nicht erreicht werden wird, und nur in diesem Fall ein steuerbarer Vorgang vorläge.

#### b. Daimler-Benz-Verschmelzung
Die Verschmelzung löst Grunderwerbsteuer in einer Größenordnung von ca. DM 160 Mio. aus. Betroffen sind nur Teile des inländischen Grundbesitzes des Daimler-Benz-Konzerns, während sich für den Großteil des Grundbesitzes infolge der bestehenden bzw. zu schaffenden gesellschaftsrechtlichen Struktur eine Grunderwerbsteuerpflicht nicht ergeben wird.

### 2.2.2 Chrysler Corporation

#### 2.2.2.1 Ertragsteuern
Für Chrysler ergeben sich weder aus dem Umtauschangebot der DaimlerChrysler AG und der Daimler-Benz-Sachkapitalerhöhung noch aus der Daimler-Benz-Verschmelzung steuerliche Folgen.

Die Chrysler-Sachkapitalerhöhung stellt aus deutscher Sicht eine Einbringung der Chrysler-Aktien im Wege einer Kapitalerhöhung gegen Sacheinlagen in die DaimlerChrysler AG dar, die für Chrysler keine steuerlichen Folgen nach deutschem Steuerrecht auslöst.

Nach den Vorschriften des US-Steuerrechts wird Chrysler keine Gewinne oder Verluste im Zusammenhang mit der Chrysler-Sachkapitalerhöhung realisieren.

Die der deutschen Besteuerung unterworfenen Chrysler-Aktionäre können unter den gleichen Voraussetzungen in den Genuß einer steuerneutralen Behandlung kommen wie die der deutschen Besteuerung unterworfenen Daimler-Benz-Aktionäre. Im einzelnen wird auf die Darstellung in Ziff. 2.1.1.1 verwiesen.

#### 2.2.2.2 Verkehrssteuern
Nennenswerte Verkehrssteuerbelastungen infolge der Chrysler-Sachkapitalerhöhung werden weder nach deutschem Steuerrecht noch nach US-Steuerrecht erwartet.

### 2.3 Laufende Besteuerung

#### 2.3.1 Bisherige Daimler-Benz-Aktionäre
Hinsichtlich der steuerlichen Behandlung der künftig von der DaimlerChrysler AG ausgeschütteten Dividende ergeben sich grundsätzlich keine Abweichungen gegenüber der bisherigen steuerlichen Behandlung auf der Ebene der Daimler-Benz-Aktionäre.

Für die bisherigen Daimler-Benz-Aktionäre ändert sich insoweit die ertragsteuerliche Behandlung von Ausschüttungen aufgrund ihres Aktienbesitzes nicht.

### 2.3.2 Bisherige Chrysler-Aktionäre

#### 2.3.2.1 Chrysler-Aktionäre mit Ansässigkeit in den USA
Da die Chrysler-Aktionäre nach der Chrysler-Sachkapitalerhöhung Aktionäre der DaimlerChrysler AG sind, richtet sich die steuerliche Behandlung der durch die DaimlerChrysler AG ausgeschütteten Dividenden nach dem Abkommen zur Vermeidung der Doppelbesteuerung zwischen der Bundesrepublik Deutschland und den USA (DBA USA).

Nach deutschem Steuerrecht unterliegen Dividenden, die die DaimlerChrysler AG an ihre Aktionäre ausschüttet, grundsätzlich einer Quellensteuer von 26,38% (einschließlich des Solidaritätszuschlags in Höhe von 5,5%) des Bruttobetrages der Dividende. Das DBA USA begrenzt die Quellenbesteuerung von Dividenden, die an in den USA ansässige Aktionäre ausgeschüttet werden, wie folgt:

Im Falle eines in den USA ansässigen Aktionärs der DaimlerChrysler AG (Privatperson oder Gesellschaft) wird die Quellensteuer (einschließlich des Solidaritätszuschlags) auf die an diese US-Aktionäre gezahlten Dividenden auf 15% des Bruttobetrages der Dividende begrenzt. Zusätzlich hat der US-Aktionär Anspruch auf eine weitere Entlastung in Höhe von 5% des Bruttobetrages der Dividende. Die nach dem DBA USA vorgesehene Quellensteuersenkung setzt einen Antrag an das Bundesamt für Finanzen, Friedhofstraße 1, 53221 Bonn, voraus.

Erlangt ein US-Aktionär die Dividendenzahlung hingegen über eine in der Bundesrepublik Deutschland gelegene Betriebsstätte oder feste Einrichtung, in deren Betriebsvermögen die Aktien an der DaimlerChrysler AG gehalten werden, findet gemäß dem DBA USA die oben erwähnte Quellensteuerbegrenzung keine Anwendung. In diesem Fall erhalten diese Aktionäre unter bestimmten Voraussetzungen zusätzlich zu der von der DaimlerChrysler AG ausgeschütteten Bardividende ein Körperschaftsteuerguthaben in Höhe von 3/7 des Bruttobetrages (vor Quellensteuerabzug) der

Bardividende, das auf die deutsche Einkommensteuer/Körperschaftsteuer angerechnet wird.

### 2.3.2.2 Chrysler-Aktionäre mit Ansässigkeit außerhalb der USA

Die steuerliche Behandlung der von der Chrysler Corporation an deren Aktionäre ausgeschütteten Dividende richtete sich bisher – soweit ein solches bestand – nach dem Abkommen zur Vermeidung der Doppelbesteuerung zwischen den USA und dem Ansässigkeitsstaat des Aktionärs.

Da die Chrysler-Aktionäre nach der Chrysler-Sachkapitalerhöhung Aktionäre der DaimlerChrysler AG sind, richtet sich die steuerliche Behandlung der durch die DaimlerChrysler AG ausgeschütteten Dividende – soweit ein solches bestehet – nach dem Abkommen zur Vermeidung der Doppelbesteuerung zwischen der Bundesrepublik Deutschland und dem jeweiligen Ansässigkeitsstaat des Aktionärs.

Für in der Bundesrepublik Deutschland ansässige bisherige Chrysler-Aktionäre richtet sich die steuerliche Behandlung der künftig durch die DaimlerChrysler AG ausgeschütteten Dividende nach deutschem Recht. Sie entspricht der steuerlichen Behandlung der in der Bundesrepublik Deutschland bisher ansässigen Daimler-Benz-Aktionäre.

## VI. Verschmelzungsvertrag

Im folgenden ist eine Erläuterung des wesentlichen Inhalts des Verschmelzungsvertrages wiedergegeben:

### Vermögensübertragung (§ 1)

Durch die Verschmelzung überträgt die Daimler-Benz AG ihr Vermögen als Ganzes mit allen Rechten und Pflichten auf die DaimlerChrysler AG. Zugleich wird die Daimler-Benz AG aufgelöst, ohne daß eine Abwicklung erforderlich wäre. Es handelt sich dabei um eine Verschmelzung durch Aufnahme im Sinne des § 2 Nr. 1 UmwG. Die Verschmelzung wird wirksam mit ihrer Eintragung in das für die DaimlerChrysler AG zuständige Handelsregister in Stuttgart. Mit der Eintragung erlischt die Daimler-Benz AG. Die Daimler-Benz-Aktionäre werden mit Wirksamwerden der Verschmelzung gemäß § 2 des Verschmelzungsvertrags ipso jure nach Maßgabe des Umtauschverhältnisses Aktionäre der DaimlerChrysler AG.

Der Übergang des Vermögens vollzieht sich im Innenverhältnis mit Wirkung zum Ablauf des 30. Juni 1998 (Verschmelzungsstichtag). Vom 1. Juli 1998 an gelten alle Handlungen und Geschäfte der Daimler-Benz AG als für Rechnung der DaimlerChrysler AG vorgenommen. Dieser Stichtag kann sich bei einer Verzögerung des Wirksamwerdens

der Verschmelzung gemäß § 9 des Verschmelzungsvertrags verschieben.

### Umtausch der Aktien (§ 2)

Die DaimlerChrysler AG gewährt bei Wirksamwerden der Verschmelzung den außenstehenden Daimler-Benz-Aktionären im Tausch für je 1 (eine) auf den Inhaber lautende Stückaktie der Daimler-Benz AG je 1 (eine) auf den Namen lautende Stückaktie der DaimlerChrysler AG.

Für den Fall, daß das Umtauschangebot der DaimlerChrysler AG im Zeitpunkt des Ablaufs der Annahmefrist bzw. einer etwaigen Nachfrist oder bei Anmeldung der Durchführung der Daimler-Benz-Sachkapitalerhöhung zur Eintragung in das Handelsregister für 90 % oder mehr der Aktien der Daimler-Benz AG (bezogen auf das Grundkapital der Daimler-Benz AG zu den jeweiligen Zeitpunkten) angenommen ist, gewährt die DaimlerChrysler AG den außenstehenden Daimler-Benz-Aktionären im Tausch für je 1 (eine) auf den Inhaber lautende Stückaktie der Daimler-Benz AG je 1,005 auf den Namen lautenden Stückaktien der DaimlerChrysler AG.

Die Aktien der DaimlerChrysler AG lauten auf den Namen. Verfügungsbeschränkungen im Sinne von § 29 UmwG, die die DaimlerChrysler AG zum Angebot einer angemessenen Barabfindung verpflichten würden, sind mit der Ausgabe von Namensaktien, die keiner Vinkulierung unterliegen, nicht verbunden. Ebenso sind Nachteile im Hinblick auf die Handelbarkeit der Aktien bei den zur Verfügung stehenden elektronischen Registrierungssystemen (elektronisches Aktienbuch) auszuschließen.

Das Umtauschverhältnis von 1:1 ist im Zusammenhang mit der ersten Stufe des Zusammenschlusses zu beurteilen. In der ersten Stufe des Zusammenschlusses werden die Daimler-Benz-Sachkapitalerhöhung und die Chrysler Sachkapitalerhöhung durch Einlage der im Umtauschverfahren eingereichten Daimler-Benz-Aktien bzw. der Beteiligung des U.S. Exchange Agent an der Chrysler Corporation durchgeführt. Da die DaimlerChrysler AG bis zum Zeitpunkt dieser Kapitalerhöhungen gegen Sacheinlagen nur über ein Grundkapital in Höhe von DM 100.000,– verfügt, leitet sich der für die Ermittlung der Umtauschverhältnisse entscheidende Unternehmenswert der DaimlerChrysler AG aus den Unternehmenswerten der Daimler-Benz AG und der Chrysler Corporation ab. Die Bewertung beruht auf einer bei der Daimler-Benz AG und der Chrysler Corporation nach denselben Methoden durchgeführten Unternehmensbewertung, die auf der Grundlage der gefestigten Grundsätze der betriebswirtschaftlichen Unternehmensbewertung erfolgt ist.

Das auf 1:1,005 erhöhte Umtauschverhältnis für den Fall, daß das vorausgegangene Umtauschangebot für 90% oder mehr der Aktien der Daimler-Benz AG angenommen ist, entspricht dem zwischen den Parteien des Business Combination Agreement vereinbarten Umtauschverhältnis im Umtauschverfahren. Der Zuschlag wird im Umtauschverfahren als Anreiz gewährt, um die Zielsetzung des Erwerbs von 90% oder mehr der Daimler-Benz-Aktien zum Zweck der Anwendbarkeit der Pooling of Interests-Methode zu erreichen. Diese jedoch verlangt, daß allen tauschenden Daimler-Benz-Aktionären in der ersten aber auch in der zweiten Stufe des Zusammenschlusses das gleiche Umtauschverhältnis gewährt wird. Deshalb muß der Zuschlag auch den durch die Daimler-Benz Verschmelzung tauschenden Daimler-Benz-Aktionären gewährt werden, obwohl er vorrangig als Anreiz zum freiwilligen Tausch bestimmt ist. Die Gleichbehandlung aller Daimler-Benz-Aktionäre ist damit gewährleistet

Für den Fall, daß in einem Spruchverfahren nach §§ 305 ff. UmwG eine Verbesserung des Umtauschverhältnisses durch bare Zuzahlung rechtskräftig festgesetzt wird, hat eine solche Zuzahlung nach § 311 UmwG an alle diejenigen Daimler-Benz-Aktionäre zu erfolgen, die zum Zeitpunkt des Wirksamwerdens der Verschmelzung (Eintragung im Handelsregister der DaimlerChrysler AG) Daimler-Benz-Aktionäre sind.

Die den früheren Daimler-Benz-Aktionären gewährten Aktien der DaimlerChrysler AG sind ab dem Beginn des am 31. Dezember 1998 endenden ersten Geschäftsjahres der DaimlerChrysler AG gewinnberechtigt, soweit sich nicht abweichendes aus dem Verschmelzungsvertrag ergibt. Der Beginn der Gewinnberechtigung kann sich insbesondere bei einer Verzögerung des Wirksamwerdens der Verschmelzung gemäß § 9 des Verschmelzungsvertrags verschieben.

Besondere Vorteile und Rechte (§ 3)
Alle außenstehenden Aktionäre der Daimler-Benz AG werden bei der Gewährung der Gegenleistung für die Übertragung des Vermögens der Daimler-Benz AG gleich behandelt.

Rechte im Sinne von § 5 Abs. 1 Nr. 7 UmwG werden ausschließlich für die in § 4 des Verschmelzungsvertrages genannten Inhaber von Options- und Wandlungsrechten gewährt.

Vorstands- oder Aufsichtsratsmitgliedern sowie den Abschlußprüfern von DaimlerChrysler AG und Daimler-Benz AG werden im Zusammenhang mit der Verschmelzung keine besonderen Vorteile im Sinne von § 5 Abs. 1 Nr. 8 UmwG, wie z.B. Abfindungen oder Honorarzahlungen über das angemessene Maß hinaus, eingeräumt. Auch der Ver-

schmelzungsprüfer erhält keinen Vorteil, der über die Zahlung einer angemessenen Vergütung für seine Tätigkeit hinausgeht.

Options- und Wandlungsrechte auf Aktien (§ 4)
Die Daimler-Benz AG hat die in § 4 des Verschmelzungsvertrags genannten Options- und Wandelanleihen begeben, die mit Options- und Wandlungsrechten ausgestattet sind und zum Erwerb von Daimler-Benz-Aktien berechtigen. Die DaimlerChrysler AG wird den Inhabern dieser Options- und Wandlungsrechte gleichwertige Rechte auf den Erwerb von auf den Namen lautenden Stückaktien der DaimlerChrysler AG gewähren.

Die Regeln lehnen sich an die Bestimmungen in den Options- und Anleihebedingungen für Kapitalerhöhungen aus Gesellschaftsmitteln an.

Anpassung für Zuzahlung und Spruchverfahren
Soweit die DaimlerChrysler AG aufgrund einer rechtskräftigen gerichtlichen Entscheidung zur Leistung einer baren Zuzahlung an die Aktionäre der Daimler-Benz AG, denen aufgrund dieses Verschmelzungsvertrages Aktien gewährt wurden, verpflichtet ist, wird

(a) bei der DM-Optionsanleihe 1996/2003 der anteilige Optionspreis je Aktie entsprechend vermindert,

(b) bei der DM-Pflichtwandelanleihe 1997/2002 je Aktie bei Wandlung ein entsprechender anteiliger Ausgleichsbetrag gewährt und

(c) bei der DM-Wandelanleihe 1996/2006, der DM-Wandelanleihe 1997/2007 und der DM-Wandelanleihe 1998/2008 der jeweilige anteilige Wandlungspreis je neuer Aktie entsprechend ermäßigt.

Gläubiger der vorgenannten Anleihen, die bereits zuvor Aktien der DaimlerChrysler AG zu den unverminderten Options- und/oder Wandlungspreisen und/oder ohne Ausgleichsbeträge bezogen haben, erhalten eine entsprechende Rück- bzw. Nachzahlung.

Diese Regelungen dienen dazu, die Inhaber von Optionsscheinen und Wandlungsrechten wirtschaftlich an zusätzlichen baren Zuzahlungen teilhaben zu lassen, unabhängig von dem Zeitpunkt, zu dem sie ihre Optionsrechte ausgeübt haben.

## Kapitalerhöhung (§ 5)

Um die Aktien der Daimler-Benz AG in Aktien von DaimlerChrysler AG tauschen zu können, wird DaimlerChrysler AG neue Aktien ausgeben.

Das Grundkapital der DaimlerChrysler AG wird zu diesem Zweck um bis zu DM 720.000.000 durch Ausgabe neuer Aktien erhöht. Dieser Betrag wurde ermittelt aufgrund der Annahme, daß die Mindestumtauschquote im Umtauschverfahren 75 % beträgt. Soweit Aktien in dem vorangehenden Umtauschverfahren getauscht worden sind, ist die DaimlerChrysler AG bereits Aktionärin der Daimler-Benz AG, so daß in Höhe dieser Beteiligung das Grundkapital der DaimlerChrysler AG nicht erhöht wird (§ 68 Abs. 1 Nr. 1 UmwG).

Die Verschmelzung darf erst eingetragen werden, nachdem die Durchführung dieser Kapitalerhöhung in das Handelsregister der DaimlerChrysler AG eingetragen worden ist (§ 66 UmwG). Die Kapitalerhöhung gilt mit dem Abschluß des Verschmelzungsvertrages und den Zustimmungsbeschlüssen der Hauptversammlungen der DaimlerChrysler AG und der Daimler-Benz AG als durchgeführt.

Der Umfang der vorgenannten Kapitalerhöhung bei der DaimlerChrysler AG zur Durchführung der Verschmelzung stellt ab auf die Höhe des am 1. Juli 1998 vorhandenen Grundkapitals der Daimler-Benz AG. In der Zeit zwischen dem 1. Juli 1998 und dem Wirksamwerden der Verschmelzung werden jedoch aufgrund von Options- und Wandlungserklärungen weitere Daimler-Benz-Aktien aus bedingtem Kapital ausgegeben. Für den Umtausch dieser zusätzlichen Daimler-Benz-Aktien im Zuge der Verschmelzung muß bei der DaimlerChrysler AG durch entsprechende bedingte Kapitalien Vorsorge getroffen werden. Auch bei diesen in § 5 Abs. 1 (b) des Verschmelzungsvertrages geregelten bedingten Kapitalien handelt es sich um Kapitalerhöhungen für Aktionäre zur Durchführung der Verschmelzung.

Zur Zeit des Wirksamwerdens der Verschmelzung bestehen noch Options- und Wandlungsrechte, die bis dahin nicht ausgeübt wurden. Diese Options- und Wandlungsrechte richten sich nach der Verschmelzung gegen die DaimlerChrysler AG. Um ihre Erfüllung zu sichern, werden bei der DaimlerChrysler AG die in § 5 Abs. 2 des Verschmelzungsvertrags vorgesehenen bedingten Kapitalien geschaffen.

## Treuhänder (§ 6)

Die Deutsche Bank AG, Frankfurt am Main, hat die Aufgabe des Treuhänders für den Empfang und die Weiterleitung der den Daimler-Benz-Aktionären zu gewährenden Aktien (§ 71 UmwG) übernommen.

## Folgen der Verschmelzung für die Arbeitnehmer und ihre Vertretungen (§ 7)

In § 7 des Vertrages werden die individual- und kollektivarbeitsrechtlichen Folgen der Verschmelzung dargestellt. Diese Vorschrift enthält keine vertraglichen Vereinbarungen zwischen den Parteien des Verschmelzungsvertrages, sondern lediglich eine Beschreibung der gesetzlichen Folgen der Verschmelzung. Daß diese in dem Verschmelzungsvertrag und nicht in dem Verschmelzungsbericht erläutert werden, beruht auf der zwingenden Anordnung des § 5 Abs. 1 Nr. 9 UmwG.

## Kosten (§ 8)

Die Daimler-Benz AG übernimmt die Kosten ihrer über die Verschmelzung beschließenden Hauptversammlung. Alle sonstigen durch den Abschluß und die Ausführung des Verschmelzungsvertrages entstehenden Kosten und die Kosten des Treuhänders trägt die DaimlerChrysler AG. Die ihm durch die Vorbereitung des Verschmelzungsvertrages entstehenden Kosten trägt jeder Vertragspartner selbst.

Diese Kostenregelung wird für den Fall relevant, daß die Verschmelzung wegen des Rücktritts eines Vertragspartners oder aus einem anderen Grund nicht wirksam wird. Nach dem Wirksamwerden der Verschmelzung ist die Kostenregelung ohne Belang, da durch die Gesamtrechtsnachfolge ohnehin alle Verbindlichkeiten der Daimler-Benz AG auf die DaimlerChrysler AG übergehen.

## Stichtagsänderung (§ 9)

Für den Fall, daß die Verschmelzung erst nach dem 1. März 1999 in das Handelsregister der DaimlerChrysler AG eingetragen werden sollte, sieht § 9 des Verschmelzungsvertrages eine Änderung des Stichtags der maßgeblichen Schlußbilanz auf den 31. Dezember 1998 sowie eine Änderung des Stichtags für den Vermögensübergang und für den Wechsel der Rechnungslegung auf den 1. Januar 1999 vor. Entsprechendes gilt bei einer Verzögerung über den 1. März eines Folgejahres hinaus. Als Grundlage der Verschmelzung soll demnach stets die aktuelle Jahresbilanz der Daimler-Benz AG dienen. Der Vermögensübergang im Innenverhältnis erfolgt dann konsequenterweise mit Beginn des folgenden Geschäftsjahres.

Für den Fall, daß die Verschmelzung erst nach der ordentlichen Hauptversammlung der Daimler-Benz AG im Jahr 1999, die über die Verwendung des im Geschäftsjahr 1998 erzielten Bilanzgewinns entscheidet, eingetragen wird, sieht § 9 des Verschmelzungsvertrags vor, daß die zum Zwecke des Tausches der Daimler-Benz-Aktien ausgegebenen neuen DaimlerChrysler-Aktien statt ab dem Be-

ginn des laufenden Geschäftsjahres erst ab dem 1. Januar
1999 gewinnberechtigt sind. Bei einer weiteren Verzöge-
rung der Eintragung über die ordentliche Hauptversamm-
lung der Daimler-Benz AG in einem Folgejahr hinaus, ver-
schiebt sich der Beginn der Gewinnberechtigung jeweils
entsprechend der vorstehenden Regelung um ein Jahr.

Für den Fall, daß die Verschmelzung nicht bis zum
1. März 1999 in das Handelsregister der DaimlerChrysler
AG eingetragen ist, soll die Eintragung erst nach der ordent-
lichen Hauptversammlung 1999 erfolgen. Dem Vorstand ob-
liegt die Sicherstellung dieser Regelung durch entspre-
chende Maßnahmen gegenüber dem Registergericht. Die
Regelung gilt für Verzögerungen in den Folgejahren ent-
sprechend.

### Eintragung der Verschmelzung (§ 10)

Der Verschmelzung als zweite Stufe des Zusammenschlus-
ses vorgeschaltet sind die Daimler-Benz-Sachkapitalerhö-
hung und die Chrysler-Sachkapitalerhöhung als erste Stufe
des Zusammenschlusses.

Um sicherzustellen, daß dieser von der Daimler-Benz
AG und der Chrysler Corporation im Business Combination
Agreement vereinbarte Ablauf eingehalten wird, sind die
Vorstände der Daimler-Benz AG und der DaimlerChrysler
AG angewiesen, die Verschmelzung erst dann zur Eintra-
gung anzumelden, wenn die Kapitalerhöhungen gegen
Sacheinlagen im Handelsregister der DaimlerChrysler AG
eingetragen sind.

### Rücktrittsrecht (§ 11)

§ 11 des Verschmelzungsvertrags sieht für jeden Vertrags-
partner die Möglichkeit vor, sich durch Rücktritt vom Ver-
trag zu lösen, wenn die Durchführung der Daimler-Benz-
Sachkapitalerhöhung und der Chrysler-Sachkapitalerhö-
hung nicht bis zum 31. Januar 1999 erfolgt ist. Die Rück-
trittsregelung lehnt sich an die entsprechende Regelung in
Art. 10 des Business Combination Agreement an. Auch dort
haben die Parteien die Möglichkeit, sich vom Vertrag nach
dem vorgenannten Zeitpunkt zu lösen, wenn u.a. der
Reverse Triangular Merger (Chrysler-Sachkapitalerhöhung)
nicht bis zum 31. Januar 1999 durchgeführt worden ist.

### Umstellung auf den Euro (§ 12)

§ 12 des Verschmelzungsvertrags sieht vor, daß bei der Um-
stellung von DM-Beträgen auf Euro diese Umstellung auch
für den Verschmelzungsvertrag gelten soll.

# X. Besteuerung in Deutschland

### Steuerliche Folgen der Unternehmenszusammen-
### führung

Die steuerlichen Folgen der Unternehmenszusammenführung sind im Kapitel IX. wiedergegeben.

### Zusammenfassung grundlegender deutscher
### Besteuerungsgrundsätze

Der folgende Abschnitt enthält eine kurze Zusammenfassung grundlegender deutscher Besteuerungsgrundsätze, die im Zusammenhang mit Erwerb, Halten und Veräußerung von Aktien zur Anwendung kommen. Eine umfassende Darstellung sämtlicher steuerrechtlich relevanter Aspekte kann hier allerdings nicht erfolgen. Grundlage der Zusammenfassung ist das zur Zeit der Abfassung dieses Prospekts geltende nationale Recht sowie typische Doppelbesteuerungsabkommen, wie sie derzeit zwischen der Bundesrepublik Deutschland und anderen wichtigen Industriestaaten bestehen; in beiden Bereichen können sich Vorschriften kurzfristig ändern, möglicherweise auch rückwirkend. Potentiellen Käufern von Aktien wird daher empfohlen, wegen der Steuerfolgen des Kaufs, des Haltens sowie der Veräußerung bzw. unentgeltlichen Übertragung von Aktien und wegen der bei der ggf. möglichen Erstattung deutscher Quellensteuern einzuhaltenden Verfahrensweisen ihre steuerlichen Berater zu konsultieren. Nur diese sind in der Lage, auch die besonderen steuerlichen Verhältnisse des einzelnen Aktionärs angemessen zu berücksichtigen.

### Gegenwärtige Besteuerungsfolgen für die Gesellschaft
### und die Aktionäre

Das deutsche Körperschaftsteuerrecht unterscheidet zum Zwecke der Besteuerung von Gewinnausschüttungen unter anderem zwischen folgenden Bestandteilen des für Ausschüttungen verwendbaren steuerlichen Eigenkapitals:

- Körperschaftsteuerbelastetes EK 45: In diesem Teilbestand sind die Gewinne enthalten, die mit der tariflichen Körperschaftsteuer von derzeit 45% besteuert worden sind.

- Nicht-körperschaftsteuerbelastetes EK 01: Dieser Teilbestand beinhaltet aus dem Ausland stammende Gewinnanteile, soweit diese Gewinne auf Ebene der DaimlerChrysler AG nicht der deutschen Besteuerung unterliegen.

- Nicht-körperschaftsteuerbelastetes EK 04: Dieser Teilbestand beinhaltet steuerfreie Vermögensmehrun-

gen, die aus Einlagen der Gesellschafter nach dem 31. Dezember 1976 entstanden sind.

### *Ausschüttung aus dem EK 45*

Erfolgt eine Ausschüttung aus dem EK 45, so mindert sich bei der DaimlerChrysler AG deren Körperschaftsteuer um den Unterschiedsbetrag zwischen der bei ihr eingetretenen Tarifbelastung des Eigenkapitals, das für die Ausschüttung als verwendet gilt, und der Ausschüttungsbelastung von derzeit 30%. Dies gilt unabhängig davon, wer Anteilseigner ist. Inländische steuerpflichtige Anteilseigner erhalten eine Bescheinigung über die anrechenbare Körperschaftsteuer in Höhe von ³/₇ der auf sie entfallenden Ausschüttung.

### *Ausschüttung aus dem EK 01*

Soweit ausweislich der von der Gesellschaft ausgestellten Steuerbescheinigung Ausschüttungen aus positiven EK 01-Beständen erfolgen, ist keine Körperschaftsteuererhöhung durchzuführen, unabhängig davon, wer Anteilseigner ist. In einem solchen Fall erhält der jeweilige Anteilseigner kein Körperschaftsteueranrechnungsguthaben. Auf die aus dem EK 01 stammenden Beträge ist jedoch grundsätzlich Kapitalertragsteuer einzubehalten. Handelt es sich bei dem Anteilseigner um eine zur Gliederung des verwendbaren Eigenkapitals verpflichtete Körperschaft (unbeschränkt steuerpflichtige Kapitalgesellschaft), bleiben die an sie ausgeschütteten EK 01-Beträge bei der Ermittlung ihres Einkommens außer Ansatz.

Inländische Betriebsstätten ausländischer Personen sowie inländische natürliche Personen – unabhängig davon, ob sie die Anteile an der Gesellschaft im Betriebs- oder Privatvermögen halten – haben die EK 01-Beträge als reguläre Kapitalertrag zu versteuern. Die einbehaltene Kapitalertragsteuer ist dabei anrechenbar. Für im Ausland ansässige natürliche Personen wird lediglich Kapitalertragsteuer einbehalten, eine Definitivbelastung der Ausschüttung mit Körperschaftsteuer bei Ausschüttungen aus dem EK 01 unterbleibt hingegen.

Bezüglich der Höhe der einzubehaltenden Kapitalertragsteuer sowie des daneben einzubehaltenden Solidaritätszuschlags verweisen wir auf die grundlegenden Ausführungen im zweiten Teil des Abschnitts.

### *Ausschüttung aus dem EK 04*

Erfolgt eine Ausschüttung aus dem EK 04, löst dies auf Ebene der DaimlerChrysler AG keine Steuerbelastung aus. Es wird weder eine Belastung mit dem generellen Ausschüttungssteuersatz der Körperschaftsteuer (30%) hergestellt, noch wird eine Kapitalertragsteuer oder ein Solidaritätszu-

schlag auf Rechnung des Anteileigners einbehalten. Hält der Aktionär die Anteile im Privatvermögen und ist er innerhalb der letzten 5 Jahre vor der Ausschüttung zu keinem Zeitpunkt zu mehr als 25 % unmittelbar oder mittelbar an der DaimlerChrysler AG beteiligt gewesen, wird eine Ausschüttung aus dem EK 04 als Kapitalrückgewähr angesehen, die nicht zu den steuerpflichtigen Einkünften des Aktionärs gehört (§ 20 Abs. 1. Nr. 1 Satz 3 EStG). Die Ausschüttung ist in diesem Fall somit in der Bundesrepublik Deutschland gänzlich steuerfrei.

Sollte die 25 %-Grenze bei einem Gesellschafter, der die Anteile im Privatvermögen hält, zu irgendeinem Zeitpunkt innerhalb der letzten 5 Jahre vor der Ausschüttung überschritten gewesen sein, wird die aus dem EK 04 gespeiste Ausschüttung lediglich mit den Anschaffungskosten für die Beteiligung verrechnet. Eine Steuerpflicht entsteht folglich erst dann, wenn die Summe der Ausschüttung aus dem EK 04 den Betrag der Anschaffungskosten übersteigt. In diesem Fall entsteht ein Veräußerungsgewinn (capital gain), der in Deutschland grundsätzlich steuerpflichtig ist. Bei einem nicht in der Bundesrepublik unbeschränkt steuerpflichtigen Aktionär kann die Besteuerung in Deutschland durch ein Doppelbesteuerungsabkommen ausgeschlossen sein.

Gehört die Beteiligung zu einem inländischen Betriebsvermögen eines in der Bundesrepublik Deutschland unbeschränkt oder beschränkt steuerpflichtigen Aktionärs, wird die aus dem EK 04 stammende Ausschüttung ebenfalls lediglich mit den Anschaffungskosten für die Beteiligung verrechnet. Eine Steuerpflicht entsteht dann, wenn die Summe der EK 04-Ausschüttungen den Betrag der Anschaffungskosten übersteigt. In diesem Fall entsteht ein laufender Gewinn, der in Deutschland steuerpflichtig ist. Zu den Besteuerungsfolgen vergleiche die nachfolgend dargestellten allgemeinen Grundsätze.

Aufgrund der Steuerpläne der im Herbst 1998 gewählten neuen Bundesregierung soll jedoch die maßgebliche Beteiligungsgrenze für die Besteuerung von Veräußerungsgewinnen bei wesentlichen Beteiligungen an Kapitalgesellschaften von 25 % auf 10 % gesenkt werden.

### Zukünftige Besteuerungsfolgen für die Gesellschaft und die Aktionäre

Im folgenden wird die zukünftige Ertragsteuerbelastung der DaimlerChrysler AG und der Aktionäre dargestellt. Im übrigen werden auch erbschaftsteuerliche Folgen auf Ebene der Aktionäre dargestellt.

#### Besteuerung der Gesellschaft

Deutsche Kapitalgesellschaften unterliegen u.a. einer Körperschaftsteuer, deren Tarifbelastung auf nicht ausgeschüttete Gewinne zur Zeit 45 % beträgt. Im Falle der Ausschüttung ist eine Ausschüttungsbelastung von 30 % herzustellen, sofern es sich nicht um Ausschüttungen aus steuerfreien ausländischen Einkünften (EK 01) oder um die Rückführung von Einlagen der Gesellschafter (EK 04) handelt.

Seit dem 1.1.1998 wird auf die Körperschaftsteuerschuld ein Solidaritätszuschlag in Höhe von 5,5 % erhoben. Körperschaftsteuer und Solidaritätszuschlag führen – unter Außerachtlassung der Gewerbesteuer – zu einer effektiven Gesamtbelastung ausgeschütteter Gewinne von 32,13 %. Der Unterschied zwischen diesem Satz und der Kombination der Nominalsätze von 31,65 % (30 % + 5,5 % davon) liegt darin begründet, daß der Solidaritätszuschlag als nicht abziehbare Ausgabe aus versteuerten Gewinnen zu entrichten ist.

#### Besteuerung von Dividenden

Deutsche Kapitalgesellschaften haben von ihren Gewinnausschüttungen eine Quellensteuer (Kapitalertragsteuer) in Höhe von 25 % einzubehalten und abzuführen. Ein Solidaritätszuschlag von 5,5 % wird auf die Kapitalertragsteuer aufgeschlagen und beträgt bezogen auf die Dividende 1,375 % (5,5 % auf die 25 %ige Kapitalertragsteuerbelastung). Für Ausschüttungen an ausländische Aktionäre wird der Quellensteuersatz nach den meisten deutschen Doppelbesteuerungsabkommen mit anderen Ländern auf 15 % reduziert. Da der jeweilige DBA-Satz die Obergrenze der gesamten deutschen Besteuerung der Dividende bestimmt, wird im Ergebnis der Solidaritätszuschlag auf die Kapitalertragsteuer voll erstattet. Die Quellensteuerermäßigung wird grundsätzlich in der Weise gewährt, daß die Differenz zwischen dem einbehaltenen Gesamtbetrag einschließlich des Solidaritätszuschlags und der unter Anwendung des einschlägigen Doppelbesteuerungsabkommens maximal geschuldeten Quellensteuer auf Antrag durch die deutsche Finanzverwaltung (Bundesamt für Finanzen, Friedhofstraße 1, 53221 Bonn) erstattet wird. Formulare für den Erstattungsantrag sind bei der deutschen Finanzverwaltung oder bei den deutschen Botschaften bzw. Konsulaten erhältlich.

Noch weitergehende Ermäßigungen sehen die meisten deutschen Doppelbesteuerungsabkommen für Dividenden vor, die an Kapitalgesellschaften ausgeschüttet werden, denen mindestens 10 % der stimmberechtigten Aktien der ausschüttenden Gesellschaft gehören. Unter Umständen ist überhaupt keine Quellensteuer auf Dividenden zu erheben,

die an Muttergesellschaften im Sinne der Richtlinie Nr. 90/ 436/EWG des Rates vom 23. Juli 1990 (sog. Mutter-Tochter-Richtlinie) ausgeschüttet werden. In diesen Fällen kann auf Antrag und bei Vorliegen weiterer Voraussetzungen bereits bei der Ausschüttung der niedrigere Quellensteuersatz berücksichtigt oder von der Einbehaltung der Quellensteuer von vornherein abgesehen werden.

In Deutschland ansässige Aktionäre sowie ausländische Aktionäre, die Aktien im Vermögen einer Betriebsstätte oder einer festen Einrichtung in Deutschland halten, sind zur Anrechnung bzw. Erstattung der auf der ausschüttenden Gesellschaft einbehaltenen Kapitalertragsteuer und des Solidaritätszuschlages auf ihre Einkommen- bzw. Körperschaftsteuerschuld und den geschuldeten Solidaritätszuschlag berechtigt. Diese Aktionäre sind darüber hinaus im Rahmen des körperschaftsteuerlichen Anrechnungsverfahrens grundsätzlich zur Anrechnung bzw. Erstattung von ³/₇ der beschlossenen und ausgeschütteten Dividende (vor Kapitalertragsteuer) berechtigt, soweit die Dividende auf mit Körperschaftsteuer belastete Einkommensteile entfällt (Ausnahmen EK 01 und EK 04). Dadurch verringert sich auch die Bemessungsgrundlage für den Solidaritätszuschlag, der auf ihre persönliche Einkommen- bzw. Körperschaftsteuerschuld erhoben wird. Sinn des körperschaftsteuerlichen Anrechnungsverfahrens ist, daß eine Doppelbelastung mit deutscher Körperschaftsteuer und Einkommensteuer im Verhältnis Gesellschaft/Aktionär vermieden und die Dividende nach den persönlichen Verhältnissen des Aktionärs besteuert wird.

Ausländischen Aktionären ohne Betriebsstätte oder feste Einrichtung in Deutschland wird nach deutschem Steuerrecht weder die (unter Umständen durch ein Doppelbesteuerungsabkommen ermäßigte) Kapitalertragsteuer (einschließlich Solidaritätszuschlag) noch das körperschaftsteuerliche Anrechnungsguthaben angerechnet bzw. erstattet.

Erträge aus Aktien, die zum Vermögen einer Betriebsstätte gehören, die eine ausländische juristische Person in Deutschland unterhält, unterliegen der deutschen Körperschaftsteuer zum Satz von 42% (zuzüglich 5,5 % Solidaritätszuschlag auf die veranlagte Körperschaftsteuer); das körperschaftsteuerliche Anrechnungsverfahren ist anwendbar und verringert die Bemessungsgrundlage für den Solidaritätszuschlag.

### Besteuerung von Veräußerungsgewinnen

Nach deutschem Steuerrecht unterliegen Gewinne aus der Veräußerung von Aktien, die von einem in Deutschland ansässigen Aktionär im Betriebsvermögen oder von einem ausländischen Aktionär im Vermögen einer Betriebsstätte

oder festen Einrichtung in Deutschland gehalten wurden, in Deutschland ohne Besonderheiten der üblichen Besteuerung.

Gewinne aus der Veräußerung im Privatvermögen gehaltener Aktien sind hingegen nur zu versteuern, wenn die Veräußerung innerhalb von sechs Monaten nach dem Erwerb stattfindet oder – nach Ablauf dieser Spekulationsfrist – wenn der Aktionär zu irgendeinem Zeitpunkt während der der Veräußerung vorangehenden fünf Jahre zu mehr als 25% unmittelbar oder mittelbar an der Gesellschaft beteiligt war. Ein ausländischer Aktionär ohne Betriebsstätte oder feste Einrichtung in Deutschland unterliegt mit Gewinnen aus der Veräußerung von Aktien der deutschen Besteuerung nur, wenn er zu irgendeinem Zeitpunkt während der der Veräußerung vorangehenden fünf Jahre zu mehr als 25% unmittelbar oder mittelbar an der Gesellschaft beteiligt war. Insoweit sehen die meisten deutschen Doppelbesteuerungsabkommen eine vollständige Befreiung von der deutschen Besteuerung vor. Aufgrund der Steuerpläne der im Herbst 1998 gewählten neuen Bundesregierung sollen jedoch die Spekulationsfrist für Veräußerungsgewinne von im Privatvermögen gehaltenen Wertpapieren auf ein Jahr verlängert und die maßgebliche Beteiligungsgrenze von 25% auf 10% gesenkt werden. Hinsichtlich der Steuerfolgen der Veräußerung von Anteilen im Privatvermögen, die der Privatinvestor aufgrund seiner Teilnahme am Umtauschangebot der Daimler-Benz AG für die Hingabe seiner Aktien an der Daimler-Benz AG erhält, siehe Kapitel IX., Abschnitt V. 2. 1.1.1.b dieses Prospekts.

### Erbschaft- bzw. Schenkungsteuer

Der Übergang von Aktien auf eine andere Person durch Schenkung oder von Todes wegen unterliegt der deutschen Erbschaft- bzw. Schenkungsteuer nur, wenn

(a) der Erblasser oder Schenker oder der Erbe, Beschenkte oder sonstige Erwerber zur Zeit des Vermögensübergangs in Deutschland seinen Wohnsitz oder seinen gewöhnlichen Aufenthalt hatte oder sich als deutscher Staatsangehöriger nicht länger als fünf Jahre im Ausland aufgehalten hatte, ohne im Inland einen Wohnsitz zu haben, oder

(b) außer im Fall von (a), die Aktien beim Erblasser oder Schenker zu einem Betriebsvermögen gehörten, für das in Deutschland eine Betriebsstätte unterhalten wurde oder ein ständiger Vertreter bestellt war, oder

(c) der Erblasser oder Schenker entweder allein oder zusammen mit anderen ihm nahestehenden Personen zu

mindestens 10% am Grund- bzw. Stammkapital der deutschen Kapitalgesellschaft unmittelbar oder mittelbar beteiligt war.

Die wenigen gegenwärtig in Kraft befindlichen deutschen Erbschaftsteuer-Doppelbesteuerungsabkommen (z.B. dasjenige mit den USA) sehen gewöhnlich vor, daß deutsche Erbschaft- bzw. Schenkungsteuer nur in den Fällen (a) und (b) erhoben werden kann.

### Sonstige Steuern

Bei Kauf, Verkauf oder sonstiger Veräußerung von Aktien fällt keine deutsche Kapitalverkehrsteuer, Umsatzsteuer, Stempelsteuer oder ähnliche Steuer an.

# XI. Finanzteil

Seite

**Daimler-Benz AG**
- Konzernabschluß zum 31. Dezember 1997                                          85
- Wesentliche Unterschiede zwischen deutscher und US-Rechnungslegung           122
- Kennzahlen wichtiger Beteiligungsgesellschaften                              123
- Zehn-Jahres-Übersicht                                                        125
- Geschäftsentwicklung Januar – September 1998 und Ausblick                    127

**Chrysler Corporation**
- Konzernabschluß zum 31. Dezember 1997                                        134
- Zehn-Jahres-Übersicht                                                        172
- Beteiligungsgesellschaften                                                   173
- Geschäftsentwicklung Januar – September 1998 und Ausblick                    178

**DaimlerChrysler**
- Ungeprüfte zusammengefaßte konsolidierte Pro-Forma-Abschlußdaten             189

# Daimler-Benz AG
## Konzernabschluß zum 31. Dezember 1997

## Erklärung des Vorstands

Für die Aufstellung des in diesem Geschäftsbericht enthaltenen Konzernabschlusses ist der Vorstand der Daimler-Benz AG verantwortlich. Er wurde vollständig nach den Rechnungslegungsvorschriften der Vereinigten Staaten von Amerika (US-GAAP) erstellt. Die weiteren in diesem Bericht enthaltenen finanzwirtschaftlichen Informationen wurden auf Basis dieses Abschlusses und der nach den amerikanischen Rechnungslegungsvorschriften vorgenommenen Bewertungen ermittelt.

Um die Einhaltung der Rechnungslegungsgrundsätze und die Ordnungsmäßigkeit der Unternehmensberichterstattung zu gewährleisten, haben wir wirksame interne Steuerungs- und Kontrollsysteme eingerichtet. Diese beinhalten die Anwendung konzernweit einheitlicher Richtlinien, den Einsatz zuverlässiger Software, die Auswahl und Schulung qualifizierten Personals sowie laufende Prüfungen unserer internen Revision. Damit wird eine den tatsächlichen Verhältnissen entsprechende Abbildung der internationalen Aktivitäten des Konzerns sicherge-

stellt und der Vorstand in die Lage versetzt, mögliche Risiken frühzeitig zu erkennen und entsprechende Gegenmaßnahmen einzuleiten.

Die KPMG Deutsche Treuhand-Gesellschaft Aktiengesellschaft Wirtschaftsprüfungsgesellschaft hat den nach US-amerikanischen Rechnungslegungsvorschriften erstellten Konzernabschluß geprüft und den im folgenden abgedruckten Bestätigungsvermerk erteilt.

Gemeinsam mit den Wirtschaftsprüfern hat der Bilanzausschuß des Aufsichtsrats den Konzernabschluß einschließlich Lagebericht sowie den Prüfungsbericht eingehend erörtert. Anschließend hat sich der gesamte Aufsichtsrat mit den Jahresabschlußunterlagen befaßt.

Jürgen E. Schrempp          Dr. Manfred Gentz

## Bericht des Abschlußprüfers

An Vorstand, Aufsichtsrat und Aktionäre
der Daimler-Benz Aktiengesellschaft

Wir haben die Konzernbilanzen zum 31. Dezember 1997 und 1996, die Konzern-Gewinn- und Verlustrechnungen, die Konzernkapitalflußrechnungen und die Aufstellungen über die Entwicklung des Konzerneigenkapitals der Geschäftsjahre 1997, 1996 und 1995 der Daimler-Benz Aktiengesellschaft geprüft. Aufstellung und Inhalt der Konzernabschlüsse liegen in der Verantwortung des Vorstands. Es ist unsere Aufgabe, auf der Grundlage der von uns durchgeführten Prüfung ein Urteil über die Ordnungsmäßigkeit der Rechnungslegung in diesen Konzernabschlüssen abzugeben.

Unsere Prüfung ist unter Beachtung der deutschen und der US-amerikanischen Grundsätze ordnungsmäßiger Durchführung von Abschlußprüfungen vorgenommen worden. Diese Grundsätze erfordern, die Prüfung so zu planen und durchzuführen, daß ein hinreichend sicheres Urteil darüber abgegeben werden kann, ob die Konzernabschlüsse frei von wesentlichen Fehlaussagen sind. Die Konzernabschlußprüfung schließt eine stichprobengestützte Prüfung der Nachweise für die Bilanzierung und für die Angaben im Konzernabschluß ein. Sie beinhaltet auch die Prüfung der angewandten Bilanzierungs- und Bewertungsmethoden und wesentlicher Einschätzungen des Vorstands sowie eine Beurteilung der Gesamtaussage der Konzernabschlüsse. Wir sind der Auffassung, daß unsere Prüfung eine hinreichend sichere Grundlage für unser Prüfungsurteil bildet.

Der Vorstand hat verschiedene Gemeinschaftsunternehmen nach der Methode der Quotenkonsolidierung in den Konzernabschluß einbezogen, wie sie nach den Regelungen der Siebenten Richtlinie des Rates der Europäischen Gemeinschaften und den Standards des International Accounting Standards Committee

zugelassen ist. Nach den US-amerikanischen Rechnungslegungsgrundsätzen hätten diese Gemeinschaftsunternehmen nach der sogenannten Equity-Methode in den Daimler-Benz-Konzernabschluß einbezogen werden müssen. Die US-amerikanische Börsenaufsichtsbehörde (SEC) hat jedoch ausdrücklich bestätigt, daß die gegen die von Daimler-Benz in der Anmerkung 2 des Konzernanhangs beschriebene und in ihren Auswirkungen erläuterte Quotenkonsolidierungsmethode keine Einwendungen erhebt.

Nach unserer Überzeugung stellen die oben genannten Konzernbilanzen zum 31. Dezember 1997 und 1996, die Konzern-Gewinn- und Verlustrechnungen, die Konzernkapitalflußrechnungen und die Aufstellungen über die Entwicklung des Konzerneigenkapitals der Geschäftsjahre 1997, 1996 und 1995 in allen wesentlichen Belangen die Vermögens- und Finanzlage des Daimler-Benz-Konzerns zum 31. Dezember 1997 und 1996 sowie die Ertragslage und die Zahlungsströme der Geschäftsjahre 1997, 1996 und 1995 angemessen dar und entsprechen mit Ausnahme der Auswirkungen der im vorstehenden Absatz erläuterten Anwendung der Quotenkonsolidierungsmethode den US-amerikanischen Rechnungslegungsgrundsätzen (United States Generally Accepted Accounting Principles).

Frankfurt am Main, den 17. März 1998
KPMG Deutsche Treuhand Gesellschaft
Aktiengesellschaft
Wirtschaftsprüfungsgesellschaft

Zielke                          Schmid
Wirtschaftsprüfer               Wirtschaftsprüfer

## Konzern-Gewinn- und Verlustrechnung

| | Anmerkung | Daimler-Benz-Konzern | | | Finanzdienstleistungen | | |
|---|---|---|---|---|---|---|---|
| | | 1997 Mio. DM | 1996 Mio. DM | 1995 Mio. DM | 1997 Mio. DM | 1996 Mio. DM | 1995 Mio. DM |
| Umsatzerlöse | 24 | 124.050 | 106.339 | 102.985 | 9.499 | 8.379 | 7.661 |
| Umsatzkosten | 4 | (98.943) | (84.742) | (86.686) | (8.650) | (7.752) | (7.239) |
| Bruttoergebnis vom Umsatz | | 25.107 | 21.597 | 16.299 | 849 | 627 | 422 |
| Vertriebskosten, allgemeine Verwaltungs-kosten, sonstige betriebliche Aufwendungen | 4 | (17.433) | (15.955) | (20.834) | (608) | (476) | (366) |
| Forschungs- und Entwicklungskosten | | (5.663) | (5.579) | (5.369) | 0 | 0 | 0 |
| Sonstige betriebliche Erträge | | 1.620 | 1.402 | 1.742 | 161 | 113 | 89 |
| Ergebnis vor Finanzergebnis und Ertragsteuern | | 3.631 | 1.465 | (8.162) | 402[1] | 264[1] | 145[1] |
| Finanzergebnis | 5 | 618 | 496 | 929 | 7 | . | 8 |
| Ergebnis vor Ertragsteuern | | 4.249 | 1.961 | (7.233) | 409 | 264 | 153 |
| Steuerertrag aus Sonderausschüttung | | 2.908[2] | | | | | |
| Steuern vom Einkommen und vom Ertrag | | 1.074[3] | | | | | |
| Steuern vom Einkommen und vom Ertrag (gesamt) | 6 | 3.982 | 712 | 1.620 | (210) | (127) | (82) |
| Auf Anteile in Fremdbesitz entfallender (Gewinn)/Verlust | | (189) | 89 | (116) | (1) | (4) | 2 |
| Konzernergebnis | | 8.042[4] | 2.762 | (5.729) | 198 | 133 | 73 |
| Ergebnis je Aktie (in DM) | | | | | | | |
| Ergebnis je Aktie | 25 | 15,59[4] | 5,37 | (11,17) | -- | -- | -- |
| Ergebnis je Aktie (voll verwässert) | 25 | 15,30[4] | 5,35 | (11,17) | -- | -- | -- |

1) Entspricht dem Operating Profit der Finanzdienstleistungen im Konzern.
2) Stellt die Steuerentlastung auf die Sonderausschüttung (20 DM je Aktie) dar.
3) Enthalten sind einmalige Steuererträge aus der Verminderung der Wertberichtigung auf aktive latente Steuern innerhalb der deutschen Organschaft zum 31. Dezember 1997 in Höhe von 1.962 Mio. DM.
4) Ohne die einmaligen Steuererträge hätte sich 1997 ein Konzernergebnis von 3.172 Mio. DM ergeben. Das Ergebnis je Aktie hätte 6,15 DM und das Ergebnis je Aktie (voll verwässert) 6,08 DM betragen.

Der nachfolgende Konzernanhang ist integraler Bestandteil des Konzernabschlusses.

## Konzernbilanz

| Aktiva | Anmerkung | Daimler-Benz-Konzern | | Finanzdienstleistungen | |
|---|---|---|---|---|---|
| | | 31. Dezember 1997 in Mio. DM | 31. Dezember 1996 in Mio. DM | 31. Dezember 1997 in Mio. DM | 31. Dezember 1996 in Mio. DM |
| Immaterielle Anlagewerte | 7 | 1.915 | 1.951 | 100 | 80 |
| Sachanlagen | 7 | 20.656 | 18.225 | 76 | 57 |
| Finanzanlagen | 13 | 3.453 | 3.536 | 205 | 60 |
| Vermietete Gegenstände | 8 | 14.931 | 11.941 | 15.055 | 12.748 |
| Anlagevermögen | | 40.955 | 35.653 | 15.436 | 12.945 |
| Vorräte | 9 | 14.390 | 13.602 | 988 | 645 |
| Forderungen aus Lieferungen und Leistungen | 10 | 12.006 | 10.864 | 373 | 382 |
| Forderungen aus Finanzdienstleistungen | 11 | 25.924 | 19.052 | 25.953 | 19.073 |
| Übrige Forderungen | 12 | 12.251[1] | 8.959 | 897 | 826 |
| Wertpapiere | 13 | 14.687 | 9.783 | 91 | 92 |
| Zahlungsmittel | 14 | 5.833 | 4.557 | 684 | 269 |
| Umlaufvermögen | | 85.091 | 66.817 | 28.986 | 21.287 |
| Latente Steuern | 6 | 10.462 | 9.603 | 27 | 162 |
| Rechnungsabgrenzungsposten | | 591 | 388 | 81 | 65 |
| Summe Aktiva | | 137.099 | 112.461 | 44.530 | 34.459 |
| Passiva | | | | | |
| Gezeichnetes Kapital | | 2.584 | 2.577 | | |
| Kapitalrücklage | | 5.247 | 5.080 | | |
| Gewinnrücklagen | | 26.508[1] | 19.033 | | |
| Übriges Eigenkapital | | 746 | (297) | | |
| Eigenkapital | 16 | 35.085 | 26.393 | 2.642 | 2.094 |
| Anteile in Fremdbesitz | | 1.170 | 936 | 55 | 52 |
| Rückstellungen | 17 | 36.618 | 34.886 | 576 | 523 |
| Finanzverbindlichkeiten | 18 | 39.302 | 28.850 | 38.383 | 29.171 |
| Verbindlichkeiten aus Lieferungen und Leistungen | 19 | 11.079 | 9.027 | 176 | 132 |
| Übrige Verbindlichkeiten | 20 | 10.116 | 8.792 | 901 | 800 |
| Verbindlichkeiten | | 60.497 | 46.669 | 39.460 | 30.103 |
| Latente Steuern | 6 | 2.003 | 2.253 | 1.345 | 1.244 |
| Rechnungsabgrenzungsposten | | 1.726 | 1.324 | 452 | 443 |
| Summe Passiva | | 137.099 | 112.461 | 44.530 | 34.459 |

1) Einschließlich Steuerforderung/Steuerertrag aus der Sonderausschüttung (20 DM je Aktie) in Höhe von rd. 2,9 Mrd. DM.
Der nachfolgende Konzernanhang ist integraler Bestandteil des Konzernabschlusses.

## Konzern-Kapitalflußrechnung

| | Daimler-Benz-Konzern | | | Finanzdienstleistungen | |
|---|---|---|---|---|---|
| | *1997* | 1996 | 1995 | *1997* | 1996 |
| | *Mio. DM* | Mio. DM | Mio. DM | *Mio. DM* | Mio. DM |
| Konzernergebnis | *8.042* | 2.762 | (5.729) | *198* | 133 |
| Auf Minderheiten entfallendes Ergebnis | *189* | (89) | 116 | *1* | 4 |
| Steuerertrag aus Sonderausschüttung | *(2.908)* | – | – | – | – |
| Ergebnis aus dem Verkauf von Beteiligungen | *(1.113)* | (217) | – | – | – |
| Abschreibungen auf Vermietete Gegenstände | *2.323* | 2.018 | 2.444 | *2.467* | 2.198 |
| Abschreibungen auf das sonstige Anlagevermögen | *5.198* | 4.908 | 8.661 | *52* | 45 |
| Veränderung der latenten Steuern | *(1.787)* | (1.572) | (2.566) | *167* | (24) |
| Veränderung der Finanzinstrumente | *455* | 392 | (77) | – | 3 |
| Ergebnis aus Verkauf von Anlagevermögen/Wertpapieren | *(685)* | (315) | 28 | *25* | – |
| Veränderung der Wertpapiere (Handelspapiere) | *(756)* | (335) | 44 | – | – |
| Veränderung der Rückstellungen | *1.730* | 876 | 3.417 | *26* | 39 |
| Veränderung bei Positionen des Umlaufvermögens und sonstigen betrieblichen Passiva: | | | | | |
| - Netto-Vorräte (vermindert um erhaltene Anzahlungen) | *(385)* | (13) | (1.505) | *(274)* | (96) |
| - Forderungen aus Lieferungen und Leistungen | *(894)* | 35 | (262) | *47* | 7 |
| - Verbindlichkeiten aus Lieferungen und Leistungen | *1.691* | 967 | 728 | *45* | (59) |
| - Sonstige betriebliche Aktiva und Passiva | *142* | 786 | 156 | *(73)* | (279) |
| Cash Flow aus der Geschäftstätigkeit | *11.242* | 10.203 | 5.455 | *2.681* | 1.971 |
| Zugänge zum Anlagevermögen: | | | | | |
| - Zugänge zu Vermieteten Gegenständen | *(7.608)* | (6.101) | (5.205) | *(6.977)* | (6.171) |
| - Erwerb von Sachanlagen | *(6.942)* | (6.212) | (4.850) | *(47)* | (24) |
| - Erwerb sonstiger langfristiger Aktiva | *(516)* | (421) | (544) | *(74)* | (26) |
| Erlöse aus dem Abgang Vermieteter Gegenstände | *3.840* | 2.537 | 2.369 | *3.401* | 3.339 |
| Erlöse aus sonstigen Anlagenabgängen | *996* | 976 | 1.086 | *41* | 11 |
| Erwerb von Beteiligungen | *(1.187)* | (462) | (2.162) | *(125)* | (162) |
| Erlöse aus dem Abgang von Beteiligungen | *2.613* | 1.107 | 15 | – | 215 |
| Erwerb von Wertpapieren (ohne Handelspapiere) | *(5.322)* | (1.319) | (928) | – | (9) |
| Erlöse aus Verkäufen von Wertpapieren (ohne Handelspapiere) | *1.677* | 1.126 | 337 | *2* | – |
| Zugänge zu Forderungen aus Finanzdienstleistungen | *(15.761)* | (10.697) | (7.880) | *(15.755)* | (10.718) |
| Rückzahlung von Forderungen aus Finanzdienstleistungen | *10.273* | 7.572 | 5.778 | *10.273* | 7.572 |
| Veränderung sonstiger Geldanlagen | *1.342* | (260) | 1.242 | *24* | 9 |
| Cash Flow aus der Investitionstätigkeit | *(16.595)* | (12.154) | (10.742) | *(9.237)* | (5.964) |
| Veränderung bei Commercial Papers und sonstiger kurzfristiger Fremdfinanzierung | *2.399* | 4.915 | 2.932 | *2.208* | 2.221 |
| Aufnahme langfristiger Finanzverbindlichkeiten | *7.572* | 2.678 | 1.521 | *6.668* | 4.322 |
| Tilgung von Finanzverbindlichkeiten | *(2.262)* | (5.675) | (1.687) | *(2.013)* | (2.838) |
| Gezahlte Dividenden (FDL: einschl. Ergebnisabführung) | *(579)* | (10) | (580) | *(240)* | (362) |
| Kapitalerhöhungen | *201* | 294 | 97 | *344* | 486 |
| Cash Flow aus der Finanzierungstätigkeit | *7.331* | 2.202 | 2.283 | *6.967* | 3.829 |
| Einfluß von Wechselkursänderungen auf die Zahlungsmittel (< 3 Monate) | *293* | 101 | (143) | *7* | 4 |
| Veränderung der Zahlungsmittel (< 3 Monate) | *2.271* | 352 | (3.147) | *418* | (160) |
| Zahlungsmittel (< 3 Monate) zum Jahresanfang | *3.220* | 2.866 | 6.015 | *262* | 422 |
| Zahlungsmittel (< 3 Monate) zum Jahresende | *5.491* | 3.220 | 2.868 | *680* | 262 |

Der nachfolgende Konzernanhang ist integraler Bestandteil des Konzernabschlusses.

## Entwicklung des Konzern-Eigenkapitals

| | Gezeichnetes Kapital Mio. DM | Kapital- rücklage Mio. DM | Gewinn- rücklagen Mio. DM | Übriges Eigenkapital | | Gesamt Mio. DM |
| | | | | Unterschieds- betrag aus Währungs- umrechnung Mio. DM | Markt- bewertung von Wert- papieren Mio. DM | |
|---|---|---|---|---|---|---|
| Stand am 1. Januar 1995 | 2.565 | 4.904 | 22.564 | (590) | (8) | 29.435 |
| Dividenden (1,10 DM je Aktie) | – | – | (564) | – | – | (564) |
| Konzernergebnis | – | – | (5.729) | – | – | (5.729) |
| Ausgabe von Aktien | 3 | 44 | – | – | – | 47 |
| Währungsumrechnung | – | – | – | (449) | – | (449) |
| Wertpapiere | – | – | – | – | 120 | 120 |
| Stand am 31. Dezember 1995 | 2.568 | 4.948 | 16.271 | (1.039) | 112 | 22.860 |
| Konzernergebnis | – | – | 2.762 | – | – | 2.762 |
| Ausgabe von Aktien | 9 | 132 | – | – | – | 141 |
| Währungsumrechnung | – | – | – | 523 | – | 523 |
| Wertpapiere | – | – | – | – | 107 | 107 |
| Stand am 31. Dezember 1996 | 2.577 | 5.080 | 19.033 | (516) | 219 | 26.393 |
| Dividenden (1,10 DM je Aktie) | – | – | (567) | – | – | (567) |
| Konzernergebnis | – | – | 8.042 | – | – | 8.042 |
| Ausgabe von Aktien | 7 | 167 | – | – | – | 174 |
| Währungsumrechnung | – | – | – | 752 | – | 752 |
| Wertpapiere | – | – | – | – | 291 | 291 |
| Stand am 31. Dezember 1997 | 2.584 | 5.247 | 26.508 | 236 | 510 | 35.085 |

Der nachfolgende Konzernanhang ist integraler Bestandteil des Konzernabschlusses.

*Entwicklung des Konzern-Eigenkapitals*

## Entwicklung des Konzern-Anlagevermögens

| Werte in Mio. DM | 01.01.1997 | Währungs-änderungen | Änderung Konsolidie-rungskreis | Zugänge | Um-buchungen | Abgänge | 31.12.1997 |
|---|---|---|---|---|---|---|---|
| | | | Anschaffungs-/Herstellungskosten | | | | |
| Konzessionen, gewerbliche Schutzrechte und ähnliche Rechte und Werte sowie Lizenzen an solchen Rechten und Werten | 899 | 25 | 7 | 247 | 11 | 153 | 1.036 |
| Geschäftswerte | 2.328 | 25 | (281) | 397 | . | 58 | 2.411 |
| Immaterielle Anlagewerte | 3.227 | 50 | (274) | 644 | 11 | 211 | 3.447 |
| Grundstücke, grundstücksgleiche Rechte und Bauten einschließlich der Bauten auf fremden Grundstücken | 20.960 | 187 | 44 | 972 | 804 | 516 | 22.451 |
| Technische Anlagen und Maschinen | 25.535 | 99 | 159 | 2.331 | 1.097 | 1.660 | 27.561 |
| Andere Anlagen und Maschinen | 15.625 | 137 | (15) | 1.888 | 300 | 1.495 | 10.440 |
| Geleistete Anzahlungen und Anlagen im Bau | 3.111 | 108 | (4) | 2.081 | (2.220) | 152 | 2.924 |
| Sachanlagen | 65.231 | 531 | 184 | 7.272 | (19) | 3.823 | 69.376 |
| Anteile an verbundenen Unternehmen | 898 | 4 | (16) | 311 | (7) | 381 | 809 |
| Ausleihungen an verbundene Unternehmen | 23 | . | 0 | 138 | 1 | 160 | 2 |
| Beteiligungen an assoziierten Unternehmen | 1.319 | 2 | 22 | 48 | 0 | 1.134 | 257 |
| Beteiligungen | 1.037 | 26 | 2 | 466 | 7 | 154 | 1.384 |
| Ausleihungen an Unternehmen, mit denen ein Beteiligungs-verhältnis besteht | 180 | 0 | . | 1 | . | 81 | 100 |
| Wertpapiere des Anlagevermögens | 752 | 3 | . | 384 | 0 | 116 | 1.023 |
| Sonstige Ausleihungen | 730 | 1 | . | 125 | . | 124 | 732 |
| Finanzanlagen | 4.939 | 36 | 8 | 1.473 | 1 | 2.150 | 4.307 |
| | 73.397 | 617 | (82) | 9.389 | (7) | 6.184 | 77.130 |
| Vermietete Gegenstände[2] | 15.201 | 1.560 | 5 | 7.608 | 7 | 5.426 | 18.955 |

1) Währungsumrechnung mit Kursen am jeweiligen Bilanzstichtag.
2) Ohne direkte Vertragsabschlußkosten (vgl. Anmerkung 8).

Der nachfolgende Konzernanhang ist integraler Bestandteil des Konzernabschlusses.

*Entwicklung des Konzern-Anlagevermögens*

| | | Abschreibungen | | | | | Buchwerte[1] | |
|---|---|---|---|---|---|---|---|---|
| 01.01.1997 | Währungs-änderungen | Änderung Konsolidie-rungskreis | Laufendes Jahr | Um-buchungen | Abgänge | 31.12.1997 | 31.12.1997 | 31.12.1996 |
| 560 | 12 | 7 | 160 | 8 | 80 | 667 | 369 | 339 |
| 716 | 8 | (125) | 299 | . | 33 | 865 | 1.546 | 1.612 |
| 1.276 | 20 | (118) | 459 | 8 | 113 | 1.532 | 1.915 | 1.951 |
| 12.407 | 61 | 30 | 780 | (47) | 270 | 12.961 | 9.490 | 8.553 |
| 21.591 | 48 | 144 | 2.104 | 38 | 1.578 | 22.347 | 5.214 | 3.944 |
| 13.000 | 86 | (9) | 1.698 | (5) | 1.360 | 13.410 | 3.030 | 2.625 |
| 8 | . | 0 | 2 | (1) | 7 | 2 | 2.922 | 3.103 |
| 47.006 | 195 | 165 | 4.584 | (15) | 3.215 | 48.720 | 20.656 | 18.225 |
| 186 | 1 | 0 | 29 | 0 | 54 | 162 | 647 | 712 |
| 2 | . | 0 | 4 | . | 6 | . | 2 | 21 |
| 602 | . | 0 | 15 | . | 617 | . | 257 | 717 |
| 395 | 1 | 2 | 104 | 0 | 5 | 497 | 887 | 642 |
| 74 | 0 | . | . | . | 2 | 72 | 28 | 106 |
| 11 | . | . | 0 | 0 | 6 | 5 | 1.018 | 741 |
| 133 | (1) | 0 | 3 | . | 17 | 118 | 614 | 597 |
| 1.403 | 1 | 2 | 155 | . | 707 | 854 | 3.453 | 3.536 |
| 49.685 | 216 | 49 | 5.198 | (7) | 4.035 | 51.106 | 26.024 | 23.712 |
| 3.378 | 445 | | 2.323 | 7 | 1.976 | 4.177 | 14.778 | 11.823 |

# Konzernanhang

## Grundlagen und Methoden

### 1. Grundsätze der Rechnungslegung

*Allgemeine Grundlagen.* Der Konzernabschluß der Daimler-Benz Aktiengesellschaft und ihrer Tochterunternehmen („Daimler-Benz", „Daimler-Benz-Konzern" oder „der Konzern") ist im Einklang mit den in den USA allgemein anerkannten Rechnungslegungsgrundsätzen („United States Generally Accepted Accounting Principles" oder „US-GAAP") aufgestellt worden. Abweichend davon haben wir bestimmte Joint Ventures quotal in den Konzernabschluß einbezogen (vgl. Anmerkung 2). Alle Beträge werden in Millionen D-Mark („Mio. DM") angegeben.

Zum 31. Dezember 1997 ist die Gliederung der Gewinn- und Verlustrechnung im Hinblick auf das Kapitalaufnahmeerleichterungsgesetz (KapAEG) an die vierte und siebente EG-Richtlinie angepaßt worden. Darüber hinaus sind im Berichtsjahr Darlehensverbindlichkeiten gegenüber verbundenen Unternehmen sowie Verbindlichkeiten aus Capital Lease und Restwert-Garantien unter Finanzverbindlichkeiten ausgewiesen worden, um die Klarheit der Darstellung zu verbessern. Die Vorjahresbeträge sind entsprechend angepaßt worden.

Um den Vertrieb der im Daimler-Benz-Konzern hergestellten Produkte zu unterstützen, werden den Kunden Finanzierungen (einschließlich Leasingverträge) angeboten. Der Konzernabschluß ist daher wesentlich durch die Aktivitäten der konzerneigenen Finanzdienstleistungsgesellschaften geprägt. Um einen besseren Einblick in die Vermögens-, Finanz- und Ertragslage zu ermöglichen, haben wir den Konzernabschluß um Informationen zu den Geschäftstätigkeiten auf dem Gebiet Finanzdienstleistungen ergänzt. Diese stellen jedoch keine Pflichtangaben nach US-GAAP dar und erfüllen nicht den Zweck, einzeln und für sich allein die Vermögens-, Finanz- und Ertragslage des Geschäftsbereiches Finanzdienstleistungen im Einklang mit US-GAAP darzustellen. Die Zahlenangaben beziehen sich nur auf das Finanzdienstleistungsgeschäft und enthalten keine Eliminierung von Transaktionen mit anderen verbundenen Unternehmen des Konzerns.

*Konsolidierung.* Alle wesentlichen Tochterunternehmen, die unter der rechtlichen oder faktischen Kontrolle der Daimler-Benz AG stehen, sind in den Konzernabschluß einbezogen. Wesentliche Beteiligungen werden nach der Equity-Methode bilanziert, wenn Daimler-Benz zwischen 20 und 50% der Anteile hält („assoziierte Unternehmen"). Joint Ventures, bei denen eine gemeinschaftliche Leitung vorliegt, werden grundsätzlich quotal konsolidiert. Übrige Beteiligungen sind zu Anschaffungskosten angesetzt. Die Kapitalkonsolidierung erfolgt nach der Buchwertmethode durch Verrechnung der Anschaffungskosten mit dem auf das Mutterunternehmen entfallenden anteiligen Eigenkapital zum Erwerbszeitpunkt („purchase accounting"). Eine Differenz zwischen den Anschaffungskosten und dem anteiligen Eigenkapital wird ganz oder teilweise den Vermögensgegenständen des Tochterunternehmens zugeordnet. Ein verbleibender aktiver Unterschiedsbetrag wird als Geschäftswert aktiviert und über die voraussichtliche Nutzungsdauer ergebniswirksam abgeschrieben.

Die Auswirkungen konzerninterner Geschäftsvorfälle werden eliminiert. Auf ergebniswirksame Konsolidierungsvorgänge werden erforderliche Steuerabgrenzungen vorgenommen.

*Währungsumrechnung.* Die Währungsumrechnung erfolgt nach Statement of Financial Accounting Standard (SFAS) 52, d. h., die Bilanzen ausländischer Tochterunternehmen werden nach dem Konzept der funktionalen Währung grundsätzlich mit den Mittelkursen am Bilanzstichtag, die Gewinn- und Verlustrechnungen mit Jahresdurchschnittskursen umgerechnet. Umrechnungsdifferenzen aus der Währungsumrechnung bei den Vermögens- und Schuldposten gegenüber der Umrechnung des Vorjahres werden ergebnisneutral im Eigenkapital erfaßt.

Bei den Vermögensgegenständen und Schulden von Tochterunternehmen in Hochinflationsländern rechnen wir monetäre Posten zu Stichtagskursen sowie nicht monetäre Posten zu historischen Kursen um; Umrechnungsdifferenzen werden ergebniswirksam berücksichtigt. Ferner werden in Hochinflationsländern Abschreibungen und Ergebnisse aus dem Abgang von Anlagen auf der Basis historischer Kurse ermittelt.

Die für die Währungsumrechnung zugrundegelegten
Wechselkurse wesentlicher Währungen haben sich wie folgt
entwickelt:

| Währung: | | Mittelkurs am Bilanzstichtag | | Jahresdurchschnittskurs | | |
|---|---|---|---|---|---|---|
| | | 31.12.1997 | 31.12.1996 | 1997 | 1996 | 1995 |
| | | DM | DM | DM | DM | DM |
| Brasilien | 1 BRL | 1,61 | 1,49 | 1,61 | 1,50 | 1,56 |
| Frankreich | 1 FRF | 0,30 | 0,30 | 0,30 | 0,29 | 0,29 |
| Großbritannien | 1 GBP | 2,98 | 2,63 | 2,84 | 2,35 | 2,26 |
| Italien | 1000 ITL | 1,02 | 1,02 | 1,02 | 0,98 | 0,88 |
| Japan | 100 JPY | 1,38 | 1,34 | 1,44 | 1,38 | 1,53 |
| Spanien | 100 ESP | 1,18 | 1,19 | 1,18 | 1,18 | 1,15 |
| USA | 1 USD | 1,79 | 1,55 | 1,73 | 1,50 | 1,43 |

*Umsatzrealisierung.* Umsätze werden nach dem Gefahrenübergang bzw. der Erbringung der Leistung abzüglich Skonti, Kundenboni und Rabatten erfaßt. Bei Langfristfertigung werden die Umsätze nach der percentage-of-completion-Methode entsprechend dem Erreichen vertraglich vereinbarter Meilensteine bzw. dem Leistungsfortschritt erfaßt. Umsätze aus Finanzforderungen werden nach der Annuitätenmethode, Einkünfte aus Leasingverträgen bei Fälligkeit einbezogen. Die Umsatzerlöse beinhalten auch Erlöse aus dem Verkauf von Leasinggegenständen.

*Produktbezogene Aufwendungen.* Aufwendungen für Werbung und Absatzförderung sowie sonstige absatzbezogene Aufwendungen werden im Zeitpunkt ihres Anfalls ergebniswirksam. Rückstellungen für Gewährleistungen bilden wir im Zeitpunkt des Verkaufs der Produkte. Aufwendungen für Forschung und Entwicklung werden bei Anfall ergebniswirksam behandelt.

*Ergebnis je Aktie.* Im Konzernabschluß zum 31. Dezember 1997 wird erstmals die Neuregelung des SFAS 128 angewendet. Bei der Berechnung des Ergebnisses je Aktie sind nunmehr gemäß SFAS 128 alle Effekte durch in Eigenkapital wandelbare Rechte zu berücksichtigen. Bei Vorliegen dieser Verwässerungseffekte sind zwei Kenngrößen für das Ergebnis je Aktie anzugeben. Bei der Kenngröße „Ergebnis je Aktie" („basic earnings per share") wird der Verwässerungseffekt nicht berücksichtigt; das Konzernergebnis wird durch den gewogenen Durchschnitt der Zahl der ausgegebenen Aktien dividiert. Die Kenngröße „Ergebnis je Aktie (voll verwässert)" („diluted earnings per share") berücksichtigt nicht nur tatsächlich ausgegebene, sondern auch aufgrund von Optionsrechten erhältliche Aktien. Die Berechnung ist in Anmerkung 25 dargestellt. Die Vorjahre wurden entsprechend angepaßt. Das Konzernergebnis stellt das im Konzern insgesamt erwirtschaftete Ergebnis des Jahres dar, von dem die auf Minderheitsgesellschafter entfallenden Anteile abgesetzt oder hinzugerechnet sind.

*Immaterielle Anlagewerte.* Erworbene immaterielle Vermögensgegenstände werden zu Anschaffungskosten bewertet und linear über ihre Nutzungsdauer von 3 bis 10 Jahren abgeschrieben. Geschäftswerte werden aktiviert und über einen Zeitraum von 3 bis 20 Jahren abgeschrieben. Die Geschäftswerte werden regelmäßig auf der Basis geschätzter zukünftiger Cash Flows auf ihre Werthaltigkeit überprüft.

*Sachanlagen.* Sachanlagen sind mit den Anschaffungsoder Herstellungskosten abzüglich planmäßiger degressiver bzw. linearer Abschreibungen bewertet. Von der degressiven wird auf die lineare Abschreibungsmethode übergegangen, sobald die gleichmäßige Verteilung des Restbuchwerts auf die verbleibende Nutzungsdauer zu höheren Abschreibungsbeträgen führt. Ausschließlich auf steuerlichen Regelungen beruhende Abschreibungen bzw. Sonderposten werden nicht angesetzt. Die Herstellungskosten selbsterstellter Anlagen umfassen Einzelkosten sowie die zurechenbaren Material- und Fertigungsgemeinkosten einschließlich Abschreibungen. Sie umfassen nach US-GAAP auch Finanzierungskosten, wenn es sich um langfristige Baumaßnahmen handelt und eine direkte Zuordnung möglich ist. Es wird von folgenden Nutzungsdauern ausgegangen: 17 bis 50 Jahre für Gebäude, 8 bis 20 Jahre für Grundstückseinrichtungen, 3 bis 20 Jahre für technische Anlagen und Maschinen, 2 bis 10 Jahre für Betriebs- und Geschäftsausstattung.

*Leasing.* Daimler-Benz nutzt als Leasing-Nehmer Sachanlagen und vermietet als Leasing-Geber vor allem Personenwagen und Nutzfahrzeuge. Die US-GAAP enthalten Regeln,

nach denen auf der Basis von Chancen und Risiken beurteilt wird, ob dem Leasing-Nehmer (sog. „capital lease") oder dem Leasing-Geber (sog. „operating lease") das wirtschaftliche Eigentum am Leasing-Gegenstand zuzurechnen ist. Vermietete Gegenstände werden zu Anschaffungs- oder Herstellungskosten angesetzt und gewöhnlich über 3 bis 7 Jahre linear abgeschrieben.

*Umlaufvermögen.* Das Umlaufvermögen umfaßt die Vorräte, Forderungen, Wertpapiere und Zahlungsmittel einschließlich Beträgen, die nach einem Jahr fällig werden.

*Wertpapiere und Beteiligungen.* Wertpapiere werden mit Marktpreisen bewertet, sofern diese verfügbar sind. Unrealisierte Gewinne und Verluste aus der Marktbewertung von Wertpapieren, die zur kurzfristigen Veräußerung bestimmt sind (Handelsbestand oder „trading"-Papiere), werden ergebniswirksam erfaßt. Unrealisierte Gewinne und Verluste aus allen anderen zu Marktpreisen bewerteten Wertpapieren (Anlagebestand oder „available for sale"-Papiere) werden, unter Berücksichtigung latenter Steuern, im Eigenkapital ausgewiesen. Die sonstigen Wertpapiere werden mit ihren Anschaffungskosten bewertet. Auf alle Wertpapiere oder Beteiligungen werden bei dauerhaften Wertminderungen Abschreibungen vorgenommen.

*Vorräte.* Vorräte werden zum niedrigeren Wert aus Anschaffungs- oder Herstellungskosten und Marktpreisen angesetzt; dabei kommt im allgemeinen das Durchschnittswertverfahren oder die Fifo-Methode („first-in-first-out") zur Anwendung. Einzelne Tochtergesellschaften in den USA bewerten ihre Vorräte nach der Lifo-Methode („last-in-first-out"). Die Herstellungskosten umfassen neben den direkten Kosten für Fertigungsmaterial und -löhne anteilige Fertigungsgemeinkosten einschließlich Abschreibungen.

*Finanzinstrumente.* Derivative Finanzinstrumente werden bei Daimler-Benz grundsätzlich nur für Sicherungszwecke eingesetzt. Finanzinstrumente einschließlich ihrer Derivate (vor allem Devisentermin- und Devisenoptionsgeschäfte, Wertpapieroptionsgeschäfte, Zins- und Währungsswaps), die nicht eindeutig bestimmten Vermögensgegenständen oder Verbindlichkeiten bzw. Aufträgen zugeordnet werden können, werden zu Marktpreisen bewertet. Daraus resultierende unrealisierte Gewinne oder Verluste werden ergebniswirksam berücksichtigt. Besteht ein unmittelbarer Zusammenhang und eine Zuordnung zwischen einem derivativen Finanzinstrument und einem Grundgeschäft, wird eine Bewertungseinheit gebildet. Gewinne und Verluste aus diesen Bewertungseinheiten, die der Sicherung von Zins- und Währungsrisiken genau zugeordneter Vermögensgegenstände

oder Verbindlichkeiten bzw. Aufträge dienen, werden nach Zuordnung erst dann ergebniswirksam, wenn das Grundgeschäft realisiert wird (vgl. Anmerkung 23 d).

*Rückstellungen.* Die Bewertung der Pensionsverpflichtungen beruht auf dem in SFAS 87 vorgeschriebenen Anwartschaftsbarwertverfahren („projected unit credit method"). Steuerrückstellungen und sonstige Rückstellungen werden gebildet, wenn eine Verpflichtung gegenüber Dritten besteht, die Inanspruchnahme wahrscheinlich und die voraussichtliche Höhe des notwendigen Rückstellungsbetrages zuverlässig schätzbar ist. Bei der Ermittlung der sonstigen Rückstellungen – insbesondere bei Gewährleistungen und Abrechnungsrisiken sowie drohenden Verlusten aus schwebenden Geschäften – fließen grundsätzlich alle Kostenbestandteile ein, die auch im Vorratsvermögen aktiviert werden. Preissteigerungseffekte werden berücksichtigt. Rückstellungen im Personal- und Sozialbereich werden soweit die ihnen zugrunde liegenden Verbindlichkeiten einen Zinsanteil enthalten – zum Barwert angesetzt.

*Schätzungen.* Im Konzernabschluß müssen zu einem gewissen Grad Schätzungen vorgenommen und Annahmen getroffen werden, die die bilanzierten Vermögensgegenstände und Verbindlichkeiten, die Angabe von Eventualverbindlichkeiten am Bilanzstichtag und den Ausweis von Erträgen und Aufwendungen während der Berichtsperiode beeinflussen. Die sich tatsächlich einstellenden Beträge können von den Schätzungen abweichen.

*Noch nicht angewandte Rechnungslegungsvorschriften.* Im Juni 1997 hat das Financial Accounting Standards Board („FASB") das SFAS 130 und SFAS 131 verabschiedet. Beide Regelungen sind ab dem Geschäftsjahr 1998 anzuwenden. SFAS 130 ist eine Ausweisvorschrift, die eine detailliertere Darstellung der nicht erfolgswirksamen und nicht auf Kapitalmaßnahmen beruhenden Eigenkapitalveränderungen fordert. SFAS 131 regelt Art und Umfang der Segmentberichterstattung neu. Im Mittelpunkt der Segmentberichterstattung nach SFAS 131 steht der sog. „management approach". Grundlage der Segmentberichterstattung ist danach die interne Berichterstattung an den Vorstand. Unterjährige Angaben sind erstmals in 1999 verpflichtend.

Im Februar 1998 wurde SFAS 132 verabschiedet. SFAS 132 vereinheitlicht weitestgehend die Anhangsdarstellung der Pensionsverpflichtungen (SFAS 87) und der Zuschußverpflichtungen für die Kosten der medizinischen Versorgung (SFAS 106). Daimler-Benz wird diese Vorschrift ab dem Geschäftsjahr 1998 anwenden.

## 2. Konsolidierungskreis

*Konsolidierungskreis.* Der Konsolidierungskreis umfaßt – neben der Daimler-Benz AG – 300 (i.V. 297) in- und ausländische Tochterunternehmen sowie 92 (i.V. 82) Gemeinschaftsunternehmen; letztere werden grundsätzlich quotal einbezogen. Darüber hinaus haben wir 12 Tochterunternehmen at equity nach der Buchwertmethode einbezogen. Im Berichtsjahr sind 44 Tochterunternehmen sowie 15 Gemeinschaftsunternehmen erstmals in den Konzernabschluß einbezogen worden. 41 Tochterunternehmen sowie 5 Gemeinschaftsunternehmen sind aus dem Konsolidierungskreis ausgeschieden. Wesentliche Auswirkungen aus der Änderung des Konsolidierungskreises auf die Konzernbilanz und auf die Konzern-Gewinn- und Verlustrechnung sind bei den einzelnen Abschlußposten erläutert. Nicht konsolidiert werden 285 (i.V. 315) Tochterunternehmen, deren Einfluß auf die Vermögens-, Finanz- und Ertragslage des Konzerns zusammengenommen von untergeordneter Bedeutung ist, sowie 6 (i.V. 10) Gesellschaften, deren Vermögen als Träger von Versorgungseinrichtungen Beschränkungen unterliegt. Im Konzernabschluß werden Beteiligungen an 122 assoziierten Unternehmen bilanziert. 11 assoziierte Unternehmen haben wir zum 31. Dezember 1997 at equity nach der Buchwertmethode in den Konzernabschluß einbezogen. Die verbleibenden assoziierten Unternehmen werden unter Beteiligungen ausgewiesen, da sie für die zutreffende Darstellung der Vermögens-, Finanz- und Ertragslage des Konzerns von untergeordneter Bedeutung sind.

*Adtranz-Joint Venture.* Im Dezember 1995 schlossen Daimler-Benz und Asea Brown Boveri („ABB") ihre Verhandlungen zur Bildung des auf dem Gebiet Bahnsysteme tätigen Joint Ventures Adtranz ab. Bei den Verhandlungen zwischen Daimler-Benz und ABB wurden Übernahmeoptionen vereinbart. Danach hat Daimler-Benz zu bestimmten Zeitpunkten zwischen 1998 bis 2005 das Recht, den von ABB gehaltenen Anteil an Adtranz von 50% für 1.800 Mio. USD zuzüglich eines Aufpreises zu übernehmen, der sich bei dem Erreichen bzw. Überschreiten fixierter zukünftiger Jahresergebnisse bemißt („Call Option"). Andererseits kann ABB in der Zeit von 1998 bis 2005 zu bestimmten Zeitpunkten von Daimler-Benz verlangen, ihren Anteil von 50% an Adtranz zu kaufen („Put Option"). Der Preis für das Ausüben der Put Option berechnet sich grundsätzlich nach zukünftigen Erträgen und den gleichen Kriterien wie für das Ausüben der Call Option; allerdings ist der sich ergebende Preis niedriger.

Seit dem 1. Januar 1996 wird das Joint Venture Adtranz mit 63 (1997: 71) Gemeinschaftsunternehmen quotal in den Konzernabschluß einbezogen. Demnach werden seine Ver-

mögensgegenstände und Verbindlichkeiten, Aufwendungen und Erträge sowie Cash Flows entsprechend dem an der Gesellschaft gehaltenen Anteil in den Konzernabschluß aufgenommen. Die Anwendung dieser Konsolidierungsmethode, die nach den Regelungen der siebenten Richtlinie des Rates der Europäischen Gemeinschaft und den Standards des International Accounting Standards Committee erlaubt ist, soll dem Leser des Konzernabschlusses einen zutreffenderen Einblick in die Vermögens-, Finanz- und Ertragslage des Konzerns ermöglichen.

Nach US-GAAP wäre die Beteiligung des Konzerns an Adtranz nach der Equity-Methode zu bewerten. Durch die quotale Konsolidierung entstehen im Vergleich zur Equity-Bewertung zwar keine Auswirkungen auf das Eigenkapital und das Konzernergebnis. Jedoch würde bei Anwendung der Equity-Methode der Netto-Beteiligungsbuchwert in der Bilanz unter den Finanzanlagen ausgewiesen und der Anteil am Jahresergebnis des Joint Ventures sowie die Abschreibung auf den erworbenen Geschäftswert in der Gewinn- und Verlustrechnung als Saldo dem Finanzergebnis zugeordnet. Zudem würde das Joint Venture die Cash Flow-Rechnung des Konzerns nur mit seinen Ausschüttungen an den Konzern beeinflussen. Daimler-Benz hat jedoch von der „United States Securities and Exchange Commission" („SEC") die Genehmigung für diese von den US-GAAP abweichende Darstellung erhalten.

Die nachstehenden Angaben stellen die anteiligen Werte dar, mit denen Adtranz in den Konzernabschluß einbezogen wird; sie enthalten auch die Auswirkungen des Geschäftswerts aus der Erstkonsolidierung im Daimler-Benz-Konzernabschluß. Die übrigen quotal konsolidierten Unternehmen sind von untergeordneter Bedeutung.

| Angaben zur Bilanz: | 31. Dezember | |
|---|---|---|
| | *1997* | 1996 |
| | *Mio. DM* | Mio. DM |
| Anlagevermögen[1] | *1.581* | 1.766 |
| Umlaufvermögen | *1.840* | 1.429 |
| Aktiva | *3.421* | 3.195 |
| | | |
| Eigenkapital | *1.393* | 1.374 |
| Anteile in Fremdbesitz | *12* | 13 |
| Rückstellungen | *970* | 886 |
| Verbindlichkeiten | *1.046* | 922 |
| Passiva | *3.421* | 3.195 |

1) Enthält den Geschäftswert aus der Kapitalkonsolidierung der Adtranz im Daimler-Benz-Konzernabschluß in Höhe von 850 (i. V. 1.039) Mio. DM.

Angaben zur Gewinn- und Verlustrechnung

| | 1997 Mio. DM | 1996 Mio. DM |
|---|---|---|
| Umsatzerlöse | 3.190 | 2.835 |
| Operating Loss[1] | (330) | (16) |
| Konzernergebnis | (302) | (95) |

1) Im Operating Loss 1997 sind außerplanmäßige Abschreibungen auf den Geschäftswert (120 Mio. DM) enthalten; wie im Vorjahr werden im Operating Loss auf Basis von Erhaltenen Anzahlungen abgeleitete Zinsen in Höhe von 111 (i.V. 122) Mio. DM ausgewiesen.

In den Zahlungsmitteln von bis zu 3 Monaten sind Forderungen gegen die Daimler-Benz AG im Rahmen des konzerninternen Cash-Concentration-Verfahrens in Höhe von 99 (1996: 116) Mio. DM enthalten.

Angaben zur Kapitalflußrechnung

| | 1997 Mio. DM | 1996 Mio. DM |
|---|---|---|
| Cash Flow aus der | | |
| – Geschäftstätigkeit | 141 | (452) |
| – Investitionstätigkeit | (24) | 125 |
| – Finanzierungstätigkeit | (98) | 81 |
| Einfluß von Wechselkursänderungen auf die Zahlungsmittel | . | 7 |
| Veränderung der Zahlungsmittel (< 3 Monate) | 19 | (239) |
| Zahlungsmittel (< 3 Monate) zum Jahresanfang | 285 | 524 |
| Zahlungsmittel (< 3 Monate) zum Jahresende | 304 | 285 |

## 3. Maßnahmen zur Reorganisation des Konzerns

Während der Jahre 1995 und 1996 hat Daimler-Benz Maßnahmen eingeleitet, um die Wettbewerbsfähigkeit und die Ertragskraft des Konzerns zu steigern. Diese Maßnahmen umfaßten im wesentlichen:

a) Nach der Ausgründung der rechtlich unselbständigen Bereiche der AEG Aktiengesellschaft („AEG") und Ausgliederung des Vermögens in die EHG Elektroholding GmbH wurde 1996 die AEG-Zentrale geschlossen und die AEG auf die Daimler-Benz AG verschmolzen. Die Bereiche Energietechnik sowie die Anlage- und Automatisierungstechnik wurden veräußert. Im Juni 1996 stimmte die Hauptversammlung der AEG der Verschmelzung zu; die Eintragung ins Handelsregister erfolgte im September 1996 mit wirtschaftlicher Wirkung zum 1. Januar 1996. Im Zuge der Verschmelzung übernahm der Konzern ausstehende Anteile von Minderheitsaktionären der AEG. Die Maßnahmen belasteten das Ergebnis des Jahres 1996 mit ca. 300 (1995: 1.600) Mio. DM.

b) Im Januar 1996 entschied Daimler-Benz, mit sofortiger Wirkung die finanzielle Unterstützung für den niederländischen Flugzeughersteller NV Koninklijke Nederlandse Vliegtuigenfabriek („Fokker") einzustellen. Anschließend wurde im Rahmen des gerichtlichen Vergleichsverfahrens die Leitung auf einen unabhängigen Vergleichsverwalter übertragen. Am 15. März 1996 wurde über das Vermögen von Fokker das Konkursverfahren nach niederländischem Recht eröffnet. Die aus der Beendigung dieses Engagements resultierenden Belastungen wurden 1995 mit einem Gesamtbetrag von 2.158 Mio. DM berücksichtigt. Aus dem Verkauf von in diesem Zusammenhang wertberichtigten Vorräten des Konzerns wurden 1996 Erträge von ca. 100 Mio. DM realisiert.

c) Seit 1994 und zunehmend 1995 verlor der US-Dollar gegenüber der D-Mark erheblich an Wert. Da ein wesentlicher Teil der Umsätze des Geschäftsfeldes Luft- und Raumfahrt (Dasa) in US-Dollar fakturiert wird, hat dies die in DM umgerechneten Umsatzerlöse belastet. Zusätzlich war Dasa mit einer anhaltend niedrigen Nachfrage auf dem Flugzeugmarkt und gekürzten Budgets für Raumfahrt und Verteidigung konfrontiert. In Anbetracht der daraus resultierenden operativen Verluste wurde ein umfassendes Programm zur Effizienzsteigerung beschlossen, das in Deutschland u.a. den Abbau von ca. 4.000 Mitarbeitern und den Verkauf von drei Betriebsstätten beinhaltete. Die Maßnahmen belasteten das Ergebnis des Jahres 1995 mit 878 Mio. DM. Weiterhin wurden 1995 im Konzern annähernd alle Geschäftswerte aus dem Erwerb der Dasa sowie verschiedene, langfristig nutzbare Anlagen mit insgesamt 2.558 Mio. DM außerplanmäßig abgeschrieben.

Während des Jahres 1996 stieg in der Luftfahrtindustrie die Nachfrage deutlich an. Insbesondere bei Daimler-Benz-Aerospace Airbus führten die sich dadurch abzeichnenden höheren Fertigungsraten zu einer Reduzierung der in 1995 gebildeten Vorsorgen für sachliche und personelle Strukturmaßnahmen in Höhe von ca. 300 Mio. DM.

d) Im Jahr 1996 brachte der Konzern das Flugzeuggeschäft von Dornier in eine neu gegründete Holding-Gesellschaft ein, deren Anteile zu 80% vom amerikanischen Flugzeughersteller Fairchild Industries Corporation gehalten werden. In diesem Zusammenhang entstanden in 1996 Aufwendungen von 435 Mio. DM, die zum Teil aus der Übernahme der bis zur Einbringung entstandenen Verluste resultierten. Die 20%-Beteiligung des Konzerns an der Holding-Gesellschaft wird nach der Equity-Methode bilanziert.

Im Januar 1997 veräußerte Daimler-Benz seine Beteiligungen an AEG Electrocom GmbH und AEG ElectroCom International, Inc. (Erkennungs- und Sortiersysteme) an die Siemens AG. Aus dem Verkauf ist im Konzernabschluß 1997 ein Ertrag in Höhe von 216 Mio. DM entstanden.

Im Juli 1997 hat debis AG die strategische Partnerschaft mit Cap Gemini Sogeti S.A. aufgrund der unterschiedlichen zukünftigen strategischen Orientierung der beiden Unternehmen beendet. Der Ertrag aus der Veräußerung der 24,4%-igen Beteiligung an Cap Gemini Sogeti S.A. beträgt 822 Mio. DM.

Erläuterungen zur Konzern-Gewinn- und
Verlustrechnung

4. Umsatzkosten und übrige Aufwendungen
In den Umsatz- und Funktionskosten sind die folgenden Materialaufwendungen enthalten:

|  | 1997 Mio. DM | 1996 Mio. DM | 1995 Mio. DM |
|---|---|---|---|
| Aufwendungen für Roh-, Hilfs- und Betriebsstoffe und für bezogene Waren | 58.245 | 51.028 | 48.440 |
| Aufwendungen für bezogene Leistungen | 12.263 | 9.844 | 11.770 |
|  | 70.508 | 60.872 | 60.210 |

Die Position Vertriebskosten, allgemeine Verwaltungskosten und sonstige betriebliche Aufwendungen setzt sich wie folgt zusammen:

|  | 1997 Mio. DM | 1996 Mio. DM | 1995 Mio. DM |
|---|---|---|---|
| Vertriebskosten | 11.867 | 10.401 | 10.507 |
| Allgemeine Verwaltungskosten | 3.567 | 3.345 | 3.494 |
| Aufwendungen aus Portfoliobereinigung | – | 319 | 3.755 |
| Abschreibungen von Firmenwerten | 299 | 142 | 1.999 |
| Andere Aufwendungen | 1.700 | 1.748 | 1.079 |
|  | 17.433 | 15.955 | 20.834 |

Die Umsatz- und Funktionskosten enthalten des weiteren sonstige Steuern in Höhe von 198 (1996: 280; 1995: 241) Mio. DM.

Die in den Jahren 1996 und 1995 angefallenen Aufwendungen aus der Portfoliobereinigung des Konzerns betreffen ausschließlich Fokker und das Strukturkonzept für die frühere AEG (vgl. Anmerkung 3). Die anderen Aufwendungen beinhalten vor allem Zuführungen zu Rückstellungen, die nicht den Funktionskosten (Umsatz-, Vertriebs- und Verwaltungskosten) zugeordnet wurden. Darüber hinaus waren in 1997 Aufwendungen aus der Rückzahlung von Entwicklungskostenzuschüssen in Höhe von 721 Mio. DM enthalten (vgl. Anmerkung 22).

In den Aufwandspositionen der Gewinn- und Verlustrechnung sind die folgenden Personalaufwendungen verrechnet:

| | 1997 Mio. DM | 1996 Mio. DM | 1995 Mio. DM |
|---|---|---|---|
| Löhne und Gehälter | 24.021 | 22.064 | 24.265 |
| Soziale Abgaben | 4.530 | 4.003 | 4.493 |
| Netto-Pensionsaufwendungen (vgl. Anmerkung 17a) | 1.493 | 1.564 | 1.613 |
| Übrige Aufwendungen für Altersversorgung | 157 | 178 | 201 |
| | 30.201 | 27.809 | 30.572 |

Im Jahresdurchschnitt waren im Konzern beschäftigt:

| | 1997 Anzahl | 1996 Anzahl | 1995 Anzahl |
|---|---|---|---|
| Arbeiter | 165.104 | 164.523 | 173.510 |
| Angestellte | 118.057 | 115.041 | 135.217 |
| Auszubildende/ Praktikanten | 12.353 | 11.704 | 12.495 |
| | 295.514 | 291.268 | 321.222 |

In Gemeinschaftsunternehmen sind 34.448 (1996: 34.655; 1995: 12.365) Personen tätig.

Die von Konzernunternehmen in 1997 gewährten Gesamtbezüge betragen für den Vorstand der Daimler-Benz AG 20 Mio. DM und für den Aufsichtsrat der Daimler-Benz AG 2 Mio. DM. Ferner hat der Vorstand im Rahmen des Stock-Option-Plans 1997 Wandelschuldverschreibungen im Nennwert von 1.200.000 DM gezeichnet. Zur Ermittlung des Wertes der mit der Wandelschuldverschreibung verbundenen Optionsrechte können Optionspreismodelle herangezogen werden. Der danach zu ermittelnde Wert unterliegt starken Schwankungen in Abhängigkeit von den getroffenen Annahmen. Ein allgemein verbindlicher Wert ist deshalb nicht bestimmbar. Bezüglich des Ergebnisses der nach U.S.-amerikanischen Rechnungslegungsgrundsätzen vorgenommenen Bewertung der Optionsrechte, deren Konditionen sowie der Bedingungen zur Ausübung der Wandlungsrechte wird auf die Erläuterungen zum Eigenkapital verwiesen (vgl. Anmerkung 16). Die Bezüge ehemaliger Vorstandsmitglieder der Daimler-Benz AG und ihrer Hinterbliebenen belaufen sich auf 18 Mio. DM. Für die ab 1997 nach US-GAAP bewerteten Pensionsverpflichtungen gegenüber früheren Mitgliedern des Vorstands sowie ihren Hinterbliebenen sind im Jahresabschluß der Daimler-Benz AG insgesamt 123 Mio. DM zurückgestellt. Zum 31. Dezember 1997 bestehen keine Vorschüsse und Kredite an Vorstandsmitglieder der Daimler-Benz AG.

### 5. Finanzergebnis

| | 1997 Mio. DM | 1996 Mio. DM | 1995 Mio. DM |
|---|---|---|---|
| Erträge aus Beteiligungen davon aus verbundenen Unternehmen 33 (1996: 39; 1995: 36) Mio. DM | 125 | 419 | 518 |
| Ergebnis aus dem Abgang von Beteiligungen, assoziierten Unternehmen und Anteilen an verbundenen Unternehmen | 897 | (18) | (4) |
| Abschreibungen auf Beteiligungen und auf Anteile an verbundenen Unternehmen | (148) | (107) | (121) |
| Ergebnis aus at equity-bilanzierten Unternehmen und sonstigen nicht konsolidierten Unternehmen | 68 | (128) | (665) |
| Beteiligungsergebnis | 942 | 166 | (272) |
| Sonstige Zinsen und ähnliche Erträge davon aus verbundenen Unternehmen 20 (1996: 24; 1995: 5) Mio. DM | 2.289 | 1.641 | 1.729 |
| Zinsen und ähnliche Aufwendungen | (971) | (872) | (1.184) |
| Zinsergebnis | 1.318 | 769 | 545 |
| Erträge aus Wertpapieren und Ausleihungen | 31 | 17 | 65 |
| Erträge aus dem Abgang von Wertpapieren | 166 | 111 | 246 |
| Abschreibungen auf Wertpapiere und Ausleihungen | (19) | (6) | (130) |
| Ergebnis aus nicht zugeordneten Finanzinstrumenten | (1.723) | (763) | 266 |
| Sonstiges Finanzergebnis | (97) | 202 | 189 |
| Übriges Finanzergebnis | (1.642) | (439) | 656 |
| | 618 | 496 | 929 |

Im Zusammenhang mit langfristigen Baumaßnahmen sind Zinsen in Höhe von 69 (1996: 49; 1995: 29) Mio. DM aktiviert worden.

### 6. Steuern vom Einkommen und vom Ertrag

Vom Ergebnis vor Ertragsteuern und Anteilen von Fremden in Höhe von 4.249 (1996: 1.961; 1995: −7.233) Mio. DM wurden 2.936 (1996: 1.200; 1995: −6.874) Mio. DM in Deutschland erwirtschaftet.

Die Ertragsteuern des Konzerns teilen sich auf das In- und Ausland wie folgt auf:

| | 1997 Mio. DM | 1996 Mio. DM | 1995 Mio. DM |
|---|---|---|---|
| Laufende Steuern | | | |
| Deutschland | (2.881) | 404 | 231 |
| Ausland | 686 | 456 | 715 |
| Latente Steuern | | | |
| Deutschland | (1.780) | (1.448) | (2.258) |
| Ausland | (7) | (124) | (308) |
| | (3.982) | (712) | (1.620) |

Im deutschen Körperschaftsteuerrecht wird bei der Besteuerung von Gesellschaften und Aktionären das Anrechnungsverfahren angewandt. Nach dem für das Geschäftsjahr 1997 geltenden Steuerrecht werden thesaurierte Gewinne zunächst mit einem Körperschaftsteuersatz von 45% zuzüglich des Solidaritätszuschlages von 7,5% auf die abgeführte Körperschaftsteuerschuld besteuert. Danach ergibt sich ein effektiver Körperschaftsteuersatz von 48,375%. Bei Ausschüttung an die Aktionäre wird der Körperschaftsteuersatz auf 30% (zuzüglich des Solidaritätszuschlages von 7,5% auf die abgeführte Körperschaftsteuerschuld von 30%) reduziert, indem der zuvor gezahlte, den effektiven Ausschüttungssteuersatz von 32,25% übersteigende Betrag erstattet wird. Bei Ausschüttung von Gewinnen erhalten in Deutschland steuerpflichtige Aktionäre darüber hinaus eine Steuergutschrift auf ihre Einkommensteuer in Höhe der zuvor von der Gesellschaft gezahlten Körperschaftsteuer.

Während die laufenden Steuern sich an dem für 1997 gültigen Steuersatz bemessen, wird für die Berechnung der latenten Steuern der ab 01.01.1998 gültige Steuersatz zugrunde gelegt. Der Solidaritätszuschlag auf die Körperschaftsteuerschuld vermindert sich ab 01.01.1998 von 7,5% auf 5,5%. Somit wird bei inländischen Gesellschaften für die Berechnung der latenten Steuern ein effektiver Körperschaftsteuersatz von 47,475% zuzüglich eines effektiven Gewerbesteuersatzes von 8,525% angewandt. Die Änderung des Steuersatzes wurde ergebniswirksam berücksichtigt. Die Auswirkung der Steuersatzänderung wird unten separat angegeben.

Die folgende Tabelle zeigt eine Überleitungsrechnung vom im jeweiligen Geschäftsjahr erwarteten zum jeweils ausgewiesenen Steueraufwand. Zur Ermittlung des erwarteten Steueraufwands wird der in den Geschäftsjahren jeweils gültige Gesamtsteuersatz von 57% mit dem Ergebnis vor Steuern multipliziert. Dieser besteht aus einem effektiven Körperschaftsteuersatz von 48,375% zuzüglich eines effektiven Gewerbesteuersatzes von 8,625%.

| | 1997 Mio. DM | 1996 Mio. DM | 1995 Mio. DM |
|---|---|---|---|
| Erwarteter Steueraufwand (-ertrag) | 2.422 | 1.118 | (4.123) |
| Änderung Steuersatz für Latente Steuern im Inland | 133 | – | – |
| Herstellung der Ausschüttungsbelastung | (3.176) | (167) | (6) |
| Besteuerungsunterschied Ausland | (73) | (260) | (218) |
| Nicht abzugsfähige Aufwendungen | 19 | 84 | 129 |
| Steuerfreie Einnahmen | (36) | (166) | (227) |
| Auflösung der per 31.12.1997 für die inländische Organschaft verbleibenden Wertberichtigungen | (1.962) | – | – |
| Sonstige Veränderung der Wertberichtigungen auf aktive latente Steuern | (909) | (1.043) | 1.381 |
| Verluste, auf die latente Steuern nicht aktiviert wurden | – | – | 260 |
| Beteiligungsabschreibungen aus Vorjahren, die steuerwirksam erst später oder gar nicht angesetzt wurden | (469) | (207) | – |
| Steuerlich nicht abzugsfähige Abschreibungen auf Geschäftswerte | 107 | 57 | 1.143 |
| Sonstige | (38) | (128) | 41 |
| Ausgewiesener Steuerertrag | (3.982) | (712) | (1.620) |

Der Steuerertrag aus der Herstellung der Ausschüttungsbelastung beträgt im Berichtsjahr 3.176 Mio. DM. Er ist im wesentlichen bedingt durch die auf die Sonderausschüttung (20 DM je Aktie) entfallende Steuerentlastung in Höhe von 2.908 Mio. DM. Aufgrund der Ausschüttung an die Aktionäre wird der Körperschaftsteuersatz von 50% auf 30% reduziert, indem der zuvor gezahlte, den effektiven Ausschüttungssteuersatz übersteigende Betrag erstattet wird.

Während des Jahres 1997 verminderten sich die Wertberichtigungen auf aktive latente Steuern um insgesamt 2.855 Mio. DM. Davon entfällt auf das Inland ein Rückgang von 2.871 Mio. DM und auf das Ausland ein leichter Anstieg von 16 Mio. DM – ausgewiesen in der Zeile Besteuerungsunterschied Ausland. Die Verminderung der Wertberichtigungen auf aktive latente Steuern im Inland ist mit 909 Mio. DM i.w. auf die Nutzung steuerlicher Verlustvorträge in 1997 zurückzuführen. Darüber hinaus wurden die – für die inländische Organschaft – per 31.12.1997 verbleibenden Wertberichtigungen auf aktive latente Steuern vollständig aufgelöst. Aufgrund der gegenüber den Vorjahren deutlich verbesserten Ertragsaussichten, die auch steuerlich zu einer nachhaltigen Ergebnisverbesserung führen werden, besteht für diese Wertberichtigung keine Grundlage mehr. Hieraus ergibt sich 1997 ein Einmaleffekt von 1.962 Mio. DM. Die per 31.12.1997 weiterhin bestehenden Wertberichtigungen auf aktive latente Steuern entfallen zum überwiegenden Teil auf das Ausland.

Weil die in den Vorjahren vorgenommenen handelsrechtlichen Beteiligungsabschreibungen an Cap Gemini Sogeti S.A. steuerlich nicht angesetzt wurden, steht 1997 dem handelsrechtlichen Veräußerungsgewinn in Höhe von 822 Mio. DM aus dem Verkauf des Aktienpakets an Cap Gemini Sogeti S.A. kein Steueraufwand gegenüber.

Während des Jahres 1996 verminderten sich die Wertberichtigungen auf aktive latente Steuern um 1.052 Mio. DM. In den Vorjahren waren in Gesellschaften des Geschäftsfeldes Luft- und Raumfahrt wegen anhaltender operativer Verluste aktive Steuerlatenzen auf steuerliche Verlustvorträge vollständig wertberichtigt worden. Einige dieser Verlustvorträge waren in ihrer Nutzbarkeit begrenzt. Die Nutzung solcher steuerlicher Verlustvorträge führte 1996 jedoch zu steuerlichen Vorteilen und daher zu einer Abnahme der Wertberichtigungen von 673 Mio. DM. Eine weitere Abnahme der Wertberichtigungen resultierte aus der Verschmelzung der AEG auf die Daimler-Benz AG, durch die vororganschaftliche Verlustvorträge der AEG für die deutsche steuerliche Organschaft nutzbar werden. Vor der Verschmelzung waren aktive Steuerlatenzen aus den vororganschaftlichen Verlustvorträgen der AEG in

Höhe von 231 Mio. DM zu 100 % wertberichtigt, da sie steuerlich nicht geltend gemacht werden konnten. Weiterhin wurden 1996 Steuerlatenzen aktiviert, die aus in Vorjahren vorgenommenen Beteiligungsabschreibungen resultieren.

Steuerlatenzen von 260 Mio. DM auf bei Fokker entstandene Verluste konnten 1995 nicht aktiviert werden, nachdem im Januar 1996 die Entscheidung getroffen wurde, die finanzielle Unterstützung für diese Gesellschaft einzustellen.

Wertberichtigungen auf aktivierte latente Steuern beruhen auf der Einschätzung, daß wahrscheinlich nicht alle aktiven Steuerlatenzen in der Zukunft realisiert werden können. Die heutige Einschätzung kann sich in Abhängigkeit von der Ertragslage zukünftiger Jahre ändern und höhere oder niedrigere Wertberichtigungen erforderlich machen.

Die aktiven und passiven latenten Steuern ergeben sich aus Buchungsunterschieden in den folgenden Bilanzpositionen:

|  | 31. Dezember | |
| --- | ---: | ---: |
|  | 1997 | 1996 |
|  | Mio. DM | Mio. DM |
| Immaterielle Anlagewerte | 628 | 917 |
| Sachanlagen | 946 | 889 |
| Vermietete Gegenstände | 1.941 | 1.694 |
| Vorräte | 2.132 | 1.473 |
| Forderungen | 882 | 311 |
| Steuerliche Verlustvorträge | 6.556 | 9.498 |
| Pensionsrückstellungen | 2.233 | 2.019 |
| Sonstige Rückstellungen | 2.374 | 1.178 |
| Verbindlichkeiten | 1.242 | 962 |
| Passive Rechnungsabgrenzung | 435 | 311 |
| Sonstige | 413 | 459 |
|  | 19.782 | 19.711 |
| Wertberichtigungen | (509) | (3.364) |
| Aktive latente Steuern | 19.273 | 16.347 |
| Sachanlagen | 492 | 521 |
| Vermietete Gegenstände | 2.608 | 2.016 |
| Finanzanlagen | 269 | 793 |
| Vorräte | 890 | 640 |
| Forderungen | 4.877 | 3.090 |
| Wertpapiere des Umlaufvermögens | 389 | 222 |
| Sonstige Rückstellungen | 803 | 1.595 |
| Sonstige | 486 | 120 |
| Passive latente Steuern | 10.814 | 8.997 |
| Netto-Betrag der aktiven latenten Steuern | 8.459 | 7.350 |

Zum 31. Dezember 1997 bestehen im Konzern körperschaftsteuerliche Verlustvorträge von 11.918 (i.V. 16.551) Mio. DM. Der Großteil der im Konzern vorhandenen Verlustvorträge entfällt auf Gesellschaften, die im Rahmen der körperschaft- und gewerbesteuerlichen Organschaft in Deutschland veranlagt werden. Diese Verluste sind unbegrenzt vortragsfähig. Ein weiterer Teil resultiert aus Verlusten von Nicht-Organgesellschaften sowohl im In- und Ausland und ist teilweise in der Vortragsfähigkeit begrenzt.

Nach Saldierungen werden die aktiven und passiven latenten Steuern wie folgt ausgewiesen:

Passive latente Steuern auf Gewinne in Höhe von 4.064 (i.V. 2.527) Mio. DM, die bei ausländischen Tochterunternehmen zur Stärkung der Eigenkapitalbasis einbehalten werden, sind nicht berechnet worden. Die Ermittlung der nicht angesetzten latenten Steuern wäre mit unverhältnismäßig hohem Aufwand verbunden.

|  | 31. Dezember 1997 | | 31. Dezember 1996 | |
| --- | --- | --- | --- | --- |
|  | Summe Mio. DM | > 1 Jahr Mio. DM | Summe Mio. DM | > 1 Jahr Mio. DM |
| Aktive latente Steuern | 10.462 | 8.242 | 9.603 | 7.913 |
| Passive latente Steuern | (2.003) | (1.710) | (2.253) | (1.519) |
|  | 8.459 | 6.532 | 7.350 | 6.394 |

## Erläuterungen zur Konzern-Bilanz

### 7. Immaterielle Anlagewerte und Sachanlagen

Zur Veränderung der immateriellen Anlagewerte und Sachanlagen verweisen wir auf die Entwicklung des Konzern-Anlagevermögens. Die immateriellen Anlagewerte beinhalten insbesondere den Geschäftswert aus der Erstkonsolidierung von Adtranz. Die Sachanlagen enthalten auch gemietete

Gebäude, technische Anlagen und andere Anlagen in Höhe von insgesamt 735 (i.V. 498) Mio. DM, die wegen der Gestaltung der ihnen zugrunde liegenden Leasing-Verträge (sog. „capital leases") dem Konzern als wirtschaftlichem Eigentümer zugerechnet werden. Die auf gemietete Anlagen entfallenden Abschreibungen des Jahres betragen 57 (1996: 86; 1995: 121) Mio. DM.

### 8. Vermietete Gegenstände

Die Veränderung der Vermieteten Gegenstände kann der Entwicklung des Konzern-Anlagevermögens entnommen werden. Vom Gesamtbestand entfallen 14.318 (i.V. 11.402) Mio. DM auf Personenwagen und Nutzfahrzeuge. Die unter den Vermieteten Gegenständen aktivierten Vertragsabschlußkosten betragen 153 (i.V. 118) Mio. DM.

Die zukünftigen Erlöse aus nicht kündbaren „operating-lease"-Verträgen beliefen sich zum 31. Dezember 1997 auf 8.451 Mio. DM und sind wie folgt fällig:

|  | Mio. DM |
| --- | --- |
| 1998 | 3.331 |
| 1999 | 2.516 |
| 2000 | 1.619 |
| 2001 | 517 |
| 2002 | 175 |
| danach | 293 |