IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE (WILMINGTON)

|  |  |
|---|---|
| X | |
| MARKUS BLECHNER, Individually and on Behalf of All others Similarly Situated, : | Case No. 04-CV-331 (JJF) |
| Plaintiff, : | |
| vs. : | |
| DAIMLER-BENZ AG, DAIMERCHRYSLER AG, JURGEN E. SCHREMPP, ECKHARD CORDES, MANFRED GENTZ, JERGEN HUBBERT, MANFRED BISCHOFF, KURT LAUK, KLASU MANGOLD, HEINER TROPITZCH, KLUS-DIETER VOHRINGER, DIETER ZETSCHE and THOMAS SONNENBERG, : | |
| Defendants. : | |
| X | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO THE MOTION OF DAIMLERCHRYSLER AG AND DAIMLER-BENZ AG TO DISMISS THE COMPLAINT**

Dated: May 2, 2005

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
Seth D. Rigrodsky (#3147)
Ralph Sianni (#4151)
919 N. Market Street, Suite 411
Wilmington, Delaware 19801
Telephone: (302) 984-0597
Facsimile: (302) 984-0870

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
Steven G. Schulman
David A.P. Brower
Ann M. Lipton
One Pennsylvania Plaza – 49th Floor
New York, NY 10119-1065
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

**SCHIFFRIN & BARROWAY, LLP**
Katharine Ryan
John Kehoe
Ian Berg
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**SEEGER WEISS, LLP**
David Buchanan
Eric T. Chaffin
One William Street
New York, New York 10004
Telephone: (212) 584-0700
Facsimile (212) 584-0799

*Plaintiffs' Co-Lead Counsel*

**TABLE OF CONTENTS**

Page

INTRODUCTION..................................................................................................................1

SUMMARY OF THE ARGUMENT......................................................................................1

I.      STATEMENT OF FACTS .......................................................................................... 2

        A.      The Alleged Fraud...........................................................................................2

        B.      Procedural Background...................................................................................4

                1.      The Original Action Complaint ....................................................... 4

                2.      The Tracinda Action ........................................................................ 5

                3.      The Present Action........................................................................... 6

II.     ARGUMENT ............................................................................................................. 6

        A.      This Court Has Jurisdiction.............................................................................6

                1.      Determining Subject Matter Jurisdiction Under the Securities
                        Laws.................................................................................................. 6

                2.      The Complaint Alleges Sufficient United States Conduct ............. 7

                3.      There Is Jurisdiction Under the Effects Test................................... 14

                4.      Jurisdiction Is Proper Under a Combination of Conduct and
                        Effects ............................................................................................. 17

                5.      Tipping Factors ............................................................................... 18

                6.      United States Policy Favors the Exercise of Jurisdiction ............. 18

        B.      International Comity and Foreign Policy Do Not Favor Dismissal ....................19

        C.      This Action is Not Barred by the Statute of Limitations.......................................23

                1.      This Court's Earlier Ruling Was Based on the Inadequacy of
                        the Lead Plaintiffs ......................................................................... 24

                2.      In the Alternative, Tolling Applies Because the Foreign
                        Investors Comprise a Proper Subclass........................................... 25

        D.      Section 14(a) ................................................................................................26

     E.    The "Merger of Equals" Allegations State a Claim for Relief..............................27

     F.    Lead Plaintiffs Have Alleged Loss Causation......................................................28

CONCLUSION ...........................................................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*A.I.G. Asian Infrastr. Fund, L.P. v. Chase Manh. Asia Ltd.*, No. 02 Civ. 10034,
2004 U.S. Dist. LEXIS 27334 (S.D.N.Y. Mar. 24, 2004) .............................................................15, 17

*AVC Nederland B.V. v. Atrium Inv. P'ship*,
740 F.2d 148 (2d Cir. 1984) ................................................................................................................18

*Alfadda v. Fenn*,
935 F.2d 475 (2d Cir. 1991) ............................................................................................7, 10, 11, 14

*In re American Med. Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996) ...............................................................................................................25

*American Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974)..............................................................................................................................26

*Andersen v. First Security Corp.*,
157 F. Supp. 2d 1230 (D. Utah 2001)................................................................................................22

*In re Baan Co. Sec. Litig.*,
81 F. Supp. 2d 75 (D.D.C. 2000).........................................................................................................22

*Berardi v. Swanson Memorial Lodge No. 48*,
920 F.2d 198 (3d Cir. 1990) ...............................................................................................................21

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) ...............................................................................................................25

*Bodner v. Banque Paribas*,
114 F. Supp. 2d 117 (E.D.N.Y. 2000) .................................................................................................21

*Butte Mining PLC v. Smith*,
876 F. Supp. 1153 (D. Mont. 1995).....................................................................................................17

*In re CINAR Corp. Sec. Litig.*,
186 F. Supp. 2d 279 (E.D.N.Y. 2002) .................................................................................................19

*In re Cable & Wireless, PLC*,
321 F. Supp. 2d 749 (E.D. Va. 2004) ............................................................................................7, 14

*Cromer Fin. Ltd. v. Berger*,
137 F. Supp. 2d 452 (S.D.N.Y. 2001) ..................................................................................................10

*In re DaimlerChrysler AG Sec. Litig.*,
216 F.R.D. 291 (D. Del. 2003) ..................................................................................1, 5, 23, 24, 25

iii

*Dura Pharms., Inc. v. Broudo*, No. 03-932,
   2005 U.S. LEXIS 3478 (Apr. 19, 2005) ..................................................................28

*Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*,
   147 F.3d 118 (2d Cir. 1998) ..............................................................6, 15, 16, 18

*F. Hoffman-La Roche Ltd. v. Empagran, S.A.*,
   124 S. Ct. 2359 (2004)..........................................................................18, 20

*In re FirstEnergy*,
   316 F. Supp. 2d 581 (N.D. Ohio 2004).........................................................22

*Freedman v. Value Health, Inc.*,
   135 F. Supp. 2d 317 (D. Conn. 2001).........................................................26

*Froese v. Staff*, No. 02 Civ. 5744,
   2003 U.S. Dist. LEXIS 11409 (S.D.N.Y. July 3, 2003) ...........................12, 15

*In re Gaming Lottery Sec. Litig.*,
   58 F. Supp. 2d 62 (S.D.N.Y. 1999) ...........................................................*passim*

*Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99 Civ. 342,
   1999 U.S. Dist. LEXIS 5439 (S.D.N.Y. Apr. 16, 1999)......................................22

*Gould v. American-Hawaiian S.S. Co.*,
   535 F.2d 761 (3d Cir. 1976) ....................................................................28

*Grainger v. State Sec. Life. Ins. Co.*,
   547 F.2d 303 (5th Cir. 1977) ...................................................................25

*Hartford Fire Ins. Co. v. California*,
   509 U.S. 764 (1993)..................................................................1, 19, 20

*Hughes v. Rowe*,
   449 U.S. 5 (1980).....................................................................................27

*In re Initial Pub. Offering Sec. Litig.*, No. 01 Civ. 0242,
   2004 U.S. Dist. LEXIS 20497 (S.D.N.Y. Oct. 13, 2004) ...............................25

*Interbrew S.A. v. EdperBrascan Corp.*,
   23 F. Supp. 2d 425 (S.D.N.Y. 1998) .........................................................16

*Itoba Ltd. v. Lep Group PLC*,
   54 F.3d 118 (2d Cir. 1995) .....................................................................*passim*

*Kaufman v. Campeau Corp.*,
   744 F. Supp. 808 (S.D. Ohio 1990) .........................................................13

*Kauthar SDN BHD v. Sternberg*,
   149 F.3d 659 (7th Cir. 1998) ..................................................................*passim*

iv

*Koal Industries Corp. v. Asland S.A.*,
808 F. Supp. 1143 (S.D.N.Y. 1992) ........................................................................17

*Korwek v. Hunt*,
827 F.2d 874 (2d Cir. 1987) ....................................................................................25

*Leasco Data Processing Equip. Corp. v. Maxwell*,
468 F.2d 1326 (2d Cir. 1972) ..................................................................................11

*Leonard v. Garantia Banking Ltd.*, No. 98 Civ. 4848,
1999 U.S. Dist. LEXIS 16046 (S.D.N.Y. Oct. 18, 1999) ..............................13, 18

*In re Lernout & Hauspie Sec. Litig.*,
214 F. Supp. 2d 100 (D. Mass. 2002) ......................................................................22

*Madanes v. Madanes*,
981 F. Supp. 241 (S.D.N.Y. 1997) ....................................................................19, 21

*Mascolo v. Merrill Lynch Pierce, Fenner & Smith, Inc.*,
61 F.R.D. 481 (S.D.N.Y. 1973) ..............................................................................25

*In re Maxwell Comm. Corp.*,
93 F.3d 1036 (2d Cir. 1996) ....................................................................................19

*McNamara v. Bre-X Minerals Ltd.*,
32 F. Supp. 2d 920 (E.D. Tex. 1999)........................................................................17

*Metro Indus. Inc. v. Sammi Corp.*,
82 F.3d 839 (9th Cir. 1996) ....................................................................................19

*Mulcahey v. Petrofunds, Inc.*,
79 F.R.D. 272 (S.D. Tex. 1978)...............................................................................25

*N. S. Fin. Corp. v. Al-Turki*,
100 F.3d 1046 (2d Cir. 1996) ..................................................................................18

*Nathan Gordon Trust v. Northgate Explor., Ltd.*,
148 F.R.D. 105 (S.D.N.Y. 1993) ............................................................................13

*In re Navarre Corp*,
299 F.3d 735 (8th Cir. 2002) ....................................................................................9

*In re Nazi Era Cases Against German Def. Litig.*,
129 F. Supp. 2d 370 (D.N.J. 2001)..........................................................................20

*Nikko Asset Mgmt. Co. v. UBS AG*,
303 F. Supp. 2d 456 (S.D.N.Y. 2004) ....................................................................15

*In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855,
2003 U.S. Dist. LEXIS 15702 (S.D.N.Y. Sep. 5, 2003)..............................14, 19

*Paraschos v. YBM Magnex Int'l, Inc.*, No. 98 Civ. 6444,
    2000 U.S. Dist. LEXIS 3829 (E.D. Pa. Mar. 28, 2000) ................................................. 7, 14

*Paraschos v. YBM Magnex Int'l, Inc.*,
    130 F. Supp. 2d 642 (E.D. Pa. 2000) ....................................................................... 21

*Psimenos v. E.F. Hutton & Co.*,
    722 F.2d 1041 (2d Cir. 1983) ................................................................................ 7, 10

*Ransom v. Marrazzo*,
    848 F.2d 398 (3d Cir. 1988) ...................................................................................... 27

*Retail Clerks Int'l Ass'n v. Schermerhorn*,
    373 U.S. 746 (1963).................................................................................................... 27

*Robinson v. TCI/US West Communs.*,
    117 F.3d 900 (5th Cir. 1997) ............................................................................ 6, 7, 8, 14

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2003) ......................................................................................... 9

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
    351 F. Supp. 2d 334 (D. Md. 2004) ................................................................ 8, 14, 19

*S.E.C. v. Berger*,
    322 F.3d 187 (2d Cir. 2003) ...................................................................................... 10

*SEC v. Kasser*,
    548 F.2d 109 (3d Cir. 1977) ........................................................................ 1, 6, 7, 9, 19

*Schoenbaum v. Firstbrook*,
    405 F.2d 200 (2d Cir. 1968) ...................................................................................... 15

*Schrob v. Catterson*,
    948 F.2d 1402 (3d Cir. 1991) .................................................................................... 27

*Shelton v. Pargo, Inc.*,
    582 F.2d 1298 (4th Cir. 1978) ................................................................................... 25

*Sloane Overseas Fund Ltd. v. Sapiens Int'l Corp.*,
    941 F. Supp. 1369 (S.D.N.Y. 1996) ........................................................................... 15

*Stonington Partners, Inc. v. Lernout & Haupsie Speech Prods.*,
    310 F.3d 118 (3d Cir. 2002) ...................................................................................... 19

*Tanzymore v. Bethlehem Steel Corp.*,
    457 F.2d 1320 (3d Cir. 1972) ..................................................................................... 22

*Torres v. S. Peru Copper Corp.*,
    965 F. Supp. 899 (S.D. Tex. 1996) ............................................................................ 20

*Toys "R" Us, Inc. v. Step Two, SA,*
  318 F.3d 446 (3d Cir. 2003) ......................................................................................... 22

*Tracinda Corp. v. DaimlerChrysler AG,*
  197 F. Supp. 2d 42 (D. Del. 2002) .......................................................................... *passim*

*Tracinda Corp. v. Daimler Chrysler AG.,* No. 00 Civ. 993,
  2005 U.S. Dist. LEXIS 5830 (D. Del. Apr. 7, 2005) .................................................. 1, 26, 27

*Tri-Star Farms Ltd. v. Marconi, PLC,*
  225 F. Supp. 2d 567 (W.D. Pa. 2002) ...................................................................... 12, 14, 17

*Tse v. Ventana Medical Systems, Inc.,*
  297 F.3d 210 (3d Cir. 2002) ......................................................................................... 28

*United Int'l Holdings, Inc. v. The Wharf (Holdings) Ltd.,*
  210 F.3d 1207 (10th Cir. 2000) ................................................................................... 19

*In re Vivendi Universal, S.A. Sec. Litig.,* No. 02 Civ. 5571,
  2003 U.S. Dist. LEXIS 19431 (S.D.N.Y. Nov. 3, 2003) .............................................. 11, 14

*In re Vivendi Universal S.A. Securities Litigation,* No. 02 Civ. 5571,
  2004 U.S. Dist. LEXIS 21230 (S.D.N.Y. Oct. 19, 2004) .............................................. 10

*Yang v. Odom,*
  392 F.3d 97 (3d Cir. 2004) ....................................................................................... *passim*

*Yung v. Lee,* No. 00 Civ. 3965,
  2002 U.S. Dist. LEXIS 16655 (S.D.N.Y. Sept. 5, 2002) ............................................... 7

*Zoelsch v. Arthur Andersen & Co.,*
  824 F.2d 27 (D.C. Cir. 1987) ....................................................................................... 7, 8

## OTHER AUTHORITIES

15 U.S.C. §78u-4 ..................................................................................................... 22

28 U.S.C. 1658 ......................................................................................................... 23

17 C.F.R. 240.3a12-3 ............................................................................................... 27

H.R. Conf. Rep. No. 104-369 (1995) ......................................................................... 22

S. Rep. No. 104-98 (1995) ......................................................................................... 22

## INTRODUCTION

This Court deferred certification of a class of acquirers of DaimlerChrysler AG stock in *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291 (D. Del. 2003) that included foreign investors due to plaintiffs' failure in that action to provide sufficient information regarding the foreign exchanges. After that decision, the instant complaint was filed on behalf of only foreign acquirers on foreign exchanges. Defendants have now moved to dismiss the complaint on the pleadings, even though, by Defendants' own admission, the allegations are substantially similar to those that this Court has already found sufficient to withstand a motion to dismiss in *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42 (D. Del. 2002).[1] For the reasons given below, the Defendants' motion should be denied.

### SUMMARY OF THE ARGUMENT

1.      Contrary to Defendants' contentions, this Court has jurisdiction. The existence of subject matter jurisdiction is based on the amount of American involvement in the alleged fraud. *See SEC v. Kasser*, 548 F.2d 109 (3d Cir. 1977). The fraud in this case was completely centered in America. Plaintiffs allege that Defendants developed an intentionally deceptive scheme to takeover and restructure an American corporate icon. The scheme involved deceiving the American management team of the target corporation. Substantial conduct pertaining to the merger took place here, including meetings and negotiations. And, most critically, the Proxy/Prospectus on which many of Plaintiffs' claims are based was partly drafted here. Thus, this is exactly the kind of case to which American securities laws apply.

2.      Dismissal on the ground of international comity is not warranted. Comity may only be a basis for dismissing a properly-filed action where there is a true conflict between the American action and a foreign proceeding. *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993). Defendants have identified no foreign proceeding with which this action might interfere.

---

[1] The Plaintiffs are aware that after a bench trial, this Court ruled for Defendants in *Tracinda Corp. v. Daimler Chrysler AG.*, No. 00 Civ. 993, 2005 LEXIS 5830 (D. Del. Apr. 7, 2005). That decision is not binding on the Plaintiffs here. Rather, the Plaintiffs in this action have requested a jury trial, and are entitled to present their case to a different factfinder.

3.      Plaintiffs' claims are timely because the statute of limitations was tolled during the pendency of the earlier class action. Putative class members are entitled to have their claims tolled until a reasonable time after class certification is denied. *See Yang v. Odom*, 392 F.3d 97 (3d Cir. 2004). Here, this Court did not include foreign class members because the American plaintiffs in *DaimlerChrysler AG Sec. Litig.* were inadequate to represent them, and failed to satisfy their evidentiary burden. Because the Court lacked sufficient information to dispositively resolve the foreign class member issue, the denial was based on the lead plaintiffs' characteristics, the Plaintiffs' claims were tolled and the Complaint is timely.

4.      Finally, Defendants make several half-hearted arguments regarding the sufficiency of the Complaint's substantive allegations. This Court rejected similar arguments by Defendants in connection with the earlier-filed actions; the same reasoning and authorities should lead this Court to reject the same arguments here, as well.

## I.    STATEMENT OF FACTS

### A.    The Alleged Fraud

This case arises out of the November 13, 1998 business combination of Chrysler Corporation ("Chrysler") and Germany-based Daimler-Benz AG ("Daimler-Benz"), resulting in a combined company known as DaimlerChrysler AG ("DaimlerChrysler). Plaintiffs contend that the defendants touted the proposed combination as a "merger of equals" that would create a new company in which the Chrysler and Daimler-Benz constituents would be equals in power, management and governance at the corporate level of the combined company. *See* Complaint, D.I. 1 (hereinafter "Compl.") ¶ 2. Plaintiffs further contend that to achieve the illusion of a merger of equals, the defendants claimed that the combined company would have dual headquarters in the United States and Germany, and Chrysler and Daimler-Benz personnel would have equal opportunity to advance to all levels of the new company. *Id.* Plaintiffs further contend that, consistent with the concept of an equal partnership, the "merger" was set with an exchange ratio to equalize the relative values of the two companies, but which did not reflect any premium for acquiring control over Chrysler. *Id.* ¶ 3. Plaintiffs further allege that at the time of the merger, and thereafter, Chrysler management and its shareholders understood the promised "merger of

2

equals" to mean that Chrysler and Daimler-Benz personnel would have equal control over the management of the combined company, as well as equal advancement opportunities at all levels of the company, and that neither Chrysler nor Daimler-Benz would dominate the combined company. *Id.* ¶ 64. However, as was later revealed, Daimler-Benz had, at all relevant times, harbored a secret intention to turn Chrysler into a mere division of Daimler, and did not intend equal control for both Daimler-Benz and Chrysler personnel. ¶¶88-89.

Plaintiffs allege that prior to the merger, Daimler-Benz met with Chrysler's Chair and CEO, Robert Eaton, several times both in the United States and Switzerland. Each time, Daimler-Benz assured Eaton that the merger would be one of equals in order to persuade him to consent to it and persuade Chrysler shareholders to assent, as well. ¶¶52-54. In May 1998, after word of the merger leaked, shares of both Daimler-Benz and Chrysler traded up both on U.S. and European securities exchanges, ¶59, and both Daimler-Benz and Eaton described the merger to the press as one of equals, ¶¶60, 62. Relying on Daimler-Benz's assurances, Eaton appeared at Chrysler headquarters in Michigan and again stated that the merger would be one of equals, ¶61.

Daimler-Benz and Chrysler prepared a joint Registration Statement and Proxy and Prospectus, dated August 6, 1998 (the "Proxy/Prospectus"). ¶63. The Proxy/Prospectus was disseminated to all Chrysler shareholders, notifying them of a special meeting to be held on September 18, 1998, for the purpose of considering and voting upon the merger and the adoption of the Business Combination Agreement ("BCA"), which had been approved by the respective boards of Chrysler and Daimler-Benz. ¶64. Lead Plaintiffs allege that the Proxy/Prospectus was materially false and misleading to the extent that it characterized the transaction contemplated by the BCA as a "merger of equals." *Id.* ¶ 69. Relying on the Proxy/Prospectus, Chrysler shareholders worldwide voted their shares in favor of the merger in September 1998. ¶67.

The merger took effect on November 17, 1998, the first day of the Class Period. Following the consummation of the Merger, Defendants consistently characterized the combination of Chrysler and Daimler-Benz as a "merger of equals." *Id.* ¶¶ 76, 78, 80, 82. Meanwhile, behind the scenes, the

3

combined entity was taking steps to minimize the influence and power of Chrysler in order to effectuate plans to transform Chrysler into a mere division of DaimlerChrysler. ¶¶70-74.

Plaintiffs contend that the market first began to become aware of Defendants' misrepresentations and omissions regarding their undisclosed intention to seize control of Chrysler without paying Chrysler shareholders a control premium after Defendant Schrempp, "co-chairman" and "co-chief executive" officer of DaimlerChrysler, gave an interview to *The Financial Times* in late 2000, in which he admitted that the Merger was really a takeover and not a "Merger of Equals". *Id.* ¶ 88.[2] The full fraud was revealed when Defendants announced a "re-organization" of the Management Board, appointing two former Daimler-Benz employees to head Chrysler. ¶90.

### B.     Procedural Background

#### 1.     The Original Action Complaint

On April 9, 2001, four pension funds located in the United States filed a First Amended Consolidated Class Action Complaint ("the Original Action") against DaimlerChrysler, Daimler-Benz and certain individual defendants. *See* D.I. 41, *DaimlerChrysler AG Securities Litigation*, Civil Action Nos. 00-993/00-984/01-004-JJF. The Original Action was filed as a class action on behalf of a putative class of domestic and foreign investors who purchased or otherwise acquired DaimlerChrysler shares on United States or foreign-based securities exchanges during the alleged class period. *See* D.I. 52, Opening Brief of DaimlerChrysler AG and Daimler-Benz AG in Support of their Motion to Dismiss the Complaint (hereinafter "Def. Br.") at 7.

On March 22, 2002, the Court granted DaimlerChrysler and Daimler-Benz's motion to dismiss the Original Action. *See In re DaimlerChrysler AG Sec. Litig.*, 197 F. Supp. 2d 42, 48 (D. Del. 2002). On May 14, 2002, the Original Action plaintiffs filed a Second Amended Consolidated Class Action

---

[2]  Defendants claim that the only "admission" of fraud alleged in the Complaint occurred during a German interview with the *Financial Times*, a British publication. Def. Br. 32. In fact, the Complaint alleges that Defendants also admitted the fraud to *Barron's*, an American publication, ¶89. Moreover, the *Financial Times* is published and widely disseminated in the United States as well as in Europe.

Complaint that alleged causes of action and fraudulent conduct similar to what Lead Plaintiffs have alleged in the present action. Orig. D.I. 156. On June 14, 2002, DaimlerChrysler and Daimler-Benz answered the Original Action. *Id.* at 200. Thereafter, extensive discovery was taken. Indeed, the Notice of Settlement in the Original Action even stated that discovery commenced in May 2002, and that Defendants produced hundreds of thousands of pages and sat for numerous depositions. *See* Notice of Pendency and Settlement of Class Action dated October 6, 2003 ("Notice of Pendency"), at ¶20, *available at* http://www.daimlerchryslersecuritieslitigation.com/notice.pdf.

On June 10, 2003, the Court certified a class of domestic investors but did not at that time certify foreign investors as class members. *See DaimlerChrysler*, 216 F.R.D. at 301. Thereafter, the Original Action settled for $300 million and the foreign class members received none of the settlement proceeds.[3] *See* Notice of Pendency ¶24.

### 2.     The Tracinda Action

In November 2000, Tracinda Corporation ("Tracinda"), formerly one of Chrysler's largest shareholders, filed a complaint in this Court against DaimlerChrysler, Daimler-Benz and certain individuals, alleging fraud in the solicitation of its vote in favor of the Merger (the "Tracinda Action".) Tracinda D.I. 1.[4] The factual allegations in the Tracinda action were virtually identical to the allegations in the Original Action, and both actions were consolidated in this Court for the purpose of dispositive motions and coordinated discovery. On March 22, 2002, this Court denied DaimlerChrysler and Daimler-Benz's motion to dismiss the Tracinda Action. Orig. D.I. 109. When the Original Action settled in mid-2003, Tracinda opted-out of the class settlement and pursued a direct action on its own behalf, which ultimately resulted in a trial before this Court.

---

[3]  "Foreign investors" who were excluded from the Original Action settlement included "all Persons [other than United States citizens or residents] who purchased or acquired their shares of Chrysler and/or DaimlerChrysler on or through a securities exchange not based in the United States[.]" *See* Notice of Pendency ¶4.

[4]  References to docket entries from the Tracinda Action, *Tracinda Corp. v. DaimlerChrysler AG, et al.*, Civil Action No. 00-984, are cited herein as "Tracinda D.I. __"

### 3.    The Present Action

On March 24, 2004, Plaintiffs filed the instant case on behalf of foreign investors who, in connection with the merger, surrendered their Chrysler shares on or through a securities exchange not based in the United States, or who purchased or otherwise acquired their DaimlerChrysler securities on a securities exchange not based in the United States during the period November 17, 1998 through November 17, 2000. Compl. ¶ 38. In virtually all respects, the fraudulent conduct that Plaintiffs alleged in the instant action is the same or substantially similar to the fraudulent conduct alleged in the Original Action that DaimlerChrysler and Daimler-Benz answered, or the Tracinda Action that DaimlerChrysler and Daimler-Benz unsuccessfully moved to dismiss.

On March 1, 2005, DaimlerChrysler and Daimler-Benz filed this motion to dismiss the instant action on various grounds, including pursuant to Fed.R.Civ.P. 12(b)(1), arguing, *inter alia*, that the Court lacks subject matter jurisdiction over claims of foreign investors who purchased or acquired DaimlerChrysler shares on foreign exchanges.[5]  *See* Def. Br. at 10-17.

## II.    ARGUMENT

### A.    This Court Has Jurisdiction

#### 1.    Determining Subject Matter Jurisdiction Under the Securities Laws

"The securities acts expressly apply to 'foreign commerce,' thereby evincing a Congressional intent for a broad jurisdictional scope for the 1933 and 1934 Acts." *SEC v. Kasser*, 548 F.2d 109, 114 (3d Cir. 1977). Jurisdiction may be established by looking to the amount of U.S. conduct involved in the fraud, *id.*, the size of the U.S. effects produced by the fraud, *see Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 125 (2d Cir. 1998) ("*EOC*"); *Robinson v. TCI/US West Communs.*, 117 F.3d 900, 905 (5th Cir. 1997), or a combination of the two.  *See Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118, 122 (2d Cir. 1995); *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 665 n.8 (7th Cir.

---

[5]    To the extent Defendants' move to dismiss claims based on alleged "channel stuffing," those allegations were intended merely as background, and Plaintiffs do not seek recovery based on the channel-stuffing claims. *See* Def. Br. at 28-30.

1998). The goal of these tests is to determine "whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court." *Itoba*, 54 F.3d at 122.; *see Yung v. Lee*, No. 00 Civ. 3965, 2002 U.S. Dist. LEXIS 16655, at *3-4 (S.D.N.Y. Sept. 5, 2002) ("[T]he guide is always the underlying policy query of 'whether there is sufficient United States involvement to justify the exercise of jurisdiction…'" (citations omitted)).

### 2.    The Complaint Alleges Sufficient United States Conduct

In *SEC v. Kasser*, the Third Circuit laid out the test for the application of the United States's securities laws to foreign transactions: "[T]he federal securities laws ***do grant*** jurisdiction in transnational securities cases ***where at least some activity designed to further a fraudulent scheme*** occurs within this country." 548 F.2d at 114 (emphasis added). This standard advances three important policy goals: First, it prevents issuers from setting up the United States as a "Barbary Coast" base of operations from which to export fraud; second, it prevents other countries from "retaliating" by refusing to apply their own securities laws to fraudulent conduct in those territories that is "exported" to the United States, and third, it furthers the basic purpose of the securities laws to encourage "high standards of conduct." *Id.* at 115.[6]

By contrast, the Second Circuit's narrower view requires that "conduct material to the completion of the fraud occurred in the United States" and "particular acts or culpable failures to act within the United States directly caused losses to foreign investors abroad." *Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir. 1991), while the D.C. Circuit in *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27 (D.C. Cir. 1987) adopted the narrowest test of all by stating that "the domestic conduct comprises all the elements of a

---

[6] It is widely recognized that the Third Circuit test is the most relaxed for the extraterritorial application of the federal securities laws among the circuits. *See Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1046 n.6 (2d Cir. 1983) (*Kasser*'s rule is broader than the Second Circuit's); *see also Kauthar*, 149 F.3d at 665-666 (the Third, Eighth, and Ninth Circuits "require some lesser quantum of conduct" than other Circuits (quoting *Robinson*, 117 F.3d at 906)); *Paraschos v. YBM Magnex Int'l, Inc.*, No. 98 Civ. 6444, 2000 U.S. Dist. LEXIS 3829, at *13-14 (E.D. Pa. Mar. 28, 2000); *In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 758 (E.D. Va. 2004) ("The Third Circuit engages the most relaxed standard of the conduct test. The Third Circuit holds that it has subject matter jurisdiction in cases involving transnational securities cases where at least some conduct occurs in the United States.").

defendant's conduct necessary to establish a violation of section 10(b) and Rule 10b-5." *Id.* at 31[7]; *see also Kauthar*, 149 F.3d at 666 (putting the D.C. Circuit at the strictest "end of the spectrum"). Notably, in their motion to dismiss, Defendants do not even mention the Third Circuit standard. Obviously, this Court should apply the governing law as stated in *Kasser*; however, even under the narrower tests, the Complaint alleges sufficient conduct.

It is obvious from the Complaint that the "center of gravity" of the alleged fraud was the United States. Defendants' entire scheme revolved around its merger with a bell-whether American company; the combined entity claims to have headquarters in this country and does a substantial amount of business here; the fraud was intended to induce the largely American shareholders of the American Chrysler corporation to tender their shares; and the fraud was effected through Defendants' actions to dismantle the American company's management structure. Thus, "[t]he activities of [Daimler] are alleged to be part of a single fraudulent scheme which included misstatements and omissions in both countries and the inflation of [Daimler's] stock price on both [European] and American exchanges." *In re Gaming Lottery Se. Litig.*, 58 F. Supp. 2d 62, 75 (S.D.N.Y. 1999).

If that were not enough, the Complaint alleges numerous details highlighting the critical importance of America to effectuate the alleged fraud. Before the merger, Daimler-Benz stock was traded on NYSE both directly and in the form of American Depository Shares (ADS's). ¶18. Daimler-Benz conducted a substantial amount of business in this country, enjoying 12% of the U.S. market for luxury cars. ¶48. Chrysler was a wholly American company whose stock traded on an American exchange. In the months leading up to the merger, Daimler-Benz engaged in substantial negotiations with Chrysler, both on U.S. soil and abroad, and these negotiations involved explicit – and intentionally fraudulent – representations to Chrysler's (American) management regarding the role that Chrysler's

---

[7] Although the D.C. Circuit in *Zoelsch* announced that it would follow the Second Circuit's view, 824 F.2d at 31, many courts have recognized that the actual rule it announced was much narrower than the Second Circuit's rule. *See Kauthar*, 149 F.3d at 666; *Robinson*, 117 F.3d at 905 n.10; *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 359 n.11 (D. Md. 2004).

(American) management would play in the merged company. These representations played a role in persuading Chrysler management to approve the merger – and thus to recommend it to Chrysler shareholders.

Afterwards, and most crucially, the Registration Statement/Proxy-Prospectus that forms the basis for many of the claims in the Complaint was drafted jointly in the United States and Germany, filed in the United States, and was mailed throughout the world, both in the United States and abroad. ¶63. Through such conduct, the Defendants used the U.S. as its base of operations for their alleged misconduct. Defendants even agreed that the merger would be governed by Delaware law, ¶12, and relied on advisory services that were mostly provided in the U.S. ¶¶15. Chrysler shareholders – most of whom, by Defendants' admission, were based in the U.S., Def. Br. 5 – consummated the merger with their proxy votes.

After the merger was announced in 1998, Defendants and Chrysler repeatedly and publicly stated that the merger would "equally" combine Chrysler's American management with Daimler-Benz's, both on U.S. soil and abroad. ¶¶60-61, 63.[8] And after the merger was consummated, DaimlerChrysler claimed to set up two principal places of business – one in Germany, the other in Michigan. ¶19. Several officers of the former Chrysler took positions on DaimlerChrysler's Board, and (reneging on their promises to investors) Defendants consummated the alleged fraud by forcing changes to the management structure of the former Chrysler. ¶71. Thus, there is no question that Defendants' conduct involved "at least some activity designed to further a fraudulent scheme" within the United States. *Kasser*, 548 F.2d at 114. Indeed, even under the Second Circuit formulation, the Defendants' United States conduct – including

---

[8]    Though Chrysler's management made many of the U.S.-based statements, these should still be attributed to Defendants (for subject matter jurisdiction purposes, at the very least) because the Chrysler representations were directly induced by false statements by Defendants to Chrysler's management. *Cf. Rombach v. Chang*, 355 F.3d 164, 174-175 (2d Cir. 2003) (defendants will be liable for statements made by a third party if they "intentionally fostered" that party's "mistaken" belief); *In re Navarre Corp,* 299 F3d 735 (8th Cir. 2002). Even if these statements were not, in and of themselves, actionable under the securities laws, they constituted conduct material to the completion of the fraud.

fraudulent representations to Chrysler executives and the joint drafting of the Registration and Proxy-Prospectus – " directly caused losses to foreign investors abroad." *Alfadda*, 935 F.2d at 478.

Defendants nonetheless insist that their American-based conduct was minimal. First, they make the argument that any domestic conduct must necessarily have been "preparatory" to the fraud because the false statements, they maintain, were issued abroad. Def. Br. 16. To begin, this simply mischaracterizes the Complaint, because the Complaint alleges that the fraudulent Proxy-Prospectus was jointly drafted in the United States and in Germany, and filed in the United States. ¶63. Rather than "preparatory" conduct, this is the precise conduct that caused the losses. *See Kauthar*, 149 F.3d at 667 (conduct included drafting of fraudulent materials within U.S.); *Itoba*, 54 F.3d at 123 ("When [SEC filings in the United States] include substantial misrepresentations, they may be a predicate for subject matter jurisdiction.").

Moreover, it is not necessary for the false statement to issue in the United States in order for subject matter jurisdiction to exist. Even under the stricter Second Circuit precedent, subject matter jurisdiction exists when "substantial acts in furtherance of the fraud" have been committed within the U.S., whether or not they include the actual transmission of the fraudulent statement. *S.E.C. v. Berger*, 322 F.3d 187, 193 (2d Cir. 2003) (quoting *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1045 (2d Cir. 1983)); *see also Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 480 (S.D.N.Y. 2001) (jurisdiction exists "where defendants have undertaken significant steps" in the U.S., "even if the final transaction occurs outside the United States and involves only foreign investors"). As the court put it in *In re Vivendi Universal S.A. Securities Litigation*, No. 02 Civ. 5571, 2004 U.S. Dist. LEXIS 21230, at *19 (S.D.N.Y. Oct. 19, 2004), "the location from where allegedly false statements emanated, while important, has not been the only factor courts considered in determining whether conduct in the United States was such that the United States had 'an interest in imposing its law.'" Rather, there is jurisdiction when "acts of material importance that had significantly contributed to the fraud occurred in the United States." *Id.* at *10.

Indeed, the Defendants' argument – that the negotiations leading to the merger cannot be considered because they were merely "preparatory" conduct – was explicitly rejected in the Second Circuit case of *Alfadda v. Fenn*. There, the foreign plaintiffs alleged that the defendants made certain false promises in an offering prospectus about how future sales of shares would be handled. *See* 935 F.2d at 477. After the plaintiffs bought shares, the defendants sold shares in a manner that violated the prospectus's terms. *Id.* The Second Circuit found jurisdiction because the additional sales of stock had connections to the U.S., even though the false statement on which the fraud was based had appeared in a prospectus issued outside the U.S. As the Court put it, "[a]t the very least, the negotiations and communications [leading to the second sale] constituted 'conduct material to the completion of the fraud.'" *Id.* at 478-79.[9] By the same token, then, Defendants' negotiations with Chrysler – which, the Complaint alleges, included fraudulent representations to Chrysler executives and induced them to approve the merger and recommend it to shareholders – constituted "conduct material to the completion of the fraud."

Domestic conduct also dominated the events in the Complaint because the fraud involved a merger with an American corporation. Other courts considering similar situations have found it highly significant when the fraud is alleged to involve foreign acquisitions of American companies. *See Gaming Lottery*, 58 F. Supp. 2d at 74 (jurisdiction exists because the complaint "revolves around GLC's acquisition of United States companies"); *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571, 2003 U.S. Dist. LEXIS 19431, at *21-23 (S.D.N.Y. Nov. 3, 2003). Indeed, the ultimate object of the fraud was to completely reorganize an American corporation; this is significant conduct by any measure.

---

[9] Nor was it relevant that the final act completing the fraud – the second sale of shares – occurred in the United States. The Second Circuit has explicitly rejected the notion that jurisdiction is premised on the location of the last act that completes the fraud. *See Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1337 (2d Cir. 1972).

Finally, the stock of Daimler-Benz and Chrysler, and then of the combined entity, traded on an American exchange, and, in fact, the fraudulent conduct was initially directed toward the (mostly American) shareholders of Chrysler in order to persuade them to vote in favor of the merger.

Defendants' cases are not to the contrary. For instance, Defendants rely extensively on *Tri-Star Farms Ltd. v. Marconi, PLC*, 225 F. Supp. 2d 567 (W.D. Pa. 2002). In that case, the defendant foreign corporation was owned almost entirely by foreign shareholders, with executive offices in England. *See id.* at 570. It had allegedly mischaracterized the status of its U.S. operations in identical financial statements filed in the U.S. and abroad. *See id.* at 577-578. The court found that there was no jurisdiction based on a combination of factors not present here: first, no false materials were alleged to have been prepared in the U.S.; second, few Americans held shares of the defendant corporation, and third, given the overwhelming amount of foreign activity, the court found it doubtful that the few false statements issued in America (via SEC filings that had been duplicated abroad) would have had any effect on foreign stock prices. *See id.* at 577-79. This case is clearly distinguishable.

Here, not only was the fraud designed to effectuate a takeover of a major American corporation with all the attendant changes in ownership and management structure, and not only do Defendants insist that the combined company has American headquarters, but numerous fraudulent acts occurred here beyond the filing of the false Registration Statement. Indeed, this is precisely the kind of case that *Tri-Star* said would support jurisdiction, for in *Tri-Star*, the court explicitly endorsed *Gaming Lottery*, stating that jurisdiction had been proper in that case because the fraud had involved a foreign corporation's acquisition of an American company and the fraudulent statements surrounding that acquisition. *See id.* at 580.

Defendants also contend that this case involves nothing more than allegedly false statements issued abroad involving legal United States conduct, and for that reason, no claim will lie. Def. Br. 17. But the cases Defendants cite are not nearly so broad. For instance, in *Froese v. Staff*, No. 02 Civ. 5744, 2003 U.S. Dist. LEXIS 11409 (S.D.N.Y. July 3, 2003), the plaintiffs accused a German corporation of issuing false financial statements because a subsidiary of its subsidiary engaged in "channel-stuffing" in

America.    The court held that these transactions were not sufficient to invoke U.S. jurisdiction, highlighting that: (1) the financial statements were conceived and engineered in Germany; (2) no American shareholders were represented in the action, and American stockholders were an "exceptionally small percentage" of the total number of stockholders and, because the stock was not traded in America, had probably been purchased abroad; and (3) the parent corporation did not do any business in America and had no American presence. *See id.* at *4-5.  By contrast, DaimlerChrysler has a substantial American presence, and both Daimler-Benz and Chrysler did business in this country before the merger.  The stock involved has always traded on American exchanges,[10] and a large number of American investors, hold shares.[11]

Moreover, there is no brightline rule stating that fraudulent statements concerning American activity cannot support jurisdiction.  In *Leonard v. Garantia Banking Ltd.*, No. 98 Civ. 4848, 1999 U.S. Dist. LEXIS 16046 (S.D.N.Y. Oct. 18, 1999), a foreign plaintiff alleged that foreign defendants misled him by promising that, when investing his money, they would simultaneously invest their own money, thus ensuring prudent investment choices.  In fact, the defendants actually invested money loaned to the plaintiff rather than their own funds, and their risky investments resulted in tremendous losses.  The only American involvement was the use of American wire transfers, the use of the defendant's American bank account, and the fact that some of the investments involved the American Depository Receipts of a Brazilian company.  None of the investments was fraudulent; they became fraudulent by virtue of the

---

[10]  The Complaint alleges that Daimler-Benz stock traded both directly and in the form of ADSs on the NYSE.  The difference is immaterial for jurisdictional purposes. *See Itoba,* 54 F.3d at 123.

[11]  Defendants' remaining cases are similarly inapposite. *Kaufman v. Campeau Corp.*, 744 F. Supp. 808 (S.D. Ohio),  has doubtful application because it explicitly relied on the D.C. Circuit's decision in *Zoelsch* which, as described above, endorsed a far narrower approach to jurisdiction than either the Second or Third Circuits.  As for *Nathan Gordon Trust v. Northgate Explor., Ltd.*, 148 F.R.D. 105 (S.D.N.Y. 1993), in that action, the fraudulent materials had been prepared in Canada but disseminated in the U.S.; the court concluded there that such activity was not sufficient to confer jurisdiction. *See id.* at 108.  This is a doubtful application of Second Circuit precedent. *See Itoba,* 54 F.3d at 123; *Gaming Lottery*, 58 F. Supp. 2d at 75 (*Nathan Gordon* reasoning has been "strongly criticized" by the Second Circuit).  And here, of course, the Complaint alleges more than simple false SEC filings.

defendants' representations to the plaintiff, all of which occurred overseas. Nonetheless, the court concluded that there was sufficient conduct to warrant the exercise of jurisdiction. *See id.* at *18.

In short, the Complaint demonstrates that fraudulent statements were communicated here, filed with the SEC, and partially drafted here. Those statements were mailed worldwide with the specific intent of influencing Chrysler shareholders, most of whom were based in the U.S. The object of the fraud was to effectuate a takeover of a major corporation, and before, during, and after the merger, Defendants conducted substantial business in the U.S. Thus, there is no question that Plaintiffs here meet this Circuit's test for jurisdiction.[12]

### 3.     There Is Jurisdiction Under the Effects Test

Though it is widely agreed that sufficient United States effects will independently support jurisdiction without a showing of domestic conduct, *Kauthar*, 149 F.3d at 665 n.8; *Robinson*, 117 F.3d at 905, only the Second Circuit has extensively examined the conditions under which the test will be satisfied. As the Second Circuit put it, jurisdiction over foreign securities transactions exists when "illegal activity abroad causes a substantial effect within the United States." *Alfadda*, 935 F.2d at 478 (quotations omitted). There can be no question that Defendants' conduct had a substantial impact in the United States.

Conceding the substantial impact of their alleged misconduct on American investors, Defendants contend that these effects must be disregarded because the claims at issue are only those of foreign

---

[12]   Defendants also contend that the Complaint has not alleged that the domestic conduct "directly caused" harm to foreign shareholders. That standard is derived from Second Circuit law and nothing in *Kasser* requires such a showing. *See Paraschos*, 2000 U.S. Dist. LEXIS 3829, at *14; *Cable & Wireless*, 321 F. Supp. at 758. Even assuming that such a showing was necessary, the Complaint clearly demonstrates that harm was caused to foreign shareholders. The fraudulent materials induced American shareholders to vote for the merger in the first place. And where a fraud involves substantial amounts of American activity, courts will find direct causation. *See, e.g., Vivendi*, 2003 U.S. Dist. LEXIS 19431; *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855, 2003 U.S. Dist. LEXIS 15702 (S.D.N.Y. Sep. 5, 2003); *Gaming Lottery*, 58 F. Supp. 2d at 74; *Royal Ahold*, 351 F. Supp. 2d at 362. Even *Tri-Star*, on which Defendants rely, endorsed the reasoning of *Gaming Lottery* that the direct causation standard would be satisfied if the Complaint alleged sufficient domestic activity. *See Tri-Star*, 225 F. Supp. 2d at 580.

investors, not American ones. Def. Br. 13-14. Defendants fundamentally misconstrue the effects test. The purpose of the subject matter jurisdiction tests is to determine whether the fraud alleged has sufficient connections to the United States to justify the use of American judicial resources. *See Itoba*, 54 F.3d at 121-22. The "effects" test thus examines whether the fraud had an adverse impact on American investors and markets such that the U.S. has an interest in the dispute. *See Schoenbaum v. Firstbrook*, 405 F.2d 200, 208 (2d Cir. 1968) (subject matter jurisdiction exists "over violations of the Securities Exchange Act although the transactions which are alleged to violate the Act take place outside the United States, at least when the transactions involve stock registered and listed on a national securities exchange, and are detrimental to the interests of American investors."). For this reason, courts consider the impact of an alleged fraud on American investors where the plaintiff is a foreigner. For instance, in *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118 (2d Cir. 1998)(*"EOC"*), a foreign plaintiff argued that the fraud affected American investors because *one* American resident had also been harmed. *EOC*, 147 F.3d at 131-32. The Second Circuit rejected the argument, *not* because it was asserted by a foreigner, but because the American harm alleged was insignificant. *See id.* at 131-32.

Thus courts have examined the American effects of an alleged fraud in order to determine whether the exercise of jurisdiction was appropriate, even where the plaintiff bringing the action was foreign. *See, e.g., A.I.G. Asian Infrastr. Fund, L.P. v. Chase Manh. Asia Ltd.*, No. 02 Civ. 10034, 2004 U.S. Dist. LEXIS 27334, at *6-7 (S.D.N.Y. Mar. 24, 2004) (jurisdiction exists over foreigner's claim in part because Americans were affected by the scheme); *Sloane Overseas Fund Ltd. v. Sapiens Int'l Corp.*, 941 F. Supp. 1369, 1374 (S.D.N.Y. 1996) (effects test used for claims of two foreign residents and one American resident; jurisdiction exists even for foreign plaintiffs, partly because of harm to American resident, and partly because the securities indirectly traded on the NASDAQ). Other courts have employed the effects test for foreign plaintiffs and found no jurisdiction, but only because, as in *EOC*, the effects were minor. *See, e.g., Froese*, 2003 U.S. Dist. LEXIS 11409, at *4; *Nikko Asset Mgmt. Co. v.*

*UBS AG*, 303 F. Supp. 2d 456, 464 (S.D.N.Y. 2004); *Interbrew S.A. v. EdperBrascan Corp.*, 23 F. Supp. 2d 425, 429-30 (S.D.N.Y. 1998).[13]

Indeed, if foreign plaintiffs are never able to assert jurisdiction on the basis of American effects, there would, in fact, be no "effects test." Rather, the rule would simply be that foreign plaintiffs must demonstrate domestic conduct, and American residents must demonstrate that they were harmed. Even the Second Circuit – which, as demonstrated above, is stricter in these matters than the Third Circuit -- has rejected such bright-line rules in favor of a careful balancing inquiry that depends on a case-specific assessment of U.S. interests. *See Itoba*, 54 F.3d at 122-24; *EOC*, 147 F.3d at 129. Just because the plaintiffs are foreign "is not determinative of jurisdictional questions. To hold otherwise would be to allow the 'admixture' of the conduct and/or effect[s] test[] set forth by the Second Circuit to be held hostage by Plaintiff's inability to affirmatively allege domestic effects. Such a conclusion is inimical to the concerns governing the application of federal securities laws to foreign securities transactions in the first place." *Yung*, 2002 U.S. Dist. LEXIS 16655, at *4-5.[14]

---

[13] The Second Circuit explained that the purpose of the effects test is regulatory:

> Section 10(b) ... is part of a regulatory system that serves the public interest of the United States in much the same way as banking and currency regulations. This apparent purpose of protecting and regulating an entire system led this court to extend, through the use of the effects test, the antifraud provisions of these laws to activity not ordinarily within the "presumptive" scope of legislation.

*EOC*, 147 F.3d at 131. Because the test is regulatory, it is not a method of assessing the harm experienced by the particular plaintiff asserting the claim.

[14] Moreover, the effects test is not barred merely because in *Bersch*, the Court separated the claims of American investors from those of foreign investors. There, the securities at issue had been specifically restricted to purchasers residing outside of the U.S. *See* 519 F.2d at 979-80. Nonetheless, approximately 386 American citizens, and only *22* American residents, had managed to obtain shares. *Id.* at 983-84, 991. The Second Circuit held that a de minimis number of American investors was not sufficient to extend jurisdiction over the claims of foreign plaintiffs, although the American plaintiffs, by demonstrating harm to themselves, could bring suit. *Id.* at 992-93; *see Itoba*, 54 F.3d at 124 (plaintiffs in *Bersch* alleged no American effects other than "an adverse affect [sic] on the American economy or American investors generally"). By contrast, in connection with the misconduct alleged here, thousands of American shareholders were harmed. These are significant effects that go far beyond the *Bersch* allegation that the fraud "generally" affected American markets by dragging down stock prices overall. *See* 519 F.2d at 984.

#### 4.    Jurisdiction Is Proper Under a Combination of Conduct and Effects

The Second and Seventh Circuits recommended that both conduct and effects be examined simultaneously in order to "give[] a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction." 54 F.3d at 122; *Kauthar*, 149 F.3d at 665 n.8. The combination of facts described above is sufficient to justify the allocation of U.S. resources to hear the claims of foreign class members. *See A.I.G.*, 2004 U.S. Dist. LEXIS 27334, at *5 (jurisdiction over claims of foreign plaintiff exists because defendants marketed securities within the U.S. and U.S. investors were harmed). The Second Circuit has emphasized that the filing of a false SEC statement within the U.S. is of particular importance in a conduct and effects analysis: As the court put it in *Itoba*, "[a] material fact that is undisclosed in an SEC filing remains undisclosed absent public enlightenment. This may bring into play a concomitant duty, i.e., the duty  to correct. Lep's uncorrected nondisclosure played as much a role in Itoba's purchases as the price listings on the London Exchange and NASDAQ. In view of the deleterious effect this continued nondisclosure had on the thousands of ADT shareholders in the United States, it cannot be described correctly as incidental or preparatory." *Itoba*, 54 F.3d at 124 (citations omitted).

---

Likewise, *Koal Industries Corp. v. Asland S.A.*, 808 F. Supp. 1143 (S.D.N.Y. 1992), cited by Defendants, supports Plaintiffs' position. There, the foreign plaintiff alleged that as a result of the fraud, certain American businesses collapsed and caused harm to the American economy.  The *Koal* court rejected these allegations as akin to the general harm alleged in *Bersch*, and stated the rule: for jurisdiction to lie, "any detrimental effects must relate to purchasers or sellers in the United States and involve the same securities that are the subject of the alleged fraud." 808 F. Supp. at 1155.  Under this test, there is no question that jurisdiction attaches. *See also Interbrew*, 23 F. Supp. 2d at 430 (following *Koal*; jurisdiction attaches when American purchasers of subject securities were injured, but not when Americans were damaged only through general market effects); *Gaming Lottery*, 58 F. Supp. at 76 (jurisdiction exists because Canadians and Americans "were, in similar measure and in similar fashion, the intended as well as the actual victims of an integrated fraudulent scheme"); *Butte Mining PLC v. Smith*, 876 F. Supp. 1153, 1163 n.37 (D. Mont. 1995).  Defendants' remaining cases are similarly inapposite. *Kaufman*, as described above, has doubtful application in this Circuit; moreover, it was decided prior to *Itoba* and *EOC.  McNamara v. Bre-X Minerals Ltd.*, 32 F. Supp. 2d 920 (E.D. Tex. 1999) and *Tri-Star* simply followed *Kaufman* without independent analysis. *See McNamara*, 32 F. Supp. 2d at 924; *Tri-Star*, 225 F. Supp. 2d at 573 n.7.

### 5.    Tipping Factors

If a U.S. interest is not sufficiently identified through these tests, an additional "tipping factor" may be required. *See EOC*, 147 F.3d at 129. Such "tipping factors" exist when "in addition to communications with or meetings in the United States, there has also been a transaction on a U.S. exchange, economic activity in the U.S., harm to a U.S. party, or activity by a U.S. person or entity meriting redress." *Id.* at 130. The extensive U.S. involvement here "raises the question whether it is even necessary to look into the existence of additional tipping factors." *Gaming Lottery*, 58 F. Supp. 2d at 75. In any case, the Complaint identifies numerous tipping factors.

It is beyond question that U.S. parties were harmed. The stocks traded on an American exchange both directly and as ADS's, and relevant meetings and negotiations occurred here. Finally, according to the Second Circuit, the extensive amount of U.S. business activity of the type present in this case tips the balance toward jurisdiction. *See EOC*, 147 F.3d at 130 (interpreting *AVC Nederland B.V. v. Atrium Inv. P'ship*, 740 F.2d 148 (2d Cir. 1984); "the extent of the activity within the regulating state and the economic activity connecting both the plaintiff and defendants to the United States weighed in favor of jurisdiction"); *see also Leonard*, 1999 U.S. Dist. LEXIS 16046, at *18 (following *EOC*; "slight additional factor" of domestic economic activity tips toward jurisdiction).

### 6.    United States Policy Favors the Exercise of Jurisdiction

Relying on the Supreme Court's decision in *F. Hoffman-La Roche Ltd. v. Empagran, S.A.*, 124 S. Ct. 2359 (2004), Defendants contend that American policy requires a narrow view of the extraterritorial application of the securities laws. Defendants' reliance on *Empagran* is entirely misplaced.[15] In fact, the

---

[15]    *Empagran* involved the Foreign Trade Antitrust Improvements Act, which had been passed specifically to narrow jurisdiction in antitrust cases. *See* 124 S. Ct. at 2365-66. No analogous statute exists in securities law, and the antitrust test for jurisdiction is different from the one employed for securities cases. *See N. S. Fin. Corp. v. Al-Turki*, 100 F.3d 1046, 1052 (2d Cir. 1996). Indeed, the *Empagran* analysis was closely tied to the statute under consideration; not only did the Court examine the specific statutory language and history, 124 S.Ct. at 2369, the Court also emphasized that many countries had filed amicus briefs arguing that the American treble damages remedy available in antitrust actions would adversely affect those nations' administration of their own antitrust laws. *See id.* at 2368.

18

conduct and effects tests described above were themselves specifically designed to effectuate U.S. policy with respect to application of the securities laws. *See Kasser*, 548 F.2d at 115; *see also Itoba*, 54 F.3d at 121-22.  No further presumption – such as a general view that Congress intended only a limited reach of the securities laws – is warranted.  Indeed, any such presumption would be manifestly at odds with *Kasser*, which made clear that a broad construction was necessary in order to effectuate important policy goals.

### B.    International Comity and Foreign Policy Do Not Favor Dismissal

Dismissal for international comity is only appropriate were "there is in fact a true conflict between domestic and foreign law." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798 (1993); *see also In re Maxwell Comm. Corp.*, 93 F.3d 1036, 1049-50 (2d Cir. 1996); *Metro Indus. Inc. v. Sammi Corp.*, 82 F.3d 839, 847 n.5 (9th Cir. 1996).  Even where there are simultaneous judicial proceedings in another country – which is not the case here – courts generally will not dismiss on comity grounds until a foreign court reaches a judgment that is res judicata, or otherwise makes a ruling that is wholly inconsistent with domestic law. *See Stonington Partners, Inc. v. Lernout & Haupsie Speech Prods.*, 310 F.3d 118, 130-131 & n.11 (3d Cir. 2002); *Madanes v. Madanes*, 981 F. Supp. 241, 263 (S.D.N.Y. 1997). Thus, even though requests for dismissal on comity grounds are frequently requested in the context of securities actions involving foreign defendants, these requests are generally denied. *See, e.g.*, *United Int'l Holdings, Inc. v. The Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1223 (10th Cir. 2000); *Nortel*, 2003 U.S. Dist. LEXIS 15702, at *20-24; *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 290-295 (E.D.N.Y. 2002); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 356-357 (D. Md. 2004).  Where there are ongoing judicial proceedings in another country but no "true conflict" due to res judicata or other factors, dismissal is not warranted "absent a showing of exceptional circumstances." *Madanes*, 981 F. Supp. at 264.

Defendants have not contended that there are any ongoing proceedings in Germany, much less any demands of German law that are inconsistent with the requirements of American law, nor are Plaintiffs aware of any.  Thus, their argument must be rejected.

Defendants nonetheless insist that this Court should decline jurisdiction based on the reasoning in *Empagran*. However, in that case, the Supreme Court was not called upon to *dismiss* an action over which American courts have jurisdiction on comity grounds. Instead, the Court merely allowed considerations of comity – including the protests of foreign governments – to inform its decision as to deciding the scope of subject matter jurisdiction in the first instance. *See Empagran*, 124 S. Ct. at 2366. Again, here no sovereign has protested this Court's exercise of jurisdiction over Plaintiffs' claims in this action.

Defendants next incorrectly state that jurisdiction may be declined even when there is no conflict with foreign law on the ground of "prescriptive comity," which defendants define as dismissal due to "legitimate sovereign interests of other nations." Def. Br. at 20 n.12. But the phrase "prescriptive comity," was defined in Justice Scalia's dissenting opinion in *Hartford Fire Insurance Co. v. California*, 509 U.S. 764 (1993):

> The "comity" they refer to is not the comity of courts, whereby judges decline to exercise jurisdiction over matters more appropriately adjudged elsewhere, but rather what might be termed "prescriptive comity": the respect sovereign nations afford each other by limiting the reach of their laws. That comity is exercised by legislatures when they enact laws, and courts assume it has been exercised when they come to interpreting the scope of laws their legislatures have enacted. It is a traditional component of choice-of-law theory.

*Id.* at 817 (Scalia, J., dissenting); *see Empagran*, 124 S. Ct. at 2366 (acknowledging Justice Scalia's dissenting opinion as the source of its definition of the phrase). Thus, Defendants' "prescriptive" comity is wholly inapplicable here.

Moreover, the cases on which Defendants rely are entirely inapposite. Two involved extremely political scenarios in which the government of the foreign country, or even our own government, had requested dismissal of the American action. *See In re Nazi Era Cases Against German Def. Litig.*, 129 F. Supp. 2d 370 (D.N.J. 2001); *Torres v. S. Peru Copper Corp.*, 965 F. Supp. 899, 909 (S.D. Tex. 1996).[16]

---

[16] In fact, *Nazi Era Cases* was not dismissed on comity grounds at all, but was instead dismissed on *other* grounds with comity invoked to demonstrate that the dismissal was "consistent" with comity. *See* 129 F. Supp. 2d at 386.

In both *Torres* and *Paraschos v. YBM Magnex Int'l, Inc.*, 130 F. Supp. 2d 642 (E.D. Pa. 2000), there were ongoing judicial proceedings in foreign countries arising out of the same subject matter as the domestic litigation. The one securities case cited by Defendants, *Paraschos*, featured a foreign bankruptcy proceeding – which American courts have said is a particularly sensitive area justifying dismissal on comity grounds, *see Madanes*, 981 F. Supp. at 264 – a stock for which "the application of United States securities laws were not contemplated by [the corporation] or its investors" because it traded exclusively on foreign exchanges, and several ongoing foreign class actions with virtually identical class definitions. *Id.* at 645-47. Moreover, the *Paraschos* court stressed that dismissal would not prevent the class from litigating its claims because of the ongoing proceedings in Canada, *see id.* at 647.

In this case, not only are there no competing foreign proceedings – or any proceedings at all – but Defendants have not even identified the foreign laws or policies with which this case would purportedly interfere. *See Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 129 (E.D.N.Y. 2000) ("Courts have consistently noted that where defendants fail to point to any specific legislative or judicial statement of policy of a foreign state or court, principles of international comity do not apply.").

If Defendants' argument were to succeed, international comity would require dismissal in every securities action involving significant foreign conduct, and thus would be permitted to defeat the valid exercise of extraterritorial jurisdiction of the securities laws.

Finally, if the Court determines that Lead Plaintiffs have not alleged sufficient facts to establish subject matter jurisdiction, the Court should grant Lead Plaintiffs an opportunity to obtain limited jurisdictional discovery to have an adequate basis to respond to the grounds on which jurisdiction is challenged. *See Berardi v. Swanson Memorial Lodge No. 48*, 920 F.2d 198, 200 (3d Cir. 1990). Courts enjoy substantial procedural flexibility in handling Rule 12(b)(1) motions, but "'the record must clearly establish that after jurisdiction was challenged the plaintiff had an opportunity to present facts by affidavit or by deposition, or in an evidentiary hearing, in support of his jurisdictional contention.'" *Id.* at 200

*(quoting Local 336, American Fed. of Musicians, AFL--CIO v. Bonatz*, 475 F.2d 433, 437 (3d Cir. 1973));

*accord Tanzymore v. Bethlehem Steel Corp.*, 457 F.2d 1320, 1323 (3d Cir. 1972).[17]

---

[17]  *See also, Toys "R" Us, Inc. v. Step Two, SA*, 318 F.3d 446, 457 (3d Cir. 2003)(holding court erred by denying jurisdictional discovery of defendant's "business activities in the [forum], including business plans, marketing strategies, sales, and other commercial interactions").

DaimlerChrysler and Daimler-Benz will undoubtedly argue that the PSLRA discovery stay bars jurisdictional discovery until after the Court rules on the jurisdictional motion to dismiss.  However, nothing in the legislative history of the PSLRA suggests that Congress intended to stay jurisdictional discovery.  Rather, as reflected in the Congressional history, Congress enacted the PSLRA discovery stay provision for two reasons: (1) to prevent plaintiffs from filing frivolous lawsuits initiated solely in the hope of finding sustainable claims through extensive discovery, often referred to as so-called "fishing expeditions" (*see* S. Rep. No. 104-98, at 14 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 693); and (2) to eliminate the threat of pressuring corporate defendants to settle frivolous securities lawsuits in an effort to avoid the high costs of discovery.  *See* H.R. Conf. Rep. No. 104-369, at 37 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 731.

This Court has already sustained substantially identical claims under Rules 12(b)(6) and 9(b). Therefore, concerns regarding the merits of Plaintiffs' claims are not at issue.  *See, e.g., In re Lernout & Hauspie Sec. Litig.*, 214 F. Supp. 2d 100, 106 (D. Mass. 2002) ("Since the plaintiffs' complaint has easily survived four defendants' motions to dismiss, discovery against those defendants cannot be deemed merely a 'fishing expedition' to find a sustainable claim ... [N]or can discovery against those defendants be an attempt to force innocent parties to settle frivolous class actions.").  Second, limited jurisdictional discovery is unlikely to impose the high costs that would pressure a defendant to settle unmeritorious claims.  In this case, given the extensive discovery produced in the Original Action and Tracinda Action, there will be little, if any, burden or cost on DaimlerChrysler to produce the requested jurisdictional discovery.  *See In re FirstEnergy*, 316 F.Supp.2d 581, 592-93 (N.D. Ohio 2004) (lifting discovery stay when defendant could not allege any burden from producing requested information because defendant had already reviewed, compiled and produced requested information to government).

Additionally, by its terms, the PSLRA discovery stay provides the Court with discretion to order limited discovery in appropriate circumstances. *See* 15 U.S.C. §78u-4(b)(3)(B). Several courts have ordered that the PSLRA discovery stay be lifted to avoid improper or unfair treatment to securities plaintiffs. *See, e.g., Lernout & Hauspie*, 214 F. Supp. 2d at 109; *Andersen v. First Security Corp.*, 157 F. Supp. 2d 1230, 1242 (D. Utah 2001); *Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99 Civ. 342, 1999 U.S. Dist. LEXIS 5439, at *5 (S.D.N.Y. Apr. 16, 1999). While no court appears to have addressed the issue of lifting the PSLRA discovery stay to allow discovery of facts relevant to subject matter jurisdiction, the court in *Baan* addressed lifting the stay to allow discovery for the closely analogous personal jurisdiction "contacts" analysis, and modified the stay and permitted the plaintiff to take discovery. *See In re Baan Co. Sec. Litig.*, 81 F. Supp. 2d 75, 83-84 (D.D.C. 2000). Should the instant action be dismissed for lack of subject matter jurisdiction without permitting Lead Plaintiffs the opportunity to take any jurisdictional discovery, Lead Plaintiffs and the Class will be unduly prejudiced, amounting to irreparable harm, because they will be barred from pursuing otherwise potentially meritorious claims.

C.    **This Action is Not Barred by the Statute of Limitations**

The statute of limitations for Plaintiffs' claims has not expired. Defendants' true intentions first began to be revealed on October 30, 2000 when the *Financial Times* published an article disclosing the fraud. ¶88. Defendants' fraud was fully revealed on November 17, 2000, when Defendants announced plans for a "re-organization" of the Management Board, with additional former Daimler-Benz employees being appointed to head Chrysler. ¶90. On November 28, 2000, the first securities class action against defendants based on substantively identical claims to those alleged here was filed with this Court on behalf of a single class of plaintiffs consisting of both foreign and domestic investors. On June 10, 2003, the Court certified a class consisting of domestic investors and excluded from that class foreign investors. *In re DaimlerChrysler Sec. Litig.*, 216 F.R.D. at 301. The Court, however, only refused to certify a class that included both domestic and foreign investors; it did not definitively deny class certification to the foreign investors, thereby leaving open whether foreign investors' claims could be certified. The Original Action was finally resolved at a final settlement approval hearing before this Court on December 5, 2004, and the instant complaint was filed a short time later on May 24, 2004.

Because in its earlier ruling, this Court never determined that the claims of foreign investors were unsuited for class treatment, the statute of limitations for the instant class was tolled while the Original Action was pending before this Court.[18]

---

[18] Defendants discuss the applicability of the Sarbanes-Oxley Act, which extended the limitations period from one year of discovery of the fraud to two years. Def. Br. at 25. The statute, by its terms, extends the period "to all proceedings . . .commenced on or after the date of enactment of this Act," 28 U.S.C. 1658(b). This case was filed well after the enactment of the Act on July 30, 2002, and therefore the Act applies. Moreover, although Defendants are correct that several courts have refused to apply Sarbanes-Oxley to cases that were time-barred as of the date the Act was enacted, those cases are inapplicable here because, as discussed below, the claims against Defendants were *not* time-barred on that date. They were not time-barred because they were tolled during the pendency of the class action. In any event, because tolling applies, Plaintiffs' claims are timely under either the one year or the two year period.

### 1.    This Court's Earlier Ruling Was Based on the Inadequacy of the Lead Plaintiffs

In *Yang v. Odom*, 392 F.3d 97 (3d Cir. 2004), the Third Circuit held that the statute of limitations for subsequently filed class actions is tolled by earlier filed substantively duplicative class actions if class certification was earlier denied because of deficiencies related to the lead plaintiffs. The Court reasoned that "applying tolling under these circumstances will allow subsequent classes to pursue class claims until a court has definitively determined that the claims are not suitable for class treatment." *Id.* at 112. The Third Circuit likewise noted that the potential prejudice to defendants, such as those in the instant case, is non-existent because "defendants were on notice of the nature of the claims and the generic identities of the plaintiffs within the required period, eliminating the potential for unfair surprise and prompting them to preserve evidence which might otherwise have been lost." *Id.* at 111.

In *Yang*, investors brought a securities fraud class action in the District of New Jersey consisting of three sub-classes after a judge in the District of Georgia denied certification of the sub-classes in an earlier filed substantively duplicative class action. The Third Circuit held that the statute of limitations was tolled for two of the sub-classes where the classes were denied on "deficiencies in the putative representatives." *Id.* at 108.  As to a third sub-class, however, the Court held that the statute was not tolled because class certification was denied for "lack of numerosity—a class defect." *Id.*

Here, in the Original Action, defendants argued that the class representatives, who were domestic investors, could not "adequately protect[]" foreign investors' interests and, therefore, class certification should be denied absent "a foreign class representative." *DaimlerChrysler*, 216 F.R.D. at 301.  Taking defendants' lead, the Court similarly emphasized that other "[c]ourts have recognized the value of foreign class representatives in representing foreign stockholders in cases involving significant foreign stock ownership." *Id.* (citing *Krangel v. Golden Rule Res., Ltd.*, 194 F.R.D. 501, 506 (E.D.Pa. 2000)). Ultimately, while the Court stated that it was aware of the "practical difficulties" in maintaining a class of foreign investors, including difficulties in managing a foreign class and measuring their damages, the

Court excluded foreign investors from the class because the "Lead Plaintiff [had] not adequately responded" to Defendants' concerns regarding these issues. 216 F.R.D. at 301.

In fact, this Court could not have definitively ruled that the foreign investors' claims were unsuitable for class treatment, because the Court explicitly noted that the Lead Plaintiffs had essentially failed to present evidence on the subject. Federal courts have repeatedly refused to decide class certification motions without a complete factual record before them. *See, e.g., Mascolo v. Merrill Lynch Pierce, Fenner & Smith, Inc.*, 61 F.R.D. 481, 486-88 (S.D.N.Y. 1973); *In re American Med. Sys., Inc.*, 75 F.3d 1069, 1086 (6th Cir. 1996).[19] Generally, when courts make a class certification ruling, they give the plaintiffs several opportunities to supplement their factual submissions in order to ensure that the court has a complete record. *See, e.g., In re Initial Pub. Offering Sec. Litig.*, No. 01 Civ. 0242, 2004 U.S. Dist. LEXIS 20497, at *10-11 (S.D.N.Y. Oct. 13, 2004) (discussing repeated factual submissions made at the court's request). Indeed, in *Yang* itself, the Third Circuit highlighted the fact that for the one subclass that had been denied certification on the basis of a "class defect," the district court had "repeatedly requested additional facts and more precise briefing on the issue of class certification" and given the plaintiff two chances to obtain certification. *Yang*, 392 F.3d at 110. Nothing like that occurred in the Original Action.

Accordingly, because the foreign investors were excluded from the Original Action due to the inadequacy of the American lead plaintiffs' presentation and the lack of a sufficient factual record, the foreign investors were not excluded due to a class defect and tolling applies.

### 2. In the Alternative, Tolling Applies Because the Foreign Investors Comprise a Proper Subclass

The Third Circuit in *Yang* explicitly followed the Second Circuit's decision in *Korwek v. Hunt*, 827 F.2d 874 (2d Cir. 1987). *See Yang*, 392 F.3d at 102. As the Third Circuit itself explained, *Korwek* left open the possibility that when a class is not certified for essentially curable reasons, such as

---

[19] *See also Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1313, n.50 (4th Cir. 1978); *Grainger v. State Sec. Life. Ins. Co.*, 547 F.2d 303, 307 (5th Cir. 1977); *Blackie v. Barrack*, 524 F.2d 891, 901 n. 17 (9th Cir. 1975); *Mulcahey v. Petrofunds, Inc.*, 79 F.R.D. 272, 281 (S.D. Tex. 1978)

manageability, a subsequently filed "proper subclass" may well be entitled to tolling. *See Yang*, 392 F.3d at 104 (quoting *Korwek*; "This Court notes that it leaves for another day the question whether the filing of a potentially proper subclass would be entitled to tolling under *American Pipe [& Constr. Co. v. Utah*, 414 U.S. 538 (1974)].").

As discussed above, the purpose of tolling is to permit subsequent classes to pursue their claims if there has been no definitive ruling barring class certification. This logic is equally applicable to proper subclasses carved out of unmanageable actions. Here, even if the Court's ruling is interpreted to be based on the unmanageability of a class comprising both domestic and foreign investors, tolling would still apply to a subsequently-filed, properly delineated and manageable subclass. This action is limited to foreign investors, and thus manageability concerns related to the presence of domestic investors are not longer applicable. At minimum, Plaintiffs should be given the opportunity to show that their properly defined subclass is a manageable one – something the lead plaintiffs in the Original Action apparently made no attempt to do.

### D.    Section 14(a)

Lead Plaintiffs alleged that Defendants violated Section 14(a) and Rule 14a-9 by having jointly issued the materially misleading Proxy Statement to Chrysler shareholders. Defendants contend that they did not issue the Proxy Statement, and that even if they had, they are exempt from Section 14(a) liability as a "foreign private issuer." Def. Br. at 31. To the contrary, a defendant may be held liable under Section 14(a) for misstatements or omissions contained in proxy materials when a defendant permits the use of his name in a manner substantially connected to the proxy solicitation. *See Tracinda Corp. v. Daimler Chrysler AG.*, No. 00 Civ. 993, 2005 U.S. Dist. LEXIS 5830 (D. Del. Apr. 7, 2005) (citing *Freedman v. Value Health, Inc.*, 135 F. Supp. 2d 317, 339 (D. Conn. 2001)). Here, Defendants issued the proxy statement jointly and allowed the use of their names in substantial connection with the proxy solicitation. Furthermore, Defendants are not exempt from Section 14(a) liability as "foreign private issuers," because the exemption does not apply to the solicitation of shareholders of a domestic

company.[20] *See Tracinda*, 2005 U.S. Dist. LEXIS 5830 at *90. By its express language, the exemption under Rule 3a12-3(b) pertains to securities registered by a foreign private issuer. *Id.* In this case, the solicitation was aimed at inducing Chrysler shareholders, including foreign shareholders, to vote their shares of Chrysler, a non-exempt registered security, in favor of the Merger. Accordingly, Plaintiffs have alleged the elements of a Section 14(a) cause of action.

### E.    The "Merger of Equals" Allegations State a Claim for Relief

In ruling on a 12(b)(6) motion, the factual allegations of the complaint must be accepted as true and the Court must give the plaintiff the benefit of every reasonable inference to be drawn from those allegations. *See Retail Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746 (1963); *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir. 1991). Furthermore, the court must resolve any ambiguities concerning the sufficiency of the claims in favor of the plaintiff. *See Hughes v. Rowe*, 449 U.S. 5 (1980). Thus, the court may dismiss a complaint only if it is clear "that no relief could be granted under any set of facts that could be proved" consistent with the allegations. *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir. 1988).

Here, Defendants concede that Lead Plaintiffs' allegations in connection with the characterization of the Merger as a "merger of equals" are substantially identical to allegations this Court previously sustained in the Tracinda and Glickenhaus Actions. Def. Br. at 32. In the instant motion, Defendants merely claim to have "preserved" their previously asserted arguments. *Id.* Consequently, the Court should deny the instant motion based on the same points and authorities relied on when the Court denied Defendants' motion to dismiss the Tracinda and Glickenhaus Actions. *Tracinda*, 197 F. Supp. 2d at 63. Indeed, "the Court is required to accept Plaintiffs' allegations as true, and taking those allegations in total, the Court cannot conclude that Plaintiffs have failed to state an actionable material misrepresentation." *Id.*

---

[20]   17 C.F.R. 240.3a12-3(b), provides that "securities registered by a foreign private issuer … shall be exempt …" from Section 14(a) liability.

**F.      Lead Plaintiffs Have Alleged Loss Causation**

To adequately plead loss causation, the plaintiff "must allege that the misrepresentation was the direct or proximate cause of the economic loss." *Id.* at 66; *see Dura Pharms., Inc. v. Broudo*, No. 03-932, 2005 U.S. LEXIS 3478, at \*19 (Apr. 19, 2005). "As the Third Circuit has recognized, the causation issue 'becomes most critical at the proof stage,' and the question of 'whether the plaintiff has proven causation is usually reserved for the trier of fact.'" *Id.* (quoting *EP Medsystems, Inc. v. Echopath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000)).

Defendants assert that the Acquirers are unable to establish loss causation because the market price of DaimlerChrysler stock increased in the days immediately following publication of the October 30, 2000 *Financial Times* article quoting Defendant Schrempp as stating that the Merger of Daimler-Benz and Chrysler was never intended to be a merger of equals.[21] Def. Br. at 33. While the stock price may have risen briefly, it fell precipitously once the complete nature of the alleged fraud was revealed. In fact, on November 17, 2000, the final day of the class period, the share price dropped over $3.00 per share, to below $40.00 per share, on disclosure of the Defendants plans for a purported "reorganization" of the Management Board, ending any and all meaningful participation in the company by Chrysler or its former shareholders. The stock then fell an additional $2.00 per share the following day, eliminating an astounding $5 billion in market capitalization.

The reasoning of this Court's previous decision on the sufficiency of the damages allegation in the Tracinda, Glickenhaus and Original Action, is equally applicable here. "[The] Defendants' argument is not so much an attack on the sufficiency of the pleadings, as it is an attack on Plaintiffs' ability to succeed on their claims as a factual matter." *Tracinda*, 197 F. Supp. 2d at 67. "[T]hese arguments are fact intensive matters usually requiring expert testimony concerning the state of the financial markets and

---

[21] Defendants assert that the Exchangers' claims are also barred for failure to plead loss causation. Def. Br. at 33. Even if this assertion was correct, which it is not because Exchangers have properly alleged actual loss for the same reasons set forth herein, the Exchangers have also proceeded on a theory of "lost opportunity" damages. *See Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 781 (3d Cir. 1976); *accord Tse v. Ventana Medical Systems, Inc.*, 297 F.3d 210, 218 (3d Cir. 2002).

the like.  Accordingly, such issues are inappropriate for disposition in the context of a motion to dismiss."

*Id.* at  67-68.

**CONCLUSION**

For the foregoing reasons, the Defendants' motion to dismiss should be denied.

DATE: May 2, 2005

Respectfully submitted,

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**

By:

Seth D. Rigrodsky (#3147)
Ralph Sianni (#4151)
919 N. Market Street, Suite 411
Wilmington, Delaware  19801
Telephone: (302) 984-0597
Facsimile: (302) 984-0870

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**

Steven G. Schulman
David A.P. Brower
Ann M. Lipton
One Pennsylvania Plaza – 49th Floor
New York, NY  10119-1065
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

**SCHIFFRIN & BARROWAY, LLP**

Katharine Ryan
John Kehoe
Ian Berg
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**SEEGER WEISS, LLP**

David Buchanan
Eric T. Chaffin
One William Street
New York, New York 10004
Telephone: (212) 584-0700
Facsimile (212) 584-0799

***Plaintiffs' Co-Lead Counsel***

29
