IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE (WILMINGTON)

| | | |
|---|---|---|
| | X | |
| MARKUS BLECHNER, Individually and on Behalf of All others Similarly Situated, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| DAIMLER-BENZ AG, DAIMERCHRYSLER AG, JURGEN E. SCHREMPP, ECKHARD CORDES, MANFRED GENTZ, JERGEN HUBBERT, MANFRED BISCHOFF, KURT LAUK, KLASU MANGOLD, HEINER TROPITZCH, KLUS-DIETER VOHRINGER, DIETER ZETSCHE and THOMAS SONNENBERG, | : | Case No. 04-CV-331 (JJF) |
| | : | |
| Defendants. | : | |
| | X | |

**COMPENDIUM OF UNREPORTED AUTHORITIES CITED IN
PLAINTIFFS' BRIEF IN OPPOSITION TO THE MOTION OF DAIMLERCHRYSLER AG
AND DAIMLER-BENZ AG TO DISMISS THE COMPLAINT**

Dated: May 2, 2005

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
Seth D. Rigrodsky (#3147)
Ralph Sianni (#4151)
919 N. Market Street, Suite 411
Wilmington, Delaware 19801
Telephone: (302) 984-0597
Facsimile: (302) 984-0870

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
Steven G. Schulman
David A.P. Brower
Ann M. Lipton
One Pennsylvania Plaza – 49th Floor
New York, NY 10119-1065
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

**SCHIFFRIN & BARROWAY, LLP**
Katharine Ryan
John Kehoe
Ian Berg
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**SEEGER WEISS, LLP**
David Buchanan
Eric T. Chaffin
One William Street
New York, New York 10004
Telephone: (212) 584-0700
Facsimile (212) 584-0799

***Plaintiffs' Co-Lead Counsel***

# TABLE OF CONTENTS

**CASE**                                                       **TAB**

*A.I.G. Asian Infrastr. Fund, L.P. v. Chase Manh. Asia Ltd.*, No. 02 Civ. 10034,
    2004 U.S. Dist. LEXIS 27334 (S.D.N.Y. Mar. 24, 2004) ...................................................... A

*Dura Pharms., Inc. v. Broudo*, No. 03-932,
    2005 U.S. LEXIS 3478 (Apr. 19, 2005) .............................................................................. B

*Froese v. Staff*, No. 02 Civ. 5744,
    2003 U.S. Dist. LEXIS 11409 (S.D.N.Y. July 3, 2003) ........................................................ C

*Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99 Civ. 342,
    1999 U.S. Dist. LEXIS 5439 (S.D.N.Y. Apr. 16, 1999) ...................................................... D

*In re Initial Pub. Offering Sec. Litig.*, No. 01 Civ. 0242,
    2004 U.S. Dist. LEXIS 20497 (S.D.N.Y. Oct. 13, 2004) ..................................................... E

*Leonard v. Garantia Banking Ltd.*, No. 98 Civ. 4848,
    1999 U.S. Dist. LEXIS 16046 (S.D.N.Y. Oct. 18, 1999) ...................................................... F

*In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855,
    2003 U.S. Dist. LEXIS 15702 (S.D.N.Y. Sep. 5, 2003) ...................................................... G

*Paraschos v. YBM Magnex Int'l, Inc.*, No. 98 Civ. 6444,
    2000 U.S. Dist. LEXIS 3829 (E.D. Pa. Mar. 28, 2000) ...................................................... H

*Tracinda Corp. v. Daimler Chrysler AG.*, No. 00 Civ. 993,
    2005 U.S. Dist. LEXIS 5830 (D. Del. Apr. 7, 2005) ............................................................. I

*In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571,
    2003 U.S. Dist. LEXIS 19431 (S.D.N.Y. Nov. 3, 2003) ....................................................... J

*In re Vivendi Universal S.A. Securities Litigation*, No. 02 Civ. 5571,
    2004 U.S. Dist. LEXIS 21230 (S.D.N.Y. Oct. 19, 2004) ...................................................... K

*Yung v. Lee*, No. 00 Civ. 3965,
    2002 U.S. Dist. LEXIS 16655 (S.D.N.Y. Sept. 5, 2002) ...................................................... L

# TAB A

LEXSEE 2004 US DIST LEXIS 27334

**A.I.G. ASIAN INFRASTRUCTURE FUND, L.P., Plaintiff, -against- CHASE MANHATTAN ASIA LIMITED, J.P. MORGAN PARTNERS (BHCA), and JOHN D. LEWIS, Defendants.**

**02-cv-10034 (KMW)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 27334*

**March 24, 2004, Decided**
**March 25, 2004, Filed**

**SUBSEQUENT HISTORY:** Affirmed by *AIG Asian Infrastructure Fund, L.P. v. Chase Manhattan Asia Ltd., 2005 U.S. App. LEXIS 3356 (2d Cir. N.Y., Feb. 25, 2005)*

**DISPOSITION:** [*1] Defendants' motion to dismiss granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For AIG Asian Infrastructure Fund, L.P., Plaintiff: J. Andrew Keyes, Jonathan P. Graham, William & Connolly, LLP, Washington, DC; Robert Shrager, Bondy & Schloss, L.L.P., New York, NY.

**JUDGES:** Kimba M. Wood, United States District Judge.

**OPINIONBY:** Kimba M. Wood

**OPINION:**

Plaintiff, a Bermuda limited liability partnership, sues Chase Manhattan Asia Limited ("Chase Asia"), a Hong Kong corporation that advised and invested in a Phillipines telecommunications company in which plaintiff also invested; J.P. Morgan Partners ("J.P. Morgan"), also an adviser to and investor in the Phillipines company; and John Lewis ("Lewis"), a controlling officer of J.P. Morgan, for violations of the Securities Exchange Act, common law fraud and negligent misrepresentation. Plaintiff alleges that defendants induced it to invest in the Phillipines company by hiding the existence of a secret agreement

between that company, Chase and J.P. Morgan that altered the nature and risk of plaintiff's investment.

Defendants move to dismiss for lack of subject matter jurisdiction and failure to state a claim. For the reasons stated below, the Court holds that it has subject [*2] matter jurisdiction over this action pursuant to the Securities Exchange Act, but grants the motion to dismiss because the action is time-barred.

Background n1

n1 Because this is a motion to dismiss, the Court assumes that plaintiff's allegations are true.

In 1994, Bayan Telecommunications Holding Corporation ("Bayantel"), a Phillipines telecommunications service provider, began to encourage plaintiff, a Bermuda holding company with United States partners, to invest in Bayantel's stock. In 1995, defendants Chase Asia and J.P. Morgan purchased common stock of Bayantel; included in this transaction was a Put Agreement that granted Chase Asia and J.P. Morgan the right to sell back the stock at the original sale price on or after October 2002. Defendant John D. Lewis ("Lewis"), a controlling officer of J.P. Morgan, executed the Put Agreement.

On January 16, 1998, plaintiff purchased more than $ 30 million worth of Preferred Stock of Bayantel, pursuant to a subscription agreement that obligated Bayantel to buy [*3] back the stock from plaintiff in 2003 at the price plaintiff paid, plus compound interest

of 6.5%. Chase Asia served as the placement agent for the transaction, and both Chase Asia and J.P. Morgan were involved in the solicitations and negotiations with plaintiff's United States partners that led to plaintiff's investment in Bayantel. All defendants concealed from plaintiff the existence of the Put Agreement between Bayantel and J.P. Morgan and Chase Asia; thus, plaintiffs were led to believe that J.P. Morgan and Chase Asia simply held common stock of Bayantel, although the secret Put Agreement actually made Chase Asia and J.P. Morgan, effectively, creditors of Bayantel.

Plaintiff first became aware of the existence of the secret Put Agreement in June 2001. In June 2002, Bayantel's holding company announced that it was unable to make interest payments due on its debt; a similar announcement followed in September from Bayantel. Plaintiff has lost a great deal of the money it invested in Bayantel.

In December 2002, plaintiff commenced this action against Bayantel, its holding company, individual officers of those companies, and Chase Asia, J.P. Morgan and Lewis, charging defendants [*4] with violations of the Securities Exchange Act, common law fraud, and negligent misrepresentation. On September 5, 2003, plaintiff voluntarily dismissed Bayantel, its holding company, and all its individual officer defendants, leaving Chase Asia, J.P. Morgan, and Lewis as the remaining defendants. Defendants now move to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

Discussion

Plaintiff bears the burden of establishing the Court's subject matter jurisdiction. See *Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)*. A party can move to dismiss for lack of subject matter jurisdiction on facial or factual grounds; a facial attack requires the Court to accept all of a party's allegations as true, whereas a factual attack requires the Court to determine whether the plaintiff has established facts sufficient to support subject matter jurisdiction. See *Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d 874, 887 n. 15 (2d Cir. 1996)*.

In considering a motion to dismiss for failure to state a claim upon which relief can be granted, the Court merely "determine[s] whether the [*5] complaint itself is legally sufficient," *Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)*, accepting as true its factual allegations, see *Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 88 (2d Cir. 1999)*. All inferences are drawn in favor of the non-moving party. See *Moore v. PaineWebber, Inc., 189 F.3d 165 (2d Cir. 1999)*. The complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts

in support of his claim which would entitle him to relief." *Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir. 2000)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957))*. In making this assessment, the Court "must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference in the complaint." *Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)*.

I. The Court Has Subject Matter Jurisdiction Over Plaintiff's Claims

Defendants raise a facial, not factual, challenge to the Court's subject matter jurisdiction; they argue that if the Court accepts every allegation [*6] in the complaint as true, the Court lacks jurisdiction. See *Poodry, 85 F.3d at 887 n. 15*. The Court disagrees.

In order to determine whether they have subject matter jurisdiction over transactions pursuant to the Securities Exchange Act of 1934 ("Securities Exchange Act"), courts in this Circuit apply a "conduct" test, an "effects" test, or a combination of the two. When they apply the conduct test, courts ask if a defendant performed any acts in the United States that were more than "merely preparatory" to securities fraud. See *Itoba Limited v. Lep Group PLC, 54 F.3d 118, 121-22 (2d Cir. 1995)*. When they apply the effects test, courts ask whether the alleged foreign fraudulent activity had "substantial effects" in the United States. See *Consolidated Gold Fields PLC v. Minorco, S.A., 871 F.2d 252, 261-62 (2d Cir. 1989)*.

Plaintiff has alleged that defendants actively encouraged investors in the United States to purchase stock in Bayantel, and that although plaintiff itself is a foreign partnership, many United States investors who are partners in plaintiff were affected by the fraudulent scheme. Compl. PP9, 25-28. These allegations, [*7] although thin, are sufficient to satisfy a combination of the conducts and effects test, and therefore to overcome a facial challenge to this Court's subject matter jurisdiction. See *Itoba, 54 F.3d at 124* ("[A] sufficient combination of ingredients of the conduct and effects tests is present in the instant case to justify the exercise of jurisdiction").

Because this is a facial challenge to subject matter jurisdiction, the Court will not review the record to determine whether the facts support its exercise of jurisdiction. However, "the factual basis for a court's subject matter jurisdiction may remain an issue through trial," and the Court can revisit the issue at any time as the record develops. *Europe. & Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 121 n. 1 (2d Cir. 1998)*.

Case 1:04-cv-00331-JJF   Document 57   Filed 05/02/2005   Page 7 of 21

Page 3
2004 U.S. Dist. LEXIS 27334, *

## II. This Action Is Time-Barred

Defendants next argue that this action is time-barred by the applicable statute of limitations. The Court agrees.

Prior to July 30, 2002, the Securities Exchange Act required that all securities fraud claims be brought within three years of the allegedly fraudulent transaction, or one year of its discovery, whichever [*8] came first. *15 U.S.C. § 78i*(e). On July 30, 2002, however, President G. W. Bush signed the Sarbanes-Oxley Act, which extended the statute of limitations to five years from the transaction, and to two years from discovery of the alleged fraud. *28 U.S.C. § 1658(b)*. Plaintiff appears to concede that its action can survive only if the new statute of limitations applies; the alleged fraudulent transaction took place on January 16, 1998, Compl. P48, which is more than three years from the commencement of plaintiff's action in December 2002; and plaintiff alleges that it discovered defendants' fraud in June 2001, which is more than a year from the commencement of this action. n2

n2 Plaintiff's complaint also alleges that it was "shocked to learn of the Secret Put Agreements" in June 2001, and that an officer of Bayantel's holding company "admitted to Plaintiff that [it] should have disclosed the put arrangements . . ." Compl. P67. With these allegations, plaintiff removes any doubt as to whether it was sufficiently on notice of defendants' fraud when it discovered the Put Agreement.

[*9]

Under the old limitations periods, plaintiff's claim is time-barred, and *was* time-barred when Sarbanes-Oxley was enacted. Plaintiff argues, however, that the new Sarbanes-Oxley limitations periods should be applied retroactively to lengthen the period of time plaintiff had to file the present action. Neither the United States Supreme Court nor the United States Court of Appeals for the Second Circuit has confronted the question of whether the Sarbanes-Oxley limitations periods should apply retroactively to claims that had expired prior to the enactment of Sarbanes-Oxley.

Whether a statute should be applied retroactively depends on both congressional intent and the statute's effect upon preexisting rights. The Supreme Court has articulated a three-step test for determining whether to give a statute retroactive application. See *Landgraf v. USI Film Products, 511 U.S. 244, 128 L. Ed. 2d 229, 114 S. Ct. 1483 (1994)*. First, if the statute explicitly states that it will be applied retroactively, a court must apply it

retroactively. *Id. at 280*. Second, if the statute is silent on retroactive application, a court must determine whether the statute would "impair rights a party possessed [*10] when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Id. The Supreme Court considers a statute to have "retroactive effect" if it has any of these three effects. Id. If a court determines that a statute has "retroactive effect," the court must not apply it retroactively, unless the legislative history reveals a "clear congressional intent favoring such a result." Id.

The Court first considers whether the Sarbanes-Oxley amendments to the Securities Exchange Act's limitations periods explicitly state that the new periods shall apply retroactively. They do not. The amendments provide, in relevant part, that the new limitations periods

shall apply to all proceedings addressed by this section that are commenced on or after the date of enactment of this Act . . . . [and] nothing in this section shall create a new, private right of action.

*28 U.S.C. 1658(b)*. This language is susceptible to an interpretation that it explicitly *precludes* retroactive application of the new limitations periods, because such retroactive application could "create . . . new, private [*11] right[s] of action" by reviving stale claims; it certainly does not explicitly call for retroactive application of the new limitations periods. See *In Re Enterprise Mortgage Acceptance Co., LLC, Securities Litigation, 295 F. Supp.2d 307, 313 (S.D.N.Y. 2003)*.

The Court next considers whether application of the new limitations period would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf, 511 U.S. at 280*. One purpose of statutes of limitations is to allow parties to know, with certainty, at what point their past actions can no longer give rise to liability. The application of a new limitations period to revive a stale claim "increase[s] a party's liability for past conduct," because it revives a party's potential liability for acts that, before passage of the new limitations period, could no longer have resulted in liability. Because retroactive application of the new Sarbanes-Oxley limitations period would renew securities fraud claims that had expired, and therefore would increase defendants' liability for conduct based [*12] on those claims, the Court holds that such retroactive application would have an "impermissible retroactive effect." Id.

2004 U.S. Dist. LEXIS 27334, *

Because the statute does not explicitly provide for retroactive application, and because it has a "retroactive effect," the Court moves to the third step of the analysis: is there "clear congressional intent" that rebuts the traditional presumption against retroactivity? *Landgraf, 511 U.S. at 280*. As is often the case, the legislative history is far from clear. There are comments in the record that could suggest that Congress intended the new limitations periods to apply to every new claim, but there are others that suggest that it would not revive already-barred claims. See *Enterprise Mortgage, 295 F. Supp. 2d at 316* (reviewing inconclusive nature of legislative history of Sarbanes-Oxley extension of limitations periods). The Court concludes that there is no clear congressional intent rebutting the traditional presumption against retroactivity.

Many courts have considered whether a statute lengthening a limitations period should revive claims that had already expired, and have concluded that it should not, barring explicit [*13] legislative instructions to the contrary. See, e.g., *Million v. Frank, 47 F.3d 385, 390 (10th Cir. 1995)* ("Applying the new time limit would alter the substantive rights of both the plaintiff and the defendant"); *Chenault v. United States Postal Serv., 37 F.3d 535 (9th Cir. 1994)*; *Ks. Pub. Employees Ret. Sys. v. Reimer & Kroger Assocs., Inc., 61 F.3d 608, 615 (8th Cir. 1995)*; *United States ex rel. Thistlethwaite v. Polymer, 6 F. Supp. 2d 263, 265 (S.D.N.Y. 1998)*.

Most courts that have addressed the specific question of whether the Sarbanes/Oxley limitations periods extension should revive stale securities claims have also concluded that it should not. See *Enterprise Mortgage, 295 F. Supp. 2d at 316*; *Glaser v. Enzo Biochem, Inc., 303 F. Supp. 2d 724, 2003 WL 21960613 at *5 (E.D. Va. July 16, 2003)*; In Re *Heritage Bond*

*Litig., 289 F. Supp. 2d 1132, 1148 (C.D. Cal. 2003)*; but see *Roberts v. Dean Witter Reynolds, Inc., 2003 U.S. Dist. LEXIS 5676, 2003 WL 1936116 at *3 (M.D. Fla. March 14, 2003)* (concluding that text of statute and legislative history calls for retroactive application of new limitations [*14] periods).

The Court concludes that the Sarbanes-Oxley amendments that expanded the limitations periods should not be applied retroactively to Securities Exchange Act claims that were stale when Sarbanes-Oxley became law. The Court therefore holds that plaintiff's securities fraud claims are time-barred, and dismisses those claims.

III. The Court Declines to Exercise Supplemental Jurisdiction On Plaintiff's Remaining State Law Claims

Having dismissed plaintiff's federal claims, the Court declines to exercise jurisdiction over plaintiff's remaining state law claims. See *28 U.S.C. § 1367(c)(3)*; *Pitchell v. Callan, 13 F.3d 545, 549 (2d Cir. 1994)*.

Conclusion

For the reasons stated above, the Court holds that plaintiff's action is time-barred, and grants defendants' motion to dismiss [11-1 & 14-1]. The clerk of court is directed to close this case. Any pending motions are moot.

SO ORDERED.

Dated: New York, New York

March 24, 2004

Kimba M. Wood

United States District Judge

# TAB B

LEXSEE 2005 US LEXIS 3478

**DURA PHARMACEUTICALS, INC., ET AL., PETITIONERS v. MICHAEL
BROUDO ET AL.**

**No. 03-932**

**SUPREME COURT OF THE UNITED STATES**

*125 S. Ct. 1627; 2005 U.S. LEXIS 3478*

**January 12, 2005, Argued
April 19, 2005, Decided**

**NOTICE:** [*1] The LEXIS pagination of this document is subject to change pending release of the final published version.

**PRIOR HISTORY:** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT. *Broudo v. Dura Pharms., Inc., 339 F.3d 933, 2003 U.S. App. LEXIS 15621 (9th Cir. Cal., 2003)*

**DISPOSITION:** Reversed and remanded.

**LexisNexis(R) Headnotes**

**SYLLABUS:** Respondents filed a securities fraud class action, alleging that petitioners, Dura Pharmaceuticals, Inc., and some of its managers and directors (hereinafter Dura), made, *inter alia,* misrepresentations about future Food and Drug Administration approval of a new asthmatic spray device, leading respondents to purchase Dura securities at an artificially inflated price. In dismissing, the District Court found that the complaint failed adequately to allege "loss causation" -- *i.e.,* a causal connection between the spray device misrepresentation and the economic loss, *15 U.S.C. § 78u-4(b)(4).* The [*2] Ninth Circuit reversed, finding that a plaintiff can satisfy the loss causation requirement simply by alleging that a security's price at the time of purchase was inflated because of the misrepresentation.

*Held:*

1. An inflated purchase price will not by itself constitute or proximately cause the relevant economic loss needed

to allege and prove "loss causation." The basic elements of a private securities fraud action -- which resembles a common-law tort action for deceit and misrepresentation -- include, as relevant here, economic loss and "loss causation." The Ninth Circuit erred in following an inflated purchase price approach to showing causation and loss. First, as a matter of pure logic, the moment the transaction takes place, the plaintiff has suffered no loss because the inflated purchase price is offset by ownership of a share that possesses equivalent value at that instant. And the logical link between the inflated purchase price and any later economic loss is not invariably strong, since other factors may affect the price. Thus, the most logic alone permits this Court to say is that the inflated purchase price suggests that misrepresentation "touches upon" [*3] *a later economic loss, as the Ninth Circuit found. However, to touch upon a loss is not to cause* a loss, as *15 U.S.C. § 78u-4(b)(4)* requires. The Ninth Circuit's holding also is not supported by precedent. The common-law deceit and misrepresentation actions that private securities fraud actions resemble require a plaintiff to show not only that had he known the truth he would not have acted, but also that he suffered actual economic loss. Nor can the holding below be reconciled with the views of other Courts of Appeals, which have rejected the inflated purchase price approach to showing loss causation. Finally, the Ninth Circuit's approach is inconsistent with an important securities law objective. The securities laws make clear Congress' intent to permit private securities fraud actions only where plaintiffs adequately allege and prove the traditional elements of cause and loss, but the Ninth Circuit's approach would allow recovery where a misrepresentation leads to an inflated purchase price, but does not proximately cause any economic loss. Pp. 3-9.

2. Respondents' complaint was legally insufficient in respect to its allegation of "loss causation. [*4] " While *Federal Rule of Civil Procedure Rule 8(a)(2)* requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," and while the Court assumes that neither the Rules nor the securities statutes place any further requirement in respect to the pleading, the "short and plain statement" must give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests," *Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99*. The complaint here contains only respondents' allegation that their loss consisted of artificially inflated purchase prices. However, as this Court has concluded here, such a price is not itself a relevant economic loss. And the complaint nowhere else provides Dura with notice of what the relevant loss might be or of what the causal connection might be between that loss and the misrepresentation. Ordinary pleading rules are not meant to impose a great burden on a plaintiff, but it should not prove burdensome for a plaintiff suffering economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. Allowing a plaintiff to forgo giving any indication [*5] of the economic loss and proximate cause would bring about the very sort of harm the securities statutes seek to avoid, namely the abusive practice of filing lawsuits with only a faint hope that discovery might lead to some plausible cause of action. Pp. 9-11.

*339 F.3d 933*, reversed and remanded.

**JUDGES:** BREYER, J., delivered the opinion for a unanimous Court.

**OPINIONBY:** BREYER

**OPINION:**

JUSTICE BREYER delivered the opinion of the Court.

A private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss. 109 Stat. 747, *15 U.S.C. § 78u-4(b)(4)*. We consider a Ninth Circuit holding that a plaintiff can satisfy this requirement -- a requirement that courts call "loss causation" -- simply by alleging in the complaint and subsequently establishing that "the price" of the security "*on the date of purchase* was inflated because of the misrepresentation." *339 F.3d 933, 938 (2003)* (internal quotation marks omitted). In our view, the Ninth Circuit is wrong, both in respect to what a plaintiff must prove and in respect to what the plaintiffs' complaint here must allege.

I

Respondents are individuals who bought [*6] stock in Dura Pharmaceuticals, Inc., on the public securities market between April 15, 1997, and February 24, 1998. They have brought this securities fraud class action against Dura and some of its managers and directors (hereinafter Dura) in federal court. In respect to the question before us, their detailed amended (181 paragraph) complaint makes substantially the following allegations:

(1)

Before and during the purchase period, Dura (or its officials) made false statements concerning both Dura's drug profits and future Food and Drug Administration (FDA) approval of a new asthmatic spray device. See, *e.g.*, App. 45a, 55a, 89a.

(2)

In respect to drug profits, Dura falsely claimed that it expected that its drug sales would prove profitable. See, *e.g., id.*, at 66a-69a.

(3)

In respect to the asthmatic spray device, Dura falsely claimed that it expected the FDA would soon grant its approval. See, *e.g., id.*, at 89a-90a, 103a-104a.

(4)

On the last day of the purchase period, February 24, 1998, Dura announced that its earnings would be lower than expected, principally due to slow drug sales. *Id.*, at 51a.

(5)

The next day Dura's shares lost almost half their value [*7] (falling from about $ 39 per share to about $ 21). *Ibid.*

(6)

About eight months later (in November 1998), Dura announced that the FDA would not approve Dura's new asthmatic spray device. *Id.*, at 110a.

(7)

The next day Dura's share price temporarily fell but almost fully recovered within one week. *Id.*, at 156a.

Most importantly, the complaint says the following (and nothing significantly more than the following) about economic losses attributable to the spray device misstatement: *"In reliance on the integrity of the market, [the plaintiffs] . . . paid artificially inflated prices for Dura securities"* and the plaintiffs suffered *"damages" thereby. Id.*, at 139a (emphasis added).

The District Court dismissed the complaint. In respect to the plaintiffs' drug-profitability claim, it held that the complaint failed adequately to allege an appropriate state of mind, *i.e.*, that defendants had acted knowingly, or the like. In respect to the plaintiffs' spray device claim, it held that the complaint failed adequately to allege "loss causation."

The Court of Appeals for the Ninth Circuit reversed. In the portion of the court's decision now before us -- the portion [*8] that concerns the spray device claim -- the Circuit held that the complaint adequately alleged "loss causation." The Circuit wrote that "plaintiffs establish loss causation if they have shown that the price *on the date of purchase* was inflated because of the misrepresentation." *339 F.3d at 938* (emphasis in original; internal quotation marks omitted). It added that "the injury occurs at the time of the transaction." *Ibid.* Since the complaint pleaded "that the price at the time of purchase was overstated," and it sufficiently identified the cause, its allegations were legally sufficient. *Ibid.*

Because the Ninth Circuit's views about loss causation differ from those of other Circuits that have considered this issue, we granted Dura's petition for certiorari. Compare *ibid.* with, *e.g.*, *Emergent Capital Investment Management, LLC v. Stonepath Group, Inc., 343 F.3d 189, 198 (CA2 2003)*; *Semerenko v. Cendant Corp., 223 F.3d 165, 185 (CA3 2000)*; *Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1447-1448 (CA11 1997)*; cf. *Bastian v. Petren Resources Corp., 892 F.2d 680, 683 (CA7 1990)*. [*9] We now reverse.

## II

Private federal securities fraud actions are based upon federal securities statutes and their implementing regulations. *Section 10(b) of the Securities Exchange Act of 1934* forbids (1) the "use or employment . . . of any . . . deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations." *15 U.S.C. § 78j(b)*. Commission *Rule 10b-5* forbids, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." *17 CFR § 240.10b-5 (2004)*.

The courts have implied from these statutes and Rule a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation. See, *e.g.*, *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730, 744, 44 L. Ed. 2d 539, 95 S. Ct. 1917 (1975)*; *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 196, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976)*. And Congress has imposed statutory requirements on that private action. *E.g.*, *15 U.S.C. § 78u-4(b)(4)*. [*10]

In cases involving publicly traded securities and purchases or sales in public securities markets, the action's basic elements include:

(1)

*a material misrepresentation (or omission)*, see *Basic Inc. v. Levinson, 485 U.S. 224, 231-232, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)*;

(2)

*scienter*, *i.e.*, a wrongful state of mind, see *Ernst & Ernst, supra, at 197, 199, 47 L. Ed. 2d 668, 96 S. Ct. 1375*;

(3)

*a connection with the purchase or sale of a security*, see *Blue Chip Stamps, supra, at 730-731, 44 L. Ed. 2d 539, 95 S. Ct. 1917*;

(4)

*reliance*, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation," see *Basic, supra, at 248-249, 99 L. Ed. 2d 194, 108 S. Ct. 978* (nonconclusively presuming that the price of a publicly traded share reflects a material misrepresentation and that plaintiffs have relied upon that misrepresentation as long as they would not have bought the share in its absence);

(5)

*economic loss, 15 U.S.C. § 78u-4(b)(4)*; and

(6)

"*loss causation*," *i.e.*, a causal connection between the material misrepresentation and the loss, *ibid.*; cf. T. Hazen, Law of Securities Regulation, § § 12.11[1], [3] (5th ed. 2002). [*11]

Dura argues that the complaint's allegations are inadequate in respect to these last two elements.

### A

We begin with the Ninth Circuit's basic reason for finding the complaint adequate, namely, that at the end of the day plaintiffs need only "establish," *i.e.*, prove, that "the price *on the date of purchase* was inflated because of the misrepresentation." *339 F.3d at 938* (internal quotation marks omitted). In our view, this statement of the law is wrong. Normally, in cases such as this one (*i.e.*, fraud-on-the-market cases), an inflated purchase price will not itself constitute or proximately cause the relevant economic loss.

For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset

by ownership of a share that *at that instant* possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation [*12] will not have led to any loss. If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. (The same is true in respect to a claim that a share's higher price is lower than it would otherwise have been -- a claim we do not consider here.) Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.*, the more likely that other factors caused the loss.

Given the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will *sometimes* play a role in bringing about a future loss. It may prove to be a necessary condition of any such loss, and in that sense one might say that the inflated purchase price [*13]  suggests that the misrepresentation (using language the Ninth Circuit used) "touches upon" a later economic loss. *Ibid.* But, even if that is so, it is insufficient. To "touch upon" a loss is not to *cause* a loss, and it is the latter that the law requires. *15 U.S.C. § 78u-4(b)(4)*.

For another thing, the Ninth Circuit's holding lacks support in precedent. Judicially implied private securities-fraud actions resemble in many (but not all) respects common-law deceit and misrepresentation actions. See *Blue Chip Stamps, supra, at 744, 44 L. Ed. 2d 539, 95 S. Ct. 1917*; see also L. Loss & J. Seligman, Fundamentals of Securities Regulation, 910-918 (5th ed. 2004) (describing relationship to common-law deceit). The common law of deceit subjects a person who "fraudulently" makes a "misrepresentation" to liability "for pecuniary loss caused" to one who justifiably relies upon that misrepresentation. *Restatement (Second) of Torts § 525*, p. 55 (1977) (hereinafter Restatement of Torts); see also *Southern Development Co. v. Silva, 125 U.S. 247, 250, 31 L. Ed. 678, 8 S. Ct. 881 (1888)* (setting forth elements of fraudulent misrepresentation). And the common law has long insisted that a plaintiff [*14] in such a case show not only that had he known the truth he would not have acted but also that he suffered actual economic loss. See, *e.g., Pasley v. Freeman, 3 T. R. 5:1,*

*100 Eng. Rep. 450, 457 (1789)* (if "no injury is occasioned by the lie, it is not actionable: but if it be attended with a damage, it then becomes the subject of an action"); *Freeman v. Venner, 120 Mass. 424, 426 (1876)* (a mortgagee cannot bring a tort action for damages stemming from a fraudulent note that a misrepresentation led him to execute unless and until the note has to be paid); see also M. Bigelow, Law of Torts 101 (8th ed. 1907) (damage "must already have been suffered before the bringing of the suit"); 2 T. Cooley, Law of Torts § 348, p. 551 (4th ed. 1932) (plaintiff must show that he "suffered damage" and that the "damage followed proximately the deception"); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 110, p. 765 (5th ed. 1984) (hereinafter Prosser and Keeton) (plaintiff "must have suffered substantial damage," not simply nominal damages, before "the cause of action can arise").

Given the common-law roots of the securities [*15] fraud action (and the common-law requirement that a plaintiff show actual damages), it is not surprising that other courts of appeals have rejected the Ninth Circuit's "inflated purchase price" approach to proving causation and loss. See, *e.g., Emergent Capital, 343 F.3d at 198* (inflation of purchase price alone cannot satisfy loss causation); *Semerenko, 223 F.3d at 185* (same); *Robbins, 116 F.3d at 1448* (same); cf. *Bastian, 892 F.2d at 685.* Indeed, the Restatement of Torts, in setting forth the judicial consensus, says that a person who "misrepresents the financial condition of a corporation in order to sell its stock" becomes liable to a relying purchaser "for the loss" the purchaser sustains "when the facts . . . become generally known" and "as a result" share value "depreciates." *§ 548A, Comment b,* at 107. Treatise writers, too, have emphasized the need to prove proximate causation. Prosser and Keeton § 110, at 767 (losses do "not afford any basis for recovery" if "brought about by business conditions or other factors").

We cannot reconcile the Ninth Circuit's "inflated purchase price" approach with these [*16]  views of other courts. And the uniqueness of its perspective argues against the validity of its approach in a case like this one where we consider the contours of a judicially implied cause of action with roots in the common law.

Finally, the Ninth Circuit's approach overlooks an important securities law objective. The securities statutes seek to maintain public confidence in the marketplace. See *United States v. O'Hagan, 521 U.S. 642, 658, 138 L. Ed. 2d 724, 117 S. Ct. 2199 (1997)*. They do so by deterring fraud, in part, through the availability of private securities fraud actions. *Randall v. Loftsgaarden, 478 U.S. 647, 664, 92 L. Ed. 2d 525, 106 S. Ct. 3143 (1986)*. But the statutes make these latter actions available, not to provide investors with broad insurance against market

losses, but to protect them against those economic losses that misrepresentations actually cause. Cf. *Basic, 485 U.S., at 252, 99 L. Ed. 2d 194, 108 S. Ct. 978* (White, J., joined by O'CONNOR, J., concurring in part and dissenting in part) ("Allowing recovery in the face of affirmative evidence of nonreliance -- would effectively convert *Rule 10b-5* into a scheme of investor's insurance. There is no support in the Securities Exchange Act, the Rule, or [*17] our cases for such a result" (internal quotation marks and citations omitted)).

The statutory provision at issue here and the paragraphs that precede it emphasize this last mentioned objective. Private Securities Litigation Reform Act of 1995, 109 Stat. 737. The statute insists that securities fraud complaints "specify" each misleading statement; that they set forth the facts "on which [a] belief" that a statement is misleading was "formed"; and that they "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § § 78u-4(b)(1), (2).* And the statute expressly imposes on plaintiffs "the burden of proving" that the defendant's misrepresentations "caused the loss for which the plaintiff seeks to recover." *§ 78u-4(b)(4).*

The statute thereby makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss. By way of contrast, the Ninth Circuit's approach would allow recovery where a misrepresentation leads to an inflated purchase price but nonetheless does [*18] not proximately cause any economic loss. That is to say, it would permit recovery where these two traditional elements in fact are missing.

In sum, we find the Ninth Circuit's approach inconsistent with the law's requirement that a plaintiff prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss. We need not, and do not, consider other proximate cause or loss-related questions.

B

Our holding about plaintiffs' need to *prove* proximate causation and economic loss leads us also to conclude that the plaintiffs' complaint here failed adequately to *allege* these requirements. We concede that the Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. Rule Civ. Proc. 8(a)(2).* And we assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss. But, even so, the "short and plain statement" must provide the defendant with "fair notice of what the plaintiff's claim is and the

grounds upon which it rests. [*19] " *Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).* The complaint before us fails this simple test.

As we have pointed out, the plaintiffs' lengthy complaint contains only one statement that we can fairly read as describing the loss caused by the defendants'"spray device" misrepresentations. That statement says that the plaintiffs "paid artificially inflated prices for Dura's securities" and suffered "damages." App. 139a. The statement implies that the plaintiffs' loss consisted of the "artificially inflated" purchase "prices." The complaint's failure to claim that Dura's share price fell significantly after the truth became known suggests that the plaintiffs considered the allegation of purchase price inflation alone sufficient. The complaint contains nothing that suggests otherwise.

For reasons set forth in Part II-A, *supra,* however, the "artificially inflated purchase price" is not itself a relevant economic loss. And the complaint nowhere else provides the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation concerning Dura's "spray device."

We concede that ordinary [*20] pleading rules are not meant to impose a great burden upon a plaintiff. *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 513-515, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002).* But it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid. Cf. H. R. Conf. Rep. No. 104-369, p. 31 (1995) (criticizing "abusive" practices including "the routine filing of lawsuits . . . with only a faint hope that the discovery process might lead eventually to some plausible cause of action"). It would permit a plaintiff "with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence." *Blue Chip Stamps, 421 U.S., at 741, 44 L. Ed. 2d 539, 95 S. Ct. 1917.* Such a rule would tend to transform a [*21] private securities action into a partial downside insurance policy. See H. R. Conf. Rep. No. 104-369, at 31; see also *Basic, 485 U.S., at 252, 99 L. Ed. 2d 194, 108 S. Ct. 978* (White, J., joined by O'CONNOR, J., concurring in part and dissenting in part).

For these reasons, we find the plaintiffs' complaint legally insufficient. We reverse the judgment of the

125 S. Ct. 1627; 2005 U.S. LEXIS 3478, *

Ninth Circuit, and we remand the case for further proceedings consistent with this opinion.

It is so ordered.

# TAB C

LEXSEE 2003 US DIST LEXIS 11409

**HASKO FROESE, individually and on behalf of all other similarly situated,
Plaintiff, - against - MARTY STAFF, VINCENT OTTOMANELLI and HUGO
BOSS AG, Defendants.**

**02 CV 5744 (RO)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2003 U.S. Dist. LEXIS 11409; Fed. Sec. L. Rep. (CCH) P92,507*

**July 3, 2003, Decided
July 7, 2003, Filed**

**SUBSEQUENT HISTORY:** Request denied by *Froese v. Staff, 2004 U.S. Dist. LEXIS 20549* (S.D.N.Y., Oct. 13, 2004)

**DISPOSITION:** [*1] Defendant's motion to dismiss for lack of jurisdiction granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Hasko Froese Lead, J Tomfoni Lead, E Bogdan Lead, G Muggenburg Lead, E Schmid Lead, V Wenzel Lead, Hasko Froese, PLAINTIFFS: Ralph M Stone, Shalov, Stone & Bonner, New York, NY USA.

For Marty Staff, DEFENDANT: Walter H Hinton, II, Greenville, SC USA.

**JUDGES:** Richard Owen, United States District Judge.

**OPINIONBY:** Richard Owen

**OPINION:**

MEMORANDUM AND ORDER

OWEN, District Judge:

Lead plaintiff Froese is a citizen and resident of Germany who alleges injury as an owner of Hugo Boss AG ("HBAG") shares, which were purchased on German exchanges through German brokerage houses. While it appears that there are American investors in HBAG stock, none of these purported investors is a plaintiff in

this action. Defendant HBAG is a German corporation with its principal place of business in Germany. It has no office, employees, bank account, or property in the United States. HBAG's stock is issued in Germany and is traded on German stock exchanges. Hugo Boss US ("HBUS") is a wholly-owned subsidiary of Hugo Boss Int'l BV (a Netherlands corporation) which is a wholly-owned subsidiary of HBAG. It is a Delaware corporation with its principal place of business [*2] in New York City. Defendant Staff is the former President and CEO of HBUS and its subsidiaries. Defendant Ottomanelli is the former CFO of HBUS and its subsidiaries'. They have never held any position with or been compensated by HBAG.

Plaintiffs claim that HBAG -- the German parent -- misrepresented its financial results during the class period by a practice known as "channel stuffing" which occurred at HBUS. Channel stuffing is a practice by which revenues were overstated by including amounts for products that the company delivered to and endeavored to force their retail network to accept despite no demand, with perhaps secret assurances that the goods, if unsold, could be returned. The allegations in the complaint are essentially that HBAG prepared and issued, from Germany, press releases and an annual report, which were materially false or misleading because of the channel stuffing. For the following reasons I grant defendants' motion to dismiss for lack of jurisdiction.

"When, as here, a court is confronted with transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have

2003 U.S. Dist. LEXIS 11409, *; Fed. Sec. L. Rep. (CCH) P92,507

wished the precious resources of the United States courts [*3] ... to be devoted to them rather than leave the problem to foreign countries." *Bersch v. Drexel Firestone, Inc. 519 F.2d 974, 985 (2d Cir. 1975)*. To do so, courts apply two different tests: the conduct test and the effects test. Under the conduct test, subject matter jurisdiction exists in a securities claim asserted by aliens

> only where there has been in the United States: (1) conduct material to the completion of the fraud; (2) perpetration of the fraudulent acts themselves; or (3) the final steps in the fraudulent scheme.

Societe Nationale d'Exploitation Industrielle des Tabacs et*Allumettes v. Salomon Brothers Int'l Ltd., 928 F. Supp. 398, 403 (S.D.N.Y. 1996)*. Only (1) above applies here and the Societe Nationale case even excludes for jurisdictional purposes, such United States conduct if it is "relatively small in comparison to those abroad ...." Id. "In sum, to satisfy the conduct test; [plaintiff] must demonstrate that the defendants' United States-based activities directly caused its financial losses." Id.

The plaintiffs argue that this test has been met because the underlying accounting problems that lead HBAG [*4] to overstate its earnings occurred in the United States. I find, however, that the fraud itself occurred, if at all, when the allegedly fraudulent

statements were conceived, engineered, and published in Germany. It is these misstatements and not any activity which lead to the alleged misrepresentations which "directly caused" the financial losses.

Under the effects test, "a federal court has jurisdiction ... where illegal activity abroad causes a substantial effect within the United States." *Euro Trade & Forfaiting, Inc. v. Vowell, 2002 U.S. Dist. LEXIS 5385, 2002 WL 500672, at *6 (S.D.N.Y. 2002)*, citing *Alfadda v. Fenn, 935 F.2d 475, 478 (2d Cir. 1991)*. The plaintiffs here are all foreign, HBAG is a German corporation, and the stock was sold on a German exchange. While plaintiffs argue that there is a substantial effect on the United States because there were investors in the United States, any such investors made up an exceptionally small percentage of the total number of investors, the shares were likely purchased on a foreign exchange, and these investors are not plaintiffs in this case. I find that applying both the conduct and effects tests leads to the conclusion that [*5] subject matter jurisdiction does not exist and accordingly the motion to dismiss is granted.

So Ordered.

Dated: July 3, 2003

    Richard Owen

    United States District Judge

# TAB D

LEXSEE 1999 US DIST LEXIS 5439

**GLOBAL INTELLICOM, INC., Plaintiff, -v- THOMSON KERNAGHAN & CO.;
BRONIA GMBH; AUGUSTINE FUND, L.P.; SOVEREIGN PARTNERS, L.P.;
ATLANTIS-CAPITAL FUND, LTD.; MARK VALENTINE; STEPHEN HICKS;
JNC OPPORTUNITY FUND, LTD; ENCORE CAPITAL MANAGEMENT, L.L.C.;
NEIL T. CHAU; JAMES A. SKALKO; FREDERICK A. LENZ; SPRATT FAMILY
TRUST; JAMES W. SPRATT, III; and SUSAN M. SPRATT, Defendants.**

**99 CIV. 342 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*1999 U.S. Dist. LEXIS 5439*

**April 15, 1999, Decided
April 16, 1999, Filed**

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For GLOBAL INTELLICOM, INC.,
plaintiff: Jonathan Rosenberg, O'Sullivan, Graev &
Karabell, L.L.P., New York, NY.

For BRONIA GMBH, defendant: Lyndon Mitchell
Tretter, Davis, Weber & Edwards, P.C., New York, NY.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINIONBY:** DENISE COTE

**OPINION:**

    MEMORANDUM OPINION AND ORDER

DENISE COTE, District Judge:

    Plaintiff Global Intellicom, Inc. ("Global") filed this
action on January 18, 1999, and an amended complaint
on February 9, 1999. Plaintiff alleges that defendants
violated the federal securities laws and state common
law by engaging in a scheme to drive down the price of
Global common stock through short selling. On February
19, 1999, discovery was stayed in this action pursuant to
*15 U.S.C. § 78u-4*(b)(3)(B), since defendants indicated
that they would be filing a motion to dismiss. The parties
are currently in the process of briefing that motion.

    On March 25, 1999, counsel for Global requested
the Court to lift the stay in order to permit the plaintiff to
conduct limited discovery. According to Global's letter,
three of the defendants, Sovereign Partners, L.P.
("Sovereign"), Atlantis Capital Fund Limited
("Atlantis"), and Thomson Kernaghan [*2] & Co., Ltd.
("Thomson") (collectively the "Thomson Defendants"),
have taken the following actions: (1) submitted notices to
Global to convert the preferred stock that is the subject
of this lawsuit; (2) demanded, pursuant to Nevada law
and the federal proxy regulations, that they be permitted
to inspect Global's shareholder lists, books and records
and to conduct an audit of Global; (3) filed a Schedule
13D, which states they intend to file a proxy statement
soliciting proxies to elect a new slate of directors; and (4)
disclosed that they have filed a lawsuit in Nevada state
court seeking a declaration that they are the record and
beneficial owners of the Global common stock reflected
in their conversion notices and demanding that Global
hold an annual shareholders meeting. n1

    n1 Global alleges that Sovereign and Atlantis
    are taking these actions directly and that
    Thomson is acting through two affiliates,
    Canadian Advantage Limited Partnership and
    Dominion Capital Fund Limited.

1999 U.S. Dist. LEXIS 5439, *

Section 21D(b)(3)(B) of the Securities [*3] Exchange Act of 1934, added as part of the Private Securities Litigation Reform Act of 1995, reads in pertinent part that

> In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

*15 U.S.C. § 78u-4*(b)(3)(B). The Thomson Defendants do not deny Global's general factual allegations but rather argue that plaintiff has failed to state what "particularized discovery" is required or what "undue prejudice" would be prevented by that discovery, as required by the statute. In addition, the Thomson Defendants indicate that the Nevada petitioners have agreed to withdraw their demands for financial records and an audit.

In a subsequent letter, Global seeks the following discovery: (1) compliance by third-party market makers with subpoenas requiring identification of trading records and customer identities with respect to the Thomson Defendants' trades, (2) from the Thomson Defendants, trading in Global common stock, or derivatives [*4] thereof, by Thomson Defendants or their affiliated entities, (3) from the Thomson Defendants, relationships and affiliations among the Thomson Defendants, Canadian Advantage Limited Partnerships ("Canadian") and any other Global shareholders or entities that have traded in Global common stock, and (4) also from the Thomson Defendants, communications, agreements or understandings among the Thomson Defendants, their affiliates, and any other Global shareholders. With respect to prejudice, Global asserts that the Thomson Defendants' success in the other forums would be detrimental to both Global and its shareholders, who have already suffered substantial losses from the Thomson Defendants' allegedly improper actions. Success in those other forums would also moot Global's ability to seek redress for those wrongs in this suit.

The Court agrees that Global has made a showing of undue prejudice to justify taking particularized discovery. Global has initiated this lawsuit against defendants who it alleges engaged in an improper short-selling scheme. Some of those defendants, based on holdings acquired in connection with that alleged scheme, are now seeking to take over the company in other [*5] forums, raising the possibility that success in those forums will prevent Global from seeking redress in this Court. Finding this to be sufficient prejudice, the Court will permit limited discovery. Nonetheless, the Court regards plaintiff's fourth request, dealing with communications, to be information that is more appropriately reserved for any discovery period to follow this Court's ruling on the motion to dismiss. As a result, Global may only proceed with the discovery outlined above as constituting the first three requests.

SO ORDERED:

Dated: New York, New York

April 15, 1999

DENISE COTE

United States District Judge