# TAB E

# (part 1 of 2)

1 of 1 DOCUMENT

**IN RE: INITIAL PUBLIC OFFERING SECURITIES LITIGATION. This Document Relates to: IN RE CORVIS CORP. INITIAL PUBLIC OFFERING SECURITIES LITIGATION; IN RE ENGAGE TECHNOLOGIES, INC. INITIAL PUBLIC OFFERING SECURITIES LITIGATION; IN RE FIREPOND, INC. INITIAL PUBLIC OFFERING SECURITIES LITIGATION; IN RE iXL ENTERPRISES, INC. INITIAL PUBLIC OFFERING SECURITIES LITIGATION; IN RE SYCAMORE NETWORKS, INC. INITIAL PUBLIC OFFERING SECURITIES LITIGATION; IN RE VA LINUX CORP., formerly known as VA LINUX SYSTEMS, INC. INITIAL PUBLIC OFFERING SECURITIES LITIGATION**

**21 MC 92 (SAS), 01 Civ. 3857 (SAS), 01 Civ. 8404 (SAS), 01 Civ. 7048 (SAS), 01 Civ. 9417 (SAS), 01 Civ. 6001 (SAS), 01 Civ. 0242 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 20497; Fed. Sec. L. Rep. (CCH) P93,014*

**October 13, 2004, Decided
October 13, 2004, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part *In re Initial Pub. Offering Secs. Litig., 2004 U.S. Dist. LEXIS 20552 (S.D.N.Y., Oct. 15, 2004)*

**PRIOR HISTORY:** *In re Initial Pub. Offering Secs. Litig., 224 F.R.D. 550, 2004 U.S. Dist. LEXIS 16879 (S.D.N.Y., Aug. 23, 2004)*

**DISPOSITION:** [*1] Plaintiffs' motion for class certification granted in part and denied in part for each of six focus cases.

**LexisNexis(R) Headnotes**

**COUNSEL:** Liaison Counsel for Plaintiffs: Melvyn I. Weiss, Esq., Robert A. Wallner, Esq., David A.P. Brower, Esq., Ariana J. Tadler, Esq., MILBERG WEISS BERSHAD & SCHULMAN LLP, New York, NY. Stanley Bernstein, Esq., Rebecca M. Katz, Esq., BERNSTEIN LIEBHARD & LIFSHITZ, LLP, New York, NY.

Liaison Counsel for Defendants (Underwriters): Gandolfo V. DiBlasi, Esq., Penny Shane, Esq., SULLIVAN & CROMWELL, New York, NY.

Liaison Counsel for Defendants (Issuers): Jack C. Auspitz, Esq., MORRISON & FOERSTER LLP, New York, NY.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINIONBY:** Shira A. Scheindlin

**OPINION:**

**OPINION AND ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I. INTRODUCTION**

Between January 11 and December 6, 2001, thousands of investors filed class action lawsuits, alleging that 55 underwriters, 310 issuers and hundreds of individuals associated with those issuers had engaged in a sophisticated scheme to defraud the investing public. In brief, the scheme consisted of a requirement, imposed

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 3 of 32

Page 2

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

by the underwriters, that IPO allocants purchase shares in the aftermarket, often at [*2] escalating prices, and pay undisclosed compensation. In addition, the underwriters prepared analyst reports that contained inaccurate information and recommendations because the analysts operated under a conflict of interest. As a result of the scheme, plaintiffs allege that they collectively lost billions of dollars. These actions were consolidated before this Court for pre-trial supervision. At the suggestion of the Court, the parties selected six cases to be used as test cases for determining whether these suits can proceed as class actions. Upon plaintiffs' motion, I now address whether these test cases can be certified as class actions.

Defendants have submitted thousands of pages of briefs, affidavits, exhibits and reports in opposition to the motion. Although they raise every conceivable argument, their major contention is that individual issues predominate over common issues with respect to almost every aspect of proof. In particular, defendants note that each plaintiff differs with respect to her knowledge of the alleged scheme when she invested (e.g., whether she was an allocant or an aftermarket purchaser or both and whether and to what extent she was exposed to press [*3] reports and other public disclosures); the nature of her investment (e.g., whether she was a long term investor, a short seller, a day trader, or a momentum trader); the timing of her investment (e.g., the purchase price of the stock and the effect of any artificial inflation at the time of purchase); the amount of her damages (e.g., the subsequent dissipation of any artificial inflation by the time of sale); and the traceability of her shares to a particular offering and registration statement. Because of these differences, defendants argue, common issues cannot predominate, and class certification must be denied. Defendants also contend that it would be impossible to ascertain which investors should be in the class and which must be excluded.

In their zeal to defeat the motion for class certification, defendants have launched such a broad attack that accepting their arguments would sound the death knell of securities class actions. Yet class-wide adjudication under *Rule 23 of the Federal Rules of Civil Procedure* is particularly well-suited to securities fraud cases. n1 In opposing certification, defendants do not truly seek separate adjudications of each individual claim. [*4] In reality, they seek *no* adjudication because the prospect of 310 million individual lawsuits (based on a hypothetical average class membership of one million investors), represents an impossible burden for all parties -- the individual plaintiffs, the defendants and the courts. n2 Thus, if certification is denied, defendants will have essentially defeated the claims without ever having been compelled to defend the suits on the merits. Of course, if

plaintiffs fail to satisfy the stringent requirements of *Rule 23*, then a class cannot be certified, even if that results in plaintiffs' inability to press their claims. n3

n1 *See Fed. R. Civ. P. 23(b)(3)* Advisory Committee Note (acknowledging that class action is an appealing tool for adjudicating cases of "fraud perpetrated on numerous persons by the use of similar misrepresentations").

n2 *See In re Worldcom, Inc. Sec. Litig., 219 F.R.D. 267, 304 (S.D.N.Y. 2003)* ("Few individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail."). [*5]

n3 *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig. ("MTBE"), 209 F.R.D. 323, 353 (S.D.N.Y. 2002)* (denying class certification).

"The class action device was designed to promote judicial efficiency and to provide aggrieved persons a remedy when individual litigation is economically unrealistic, as well as to protect the interests of absentee class members." n4 This underlying purpose of *Rule 23* provides much-needed guidance in focusing on the real issues. While highly competent counsel, with unlimited resources, have the capability to advance an almost unlimited array of complex arguments against certification, the Court must not lose sight of the ultimate question: whether class adjudication of the issues raised in these complaints is clearly superior to any other form of dispute resolution. Although defendants' arguments have raised a number of thorny problems, forcing this Court to take a hard look at the pleadings and the many submissions made in support of and in opposition to this motion, the balance tips strongly in favor of certification. Trying these cases will [*6] be an arduous task, but that is no reason to close the courthouse door to the alleged victims of a sophisticated and widespread fraudulent scheme. Accordingly, for the reasons set forth below, class certification, to the extent noted, is granted in each of the six focus cases.

n4 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.03 (3d ed. 2004).

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

## II. FACTS

### A. The Alleged Scheme

Plaintiffs seek recovery for securities fraud pursuant to the *Securities Act of 1933* (the "Securities Act") and the *Securities Exchange Act of 1934* (the "Exchange Act"). Plaintiffs allege that defendants engaged in a comprehensive scheme to defraud investors by artificially inflating the prices of the issuers' stocks. The alleged scheme is described at length in my February 19, 2003 Opinion denying defendants' motion to dismiss. n5 Familiarity with that Opinion is assumed.

> n5 *See In re Initial Pub. Offering Sec. Litig.* ("In re IPO"), 241 F. Supp. 2d 281 (S.D.N.Y. 2003).

[*7]

### B. The Focus Cases

These proceedings sweep together for pre-trial management 310 consolidated class actions, each with a distinct group of defendants (many of whom are overlapping) but alleging the same scheme to defraud investors. Because the question of whether a class can be certified under the rigorous standard set forth by *Rule 23* is common to *all* of these consolidated actions, judicial efficiency counsels in favor of a test case approach. Accordingly, the parties have presented for the Court's consideration six cases, involving the following issuers: Corvis Corp. ("Corvis"); Engage Technologies, Inc. ("Engage"); Firepond, Inc. ("Firepond"); iXL Enterprises, Inc. ("iXL"); Sycamore Networks, Inc. ("Sycamore"); and VA Software Corp, formerly known as VA Linux Systems, Inc. ("VA Linux") (collectively, the "focus cases"). n6

> n6 Plaintiffs selected Corvis, Engage, Firepond, Sycamore and VA Linux. *See* 10/14/03 Letter to the Court from Melvyn I. Weiss, liaison counsel for plaintiffs. Defendants selected iXL. *See* 11/26/03 Letter to Weiss from Mark Holland, counsel for defendant Merrill Lynch.

[*8]

The parties have agreed that "the rulings on the class certification motions in the selected cases will govern those cases only." n7 However, most of the issues this Opinion addresses would undoubtedly be raised in a motion for class certification with respect to the remaining 304 consolidated actions. This Opinion is intended to provide strong guidance, if not dispositive

effect, to all parties when considering class certification in the remaining actions. n8

> n7 7/11/03 Case Management Term Sheet, Part II.D.

> n8 *See* Transcript of 6/17/04 Hearing at 3:1-6 ("THE COURT: Once there is a decision on these motions, . . . we can talk about what common issues . . . would only reappear in every other class certification motion, and what unique issues there may be in the remaining action.").

### C. The Parties' Submissions

On September 2, 2003, plaintiffs moved for class certification and submitted Plaintiffs' Memorandum of Law in Support of Their Omnibus Motion for Class Certification ("Plaintiffs' Omnibus [*9] Mem."). Defendants responded with six opposition briefs: the Underwriter Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification in Corvis ("Corvis Mem."); the Memorandum in Opposition to Omnibus Motion for Class Certification, and to Certification of the Proposed Class in Engage Technologies, Inc. ("Engage Mem."); the Underwriter Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification in Firepond ("Firepond Mem."); the iXL Underwriter Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification ("iXL Mem."); the Underwriter Defendants' Opposition to Plaintiffs' Motion for Class Certification in Sycamore ("Sycamore Mem."); and Credit Suisse First Boston ("CSFB") LLC's Memorandum in Opposition to Plaintiffs' Motion for Class Certification in VA Linux ("VA Linux Mem."). n9 Plaintiffs replied on April 19, 2004, with Plaintiffs' Corrected Reply Memorandum of Law in Support of Their Omnibus Motion for Class Certification ("Plaintiffs' Reply"). Defendants responded on May 10, 2004, with the Underwriter Defendants' Sur-Reply Memorandum in Opposition to Plaintiffs' Motion for Class Certification ("Defendants' [*10] Sur-Reply"), and plaintiffs submitted Plaintiffs' Response to Underwriter Defendants' Sur-Reply Memorandum in Opposition to Class Certification ("Plaintiffs' Response") on May 19, 2004.

> n9 The iXL Mem. is dated February 23, 2004. The Corvis, Engage, Firepond and VA Linux memoranda are all dated February 24, 2003. The corrected Sycamore Mem. is dated April 7, 2004.

Case 1:04-cv-00331-JJF     Document 57-2     Filed 05/02/2005     Page 5 of 32

Page 4

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

After oral argument on June 17, 2004, I directed plaintiffs to submit a letter brief refining their proposed class definition, which plaintiffs submitted on July 6, 2004 ("Class Def. Letter"). Defendants responded to the proposed definition on July 20, 2004, in a letter brief of their own ("Class Def. Opp."). Finally, on September 7, 2004, I ordered plaintiffs to submit a proposed trial plan, which plaintiffs submitted on September 15, 2004 ("Trial Plan"). Defendants opposed the Trial Plan in a letter brief dated September 22, 2004, and plaintiffs replied on September 28, 2004.

The parties have also submitted many expert reports regarding the hotly [*11] contested issues of loss causation and damages. Plaintiffs submitted an expert report by Professor Daniel Fischel on January 20, 2004 ("1/20/04 Fischel Report"). Defendants countered with reports by the following experts: Dr. Christopher B. Barry in support of iXL Mem. ("Barry Report"); Dr. Paul A. Gompers in support of Sycamore Mem. ("Gompers Report"); Dr. Allan W. Kleidon in support of Sycamore Mem. ("Kleidon Report"); Dr Maureen O'Hara in support of Corvis Mem. and VA Linux Mem. ("2/23/04 O'Hara Report"); Dr. Erik R. Sirri in support of iXL Mem. ("Sirri Report"); and Dr. Rene M. Stultz in support of Firepond Mem. ("Stultz Report"). n10 Plaintiffs submitted a rebuttal report by Professor Fischel dated April 15, 2004 ("4/15/04 Fischel Report"). Defendants countered with a report by Dr. Bradford Cornell, dated May 10, 2004 ("Cornell Report"). In my June 21, 2004 Order, I directed plaintiffs to "submit a supplemental report from [] Fischel in which he analyzes the causal link between the alleged tie-in agreements and their effect on stock price in light of *all* tie-in purchases in the six focus cases known to plaintiffs' counsel (both in the form of aftermarket trades and pre-opening [*12] bids-and-asks). [] Fischel is advised to pay particular attention to the duration of any inflationary effect caused by this activity." n11 Plaintiffs submitted a final Fischel report on July 12, 2004 ("7/12/04 Fischel Report"), and defendants countered with a report from Dr. O'Hara dated July 23, 2004 (the "7/23/04 O'Hara Report").

n10 The Barry Report, 2/23/04 O'Hara Report and Sirri Report are all dated February 23, 2004. The Gompers Report, Kleidon Report and Stultz Report are all dated February 24, 2004.

n11 *In re Initial Pub. Offering Sec. Litig., 2004 U.S. Dist. LEXIS 13877, No. 21 MC 92, 2004 WL 1635575, at *1 (S.D.N.Y. June 23, 2004)* (emphasis in original).

**D. The Proposed Class Periods**

For each of these consolidated actions, "the Class consists of all persons and entities that purchased or otherwise acquired the securities of [Specific Issuer] during the Class Period and were damaged thereby," subject to various exclusions. n12 Plaintiffs propose class periods for each case that span the period between the initial public offering [*13] ("IPO") and December 6, 2000. n13 For the purposes of this Opinion, plaintiffs' proposed class periods are adopted for plaintiffs' Exchange Act claims; however, plaintiffs' proposed class periods must be shortened with respect to plaintiffs' claims pursuant to *section 11 of the Securities Act in* each of the six focus cases. n14

n12 Class Def. Letter at 1. The exclusions from this class definition are discussed in detail in Part IV.A.4., *infra.*

n13 *See* 4/19/02 Consolidated Amended Class Action Complaint For Violations of the Federal Securities Laws for Corvis P58; 4/19/02 Consolidated Amended Class Action Complaint For Violations of the Federal Securities Laws for Engage P55; 4/19/02 Consolidated Amended Class Action Complaint For Violations of the Federal Securities Laws for Firepond P53; 4/19/02 Amended Class Action Complaint For Violations of the Federal Securities Laws for iXL P64; 4/19/02 Consolidated Amended Class Action Complaint For Violations of the Federal Securities Laws for Sycamore P68; 4/19/02 Consolidated Amended Class Action Complaint For Violations of the Federal Securities Laws for VA Linux P52. [*14]

n14 *See infra* Part IV.B.4.

**E. Focus Case-Specific Facts**

**1. Corvis**

**a. The Corvis IPO**

Corvis held its IPO on July 28, 2000, with CSFB serving as the lead underwriter, offering 31,625,000 shares at $ 36.00 per share. n15 Defendants note that "prior to the IPO, Corvis had issued a significant number of unregistered shares . . . which would have been freely tradeable at the time of the IPO, provided that the shareholders satisfied SEC *Rule 144.*" n16 Corvis reported a number of outstanding unregistered shares of stock that had been issued to other companies and to Corvis affiliates before the Corvis IPO. n17 On the first day of trading, the stock opened at $ 74.00, peaked at $

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 6 of 32

Page 5

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

98.00 and closed at $ 84.72, a 135% increase over the offering price. n18 By the end of the first day of trading, 28,137,100 shares had changed hands in 35,755 transactions. n19

n15 *See* Corvis Corp. IPO Facts, Ex. A to 2/24/04 Declaration of Fraser L. Hunter, Jr. in Support of Corvis Opposition ("Hunter Corvis Decl."). [*15]

n16 Corvis Mem. at 20 n.19.

n17 *See* 7/27/00 Form S-1/A filed by Corvis ("Corvis Form S-1/A"), Ex. N to Hunter Corvis Decl. at II-2-5.

n18 *See id.*

n19 *See* Corvis Corp. (CORV) Market-Wide Trading Data for Day One, Ex. D to Hunter Corvis Decl.

Plaintiffs allege that 195 of the institutional allocants in the Corvis IPO, to whom 12,193,450 shares were allocated, entered into tie-in agreements with the allocating underwriter. n20 Plaintiffs further allege that purchase orders from these allocants accounted for 1,469,600 of the 2,569,600 purchase orders placed during the pre-open bid session, during which the opening share price rose to more than twice the $ 36.00 offering price. n21 During the ten business days from July 28 through August 10, 2000, Corvis allocants purchased a total of 11,582,004 shares in the aftermarket. The same investors sold a total of 1,543,240 shares during that time. n22

n20 *See* Summary of Alleged Tie-In Agreements ("Fischel Tie-In Summary"), Ex. A to 7/12/04 Fischel Report. [*16]

n21 *See* Purchase Orders for the Focus Case Stocks in the Pre-Open Bid Session ("Fischel Purchase Order Summary"), Ex. B to 7/12/04 Fischel Report.

n22 *See* Aftermarket Trading in Corvis Corp. by CSFB Allocated Accounts, Ex. D-1 to 7/12/04 Fischel Report.

Following the IPO, Corvis's stock climbed to its highest price, $ 108.06 per share, on August 4, 2000, the same day Broadwing disclosed a $ 44,000,000 investment position in Corvis and announced that it would buy $ 200,000,000 in equipment. n23 By the end of September 2000, the stock had fallen to just over $ 60.00 per share. n24 On October 2, 2000, Corvis filed a prospectus for 2,446,074 newly registered shares acquired through the exercise of employee stock options. n25 Corvis explicitly incorporated the disclosures made in its IPO prospectus into its October 2, 2000 prospectus. n26 During November 2000, the stock slid from $ 64.00 to $ 28.81 per share. n27 Corvis experienced a slight rebound in December 2000, reaching $ 40.38 per share on December 6. n28 According to Professor Fischel, Corvis underperformed when compared to various [*17] market benchmarks by 27 to 64 percentage points from July 28 to December 6, 2000, and by 35 to 67 points thereafter. n29 On May 10, 2001, when the first Corvis case, *PRFT Partners v. Corvis Corp.,* No. 01 Civ. 3994, was filed, shares of Corvis closed at $ 7.380 per share. n30

n23 *See* Corvis Corp. Chronology of Events from July 28, 2000 to December 6, 2000 ("Corvis Chronology"), Ex. F to Hunter Corvis Decl., at 1.

n24 *See id.* at 3.

n25 *See* 10/2/00 Form S-8 for Corvis ("October 2, 2000 Prospectus"), Ex. N to Hunter Corvis Decl.

n26 *See id.* at II-1.

n27 *See* Corvis Chronology at 5-6.

n28 *See id.* at 6.

n29 *See* 1/20/04 Fischel Report PP26, 29. "Underperformed" and "overperformed," as the terms are used by Fischel, mean that stock prices either declined or rose relative to the price movements of various benchmark indices. *See* 1/20/04 Fischel Report PP23-26. For example, if the benchmark suggests that the market lost 50% of its value during the period, and a stock lost 80% of its value, then the stock is said to have "underperformed" the benchmark by 30 percentage points. Conversely, if another stock lost only 20% of its value over that period, it "overperformed" by 30 percentage points. As discussed in Part IV.B.2., *infra,* plaintiffs assert that price underperformance after December 6, 2000 shows that price dissipation continued throughout and after the class period. [*18]

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

n30 *See* NASDAQ: Charts, http://quotes.nasdaq.com/quote.dll?page=charting&mode=basics&intraday=off&timeframe=4y&charttype=ohlc&splits=off&earnings=off&movingaverage=None&lowerstudy=volume&comparison=off&index=&drilldown=off&symbol=CORV&selected=CORV (Aug. 20, 2004).

### b. Corvis Class Representatives n31

n31 The Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (1995), amended the Securities Act and Exchange Act to require that "each plaintiff seeking to serve as a representative party" in a class action under those sections submit a certification containing information about the proposed representative's claim and capacity to serve. *See 15 U.S.C. § 77z-1(a)(2)(A); 15 U.S.C. § 78u-4(a)(2)(A).* There are discrepancies between the transactions reported by the proposed class representatives in their PSLRA Lead Plaintiff Certifications and the transactions listed by defendants in their submission entitled Proposed Class Representative Transactions in Corvis During 92 Trading Days of the Proposed Class Period ("Corvis Transactions Data"), Ex. K to Hunter Corvis Decl. For example, Michael Huff lists only five purchases of Corvis stock while the Corvis Transactions Data reveals fifteen purchases. *Compare 6/26/01 Huff PSLRA Lead Plaintiff Certification*, Ex. K to Hunter Corvis Decl., *with* Corvis Transactions Data. For purposes of this Opinion, I rely on the Corvis Transactions Data.

[*19]

### (1) Satswana Basu

Satswana Basu, who also seeks to act as a class representative in six other IPO cases, purchased and sold 95,198 Corvis shares, and sold and covered short 20,000 Corvis shares between November 17 and December 6, 2000, resulting in a $ 736,869.20 loss during that time. Basu also purchased Corvis shares after December 6, 2000. n32

n32 *See* Corvis Transactions Data.

### (2) Michael Huff

Between August 24 and September 26, 2000, Michael Huff bought and sold 12,000 shares of Corvis stock for a $ 22,755.00 profit. On September 28 and 29, 2000, however, Huff purchased a total of 6,000 shares for $ 472,832.50, which he had not sold as of December 6, 2000. Had he sold the shares that day, when the stock closed at $ 40.38 per share, Huff would have suffered a total pre-December 6, 2000 loss of $ 207,797.50. n33

n33 *See id.* Unrealized losses may serve as the basis for a securities fraud claim. *See Federman v. Empire Fire and Marine Ins. Co, 597 F.2d 798, 801-02 n.1 (2d Cir. 1979)* (acknowledging that where "the amended complaint alleged that . . . on the stock retained, Federman sustained an unrealized loss of approximately $ 900.00, . . . there is no question . . . that the plaintiffs complied with the purchaser-seller standing requirement").

[*20]

### (3) Sean Rooney

Sean Rooney purchased 1,000 shares of Corvis stock on August 7, 2000 at $ 107.50 per share and another 500 shares on August 11, 2000 at $ 90.00 per share. Rooney sold 500 shares on December 5, 2000, at $ 39.00 per share, leaving him with 1,000 unsold shares on December 6, 2000. Had he sold his shares that day, when the stock closed at $ 40.38 per share, he would have suffered a total pre-December 6, 2000 loss of $ 92,620.00. n34 Rooney also received an allocation of 500 shares in the Priceline.com IPO. n35

n34 *See* Corvis Transactions Data.

n35 *See* 11/25/03 Deposition of Sean P. Rooney, Ex. M to Hunter Corvis Decl., at 77:25-78:10.

### 2. Engage

### a. The Engage IPO

Engage held its IPO on July 20, 1999, with Goldman Sachs acting as lead underwriter, offering 6,938,000 shares at $ 15.00 per share. n36 The IPO prospectus for Engage notes that 1,225,324 shares of common stock were already outstanding well before the IPO, on April 30, 1999. n37 On the first day of trading, [*21] the stock opened at $ 28.00, peaked at $ 47.00 and closed at $ 41.00, a 173% increase over its offering price. By the end of the first day of trading, 14,887,200 shares had changed hands. n38

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 8 of 32

Page 7

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

n36 See 7/19/99 Engage Prospectus, Ex. B to 2/24/04 Declaration of Gandolfo V. DiBlasi ("DiBlasi Decl."), at 5 n.1.

n37 See id. The prospectus also notes that, under Rule 144 promulgated pursuant to the Securities Act, 17 C.F.R. § 230.144, beneficial owners of pre-IPO Engage stock became eligible to trade their shares on the open market 90 days after the IPO -- i.e., on October 18, 1999. See id.

n38 See CBS MarketWatch: Historical Quote, http://cbs.marketwatch.com/tools/quotes/historical.asp?date=7%2F20%2F99&symb=ENGA&siteid=mktw (Sept. 3, 2004).

Plaintiffs allege that forty-nine of the institutional allocants in the Engage IPO, to whom 786,900 shares were allocated, entered into tie-in agreements with the allocating underwriter. n39 Plaintiffs further allege that purchase orders from these allocants [*22] made up 693,000 of the 1,251,000 total purchase orders placed during the pre-open bidding session, during which the opening price for Engage was set at $ 28.00, $ 13.00 above the offering price. n40 During the ten business days from July 20, 1999 through August 2, 1999, Engage allocants purchased a total of 3,313,660 shares in the aftermarket. n41 The same investors sold a total of 135,850 shares during that time. n42

n39 See Fischel Tie-In Summary.

n40 See Fischel Purchase Order Summary.

n41 See id.

n42 See Aftermarket Trading in Engage Technologies, Inc. by Goldman Sachs Allocated Accounts July 20, 1999 -- August 2, 1999, Ex. D-2 to 7/12/04 Fischel Report.

Following the IPO, the price for Engage stock fell, but the stock traded consistently in the mid-twenties through the end of 1999. n43 On January 16, 2000, approximately 6,700,000 non-IPO shares associated with "employee stock options, corporate acquisitions, and other transactions became freely tradable in large numbers in [*23] the secondary market." n44 From January to February 2000, Engage prices climbed to all-time highs, peaking at over $ 180.00 per share. n45 The price declined rapidly in March and April of 2000, and the stock split two for one on April 4, 2000. n46 By August 2000, the stock was trading around the offering

price of $ 15.00 per share when adjusted to reflect the split. The price dropped below the offering price for the first time in October 2000, and continued to decline through December 6, 2000, when it was trading at a split-adjusted price of approximately $ 3.19 per share. n47 Fischel asserts that Engage underperformed when compared to various market benchmarks by 35 to 72 percentage points from July 20, 1999 to December 6, 2000, and by 34 to 68 points thereafter. n48 On September 7, 2001, when the first Engage case, Chin v. Engage Tech., Inc., No. 01 Civ. 8404, was filed, Engage stock closed at $ 0.190 per share. n49

n43 See Engage Mem. at 5.

n44 Id. at 26. See also DiBlasi Decl. P11.

n45 See Engage Mem. at 5. See also Engage Price Chart, Ex. C to DiBlasi Decl. [*24]

n46 See Summary of Trading by Kasbarian ("Kasbarian Trading Summary"), Ex. C to 2/24/04 Declaration of David M.J. Rein ("Rein Decl."), at 2.

n47 See Engage Price Chart.

n48 See 1/20/04 Fischel Report PP26, 29.

n49 See NASDAQ: Charts, http://quotes.nasdaq.com/quote.dll?page=charting&mode=basics&intraday=off&timeframe=4y&charttype=ohlc&splits=off&earnings=off&movingaverage=None&lowerstudy=volume&comparison=off&index=&drilldown=off&symbol=ENGA&selected=ENGA (August 20, 2004).

**b. Engage Class Representatives**

**(1) Stathis Pappas**

Stathis Pappas was an allocant in Engage's IPO, receiving 100 shares of Engage stock on July 20, 1999, at $ 15.00 per share. n50 Pappas made no aftermarket purchases in Engage. It does not appear from the facts before this Court that Pappas ever sold any of those shares, which were worth approximately $ 3.19 per share on December 6, 2000. n51 Had he sold his shares that day, he would have suffered a $ 1,181.26 loss on the transaction. According to defendants, Pappas is a member of more than fifteen potential classes in these consolidated [*25] actions. n52

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 9 of 32

Page 8

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

n50 *See* Pappas PSLRA Lead Plaintiff Certification, Ex. F to Rein Decl.

n51 *See* 12/9/03 Deposition of Stathis Pappas ("Pappas Dep."), Ex. B to Rein Decl., at 214:4-7 ("If I sold the 30 cent stock or whatever it is today, I haven't looked at it because it depresses me.").

n52 *See* Engage Mem. at 31.

### (2) Krikor Kasbarian

Between March 31 and August 29, 2000, Krikor Kasbarian purchased 20,000 shares of Engage stock for $ 1,008,687.50 and sold 30,000 post-split shares for $ 411,450.00, resulting in a total pre-December 6, 2000 loss of $ 597,237.50. n53 On his October 8, 2001 PSLRA certification, Kasbarian failed to disclose several transactions. n54 In October, 2000, Kasbarian destroyed records documenting his Engage trades. n55 He held no Engage stock on December 6, 2000. n56

n53 *See* Kasbarian Trading Summary at 2.

n54 *See* Engage Mem. at 35 ("His lead plaintiff certifications omitted many of his trades in Engage as well as other securities on which he is suing in this litigation, and his sworn explanations for those omissions are inconsistent."); *see also* Comparison of PSLRA Certifications of Krikor Kasbarian to His Trading Records, Ex. E to Rein Decl. For example, Kasbarian failed to disclose that on August 25, 2000 he purchased 10,000 shares for $ 113,687.50, which he sold on August 29, 2000 for $ 117,562.50, resulting in a profit of $ 3,875.00 on the transaction. [*26]

n55 *See* 12/10/03 Deposition of Krikor Kasbarian, Ex. A to Rein Decl., at 110:21-111:9.

n56 *See* Kasbarian Trading Summary at 2.

Kasbarian engaged in six transactions involving Engage after December 6, 2000. In July 2001, Kasbarian bought Engage twice and sold twice, each sale within a few days of the respective purchase. Kasbarian made a profit of $ .06 per share on the first set of trades and broke even on the second set. n57 Kasbarian failed to disclose these trades on his PSLRA certification. n58 Following submission of the certification, Kasbarian made a final pair of trades in Engage stock, purchasing

4,000 shares on October 25, 2001, and selling those shares for a $ .03 profit per share on October 30, 2001. n59 According to defendants, Kasbarian is also a member of more than fifteen potential classes in these consolidated actions and seeks to serve as a class representative in the TheGlobe.com litigation. n60

n57 *See id.*

n58 *See* 12/10/03 PSLRA Lead Plaintiff Certification for Kasbarian, Ex. D to Rein Decl., at 1. [*27]

n59 *See* Kasbarian Trading Summary at 2.

n60 *See* Engage Mem. at 31.

### 3. Firepond

### a. The Firepond IPO

Firepond held its IPO on February 4, 2000, with Robertson Stephens acting as lead underwriter, offering approximately 5,000,000 shares at $ 22.00 per share. n61 On that date, 27,751,713 unregistered shares were already outstanding. n62 On the first day of trading, Firepond's stock opened at $ 52.00, peaked at $ 102.31 and closed at $ 100.25, an increase of 356% over its offering price. By the end of the first day of trading, 9,284,900 shares had changed hands. n63

n61 *See* 2/4/00 Firepond Prospectus, Ex. A to 2/24/04 Declaration of Brendan J. Dowd ("Dowd Decl."), at 1.

n62 *See id.* at 58. With respect to the number of unregistered shares eligible for trading after the IPO, the Firepond Prospectus bizarrely states that "4,486,242 shares will be available for resale in the public market in reliance on *Rule 144(k)* immediately following this offering, of which 4,552,074 shares are subject to lock-up agreements." *Id.* This remarkable calculation leaves considerably fewer than zero unregistered shares eligible for trading on the date of the IPO. However, the Prospectus also notes that, under *Rule 144*, thousands of shares would become tradeable 90 days after the IPO -- *i.e.*, on May 4, 2000. *See id.* [*28]

Case 1:04-cv-00331-JJF     Document 57-2     Filed 05/02/2005     Page 10 of 32

Page 9

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

n63 *See* CBS MarketWatch: Historical Quote, http://cbs.marketwatch.com/tools/quotes/historical.asp?date=2%2F4%2F00&symb=FIRE&siteid=mktw (Sept. 3, 2004).

Plaintiffs allege that 152 of the institutional allocants in the Firepond IPO, to whom 3,153,100 shares were allocated, entered into tie-in agreements with the allocating underwriter. n64 Plaintiffs further allege that purchase orders from these allocants made up 3,965,100 of the 4,125,100 million total purchase orders placed during the pre-open bidding session, during which the opening price for Firepond rose to $ 30.00 above the offering price. n65 During the ten business days from February 4 through February 17, 2000, Firepond allocants purchased a total of 13,970,988 shares in the aftermarket. The same investors sold a total of 12,611,116 shares during that time. n66

n64 *See* Fischel Tie-In Summary.

n65 *See* Fischel Purchase Order Summary.

n66 *See* Aftermarket Trading in Firepond, Inc. by Robertson Stephens Allocated Accounts, Ex. D-3 to 7/12/04 Fischel Report.

[*29]

Following the IPO, Firepond's stock fell slightly, closing at $ 71.00 on February 17, 2000. The price then rebounded, reaching a high of $ 97.44 on February 29, only to rapidly decline to $ 15.88 by April 17. n67 Defendants claim that the number of outstanding shares increased by nearly 2,000,000 between the IPO and April 30, 2000. n68 The stock once again rebounded, peaking at $ 40.69 on June 29, 2000, but soon resumed its decline, trading in the upper teens again by August 1. n69 On August 2, 2000, Firepond's 180-day lock-up expired, and more than 26,000,000 shares became tradeable. n70 The price of the stock began to fall dramatically in the fall of 2000, declining from over $ 17.00 a share on September 14 to a closing price of $ 6.69 on December 6, 2000. n71 Fischel asserts that Firepond underperformed when compared to various market benchmarks by 27 to 63 percentage points from February 4, 2000 to December 6, 2000, and 33 to 65 points thereafter. n72 On July 31, 2001, when the first Firepond case, *Barrett v. FirePond, Inc.*, No. 01 Civ. 7048, was filed, Firepond closed at $ 0.66. n73

n67 *See* Firepond, Inc. Closing Prices 2000, Ex. B to Dowd Decl. [*30]

n68 *See* Firepond Mem. at 38.

n69 *See* Firepond, Inc. Closing Prices 2000.

n70 *See* 2/4/00 Firepond Prospectus at 53.

n71 *See* Firepond, Inc. Closing Prices 2000.

n72 *See* 1/20/04 Fischel Report PP26, 29.

n73 *See* Bigcharts -- Historical Quotes, http://bigcharts.marketwatch.com/historical/default.asp?detect=1&symbol=fire&close_date=7%2F31%2F01&x=0&y=0 (August 20, 2004).

### b. Firepond Class Representatives

### (1) Zitto Investments

Zitto Investments ("Zitto") purchased 345 shares of Firepond stock between February and April of 2000. It sold 100 shares in February for a profit but sold 245 shares in August 2000 for less than $ 20.00 per share, resulting in a net loss of $ 7,258.75. n74

n74 *See* Class Representative Trading Summary, App. B to Firepond Mem, at 1.

### (2) James and Diane Collins

James and Diane Collins ("the Collinses") made four purchases of Firepond [*31] stock between March 14 and May 1, 2000, totaling 500 shares for $ 24,300.00. The Collinses had not sold any shares of Firepond stock prior to December 6, 2000, when the stock closed at $ 6.69 per share. n75 Had the Collinses sold their shares that day, they would have suffered a $ 20,955.00 loss on the transaction.

n75 *See id.*

### (3) Joseph Zhen

Between February 11 and March 17, 2000, Joseph Zhen purchased 2,600 Firepond shares for $ 192,956.25 and sold 1,600 shares for $ 126,725.00, resulting in a gain of $ 7,982.69. Zhen still held 1,000 shares when the price dropped dramatically in late March. He sold his remaining shares on April 17, 2000 for $ 16,093.80, bringing his total pre-December 6, 2000 loss to $ 50,137.45. n76 Zhen omitted thirteen of his seventeen Firepond trades, some of which resulted in profits, from his September 20, 2001 PSLRA certification. n77 During

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 11 of 32

Page 10

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

discovery, Zhen failed to produce trading records for transactions in securities other than Firepond. n78

n76 *See id.* [*32]

n77 *See* Firepond Mem. at 36.

n78 *See* 12/5/03 Deposition of Joseph Zhen, Ex. D to Dowd Decl., at 96:15-97:10.

### 4. iXL

#### a. The iXL IPO

iXL held its IPO on June 2, 1999, with Merrill Lynch serving as lead underwriter, offering close to 7,000,000 shares at $ 12.00 per share. n79 The iXL IPO Prospectus notes that "no restricted securities will be eligible for immediate sale on the date of this prospectus," and that "121,828 restricted securities issuable pursuant to stock options will be eligible for sale 90 days after the date of this prospectus [on August 31, 1999.]" n80 During the first day of trading, the stock opened at $ 15.13, peaked at $ 24.50 and closed at $ 17.88, an increase of 49% above the offering price. On the first day of trading, 14,008,117 shares changed hands. n81

n79 *See* 6/2/99 iXL Prospectus, Ex. E to 2/24/04 Declaration of Robert G. Houck ("Houck Decl."), at E2.

n80 *See* 6/2/99 iXL IPO Prospectus at 97.

n81 *See* iXL Enterprises Daily Stock Prices and Volume, Ex. I to Houck Decl., at I2.

[*33]

Plaintiffs allege that thirty-seven of the institutional allocants in the iXL IPO, to whom 1,222,750 shares were allocated, entered into tie-in agreements with the allocating underwriter. n82 During the ten business days from June 3 through June 16, 1999, iXL allocants purchased a total of 3,080,089 shares in the aftermarket. The same investors sold a total of 2,956,325 shares during that time. n83

n82 *See* Fischel Tie-In Summary. Fischel states that he was not provided with any pre-opening bid information for iXL. *See* 7/12/04 Fischel Report P6.

n83 *See* Aftermarket Trading in iXL Enterprises, Inc. by Merrill Lynch Allocated Accounts, Ex. D-4 to 7/12/04 Fischel Report.

In the weeks following the iXL IPO, the share price rose slightly, closing at $ 19.13 on June 28, 1999. n84 That day, 4,000,000 shares were registered with the SEC for use in future acquisitions. n85 A month later, on July 27, 1999, iXL issued a positive earnings announcement, n86 and Merrill Lynch upgraded the stock from near-term [*34] "accumulate/buy" to near-term "buy/buy." n87 The following day, shares closed at $ 29.13. In August 1999, the price dropped to $ 22.00. Shares rebounded to $ 37.00 in mid-November and, on January 20, 2000, the price reached $ 58.75, the stock's high-water mark. n88

n84 *See* iXL Enterprises Daily Stock Prices and Volume at I2.

n85 *See* 6/28/99 Form S-4 for iXL, Ex. E to Houck Decl., at E24-E26.

n86 *See* 7/27/99 iXL Press Release: "iXL Enterprises Reports Record Revenue Sequential Quarterly Revenue [sic] for iXL, Inc. Subsidiary Increases 41 Percent," Ex. D to Houck Decl., at D8-D11.

n87 7/28/99 Merrill Lynch Report for iXL, Ex. G to Houck Decl., at G14.

n88 *See* iXL Enterprises Daily Stock Prices and Volume at I2-I4.

In February 2000, more than 50,000,000 shares became tradeable due to the expiration of a lock-up that had taken effect shortly after the IPO. n89 Between mid-February and late June, 2,400,000 shares that had been subject to lock-up agreements were sold. n90 On February 18, 2000, Merrill [*35] downgraded iXL to "accumulate" and warned of the risk of sales of unlocked shares. n91 Merrill reclassified its long-term rating to "buy" on March 20, 2000. n92 In September 2000, Merrill downgraded iXL first to "accumulate" n93 and then to "neutral." n94 The price of iXL shares closed at $ 1.25 on December 6, 2000. n95 Fischel asserts that iXL underperformed when compared to various market benchmarks by 63 to 99 percentage points from June 2, 1999 to December 6, 2000, and by 36 to 62 points thereafter. n96 On October 25, 2001, when the first iXL case, *Turner v. iXL Enterprises, Inc.*, No. 01 Civ. 9417, was filed, iXL closed at $ 0.32 per share. n97

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 12 of 32

Page 11

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

n89 *See* iXL Mem. at 10-11.

n90 *See id.* at 11.

n91 2/18/00 Merrill Lynch Report for iXL, Ex. G to Houck Decl., at G68.

n92 3/20/00 Merrill Lynch Report for iXL, Ex. G to Houck Decl., at G72.

n93 9/1/00 Merrill Lynch Report for iXL, Ex. G to Houck Decl., at G84.

n94 9/5/00 Merrill Lynch Report for iXL, Ex. G to Houck Decl., at G86.

n95 *See* iXL Mem. at 11.

n96 *See* 1/20/04 Fischel Report PP26, 29.

n97                                    *See* http://bigcharts.marketwatch.com/print/print.asp?frames=0&time=100&freq=1&compidx=aaaaa%3A0&comp=NO_SYMBOL_CHOSEN&ma=0&maval=9&uf=0&1f=1&1f2=0&1f3=0&type=64&style=320&size=3&sid=149463&o_symb=DE%3A922795&startdate=12%2F6%2F00&enddate=10%2F25%2F2001&show=&symb=DE%3A922795&draw.x=43&draw.y=14&default=true&backurl=%2Fintchart%2Fframes%2Fframes%2Easp&prms=qcd (Oct. 11, 2004).

[*36]

**b. iXL Class Representatives**

**(1) John Miles**

Between August 19, 1999 and November 2, 2000, John Miles purchased 16,400 iXL shares for $ 138,233.41. Miles sold 2,400 shares by August 16, 2000 for $ 53,452.04, but still held 14,000 shares as of December 6, 2000. n98 Had he sold his remaining shares that day, when the stock closed at $ 1.25 per share, he would have suffered a total pre-December 6, 2000 loss of $ 67,281.37.

n98 *See* John Miles iXL Trades, Ex. J to Houck Decl., at J18.

**(2) John Rowe**

Between June 4 and August 31, 1999, John Rowe purchased 1,335 iXL shares for $ 25,685.23. He sold 335 shares between September 17 and November 22, 1999 for $ 12,029.82, at a profit, leaving him with 1,000 unsold shares as of December 6, 2000. n99 Had he sold his remaining shares that day, when the stock closed at $

1.25 per share, Rowe would have suffered a total pre-December 6, 2000 loss of $ 12,405.41.

n99 *See* J. Chris Rowe iXL Trades, Ex. J to Houck Decl., at J29. Rowe actually sold the remaining shares on December 29, 2000 for $ 938.71. *See id.*

[*37]

**5. Sycamore**

**a. The Sycamore IPO**

Sycamore held its IPO on October 21, 1999, with Morgan Stanley acting as the co-lead underwriter, offering 7,475,000 shares at $ 38.00 per share. n100 On the first day of trading, Sycamore shares opened at $ 270.88, the day's high price, and closed at $ 184.75, an increase of 386% above the offering price. Almost 10,000,000 shares changed hands on the first day of trading. n101

n100 *See* 10/21/99 Sycamore Prospectus, Ex. 6 to 2/24/04 Declaration of Brant W. Bishop ("Bishop Decl.").

n101 *See* CBS MarketWatch: Historical Quote, http://cbs.marketwatch.com/tools/quotes/historical.asp?date=10%2F22%2F99&symb=SCMR&siteid=mktw (Sept. 3, 2004).

Plaintiffs allege that eighty-seven institutional allocants in the Sycamore IPO, to whom 1,077,625 shares were allocated, entered into tie-in agreements with the allocating underwriter. n102 Plaintiffs further allege that purchase orders from these allocants made up 561,900 of the 2,868,035 total purchase orders placed during [*38] the pre-open bidding session, during which the opening price for Sycamore rose to $ 232.88 above the offering price. n103 During the first ten days following Sycamore's IPO, Sycamore allocants purchased a total of 2,297,115 shares. The same investors sold a total of 745,832 shares during that time. n104

n102 *See* Fischel Tie-In Summary.

n103 *See* Fischel Purchase Order Summary.

n104 *See* Aftermarket Trading in Sycamore by Morgan Stanley Allocated Accounts, Ex. D-5 to 7/12/04 Fischel Report.

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 13 of 32

Page 12

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

Defendants assert that on the first day of public trading, 5,734,183 previously issued non-IPO Sycamore shares were not subject to lock-up. n105 At least 368,587 of these shares became tradeable 90 days after the Sycamore IPO -- *i.e.,* on January 19, 2000. n106 Following the IPO, the price of Sycamore stock climbed steadily, closing at $ 203.00 on October 26, 1999. n107 On January 19, 2000, millions of additional shares that had been issued prior to the Sycamore IPO were released from lock-up, n108 and [*39] by the end of that week, the stock price reached $ 280.00. n109 The stock split three for one on February 14, 2000. n110 On March 2, 2000, the stock soared to a price of $ 569.81 per share, n111 and the next day 8,985,186 more shares, issued one year earlier, were released from lock-up. n112 A secondary offering of 10,200,000 Sycamore shares occurred on March 14, 2000. n113 On April 18, 2000, 26,965,355 additional shares were released from lock-up. n114 After rising and falling several times, the stock price eventually declined, trading around $ 300.00 per share in October of 2000, and closing at a split-adjusted price of $ 169.31 per share on December 6, 2000. n115 Fischel asserts that Sycamore underperformed when compared to various market benchmarks by 32 to 68 percentage points from October 21, 1999 to December 6, 2000, and by 32 to 64 points thereafter. n116 On July 2, 2001, when the first Sycamore case, *Pond Equities v. Sycamore Networks, Inc.,* No. 01 Civ. 6001, was filed, Sycamore closed at $ 8.63 per share. n117

n105 *See* 10/21/99 Sycamore Prospectus at 53 (explaining that 65,471,542 of the 71,205,725 shares issued and sold by Sycamore were subject to lock-up, leaving 5,734,183 free shares). [*40]

n106 *See id.* at 52. In fact, millions of shares otherwise subject to 180-day lock-up agreements became tradeable on January 19, 2000, because Sycamore shares had traded at more than twice the IPO price, satisfying a release condition of many of the Sycamore lock-up agreements. *See id.;* Sycamore Mem. at 37; 3/14/00 Secondary Prospectus filed by Sycamore, Ex. 7 to Bishop Decl., at 54 (noting that nearly 30 million restricted shares were eligible for trading on January 19, 2000).

n107 *See* Sycamore Significant Days Summary, Ex. 13 to Gompers Report, at 2.

n108 *See* 10/21/99 Sycamore Prospectus at 52 (noting that the expiration of the lock-up

would occur 180 days following the 10/21/99 Sycamore IPO).

n109 *See* Sycamore Significant Days Summary at 3.

n110 *See id.* at 45. The stock prices in this subsection are adjusted for the 3-1 stock split.

n111 *See id.* at 8.

n112 *See* 3/14/00 Sycamore Prospectus, Ex. 7 to Bishop Decl., at 54 (noting that 8,985,186 shares were freed from lock-up on March 3, 2000).

n113 *See id.*

n114 *See id.* at 67.

n115 *See* Sycamore Significant Days Summary at 39-42.

n116 *See* 1/20/04 Fischel Report PP26, 29. [*41]

n117                                    *See* http://cbs.marketwatch.com/tools/quotes/historical.asp?date=7%2F2%2F01&symb=SCMR&siteid=mktw (Oct. 11, 2004).

### b. Sycamore Class Representatives

### (1) Barry Lemberg

Barry Lemberg purchased 100 Sycamore shares for $ 175.00 per share on March 3 and an additional 100 shares on April 13, 2000 for $ 71.13 per share. n118 Lemberg had not sold those shares as of December 6, 2000, when the stock closed at $ 56.44 per share. n119 Had Lemberg sold the shares that day, he would have suffered a $ 13,325.00 loss on the transaction. While Lemberg alleges that he is entitled to damages relating to 1,200 shares, he purchased only 200 shares before December 6, 2000. n120

n118 *See* 7/20/01 PSLRA Lead Plaintiff Certification of Barry Lemberg.

n119 This price reflects the stock's closing price without adjusting for the 3-1 stock split on February 14, 2000.

n120 *See* Deposition of Barry Lemberg ("Lemberg Dep."), Ex. 8 to Bishop Decl., at 72:6-73:6. Lemberg purchased 1,000 shares on February 15, 2001. *See id.* at 73:7-10.

Case 1:04-cv-00331-JJF   Document 57-2   Filed 05/02/2005   Page 14 of 32

Page 13

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

[*42]

Lemberg's testimony and questionnaire responses conflict as to whether he received an IPO allocation, n121 and although Lemberg alleged that he had never personally bought and sold the same stock on the same day, the record reveals that he had conducted a same day transaction on at least one occasion. n122 He testified that he does not remember having any involvement in preparing the Complaint. n123 Moreover, defendants claim that he "does not understand financial markets well," and is "unable to describe the specific behavior of Morgan Stanley that was improper." n124

n121 *Compare* 9/12/03 Questionnaire of Barry I. Lemberg ("Lemberg Questionnaire"), Ex. 1 to Ex. 8 to Bishop Decl., at 3 (answering "No" when asked whether he received any allocation of stock relating to the current litigation), *with* Lemberg Dep. at 42:5-10 (answering "Yes" to the same question).

n122 *Compare* Lemberg Questionnaire at 3 (answering "No" when asked whether, from 1998 to 2000, he had ever engaged in "buying and selling same stock [sic] on the same trading day"), *and* Lemberg Dep. at 27:14-16 (same), *with* Active Assets Account Report for Barry Lemberg, Ex. 2 to Lemberg Dep., at 8 (reporting that Lemberg both bought and sold CacheFlow stock on 11/24/99), *and* Lemberg Dep. at 32:16-33:11 (acknowledging the discrepancy between Lemberg's previous affirmation and the CacheFlow transaction). [*43]

n123 *See* Lemberg Dep. at 94:17-96:11.

n124 Sycamore Mem. at 49.

### (2) Vasanthakumar Gangaiah

Vasanthakumar Gangaiah purchased and sold 11,600 shares of Sycamore stock between March 1 and December 6, 2000, resulting in a $ 69,276.21 loss. n125 Defendants assert that Gangaiah provided "conflicting and false" testimony about his investment accounts, n126 and "falsely claimed never to have received an IPO allocation." n127 Defendants also question Gangaiah's understanding of the litigation, noting that he does not know what kind of damages are being sought in the case or which people are members of the class. n128

n125 *See* 3/01/00 to 12/31/00 E*Trade Account Statements for Vasanthakumar Gangaiah, Ex. 6 to 11/30/03 Deposition of Vasanthakumar Gangaiah ("Gangaiah Dep."), Ex. 9 to Bishop Decl.

n126 Sycamore Mem. at 46. When initially asked when he opened his first investment account in the United States, Gangaiah responded that his first account, an E*Trade account, was opened in 1999. *See* Gangaiah Dep. at 21:9-14. However, Gangaiah later testified that he had opened a DLJ Direct account in 1998, prior to the E*Trade account, which he claimed had been closed after a couple of months. *See id.* at 27:1-9. Defendants observe that Gangaiah's documents show that his DLJ Direct account had not been closed in 1998, but was active as late as June 2000. *See* Sycamore Mem. at 46. Defendants allege that while Gangaiah claimed that he held only the E*Trade and DLJ investment accounts, he actually held another account with BancBoston Robertson Stephens ("BancBoston"). *See id.* [*44]

n127 Sycamore Mem. at 47. Gangaiah testified that he had never received an IPO allocation. *See* Gangaiah Dep. at 40:10-12. Defendants assert, however, that Gangaiah's BancBoston account was "opened for the express purpose of receiving 750 shares in the Stamps.com IPO (one of the IPOs at issue in this litigation)." Sycamore Mem. at 46-47.

n128 *See* Sycamore Mem. at 47.

### (3) Frederick Henderson

Frederick Henderson received an IPO allocation of 50 shares of Sycamore stock at $ 38.00 per share, which he flipped on October 22, 1999 for $ 200.00 per share. n129 Between May 2 and October 13, 2000, Henderson purchased an additional 14,000 shares for $ 1,550,081.25. He sold 4,000 shares on November 16, 2000 for $ 266,675.00, for a loss, leaving him with 10,000 unsold shares as of December 6, 2000. Had he sold them that day, when the stock closed at $ 56.44, Henderson would have suffered a total pre-December 6, 2000 loss of $ 710,906.25. n130

n129 *See id.* at 19, 38.

n130 *See* 8/14/01 PSLRA Lead Plaintiff Certification of Frederick B. Henderson. This

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 15 of 32

Page 14

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

result factors in the $ 8,100 profit Henderson made when he flipped his 50 allocated shares.

[*45]

Henderson does not recall seeing the Amended Complaint before it was filed. n131 He acknowledges that he "has no idea how or why December 6, 2000 was selected as the end of the class period, nor . . . whether it should be the end of the class period." n132

> n131 See 12/2/03 Deposition of Frederick Henderson, Ex. 3 to Bishop Decl., at 40:4-11.

> n132 Id. at 176:18-177:7.

### 6. VA Linux

#### a. The VA Linux IPO

VA Linux held its IPO on December 9, 1999, with CSFB serving as its lead underwriter, offering 5,060,000 shares at $ 30.00 per share. n133 At that time, VA Linux had already issued 35,301,586 unregistered shares. n134 The VA Linux Prospectus notes that VA Linux's "directors and officers as well as other stockholders and optionholders" had agreed to subject themselves to a 180-day lock-up on their unregistered shares, but does not explicitly state whether each and every one of the 35,301,586 unregistered shares was subject to lock-up. n135 VA Linux registered 24,863,635 additional shares [*46] simultaneously with its IPO as part of its various stock option benefit plans. VA Linux's filings for these stock option benefit plans explicitly incorporate the contents of the VA Linux IPO Prospectus and set their prices at $ 30, the same as the IPO price. n136 On the first day of trading, VA Linux stock opened at $ 299.00 and peaked at $ 320.00, with a trading volume of 7,685,600 shares. Shares closed that day at $ 239.25, an increase of 698% over the offering price. n137

> n133 See 12/9/99 VA Linux Prospectus, Ex. H to 2/24/04 Declaration of Fraser L. Hunter, Jr. in Support of VA Linux Opposition ("Hunter VA Linux Decl.").

> n134 See id. at 65.

> n135 Id.

> n136 See id.

> n137 See CBS MarketWatch: Historical Price, http://cbs.marketwatch.com/tools/quotes/historica

l.asp?date=12%2F9%2F99&symb=LNUX&sitei d=mktw (Sept. 3, 2004).

Plaintiffs allege that 147 of the institutional allocants in the VA Linux IPO, to whom 2,174,850 shares were allocated, entered into tie-in agreements with [*47] the allocating underwriter. n138 Plaintiffs further allege that purchase orders from these allocants made up 294,230 of the 426,230 total purchase orders placed during the pre-open bid session, when the opening price was set at $ 299.00, $ 269.00 above the offering price. n139 During the first ten days following VA Linux's IPO, VA Linux allocants purchased a total of 1,572,138 shares in the aftermarket. The same investors sold a total of 165,473 shares during that time. n140

> n138 See Fischel Tie-In Summary.

> n139 See Fischel Purchase Order Summary.

> n140 See Aftermarket Trading in VA Linux Systems, Inc. by CSFB Allocated Accounts, Ex. D-6 to 7/12/04 Fischel Report.

On February 3, 2000, VA Linux announced its acquisition of Andover.net, Inc. in a $ 913,300,000 stock deal. n141 In March and April 2000, VA Linux announced acquisitions, using stock and cash, of Trusolutions, Inc., NetAttach and Precision Insight, Inc. n142 On June 7, 2000, a total of 22,940,202 shares became tradeable at the end [*48] of a lock-up period. n143 On November 6, 2000, the company announced that it would miss its earnings estimates. n144 That day, four firms monitoring VA Linux issued analyst reports, and the stock plummeted from $ 30.00 to $ 17.38. n145 The stock closed at $ 7.94 on December 6, 2000. n146 Fischel asserts that VA Linux underperformed when compared to various market benchmarks from 30 to 66 percentage points from December 9, 1999 to December 6, 2000, and by 26 to 58 points thereafter. n147 On January 11, 2001, when the first VA Linux case, Makaron v. VA Linux Sys., Inc., No. 01 Civ. 0242, was filed, VA Linux closed at $ 9.031 per share. n148

> n141 See VA Linux Chronology of Events from December 9, 1999 to December 6, 2000 ("VA Linux Chronology"), Ex. I to Hunter VA Linux Decl., at 6. The Andover.net, Inc. deal closed on June 7, 2000. See VA Software Corp. 10-Q filed on 6/12/00, ex. H to Hunter VA Linux Decl., at 9.

> n142 See id. at 9, 11.

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 16 of 32

Page 15

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

n143 *See* 12/9/99 VA Linux Prospectus at 65.

n144 *See* VA Linux Chronology at 28.

n145 *See id.* at 28-29.

n146 *See* CBS MarketWatch: Historical Price, http://cbs.marketwatch.com/tools/quotes/historical.asp?date=12%2F6%2F00&symb=LNUX&siteid=mktw (Sept. 13, 2004) [*49]

n147 *See* 1/20/04 Fischel Report PP26, 29.

n148 *See* NASDAQ: Charts, http://quotes.nasdaq.com/quote.dll?page=charting&mode=basics&intraday=off&timeframe=5y&charttype=ohlc&splits=off&earnings=off&movingaverage=None&lowerstudy=volume&comparison=off&index=&drilldown=off&symbol=LNUX&selected=LNUX (August 20, 2004).

### b. VA Linux Class Representatives

### (1) Harold Zagoda

On December 9, 1999, Harold Zagoda purchased 10,000 shares of VA Linux stock at $ 300.00 per share and received an allocation of 300 shares at $ 30.00 per share. He sold 800 shares on December 13, 1999 for $ 200.06 per share. On June 3, 2000, he purchased 1,000 shares at $ 61.50 per share; on July 31, he purchased 1,500 shares at $ 32.00 per share; and on October 27, he purchased 1,000 shares at $ 27.50 per share. He held 13,000 shares on December 6, 2000, when the stock closed at $ 7.94 per share. n149 Had he sold his remaining shares that day, Zagoda would have suffered a total pre-December 6, 2000 loss of $ 2,882,732.00. n150

n149 *See* Proposed Class Representative Transactions in VA Linux During 252 Days of the Proposed Class Period ("VA Linux Transactions Data"), Ex. L to Hunter VA Linux Decl. [*50]

n150 Based on the record before the Court, Zagoda continued to hold these shares until January 11, 2001, the date when *Makaron v. VA Linux Sys., Inc.,* No. 01 Civ. 0242, was filed.

### (2) Spiros and Mary Gianos

Spiros and Mary Gianos purchased 3,000 shares of VA Linux stock on December 10, 1999 for $ 764,180.00 and an additional 1,000 shares on December 13, 1999 for $ 200,000.00. Between December 13, 1999 and April 6, 2000, the Gianoses sold their 4,000 shares for $ 367,183.00, resulting in a loss of $ 596,997.00. n151

n151 *See id.*

### (3) Anita Budich

Anita Budich purchased 13 shares of VA Linux stock on December 15, 1999, at $ 230.63 per share, which she still owned on December 6, 2000. n152 Had she sold them that day, when the stock closed at $ 7.94 per share, Budich would have suffered a $ 2,894.97 loss on the transaction.

n152 *See id.* Budich reported on her PSLRA Certification that she purchased 23 shares of VA Linux stock for $ 227.00 per share. *See* 1/16/01 PSLRA Lead Plaintiff Certification of Anita J. Budich. However, for purposes of this Opinion I rely on the values provided in the VA Linux Transactions Data.

[*51]

### F. Industry-Wide Events Affecting All Focus Cases During the Class Period

In opposition to these motions, defendants note that throughout the class period, various events affected the markets for each of the six focus cases, and indeed for all of these 310 consolidated actions. *First,* the market for Internet and technology stock underwent an unprecedented boom in the late 1990s, ignited by the emergence and visibility of the Internet coupled with a streak of economic optimism and experimentation. n153 Stock prices soared. n154 Eventually, though, the "huge market bubble in Internet stocks burst, propelling prices of those stocks down 90% in a few months," n155 prompting a period of "market chaos." n156

n153 *See* Gompers Report PP12, 13.

n154 *See* Selected Internet Related Indices 10/22/99-12/29/00, Ex. 6 to Gompers Report.

n155 iXL Mem. at 29.

n156 *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 289 F. Supp. 2d 416, 419 (S.D.N.Y. 2003).*

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 17 of 32

Page 16

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

*Second,* [*52] various reports were published describing the use of tie-in agreements by some allocating underwriters in IPOs. In mid-June of 1999, amidst a period of staggering decline in many Internet stock prices, MSNBC published an investigative report stating that underwriters had employed "a widely practiced marketing scheme known as a 'tie-in'" to artificially inflate the price of Internet IPO stock. n157 According to the MSNBC article, this practice extended to "the industry's leading, most prestigious firms." n158 The article described a scheme whereby "the opportunity to get in on IPO offerings at cheap, pre-market prices" was "conditioned on an unwritten, oral agreement" that the customer would "give back to the underwriters what amounts to a blank check to buy many more shares . . . the minute the deal goes public." n159 The MSNBC article attained some notoriety within the investment industry. n160 Then, on July 14, 2000, the *Wall Street Journal* published a front page article reporting that Gary Tanaka, a partner in the growth-oriented mutual fund group Amerindo, had made an "agreement to buy shares [of an internet company] in the aftermarket" to increase his fund's allocation [*53] in the IPO and that "market experts" believed such agreements "raise regulatory questions." n161

n157 Christopher Byron, *IPO Quid Pro Quo Squeezes Investors,* MSNBC, June 16, 1999, Ex. A to Houck Decl., at A2.

n158 *Id.* at A3.

n159 *Id.* at A2.

n160 Byron reiterated the claims made in his MSNBC article on television during a CNBC interview held on June 18, 1999. *See* Bill Griffeth, *Interview with Christopher Byron on Possible Price Manipulation of Internet Stocks,* CNBC, June 18, 1999, Ex. A to Houck Decl., at A12. That same day, the well-visited financial website *Raging Bull* featured Byron's article as the second listing on its "News Links of the Week" page. *See* Lycos Finance's Raging Bull: News Links of the Week for June 18, 1999, Ex. A to Houck Decl., at A8. A discussion of the article also appeared as a post in a Yahoo! chat room. *See* MSFT_Sux, Yahoo Groups Internet Stock Talk: *Potential Dangers of Playing Internet IP,* June 18, 1999, Ex. A to Houck Decl., at A10.

n161 Greg Ip et al., *The Color Green: The Internet Bubble Broke Records, Rules and Bank Accounts,* Wall St. J., July 14, 2000, Ex. A to Houck Decl., at A1.

[*54]

On August 25, 2000, the SEC's Division of Market Regulation issued Staff Legal Bulletin No. 10, warning securities distributors that "soliciting their customers to make additional purchases of the offered security after trading in the security begins" violates Regulation M, promulgated pursuant to the Exchange Act. n162 The Bulletin called tie-in agreements "a particularly egregious form of solicited transaction" that "undermine the integrity of the market as an independent pricing mechanism for the offered security." The Bulletin explained that "underwriters have an incentive to artificially influence aftermarket activity because they have underwritten the risk of the offering, and a poor aftermarket performance could result in reputational and subsequent financial loss."

n162 SEC Div. of Market Reg.: Staff Legal Bulletin No. 10 (Aug. 25, 2000), Ex. A to Houck Decl., at A25.

The release of the SEC Bulletin prompted *Barron's* to publish an article on September 11, 2000, stating that despite its "tame" tone, [*55] "the bulletin targets one of the main grease guns now lubricating the IPO machine." n163 *The Wall Street Journal* followed suit on December 6, 2000, publishing an article detailing the "new IPO playbook on Wall Street," in which investors who agree to buy in the aftermarket are the ones who receive the largest allocations. n164 The article also acknowledged that while the SEC, in its August Bulletin, was "blowing the whistle" to quell the practice of using tie-in agreements, the understandings between investors and brokers were usually informal and unwritten, making them difficult to police. However, despite their "limited and implicit" nature, claimed some investors, "tie-ins . . . have a significant market impact . . . providing the rocket fuel that sometimes boosts IPO prices into orbit on the first trading day." n165 Prices for all six of the focus stocks remained depressed, and never returned to their offering levels. n166

n163 Jack Willoughley, *Pump It Up: The Dirty Little Secret Behind the IPO Boom,* Barron's, Sept. 11, 2000, Ex. A to Houck Decl., at A28.

n164 Susan Pulliam and Randall Smith, *Trade-Offs: Seeking IPO Shares, Investors Offer to Buy More in After-Market,* Wall St. J., Dec. 6, 2000, at A1, Ex. K to 1/20/04 Fischel Report. [*56]

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 18 of 32

Page 17

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

n165 *Id.*

n166          *See          generally*
http://bigcharts.marketwatch.com     (Oct.    11,
2004).

*Finally,* defendants note that various press reports
described apparent conflicts of interest among analysts
and underwriters. n167 SEC Chairman Arthur Levitt
acknowledged the problem on April 13, 1999, issuing an
"early warning signal" that the high number of "rosy
stock analyses appear to be shaped by the lucrative
investment banking ties that analysts' firms have with the
companies they're supposed to watch with a critical eye."
n168 Following Levitt's warning, allegations of analyst
conflicts continued to appear in the press. For example,
the British *Sunday Times* reported on April 23, 2000, that
"the 'Chinese Walls' that once separated researchers and
bankers have all but disappeared in today's banking
world and researchers have often become blatant
pitchmen for bank deals," n169 and an August 1, 2000
article in *The Philadelphia Inquirer* quoted a finance
professor to the effect that the analyst conflict problem
"seems to have gotten worse in recent years," with
analysts issuing approximately [*57] fifty "buy"
recommendations for every "sell" recommendation, a far
cry from the six to one ratio that existed in the early
1990s. n170

n167 *See* Press Reports on Analyst Conflicts,
Ex. B to Houck Decl., at B1 (documenting fifteen
articles discussing analyst conflicts published
from October 27, 1985 through August 1, 2000).

n168 *A Briefing for Investors: Analysts' Rosy
Reports Draw SEC Chief's Fire,* L.A. Times,
Apr. 14, 1999, at C4, Ex. B to Houck Decl., at
B46.

n169 Garth Alexander, *The Tipsters Who
Never Say Sell,* Sunday Times (of Britain), Apr.
23, 2000, at 8, Ex. B to Houck Decl., at B59.

n170 Miriam Hill, *Even Research Comes
With Spin,* The Philadelphia Inquirer, Aug. 1,
2000, at C1, Ex. B to Houck Decl., at B66.

## III. LEGAL STANDARD

### A. The Requirements of *Rule 23*

*Federal Rule of Civil Procedure 23* governs class
certification. To be certified, a putative class must meet
all four requirements of *Rule 23(a)* as well as the
requirements of one of the three subsections [*58] of
*Rule 23(b)*. In this case, as in most cases seeking money
damages, plaintiffs bear the burden of demonstrating that
the class meets the requirements of *Rule 23(a)* -- referred
to as numerosity, commonality, typicality, and adequacy
n171 -- and that the action is "maintainable" under *Rule
23(b)(3)*. n172 Under *Rule 23(b)(3)* -- the only applicable
subsection of *Rule 23(b)* -- "common" issues of law or
fact must "predominate over any questions affecting only
individual members," and a class action must be
demonstrably "superior" to other methods of
adjudication. n173

n171 *See     Caridad    v.    Metro-North
Commuter R.R., 191 F.3d 283, 291 (2d Cir.
1999).*

n172 *See Amchem Prods., Inc. v. Windsor,
521 U.S. 591, 614, 138 L. Ed. 2d 689, 117 S. Ct.
2231 (1997).*

n173 *Fed. R. Civ. P. 23(b)(3).*

### 1. *Rule 23(a)*

#### a. Numerosity

*Rule 23* requires that the class be "so numerous that
joinder of all members is impracticable." n174
"Impracticability does not mean impossibility of joinder,
but refers to the difficulty or [*59] inconvenience of
joinder." n175 Although precise calculation of the
number of class members is not required, and it is
permissible for the court to rely on reasonable inferences
drawn from available facts, numbers in excess of forty
generally satisfy the numerosity requirement. n176 The
numerosity of plaintiffs' proposed classes, each of which
includes thousands of investors, is undisputed.

n174 *Fed. R. Civ. P. 23(a)(1).*

n175 *In re Independent Energy Holdings
PLC Sec. Litig., 210 F.R.D. 476, 479 (S.D.N.Y.
2002)* (citing *In re Avon Sec. Litig., 1998 U.S.
Dist. LEXIS 18642, No. 91 Civ. 2287, 1998 WL
834366, at *5 (S.D.N.Y. Nov. 30, 1998)*).

n176 *See Trief v. Dun & Bradstreet Corp.,
144 F.R.D. 193, 198 (S.D.N.Y. 1992).*

### B. Commonality

Commonality requires a showing that common
issues of fact or law affect all class members. n177 A

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 19 of 32

Page 18

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

single common question may be sufficient to satisfy the commonality requirement. n178 "The critical inquiry is whether the common questions are at the [*60] core of the cause of action alleged." n179

n177 *See Fed. R. Civ. P. 23(a)(2); see also Trief, 144 F.R.D. at 198.*

n178 *See German v. Federal Home Loan Mortgage Corp., 885 F. Supp. 537, 553 (S.D.N.Y. 1995).*

n179 *Labbate-D'Alauro v. GC Servs. Ltd. Pshp., 168 F.R.D. 451, 456 (E.D.N.Y. 1996)* (quotation omitted). *See also In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 145, 166-67 (2d Cir. 1987).*

The commonality requirement has been applied permissively in securities fraud litigation. n180 In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied. n181

n180 *See In re Blech Sec. Litig., 187 F.R.D. 97, 104 (S.D.N.Y. 1999).*

n181 *See, e.g., Blackie v. Barrack, 524 F.2d 891, 902 (9th Cir. 1975)* ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable. . . ."); *In re Baldwin-United Corp. Litig., 122 F.R.D. 424, 426 (S.D.N.Y. 1986)* ("The nub of plaintiffs' claims is that material information was withheld from the entire putative class in each action, either by written or oral communication. Essentially, this is a course of conduct case, which as pled satisfies the commonality requirement of *Rule 23. . . .").*

[*61]

### c. Typicality

The typicality requirement "is not demanding." n182 A named plaintiff's claims are "typical" pursuant to *Rule 23(a)(3)* where each class member's claims arise from the same course of events and each class member makes similar legal arguments to prove the defendants' liability. n183 "The rule is satisfied . . . if the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." n184

n182 *Forbush v. J.C. Penney Co., 994 F.2d 1101, 1106 (5th Cir. 1993)* (citing *Shipes v. Trinity Indus., 987 F.2d 311, 316 (5th Cir. 1993)).*

n183 *See Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 155 (2d Cir. 2001).*

n184 *Marisol A. v. Giuliani, 929 F. Supp. 662, 691 (S.D.N.Y. 1996), aff'd, 126 F.3d 372 (2d Cir. 1997).*

In addition, a putative class representative's claims are not typical if that representative is subject to unique [*62] defenses. n185 The test is whether the defenses will become the focus of the litigation, overshadowing the primary claims and prejudicing other class members. n186 Accordingly, the commonality and typicality requirements "'tend to merge' because 'both serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence.'" n187

n185 *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d Cir. 2000).*

n186 *See Landry v. Price Waterhouse Chartered Accountants, 123 F.R.D. 474, 476 (S.D.N.Y. 1989).*

n187 *Caridad, 191 F.3d at 291* (alterations in original) (quoting *General Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 157 n.13, 72 L. Ed. 2d 740, 102 S. Ct. 2364 (1982)).*

### D. Adequacy

Plaintiffs must also show that "the representative parties will fairly and adequately protect the interests of the class. [*63] " n188 To do so, plaintiffs must demonstrate that the proposed class representatives have no "interests [that] are antagonistic to the interest of other members of the class." n189 Courts have also considered "whether the putative representative is familiar with the action, whether he has abdicated control of the litigation to class counsel, and whether he is of sufficient moral character to represent a class." n190

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 20 of 32

Page 19

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

n188 *Fed. R. Civ. P. 23(a)(4). See also Banyai v. Mazur, 205 F.R.D. 160, 164 (S.D.N.Y. 2002).*

n189 *Baffa, 222 F.3d at 60.* An antagonistic interest arises when there is a "fundamental conflict or inconsistency between the claims of the proposed class members" that is "so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation." *In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 514-15 (S.D.N.Y. 1996). See also Robinson, 267 F.3d at 170* (holding that *Rule 23(a)(4)* requires "absence of conflict" between named representatives and class, as well as "vigorous prosecution"). [*64]

n190 *Noble v. 93 Univ. Place Corp., 224 F.R.D. 330, 2004 U.S. Dist. LEXIS 7631, No. 02 Civ. 1803, 2004 WL 944543, at *4 (S.D.N.Y. May 3, 2004)* (citations omitted).

Class representatives cannot satisfy *Rule 23(a)(4)*'s adequacy requirement if they "have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interest of the attorneys." n191 However, it is well established that "in complex litigations such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance upon the expertise of counsel is to be expected." n192

n191 *Baffa, 222 F.3d at 61* (quotations and citation omitted).

n192 *In re AM Int'l Inc., Sec. Litig. 108 F.R.D. 190, 196-97 (S.D.N.Y. 1985).*

The requirements of adequacy and typicality [*65] tend to bleed into one another. But "regardless of whether the issue is framed in terms of the typicality of the representative's claims . . . or the adequacy of [their] representation . . . there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to [her]." n193

n193 *Gary Plastic Packaging Corp. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990).*

### e. Ascertainability

Although "'*Rule 23(a)* does not expressly require that a class be definite in order to be certified[,] a requirement that there be an identifiable class has been implied by the courts.'" n194 "This implied requirement is often referred to as 'ascertainability.'" n195

n194 *In re MTBE, 209 F.R.D. at 336* (quoting *Zapka v. Coca-Cola Co., 2000 U.S. Dist. LEXIS 16552, No. 99 Civ. 8238, 2000 WL 1644539, at *2 (N.D. Ill. Oct. 27, 2000)*).

n195 *Id.* (citing *Van West v. Midland Nat'l Life Ins. Co., 199 F.R.D. 448, 451 (D.R.I. 2001); In re Copper Antitrust Litig., 196 F.R.D. 348, 358 (D. Wis. 2000)*).

[*66]

"An identifiable class exists if its members can be ascertained by reference to objective criteria." n196 "Class members need not be ascertained prior to certification, but 'the exact membership of the class must be ascertainable at some point in the case.'" n197 It must thus be "administratively feasible for a court to determine whether a particular individual is a member" of the class. n198 "The Court must be able to make this determination without having to answer numerous fact-intensive questions." n199

n196 *Id. at 337* (quoting *Zapka, 2000 U.S. Dist. LEXIS 16552, 2000 WL 1644539, at *2*). See also *Clay v. American Tobacco Co., 188 F.R.D. 483, 490 (S.D. Ill. 1999); Gomez v. Illinois State Bd. of Educ., 117 F.R.D. 394, 397 (N.D. Ill. 1987).*

n197 *Id.* (quoting *Rios v. Marshall, 100 F.R.D. 395, 403 (S.D.N.Y. 1983)*).

n198 *Rios, 100 F.R.D. at 403* (citing 7 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FED. PRAC. & PROC. § 1760 at 581 (1972)).

n199 *Daniels v. City of New York, 198 F.R.D. 409, 414 (S.D.N.Y. 2001)* (quotation omitted). A plaintiff's failure to plead a class that can be ascertained without subjective individual inquiries may cause individual issues (*i.e.,* whether each individual class member belongs in the class) to predominate. Consequently, the question of ascertainability takes on great

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 21 of 32

Page 20

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

importance in 23(b)(3) class actions, which may only be certified if common questions -- not individual inquiries -- predominate. *See infra* Part IV.B.1.

[*67]

## 2. *Rule 23(b)*

If plaintiffs can demonstrate that the proposed class satisfies the elements of *Rule 23(a)*, they must then establish that the action is "maintainable" as defined by *Rule 23(b)*. *Rule 23(b)* provides that "an action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition" one of three alternative definitions of maintainability is met. Plaintiffs argue that these putative class actions are maintainable under *subsection (b)(3)*, which requires "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." n200 *Rule 23(b)(3)* thus has two elements: "predominance" and "superiority."

n200 *Fed. R. Civ. P. 23(b)(3).*

### a. Predominance

"In order to meet the predominance requirement of *Rule 23(b)(3)*, a plaintiff must establish that the issues in the class action [*68] that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof." n201 "The *23(b)(3)* predominance requirement is 'more stringent' and 'far more demanding than' the commonality requirement of *Rule 23(a)*." n202 Courts frequently have found that the requirement was not met where, notwithstanding the presence of common legal and factual issues that satisfy the commonality requirement, individualized inquiries predominate. n203 Nonetheless, the Supreme Court has noted that "predominance is a test readily met in certain cases alleging consumer or securities fraud. . . ." n204

n201 *Wal-Mart Stores, Inc. v. Visa USA Inc. (In re Visa Check/MasterMoney Antitrust Litig.), 280 F.3d 124, 136 (2d Cir. 2001)* (quotation marks and citation omitted).

n202 *Maneely v. City of Newburgh, 208 F.R.D. 69, 76 (S.D.N.Y. 2002)* (quoting *Amchem Prods., 521 U.S. at 623-24*).

n203 See, e.g., *Augustin v. Jablonsky, 2001 U.S. Dist. LEXIS 10276, No. 99-CV-3126, 2001 WL 770839, at \*13 (E.D.N.Y. Mar. 8, 2001)* (finding individualized issues of proximate causation predominate despite plaintiffs' showing of commonality under *Rule 23(a)(2)*); *Martin v. Shell Oil Co., 198 F.R.D. 580, 592-93 (D. Conn. 2000)* (finding individualized proof of breach, causation, and trespass predominates where commonality was not contested); *In re MTBE, 209 F.R.D. at 350* (finding individual issues predominate although defendants conceded commonality). [*69]

n204 *Amchem Prods., 521 U.S. at 625.*

### b. Superiority

The superiority prong of *Rule 23(b)(3)* requires a court to consider whether a class action is superior to other methods of adjudication. n205 The court should consider, *inter alia*, "the interest of the members of the class in individually controlling the prosecution or defense of separate actions" and "the difficulties likely to be encountered in the management of a class action." n206

n205 *See Fed. R. Civ. P. 23(b)(3); see also Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 164, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (1974).*

n206 *Fed. R. Civ. P. 23(b)(3).*

### 3. *Rule 23(g)*

*Rule 23(g)* requires a court to assess the adequacy of proposed class counsel. To that end, the court *must* consider the following: (1) the work counsel has done in identifying or investigating potential claims in the action, (2) counsel's experience in handling class actions, other [*70] complex litigation, and claims of the type asserted in the action, (3) counsel's knowledge of the applicable law, and (4) the resources counsel will commit to representing the class. n207 The court *may* also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." n208

n207 *See Noble, 2004 U.S. Dist. LEXIS 7631, 2004 WL 944543, at \*5* (citing *Rule 23(g)(1)(C)(i)*). See also *In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir.*

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 22 of 32

Page 21

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

*1992)* ("Class counsel must be qualified, experienced and generally able to conduct the litigation.") (quotation marks and citation omitted).

n208 *Rule 23(g)(1)(C)(ii).*

Defendants do not contest the qualifications of class counsel, who easily meet the requirements of *Rule 23(g).*

### B. The Standard of Proof

All of these requirements are aimed at answering two questions: *Can* the claims be managed as class actions, and *should* they be managed as class actions? In this regard, the term "claims" [*71] encompasses not only plaintiffs' claims, but also any affirmative defenses that defendants may assert. n209

n209 *See Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 295 (1st Cir. 2000)* ("Affirmative defenses should [also] be considered in making class certification decisions."); *Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996)* (explaining that "a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues").

Courts must therefore exercise their judgment to further *Rule 23*'s goals of promoting judicial economy and providing aggrieved persons a remedy when it is not economically feasible to obtain relief through multiple individual actions. n210 The Second Circuit requires a "liberal" construction of *Rule 23.* n211 Thus, "to deny a class action simply because all of the allegations of the class do not fit together like pieces in a jigsaw puzzle [] would [*72] destroy much of the utility of *Rule 23.*" n212 Accordingly, in securities cases, "when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward." n213

n210 *See Califano v. Yamasaki, 442 U.S. 682, 701, 61 L. Ed. 2d 176, 99 S. Ct. 2545 (1979). See generally 5* JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.03 (3d ed. 2004) ("Rather than attempting to interpret *Rule 23* through a 'liberal' or 'strict' construction, the best policy is to take a flexible approach, and to interpret *Rule 23* so as to promote the purposes underlying the rule. The class action device was designed to promote judicial efficiency and to

provide aggrieved persons a remedy when individual litigation is economically unrealistic, as well as to protect the interests of absentee class members. The underlying purposes of *Rule 23* may supply meaningful guidance for courts called on to resolve disputes concerning the proper interpretation of the Rule.").

n211 *See Korn v. Franchard Corp., 456 F.2d 1206 (2d Cir. 1972); In re Lloyd's Am. Trust Fund Litig., 1998 U.S. Dist. LEXIS 1199, No. 96 Civ. 1262, 1998 WL 50211, at *5 (S.D.N.Y. Feb. 6, 1998)* ("The Second Circuit has directed district courts to apply *Rule 23* according to a liberal rather than a restrictive interpretation."). [*73]

n212 *Green v. Wolf Corp., 406 F.2d 291, 300 (2d Cir. 1968).*

n213 *In re Indep. Energy, 210 F.R.D. at 479* (citation omitted). To that end, the Second Circuit has recently reaffirmed that while class certification decisions are reviewed for abuse of discretion, it is "'noticeably less deferential to the district court when that court has denied class status than when it has certified a class.'" *Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002)* (quoting *Caridad, 191 F.3d at 291*).

Notwithstanding the general liberality in this circuit towards class certification motions, the Supreme Court unequivocally requires district courts to undertake a "rigorous analysis" that the requirements of *Rule 23* have been satisfied. n214 The burden rests on plaintiffs to make this showing. n215

n214 *Falcon, 457 U.S. at 161.*

n215 *See Caridad, 191 F.3d at 291.*

[*74]

The question remains, however, as to what constitutes a rigorous analysis. Must plaintiffs prove their case? Must a district court make factual and legal findings that the proposed class satisfies the Rule? Given that class certification decisions only became appealable in 1998, n216 and that the Supreme Court did not even articulate the "rigorous analysis" standard until 1982, the guidance from higher courts is scant.

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 23 of 32

Page 22

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

n216 *See Fed. R. Civ. P. 23(f)* and Advisory Committee Note.

In *Eisen v. Carlisle & Jacquelin,* a securities and antitrust suit that originated in this district, the Supreme Court made its first significant pronouncement on class certification. In that case, the district court, after conducting a hearing on the merits of plaintiffs' claims, imposed 90% of the cost of the class notice on defendants. Finding fault in the lower court's approach, the Supreme Court explained that "nothing in either the language or history of *Rule 23* . . . gives a court any authority to conduct a preliminary inquiry [*75] into the merits of a suit in order to determine whether it may be maintained as a class action. Indeed, such a procedure contravenes the Rule . . . ." n217

n217 *417 U.S. at 177. See also Miller v. Mackey Int'l, Inc., 452 F.2d 424, 427 (5th Cir. 1971)* ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of *Rule 23* are met.") *quoted in Eisen, 417 U.S. at 178.*

Many lower courts have understood this passage in *Eisen* to mean that on a *Rule 23* motion, as on a *Rule 12(b)(6)* motion, a court must assume the allegations contained in the complaint to be true and draw all inferences in plaintiffs' favor. In several cases decided shortly after *Eisen,* for instance, the Second Circuit held that on a *Rule 23* motion, "the facts will be taken as alleged in the complaint or as they appear without dispute in the record before us. [*76] " n218

n218 *Shayne v. Madison Square Garden Corp., 491 F.2d 397, 398 (*2d Cir. 1974). *Accord Shelter Realty Corp. v. Allied Maint. Corp., 574 F.2d 656, 661 n.15 (2d Cir. 1978)* ("We have previously held that it is proper to accept the complaint allegations as true in a class certification motion."). *See also Green, 406 F.2d at 294 n.1* (stating, in a case decided prior to *Eisen:* "We have assumed for the purpose of this appeal, as we are required to do, that the 'facts' stated in the complaint and accompanying papers submitted to Judge Ryan are true.").

But such a view -- if it was ever correct -- is no longer the prevailing view. As Judge Frank Easterbrook recently stated, "the proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in *Rule 23* and has nothing to recommend it." n219

n219 *Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 675 (7th Cir. 2001). See id. at 677* (explaining that *Eisen* does not require a court to accept the allegations of a complaint as true, but only prohibits a court from saying something like "I'm not going to certify a class unless I think that the plaintiffs will prevail."); *Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004)* ("*Eisen* simply restricts a court from expanding the *Rule 23* certification analysis to include consideration of whether the proposed class is likely to prevail ultimately on the merits."); *Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 186-89 (2d Cir. 2001)* (finding it "not only . . . appropriate, but also necessary" to look beyond the pleadings at class certification); *Waste Mgmt. Holdings, 208 F.3d at 298* ("[A] district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate."); *Castano, 84 F.3d at 744* (holding that *Eisen* does not suggest "that a court is limited to the pleadings when deciding on certification. . . . A district court certainly may look past the pleadings to determine whether the requirements of *Rule 23* have been met.").

[*77]

Just four years after *Eisen,* the Supreme Court explained in *Coopers & Lybrand v. Livesay* that although district courts should avoid weighing the merits of a plaintiff's claims at class certification, "class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" n220 Four years later, the Court imposed its "rigorous analysis" test. n221 Repeating the just-quoted language from *Livesay,* Justice Stevens wrote in *General Telephone Company of the Southwest v. Falcon* that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question. . . . Actual, not presumed, conformance with *Rule 23(a)* remains . . . indispensable." n222 In light of this language, it would be error to presume plaintiffs' allegations to be true.

n220 *437 U.S. 463, 469, 57 L. Ed. 2d 351, 98 S. Ct. 2454 (1978)* (quoting *Mercantile Nat'l Bank v. Langdeau, 371 U.S. 555, 558, 9 L. Ed. 2d 523, 83 S. Ct. 520 (1963)*). In a footnote, the

Case 1:04-cv-00331-JJF   Document 57-2   Filed 05/02/2005   Page 24 of 32

Page 23

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

Court quoted with approval a leading civil procedure treatise:

> Evaluation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims. The typicality of the representative's claims or defenses, the adequacy of the representative, and the presence of common questions of law or fact are obvious examples. The more complex determinations required in *Rule 23(b)(3)* class actions entail even greater entanglement with the merits . . . .

15 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3911, at p. 485, n.45 (1976) *quoted in Coopers & Lybrand v. Livesay, 437 U.S. at 469, 57 L. Ed. 2d 351, 98 S. Ct. 2454 n.12.* [*78]

n221 *Falcon, 457 U.S. at 161.*

n222 *Id. at 160.*

The tricky question that remains, however, is: If a court may not take the allegations of the complaint as true, what showing must plaintiffs make in support of their class certification motion? On this question, the Supreme Court has been silent.

At least two Courts of Appeal have implied that plaintiffs' showing on a class certification motion must satisfy the requirements of *Rule 23* by a *preponderance of the evidence* or a similar standard. In *Szabo v. Bridgeport Machines, Inc.,* the Seventh Circuit held that where it is necessary to make legal or factual inquiries on a *Rule 23* motion, the court should "receive evidence (if only by affidavit) and resolve the disputes before deciding whether to certify the class," even if such a resolution requires a "preliminary inquiry into the merits." n223 *Szabo* likened a district court's finding under *Rule 23* to the sorts of "inquiries routinely [undertaken] under *Rule 12(b)(1)* and *12(b)(2)* before deciding whether [the courts] possess jurisdiction over [*79] the subject matter of the case and the persons of the defendants, the location of the proper venue, application of *forum non conveniens,* and other preliminary issues." n224 If such situations are truly

analogous to class certification, then a district court would need to find that the proposed class satisfies each of the elements of *Rule 23* by a preponderance of the evidence. n225

n223 *249 F.3d at 676.*

n224 *Id.*

n225 *See, e.g., Luckett v. Bure, 290 F.3d 493, 496-97 (2d Cir. 2002)* (noting that a district court must find the existence of subject matter jurisdiction by a preponderance of the evidence); *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996)* (same, for personal jurisdiction); *GTFM Inc. v. Int'l Basic Source, Inc., 2002 U.S. Dist. LEXIS 345, No. 01 Civ. 6203, 2002 WL 42884, at *2 (S.D.N.Y. Jan. 11, 2002)* (same, for change of venue); *Ultra Sucro Co. v. Illinois Water Treatment Co., 146 F. Supp. 393, 398 (S.D.N.Y. 1956)* (I. Kaufman, J.) (same, for *forum non conveniens*).

[*80]

Even more recently, the Fourth Circuit held -- in a securities fraud case -- that a district court must make "findings" in resolving a *Rule 23* motion, even if such findings overlap with the merits. n226 The court explained:

> The . . . concern that *Rule 23* findings might prejudice later process on the merits need not lead to the conclusion that such findings cannot be made. The jury or factfinder can be given free hand to find all of the facts required to render a verdict on the merits, and if its finding on any fact differs from a finding made in connection with class action certification, the ultimate factfinder's finding on the merits will govern the judgment. A model for this process can be observed in the context of the preliminary injunction practice. Courts make factual findings in determining whether a preliminary injunction should issue, but those findings do not bind the jury adjudging the merits, and the jury's findings on the merits govern the judgment to be entered in the case. n227

The court's analogy to a preliminary injunction hearing suggests that on a class certification motion in the Fourth

Case 1:04-cv-00331-JJF   Document 57-2   Filed 05/02/2005   Page 25 of 32

Page 24

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

Circuit, a plaintiff must establish the elements of *Rule 23* [*81] by evidence sufficient to establish a "likelihood of success on the merits" -- a burden similar to the Seventh Circuit's apparent requirement that plaintiffs prove that they satisfy *Rule 23* by a preponderance of the evidence. n228

> n226 *Gariety, 368 F.3d at 366.*
>
> N227 *Id.*
>
> n228 In the Fourth Circuit, a preliminary injunction may be granted only where the court finds that "the moving party clearly establishes entitlement to the relief sought." *Hughes Network Sys. Corp. v. Interdigital Communications Corp.,* 17 F.3d 691, 693 (4th Cir. 1994). While such a determination entails some fact-finding, the moving party need not establish her claims by a preponderance of the evidence; rather, "a probable right, and a probable danger that such right will be defeated, without the special interposition of the court, is all that need be shown." *United States v. Fang,* 937 F. Supp. 1186, 1197 (D. Md. 1996) (construing *Hughes*) (citations omitted).

Both the Supreme [*82] Court and the Second Circuit, however, have suggested that requiring a plaintiff to establish the elements of *Rule 23* -- especially when those elements are "enmeshed" in the merits -- by a preponderance of the evidence would work an injustice. In *Eisen,* the Court noted that

> a preliminary determination of the merits may result in substantial prejudice to the defendant, since of necessity it is not accompanied by the traditional rules and procedures applicable to civil trials. The court's tentative findings, made in the absence of established safeguards, may color the subsequent proceedings and place an unfair burden on the defendant. n229

> n229 *417 U.S. at 178.*

More recently, in *Caridad v. Metro-North Commuter Railroad,* the Second Circuit reminded district courts that they "must not consider or resolve the merits of the claims of the purported class." n230 Rather, a plaintiff is only required to make "some showing." n231 Differing from the Seventh and Fourth Circuits, the

Second [*83] Circuit clearly held that "a weighing of the evidence is not appropriate at this stage in the litigation." n232 If a district court is forbidden to weigh the evidence on class certification, *a fortiori,* plaintiffs need not establish the elements of *Rule 23* by a preponderance of the evidence.

> n230 *191 F.3d at 293* (citing *Eisen, 417 U.S. at 177*).
>
> n231 *Id. at 292.*
>
> n232 *Id. at 293.*

Even more recently, in *In re VISA Check/MasterMoney Antitrust Litigation,* the Second Circuit reiterated the "some showing" standard. Juxtaposing the requirements of *Falcon* and *Caridad,* the court held that "although a trial court must conduct a 'rigorous analysis' to ensure that the prerequisites of *Rule 23* have been satisfied before certifying a class, 'a motion for class certification is not an occasion for examination of the merits of the case.'" n233 In the context of expert reports, for example, *VISA Check* teaches that a district court "may not weigh conflicting expert [*84] evidence or engage in 'statistical dueling' of experts." n234 Instead, the *sole* job of a district court in assessing expert evidence on a class certification motion is to "ensure that the basis of the [plaintiff's] expert opinion is not so flawed that it would be inadmissible as a matter of law." n235

> n233 *280 F.3d at 134-35* (quoting *Caridad, 191 F.3d at 291*).
>
> n234 *Id. at 135* (quoting *Caridad, 191 F.3d at 292*).
>
> n235 *Id.* (citing cases).

In sum, under the binding caselaw in this Circuit, a district court may not simply accept the allegations of plaintiffs' complaint as true. Rather, it must determine, after a "rigorous analysis," whether the proposed class comports with all of the elements of *Rule 23.* In order to pass muster, plaintiffs -- who have the burden of proof at class certification -- must make *"some showing."* That showing may take the form of, for example, expert opinions, evidence (by document, affidavit, live testimony, or otherwise), [*85] or the uncontested allegations of the complaint.

## IV. DISCUSSION

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 26 of 32

Page 25

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

## A. *Rule 23(a)*

### 1. Commonality

The common issues of liability presented in these six class actions are overwhelming. Any plaintiff seeking damages -- whether proceeding individually or as a class member -- will have to establish the following facts, all of which defendants vigorously dispute: n236

. The participation of each defendant in the alleged scheme.

. The existence and terms of tie-in agreements, and the process by which defendants induced allocants to enter into tie-in agreements.

. Defendants' failure to disclose the existence, extent and purpose of the tie-in agreements, and the materiality of that omission.

. The existence and magnitude of excess compensation, and how such payments were induced. If excess compensation was paid in unusual forms, such as wash sales, that those actions amounted to payment of excess compensation.

. Defendants' failure to disclose excess compensation, and the materiality of defendants' omission.

. Where defendants conducted a secondary public offering ("SPO") (*e.g.,* Corvis, Sycamore and iXL), that the SPO offering price [*86] was derived from prices that were artificially inflated through market manipulation, that defendants failed to disclose the price inflation, and the materiality of that omission.

. That plaintiffs are entitled to a presumption of reliance.

. That plaintiffs bought their shares in an efficient market.

. That analysts reporting on the specific securities had conflicts of interest, that the analysts failed to disclose such conflicts, and that such omissions were material.

. That analyst coverage was used in the marketing of defendants' IPOs.

. That price-targets set in analyst reports were the product of manipulated prices.

. That tie-in agreements and analyst reports materially affected stock prices.

. That defendants acted with scienter in manipulating stock prices.

. That defendants' manipulation actually caused inflation of stock prices.

. That the artificial inflation of stock prices caused by the unlawful scheme dissipated over time.

. The true value and actual price of the stock at the time plaintiffs purchased and sold stock.

. That press reports and regulatory announcements were neither sufficiently clear nor specific to [*87] place plaintiffs on inquiry notice of the alleged scheme with respect to each issuer. n237

Proof of these facts may require extensive discovery and expert testimony, and, if the three and one-half years that have elapsed since the filing of the first suit in these consolidated actions, *Makaron v. VA Linux,* are any indication, the disposition of *all* of the 310 consolidated class actions will take years.

n236 The following is a list of common issues for all plaintiffs asserting claims under *section 10(b)* and *Rule 10b-5.* Those plaintiffs who also fall into plaintiffs' *section 11* classes will need to prove additional common issues with respect to those claims, including whether class members who bought in the aftermarket can trace their shares to a defective registration statement and whether class members who bought after a 12-month earnings statement had been issued can prove that the earnings statement failed to cure the registration statement's misrepresentations and omissions.

n237 *See* Trial Plan. This list includes some of the common questions anticipated by plaintiffs and the Court. Defendants, of course, may present defenses that raise issues common to all

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 27 of 32

Page 26

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

class members and that can be decided based on common proof.

[*88]

By contrast, only a few authentically individualized issues remain. Most prominent is the need to calculate damages individually, but even that may be accomplished by applying a common formula to each individual claim. n238 Indeed, the quantum of damages is the *only* element *plaintiffs* must prove on an individual basis. All other individual questions (*e.g.,* actual knowledge and inquiry notice) will arise because of issues *defendants* choose to raise. In fact, many of defendants' anticipated defenses will require proof that is relevant to large groups within the class; for example, if defendants assert that a plaintiff's claim is barred because the June 16, 1999, MSNBC article placed that plaintiff on notice that the IPO market was tainted by fraud, the determination of that issue is relevant to all plaintiffs who purchased after the MSNBC article. Similarly, if defendants argue that a plaintiff's claim is barred because her trading history shows the payment of undisclosed compensation through "wash" sales, the questions of whether the wash sale constitutes undisclosed compensation and whether a particular pattern of trading activity constitutes a wash sale bear on all [*89] similarly situated class members.

n238 *See infra* Part IV.B.3.

As a result, plaintiffs have satisfied the *Rule 23(a)* commonality requirement. Defendants' contention that individual issues will predominate at trial is addressed in the discussion of the *Rule 23(b)(3)* predominance requirement. n239

n239 *See infra* Part IV.B.

**2. Typicality**

"When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." n240 "The factual background of each named plaintiff's claim need not be identical to that of all the class members as long as 'the disputed issue of law or fact occup[ies] essentially the same degree of centrality to the named [*90] plaintiff's claim as to that of other members of the proposed class.'" n241 For example, where plaintiffs allege a market manipulation scheme,

typicality may be satisfied despite fluctuations in the amount of inflation over time, even though such fluctuations create differences between class members and class representatives in terms of how much, if any, of their loss was caused by an alleged scheme. n242

> n240 *Robidoux v. Celani, 987 F.2d 931, 936-37 (2d Cir. 1993)*.
>
> n241 *In re Worldcom, 219 F.R.D. at 280* (alteration in original) (quoting *Caridad, 191 F.3d at 293*).
>
> n242 *See In re Worldcom, 219 F.R.D. at 280; cf. In re Sumitomo Copper Litig., 262 F.3d 134, 140-41 (2d Cir. 2001);*

Plaintiffs' proposed class representatives allege that they were harmed in the same "unitary scheme" as the rest of the class. n243 All class members, including the proposed class representatives, bought shares allegedly inflated by defendants' [*91] wrongdoing, and each was damaged thereby. n244 The disputed issues are central to the claims of all proposed class representatives and the class members they seek to represent. n245

> n243 Plaintiffs' Reply at 15.
>
> n244 Pappas, one of plaintiffs' proposed Engage class representatives, was an allocant and did not purchase shares in the aftermarket. He is clearly qualified to serve as plaintiffs' Engage *section 11* class representative. *See infra* Part IV.B.4. Pappas will therefore likely be preoccupied by showing that the omission of the alleged scheme (*i.e.,* tie-in agreements, undisclosed compensation and analyst conflicts) from the registration statement was material, and *not* that the alleged scheme actually drove up prices in the aftermarket. Similarly, to the extent that Pappas asserts market manipulation claims, defendants may challenge his ability to prove loss causation (because he bought shares before any artificial inflation created by tie-in agreements affected the market price). Accordingly, Pappas is not a suitable *10b-5* class representative.
>
> n245 Some class representatives, though, are not qualified to represent plaintiffs' *section 11* classes because they would be preoccupied by the unique defense that they cannot trace their shares to a defective registration statement. *See infra* Part IV.B.4.b.

[*92]

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 28 of 32

Page 27

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

However, even where a class representative's motivation to prove the underlying fraud is typical of all class members, she may nonetheless be excluded as atypical if she is "subject to unique defenses which threaten to become the focus of litigation." n246 Defendants contend that some of plaintiffs' proposed class representatives are subject to unique defenses, and thus atypical, because they: (1) were allocants, engaged in tie-in agreements, or were knowledgeable institutional investors, and thus can be charged with knowledge of the alleged scheme; n247 (2) purchased stock after publication of certain articles or after the SEC Bulletin, and thus were on inquiry notice of the alleged scheme; n248 (3) were short sellers, momentum traders or day traders, and therefore cannot avail themselves of a presumption of reliance on stock prices; n249 or (4) purchased stock after the close of the class period or after filing suit, and therefore cannot be said to have relied on the integrity of the market, because they were willing to buy after learning of the alleged scheme. n250

n246  *Gary Plastic, 903 F.2d at 180.* While *Gary Plastic* also found that a holder of certificates of deposit ("CDs") who discovered that interest on those CDs was being fraudulently underpaid but nevertheless allowed the CDs to roll over several times was subject to such a unique defense, *id.,* such a finding is not mandated here for proposed class representatives who purchased shares after the close of the class period. In an efficient stock market -- as opposed to the market for CDs -- information that share prices have been fraudulently manipulated is immediately reflected in share prices, and the resulting artificial inflation disappears. *See infra* Part IV.B.1. [*93]

n247  *See* Engage Mem. at 24; Firepond Mem. at 28-31; VA Linux Mem. at 40 n.39.

n248  Defendants argue that such notice would both bar some class representatives' claims under the *section 10(b)* statute of limitations, *see* iXL Mem. at 18-19, and prevent others from enjoying a presumption of reliance, *see* Corvis Mem. at 18-19.

n249  *See* Firepond Mem. at 31-32.

n250  *See* Engage Mem. at 33-34.

Defendants' arguments are unavailing. The question of participation resulting in actual knowledge is adequately addressed by the revised class definition. n251 The question of whether any particular publication placed a class representative on inquiry notice of the alleged scheme early enough that her claim would be barred under the *section 10(b)* statute of limitations is itself a question common to all class members. Defendants may also choose to challenge the rebuttable presumption of reliance with respect to any individual class representative on the grounds that some publication (*e.g.,* the MSNBC article or the SEC Bulletin) placed her on inquiry notice of the alleged scheme. [*94] This will not raise a unique defense. To the contrary, a determination that such publications were not sufficient to place the class representative on inquiry notice would inure to the benefit of all class members who, like the class representative, bought after the publication was issued. n252 Conversely, if defendants succeed in rebutting the presumption of reliance as to any class representative, then each similarly situated class member would be forced to prove reliance individually, thereby causing individual questions to predominate for those investors and mandating amendment of the class definition or decertification.

n251  *See infra* Part IV.A.4.

n252  *See infra* Part IV.B.1.b.(3).

Similarly, defendants' attacks on the proposed class representatives' reliance on the integrity of the market because of "unique" investment strategies do not defeat typicality. n253 The classes as pled include many investors with similar investment strategies, so any "unique defenses" based on those strategies are [*95] in fact common questions. n254 Finally, defendants' argument that class representatives who purchased after the close of the class period should be excluded because the "fact that [the] proposed plaintiff purchased shares both after learning of the fraud and after filing suit rebuts the fraud-on-the-market presumption" n255 makes no sense. Just because a stock is manipulated at one point in its trading history does not mean that the stock is forever tainted; a plaintiff may legitimately believe that, although his past losses were caused by market manipulation, the effect of that manipulation has dissipated and the stock price once again reflects all available information about its true value.

n253  *See, e.g., In re Worldcom, 219 F.R.D. at 281-82* (rejecting similar arguments, noting that "each of these methods of making investment decisions is representative of methods used by many other investors. Each of the methods

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 29 of 32

Page 28

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

reflects an evaluation of the publicly available information about Worldcom . . . .").

n254 *See infra* Part IV.B.1.b.(2).

n255 Engage Mem. at 34 (construing *Rolex Employees Ret. Trust v. Mentor Graphics Corp., 136 F.R.D. 658, 664 (D. Or. 1991)*).

[*96]

Plaintiffs' proposed class representatives' claims arise from the same course of events, and require the same legal arguments, as those of the class at large. Consequently, because defendants have not established that any proposed class representative in the six focus cases will assert atypical claims or be subject to unique defenses that "overshadow[] the primary claims and prejudice other class members," plaintiffs have satisfied the *Rule 23(a)* typicality requirement with respect to their Exchange Act claims. n256 However, certain proposed class representatives are atypical with respect to plaintiffs' *section 11* classes because they are subject to the unique defense that they cannot trace their shares to an allegedly defective registration statement, as discussed in Part IV.B.4.b. below.

n256 *In re MTBE, 209 F.R.D. at 338 n.22.*.

### 3. Adequacy

#### a. Antagonistic Interests

Defendants attack as inadequate any proposed class representative who is either a proposed class representative [*97] or a class member in another of these consolidated actions. n257 Defendants submit that this dual role creates a conflict of interest because plaintiffs with interests in multiple cases may seek to increase any settlement designation in favor of one action at the expense of another.

n257 *See* Engage Mem. at 31-32. These representatives include Pappas and Kasbarian, who seek to represent the Engage class, *see id;* Zitto, a class representative in Firepond, *see* Firepond Mem. at 35; and Basu, a class representative in Corvis, *see* Corvis Mem. at 17.

Defendants cite two cases in support of their theory, but both are inapposite. *First,* in *duPont v. Wyly,* the court found duPont to be an inadequate class representative because he was also the plaintiff in a personal action he brought against University Computing

Company ("UCC"), a defendant in *Wyly.* n258 Given that recovery in either case could have rendered UCC judgment-proof, the court found that duPont could not represent the class as he [*98] would have an interest in ensuring his own recovery in his personal law suit. n259 *Second,* in *Boro Hall v. Metropolitan Tobacco Co.,* Jamaica Tobacco, a proposed class representative, had not only brought a personal antitrust action against Metro Tobacco, but was also a competitor of other class members. n260 Furthermore, Metro Tobacco counterclaimed against Jamaica Tobacco, giving Jamaica Tobacco an incentive to settle that other class members would not share. n261

n258 *61 F.R.D. 615, 624 (D. Del. 1973).*

n259 *See id.*

n260 *74 F.R.D. 142, 144 (E.D.N.Y. 1977).*

n261 *See id.*

It is overwhelmingly likely that the interests of the proposed class representatives, even in a settlement posture, will be in maximizing the possible recovery of all classes in which the class representative is a member. For a class representative to profit by reducing the recovery of the class she represents for the sake of another class, her monetary interest in the benefitted class would [*99] have to be many times greater than her interest in the class she represents, because the money sacrificed by one class is likely to be distributed among three hundred different classes, each with thousands of class members. There is no evidence that any class representative has such a disproportionately small interest in the class that he, she, or it seeks to represent. Furthermore, this Court will review the fairness of any settlement to ensure that it is reasonable and adequate, and to prevent inequitable distribution. n262 For these reasons, membership in more than one of these consolidated classes does not result in an interest so antagonistic as to prevent the adequate representation of absent class members.

n262 *See Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir. 2000).*

#### b. Familiarity with the Action

Defendants argue that the proposed Sycamore class representatives cannot fulfill their roles as fiduciaries to class members because they are unfamiliar both with their case and their [*100] duties as class representatives. n263 For example, defendants claim that

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 30 of 32

Page 29

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

Henderson, a Sycamore class representative, "does not understand the scheme alleged" in the Complaint. n264 However, at his deposition Henderson described the alleged laddering, biased analyst reporting, and the inflated commissions allegedly received by underwriter defendants. n265 Henderson also described his responsibilities as class representative to include retaining the best available counsel, remaining involved in the litigation, and ensuring that class members are kept informed about the litigation and that their interests are protected. n266 Given his familiarity with the case and his responsibilities, Henderson satisfies *Rule 23(a)(4)*'s adequacy requirement. Gangaiah's testimony demonstrates a similar level of familiarity with the case and an understanding of his responsibilities. n267 Lemberg, on the other hand, is clearly not a sophisticated investor and was unable to describe the operation of the alleged market manipulation. n268 "Regardless, 'it is unreasonable to expect an ordinary investor . . . to have the requisite sophistication and legal background to assist counsel in assessing liabilities [*101] under the securities laws.'" n269 Even Lemberg, with his basic understanding of the case, satisfies *Rule 23(a)(4)*'s adequacy requirement. n270 No evidence suggests that any proposed class representative is so lacking in her understanding of and involvement in her case that she is inadequate.

n263 *See* Sycamore Mem. at 44-50 (discussing the inadequacies of class representatives Gangaiah, Henderson, and Lemberg). Sycamore's claim that class representatives have "conflicting views of the theory of [the] case," *id.*, is essentially identical to their claim that the representatives do not understand the nature of the litigation or their responsibilities.

N264 *Id.* at 47.

n265 *See* Henderson Dep. at 107-11, 121-34.

n266 *See id.* at 165-66.

n267 *See* Gangaiah Dep. at 59-66, 98-99.

n268 *See* Lemberg Dep. at 89.

n269 *In re College Bond Consol. Litig.*, 1994 U.S. Dist. LEXIS 7074, No. 93 Civ. 2348, 1994 WL 236163, at *4 (S.D.N.Y. May 31, 1994) (quoting *Klein v. A.G. Becker Paribas Inc.*, 109 F.R.D. 646, 651-52 (S.D.N.Y. 1986)).

n270 *See* Lemberg Dep. at 89, 145.

[*102]

**c. Abdication of Control to Class Counsel**

Defendants argue that the proposed class representatives have abdicated to class counsel their roles as fiduciaries for the class and so are inadequate to serve as representatives. n271 Essentially, defendants raise the concern that by relinquishing responsibility for prosecuting the case to class counsel, the proposed representatives will be unable to protect the class members should a conflict of interest arise between class counsel and class members.

n271 *See* Firepond Mem. at 32-36.

Defendants' concern is unwarranted. To the extent that it relates to the representatives' purported lack of participation or control, this argument is merely an extension of the familiarity objection, which I have already rejected. Even if, as defendants claim, counsel and the class representatives have conflicting views of the case, "a great deal of reliance upon the expertise of counsel is to be expected." n272 For this reason, "the ultimate responsibility to ensure that the [*103] interests of class members are not subordinated to the interests of either the class representatives or class counsel rests with the district court" -- not the proposed class representatives. n273

n272 *In re AM Int'l.*, 108 F.R.D. at 196-97.

n273 *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995). The foregoing discussion also disposes of defendants' concern that the "class representatives and their own counsel have conflicting views of the theory of this case." Sycamore Mem. at 44.

**D. Moral Character**

"Although credibility may warrant denying certification, 'it is generally inappropriate to deny certification based on questions going to the credibility of named plaintiffs.'" n274 Defendants assert that certain class representatives are inadequate because of their failure to disclose all transactions in the relevant security, inconsistencies in their sworn statements and testimony, and, in the case of Kasbarian, destruction of trading records [*104] after learning of the alleged fraud (but prior to filing suit). n275

n274 *Saddle Rock Partners v. Hiatt, 2000 U.S. Dist. LEXIS 11931, No. 96 Civ. 9474, 2000*

WL 1182793, at *5 (S.D.N.Y. Aug. 21, 2000) (quoting *In re Frontier Ins. Group Secs. Litig.*, 172 F.R.D. 31, 41 (E.D.N.Y. 1997)).

n275 *See, e.g.*, Engage Mem. at 35 (discussing Kasbarian); Firepond Mem. at 36-37 (discussing Zhen); Sycamore Mem. at 46-50 (discussing Gangaiah and Lemberg).

Defendants' argument has no merit. There is no evidence that any of the conduct here was the result of bad faith or an attempt to deceive defendants or the court. For example, Kasbarian's destruction of trading records occurred before he was aware of the possibility of a lawsuit; he had no reason to believe he would need those records. n276 Such conduct does not render Kasbarian inadequate to prosecute the interests of the class. Furthermore, none of the inconsistencies or omissions complained of by defendants, such as failing to disclose certain specific [*105] transactions, affect the merits of the class representatives' manipulation claims. Given the complexity of these actions, minor testimonial inconsistencies and omissions are likely to occur. Only if "the problems alleged call the validity of the plaintiffs' entire case into question" do such credibility issues merit denial of class certification. n277 The temporary omission of certain transactions from class representatives' disclosures does not call into question the overall validity of their claim that they lost money because of defendants' manipulation of securities markets. Denial of certification on credibility grounds is not warranted. n278

n276 *See* Kasbarian Dep. at 113.

n277 *Harrison v. Great Springwaters of Am., Inc.*, 1997 U.S. Dist. LEXIS 23267, No. 96 Civ. 5110, 1997 WL 469996, at *6 (E.D.N.Y. June 18, 1997).

n278 A number of courts have reached the same conclusion. *See, e.g., Saddle Rock Partners*, 2000 U.S. Dist. LEXIS 11931, 2000 WL 1182793, at *5; *In re Frontier Ins. Group*, 172 F.R.D. at 41; *Kalodner v. Michaels Stores, Inc.*, 172 F.R.D. 200, 210 (N.D. Tex. 1997); *In re Consumers Power Co. Sec. Litig.*, 105 F.R.D. 583, 605-06 (E.D. Mich. 1985); *see also* Plaintiffs' Reply at 111-18.

[*106]

### 4. Ascertainability

Ascertainability, not ascertainment, is a prerequisite to class certification. n279 Accordingly, at this stage of the proceedings, plaintiffs need not present an airtight method of identifying every class member who may be entitled to a recovery. Rather, the goal at this stage is to define a class that excludes, with broad strokes, segments of the proposed class that are not so entitled. Precise identification of every class member may be accomplished at a later stage. n280

n279 *See, e.g., Dunnigan v. Metropolitan Life Ins. Co.*, 214 F.R.D. 125, 135 (S.D.N.Y. 2003) ("Class members need not be ascertained prior to certification, but must be ascertainable at some point in the case.").

n280 *See id.; Dorchester Investors v. Peak Trends Trust*, 2002 U.S. Dist. LEXIS 3067, No. 99 Civ. 4696, 2002 WL 272404, at *6 (S.D.N.Y. Feb. 26, 2002) (acknowledging that class members who knew of the alleged scheme cannot recover); *id.* 2002 U.S. Dist. LEXIS 3067, [WL] at 6 n.6 (certifying class even in light of "Defendants['] argument that because neither those who sell short nor those who knew about the short selling scheme can be readily identified, the class should not be certified," stating that "the Court rejects this argument because, as discussed above, certifying the class is the most efficient method available for [a securities] class action. The parties must use the available discovery mechanisms to determine who falls in or out of the class . . . .").

[*107]

Defendants impliedly argue that because the Federal Rules of Civil Procedure were revised in 2003 to eliminate the availability of "conditional certification," perfect ascertainment of class members should be a prerequisite of class certification. n281 This is not so. The 2003 revisions to *Rule 23* do not require identification of every class member prior to certification. Rather, to certify a class, a court must simply be "satisfied that the requirements of *Rule 23* have been met." n282 The court may alter or amend the certification order, or even decertify the entire class, at any point before final judgment if the need arises. n283 To require the identification of all class members at the class certification stage would impermissibly require a determination, on the merits, of the validity of each proposed class member's claim. n284

n281 *See* Class Def. Opp. at 2 n.1 (challenging plaintiffs' citation of *Dorchester*, 2002 U.S. Dist. LEXIS 3067, 2002 WL 272404,

Case 1:04-cv-00331-JJF    Document 57-2    Filed 05/02/2005    Page 32 of 32

Page 31

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

on the ground that *Dorchester* "merely held -- when conditional certification was still permissible -- that questions about the class period and the knowledge of a small number of investors should not bar an initial certification ruling that would be modified as appropriate in light of discovery"). [*108]

n282 *Fed. R. Civ. P. 23(c)(1)(C)* Advisory Committee Note.

n283 *See id.* ("For example, proceedings to define the remedy may demonstrate the need to amend the class definition or subdivide the class. . . . A determination of liability after certification . . . may show a need to amend the class definition. Decertification may be warranted after further proceedings.").

n284 *See In re MTBE, 209 F.R.D. at 337 n.20* (quoting *Forbush, 994 F.2d at 1104-06*).

"It is axiomatic that one cannot commit a fraud . . . against oneself." n285 This truism takes on special importance when the participation of certain investors (*i.e.,* those who engaged in laddering and paid undisclosed compensation) is integral to the alleged scheme. It should be noted that this inquiry -- which seeks to ascertain which investors *could not have been defrauded* because of their actual knowledge of the alleged scheme -- is not the same as the question of which investors knew enough that they *could not have relied* on the market price of securities as an accurate measure of their [*109] intrinsic value. n286 That question is one of predominance, not ascertainability. n287 Plaintiffs concede that investors who knowingly participated in the alleged scheme have no right to recover. n288 Plaintiffs' revised class definition seeks to exclude these investors. n289

n285 *In re RCS Engineered Products Co., Inc., 102 F.3d 223, 226 (6th Cir. 1996). See also Gurary v. Winehouse 190 F.3d 37, 45 (2d Cir. 1999)* (a plaintiff "must establish that he or she engaged in a securities trade in ignorance of the fact that the price was affected by the alleged manipulation.").

n286 *See Hevesi v. Citigroup, Inc., 366 F.3d 70, 77 (2d Cir. 2004)*.

n287 *See infra* Part IV.B.1.b.(3).

n288 *See* Plaintiffs' Reply at 5 ("As a result, the Class definition eliminates anyone who knowingly participated in the alleged misconduct.").

n289 Of course, plaintiffs' suggestion is not binding; it is the Court, not plaintiffs, that ultimately decides what class to certify. *See, e.g., Gibson v. Local 40, Supercargoes & Checkers of the ILWU, 543 F.2d 1259, 1264 (9th Cir. 1976)* (narrowing proposed class definition); *Taylor v. Safeway Stores, Inc., 524 F.2d 263, 269 (10th Cir. 1975)* (same) *overruled on other grounds by Ruckelshaus v. Sierra Club, 463 U.S. 680, 77 L. Ed. 2d 938, 103 S. Ct. 3274 (1983); Martin v. American Med. Sys., Inc., 1995 U.S. Dist. LEXIS 22169, No. IP 94-2067-C-H/G, 1995 WL 680630, at *6 (S.D. Ind. Oct. 25, 1995)* ("The court need not merely accept or reject plaintiffs' proposed class definition without considering modifications of that definition.").

[*110]

The first and most important inquiry in determining which groups of investors to exclude on the basis of actual knowledge is the question of what the scheme entails. In this case, plaintiffs have alleged that defendants engaged in the following scheme to manipulate the market:

15. The Underwriter Defendants set about to ensure that there would be large gains in aftermarket trading on shares following initial public offerings by improperly creating artificial aftermarket demand. They accomplished this by conditioning share allocations in initial public offerings upon the requirement that customers agree to purchase, in the aftermarket, additional shares of stocks in which they received allocations, and, in some instances, to make those additional purchases at pre-arranged, escalating prices ("Tie-in Agreements").

. . .

16. By extracting agreements to purchase shares in the aftermarket, the Underwriter Defendants created artificial demand for aftermarket shares, thereby causing the price of the security to artificially escalate as soon as the shares were publicly issued.