# TAB E

# (part 2 of 2)

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 2 of 26

Page 32

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

17. Not content with record underwriting fees obtained in connection with new offerings, the [*111] Underwriter Defendants sought, as part of their manipulative scheme, to further enrich themselves by improperly sharing in the profits earned by their customers in connection with the purchase and sale of IPO securities. The Underwriter Defendants kept track of their customers' actual or imputed profits from the allocation of shares in the IPOs and then demanded that the customers share a material portion of the profits obtained from the sale of those allocated IPO shares through one or more of the following types of transactions: (a) paying inflated brokerage commissions; (b) entering into transactions in otherwise unrelated securities for the primary purpose of generating commissions; and/or (c) purchasing equity offerings underwritten by the Underwriter Defendants, including, but not limited to, secondary (or add-on) offerings that would not be purchased but for the Underwriter Defendants' unlawful scheme. (Transactions "(a)" through "(c)" above will be, at varying times, collectively referred to hereinafter as "Undisclosed Compensation). n290

Clearly, the laddering scheme plaintiffs allege includes three necessary components: the tie-in agreements, the undisclosed compensation, [*112] and the escalation in share prices caused by artificial demand. Accordingly, an investor can only be said to have full knowledge of the alleged laddering scheme if she is aware of all three components.

n290 MA PP14, 16-17.

Defendants complain that "identifying claimants with knowledge would be a massive undertaking in light of plaintiffs' assertion that thousands of [investors] participated in the alleged manipulation in hundreds of offerings." n291 Defendants base their assertion of widespread participation on plaintiffs' own allegations, which read in pertinent part:

> 30. Institutional and retail investors, who have received allocations in initial public offerings from various firms, have noted that it was common knowledge that the

clients who were forced to pay Undisclosed Compensation to the underwriters, in the form of commissions or otherwise, and who agreed to purchase in the aftermarket received allocations in IPOs.

31. This industry-wide understanding was sometimes expressed by the Underwriter [*113] Defendants and other times implied, but nevertheless invariably communicated between those with the power to make allocations of shares in initial public offerings (the underwriters) and customers seeking the allocations. n292

n291 Defendants' Sur-Reply at 5. Defendants assert that exclusion of class members who had actual knowledge of the alleged scheme would require "claimant-by-claimant inquiry at trial." *Id.* at 6. This argument involves elements both of ascertainability and predominance. Essentially, defendants argue that if plaintiffs cannot at this stage provide a means for excluding *all* class members with actual knowledge, then trial of these actions will be dominated by individual inquiries into whether *each* class member had knowledge. However, if plaintiffs can plead an ascertainable class, then individual determinations of actual knowledge -- ultimately inquiries into who belongs in the class -- will not predominate at trial. Whether the analysis is denominated as "ascertainability" or "predominance," the outcome is the same.

n292 MA PP30-31.

[*114]

Defendants' concerns are unfounded. *First,* a close look at these paragraphs is absolutely necessary in view of defendants' argument. Paragraph 30 reveals that the allegation is only that "investors [who are allocants] have noted that . . . ." Thus, the pleading is not that "everyone knew of the scheme" but rather that some allocants "noted" that certain information was common knowledge. This is not a judicial admission by plaintiffs that "everyone knew of the scheme." n293 In addition, one must look closely at what these investors say was common knowledge. They say that it was common knowledge that investors who paid undisclosed compensation and agreed to purchase in the aftermarket received allocations. This is not surprising. But they do not say that it was common knowledge that the price of

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 3 of 26

Page 33

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

stock was artificially inflated through illegal tie-in arrangements that *required* a large percentage of allocants to pay undisclosed compensation and to agree to make a certain number of purchases in the aftermarket at escalating prices *in order to obtain* an allocation. That is the guts of the scheme now alleged and nothing in paragraph 30 pleads that such a scheme was commonly [*115] known by the investing public.

n293 Indeed, even the broadest reading of paragraphs 30 and 31 does not support a conclusion that *analyst conflicts* -- one part of the coherent fraudulent scheme alleged -- were common knowledge.

The same is true of paragraph 31. The paragraph begins with the words "this industry-wide understanding." This raises the question -- to what does the word "this" refer? The natural reading is that it refers back to the immediate prior paragraph so that "this industry-wide understanding" is that investors who paid undisclosed compensation and agreed to purchase in the aftermarket received allocations. Paragraph 31 merely pleads that the underwriters made it known that those who paid undisclosed compensation and agreed to purchase stock in the aftermarket received allocations -- not that such investors were aware of an illegal scheme to inflate stock prices.

*Second,* even if plaintiffs' allegations are construed as broadly as possible, they do not suggest that many investors knew [*116] of the *entire scheme alleged.* Nowhere do plaintiffs allege that allocants were aware that such agreements were part of an industry-wide scheme to inflate share prices through the creation of artificial demand. Many allocants may have been defendants' unwitting tools, each performing certain acts (*i.e.,* paying undisclosed compensation and agreeing to purchase in the aftermarket) that only when aggregated constituted a cohesive scheme to defraud investors. Even to the extent that allocants might have suspected illegality, that wrongdoing could be ascribed a clear and direct goal -- the enrichment of the Underwriter defendants through payment of excessive compensation and increased business ensured by tie-in agreements -- *not* the indirect scheme to defraud investors by artificially driving up securities prices alleged here. As plaintiffs' counsel has noted, it is unlikely indeed that investors who had full knowledge of the alleged scheme would retain their shares for any length of time after the securities' immediate price gains if they knew that the heavy demand had *artificially* inflated the price, and that the artificial inflation would inevitably dissipate over time. [*117] n294

n294 *See* Transcript of 6/17/04 Hearing, 49:3-8 ("[MR. BROWER:] Simply, persons who participated in the scheme, those who had knowledge are unlikely to have lost money net trading in the stock in which they received an allocation, because even if they did aftermarket transactions as part of tie-in agreements, they still wouldn't trade themselves to a loss.").

*Finally,* plaintiffs' counsel has explained that, contrary to defendants' assertions that the *scheme* was "common knowledge" and "invariably communicated" to allocation-seekers, only a limited population of allocants actually paid undisclosed compensation or consummated tie-in agreements:

MR. WEISS: We're not saying that all allocants were subjected to this kind of requirement for laddering and kickbacks. There's a certain small universe, but we say that the universe was sufficient to be able to doctor this market and to create huge additional compensation that was undisclosed for these underwriters; a scheme, information that was [*118] never disclosed by . . . the defendants throughout the class period. The population of those allocants who participated is a relatively small population . . . . n295

This position is more consistent with information gleaned through the discovery process than is the notion that every customer who ever expressed an interest in an allocation somehow became privy to the alleged scheme. n296

n295 *Id.* at 54:10-19.

n296 *See* Plaintiffs' Reply at 47 ("The uncontroverted testimony of all 17 [named] Plaintiffs [several of whom received allocations] is that each was entirely ignorant of the manipulation when each purchased his or her shares.").

After reviewing plaintiffs' new proposed class definition, and considering the traits most likely to separate investors who knew of the alleged scheme from those who did not know, the following represents an ascertainable class: n297

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 4 of 26

Page 34

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

The Class consists of all persons and entities that purchased or otherwise acquired the securities of [Specific Issuer] [*119] during the Class Period and were damaged thereby. Excluded from the Class are:

(1) Defendants herein, each of their respective parents, subsidiaries, and successors, and each of their respective directors, officers and legal counsel during the Class Period, and each such person's legal representatives, heirs, and assigns, members of each such person's immediate family, and any entity in which such person had a controlling interest during the Class Period;

(2) all persons and entities that, with respect to [Specific Issuer's] initial public offering: (a) received an allocation, (b) placed orders to purchase shares of that issuer's securities in the aftermarket within four weeks of the effective date of the offering, (c) paid any undisclosed compensation to the allocating underwriter(s), and (d) made a net profit (exclusive of commissions and other transaction costs), realized or unrealized, in connection with all of such person's or entity's combined transactions in [Specific Issuer's] securities during the Class Period; and

(3) all persons and entities who satisfy all of the requirements of sub-paragraph (2) with respect to any of the 309 initial public offerings [*120] that are the subject of these coordinated actions, if that offering occurred prior to [Specific Issuer's] offering. n298

n297 The structure of the class definition is based on that of the proposed definition submitted by plaintiffs in response to my June 21 Order. See Class Def. Letter at 1. However, the content of this definition differs substantially from plaintiffs' proposal.

n298 This definition applies equally to plaintiffs' section 11 classes, because knowledge also precludes recovery under that statute. See 15 U.S.C. § 77k(a) (granting right of recovery to "any person acquiring such security (unless it is

proved that at the time of such acquisition he knew of such untruth or omission)").

As I have previously noted, the ascertainability inquiry does not demand ascertainment at the class certification stage. Certain investors not automatically stricken by the class definition may later prove to have actual knowledge of the alleged scheme. Any securities fraud class [*121] action runs the risk of including individual investors who may be ineligible for recovery for any number of reasons, including actual knowledge of the alleged fraud. n299 If the possibility that certain class members might eventually be excluded were sufficient to preclude class certification, there could *never* be a securities fraud class action. At trial, defendants may choose to bear the burden and the cost of proving that any particular investor had access to nonpublic information that gave that investor actual knowledge of the alleged scheme. n300

n299 It is well-established that defendants in a class action may contest the claims of individual class members even when they are included within the class definition. See, e.g., *Basic Inc. v. Levinson, 485 U.S. 224, 249, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)* (acknowledging possibility of rebutting presumption of reliance as to individual class members); *In re Ski Train Fire in Kaprun, Austria on November 11, 2000, 220 F.R.D. 195, 208 (S.D.N.Y. 2003)* (certifying wrongful death class action, noting "the determination of which heir (or heirs) of the decedents is entitled to a judgment can be decided during the damages phase of the trial."). [*122]

n300 One of the interesting side effects of the class action form is that, in some cases, it effectively transfers the burden of proving individual facts from plaintiffs to defendants. As the Supreme Court has noted, "the Advisory Committee had dominantly in mind [in enacting *Rule 23(b)(3)*] vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., 521 U.S. at 617* (quotation marks and citation omitted); *accord Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 813, 86 L. Ed. 2d 628, 105 S. Ct. 2965 (1985)* ("The plaintiff's claim may be so small . . . that he would not file suit individually . . . ."). Just as a *plaintiff* who suffered a small loss may not have

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 5 of 26

Page 35

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

the resources or motivation to bring an individual suit, a *defendant* in a 23(b)(3) class action is forced to make the difficult decision whether it is worth expending resources to prove that a small-stake class member should be excluded from recovery. In either situation, the inevitable cost of litigating an issue forces a party to weigh the expected benefit (subtracting transaction costs) against the cost of losing if she does not litigate the issue. *Rule 23* simply transfers that cost-benefit analysis from the alleged victim to the alleged wrongdoer.

[*123]

The class definition broadly excludes those investors who exhibit the hallmarks of full participation in the alleged scheme. Defendants are alleged to have defrauded investors by manipulating the conduct of allocants, both in terms of the compensation they paid and their aftermarket activity, thereby creating a market where the aggregate demand caused by tie-in agreements artificially inflated the price of the stock. n301 The class excludes those who engaged in the acts alleged to have driven up securities prices, and who exhibited their knowledge of the overall scheme by selling their shares for a profit before the effects of the scheme dissipated. The class definition further excludes those who had knowledge of the scheme in one case from participating in the classes for *any* subsequent IPOs in these consolidated actions, because an investor who has knowledge of the alleged fraud in one offering cannot erase that knowledge thereafter.

n301 *See* MA PP14-17.

Defendants assert that applying plaintiffs' [*124] proposed exclusions, which are similar (although not identical) to those just enumerated by the Court, will present serious manageability problems because the information to be gathered with respect to each allocant "would be scattered in multiple formats among many firms" and "would have to be repeated for each of the few thousand allocants in a single case, and for each of the thousands in 309 cases." n302 However, the requirement is ascertainability -- not ascertainability with ease. Plaintiffs in a class action meet their burden by pleading a class whose membership is ascertainable, even if actual ascertainment might prove "slow and burdensome." n303 Here, plaintiffs note that the class definition factors "are all mathematically certain and objectively determinable," and that the documentary evidence required to apply the proposed definition "is legally required to be retained by broker-dealers" and

includes "customer monthly statements, trade confirmations, and order tickets." n304

n302 Class Def. Opp. at 4. Defendants also launch other attacks on the class exclusions, noting particularly that "plaintiffs propose no method to count 'repeat conduct' by multi-faceted 'entities,'" and that some non-party brokers may no longer retain records of allocants' trading behavior. *Id.* However, plaintiffs are not required to anticipate and address all possible problems that may arise as discovery continues; all that is required at this stage is a method of ascertaining class members that can be manageably applied. If defendants' predictions come true, and the effect is disabling, then they may properly move to amend this certification order or to decertify the class. *See Fed. R. Civ. P. 23(c)(1)(C).* [*125]

n303 *Dunnigan, 214 F.R.D. at 136.*

n304 Class Def. Letter at 2.

Although defendants mount several attacks on whether the proposed class definition will successfully exclude those with actual knowledge of the alleged scheme, only three require comment. *First,* defendants complain that the class definition "is based only on investor conduct in the '309' IPOs and thus fails to account for knowledge acquired or shown through participation in [] the 87 follow-on offerings" conducted by 82 issuers in these consolidated actions. n305 Defendants make a good point. An investor who participated in an IPO or traded in its aftermarket in ignorance of the alleged scheme, but later exhibited knowledge of the alleged scheme in connection with a follow-on offering, should be charged with knowledge of the scheme only after her knowing participation. Consequently, the class exclusions apply to participants in follow-on offerings, but only exclude those participants with respect to trades executed *after* they satisfy the class exclusion criteria.

n305 Class Def. Opp. at 3 n.3 (quoting Plaintiffs' Reply at 2).

[*126]

*Second,* defendants claim that the class definition does not adequately exclude investors who had knowledge of the fraudulent scheme through participation in "the 'more than 900' IPOs that plaintiffs

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 6 of 26

Page 36

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

allege were manipulated as part of this purported industry wide scheme," but 600 of which are not part of these consolidated actions. n306 I note, however, that defendants have vehemently opposed suggestions that they produce any discovery whatsoever with respect to any IPOs other than those consolidated here. n307 Defendants may not now have it both ways; if plaintiffs do not obtain full discovery in the IPOs that are not in suit, then defendants are barred from making this argument. On the other hand, if defendants now believe that it would be beneficial to alter the boundaries of this case to give plaintiffs access to discovery in the approximately 600 remaining IPOs, this issue can be revisited. Otherwise, defendants' argument is without merit.

n306 *Id.*

n307 *See, e.g.,* Transcript of 3/5/03 Hearing at 46:3-6 ("MR. DiBLASI: Your Honor, the notion that [plaintiffs' counsel] intends to introduce discovery issues relating to the [6]00 other IPOs makes absolutely no sense to any of the underwriters, and we will oppose that every way we can."); 10/29/03 Letter from DiBlasi to Weiss at 2 ("The burdens associated with Plaintiffs' proposed change in approach [*i.e.,* requiring defendants to provide additional discovery outside the 309 cases] would be enormous and unfair."); Transcript of 12/11/03 Hearing at 25:16-18 ("MR. ICHEL: The parties are spending incredible amounts of time on discovery in just six class focus cases. So by bringing in additional IPOs beyond the 310 it makes it unmanageable."). Plaintiffs have also relied on the limitation to the 309 consolidated actions. *See, e.g.,* 8/19/03 Letter to the Court from Stanley Bernstein, counsel for plaintiffs; 8/23/03 Letter from Bernstein; 10/14/03 Letter from Bernstein. It makes no sense to allow defendants to offer evidence that potential class members participated in the alleged scheme in the 600 IPOs not at issue here while simultaneously precluding plaintiffs from taking discovery on those IPOs to determine the extent of each defendant's participation in the alleged scheme.

[*127]

*Third,* defendants note that "the proposal would not exclude those participants who supposedly paid undisclosed compensation through 'churned' or 'wash' transactions or high volume trades [] or those who allegedly obtained allocations by purchasing shares in 'undesired add-on offerings.'" n308 Defendants are

simply wrong. Allocants who paid undisclosed compensation -- in whatever form -- are excluded if they also purchased in the aftermarket and profited from their investments. The only question is whether such transactions amount to undisclosed compensation. That is a common question of law, not an ascertainability problem.

n308 Class Def. Opp. at 4 n.3 (quoting MA PP42-43).

Accordingly, plaintiffs' class is ascertainable.

### B. *Rule 23(b)*: Predominance

Defendants challenge plaintiffs' proposed class on the grounds that individualized questions will predominate at trial. Defendants' predominance arguments fall into four major categories: transaction causation, loss causation, damages, and section [*128] *11* liability. As discussed earlier, plaintiffs' cases offer a wealth of common issues. n309 With the exception of defendants' arguments regarding *section 11* tracing (which are limited to the duration of the *section 11* classes), none of defendants' arguments defeat plaintiffs' showing of predominance.

n309 *See supra* Part IV.A.1.

#### 1. Transaction Causation

"Like reliance, transaction causation refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities. It is established simply by showing that, but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transactions." n310 Plaintiffs may avail themselves of a rebuttable presumption of reliance under the following theories.

n310 *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir. 2003) (citations omitted).

[*129]

#### a. The *Affiliated Ute* Presumption

"In securities fraud claims, reliance is presumed when the claim rests on the omission of a material fact." n311 This presumption of reliance is not conclusive. n312 Rather, "once the plaintiff establishes the materiality of the omission . . . the burden shifts to the

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 7 of 26

Page 37

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

defendant to establish . . . that the plaintiff did not rely on the omission in making the investment decision." n313 To satisfy this burden, a defendant must prove "that 'even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was.'" n314

> n311 *In re Worldcom*, 219 F.R.D. at 291 (citing *Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54, 31 L. Ed. 2d 741, 92 S. Ct. 1456 (1972). Accord Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 186 (2d Cir. 2001); Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 539 (2d Cir. 1999)*).

> n312 *See DuPont v. Brady, 828 F.2d 75, 78 (2d Cir. 1987)*.

> n313 *Id. at 76.*

> n314 *Id. at 78* (quoting *Rochez Bros. v. Rhoades, 491 F.2d 402, 410 (3d Cir. 1974)*).

[*130]

Defendants attempt to distinguish *Affiliated Ute* on the following grounds: "*Affiliated Ute* was not a class action, did not involve alleged market manipulation, was not deemed applicable to the manipulation and misrepresentation claims asserted in *Basic*, and would [still] require" that plaintiffs demonstrate the materiality of the omissions and their ignorance of the omitted facts. n315 While a court need not address every argument it rejects, a few observations are in order. The Second Circuit has applied *Affiliated Ute* in the class action context. n316 Moreover, while *Basic* adopted the "fraud on the market" presumption, it contains no language disfavoring *Affiliated Ute* where both market manipulation and material omissions are alleged. Rather, *Basic* approved the *Affiliated Ute* presumption and presented the "fraud on the market" presumption alongside it in the panoply of securities fraud-related presumptions. n317 Finally, the materiality of the alleged omissions here (*i.e.*, the total nondisclosure of the alleged scheme) has not been disputed. Plaintiffs are entitled to an *Affiliated Ute* presumption of reliance to the extent their *10b-5* claims [*131] derive from material omissions.

> n315 Class Def. Opp. at 5 n.5.

> n316 *See Handwerger v. Ginsberg, 519 F.2d 1339, 1341-42 (2d Cir. 1975)* (holding, in class action context, that *Affiliated Ute* eliminated "the requirement of proving individual reliance . . . at least as to claims of fraudulent omissions brought under s *10(b)* and *Rule 10b-5*.").

> n317 *See Basic*, 485 U.S. at 243 ("There is, however, more than one way to demonstrate the causal connection. Indeed, we previously have dispensed with a requirement of positive proof of reliance, where a duty to disclose material information had been breached, concluding that the necessary nexus between the plaintiffs' injury and the defendant's wrongful conduct had been established. *See Affiliated Ute Citizens v. United States* . . . ."); *id. at 245* ("Requiring a plaintiff to show a speculative state of facts, *i.e.*, how he would have acted if omitted material information had been disclosed, see [*Affiliated Ute*] . . ., would place an unnecessarily unrealistic evidentiary burden on the *Rule 10b-5* plaintiff who has traded on an impersonal market.").

[*132]

### b. The Fraud on the Market Presumption

Plaintiffs may also avail themselves of a presumption of reliance, under the "fraud on the market" theory, for claims arising from alleged misrepresentations and market manipulation.

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations. n318

"The fraud-on-the-market doctrine, as described by the Supreme Court in *Basic v. Levinson*, creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value." n319 A defendant, of course, may rebut the fraud on the [*133] market presumption by showing that it made no material misrepresentations because the alleged misrepresentations were already known to the market -- a so-called "truth on the market" defense. n320

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 8 of 26

Page 38

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

n318  *Id. at 241-42* (quotation marks and citation omitted, alterations in original).

n319  *Hevesi, 366 F.3d at 77.* In *Hevesi,* the Second Circuit noted that "although the fraud-on-the-market doctrine clearly applies to statements made by *issuers,* as in *Basic,* we have never addressed whether it also applies to reports by *analysts." Id.* (emphasis in original). In this case, plaintiffs' allegations that conflicts of interest led analysts to issue improperly glowing reports on the manipulated securities do not reflect the whole of plaintiffs' theory of liability; rather, such fraudulent reports are alleged in connection with a larger scheme to artificially inflate prices. Accordingly, plaintiffs' claims are not dependent upon a finding that they are entitled to a presumption of reliance on analyst reports; if plaintiffs prove that the scheme as a whole artificially inflated prices, then they may employ the fraud-on-the-market presumption to prove that they relied on those prices "as a measure of their intrinsic value." *Id.* [*134]

n320  *See Ganino v. Citizens Utils. Co., 228 F.3d 154, 167 (2d Cir. 2000)* ("Under [the truth on the market theory], a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market. A defendant may rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known. However, the corrective information must be conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements.") (citing *Provenz v. Miller, 102 F.3d 1478, 1492 (9th Cir. 1996); Associated Randall Bank v. Griffin, Kubik, Stephens & Thompson, Inc., 3 F.3d 208, 213-14 (7th Cir. 1993)*).

**(1) Market Efficiency**

The fraud on the market presumption only applies if the market for the security is open and developed enough that it quickly incorporates material information into the price of the security -- in other words,  [*135] the market must be an "efficient" one. n321 Defendants object that plaintiffs have not met their evidentiary burden of showing that the markets for the stocks in the focus cases were efficient. n322

n321  *See, e.g., Freeman v. Laventhol & Horwath, 915 F.2d 193, 197 (6th Cir. 1990)* ("The fraud on the market theory rests on the assumption that the price of an actively traded security in an open, well-developed, and efficient market reflects all the available information about the value of a company.") (citation omitted). Definitions of the relevant economic terms are provided in *Cammer v. Bloom, 711 F. Supp. 1264, 1276 n.17 (D.N.J. 1989)*: "'An open market is one in which anyone, or at least a large number of persons, can buy or sell. . . . A developed market is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. . . . An efficient market is one which rapidly reflects new information in price. These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.'" (quoting BROMBERG & LOWENFELS, 4 SECURITIES FRAUD AND COMMODITIES FRAUD, § 8.6 (Aug. 1988)). [*136]

n322  *See* 6/8/04 Letter from DiBlasi to the Court at 2 ("Plaintiffs have offered the Court no evidence that the relevant markets were efficient at the time of the offerings or later in the 'internet bubble' environment.").

The Second Circuit has not adopted a test or method for determining whether the market for a security is efficient. n323 Nonetheless, the record in this case contains several strong indications that the market in which the focus stocks traded was efficient. Three facts stand out as particularly probative: *first,* all the focus stocks were traded on the NASDAQ National Market; n324 *second,* the focus stocks were traded actively at high volumes throughout the class period; and *third,* the focus stocks were the subjects of numerous analyst reports and extensive media coverage. Under any conceivable test for market efficiency, these three facts are sufficient to meet plaintiffs' *Rule 23* burden to make "some showing" that the stocks in question traded on an efficient market.

n323  The *Cammer* court identified five factors that would be useful in proving an efficient market: (1) a large weekly trading

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 9 of 26

Page 39

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases. See *711 F. Supp. at 1286-87*. Several courts have used this approach. *See Binder v. Gillespie, 184 F.3d 1059, 1065 (9th Cir. 1999)* (adopting the *Cammer* approach); *Hayes v. Gross, 982 F.2d 104, 107 (3d Cir. 1992)* (same); *Freeman, 915 F.2d at 199* (same); *Krogman v. Sterritt, 202 F.R.D. 467, 474 (N.D. Tex. 2001)* (employing three factors from *O'Neil v. Appel, 165 F.R.D. 479 (W.D. Mich. 1996)*, in addition to the *Cammer* approach); *O'Neil, 165 F.R.D. at 503* (suggesting additional factors from the economic literature to supplement the *Cammer* approach). But see *In re Polymedica Corp. Secs. Litig., 224 F.R.D. 27, 2004 U.S. Dist. LEXIS 17985, No. CIV.A. 00-12426-REK, 2004 WL 1977530, at *14 (D. Mass. Sept. 7, 2004)* (rejecting *Cammer* and similar cases for unfairly reading economic definitions into Basic's efficient market requirement, noting that "the relevant question is whether the market . . . is one in which market professionals generally consider most publicly announced material statements about [the issuer], thereby affecting [its] stock market price") (quotation marks, alterations and citations omitted). Here, whether the *Cammer* test or the broader definition of efficiency adopted by *In re PolyMedica* is applied, the outcome is the same. [*137]

    n324 Federal courts have repeatedly held that a listing on NASDAQ or a similar national market is a good indicator of efficiency. See, e.g., *Stevelman v. Alias Research, Inc., 2000 U.S. Dist. LEXIS 9115, No. 5:91-CV-682, 2000 WL 888385, at *4 (D. Conn. June 22, 2000)* ("For stocks . . . that trade on a listed exchange such as NASDAQ, [the] reliance element of a *10b-5* cause of action is presumed."); *Levine v. SkyMall, Inc., 2001 U.S. Dist. LEXIS 24705, No. CIV. 99-166-PHX-ROS, 2002 WL 31056919, at *5 (D. Ariz. May 24, 2002)* ("Although not dispositive, the fact that SkyMall stock is traded on the NASDAQ stock market's National Market System also contributes to finding that the market is efficient."); *RMED Intern., Inc. v. Sloan's Supermarkets, 185 F. Supp. 2d 389, 404-05 (S.D.N.Y. 2002)* ("Indeed,

research has failed to reveal any case where a stock traded on the AMEX was found not to have been traded in an open and efficient market. . . . Rather, to the contrary, numerous courts have held that stocks trading on the AMEX are almost always entitled to the presumption.") (citations omitted); *O'Neil, 165 F.R.D. at 504* ("The market system upon which a particular stock trades provides some insight as to the likelihood that the market for that stock is efficient . . . .").

[*138]

    Ultimately, whether the relevant markets were efficient is a question of fact to be resolved at trial. n325 The present finding -- that plaintiffs have made "some showing" that the focus markets were efficient -- is solely for the purposes of adjudicating the pending motion for class certification, and is not binding on the finder of fact. Based on the evidence presented at trial, the finder of fact may conclude that the relevant markets were efficient, in which case all class members will benefit from a presumption of reliance. On the other hand, the finder of fact may conclude that one or more of the relevant markets was inefficient, n326 in which case those plaintiffs who traded in such markets would be required to make individual showings of reliance.

        n325 See, e.g., *Basic, 485 U.S. at 249 n.29* ("Proof [rebutting a presumption of reliance] is a matter for trial, throughout which the District Court retains the authority to amend the certification order as may be appropriate. See *Fed. R. Civ. P. 23(c)(1)* and *(c)(4)*. See *7B C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE 128-132 (1986)*. Thus, we see no need to engage in the kind of factual analysis the dissent suggests that manifests the 'oddities' of applying a rebuttable presumption of reliance in this case."); *In re Ashanti Goldfields Sec. Litig., 2004 U.S. Dist. LEXIS 5165, No. CV 00-0717, 2004 WL 626810, at *16 (E.D.N.Y. Mar. 30, 2004)* ("Proof of market inefficiency . . . or rebuttal of the presumption of reliance is best left to the trial phase of litigation.") (citing *Basic, 485 U.S. at 248 n.29*); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., 2002 U.S. Dist. LEXIS 23829, No. 94 Civ. 5587, 2002 WL 31780188, at *4 (S.D.N.Y. Dec. 11, 2002)* ("Whether or not a market for a stock is open and efficient is a question of fact.") (citing *In re Laser Arms Corp. Sec. Litig., 794 F. Supp. 475, 490 (S.D.N.Y. 1989)* (holding that "whether in fact Laser Arms traded in an efficient market is a question of fact.

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 10 of 26

Page 40

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

Therefore, resolution of that issue must await presentation of further proof at trial."), *aff'd*, 969 F.2d 15 (2d Cir. 1992)). While these cases all pre-date the 2003 amendments to *Rule 23* forbidding conditional certification, the new Rule still permits a court to decertify a class or amend the certification as necessary. [*139]

n326 For example, the finder of fact might accept defendants' suggestion that the relevant markets were inefficient because they were part of the "internet bubble." *See* 6/8/04 DiBlasi Letter at 2.

### (2) Investment Strategies

"It has been noted that 'it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?'" n327 Defendants believe there are such investors. Indeed, they claim that so many reckless gamblers engaged in a 'crooked crap game,' and that exposing their folly would be such an arduous task, that any adjudication of their claims would require innumerable individual inquiries.

n327 *Basic*, 485 U.S. at 246-47 (quoting *Schlanger v. Four-Phase Sys. Inc.*, 555 F. Supp. 535, 538 (S.D.N.Y. 1982)).

Defendants assert that "thousands of day and momentum traders [] were not concerned [*140] about the integrity of a stock's market price," and argue that "for both types of traders the integrity of the market price was irrelevant to the investor's decision to purchase." n328 According to defendants, "subjective inquiries" into whether these traders actually relied on market integrity would cause individual issues to predominate. n329 But day and momentum traders have the same incentives to prove defendants' liability as all other class members, and their presence in a securities class does not create intra-class conflicts. n330

n328 iXL Mem. at 20-21 (quotations omitted). Defendants define "day traders" as follows: "Day traders . . . focus solely on price volatility. They 'hope that their stocks will continue climbing or falling in value for the seconds to minutes they own the stock.'" iXL Mem. at 12-13 (quoting SEC, Day Trading: Your Dollars        at        Risk,

http://www.sec.gov/investor/pubs/daytips.htm (Aug. 23, 2004)). Defendants define "momentum traders" by comparison: "'Momentum traders' likewise buy 'stocks simply because they're going up in price.' . . . Though they may hold stock longer than a day trader, they similarly wish to take advantage of price movement -- even movement due to a bubble or manipulation." *Id.* at 13 (quoting Perkins & Perkins, *The Internet Bubble* 25 (1999)). [*141]

n329 *Id.*

n330 *See, e.g., In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 377 (S.D.N.Y. 2000) (rejecting purported intra-class conflicts between in-and-out investors and those that held their shares throughout the period, noting that "'common questions [of fact and law] . . . bind class members with more force than the varying questions related to price inflation drive them apart.'" (quoting *In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 69-71 (S.D.N.Y. 1999)) (alterations in original); *Saddle Rock Partners, 2000 U.S. Dist. LEXIS 11931, 2000 WL 1182793, at *5* (addressing defendants' concerns that a proposed day trading class representative would not adequately assert the element of reliance, stating that "the fact that he may have traded Maybelline shares on the basis of short term price drops which he believed to reflect market inefficiencies indicates that he may have been relying on the integrity of the market to establish the more stable, longer term price.").

Similarly, defendants challenge plaintiffs' proposed classes on the grounds that they may contain [*142] short sellers, n331 and that, "because short sellers do not rely on the market price, they do not enjoy a presumption of reliance." n332 Defendants cite the Third Circuit's decision in *Zlotnick v. TIE Communications* in support of this contention. n333 But *Zlotnick* does not control. Not only is *Zlotnick* a Third Circuit case (and therefore not binding on this Court), it pre-dates the Supreme Court's seminal opinion in *Basic*. Indeed, in cases like this one, courts in the Third Circuit and elsewhere have almost unanimously rejected the *Zlotnick* exception. n334 One such court noted that:

Moreover, under defendants['] view of the case, any plaintiff seeking to represent a class of investors of a large, publicly traded corporation would be unable to

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 11 of 26

Page 41

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

satisfy reliance, and, hence, typicality, as a matter of law . . . . It can be stated without fear of gainsay that the shareholders of every large, publicly traded corporation includes [sic] institutional investors, short-sellers, arbitragers etc. The fact that these traders have divergent motivations in purchasing shares should not defeat the fraud-on-the-market presumption absent convincing proof that price played [*143] *no part whatsoever* in their decision making. If defendants believe that this stretches the concept of reliance beyond the intent of the statute, their course of attack is to overrule *Basic*, not render its holding meaningless. n335

This analysis is far more persuasive than defendants' application of the *Zlotnick* exception, and it comports with the policy and practice of certifying securities class actions in this Circuit. n336 Accordingly, the presence of short sellers does not undermine plaintiffs' showing of predominance.

n331 "Short selling is accomplished by selling stock which the investor does not yet own; normally this is done by borrowing shares from a broker at an agreed upon fee or rate of interest. At this point the investor's commitment to the buyer of the stock is complete; the buyer has his shares and the short seller his purchase price. The short seller is obligated, however, to buy an equivalent number of shares in order to return the borrowed shares. In theory, the short seller makes this covering purchase using the funds he received from selling the borrowed stock. Herein lies the short seller's potential for profit: if the price of the stock declines after the short sale, he does not need all the funds to make his covering purchase; the short seller then pockets the difference. On the other hand, there is no limit to the short seller's potential loss: if the price of the stock rises, so too does the short seller's loss, and since there is no cap to a stock's price, there is no limitation on the short seller's risk. There is no time limit on this obligation to cover. 'Selling short,' therefore, actually involves two separate transactions: the short sale itself and the subsequent covering purchase." *Zlotnick v. TIE Communications, 836 F.2d 818, 820 (3d Cir. 1988).* [*144]

n332 iXL Mem. at 21.

n333 *See id.* at 21 (citing *Zlotnick, 836 F.2d at 823*).

n334 *See Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp., 315 F. Supp. 2d 666, 676 n.13 (E.D. Pa. 2004); Moskowitz v. Lopp, 128 F.R.D. 624, 630-31 (E.D. Pa. 1989)* (citing *Zlotnick* for its discussion of the elements of the fraud-on-the-market presumption, but nevertheless applying the presumption to a class including short-sellers); *In re W. Union Sec. Litig., 120 F.R.D. 629, 637 (D.N.J. 1988)* ("While *Zlotnick* can arguably be seen as a cutting-back on the potential scope of [ *Peil v. Speiser, 806 F.2d 1154 (3d Cir. 1986)*, in which the Third Circuit accepted the fraud on the market theory], we find its validity somewhat questionable in light of *Basic, supra*. Not only is *Basic* a later opinion of a superior court, it also makes several positive references to *Peil, supra*, the scope of which *Zlotnick* arguably constricts."). Defendants proffer only one recent case applying the *Zlotnick* exception, and that case used the exception solely to reject a proposed class representative whom the court had already found inadequate because he was subject to the unique defense that he had sold all of his shares for a profit. *See Weikel v. Tower Semiconductor, Ltd., 183 F.R.D. 377, 392 (D.N.J. 1998).* [*145]

n335 *Moskowitz, 128 F.R.D. at 631* (emphasis in original).

n336 *See, e.g., In re Ames Dep't. Stores Inc. Stock Litig., 991 F.2d 953, 967 (2d Cir. 1993)* (noting the general applicability of the fraud-on-the-market presumption to all investors, stating that "because the fraud on the market may taint each purchase of the affected stock, each purchaser who is thereby defrauded (and, since the presumption is rebuttable, not all purchasers necessarily are defrauded by the information) is defrauded by reason of the publicly disseminated statement."); *In re Worldcom, 219 F.R.D. at 296* ("The existence of short selling, even voluminous short selling . . . does not suggest that the presumption of reliance should not apply to those [short sellers] who purchased the [securities] and lost money.").

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 12 of 26

Page 42

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

**(3) Knowledge of Fraudulent Scheme**

A presumption of reliance may be rebutted by a showing that the plaintiff had knowledge of the omitted fact or fraudulent scheme. "If the plaintiff has been furnished with the means of knowledge and he is not prevented [*146] from using them he cannot say that he has been deceived by the misrepresentations of the other party." n337

> n337 *Frigitemp v. Financial Dynamics, 524 F.2d 275, 282 (2d Cir. 1975)* (applying common law principles of fraud in the context of *Rule 10b-5*) (citing *Shappirio v. Goldberg, 192 U.S. 232, 241-42, 48 L. Ed. 419, 24 S. Ct. 259 (1904)*).

Defendants note that "pervasive press reports mirrored the allegations in these cases," n338 pointing to several occasions exposing class members, through the national media or official releases, to information which, defendants claim, "would have made any reader aware of the allegations here and put them on notice to inquire further." n339 Defendants maintain that determining "which purchasers knew what, and when . . . will require . . . subjective inquiry into each claimant's state of mind." n340

> n338 *Id.* at 7. Defendants also assert that determining which class members had actual knowledge of the scheme through their participation in various IPOs will require subjective individual inquiries. This argument was addressed at Part IV.A.4., *supra.* [*147]

> n339 *Id.* While there is no debate regarding the content and distribution of these publications, which are described in Part II.F., *supra,* determining whether they placed investors on inquiry notice is a task better left to the finder of fact. Indeed, I note that the MSNBC article, while it includes the language cited by defendants, also features a flat denial from defendant Goldman Sachs that its firm engaged in any unlawful tie-in schemes. *See* Ex. A to Houck Decl., at A5-A6 ("An official at Goldman, which also underwrote the eToys IPO, would say only that the firm 'does not make the allocation of IPO securities conditional on an undertaking to buy securities in the aftermarket.'"). Finally, the words "Corvis," "Engage," "Firepond," "iXL," "Sycamore" and "VA Linux" do not appear in this article; nor do

defendants cite any other articles specifically connecting any of the six focus cases to the alleged scheme. *See* Defendants' Sur-Reply at 7; Exs. A, B to Houck Decl. (comprising various articles purportedly alluding to the alleged scheme).

> n340 Defendants' Sur-Reply at 8.

[*148]

However, the question of whether publicly available information "would have made any reader aware of the allegations here" n341 presents an important class-wide common issue. n342 If any of defendants' proffered publications is determined to have been so relevant, clear and widely disseminated that knowledge of the alleged scheme must be imputed to the universe of investors in the stock market, then reliance cannot be proven individually or collectively. n343 Furthermore, differences among class members in terms of access to publicly available information (*e.g.,* whether certain investors *actually* saw all publicized materials, or whether they had access to sophisticated investment advice in interpreting the releases) are insufficient to defeat certification or rebut plaintiffs' presumed reliance. n344

> n341 *Id.* at 6.

> n342 The issue of when plaintiffs were placed on inquiry notice by publicity is also a common question in the context of defendants' statute of limitations arguments. *See* iXL Mem. at 18-19. Although the two arguments have different ramifications (*i.e.,* a finding that a plaintiff knew of the fraud forces the plaintiff to prove reliance individually, while a finding that the plaintiff was on inquiry notice so long before suit that her claim is time-barred precludes recovery completely), the common questions they present are exactly the same. This situation is easily distinguished from that considered by the Second Circuit in *Moore, 306 F.3d 1247, 1253,* which (1) concerned fraudulent misrepresentations in connection with individual insurance contracts (and thus did not invoke any securities fraud-related presumptions of reliance), and (2) concerned *oral* misrepresentations agents made directly to customers, not the market-wide public dissemination of written information. Similarly, *Zimmerman v. Bell, 800 F.2d 386, 390 (4th Cir. 1986)* (holding that, where specific information regarding the alleged fraud was abundant, "individual class members must demonstrate that the omitted information was not

Case 1:04-cv-00331-JJF   Document 57-3   Filed 05/02/2005   Page 13 of 26

Page 43

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

otherwise available to them") is inapposite. Not only is *Zimmerman* a Fourth Circuit case, it predated the fraud on the market presumption of reliance created in *Basic*, and concerned a situation where the alleged fraud was *explicitly* revealed by numerous publications. [*149]

n343 Defendants cite a number of cases in support of their contention that, because some of the proposed class members may be charged with knowledge of the alleged scheme, the class should not be certified. *See* Defendants' Sur-Reply at 7 n.3. Defendants' citations are inapposite. *See, e.g., Seibert v. Sperry Rand, 586 F.2d 949, 952 (2d Cir. 1978)* (finding that alleged scheme was a "matter[] of public knowledge" where "affidavits submitted by both parties show that [defendants'] difficulties were reported countrywide in the press and on radio and television, were discussed in Congress, and were analyzed in published administrative and judicial opinions[, and] that a nationwide consumer boycott was being conducted against [defendant], accompanied by massive media advertising"); *Frigitemp, 524 F.2d at 282* (rejecting appellant plaintiffs' claims based on the fact that "shareholders gave up shares in the belief that the financial structure of the corporate entity would be strengthened," where "the defendants did nothing to induce that belief, the truth of which was peculiarly within the knowledge of the appellants."). In fact, defendants' citation to *Siebert,* which involved vast dissemination of the facts underlying each plaintiff's claim, demonstrates the value of adjudicating common facts (*e.g.,* whether all plaintiffs should be charged with knowledge based on publicly available information) in a single proceeding. *Siebert* held, at the summary judgment stage, that publicity regarding an alleged fraud was so widely disseminated that plaintiffs could not avail themselves of a presumption of reliance based on material omissions; here, the Court or a finder of fact may similarly determine that such publicity placed class members on constructive notice of the scheme, and thus bar the class, or members of the class who purchased after such reports were disseminated, from invoking a presumption of reliance. [*150]

n344 *See, e.g., In re Data Access Sys. Sec. Litig., 103 F.R.D. 130, 139 (D.N.J. 1984)* ("There will always be some individuals who read the financial statements directly, others who read secondary analyses . . . and many others who relied on advice of stockbrokers or friends. If defendants' argument were to prevail that factual differences of this nature were sufficient to defeat class action certification, there could never be a class action of securities purchasers.").

## 2. Loss Causation

In addition to transaction causation, plaintiffs must prove loss causation; that is, they must show a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." n345 Plaintiffs may submit an expert report suggesting a methodology for determining such a link. n346 "A district court must ensure that the basis of [such an] expert opinion is not so flawed that it would be inadmissible as a matter of law." n347 At the class certification stage, the question "is whether plaintiffs' expert evidence is sufficient to demonstrate common questions of [*151] fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive;" a district court should therefore refrain from "weighing conflicting expert evidence or engaging in 'statistical dueling' of experts." n348 Under *Rule 23(b)(3),* plaintiffs must present a methodology for determining loss causation that may be commonly applied to all members of the class. n349

n345 *Emergent Capital, 343 F.3d at 197.*

n346 *See VISA Check, 280 F.3d at 134-35* (examining submission of expert report to show loss causation in the antitrust class action context). In an antitrust case, "a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent" -- a requirement akin to the loss causation requirement in securities fraud cases. *J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 562, 68 L. Ed. 2d 442, 101 S. Ct. 1923 (1981).*

n347 *VISA Check, 280 F.3d at 135.*

n348 *Id.* (citing *Caridad, 191 F.3d at 292-93).*

n349 *See id; see also In re Sumitomo Copper Litig., 182 F.R.D. at 91* (granting class certification upon finding that "plaintiffs' econometric methodologies have a reasonable

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 14 of 26

Page 44

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

probability of establishing" plaintiffs' claims by common proof). *But see Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 189 (3d Cir. 2001)* (where determining the existence of loss would require individual analysis of each investor's trades, "the individual questions . . . are overpowering.").

[*152]

Unlike damages, which require a showing of the quantum of loss, loss causation requires only that there be a causal connection between the alleged wrongdoing and plaintiffs' loss. n350 In a market manipulation case, plaintiffs can satisfy their burden by presenting a means to determine that the scheme caused an increase in price that dissipated throughout the class period. n351 To satisfy *Rule 23* in the context of loss causation, plaintiffs need not precisely quantify the proportion of each plaintiff's loss attributable to dissipation; they need only provide a mechanism showing that the alleged scheme actually caused *some* loss to all class members. n352 Plaintiffs must, however, provide a mechanism for proving that inflation dissipation occurred throughout the class period. Otherwise, investors who purchased after all artificial inflation created by the alleged scheme had dissipated would be differently situated (*i.e.,* they would be forced to prove loss causation individually using alternatives to the class method of proof), and individual questions would dominate the loss causation inquiry.

n350 *See Emergent Capital, 343 F.3d at 197.* [*153]

n351 *See In re Initial Pub. Offering Sec. Litig., 297 F. Supp. 2d at 675* ("It is that dissipation -- and not the inflation itself -- that caused plaintiffs' loss."). In this case, the alleged "misstatements and omissions did nothing more than conceal the Underwriters' alleged market manipulation;" hence, plaintiffs need not proffer separate loss causation methodologies for their misstatement and omission allegations. *Id.* Defendants' complaint that plaintiffs' methodology only links tie-in agreements, but not analyst conflicts or undisclosed compensation, to loss causation is also rejected. If the alleged scheme, taken as a whole, caused plaintiffs' loss, then there is no need to parse the scheme into its component parts and determine whether *each alleged component* caused inflation.

n352 *See, e.g., Dukes v. Wal-Mart, Inc., 222 F.R.D. 189, 192 (N.D. Cal. 2004)* (finding that even where plaintiffs' expert "conceded that he could not calculate whether 0.5 percent or 95 percent of the employment decisions at Wal-Mart might be determined by stereotyped thinking," report was nonetheless admissible to prove that stereotyped thinking *caused* plaintiffs' injuries).

[*154]

Plaintiffs submit the expert opinion of Professor Fischel to provide a method of proving that the alleged scheme inflated stock prices as early as the beginning of trading, and that the inflation dissipated throughout the class period. n353 Fischel's methodology for proving loss causation depends on two separate analyses: *first,* an analysis of the initial inflation caused by alleged tie-in agreements; and *second,* an analysis of the dissipation of that inflation over time.

n353 *See* 1/20/04 Fischel Report; 4/15/04 Fischel Report; 7/12/04 Fischel Report.

Fischel empirically demonstrates the effect of tie-in agreements on demand and price through an analysis of the pre-open bid sessions for five of the six focus cases. n354 During the pre-open bid session, in which a new issue takes dealer quotes before actual trading begins, the lead underwriter opens the bidding and investors may enter bids to purchase shares. The level of demand in the pre-open bid session affects bid prices. n355 Fischel describes [*155] and analyzes price changes in the "inside bid" -- the highest bid at any given time -- with respect to the bidding activity of the lead underwriter and investors alleged to have executed tie-in agreements. n356 Institutional investors with alleged tie-in agreements constituted much of the demand for shares in each pre-open bid session, and purchase orders executed after these sessions accounted for a substantial portion of all shares issued in the IPO. n357 Demand by investors with tie-in agreements remained strong throughout the pre-open bid session. n358 Fischel notes that, "consistent with the substantial purchase orders at the end of the pre-open bid session, the opening price for each of the focus case stocks was substantially higher than the offer price." n359

n354 *See* 7/12/04 Fischel Report. Fischel did not have access to data regarding the iXL pre-open bid session. *See id.* P6.

n355 *See* Sirri Report PP14-16.

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 15 of 26

Page 45

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

n356 *See* 7/12/04 Fischel Report PP7-12.

n357 *See id.* P8 (using FirePond as an example, "institutional allocants with alleged tie-in agreements accounted for 95 percent of the total demand for FirePond stock [as measured by the proportion of purchase orders from those with alleged tie-in agreements] at the beginning of the pre-open bid session . . . amounting to 52 percent of the 5,666,666 shares issued in the FirePond IPO"). [*156]

n358 *See id.* P10 (by the end of the session, purchase orders from allocants with alleged tie-in agreements constituted 96% of the total demand at that time, which amounts to 70% of the total number of shares issued). By comparison, only 55.6% of the Firepond IPO shares were actually allocated to investors with alleged tie-in agreements. *See id.* P5.

n359 *Id.* P11. *See also supra* Part II.D. (noting, for example, that Sycamore stock was offered at $ 38 per share, but opened at $ 270.88).

Fischel also observes that the lead underwriter in each pre-open bid session set the initial bid substantially higher than the offering price, and that "this is consistent with . . . knowledge of the volume of pending purchase orders." n360 Fischel asserts that:

> The literature has documented that even before the opening of trading, significant price discovery takes place and that a large proportion of the change in price from the offer price to the opening price is captured in the first quote entered by the lead underwriter. This evidence supports the conclusion that the alleged tie-in [*157] agreements affected prices before trading began. n361

Fischel also notes that "activity in the lead underwriter's bid during the pre-open bid session was [frequently] followed by an increase in the inside [best] bid." n362

n360 7/12/04 Fischel Report P9.

n361 *Id.* (footnote omitted).

n362 *Id.* P12. Although Fischel does not fully explain the import of this observation, it seems to reflect the same type of "price discovery" -- that is, knowledge of expected demand -- he infers with respect to the initial underwriter bids.

Trading activity of allocants with alleged tie-ins was not limited to purchase orders executed at the beginning of trading. Rather, Fischel notes that allocants "purchased substantial quantities of shares in each focus [stock's] aftermarket." n363 Fischel also undertakes a regression analysis to show that the size of each allocation correlates to the quantity of stock that allocant purchased in the aftermarket. n364 To explain how such purchases might inflate prices, [*158] Fischel notes that "Keim and Madhavan . . . find that a buyer-initiated trade of only 0.16 percent of a company's outstanding stock is associated with a *permanent* price increase of 4.7 percent in the stock price." n365

n363 *Id.* P13. Fischel does not clarify whether this reference is to allocants with tie-in agreements, or to the entire population of allocants.

n364 *See id.* P15. Of course, this analysis tends more to show the existence of tie-in agreements than the existence of artificial inflation. Nonetheless, it does highlight the possible breadth of the alleged scheme.

n365 *Id.* P23 (citing Keim, Donald B. & Ananth Madhavan, *The upstairs market for large-block transactions: analysis and measurement of price effects,* 9 Rev. Fin. Studies (Spring 1996), 1-36, at 19) (emphasis in original). Defendants' expert, Dr. O'Hara, challenges Fischel's assertion of a permanent price increase, noting that, in the market microstructure field, "permanent effects refer to the impact of the trade on beliefs," not to indelible or long-enduring price effects. 7/23/04 O'Hara Report at 4 n.2. This is *exactly* what Fischel intends to show -- that the alleged tie-ins changed investors' beliefs in the true value of the securities and that, over time, the artificial price inflation dissipated. The quantity of alleged tie-in purchases distinguishes this case from *West v. Prudential Secs., Inc., 282 F.3d 935 (7th Cir. 2002),* in which the Seventh Circuit rejected plaintiffs' allegation that the purchasing behavior of eleven investors privy to secret information raised market prices. Here, the number of alleged tie-in purchases as a proportion of overall share demand is considerable, and Fischel offers a method to detect inflation attributable to those tie-in purchases.

[*159]

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 16 of 26

Page 46

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

Having thus established a mechanism for proving that the alleged scheme caused artificial inflation, Fischel turns to the problem of how to determine the duration of that inflation and its rate of dissipation. Fischel adopts the "Comparable Index Approach," in which the overall performance of an issue is compared to a benchmark index averaging the price movements of comparable stocks. n366 Defendants' expert asserts, and Fischel concedes, that the Comparable Index Approach is usually invoked to determine *damages,* not loss causation. n367 Specifically, "the premise of the Comparable Index Approach is that all changes in the price of a company's stock not accounted for by movements in the comparable company stock prices and not accounted for by movements in the general market are attributed to the alleged fraud." n368 Thus, as generally applied, the Comparable Index Approach is used to calculate damages where loss causation has already been proven or is assumed; that is, it *"assumes loss causation rather than detects it."* n369

n366 *See* 1/20/04 Fischel Report PP16-19; 4/15/04 Fischel Report PP6-7. Fischel proposes that the rate of dissipation can be shown using either the Comparable Index Approach or the "Event Study Approach," both of which compare the observed fluctuations in a security's price to the expected returns if that stock had not been manipulated (*i.e.,* was neither undergoing artificial inflation, and thus overperforming its expected value, nor dissipating that inflation, and thus underperforming). Both theories adopt the same formula for determining the degree of variation from expected returns. Through this mechanism, they quantify performance deviations over time, creating a "value line" that can be compared to the actual "price line" of a stock to show the existence of loss and degree of damages to investors at any given time. [*160]

n367 *See* Cornell Report PP4-8; 4/15/04 Fischel Report P6 (the Comparable Index Approach "could be used to compute the *value line*" of a stock) (emphasis added).

n368 Cornell Report P4.

n369 *Id.* (emphasis in original).

However, Fischel has already provided a method to show that the alleged scheme artificially inflated stock prices. Plaintiffs' loss causation calculation does not depend on the Comparable Index Approach. It is,

however, a component of the analysis. Once artificial inflation has been established by the mechanisms discussed earlier (*i.e.,* by a lead underwriter making a high initial bid in the pre-open bid session and raising its own bid; by creation of artificial demand through tie-in agreements, which causes prices to rise; and by permanent changes in beliefs caused by buyer-initiated trading), all that remains is detecting the dissipation of that inflation. Here, each of the focus stocks ultimately plummeted in value to levels far below their offering prices and not far above zero, the lowest possible value. Some loss causation may be inferred simply from [*161] the disappearance of the original inflation. n370 After all, when an artificially inflated stock tumbles to a fraction of its offering price, it is logical to assume that the artificial inflation has dissipated. The Comparable Index Approach need not carry the load of proving the *existence* of inflation or dissipation.

n370 *See In re IPO,* 297 F. Supp. 2d at 674 ("In market manipulation cases, therefore, it may be permissible to infer that the artificial inflation will inevitably dissipate."). For example, of the focus cases, Engage, Firepond and iXL all traded below $ 10 per share on December 6, 2000. The stocks continued to underperform after the close of the class period (*e.g.,* on the date the first suit was filed in each case, Corvis closed at $ 7.38, Engage at $ 0.19, Firepond at $ 0.66, Sycamore at $ 8.63 and VA Linux at $ 9.03). *See supra* Part II.E.

Fischel proposes only to use the Comparable Index Approach to determine the *duration* of dissipation. n371 Under this framework, [*162] Fischel finds that each of the focus stocks significantly overperformed on the first day of trading and underperformed in the long term when compared to various benchmark indices. n372 Fischel attributes the securities' initial overperformance to artificial inflation in the immediate aftermarket and their later underperformance, at least in part, to a gradual dissipation of that inflation. The rate of dissipation, and its existence, can be inferred from the fact that, in the long run, the focus stocks consistently declined further in price than comparable market benchmarks, which presumably reflected the same market-wide variables. Fischel notes that the markets for the six focus cases significantly underperformed market benchmarks even after December 6, 2000, implying that the stock price continued to shed inflation throughout and after the close of the class period. n373 As a result, Fischel has established a method by which a finder of fact could conclude both that stock prices were artificially inflated

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 17 of 26

Page 47

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

and that the inflation dissipated throughout the class period, continuing even after December 6, 2000. n374

n371 See 7/12/04 Fischel Report PP20-22. [*163]

n372 See id. P21; 1/20/04 Fischel Report PP23-29; 4/15/04 Fischel Report P22.

n373 See 7/12/04 Fischel Report P20 ("The fact that underperformance continued for each of the six focus case stocks after December 6, 2000 strongly suggests that the inflation that existed at the time of each stock's IPO had not fully dissipated by the end of the class periods.").

n374 Dr. O'Hara notes that, in fact, Corvis occasionally overperformed market benchmarks well after its IPO but during the class period, when a simplistic application of Fischel's underperformance measure of dissipation would imply constant underperformance. See 7/23/04 O'Hara Report P17. However, there could be any number of reasons for such an unexpected price increase, including materially misleading analyst reports. While quantifying the actual amount of inflation at every point during the class period is a necessarily fact-intensive inquiry, it is not one that plaintiffs must undertake to prove loss causation. Plaintiffs must merely show *some* loss, and the significant protracted underperformance of the focus stocks throughout and after the class period satisfies plaintiffs' burden at this stage.

[*164]

Fischel's theory is not fatally flawed. Although defendants present a cadre of experts clamoring to apply alternative methods of determining loss causation, n375 now is not the time to "weigh conflicting evidence or engage in 'statistical dueling' of experts." n376 Defendants are free to attack Fischel's theory at trial or present alternative theories if they choose.

n375 It seems unusual that defendants in a securities fraud case would go to such trouble to provide methods for measuring and detecting the harm caused by their alleged wrongdoing. Clearly, though, defendants' efforts to adduce their own theories of loss causation seek to persuade the Court that any valid theory of loss causation -- like those defendants proffer -- would require intensive trade-by-trade analysis

and be characterized by instantaneous dissipation of artificial inflation. Defendants' alternative theories of loss causation, then, are offered to serve twin goals: *first*, to challenge manageability and predominance by presenting a laborious and time-consuming method for detecting inflation; and *second*, to provide a method that assumes an almost instantaneous rate of dissipation that, if adopted, would exclude most class members from recovery. The class certification decision is not the appropriate place to choose the winning theory of loss causation. The only issue now is whether plaintiffs' theory must be rejected as a matter of law. [*165]

n376 VISA Check, 280 F.3d at 135. But see Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 178-79 (3d Cir. 2001) (affirming finding that individual loss causation inquiries predominated where securities broker-dealers were accused of failing to procure the best price possible for their clients). Newton, however, dealt with very different conduct from that alleged here. In Newton, the district court found "that defendants' practice did not detrimentally affect the value of plaintiffs' securities across the entire market [and that there was] no resemblance to cases where economic injury naturally flowed from defendant's alleged conduct." Id. at 178. Here, plaintiffs allege a coordinated scheme that artificially inflated prices throughout the entire market.

Plaintiffs have satisfied their burden at this stage to articulate a theory of loss causation that is not fatally flawed. Moreover, because plaintiffs' theory posits protracted dissipation throughout the proposed class period, it presents common questions of liability [*166] -- namely, whether tie-in agreements artificially inflated stock prices and the duration of any such inflation (i.e., whether the inflation dissipated abruptly or over the course of the entire class period). Defendants' alternative theories of loss causation, which generally require intensive trade-by-trade analysis of transitory price effects, would, if adopted by the jury, answer that question in the negative. n377 Defendants provide various criticisms of Fischel's "methodology," but these attacks go to the weight of Fischel's conclusions and must be reserved for trial. n378 Defendants also point out that Fischel's analysis may not be able to quantify the amount of inflation or dissipation at any given time. n379 However, as I have already noted, loss causation only requires that plaintiffs establish *some* inflation and

Case 1:04-cv-00331-JJF     Document 57-3     Filed 05/02/2005     Page 18 of 26

Page 48

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

dissipation, not the precise size of the inflation or amount of the loss. That inquiry relates to damages, not loss causation, and is therefore addressed in the next section.

n377 *See* Kleidon Report PP44-71; 2/24/04 O'Hara Report PP23-47; Sirri Report PP34-37; Stultz Report PP8-43. [*167]

n378 *See Emergent Capital, 343 F.3d at 197* ("Of course, if the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established. But such is a matter of proof at trial . . . ."). For example, defendants argue that: Fischel's benchmark comparisons may suffer from selection bias, *see* 7/23/04 O'Hara Report P14; that Fischel's theory does not explain the lack of correlation between amount of wrongdoing (as a percentage of shares issued) and magnitude of initial overperformance, *see* 7/23/04 O'Hara Report P28; and that Fischel ignores possible confounding factors and important events both in the course of focus case trading and in the larger context of the Internet bubble, *see generally* Barry Report; Gompers Report. *See also* Sycamore Mem. at 13 ("Sycamore's price performance over the proposed class period is readily explained by market forces that impacted stocks in general, and the optical networking sector in particular . . . ."). However, to prove loss causation, plaintiffs need not show that the alleged scheme was the *sole* cause of loss. Plaintiffs may satisfy their burden by showing that, because of the alleged scheme, they lost *more* than they would have lost had the stock price been affected only "by market forces that impacted stocks in general." *Id.* [*168]

n379 *See, e.g.,* 7/23/04 O'Hara Report at 6 n.5, PP17, 18, 31, 34-36.

### 3. Damages

If plaintiffs are successful in proving liability, they will have to provide a methodology for calculating damages. In any publicly traded securities market, some investors own many shares and some own only a few; some maintain their portfolios for years, and some trade shares daily. Thus, the extent of the harm suffered by each class member as a result of the alleged misconduct is, by definition, an individualized inquiry. n380

n380 *See Blackie, 524 F.2d at 905* ("The amount of damages [in a *10b-5* class action] is invariably an individual question . . . ."); *see also In re Rent-Way Sec. Litig., 218 F.R.D. 101, 119 (W.D. Pa. 2003)* ("The problems presented by 'in and out sellers' are bound to inhere in any securities action alleging a fraud on an open securities market. This is all the more true in cases such as this one where the alleged fraudulent scheme was of longer duration and/or involved a multiplicity of alleged misrepresentations.").

[*169]

However, where common questions otherwise predominate, the need for individualized damages inquiries is not enough to scuttle the class action. n381 Rather, the Second Circuit has recognized several methods by which a court may address the problem of individual damages while securing the benefits of the class action device for common issues of liability:

> There are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class. n382

"Particularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification." n383 Although there are extreme [*170] cases in which calculation of damages may present such an intolerable burden that it renders class certification inappropriate, n384 "such cases rarely, if ever, come along." n385

Case 1:04-cv-00331-JJF     Document 57-3     Filed 05/02/2005     Page 19 of 26

Page 49
2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

n381 *See VISA Check*, 280 F.3d at 139 ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."); *In re Worldcom*, 219 F.R.D. at 302 ("When liability can be determined on a class-wide basis, individualized damage issues are not ordinarily a bar to class certification."); *see also Fed. R. Civ. P. 23(b)(3)* Advisory Committee Note ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.").

n382 *VISA Check*, 280 F.3d at 141 (footnotes omitted).

n383 *Klay v. Humana, Inc.*, 382 F.3d 1241, 2004 U.S. App. LEXIS 18494, No. 02-16333, 2004 WL 1938845, at *13, F.3d (11th Cir. Sept. 1, 2004) (footnotes omitted); *see also id.* ("In assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods for computing damages are so insubstantial as to amount to no method at all[.] Plaintiffs need only come forward with plausible statistical or economic methodologies to demonstrate impact on a class-wide basis.") (citation and alterations omitted). [*171]

n384 *See, e.g., Windham v. Am. Brands, Inc.*, 565 F.2d 59, 70 (4th Cir. 1977) ("The district court estimated -- conservatively, we think -- that in the absence of a practical damage formula, determination of damages in this case would consume ten years of its time. The propriety of placing such a burden on already strained judicial resources seems unjustified."). Nonetheless, the *Windham* court noted that "in cases where the fact of injury and damage breaks down in what may be characterized as 'virtually a mechanical task,' 'capable of mathematical or formula calculation,' the existence of individualized claims for damages seems to offer no barrier to class certification on grounds of manageability." *Id. at 68* (citing, *inter alia, Blackie*, 524 F.2d at 905). *Windham* was a complicated antitrust case where "plaintiffs could plead no common impact or injury from an alleged conspiracy to control prices in tobacco auctions. Such an allegation was precluded by the great variety of geographical markets, daily price fluctuations and individualized systems for grading product quality." *Rios*, 100 F.R.D. at 408 n.13. Unlike the plaintiffs in *Windham*, though, plaintiffs here seek to prove damages for each class member through a common formula that their expert says can be developed after the completion of discovery. *See* 4/15/04 Fischel Report PP4-7. [*172]

n385 *Klay*, 2004 U.S. App. LEXIS 18494, 2004 WL 1938845, at *14.

"Before and after the enactment of the PSLRA, absent class members in securities fraud cases have been awarded a common fund of damages computed by the trier of the fact, based usually on expert testimony . . . ." n386 For example, a jury may be asked to compute the "true value" of a stock over time, including fluctuations due to various price-affecting events, and consequently determine by what degree the stock was inflated at any given time during the class period. n387 Thus, important common questions regarding damages, as well as loss causation, may be resolved by asking the jury to trace a "graph delineating the actual value of the stock throughout the class period. When compared with a comparable graph of the price the stock sold at, the determination of damage will be a mechanical task for each class member." n388

n386 *In re Oxford Health Plans Inc., Sec. Litig.*, 244 F. Supp. 2d at 251.

n387 This type of damages calculation is common in securities cases. *See, e.g., Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 576-77 (2d Cir. 1982); *In re Seagate Tech II. Sec. Litig.*, 843 F. Supp. 1341, 1348-49 (N.D. Cal. 1994); *Effective Use of Damages Experts in Securities Class Actions*, 1332 Practicing Law Institute, Corporate Law and Practice Course Handbook Series 805, 811 (Sept.-Oct. 2002) (discussing use of expert testimony to determine the "ribbon" of artificial inflation between the true value and market price of shares over time). [*173]

n388 *Blackie*, 524 F.2d at 909 n.25; *see also In re Rent-Way*, 218 F.R.D. at 119 (granting class certification and noting that plaintiffs "will be able to present a workable framework for

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 20 of 26

Page 50

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

determining aggregate damages and price inflation at . . . trial through the use of expert witnesses who will extrapolate these figures based on trading data during the class period.").

Plaintiffs suggest just such an approach. n389 Plaintiffs have proposed using both the "Event Study Approach" and the "Comparable Index Approach" to determine the effect that any given event during the class period had on stock prices. n390 While assessing the effect of each salient event over hundreds of days in any given class period may be a laborious and time-consuming task, it nonetheless provides a common basis for calculating the damages of all class members. By contrast, an alternative approach that would force each class member to prove in individual proceedings how various events impacted the stock price when she purchased and sold stock would be staggeringly inefficient, would provide [*174] countless opportunities for juries to render inconsistent verdicts, and, if the cost were placed on individual class members seeking to prove damages, would likely present a formidable (if not complete) barrier to recovery. n391

n389 See Plaintiffs' Reply at 83-87 ("The difference between the two lines [representing true value and actual price] shows the amount that a purchaser paid above the actual value of the stock, and therefore the damages that the purchaser incurred by paying more for the stock than it was worth.") (citing Green v. Occidental Petroleum Corp., 541 F.2d 1335, 1344-45 (9th Cir. 1976) (Sneed, J. concurring)).

n390 For an explanation of these theories, see supra n. 29.

n391 See, e.g., Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) (Posner, J.) ("The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $ 30.").

Accordingly, by [*175] suggesting a method by which a jury could determine the true value of securities over time, plaintiffs present the common question of magnitude of damages. At this stage of the proceedings, plaintiffs have met their burden to establish that common questions predominate. n392

n392 However, I note that although plaintiffs have presented a method by which damages

could be commonly proved in the same trial as the remainder of plaintiffs' claims, the Court is not bound to limit the proceedings to a single trial. If, as the case develops, it becomes apparent that another method of determining or apportioning damages would be superior to a unitary proceeding, then other avenues of adjudication may be pursued. See VISA Check, 280 F.3d at 141.

### 4. Section 11 Claims

#### a. Tracing

"Aftermarket purchasers who can trace their shares to an allegedly misleading registration statement have standing to sue under § 11 of the 1933 Act." n393 A plaintiff successfully traces her shares if she demonstrates [*176] that her stock was actually "issued pursuant to a defective [registration] statement;" it is "insufficient that [her] stock 'might' have been issued pursuant to a defective [registration] statement." n394 This requirement has been strictly applied, even where its application draws arbitrary distinctions between plaintiffs based on the remote genesis of their shares. n395

n393 Demaria v. Andersen, 318 F.3d 170, 178 (2d Cir. 2003) (citing Barnes v. Osofsky, 373 F.2d 269, 272 (2d Cir. 1967)).

n394 Lorber v. Beebe, 407 F. Supp. 279, 287 (S.D.N.Y. 1975). Accord Krim v. pcOrder.com, 210 F.R.D. 581, 586 (W.D. Tex. 2002); Harden v. Raffensperger, Hughes & Co., 933 F. Supp. 763, 766 (S.D. Ind. 1996); In re Quarterdeck Office Sys. Sec. Litig., 1993 U.S. Dist. LEXIS 19806, No. CV 92-3970, 1993 WL 623310, at *2 (C.D. Cal. Sept. 30, 1993); Kirkwood v. Taylor, 590 F. Supp. 1375, 1379 (D. Minn. 1984).

n395 See Barnes, 373 F.2d at 272-73 (strictly applying tracing requirement despite acknowledging "that this construction gives § 11 a rather accidental impact as between one open-market purchaser of a stock already being traded and another"); see also In re Crazy Eddie Sec. Litig., 792 F. Supp. 197, 202 (E.D.N.Y. 1992) ("If Congress wishes to ease the burden on securities holders such as plaintiffs, it can do so.").

[*177]

Tracing may be established either through proof of a direct chain of title from the original offering to the

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 21 of 26

Page 51

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

ultimate owner (e.g., if the owner was an allocant in the IPO, or took actual physical possession of share certificates directly from an allocant), or through proof that the owner bought her shares in a market containing only shares issued pursuant to the allegedly defective registration statement. n396 The modern practice of electronic delivery and clearing of securities trades, in which all deposited shares of the same issue are held together in fungible bulk, makes it virtually impossible to trace shares to a registration statement once additional unregistered shares have entered the market. n397 Even where the open market is predominantly or overwhelmingly composed of registered shares, plaintiffs are not entitled to a presumption of traceability. n398

     n396 See Lorber, 407 F. Supp. at 287; Abbey v. Computer Memories, Inc., 634 F. Supp. 870, 873 (N.D. Cal. 1986). Similarly, the presence of identical shares that were traded before an offering and remain in the market after the offering forecloses the possibility of a section 11 class. See Klein v. Computer Devices, Inc., 591 F. Supp. 270, 273 n.7 (S.D.N.Y. 1984) ("The open-market purchaser . . . must be able to trace his particular securities to the registration statement when it covered additional securities of an outstanding class. If the purchaser bought identical securities already being traded on the open market, he must look elsewhere for relief.") (citations omitted). [*178]

     n397 See Lorber, 407 F. Supp. at 287; Abbey, 634 F. Supp. at 873-75; see also 2/20/04 Declaration of Jeffrey Waddle, Senior Counsel and Vice President of the Depository Trust & Clearing Corporation, in support of iXL Mem. ("Waddle Decl.") at 1-2.

     n398 See Barnes, 373 F.2d at 273 ("an action under § 11 may be maintained 'only by one who comes within a narrow class of persons, i.e. those who purchase securities that are the direct subject of the prospectus and registration statement'") (quoting Fischman v. Raytheon Mfg. Co, 188 F.2d 783, 786 (2d Cir. 1951)); see also Barnes, 373 F.2d at 272 ("It seems unlikely that the section developed to insure proper disclosure in the registration statement was meant to provide a remedy for other than the particular shares registered. . . . Beyond this, the over-all limitation of § 11(g) that 'In no case shall the amount recoverable under this section exceed the price at which the security was offered to the public,' and

the provision of § 11(e) whereby . . . an underwriter's liability shall not exceed 'the total price at which the securities underwritten by him and distributed to the public were offered to the public,' point in the direction of limiting § 11 to purchasers of the registered shares, since otherwise their recovery would be greatly diluted when the new issue was small in relation to the trading in previously outstanding shares."). See generally Krim, 210 F.R.D. at 586 (even where market consisted of 91% IPO stock, court held named plaintiffs seeking class certification did not have standing because "plaintiffs must demonstrate all stock for which they claim damages was actually issued pursuant to a defective statement, not just that it might have been, probably was, or most likely was, issued pursuant to a defective statement.") (emphasis in original); In re Quarterdeck, 1993 U.S. Dist. LEXIs 19806, 1993 WL 623310, at *2-3 (same result where 97% of market was IPO stock); Abbey, 634 F. Supp. at 874-75 (same result where 82% of market was IPO stock).

[*179]

    Defendants assert that the actual tracing of each plaintiff's stock is "a necessarily individualized inquiry." n399 Furthermore, defendants proclaim that, insofar as each class member must individually prove that her shares were issued pursuant to the relevant registration statement, the necessity of trying individual issues should disqualify the class under the Rule 23(b)(3) predominance requirement. n400

     n399 Sycamore Mem. at 35. See also Corvis Mem. at 20; Engage Mem. at 26; Firepond Mem. at 38-39; iXL Mem. at 35-37; VA Linux Mem. at 42.

     n400 See, e.g., Corvis Mem. at 20.

    Defendants are correct. If the classes for each of the focus cases are to extend from the date of the IPO to the last day of plaintiffs' proposed class period, December 6, 2000, then each class will include plaintiffs who purchased their shares after untraceable shares entered the market. While some individual class members who purchased after the end of the class period might be able to trace their shares successfully, the [*180] resulting inquiry would fragment the class action into myriad mini-trials on the subject of tracing. Plaintiffs' proposed section 11 classes are suitable only for those periods in which class members' ability to trace their shares is susceptible to common proof. n401 Such generalized

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

proof is possible if plaintiffs' *section 11* class periods are limited to exclude all purchases made after untraceable securities entered the market. As a result, the *section 11* class periods for each of the focus cases must end at the time when unregistered shares became tradeable. n402

n401 *See, e.g., Harden, 933 F. Supp. at 766-67* (only those with *section 11* standing "may properly be considered members of the class"); *In re Quarterdeck, 1993 U.S. Dist. LEXIS 19806, 1993 WL 623310, at *2-4* (denying class certification, finding that named plaintiffs lacked standing because they could not trace their shares to the allegedly defective registration statement, and finding that named plaintiffs' lack of standing constituted a "unique defense" violating the typicality requirement of *Rule 23(a)(3)*).

n402 Because of the impossibility of tracing shares once they have mingled with unregistered shares, reserving the tracing issue until a future claims process would be of limited utility. *See* Waddle Decl.; *In re Crazy Eddie, 792 F. Supp. at 201-02*. Class members who purchased when only registered shares existed in the market would automatically satisfy the tracing requirement, and class members who purchased shares once untraceable shares entered the market would, because of the anonymity of fungible bulk storage, almost certainly be unable to satisfy their requirement. Thus, common sense requires limitation of *section 11* classes to those periods in which plaintiffs will be able to satisfy their burden to show traceability and to exclude potential plaintiffs whose claims would almost invariably be futile. Plaintiffs' counsel has noted bitterly the possible unfairness of this standard:

> MR. WEISS: Because most people today keep their stock at the brokerage firm, the street name, they throw it all into this common fungible account. So [the underwriters'] conduct is designed to make it virtually impossible, once they introduce new shares into the market through [Rule] 144, to be able to distinguish one share from the other. . . . You are giving them an incentive to avoid *section 11* liability. THE COURT: What do I do about the case law, which according to the defense, whether it's one percent or less than one percent, once that

> problem occurs, the cases, they . . . uniformly say it's over. MR. WEISS: . . . This is different from the other cases because the conduct of the underwriter[s] . . . they are creating an environment that makes it impossible for somebody to take advantage of [] *section 11* . . . . I am trying to couple the conduct of the underwriters, who are actually in charge of handling the shares physically. . . . THE COURT: Has any court adopted this theory? MR. WEISS: I don't think so.

Transcript of 6/17/04 Hearing at 108:15-109:23. The advent of fungible bulk storage has made plaintiffs' tracing requirement a stringent one indeed; however, it is not the domain of this Court to abrogate such a requirement. That is a job for Congress.

[*181]

For each focus case, the filed registration statement summarizes the number and status of outstanding shares, and tells investors when outstanding shares will qualify to enter the market, including information as to when lock-ups will expire and at what point previously issued shares become eligible for trading under *Rule 144*, promulgated pursuant to the Securities Act. n403 *Rule 144* provides, in pertinent part, that affiliated holders of restricted securities who have satisfied the statutory holding period must wait until the issuer "has been subject to the reporting requirements of [either*] section 13* . . . or *section 15(d)* of the [Exchange Act] . . . for a period of at least 90 days" and "has filed all the reports required to be filed thereunder during the 12 months preceding such sale . . . ." n404 In either case, the issuer becomes subject to the filing requirements of the Exchange Act when its filed registration statement becomes effective. n405

n403 *See* 10/2/00 Form S-8 filed by Corvis ("Corvis Form S-8"), Ex. N to Hunter Corvis Decl., at 2; 7/19/99 Engage Prospectus at 5; 2/4/00 Firepond Prospectus at 58; 6/2/99 iXL IPO Prospectus at 97; 10/21/99 Sycamore Prospectus at 52; 12/9/99 VA Linux Prospectus at 65. [*182]

n404 *17 C.F.R. § 230.144(c)(1).*

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 23 of 26

Page 53
2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

n405 *See 15 U.S.C. § § 78m, 78o(d).*

In the Corvis and VA Linux cases, additional stock offerings were consummated before the 90-day *Rule 144* holding period expired. n406 Where there are multiple public offerings of a security, a plaintiff is entitled to a presumption that she has satisfied the tracing requirement of *section 11* only if every such offering was defective. n407 However, in both cases, the additional offerings explicitly incorporated the contents of the IPO prospectuses. n408 Thus, to the extent that the IPO registration statements are defective, so are the additional registration statements.

n406 *See* Corvis Mem. at 20 n.19 (shares issued pursuant to employees' exercise of stock options); VA Linux Mem. at 43 n.41 (same).

n407 *See, e.g., Bernstein v. Crazy Eddie, Inc., 702 F. Supp. 962, 972 (E.D.N.Y. 1988); In re Eagle Computer Sec. Litig.,* No. C-84-20382(A), *1986 WL 12574,* at *9 (N.D. Cal. Mar. 31, 1986). [*183]

n408 *See* Corvis Form S-8 at 2; S-8 Forms filed by VA Linux on 12/9/99, Ex. H to Hunter VA Linux Decl.

Under *Rule 144(k),* non-affiliates who hold unregistered shares may sell their shares without restriction after they have held the shares for a period of two years. n409 Defendants imply that some unregistered shares might have been tradeable at the time of the IPOs in Corvis, Firepond and Sycamore. No such inference is supported by the facts. In Corvis, all outstanding shares issued before 1999 (and therefore tradeable under *Rule 144(k)* before 2001) were issued to affiliates, and defendants have produced no evidence that such shares were ever transferred to non-affiliates. n410 In Firepond, all *Rule 144(k)* shares were subject to 180-day lock-up agreements. n411 In Sycamore, the company did not exist two years prior to the IPO, making it impossible for any non-affiliate to have held unregistered shares for the two years required by *Rule 144(k).* n412

n409 *See 17 C.F.R. § 230.144(k).*

n410 *See* Corvis Form S-1/A at II-2-5. It is possible that some shares held by Corvis affiliates were sold to non-affiliates more than two years before the Corvis IPO. It unjustifiably aggravates

an already onerous burden to force plaintiffs to prove a negative (*i.e.,* that no such shares were transferred prior to the expiration of the *Rule 144* 90-day holding period). If, however, defendants can prove that such transfers occurred and unregistered shares were tradeable earlier, then the Corvis *section 11* class will be shortened accordingly. [*184]

n411 *See* 2/4/00 Firepond Prospectus at 58.

n412 Sycamore's web page shows that the company was founded in February 1998. *See* Sycamore Networks: Corporate Information: News & Events, http://www.sycamorenetworks.com/corporate/news/index.asp?id=fastfacts (August 8, 2004).

Shares issued in the context of stock-based acquisitions (like those in the VA Linux case) cannot circumvent the required holding periods of *Rule 144.* Before trading unregistered stock, a recipient must hold the stock for "[a] minimum of one year . . . ." n413 Thus, a recipient of stock in VA Linux's first acquisition -- of Trusolutions, Inc., on March 28, 2000 -- would not have been able to sell that stock until March 28, 2001, well after the end of plaintiffs' proposed class period.

n413 *17 C.F.R. § 230.144(d)(1).*

Accordingly, plaintiffs' *section 11* class periods are appropriately limited to the periods between each IPO and the time when [*185] unregistered shares entered the market. In Corvis, Engage, Firepond, iXL and Sycamore, unregistered shares became tradeable 90 days after the IPO pursuant to *Rule 144.* In VA Linux, all outstanding shares appear to have been subject to 180-day lock-up agreements, n414 so the VA Linux *section 11* class period extends for 180 days after the IPO. Thus, plaintiffs' *section 11* class periods are limited to the following: Corvis, July 28, 2000 to October 26, 2000; Engage, July 20, 1999 to October 18, 1999; Firepond, February 4, 2000 to May 4, 2000; iXL, June 2, 1999 to August 31, 1999; Sycamore, October 21, 1999 to January 19, 2000; and VA Linux, December 9, 1999 to June 12, 2000.

n414 *See* 12/9/99 VA Linux Prospectus at 65.

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 24 of 26

Page 54

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

### b. Adequacy and Typicality of *Section 11* Class Representatives

A class representative's lack of standing under *section 11* qualifies as a "unique defense" sufficient to defeat the typicality of a proposed class representative. n415 Moreover, because *section 11* grants a right of recovery only [*186] to plaintiffs who sold their securities below the offering price, and limits that recovery to the difference between the sale and offering prices (or the difference between the offering price and the value of shares still held at time of suit), plaintiffs who sold all their traceable stock at prices above the offering price have no right to recover under *section 11*. n416 Defendants argue that any proposed class representative who sold her shares at a price in excess of the offering price should be excluded because, absent any possibility of *section 11* recovery, her claims are not typical of *section 11* class members who have a right to recover damages. n417 Defendants are correct. Besides the fact that such a class representative would be subject to unique defenses with respect to her *section 11* claims, the foreclosure of any hope for recovery calls into question her motivation to fairly and adequately protect the interests of the class. n418

> n415 *See In re Quarterdeck, 1993 U.S. Dist. LEXIS 19806, 1993 WL 623310, at *4.*

> n416 *See In re IPO, 241 F. Supp. 2d at 351.*

> n417 *See* Sycamore Mem. at 40. [*187]

> n418 *See Fed. R. Civ. P. 23(a)(4).*

Consequently, representatives of plaintiffs' proposed *section 11* classes must (1) have purchased shares during the appropriate class period, and (2) have either sold the shares at a price below the offering price or held the shares until the time of suit.

Accordingly, the following class representatives are appropriate representatives for their *section 11* classes: for Corvis, Huff and Rooney; for Engage, Pappas; for Firepond, the Collinses, Zhen and Zitto; and for VA Linux, Budich and Zagoda. Because plaintiffs have no suitable class representatives for their iXL and Sycamore *section 11* classes, their motion to certify those classes must be denied.

### C. *Rule 23(b)(3)*: Superiority

Plaintiffs must show that a "class action is superior to other available methods for the fair and efficient adjudication of the controversy." n419 *Rule 23* suggests a number of nonexclusive factors the trial judge can weigh to determine superiority, including "the interest of members of the class in individually controlling the prosecution." n420 In a case with thousands or [*188] millions of claimants, though, a class member's interest in *aggregating* the claims substantially outweighs her interest in individual control of the litigation. "The more claimants there are, the more likely a class action is to yield substantial economies in litigation." n421 "In enacting *Rule 23(b)(3)*, 'the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" n422 In a securities class action where millions of shareholders are damaged by fraudulent conduct, none but the very largest individual investors have the capital to prosecute their claims individually. This is especially true in a case such as this one, where expert reports, voluminous briefing and vast discovery are par for the course. n423 However, when investors' claims are aggregated, even an investor who bought a single share has the chance to recover for defendants' alleged wrongdoing. This benefit of the class action form is not easily overcome. n424

> n419 *Fed. R. Civ. P. 23(b)(3). See also Eisen, 417 U.S. at 164.* [*189]

> n420 *Fed. R. Civ. P. 23(b)(3)(A).*

> n421 *Carnegie, 376 F.3d at 661. See also id.* ("It would hardly be an improvement to have in lieu of [a] single class action 17 million suits each seeking damages of $ 15 to $ 30."). While individual plaintiffs here seek substantially more money (*e.g.*, Spiros and Mary Gianos, proposed class representatives for VA Linux, lost $ 597,085.00 in connection with their purchases of VA Linux stock), the cost of litigating a securities fraud action against multiple well-funded defendants is staggering. *See, e.g., In re Cendant Corp. Litig., 243 F. Supp. 2d 166, 172-74 (D.N.J. 2003)* (finding that class counsel's 35,000 hours of attorney time and $ 55,000,000 requested fee were "not clearly excessive" in a securities fraud class action that the Third Circuit found was "a simple case in terms of liability") (quoting *In re Cendant Corp. Litig., 264 F.3d 201, 285 (3d Cir. 2001)*).

> N422 *Klay, 2004 U.S. App. LEXIS 18494, 2004 WL 1938845, at *23* (quoting *Amchem*

Case 1:04-cv-00331-JJF    Document 57-3    Filed 05/02/2005    Page 25 of 26

Page 55

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

*Prods., 521 U.S. at 617*) (internal quotation omitted).

n423 *Cf. In re Worldcom, 219 F.R.D. at 304* ("Few individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail."). [*190]

n424 *See, e.g., Castano, 84 F.3d at 748* (stating that the "most compelling rationale for finding superiority in a class action [is] the existence of a negative value suit"); *In re Inter-Op Hip Prothesis Liab. Litig., 204 F.R.D. 330, 348 (N.D. Ohio 2001)* ("Negative value claims are claims in which the costs of enforcement in an individual action would exceed the expected individual recovery.").

Any consideration of superiority must be framed in this context. Thus, the mere possibility of complexity or unmanageability does not defeat a class action. n425 Because a securities fraud class action offers the opportunity for redress of wrongs where victims would otherwise be unable to press their claims, "a class action has to be unwieldy indeed before it can be pronounced an inferior alternative -- no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied -- to no litigation at all." n426

n425 *See In re MTBE, 209 F.R.D. at 349* ("[a] court may not decline to certify a class for the sole reason that it may become unmanageable.") [*191]

n426 *Carnegie, 376 F.3d at 661.*

Moreover, the superiority of the class action form to alternative means of adjudication cannot -- and should not -- be considered in a vacuum. "In many respects, the predominance analysis . . . has a tremendous impact on the superiority analysis . . . for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." n427 Any consideration of superiority must therefore be subjective; it must weigh the benefits and costs of allowing the class action to proceed *versus* the benefits and costs of individual adjudication. n428

n427 *Klay, 2004 U.S. App. LEXIS 18494, 2004 WL 1938845, at *22.*

n428 *See 2004 U.S. App. LEXIs 18494, [WL] at *27* ("We are not assessing whether this class action will create significant management problems, but instead determining whether it will create *relatively more* management problems than any of the alternatives (including, most notably, 600,000 separate lawsuits by the class members).") (emphasis added).

[*192]

In this case, class adjudication is clearly superior to any other form of adjudication. Although preparation and trial of 310 class actions, each of which includes the multitude of common questions presented here, is daunting, preparation and trial of 310 *million* individual suits with virtually identical allegations would be impossible for all participants -- plaintiffs, defendants and the courts. *Rule 23* is intended to facilitate, *not prevent,* litigation of a multitude of claims with substantially identical allegations. n429

n429 *See 2004 U.S. App. LEXIS 18494, [WL] at *23*; *Fed. R. Civ. P. 23(b)(3)* Advisory Committee Note (acknowledging that class action is an appealing tool for adjudicating cases of "fraud perpetrated on numerous persons by the use of similar misrepresentations").

Defendants make little effort to propose alternative means of adjudication that might be superior to the class action form. The two alternative forms defendants suggest -- individual prosecution of claims and NASD arbitration n430 -- are both impractical [*193] for the reasons just described. Because of the costs arbitration or litigation impose on small-stakes securities fraud plaintiffs, neither could result in any recovery for the vast majority of investors included in the class definition, even if defendants' liability is ultimately proved. As neither the defendants nor the Court can suggest a means of adjudicating plaintiffs' claims that would be superior or even comparable to the efficiency and fairness of a class action, plaintiffs have satisfied the superiority requirement of *Rule 23(b)(3).*

n430 *See* iXL Mem. at 40.

## V. CONCLUSION

2004 U.S. Dist. LEXIS 20497, *; Fed. Sec. L. Rep. (CCH) P93,014

Accordingly, plaintiffs' motion for class certification is granted in part and denied in part for each of the six focus cases. Plaintiffs' Exchange Act classes are certified to the extent they include investors who acquired shares between the date of the IPO and December 6, 2000 and who satisfy the Court's revised class definition. Plaintiffs' *section 11* classes for Corvis, Engage, Firepond and VA Linux are certified as [*194] to all investors that satisfy the revised class definition and acquired shares before unregistered shares entered the market, and sold those shares for a loss at prices below the offering price. All of plaintiffs' proposed class representatives except Pappas are suitable to prosecute the Exchange Act claims. Huff, Rooney, Pappas, the Collinses, Zhen, Zitto, Budich and Zagoda are appropriate class representatives for their respective *section 11* classes. Because plaintiffs have proposed no suitable class representatives for their iXL or Sycamore *section 11* classes, those classes cannot be certified.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

October 13, 2004