# TAB F

LEXSEE 1999 US DIST. LEXIS 16046

**DAN LEONARD, Plaintiff, -against- GARANTIA BANKING LIMITED and CLAUDIO GANDELMAN, Defendants.**

**98 Civ. 4848 (LMM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1999 U.S. Dist. LEXIS 16046; Fed. Sec. L. Rep. (CCH) P90,674*

**October 18, 1999, Decided
October 19, 1999, Filed**

**DISPOSITION:** [*1] Leonard's complaint dismissed under Rule 12(b)(3) due to the existence of a valid, enforceable forum selection clause.

**LexisNexis(R) Headnotes**

**COUNSEL:** For DAN LEONARD, plaintiff: Barry R. Fischer, Lacaz Martins, Srour & Fischer LLP., New York, NY.

**JUDGES:** LAWRENCE M. McKENNA, U.S.D.J.

**OPINIONBY:** LAWRENCE M. McKENNA

**OPINION:**

MEMORANDUM AND ORDER

McKENNA, D.J.

Dan Leonard ("Leonard"), a Brazilian resident, commenced this action against Garantia Banking Limited ("Garantia") n1, a bank incorporated in the Bahamas, and Claudio Gandelman ("Gandelman"), a Garantia securities salesman and Brazilian resident (collectively "Defendants"). The action is premised upon an alleged violation of the 1934 Securities Exchange Act ("SEA") section 10(b), *15 U.S.C. § 78j*(b), SEA section 20(a), *15 U.S.C. § 78t*(a), and Securities and Exchange Commission Rule 10b-5, *17 C.F.R. § 240.10b-5*, as well as common law claims of fraud, negligence, and breach of fiduciary duty.

n1 On September 1, 1998, Garantia was renamed Credit Suisse/First Boston Garantia Limited. (Def. Brief at 2).

[*2]

Leonard asserts that this Court has subject matter jurisdiction over the alleged SEA violation pursuant to SEA section 27, *15 U.S.C. § 78aa*, and *28 U.S.C. § 1331*. (Compl. P 1). Leonard invokes supplemental jurisdiction over the common law claims pursuant to *28 U.S.C. § 1367*. (Id. P 1).

Pursuant to *Fed. R. Civ. P. 12(b)(1)* ("Rule 12(b)(1)"), Defendants have moved this Court to dismiss Leonard's complaint for lack of subject matter jurisdiction. Defendants also seek dismissal on the grounds of improper venue and forum non conveniens under *Fed. R. Civ. P. 12(b)(3)* ("Rule 12(b)(3)"). While the Court finds that subject matter jurisdiction is sustainable, Leonard's complaint is dismissed under Rule 12(b)(3) due to the existence of a valid, enforceable forum selection clause.

**I. FACTUAL BACKGROUND**

The following facts are gathered primarily from Leonard's complaint and filings with respect to this motion. Where Defendants dispute Leonard's material allegations, it is so noted.

Leonard, a Portuguese speaking resident of Brazil, sought to invest the accumulated savings of his family. (Compl. PP 3, 7). [*3] In March, 1996, he met with Gandelman at Garantia's Sao Paulo branch office and opened a joint, non-discretionary securities trading

Case 1:04-cv-00331-JJF    Document 57-4    Filed 05/02/2005    Page 3 of 27

Page 2

1999 U.S. Dist. LEXIS 16046, *; Fed. Sec. L. Rep. (CCH) P90,674

account. n2 (Compl. P 7). During this meeting, Leonard explained to Gandelman, in Portuguese, that he wished his family's funds to be placed in conservative investments. (Compl. P 7). He further told Gandelman that he had no investment experience and thus would rely on Gandelman's recommendations concerning which investments would be consistent with his goals. (Compl. P 7). Leonard also made Gandelman aware that he was not fluent in English, the language in which Garantia conducted its business. (Compl. P 7).

> n2 A non-discretionary account requires the bank to obtain the investor's permission prior to making transactions. (Def. Brief at 3).

Among the forms which Gandelman requested that Leonard sign was an Account Agreement ("the Agreement"), written in English, with a forum selection clause ("the Forum Clause"). (Pl. Brief at 3). The Forum Clause provided that any dispute arising [*4] out of the Agreement was to be submitted to the Bahamian courts. (Pl. Brief at 3). Leonard claims he could not understand the Agreement, but signed it because he trusted Gandelman. (Pl. Brief at 3).

Shortly after that March meeting, Leonard wire-transferred $ 699,804.71 to a Garantia account in New York City. (Compl. P 8). Leonard signed subscription agreements investing his money in three different bond mutual funds managed and administered by Garantia out of Brazil. (Compl. P 9; Def. Brief at 3). These three funds invested exclusively in Brazilian debt instruments and securities. (Def. Brief at 3).

In January 1997, Leonard again met with Gandelman in Gandelman's Sao Paulo office. (Compl. P10; Pl. Brief at 4). Gandelman informed Leonard that, while his investments were performing successfully, there was a method by which Leonard could greatly increase his returns. (Compl. P 10). According to Leonard, Gandelman stated that Garantia, in order to pursue the higher-return method, would be willing to invest its own money "with" Leonard. (Compl. P 10). Gandelman allegedly told Leonard that under this new method Garantia would provide eighty percent of the funds to be invested, and that [*5] profits and losses would be split between Leonard and Garantia in proportion to their respective investments. (Compl. P 10). Leonard agreed to this arrangement. (Pl. Brief at 5). Soon thereafter, using the United States "Swift" or "Fedwire" system, he wire-transferred an additional $ 450,000 to a Garantia account located in New York City. (Compl. P 11; Pl. Brief at 5).

As it turned out, Garantia did not invest its own money with Leonard. Rather, a margin facility was established on Leonard's account whereby Garantia *loaned* Leonard eighty percent of the purchase amounts for his investments. (Compl. P 11-13; Pl. Brief at 5-6). Defendants argue that Leonard was aware of the true nature of this method of investment. (Def. Brief at 4). Leonard, however, maintains that he never asked for such a margin facility, and that Gandelman failed to adequately explain the risks inherent in such activity, including the risk that Leonard could lose more money than he had actually invested. (Compl. P 14; Pl. Brief at 5-6).

Over the next few months, Gandelman used Leonard's funds and funds borrowed from Garantia to execute securities transactions, including the purchase of Brazilian Globo Par Eurobonds, [*6] Brazilian Net Sat Eurobonds, and EI Brazilian Brady Bonds. (Compl. P 15; Def. Brief at 5). Gandelman also invested Leonard's money in American Depository Receipts ("ADRs") n3 and call options on ADRs of Telebras, the Brazilian national telephone company. (Compl. P 15; Def. Brief at 5).

> n3 ADRs are securities issued by a U.S. bank against a holding by the institution of ordinary shares in a foreign company. MIT Dictionary of Modern Economics 14 (4th ed. 1992).

According to Leonard, "on some isolated occasions" after Gandelman had executed a transaction, Leonard would receive a confirmation written in English and thereby beyond his understanding. (Compl. P 16). However, because Leonard believed that Garantia was taking eighty percent of the risk and that he could trust Gandelman to represent his best interests, Leonard routinely signed these confirmations. (Compl. P 16). Leonard claims that most often he received no notification of the transactions effected by Gandelman. (Compl. P 17).

Leonard alleges that [*7] Defendants, throughout 1997, engaged in excessive and risky trading in his account that was intended primarily for Defendants' benefit. (Compl. P 21). Around October 30 of that year, Leonard received a phone call from Gandelman, who told him that it would be necessary for him to deposit another $ 500,000 into his account if he wanted to prevent his investments from "turning to dust." (Compl. P 25). Leonard thereafter wire-transferred $ 320,000, the remainder of his family's funds, to a New York City Garantia account. (Compl. P 25). Leonard used United States "Swift" and "Fedwire" interbank systems to carry out these transfers. (Compl. P 26).

Case 1:04-cv-00331-JJF    Document 57-4    Filed 05/02/2005    Page 4 of 27

Page 3

1999 U.S. Dist. LEXIS 16046, *; Fed. Sec. L. Rep. (CCH) P90,674

As it turned out, Leonard's investments had suffered substantial losses and Gandelman's request for additional funds was a margin call designed to make Garantia more secure in its loans to Leonard. (Compl. P 27). A few days later, Gandelman contacted Leonard and asked him to deposit more money, but Leonard possessed no additional funds. (Compl. P 28). Leonard, after consulting a banker friend, closed out his margin account and withdrew his remaining funds. (Compl. P 29).

Leonard claims that, as a result of Defendants' misrepresentations and nondisclosures [*8] as well as Defendants' mismanagement of his account, he lost the following: $ 881,010 of the $ 1,469,804 that he invested over the course of his dealings with Defendants; an unknown amount in excess interest, fees, commissions and mark ups to Garantia; and at least $ 140,000 in lost income. (Compl. P 30).

## II. DISCUSSION

### A. SUBJECT MATTER JURISDICTION

The first issue is whether the parties' conduct within the United States is sufficient to confer subject matter jurisdiction upon this Court. For the reasons that follow, this Court finds that there is subject matter jurisdiction.

#### 1.

On a motion to dismiss brought under Rule 12(b), a court must accept as true the material factual allegations in the complaint. *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992).* However, a court may rely on material outside the complaint in ruling on a Rule 12(b)(1) motion, as it would in considering a summary judgment motion. *Europe & Overseas Commodity Traders v. Banque Paribas London, 147 F.3d 118, 121 n.1 (2d Cir. 1998),* cert. denied *119 S. Ct. 1029 (1999).; Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986).* [*9] While the burden of proving jurisdiction is on the party asserting it, where there has been no hearing and no discovery, as in this case, a plaintiff need only make a prima facie showing of jurisdiction. *Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994); Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., 941 F. Supp. 1369, 1373 n.2 (S.D.N.Y. 1996).* n4

n4 It should be remembered that "in a close case, the factual basis for a court's subject matter jurisdiction may remain an issue through trial, and, if and when doubts are resolved against jurisdiction, warrant dismissal at that time." *Europe & Overseas Commodity Traders, 147 F.3d at 121 n. 1.*

#### 2.

Neither the SEA nor the Rules promulgated thereunder provide specific guidance concerning the SEA's extraterritorial application. See *Itoba Ltd. v. Lep Group PLC, 54 F.3d 118, 121 (2d Cir. 1995),* cert. denied, *516 U.S. 1044 (1996); In re Gaming Lottery Sec. Litig., 58 F. Supp. 2d 62, 1999 U.S. Dist. LEXIS 1878, 1999 WL 102755,* [*10] at *11 (S.D.N.Y. 1999). When confronted with transnational transactions, this Court must consider the policy question of "whether Congress would have wished the precious resources of the United States courts ... to be devoted to them rather than leave the problem to foreign countries." *Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985 (2d Cir.),* cert. denied sub nom. *Bersch v. Arthur Andersen & Co., 423 U.S. 1018, 46 L. Ed. 2d 389, 96 S. Ct. 453 (1975).*

The Second Circuit has established two tests for guidance concerning the SEA's extraterritorial application, the effects test and the conduct test. *Itoba, 54 F.3d at 121-122.* Leonard does not argue that the effects test applies in this case, and no discussion regarding that test is necessary.

The conduct test focuses on "the nature of conduct within the United States as it relates to carrying out the alleged fraudulent scheme, on the theory that Congress did not want 'to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners.'" *Psimenos v. E.F. Hutton & Co., 722 F.2d 1041, 1045 (2d Cir. 1983)* [*11] (quoting *IIT v. Vencap, Ltd., 519 F.2d 1001, 1017 (2d Cir. 1975)).* Under the conduct test, a court has subject matter jurisdiction if (1) the defendant's activities in the United States were more than merely preparatory to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States directly caused the claimed losses. *Itoba, 54 F.3d at 122.*

#### 3.

In his attempt to establish jurisdiction in this case, Leonard points to two connections to the United States. First, Defendants do not dispute that Leonard, through the use of United States "Swift" and/or "Fedwire" systems, transferred his investment money into Garantia's New York City bank accounts. (Pl. Brief at 12). Leonard argues that this act of "obtaining possession of Leonard's money" was "an essential step in perpetrating the fraud." (Pl. Brief at 12).

Second, Leonard argues that the transactions involving the Telebras ADRs and options necessarily involved trading on the New York Stock Exchange ("NYSE"). (Pl. Brief at 15). Defendants mount a three-tier defense to this assertion, claiming that (1) the ADRs

Case 1:04-cv-00331-JJF    Document 57-4    Filed 05/02/2005    Page 5 of 27

Page 4

1999 U.S. Dist. LEXIS 16046, *; Fed. Sec. L. Rep. (CCH) P90,674

were not necessarily acquired over [*12] the NYSE, (2) Garantia was Leonard's counterparty on all ADR transactions, and (3) "notes" of ADRs, rather than ADRs themselves, were used in the transactions between Garantia and Leonard. (Def. Brief at 10-12; Def. Reply Brief at 5-6). For the reasons that follow, this Court finds that Defendants have not adequately rebutted Leonard's allegations that the ADRs were acquired from the NYSE and were themselves involved in the transactions at issue.

Leonard, through the expert opinion of Zachary Verdino, argues that Telebras ADRs are only traded over the NYSE. (Pl. Brief at 15; Verdino Decl. P 5.) While Defendants, through their expert Claudio Andrade, respond that the ADRs "can be traded over a number of electronic trading networks without crossing the [NYSE]," (Def. Reply Brief at 5; Andrade Decl. P 2), Defendants do not offer any evidence of where they acquired the specific ADRs at issue in this case. This is particularly interesting since Defendants should have exclusive possession of evidence showing where these ADRs were actually acquired. Thus, this Court accepts for purposes of this motion that the ADRs were indeed acquired from the NYSE.

Even if the Telebras ADRs were acquired [*13] from the NYSE, Defendants argue that Garantia was Leonard's counterparty on all ADR transactions, and thus "the specific transactions in which [Leonard] participated did not take place over ... any U.S. exchange." (Def. Brief at 5). This Court agrees with Leonard that Defendants' argument "exalts form over substance." (Pl. Brief at 16). Even if Garantia acquired the ADRs from the NYSE for its own account and then resold them to the Leonard account, the purchase from the NYSE nevertheless constituted a necessary act for perpetration of this stage of the alleged fraud, and is thus material to the question of subject matter jurisdiction.

Finally, Defendants argue that "notes" of ADRs issued by Garantia, not ADRs themselves, were used for "ease of transfer and convenience." (Def. Brief at 5). However, the transaction confirmations refer to ADRs or options on ADRs, and make no mention of "notes". (See Pl. Ex. A at App. 8.C.1-8.C.8, 8.D.1-8.D.12). While records of Leonard's account activity do make some mention of "Settlement of Notes ADR," they also refer to "Settlement of ADR[s]." (See Pl. Ex. A at App. 2.1-2.12). Defendants also proffer two ADR notes and supplements and an [*14] unsigned form note issuance agreement. (See Def. Ex. H). However, the notes do not account for all the ADR transactions. Further, these documents are unsigned. This Court finds, therefore, that Defendants' evidence does not adequately demonstrate that notes of ADRs were used in the relevant transactions, and accepts Leonard's allegations that

ADRs acquired from the NYSE were involved in the relevant transactions.

**4.**

Leonard relies heavily on Psimenos v. E.F. Hutton & Co., a case involving a jurisdictional question under the anti-fraud provision of the Commodities Exchange Act ("CEA"). n5 *722 F.2d 1041, 1042 (2d Cir. 1983)*. Psimenos involved a Greek plaintiff who sued E.F. Hutton, an American commodities broker. Psimenos, who had established a discretionary account with Hutton's Greece office, alleged that agents of Hutton placed his money in risky investments and also churned his account simply to generate commissions. *722 F.2d at 1043-44*. The conduct occurring within the United States included the following: (1) an allegedly misleading pamphlet emanated from the defendant's New York office, and (2) the transactions involved the trading [*15] of domestic futures contracts on American commodities exchanges. *722 F.2d at 1046*. The court stated that the pamphlet could be "considered substantial if ... it induced [Psimenos] to open and maintain an account with Hutton." Id. However, the court went on to state that the pamphlet was not, by itself, enough to sustain jurisdiction. Id. "Far weightier" was "the fact that Hutton's agents completed the alleged fraud by trading domestic futures contracts on American commodities exchanges." Id. The court found the conduct test satisfied because "Hutton's trades in the United States ... were material acts that directly caused Psimenos' claimed losses," *722 F.2d at 1044*, and thus held that the district court had jurisdiction over the case.

> n5 The Second Circuit noted that "in construing the reaches of jurisdiction under the CEA" it was proper to "analogize[] to similar problems under the securities laws which have been more extensively litigated," such as the SEA. *Psimenos, 722 F.2d at 1044* (internal citations omitted).

[*16]

The facts of Psimenos parallel the facts of this case. Indeed, the holding of that case that "trading activities on United States ... markets were significant acts ... and are sufficient to establish jurisdiction" applies here. *Psimenos, 722 F.2d at 1048*. n6 As discussed above, Leonard has, for present purposes, established to a sufficient degree of certainty on the present record that the ADRs were traded over the NYSE. While the ADRs were just one of seven funds or instruments in which Leonard invested through Garantia, the ADR transactions accounted for a significant portion of the total transactions in the account. Over $ 7 million of

Case 1:04-cv-00331-JJF    Document 57-4    Filed 05/02/2005    Page 6 of 27

Page 5

1999 U.S. Dist. LEXIS 16046, *; Fed. Sec. L. Rep. (CCH) P90,674

transactions involving ADRs or call options on ADRs were carried out in Leonard's account. (See Pl. Ex. A at pp. App. 2.1-2.12). This amount constituted over %500 of Leonard's original investment of $ 1.4 million.

> n6 Other courts in this district have relied on Psimenos in finding that trading activity on U.S. markets is by itself sufficient to establish subject matter jurisdiction in situations involving extraterritorial application of U.S. securities laws. See, e.g., *Rohrer v. FSI Futures, Inc., 981 F. Supp. 270, 277-78 (S.D.N.Y. 1997)*(relying on Psimenos to find jurisdiction based upon fraudulent trading in U.S. commodities markets); *Cresswell v. Prudential-Bache Sec., Inc., 580 F. Supp. 55, 58 (S.D.N.Y. 1984)*(concluding that "Psimenos establishes jurisdiction for the plaintiffs' CEA claim based solely on transactions on an American exchange as the final step in the fraudulent scheme.").

[*17]

Defendants emphasize that all of the alleged misrepresentations and omissions in this case occurred in Brazil. (Def. Brief at 8-9). While the facts of Psimenos can be distinguished because that case involved an allegedly misleading pamphlet which emanated from Hutton's New York office, that court clearly found trading activity alone to be a sufficient basis for a finding of subject matter jurisdiction.

This Court recognizes that in the more recent case of Europe & Overseas Commodity Traders v. Banque Paribas London, the Second Circuit apparently raised the standard for extraterritorial application of the *SEA. 147 F.3d 118 (2d Cir. 1998)*(hereinafter "EOC"), cert. denied, *119 S. Ct. 1029 (1999)*. In that case, the court opined that where the conduct test is met, if "the surrounding circumstances show that no relevant interest of the United States [is] implicated", jurisdiction might not be established without "some additional factor tipping the scales in favor of our jurisdiction." *EOC, 147 F.3d at 129;* see also *In re Gaming Lottery Sec. Litig., 58 F. Supp. 2d 62, 1999 U.S. Dist. LEXIS 1878, 1999 WL 102755* at *12 (S.D.N.Y. 1999). [*18] In this case, there is arguably no relevant United States interest at stake, since all parties are foreign and there is no allegation of any effect in the United States. However, "the slight additional factor of economic activity in the United States", *EOC, 147 F.3d at 130,* is present here in the form of Garantia's use of New York City bank accounts to receive Leonard's funds. In addition, the United States "Swift" and/or "Fedwire" systems were used to transfer Leonard's funds to these accounts. While these contacts

would not by themselves be sufficient to support a finding of subject matter jurisdiction, they do constitute conduct which "tips the scales" in favor of this Court sustaining jurisdiction.

In sum, this Court finds that the trading of ADRs on the NYSE satisfies the conduct test, and any "tipping of the scales" which might be required by EOC is present in the use of United States banks and wire-transfer systems. Thus, Leonard's complaint will not be dismissed under Rule 12(b)(1).

**B. Forum Selection Clause**

Defendants argue that the Forum Clause contained in the Agreement signed by Leonard during his first meeting with Gandelman mandates that [*19] this action be dismissed. The last paragraph of the Agreement reads as follows: "The Customer hereby agrees that the terms and conditions of this Account Application shall be governed by, and construed in accordance with, the laws of the Commonwealth of the Bahamas, and any dispute arising out of said terms and conditions shall be submitted to the Bahamian courts." (Def. Ex. A). This Court finds the Forum Clause to be valid and enforceable, and thus dismisses Leonard's complaint.

**1.**

Forum selection clauses are valid and enforceable absent a strong showing that they should be set aside. See *M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15, 32 L. Ed. 2d 513, 92 S. Ct. 1907 (1972); Jones v. Weibrecht, 901 F.2d 17, 18 (2d Cir. 1990).* In the Second Circuit, a forum selection clause is considered reasonable unless one of the following factors is present: (1) the clause's incorporation into the agreement was the result of fraud or overreaching; (2) the complaining party will for all practical purposes be deprived of his day in court, due to the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen [*20] law may deprive the plaintiff of a remedy; or (4) the clause contravenes a strong public policy of the forum state. See *Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1363 (2d Cir.), cert. denied, 510 U.S. 945, 126 L. Ed. 2d 333, 114 S. Ct. 385 (1993)*(citations omitted).

**2.**

Leonard relies on the first abovementioned factor, arguing that the Forum Clause in this case was procured by fraud. (Pl. Brief at 19). More specifically, Leonard points to the following: (1) the "inherent unequality" of the two parties; (2) Leonard could not understand the clause (and indeed the entire Agreement) because it was written in English, and Gandelman told Leonard "not to worry" about having to sign an Agreement written in English; and (3) the clause was "written ... in very fine print, and in terminology that is abstract, ambiguous and

Case 1:04-cv-00331-JJF     Document 57-4     Filed 05/02/2005     Page 7 of 27

Page 6

1999 U.S. Dist. LEXIS 16046, *; Fed. Sec. L. Rep. (CCH) P90,674

seemingly innocuous." (Pl. Brief at 19-20). These facts, individually or taken as a whole, do not convince this Court that the inclusion of the Forum Clause was the result of any fraud on Defendants' part.

Leonard's attempt to portray himself as a "naive first time investor" in the clutches of a "huge financial empire," (Pl. Brief at [*21] 19), is not supported by other facts of this case. Leonard may have been a first-time investor, but he originally invested nearly $ 700,000 and in time invested over $ 1.4 million - hardly a paltry sum. A person investing such an amount surely has the ability to agree only to terms that are acceptable to him or else take his business elsewhere. Further, even if the parties were inherently unequal in terms of bargaining power, that does not necessarily mean that Garantia improperly used that power. Here, there is no allegation that Defendants in any way coerced Leonard into signing the Agreement or entering into any relationship whatsoever with Garantia.

Leonard also notes that the Forum Clause was written in English, while Gandelman understands only Portuguese. (Pl. Brief at 19). However, the failure of a party to read documents or seek interpretation of a contract cannot be viewed as fraud or overreaching on the part of the other party. See *Citibank, N.A. v. Collins, 1991 U.S. Dist. LEXIS 4919, No. 90 Civ. 3330 (KMW), 1991 WL 64174,* at *2 (S.D.N.Y. Apr. 15, 1991); *Leasing Serv. Corp. v. Graham, 646 F. Supp. 1410, 1415 (S.D.N.Y. 1986).* Leonard alleges only that Gandelman told [*22] him "not to worry" about the Agreement being written in English. (Pl. Brief at 20). There is no indication that Gandelman refused to read the Agreement to Leonard, nor that Gandelman did anything to prevent Leonard from having the Agreement translated before signing it. Indeed, a person investing $ 700,000 should make sure that the terms of any agreement which he signs are explained to him, especially when that money constitutes the accumulated savings of his family. As the Seventh Circuit has stated: "We live in a global economy and contracts between parties of different nationalities, and speaking different languages, are commonplace. But a party who agrees to terms in writing without understanding or investigating those terms does so at his own peril." *Paper Express, Ltd. v. Pfankuch Maschinen, 972 F.2d 753, 757 (7th Cir. 1992).* Gandelman's alleged statement that Leonard need not worry simply does not excuse Leonard's lack of diligence, and does not amount to an act of fraud.

Leonard's portrayal of the Agreement as "written in very fine print" and "ambiguous" is also unconvincing. The Agreement is certainly readable and is only one page long. Further, the Forum [*23] Clause is written in a straightforward manner, and is clear enough to put a layperson on notice that a legal dispute is to be resolved

in the Bahamas. In addition, the Forum Clause is the last clause of the Agreement and is placed just above the spot where Leonard signed the Agreement. Had Leonard had the Agreement translated, this Court believes that he would have noticed and understood the implications of the Forum Clause.

Even if this Court were to accept Leonard's argument that the Agreement as a whole was procured by fraud, he would not have met his burden. For a forum selection clause to be held invalid, a party must show that the inclusion of the clause itself was a result of fraud or coercion. See *AVC Nederland B.V. v. Atrium Inv. Partnership, 740 F.2d 148, 158 n.16 (2d Cir. 1984); Composite Holdings, LLC v. Westinghouse Elec. Corp., 992 F. Supp. 367, 369 (S.D.N.Y. 1998); Grace v. Corp. of Lloyd's, 1997 U.S. Dist. LEXIS 14994, No. 96 Civ. 8334 (JGK), 1997 WL 607543,* at *8 (S.D.N.Y. Oct. 2, 1997); *Stamm v. Barclays Bank of New York, 960 F. Supp. 724, 729 (S.D.N.Y. 1997).* Leonard contends that Gandelman told him not to worry about the Agreement [*24] as a whole. There are no allegations of fraud specifically tailored towards the Forum Clause itself.

Though Leonard does not argue the point, this Court notes that none of the other three factors mentioned by the Second Circuit in Roby render the Forum Clause inapplicable. Enforcement of the Forum Clause will not deprive Leonard of his day in court nor will Bahamian law deprive him of a remedy. *Roby, 996 F.2d 1353.* Leonard's travel expenses and overall inconvenience would not be greater if this action were tried in the Bahamas rather than the United States. Further, Leonard does not contest the validity of the Declaration of Michael Barnett, a Bahamian lawyer. Barnett states that any injury suffered by Leonard could be adequately addressed by the Bahamian court system and Bahamian laws. (See Barnett Decl. pp. 2-4). Concerning the fourth and final factor mentioned in Roby, enforcement of the Forum Clause does not contravene a strong public policy of the United States. *Roby, 996 F.2d at 1363.* The United States obviously has an interest in protecting the integrity of its securities markets through the enforcement of its securities laws. However, [*25] this interest wanes when all parties involved are foreign and the Forum Clause establishes one of the parties' home countries as the designated forum for resolution of any disputes. Indeed, "international comity dictates that American courts enforce these sorts of clauses out of respect for the integrity and competence of foreign tribunals." *Roby, 996 F.2d at 1363.* Here, the Account Agreement utilized by Garantia, a Bahamian corporation, established the Bahamas as the forum in which disputes arising out of the Agreement would be resolved. Since, as mentioned above, Bahamian courts and Bahamian law are able to provide Leonard a remedy for any injury he

Case 1:04-cv-00331-JJF    Document 57-4    Filed 05/02/2005    Page 8 of 27

Page 7

1999 U.S. Dist. LEXIS 16046, *; Fed. Sec. L. Rep. (CCH) P90,674

may have suffered, this Court finds no public policy contravened by enforcement of the Forum Clause.

**3.**

Beyond his claims of fraud, Leonard argues that the Forum Clause is inapplicable because it did not expressly apply to securities trading on the margin. (Pl. Brief at 20). Leonard claims that even had he understood the language of the Agreement, he still would not have had notice that any dispute with Garantia regarding securities trading and margin loans would have to be submitted to the Bahamian courts. (Pl. [*26] Brief at 21). This Court disagrees.

Leonard clearly visited Gandelman with the intent to invest his funds, and the Agreement initially states that it is "in consideration of [Garantia] opening an account ... at the request of [Leonard]." (Def. Ex. A). The eighth paragraph of the Agreement states the "the account ... may operate as an account whereby the Bank may grant loans to [Leonard]." (Id.) While margin loans are not specifically mentioned, the language is broad enough to contemplate the extension of such loans to Gandelman. The Selection Clause clearly states that "any dispute arising out of [the] terms and conditions [of the Agreement] shall be submitted to the Bahamian courts." (Id.) This dispute concerns alleged improper extension and usage of margin loans and improper management of Leonard's account. Therefore, this Court finds that the Agreement does indeed extend to cover this dispute.

**4.**

Lastly, Leonard states that the Forum Clause should be viewed with a "high measure of skepticism" because in another client's account Garantia drafted a loan agreement with a forum selection clause establishing New York as the designated forum for any disputes. [*27] (Pl. Brief at 21-22). In view of the findings already made that the Forum Clause was not procured by fraud, this Court does not find the forum selection clause in another client's account to warrant a finding that the present Forum Clause is unenforceable.

**5.**

For the reasons stated above, this Court concludes the Selection Clause is valid and enforceable, and thus dismisses Leonard's claims.

### C. Forum Non Conveniens

Because this Court finds the Forum Clause to be an adequate ground for dismissal of this action, it need not reach the application of the forum non conveniens doctrine in this case.

SO ORDERED.

DATED: October 18, 1999

New York, New York

LAWRENCE M. McKENNA

U.S.D.J.

# TAB G

LEXSEE 2003 US DIST LEXIS 15702

**IN RE NORTEL NETWORKS CORP. SECURITIES LITIGATION, THIS DOCUMENT RELATES TO: ALL CLASS ACTIONS**

Consolidated Civil Action 01 Civ. 1855 (RMB)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 15702*

**September 5, 2003, Decided
September 8, 2003, Filed**

**SUBSEQUENT HISTORY:** Motion denied by *In re Nortel Networks Corp. Sec. Litig., 2004 U.S. Dist. LEXIS 19129 (S.D.N.Y., Sept. 21, 2004)*

**PRIOR HISTORY:** *In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 2003 U.S. Dist. LEXIS 67 (S.D.N.Y., 2003)*

**DISPOSITION:** [*1] Plaintiff's motion for class certification granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Ontario Public Service Employees' Union Pension Trust Fund Lead, PLAINTIFF: Steven G Schulman, Milberg, Weiss, Bershad, Hynes & Lerach LLP, New York, NY USA.

For Eli Weinstein, PLAINTIFF: Joshua M Lifshitz, Peter D Bull, Bull & Lifshitz, LLP, New York, NY USA.

For Nortel Networks Corporation, John Andrew Roth, Fran Dunn, DEFENDANTS: Tai H Park, Stuart J Baskin, Shearman & Sterling, LLP, New York, NY USA.

**JUDGES:** RICHARD M. BERMAN, U.S.D.J.

**OPINIONBY:** RICHARD M. BERMAN

**OPINION:**

**DECISION AND ORDER ON CLASS CERTIFICATION**

**I. Background**

In this action filed on March 2, 2001, the Trustees of the Ontario Public Employees' Union Pension Trust Fund ("OPTrust"), on behalf of a putative class, allege that Nortel Networks Corporation ("Nortel"), John Andrew Roth, Nortel's Chief Executive Officer and President during the Class Period, Clarence Chandran, Nortel's Chief Operating Officer during the Class Period, and Frank Dunn, Nortel's Chief Financial Officer during the Class Period (collectively, "Defendants") violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), [*2] *15 U.S.C. § 78j(b)*, Rule 10b-5 promulgated thereunder, *17 C.F.R. § 240.10b-5*, and Section 20(a) of the Exchange Act, *15 U.S.C. § 78t(a)* by, among other things, "knowingly or recklessly issuing a stream of materially false and misleading representations to the investing public." (Second Consolidated and Amended Class Action Complaint ("Complaint") P 3, at 2.) n1

> n1 For a more detailed recitation of the facts, see this Court's Order resolving Defendants' motion to dismiss the Complaint against Nortel, reported at *238 F. Supp. 2d 613 (S.D.N.Y. 2003)*.

OPTrust moves to certify a class "consisting of all persons and entities who, during the period October 24, 2000 and continuing through and including February 15, 2001, purchased Nortel common stock or call options or sold Nortel put options, and who suffered damages thereby, including, but not limited to, those persons who

traded in Nortel Securities on the New York Stock Exchange [*3] and/or the Toronto Stock Exchange." (Mem. of Law in Supp. of Lead Pl.'s Motion for Class Certification ("Pl. Br.") at 7.) OPTrust argues that "this action meets all of the requirements of *Rule 23 of the Federal Rules of Civil Procedure* for the maintenance of a class action" (Pl. Br. at 2) and, among other things, that all members of the class relied upon Defendants' allegedly "deceptive and materially false and misleading statements to the investing public." (Compl. P 198, at 84; see id. P 203, at 86 ("Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, traded in Nortel Securities at prices artificially inflated or distorted by defendants' wrongful conduct.") Defendants oppose class certification, arguing that (1) OPTrust is atypical because it is subject to unique defenses; (2) OPTrust is an inadequate representative because it has ceded control of the litigation to its lawyers; (3) common questions of law or fact do not predominate "because plaintiffs cannot rely upon the fraud-on-the-market theory [*4] of reliance." (Def. Mem. of Law in Opp'n to Lead Pl.'s Motion for Class Certification ("Def. Br.") at 1-12); and (4) the Court does not have subject matter jurisdiction over foreign purchasers of Nortel Securities. **For the reasons set forth below, the Court grants Plaintiff's motion for class certification and appoints OPTrust as Class representative.**

## II. Standard of Review

To succeed on a motion to certify a class, plaintiffs first must satisfy the prerequisites listed in *Rule 23(a) of the Federal Rules of Civil Procedure*: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(a)*; *In re AMF Bowling Secs. Litig., 2002 U.S. Dist. LEXIS 4949, 99 Civ. 3023, 2002 WL 461513, at *3 (S.D.N.Y. Mar. 26, 2002)*. "Second, plaintiffs must show that the putative class falls within one of the three categories set forth in *Rule 23(b)*." *Id.* n2

n2 Plaintiffs seek certification under *Rule 23(b)(3)*, which requires that the Court find "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods

for the fair and efficient adjudication of the controversy." *Fed. R. Civ. P. 23(b)(3)*.

[*5]

"The Second Circuit has directed district courts to apply *Rule 23* according to a liberal rather than a restrictive interpretation and has explicitly noted its preference for class certification in securities cases." *Maywalt v. Parker & Parsley Petroleum Co., 147 F.R.D. 51, 54 (S.D.N.Y. 1993)*; see *In re Blech Sec. Litig., 187 F.R.D. 97, 102 (S.D.N.Y. 1999)* ("Class action treatment of related claims is particularly appropriate when plaintiffs seek redress for violations of the securities laws ....").

"Although a court must conduct a rigorous inquiry in determining whether the requirements of *Rule 23* have been satisfied, it must accept plaintiffs' allegations as true and refrain from conducting an examination of the merits when determining the propriety of class certification." *In re AMF, 2002 U.S. Dist. LEXIS 4949, 2002 WL 461513, at *3 (citations omitted); see Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999); Shelter Realty Corp. v. Allied Maintenance Corp., 574 F.2d 656, 661 n.15 (2d Cir. 1978)*.

## III. Analysis

The Court has reviewed, among other things, Pl. Br., dated March 21, 2003; Def. Br. [*6] , dated May 30, 2003, which attaches the (expert) reports of Professor Paul A. Gompers and Professor Christopher M. James; "Lead Plaintiff's Reply Memorandum of Law in Further Support of its Motion for Class Certification," dated August 1, 2003 ("Pl. Reply"), which attaches the (expert) reports of Professor Anthony Saunders, Blaine F. Nye, Ph.D., and Professor Sanjai Bhagat; and the Complaint, dated January 18, 2003. The Court heard oral argument on September 3, 2003.

### A. *Fed. R. Civ. P. 23(a)(1)* - Numerosity

According to OPTrust, approximately 3,006,967,918 shares of Nortel were outstanding during the class period. (Pl. Br. at 7; see Compl. P 39, at 15.) OPTrust estimates that "there are, at a minimum, thousands of members of the Class who purchased Nortel common stock during the Class Period." (Compl. P 39, at 15.) Defendants do not dispute that the proposed class is sufficiently numerous and that joinder would be impractical. (Accord Def. Br.) Indeed, the class likely will number in the hundreds or thousands. See *Maywalt, 147 F.R.D. at 55*; see also *In re Frontier Ins. Group Secs. Litig., 172 F.R.D. 31, 40 (E.D.N.Y. 1997)* ("'In securities [*7] fraud actions brought against publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large

number of shares were outstanding and traded during the relevant period." (citation omitted)); *Dietrich v. Bauer, 192 F.R.D. 119, 123 (S.D.N.Y. 2000).*

### B. Fed. R. Civ. P. 23(a)(2) - Commonality

OPTrust asserts that common legal and factual issues here include, among others, "whether defendants violated the federal securities laws by the acts and conduct alleged" and "whether Nortel issued false and misleading statements during the Class Period." (Pl. Br. at 10.) Defendants do not dispute commonality. (Accord Def. Br.) "The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." *Robinson v. Metro- North Commuter R.R., 267 F.3d 147, 155 (2d Cir. 2001)* (citation omitted). "The commonality requirement of *Rule 23(a)(2)* has been applied permissively by courts in the context of securities fraud litigation." *In re Blech, 187 F.R.D. at 104*; see also *In re Frontier, 172 F.R.D. at 40.*

### C. Fed. R. Civ. P. 23(a)(3) - Typicality [*8]

OPTrust's claims, as well as those of the other members of the proposed class, arise out of alleged misrepresentations by Defendants concerning Nortel. (See Pl. Br. at 10-11.) OPTrust argues, among other things, that its "use of an indexed trading strategy [does not] give[] rise to atypical defenses" because "indexed trading typifies its reliance on the integrity of the market." (Pl. Reply at 5.) Moreover, OPTrust alleges specifically that it relied on Defendants' alleged misrepresentations. (See, e.g., Compl. P 203, at 86 (**"Lead Plaintiff ... relying on the materially false and misleading statements described herein, ... traded in Nortel Securities ....**" (emphasis added))); see also *In re Avon Sec. Litig., 1998 U.S. Dist. LEXIS 18642, 91 Civ. 2287, 1998 WL 834366, at *5 (S.D.N.Y. Nov. 30, 1998)* ("Decisions regarding class certification are to be based on the allegations set forth in the complaint, which are accepted as true."). n3

n3 In addition, OPTrust argues that "courts have repeatedly held that additional purchases after the price of the security drops as a result of corrective disclosure do not give rise to atypical defenses." (Pl. Reply at 5-6 (citing cases)); see, e.g., *In re Frontier, 172 F.R.D. at 42* (concluding that a plaintiff's purchase of defendant's stock after the disclosure of alleged misrepresentations "has no bearing on whether or not she relied on the integrity of the market during the class period" and did not defeat typicality).

[*9]

Defendants dispute OPTrust's claim that it satisfies the typicality requirement because "'class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'" (Def. Br. at 12-13 (citing, among other opinions, *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990))*.) Defendants argue that, unlike the putative class described in the Complaint, OPTrust "did not rely on the 'integrity' of Nortel's stock price" when OPTrust purchased Nortel stock. (Def. Br. at 13 ("[OPTrust's] trading strategy ran directly counter to market sentiment because its investment advisors concluded that the stock was highly 'overvalued' and indeed saw the emergence of a 'bubble' far earlier than the rest of the market. Yet, OPTrust bought Nortel stock largely because it was tracking an index, not because it was lulled into believing that Nortel was trading at 'a fair market price.'").) n4

n4 Defendants also argue that OPTrust's purchase of Nortel stock "well after the alleged 'fraud' was 'exposed'" militates against typicality. (Id. at 16.)

[*10]

"The claims of the class representatives [must] be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997)* (per curiam). Because, among other things, "reliance" is clearly alleged, (see, e.g., Compl. P 203, at 86), and because a jury may conclude that pursuing an index strategy entails reliance (see Pl. Reply at 5 ("Indexed trading is the ultimate acknowledgment that the market is efficient because it cannot be beat.")), OPTrust satisfies the typicality requirement. See *In re Blech, 187 F.R.D. at 106* ("The typicality requirement is satisfied because, as set forth in the Complaint, the Plaintiffs' claims of fraud arise from the same course of conduct.").

Moreover, "the rule barring certification of plaintiffs subject to unique defenses is not 'rigidly applied in this Circuit.'" *In re Frontier, 172 F.R.D. at 41*; see also *In re Gaming Lottery Sec. Litig., 58 F. Supp. 2d 62, 72 (S.D.N.Y. 1999)* ("Because [*11] a person is ineligible to represent a class of securities purchasers only if he 'clearly did not rely upon either the misleading financials or on the integrity of the market price or information, [Plaintiff] remains qualified to serve as a class representative." (citation omitted); see also *In re Indep. Energy Holdings PLC Sec. Litig., 210 F.R.D. 476, 481*

(S.D.N.Y. 2002) (While the extent of any non-reliance on [plaintiff's] part will certainly be a fact question to be decided at trial, it is unlikely to significantly shift the focus of the litigation to the detriment of the absent class members.").

D. *Fed. R. Civ. P. 23(a)(4)* - Adequate Representative

Defendants argue that OPTrust is "a wholly inadequate class representative, for it is a reluctant party that has ceded control over the litigation to lawyers." (Def. Br. at 17.) OPTrust responds that its "interests are not antagonistic to those of the Class" and that the "interests of the Class will be protected and advanced by OPTrust because its claims and interests are coextensive with those of the absent Class members." (Pl. Br. at 12.) In addition, OPTrust asserts that it has been "zealously representing [*12] the interests of the proposed Class by, among other things, retaining experienced counsel and devoting substantial time and effort to the prosecution of this case." (Id.) "Representatives of OPTrust met with senior attorneys from Milberg Weiss on three separate occasions to discuss the substantive allegations, the procedural posture of the litigation, the responsibilities of a class representative and OPTrust's potential interest in stepping into a lead role." (Pl. Reply at 7.) "Independent from the lawyers, OPTrust's Board of Trustees formed a Nortel Class Action Subcommittee ... to 'monitor developments, develop overall strategic direction and report to the Board in respect to the class action lawsuit" and "at a Special Board of Trustees meeting on December 18, 2001 - with the advice and assistance of an independent consultant -- the Board passed a resolution confirming its desire to seek the role of Lead Plaintiff." (Id.; see also id. at 8 n.14 ("We have a number of responsibilities, one of them being to manage the litigation ... [and] we have set up a subcommittee to do that." (quoting the deposition testimony of OPTrust's Chief Investment Officer, Morgan Eastman).) [*13]

Under *Fed. R. Civ. P. 23(a)(4)*, "adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interests of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000).* OPTrust satisfies the adequacy requirement. Its claims appear to be in harmony with those of the other members of the proposed class; it has taken several significant "hands on" steps to prosecute this case; and its counsel, Milberg Weiss Bershad Hynes & Lerach LLP, is clearly qualified to pursue this sort of litigation. See also *id. at 61.*

E. *Fed. R. Civ. P. 23(b)(3)*

Predominance of Common Questions of Law or Fact

Defendants argue in their brief that "because plaintiffs cannot rely upon the fraud-on-the-market theory of reliance" common questions of law or fact do not predominate over individual questions. (Def. Br. at 1); see also *Crommer Fin. Ltd. v. Berger, 205 F.R.D. 113, 130 n.21 (S.D.N.Y. 2001)* (citing *In re Towers Fin. Corp. Noteholders Litig., 1995 U.S. Dist. LEXIS 21147, 93 Civ. 0810, 1995 WL 571888,* [*14] at *21 (S.D.N.Y. Sept. 20, 1995),* which states: "The [fraud-on-the-market theory] 'presumes that the market is a 'transmission belt which efficiently translates all information concerning a security into a price. In other words, it presumes the operation of an efficient market.'")). Defendants argue that "the market was not efficiently driven by fundamental value, and that is the death knell to application of the fraud-on-the-market theory." (Def. Br. at 12; see id. at 2 ("Without resort to the presumption, a class cannot be certified since individual claims of reliance would have to be proven and would overwhelm the common issues.").) Defendants urge the Court, preliminarily and by a separate proceeding, to "determine whether the plaintiffs are entitled to rely on the [fraud-on-the-market] presumption for purposes of class certification," (id. at 4 & n.3 ("The availability of the fraud-on-the-market presumption is a legal issue that must be resolved by the Court for purposes of deciding class certification.")) citing several cases (from other Circuits) for this proposition. *Cammer v. Bloom, 711 F. Supp. 1264, 1290 (D.N.J. 1989), Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 677 (7th Cir. 2001),* [*15] and *O'Neil v. Appel, 165 F.R.D. 479, 496-505 (W.D. Mich. 1996).* n5

n5 Defendants submitted a letter to the Court, dated August 12, 2003, seeking to postpone a decision on OPTrust's motion for class certification so that the parties may conduct more "expert discovery followed by a possible hearing" on these issues. OPTrust responded with a letter to the Court, dated August 19, 2003, arguing "the Court can and should decide the motion on the basis of the admittedly 'substantial' record already before it." The Court agrees with OPTrust on this issue. That is, the parties' thoughtful and comprehensive briefs on the motion to certify the class, which included submission of expert reports from Defendants and OPTrust, and helpful oral argument, have afforded the parties a full opportunity to address all salient points and authorities. See *Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (1974)* ("We find nothing in either the language or history of *Rule 23* that gives a court any authority to conduct a preliminary inquiry

into the merits of a suit in order to determine whether it may be maintained as a class action."); *Baffa, 222 F.3d at 58* ("[A] motion for class certification is not an occasion for examination of the merits of the case ... 'Nothing in either the language or history of *Rule 23* ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.'" (citations omitted)). **And, Defendants themselves have acknowledged that the existing class certification record is substantial as recently as July 29, 2003.** (July 29, 2003 Tr. at 2 ("We have submitted a detailed brief, two expert reports, and I anticipate the plaintiffs will be doing the same. It's a pretty substantial record.").)

[*16]

OPTrust contends that "it enjoys the benefit of the fraud on the market evidentiary rule, pursuant to which, in a *Rule 10b-5* action against a public company such as Nortel, whose shares are traded in an open, well-developed market, it is presumed that (a) the alleged misrepresentations, so long as they are material, will inflate the value of the Company's shares and (b) plaintiff and all members of the Class relied upon the integrity of the market for those shares" and that "reliance is a common issue in this action." (Pl. Br. at 14.) OPTrust also argues "'whether or not a market for a stock is open and efficient is a question of fact' that must wait for resolution at trial." (Pl. Reply at 1 (quoting *RMED Int'l Inc. v. Sloan's Supermarkets, 2002 U.S. Dist. LEXIS 23829, 94 Civ. 5587, 2002 WL 31780188 (S.D.N.Y. Dec. 11, 2002)*)); see also *In re Laser Arms Corp. Sec. Litig., 794 F. Supp. 475, 490 (S.D.N.Y. 1989)* ("Whether in fact Laser Arms traded in an efficient market is a question of fact. Therefore, resolution of that issue must await presentation of further proof at trial."), aff'd, *969 F.2d 15 (2d Cir. 1992)*. OPTrust argues that "Defendants' attempt to transform [*17] class certification into a complicated battle of the experts is precisely what the Supreme Court sought to preclude by barring 'preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.'" (Pl. Reply at 1 (quoting *Eisen, 417 U.S. at 177*).)

The parties have been afforded "substantial" opportunity to present their respective points of view. n6 See *In re Frontier, 172 F.R.D. at 42* ("For the purposes of this motion [for class certification], the court assumes the market for Frontier stock is an efficient one incorporating all public information about the company."); *Crommer, 205 F.R.D. at 133* ("While [defendant] has identified evidence and arguments it may use at trial to rebut the presumption, it remains true that it is logical and fair to presume reliance here."); see also *Baffa, 222 F.3d at 58* ("[A] motion for class certification is not an occasion for examination of the merits of the case ... 'Nothing in either the language or history of *Rule 23* ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine [*18] whether it may be maintained as a class action.'" (citations omitted)); *In re Frontier, 172 F.R.D. at 39* ("In evaluating a motion for class certification, the court accepts as true the substantive allegations in the complaint and does not conduct even a preliminary inquiry into the merits of the case." (citing *Eisen, 417 U.S. at 177-78*); *In re Blech, 187 F.R.D. at 107* ("When determining whether common questions predominate courts focus on the liability issue ... and if the liability issue is common to the class, common questions are held to predominate over individual questions." (citation omitted)).

n6 See also supra note 5.

Superiority of Class Action

The Court considers the following factors in making the determination of superiority: "(A) the interest of members of the class in individually controlling the prosecution or defenses of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against [*19] members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." *Fed. R. Civ. P. 23(b)(3)*.

Here, a class action is superior to other alternatives. The claims likely will be numerous but, in many instances, too small to pursue individually and, even if individual plaintiffs chose to pursue the action, multiple lawsuits would be inefficient. See *In re Blech, 187 F.R.D. at 107* ("In general, securities suits such as this easily satisfy the superiority requirement of *Rule 23*. Most violations of the federal securities laws, such as those alleged in the Complaint, inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible. Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would neither be 'fair' nor an adjudication of their claims.").

F.  Subject Matter Jurisdiction over Foreign Purchasers

Defendants argue that, even if the Court certifies [*20] a class in this action, the Court "should exclude foreign purchasers of Nortel stock." (Def. Br. at 20.) Citing *Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985-90 (2d Cir. 1975)*, Defendants argue that "when foreign purchasers on a foreign exchange seek to rely upon the *Exchange Act*, the Second Circuit has held that our securities laws should not be exported to foreign countries that are perfectly capable of policing the companies that reside within them." (Def. Br. at 21.) Defendants emphasize Nortel's connection to Canada. (Id. at 22 ("The essence of the fraud alleged here is that Nortel's senior management -- all based in Canada -- made a series of representations, which materially overstated the Company's earnings."; "All of the allegedly fraudulent statements were disseminated from Nortel's headquarters in Ontario. Moreover, all challenged accounting decisions likewise were made in Canada." (footnote omitted)).) Defendants also argue that "as a matter of international comity, accepting jurisdiction over Canadian purchasers would overlap and supplant at least three pending Canadian class actions brought on behalf of such purchasers in the courts of Canada. [*21] Moreover, issues of judicial administration would be a nightmare ...." (Id. at 24-25.) n7

n7 Relatedly, the Court received a letter, dated August 25, 2003 from counsel for plaintiffs in a Canada-wide class action entitled Law, et al. v. Nortel Networks Corp., et al., 02-CL-4605 (Ontario Superior Court of Justice), which notes that "the other two cases are, to the best of our knowledge, limited to the Provinces of British Columbia and Quebec" and that "the Canadian courts are the proper place for determining the claims of Canadian citizens who purchased Nortel shares on the Toronto Stock Exchange." (Letter to the Court from Joel P. Rochon, dated Aug. 25, 2003 at 2-3.) The Court received a letter in response, dated September 2, 2003 from counsel for OPTrust, which argues, among other things, that "there is nothing in the applicable case law, or any proposition of international law identified by defendants, that would bar the extraterritorial application of the federal securities laws in this case ... provided that the applicable Second Circuit standards are met, which they are." (Letter to the Court from Steven G. Schulman, dated Sept. 2, 2003 at 2.)

[*22]

OPTrust counters that "defendants' substantial activities in the United States are much more than merely preparatory to the fraud and thus favor a finding of subject-matter jurisdiction." (Pl. Reply at 8-9.) "The vast preponderance of customers and potential customers with whom Nortel did business during the Class Period were fiber-optic cable networks and internet service providers overwhelmingly located in the U.S." and "Nortel used its artificially inflated stock to fund an aggressive growth-by-acquisition strategy, then misled investors by failing to write down the goodwill associated with its numerous U.S. acquisitions despite substantial declines in their value ... Many of these acquisitions involved properties in the U.S." (Id. at 9.) In addition, OPTrust argues that the mere existence of Canadian lawsuits should not persuade the Court to deny certification. (Id. at 9 n. 15. ("Defendants offer no information about the nature or status of these actions, and fail to mention important differences between U.S. and Canadian securities law - most notably the unavailability of the fraud-on-the-market-theory to Canadian plaintiffs. This Court should not grant defendants' request [*23] to avoid application of the securities laws to persons executing trades in Canada, given that Second Circuit standards for extending those laws to foreign investors in this case are satisfied.").)

"Since the *Securities Exchange Act* is silent as to its extraterritorial application, courts have developed two tests for determining the subject matter jurisdiction over foreign transactions." *Nathan Gordon Trust v. Northgate Exploration, Ltd., 148 F.R.D. 105, 108 (S.D.N.Y. 1993)*. "Under the 'conduct' test, a federal court has subject matter jurisdiction if the defendant's conduct in the United States was more than merely preparatory to the fraud, and particular acts or culpable failures to act within the United States directly caused losses to foreign investors abroad. A federal court also has jurisdiction under the 'effects' test where illegal activity abroad causes a 'substantial effect' within the United States." *Id.* (quoting *Alfadda v. Fenn, 935 F.2d 475, 478 (2d Cir. 1991)*.

Defendants activities in the United States satisfy the test for subject matter jurisdiction. Among other things, OPTrust alleges that "defendants were consummating risky vendor [*24] financing deals in an effort to boost reported 'revenues' throughout the Class Period." (Compl. P 64, at 26.) According to OPTrust, Defendants were extending vendor financing to "numerous U.S. customers that defendants knew to be uncreditworthy, so as to artificially inflate the Company's revenues." (Pl. Reply at 9); see *In re Gaming Lottery Sec. Litig., 58 F. Supp. 2d 62, 73-75 (S.D.N.Y. 1999)* ("Subject matter jurisdiction is thus supported by substantial fraudulent activity in the United States directly causing harm abroad, the manner in which the same fraudulent scheme allegedly straddled both sides of the border, and the

2003 U.S. Dist. LEXIS 15702, *

degree of economic activity connecting [defendant] to the United States."). The Court also notes, in finding subject matter jurisdiction, that "it is well established that a court can certify a class while reserving the right to shape the class more precisely to fit the issues of the case as those emerge during the litigation." *Langner v. Brown, 1996 U.S. Dist. LEXIS 18256, 95 Civ. 1981, 1996 WL 709757, at *4 (S.D.N.Y. Dec. 10, 1996).*

**IV. Conclusion**

For the reasons stated herein, the Court grants OPTrust's motion to certify the class.

Dated: [*25] September 5, 2003

**RICHARD M. BERMAN, U.S.D.J.**

# TAB H

LEXSEE 2000 US DIST LEXIS 3829

**JOHN PARASCHOS, et al., Plaintiffs v. YBM MAGNEX INTERNATIONAL, INC., et al., Defendants**

**CIVIL ACTION NO. 98-6444**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2000 U.S. Dist. LEXIS 3829*

**March 28, 2000, Decided**
**March 29, 2000, Filed**

**DISPOSITION:** [*1] Motions to dismiss DENIED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For JOHN PARASCHOS, PLAINTIFF: SAMUEL R. SIMON, BARRACK, RODOS & BACINE, PHILA, PA USA. STEVEN G. SCHULMAN, MICHAEL SPENSER, MILBERG, WEISS, BERSHAD, HYNES & LERACH LLP, NEW YORK, NY USA. R. PAUL YETTER, YETTER & WARDEN, HOUSTON, TX USA.

For SHELDON KAPUSTIN, RALPH A. SUTTON, STEPHEN K. LEFF, CAISSE DE DEPOT ET PLACEMENT DU QUEBEC, PLAINTIFFS: SAMUEL R. SIMON, BARRACK, RODOS & BACINE, PHILA, PA USA.

For YBM MAGNEX INTERNATIONAL INC., DEFENDANT: EDWARD C. TOOLE, JR., PEPPER HAMILTON, LLP, PHILA, PA USA.

For FRANK GREENWALD, HARRY W. ANTES, DEFENDANTS: PAUL M. HUMMER, SAUL EWING REMICK & SAUL, PHILADELPHIA, PA USA. KARA H. GOODCHILD, SAUL, EWING, REMICK & SAUL, LLP, PHILA, PA USA.

For DELOITTE & TOUCHE, L.L.P., DEFENDANT: LAWRENCE J. PORTNOY, DANIEL F. KOLB, DAVIS, POLK & WARDWELL, NEW YORK, NY USA. EDWARD F. MANNINO, AKIN GUMP STRAUSS HAUER & FELD LLP, PHILADELPHIA, PA USA.

For PARENTE, RANDOLPH, ORLANDO & CAREY ASSOCIATES, DEFENDANT: JAMES G. WILES, BLANK, ROME, COMISKY & MCCAULEY, PHILA, PA USA. IAN M. COMISKY, BLANK ROME COMISKY & McCAULEY LLP, PHILADELPHIA, PA USA.

For JOHN A. DARKO, MOVANT: STEVEN M. STEINGARD, KOHN, [*2] SWIFT & GRAF, P.C., PHILADELPHIA, PA USA. DENNIS J. JOHNSON, THE LAW OFFICES OF DENNIS J. JOHNSON, SOUTH BURLINGTON, VT USA.

For JACOB G. BOGATIN, DEFENDANT: THOMAS B. ROBERTS, BALLARD, SPAHR, ANDREWS AND INGERSOLL, PHILA, PA USA.

For R. OWEN MITCHELL, DEFENDANT: JOHN W. MORRIS, KAUFMAN, COREN & RESS, PHILA, PA USA.

For DAVID R. PETERSON, DEFENDANT: WILLIAM T. HANGLEY, HANGLEY, ARONCHICK, SEGAL AND PUDLIN, PHILA, PA USA.

For DANIEL E. GATTI, DEFENDANT: KAREN ANNE POHLMANN, MORGAN, LEWIS & BOCKIUS LLP, PHILADELPHIA, PA USA. JOHN C. DODDS, MORGAN, LEWIS & BOCKIUS, PHILA, PA USA.

2000 U.S. Dist. LEXIS 3829, *

For JAMES J. HELD, GUY R. SCALA, DEFENDANTS: MICHAEL J. HOLSTON, KIRKE D. WEAVER, GREGG R. MELINSON, DRINKER BIDDLE & REATH LLP, PHILADELPHIA, PA USA.

**JUDGES:** Clarence C. Newcomer, S.J.

**OPINIONBY:** Clarence C. Newcomer

**OPINION: MEMORANDUM**

Presently before this Court are the following slew of motions filed by ten of the eleven defendants n1 in this action:

> n1 All actions, including the instant proceedings, against YBM have been stayed and enjoined due to bankruptcy proceedings in the Bankruptcy Court. YBM, therefore, has not filed a motion to dismiss here.

[*3]

(1) Defendant Parente, Randolph, Orlando, Carey & Associates' Motion to Dismiss Claims of Canadian Plaintiffs on the Grounds of Comity;

(2) Defendant Parente, Randolph, Orlando, Carey & Associates' Motion to Dismiss pursuant to the Private Securities Litigation Reform Act of 1995 ("Reform Act") and *Federal Rules of Civil Procedure 9(b)* and *12(b)(6)*;

(3) Defendant R. Owen Mitchell's Motion to Dismiss Consolidated Amended Complaint pursuant to *Fed.R.Civ.P. 12(b)(6)* and *12(b)(1)*;

(4) Defendant Deloitte & Touche LLP's Motion to Dismiss Plaintiff's Consolidated Amended Complaint pursuant to *Fed.R.Civ.P. 12(b)(6)* and the Reform Act;

(5) Defendant David R. Peterson's Motion to Dismiss Consolidated Amended Complaint pursuant to *Fed.R.Civ.P. 12(b)(6)*;

(6) Defendants James J. Held's and Guy R. Scala's Motion to Dismiss Plaintiff's Consolidated Amended Complaint pursuant to Rule 12(b)(6);

(7) Defendants Harry Antes' and Frank Greenwald's Motion to Dismiss pursuant to *Fed.R.Civ.P. 12(b)(1)* and *12(b)(6)* n2 ;

> n2 Defendants Harry Antes and Frank Greenwald have also filed a Motion Joining in Defendant Parente, Randolph, Orlando, Carey & Associates' Motion to Dismiss Claims of Canadian Plaintiffs on the Grounds of Comity.

[*4]

(8) Defendant Jacob Bogatin's Motion to Dismiss Consolidated Amended Complaint pursuant to *Fed.R.Civ.P. 9(b)* and *12(b)(6)* n3 ; and

> n3 Defendant Bogatin moves, in the alternative, to dismiss strike portions of the consolidated Amended Complaint pursuant to *Fed.R.Civ.P. 12(f)*.

(9) Defendant Daniel E. Gatti's Motion to Dismiss pursuant to *Fed.R.Civ.P. 12(b)(6)* and *12(b)(1)*.

For the reasons discussed below, the motions to dismiss are DENIED and the case shall go forth so that the parties may begin discovery.

**I. BACKGROUND**

Plaintiffs bring this consolidated class action on behalf of persons who purchased the common stock of defendant YBM Magnex International Inc. ("YBM") between January 19, 1996 and May 14, 1998 n4 alleging: (1) violations of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5; (2) violations of section 20(a) of the Exchange Act; and (3) state law claims of negligent misrepresentation. Plaintiffs have named as defendants: (1) YBM; (2) Parente, Randolph, [*5] Orlando, Carey & Associates ("Parente"), a firm of certified public accountants; (3) Deloitte & Touche, LLP ("Deloitte"); (4) Jacob G. Bogatin, former President, Chief Executive Officer, and member of the Board of Directors of YBM; (5) Harry W. Antes, former Chairman of the Board of YBM; (6) R. Owen Mitchell, former member of the Board of YBM and Chairman of several Special Committees of the Board; (7) Frank Greenwald, former member of the Board of YBM; (8) David R. Peterson, former member of the Board of YBM and former Premier of the Province of Ontario; (9) Daniel E. Gatti, former Vice President of Finance and Chief Financial Officer of YBM; (10) James J. Held, former Vice President of Business Development and Investor Relations of YBM; and (11) Guy R. Scala, former Vice President of Sales and Marketing of YBM.

> n4 Any persons who may qualify as members of the class shall hereinafter be referred to collectively as "the Class".

In sum, plaintiffs allege that defendants engaged in an elaborate fraud over the course [*6] of several years,

2000 U.S. Dist. LEXIS 3829, *

during which time YBM allegedly held itself out as a manufacturer of magnets and a participant in several other businesses, when in fact YBM was a front for the laundering of money obtained by Russian organized crime. Plaintiffs aver that their claims arise from a scheme to launder the proceeds of organized crime activities in Eastern Europe, to convert the criminal revenue to clean money through lawful sales of the common stock of YBM, and to defraud purchasers of YBM's common stock.

With regard to the § 10(b) and Rule 10b-5 claims, plaintiffs contend that defendants carried out a course of conduct which was intended to and did deceive the investing public, artificially inflate and maintain the market price of YBM common stock, and cause plaintiffs and other members of the Class to purchase YBM common stock at artificially inflated prices. The plaintiffs allege that the defendants who were insiders of YBM ("Insider defendants") are liable because each was a high-level executive and/or director of YBM during the Class period and/or was a member of the company's senior management; each was privy to and participated in the preparation of YBM's financial statements [*7] and reporting of the company's financial condition, operations, and performance; each enjoyed significant personal contact and familiarity with other Insider defendants and was advised of and had access to other members of YBM's management team, internal reports, and other data and information about the company's resources at all relevant times; and each was aware of YBM's dissemination of information to the investing public which each knew or recklessly disregarded as materially false and misleading.

Plaintiffs contend that the auditors violated § 10(b) of the Exchange Act and Rule 10b-5 because they rendered unqualified opinions on the company's financial statements despite knowing or recklessly disregarding that YBM's financial statements contained materially false representations, including representations of revenue, earnings, and business operations. Plaintiffs assert that these actions were an extreme departure from a standard of ordinary care.

The second claim for violation of § 20 of the Exchange Act applies only to the Insider defendants, who allegedly acted as controlling persons of YBM, and had the power to, and did, influence and control the decision-making of the [*8] company. Plaintiffs assert that the Insider defendants' decisions included the content and dissemination of various public statements that plaintiffs contend are false and misleading. Plaintiffs claim that pursuant to § 20(a), the Insider defendants are liable jointly and severally with and to the same extent as the company for its violations of § 10(b) and Rule 10b-5.

The third claim for negligent misrepresentation is brought against all defendants for their alleged failures to state material facts necessary: (1) in order to make the statements, in light of the circumstances under which they were made, not misleading, and (2) in order that prospective investors in YBM common stock would have all the material facts necessary for an informed decision.

Defendants' instant motions to dismiss, filed in response to plaintiffs' consolidated Amended Complaint ("Complaint"), fall into 3 general categories: (1) dismissal based on a lack of subject matter pursuant to 12(b)(1), or alternatively, dismissal based on concerns of international comity; (2) dismissal based on plaintiffs' failure to plead fraud with particularity pursuant to Rule 9(b) and the Reform Act; and (3) dismissal based [*9] on the failure to state a claim pursuant to Rule 12(b)(6). The Court will now discuss these issues in turn.

## II. DISCUSSION

### A. DISMISSAL: SUBJECT MATTER JURISDICTION AND COMITY

Defendant Parente, Randolph, Orlando, Carey & Associates ("Parente") filed a Motion to Dismiss Claims of Canadian Plaintiffs on the Grounds of Comity ("Comity Motion"), which was joined by defendants Harry W. Antes and Frank Greenwald through their Motion to Join in Motion to Dismiss Claims of Canadian plaintiffs. Defendants Mitchell, Held, Scala, Bogatin, and Gatti also joined in Parente's Comity Motion through their respective motions to dismiss. n5

n5 This Court notes that these 5 defendants join in Parente's Comity Motion, but mislabel said Comity Motion as a motion to dismiss based on lack of subject matter jurisdiction pursuant to Rule 12(b)(1). As pointed out in both Parente's Comity Motion (note 12, page 13) and Parente's Reply Brief (page 1), Parente's argument is not that this Court lacks subject matter jurisdiction under the federal securities laws, but rather that this Court should exercise its discretion and dismiss the claims of the Canadian plaintiffs as a matter of comity. As a preliminary matter, this Court will address its subject matter jurisdiction over this matter under the federal securities laws.

[*10]

Defendants contend that YBM was a Canadian corporation, was offered by Canadian underwriters, was traded solely on Canadian stock exchanges and never on any U.S. exchanges, and was a "reporting issuer" with the Canadian provincial securities commissions in

Ontario, Alberta, Quebec and British Columbia. In essence, defendants argue that as a matter of comity this Court should exercise its discretion and dismiss the claims of the Canadian plaintiffs in order that they may be adjudicated under Canadian law in a Canadian court because of the underlying Canadian nature of this action and the circumstances that give rise to it.

Defendants argue that the Canadian plaintiffs are taking advantage of a U.S. forum to apply the U.S. securities laws to determine their rights and remedies with respect to a foreign corporation: (1) whose securities the plaintiffs purchased in their own country; (2) which was incorporated in plaintiffs' own country; (3) whose shares traded solely on a stock exchange in plaintiffs' own country; (4) whose financial statements were prepared in accordance with the GAAP of the plaintiffs' own country; and (5) whose securities were regulated by the securities authorities [*11] of the plaintiffs' own country. Moreover, defendants posit that Canada has a judicial forum and a fully articulated body of law available to the plaintiff. Defendants point to two separate shareholder class actions that were filed in Canada: one class covering plaintiffs who made open market purchases, and of which the Canadian plaintiffs here would be members; and another class covering a proposed class of Canadian investors who bought in YBM's November 17, 1997 public offering.

Plaintiffs respond to defendants' arguments by arguing that this Court does in fact have jurisdiction over this action, and that relevant policy considerations and caselaw provide reasons for this Court not to dismiss the Canadian plaintiffs on grounds of comity.

## 1. EXTRATERRITORIAL SUBJECT MATTER JURISDICTION OF THE EXCHANGE ACT

As a preliminary matter, and to address any arguments that this Court may not have subject matter jurisdiction over this action, the Court will begin by discussing its extraterritorial subject matter jurisdiction under the federal securities laws.

Section 27 of the Exchange Act vests federal courts with exclusive jurisdiction over actions involving violations of the Exchange [*12] Act, as well as rules and regulations adopted thereunder. However, neither the Exchange Act nor the Rules promulgated thereunder provide specific guidance as to the extraterritorial application of the Act. "Although the preamble to the [Exchange] Act expressly contemplates its application to transactions in 'interstate and foreign commerce,' . . . thereby suggesting Congress intended a broad jurisdictional scope, . . . the specific provisions of the statute itself are silent with respect to its extraterritorial reach. *Starlight Int'l, Inc. v. Herlihy*, 13 F. Supp. 2d 1178, 1182 (D. Kan. 1998) (citations omitted).

In the absence of clear statutory guidance, the Second Circuit has extensively considered the application and extraterritorial jurisdiction of the federal securities laws to transnational transactions and fraud. The Second Circuit has developed two alternative tests for determining when federal securities laws apply extraterritorially: the "conduct test," which in essence asks whether the fraudulent conduct that forms the alleged violation occurred in this country; and the "effects test," which asks whether conduct outside the United States resulted in substantial [*13] adverse effects on American investors or securities markets. See *Robinson v. TCI/US West Communications*, 117 F.3d 900, 905 (5th Cir. 1997). It has been held that satisfaction of either test is enough to confer subject matter jurisdiction on the court. See Id.

In the instant case, plaintiffs' briefs appear to rely on the "conduct test" to satisfy jurisdictional requirements. They argue that defendants' fraudulent conduct and misrepresentations took place in the United States, and therefore defendants should be held liable under U.S. securities law. The courts of appeals however, have not agreed on the type of activities required to satisfy the conduct test, although all agree that essentially, the test is based "on the idea that Congress did not want the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." Id. (citations omitted). The Second, Fifth, and District of Columbia Circuits have held that the domestic conduct be "of material importance" to, or "have directly caused" the alleged fraud. *Id. at 905-06.* The Third Circuit, however, along with the Eighth [*14] and Ninth Circuits, requires only that the domestic conduct be significant to the fraud rather than a direct cause of it. *Id. at 906* (citing *SEC v. Kasser*, 548 F.2d 109, 114 (3d Cir. 1977)).

The facts of the instant action meet the criteria of the conduct test, and the defendants' conduct in the United States was of such significance that subjecting them to the jurisdiction of this Court is proper. Most, if not all, of defendants' conduct allegedly took place in the United States. The misrepresentations concerning YBM, as well as the audits of the company, which plaintiffs contend constitute the fraud, occurred domestically. Furthermore, if plaintiffs' allegations are proven, defendants' conduct would easily be found to have been significant to the alleged fraud and plaintiffs' subsequent reliance on said fraud.

Even under the stricter reading of the conduct test, plaintiffs have sufficiently pleaded that defendants' alleged domestic conduct: (1) was more than "merely preparatory," and (2) directly caused their injury and losses. See *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 987 (2d Cir. 1975), cert. denied, 423 U.S. 1018

*(1975).* [*15] Plaintiffs claim that the misrepresentations and fraud that occurred in the U.S. were part of an elaborate scheme, which indicates that defendants' conduct was more than mere preparation. Furthermore, there is little doubt that if plaintiffs allegations are proven, the misrepresentations and fraud, upon which plaintiffs allegedly relied, directly led to and caused plaintiffs' injuries. Therefore, this Court finds that it has proper extraterritorial subject matter jurisdiction over this matter under U.S. securities laws; and plaintiffs can properly bring this action under the Exchange Act.

## 2. INTERNATIONAL COMITY

This Court now turns to the brunt of defendants' motions to dismiss based on comity. The principle of international comity, also known as the "comity of nations doctrine," permits the "recognition of foreign proceedings to the extent that such proceedings are determined to be orderly, fair and not detrimental to the nation's interests." *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru, 165 B.R. 379, 384 (S.D. N.Y. 1994).* The Supreme Court in *Hilton v. Guyot, 159 U.S. 113, 164, 40 L. Ed. 95, 16 S. Ct. 139 (1895)* defined international [*16] comity as:

> "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."

When the extraterritorial enforcement of United States law creates an actual or potential conflict with the laws or policies of the nations, it is appropriate for the enforcing court to consider whether, in light of considerations of comity, it should decline to exercise jurisdiction and to enforce the United States law. See *Westel de Venezuela v. American Telephone and Telegraph Co., 1992 U.S. Dist. LEXIS 12301, CIV.A. No. 6665, 1992 WL 209641,* at *19 (S.D. N.Y. Aug. 17, 1992) (citing *Timberlane Lumber Co. v. Bank of America National Trust & Savings Association, 749 F.2d 1378, 1384 (9th Cir. 1984),* cert. denied, *472 U.S. 1032, 87 L. Ed. 2d 643, 105 S. Ct. 3514 (1985)).*

Under the principle of comity between sovereign nations, a district court should decline to exercise jurisdiction under certain circumstances in deference to the laws and interests [*17] of another foreign country.

*Basic v. Fitzroy Engineering, Ltd., 949 F. Supp. 1333, 1340 (1996) 1996 WL 753336,* at *8 (7th Cir. 1996) (citing *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa, 482 U.S. 522, 543 n.27, 96 L. Ed. 2d 461, 107 S. Ct. 2542 (1987).* "United States courts ordinarily . . . defer to proceedings taking place in foreign countries, allowing those . . . proceedings to have extraterritorial effect in the United States." *Pravin Bank Assocs., 109 F.3d 850 at 854* (citations omitted).

Many federal courts have dismissed cases solely on the basis of comity. See *Fleeger v. Clarkson Co. Limited, 86 F.R.D. 388, 392 (N.D. Tex. 1980)* (citing *Cornfeld v. Investors Overseas Services, Ltd., 471 F. Supp. 1255 (E.D. N.Y. 1979),* and pointing to cases cited therein at 1262). The rationale for dismissals based on comity is not based simply on a lack of familiarity with the particular foreign law, but rather is in deference to the foreign country's legal, judicial, legislative, and administrative system of handling disputes over which it has jurisdiction, in a spirit of international [*18] cooperation. Id. (citing *Cornfeld, 471 F. Supp. at 1262).* However, comity is not extended to foreign proceedings when doing so would be contrary to the public policy of the U.S. *Pravin, 109 F.3d at 854.*

In a situation such as the instant one, a district court is also empowered, in the interests of international comity, to dismiss a federal suit whenever it is duplicative of a parallel action pending in courts in a foreign country. *Ingersoll Mill. Mach. Co. v. Granger, 833 F.2d 680, 685 (7th Cir. 1987).* An action is parallel to another action when "substantially the same parties are contemporaneously litigating substantially the same issues in another forum." *Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc., 962 F.2d 698, 700 (7th Cir. 1992).* The two actions may be parallel when the parties share some legal identity of interest such that they are "substantially the same." *Id. at 700-01.* Though the actions do not have to be identical, the issues must be sufficiently similar, in that there must be a "substantial likelihood that the [foreign] litigation will dispose of all claims presented [*19] in the federal case." *Lumen Constr., Inc. v. Brant Constr. Co., 780 F.2d 691, 695 (7th Cir. 1985).*

Even when two suits are parallel, however, a district court should exercise jurisdiction over an action even where identical subject matter is concurrently before a foreign court. See *Ingersoll, 833 F.2d at 684.* The court should look to extraordinary circumstances that necessitate dismissal, including the desirability of avoiding duplicative litigation, the inconvenience of the domestic forum, the governing law, the order in which jurisdiction was obtained in each forum, the relative progress of each proceeding, and the contrived nature of

the domestic claim. See *Balcom v. Rosenthal & Co., 1997 U.S. Dist. LEXIS 20842, CIV.A. No. 96-6310, 1998 WL 2835* (N.D. Ill. Jan. 2, 1998) (citing *Ludgate Ins. Co. v. Becker, 906 F. Supp. 1233, 1242 (N.D. Ill. 1995).*

Defendants have pointed to extensive policy reasons supporting dismissal of the present claims of the Canadian plaintiffs; and in general, this Court agrees with many of them. Defendants' arguments are very persuasive. It is true that the Canadian courts serve as a reliable alternative to this Court [*20] and can be trusted to be orderly, fair, and not detrimental to this country's interests. Defendants have also successfully shown that many of the legal issues in this case arise from circumstances that are transnational (Canadian) in nature. In addition, the interests of international duty as well as judicial economy and convenience are very legitimate issues in this case.

However, the reasons for maintaining jurisdiction of this case are more compelling. To the extent that subject matter jurisdiction over this case is proper, plaintiffs, even foreign plaintiffs, should be permitted to bring their claims in the forum of their choice. More importantly, the deciding factor for this Court is plaintiffs' clear choice of law. The Canadian plaintiffs bring their claims under U.S. securities law, not Canadian law. Plaintiffs have specifically chosen to utilize the jurisdiction afforded to them to have their claims brought under the Exchange Act and have them adjudicated in a United States district court.

That being the case, this Court acknowledges the absence from this case some of the more important factors of comity dismissal. First, the pending cases in the Canadian courts involve [*21] different legal issues. As defendants point out, the Canadian courts will not be applying U.S. securities law. Therefore, while defendants claim that there are conflict of law issues, there appear to be no actual or potential conflicts of law. The claims under the Exchange Act, as well as the state law claims for negligent misrepresentation, are not in conflict with Canadian law or the cases presently pending in the Canadian courts. Consequently, those issues being tried in Canada do not preclude the instant action; and conversely, the issues in this case should not estop any of the issues being tried in the Canadian proceedings. The claims brought here are distinct from those other claims in the foreign court, and this Court chooses to allow plaintiffs to bring their claims here.

Second, this Court feels that dismissal of this action would not be out of a spirit of international cooperation in deference to Canada's legal, judicial, legislative, and administrative system of handling disputes. Rather, dismissal of plaintiffs' claims would turn out to be an outright dismissal of plaintiffs' legitimate U.S. securities

law claims. Plaintiffs would lose out on the protections of U.S. law [*22] that are available to them under the extraterritorial applications of the Exchange Act. If this action were brought under Canadian law, or if this Court was being asked to apply Canadian law, it would be an entirely different matter and a different holding may very well result. However, since this Courts is the only forum in which the Canadian plaintiffs have brought their legitimate U.S. securities law claims, they will not be prevented from doing so.

## B. DISMISSAL: FAILURE TO STATE A CLAIM AND FAILURE TO PLEAD WITH PARTICULARITY

Each of the defendants has also moved this Court to dismiss for plaintiffs' failure to state a cause of action pursuant to Rule 12(b)(6). In conjunction with their motions defendants argue that plaintiffs have failed to satisfy heightened pleading requirements that apply to their § 10(b) and Rule 10b-5 claims.

## 1. LEGAL STANDARD: MOTION TO DISMISS

Under Rule 12(b)(6), a court should dismiss a claim for failure to state a cause of action only if it appears to a certainty that no relief could be granted under any set of facts which could be proved. *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984).* [*23] Because granting such a motion results in a determination on the merits at such an early stage of a plaintiffs' case, the district court "must take all the well pleaded allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Colburn v. Upper Darby Township, 838 F.2d 663, 664-65 (3d Cir. 1988),* cert. denied, *489 U.S. 1065, 103 L. Ed. 2d 808, 109 S. Ct. 1338 (1989)* (quoting *Estate of Bailey by Oare v. County of York, 768 F.2d 503, 506 (3d Cir. 1985)).* "To withstand the motion, 'it is not necessary to plead facts upon which the claim is based.'" *In re Meridian Sec. Litig., 772 F. Supp. 223, 226 (E.D. Pa. 1991)* (quoting *In re Midlantic Corp. Shareholder Litig., 758 F. Supp. 226, 230 (D. N.J. 1990)* in the context of assessing Rule 12(b)(6) motions to dismiss § 10(b) claims).

## 2. LEGAL STANDARD: PLEADING REQUIREMENT UNDER *FED.R.CIV.P. 9(b)* AND THE REFORM ACT

*Federal Rule of Civil Procedure 9(b)* and the Reform Act require that a securities fraud claim [*24] be subject to heightened pleading requirements. Because § 10(b) and Rule 10b-5 are anti-fraud provisions, plaintiffs must plead them with the particularity required by Rule

9(b) and the Reform Act. n6 See *In re Burlington Coat Factory, Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997).*

> n6 However, Rule 9(b) and the Reform Act do not apply to claims grounded in negligence, so plaintiffs are not required to satisfy the heightened pleading requirements for their negligence misrepresentation claims against defendants. See *Shapiro v. UJB Fin. Corp., 964 F.2d 272, 288 (3d Cir.), cert denied, 506 U.S. 934, 113 S. Ct. 365, 121 L. Ed. 2d 278 (1992).*

Rule 9(b) provides that "in all averments of fraud or mistake, the circumstances constituted fraud or mistake shall be stated with particularity." The purposes of Rule 9(b) are to provide notice of the precise misconduct with which defendants are charged and to "safeguard defendants against spurious charges of immoral and fraudulent [*25] behavior." *Seville Indus. Mach. v. Southmost Mach., 742 F.2d 786, 791 (3d Cir.1984); See Rolo v. City Investing Co., 155 F.3d 644, 658 (3d Cir.1998)* (citations omitted).

"As long as the allegations of fraud reflect precision and some measure of substantiation, the complaint is adequate." *Meridian, 772 F. Supp. at 229* (citing *Seville, 742 F.2d at 791).* While allegations of time, place, and date certainly meet this requirement, see *Rolo, 155 F.3d at 658,* allegations that set forth the details of the alleged fraud may also meet these requirements, and plaintiffs "are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville, 742 F.2d 786 at 791* (finding that plaintiff had met burden when it incorporated into the complaint a list of the pieces of machinery allegedly subject to fraud and otherwise described the "nature and subject" of the supposed misrepresentations); *Saporito v. Combustion Eng'g, Inc., 843 F.2d 666, 675 (3d Cir.1988),* judgment vac'd on other grounds, *489 U.S. 1049, 103 L. Ed. 2d 576 (1989)* [*26] (stating that plaintiff did not meet burden when it pled in very general terms, and did not allege who made or received fraudulent statements). As to scienter, plaintiffs must allege specific facts that give rise to a 'strong inference' that defendants possessed the requisite intent. *Burlington Coat Factory, 114 F.3d at 1418.*

The Third Circuit has repeatedly cautioned that courts should apply this rule flexibly, particularly when the information at issue may be in the defendants' control. See *Seville, 742 F.2d at 791.* In fact, the Third Circuit has held that:

> courts must be sensitive to the fact that application of Rule 9(b) prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.' Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs . . . . Thus, courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control.

*In re Craftmatic Sec. Litig., 890 F.2d 628, 645 (3d Cir. 1989)* (citations omitted). In addition, the Craftmatic [*27] Court "expressly declined to adhere to the rigid enforcement of Rule 9(b) in securities fraud cases." *In re Midlantic Corp. Shareholder Litig., 758 F. Supp. 226, 232 (D. N.J. 1990)* (citing *Craftmatic, 890 F.2d at 645-46).*

The Reform Act requires that a plaintiff alleging that a defendant has made misleading statements must:

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

*15 U.S.C. § 78u-4(b)(1).*

To establish scienter under the Reform Act, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2).* The Third Circuit has held that under the requirement, plaintiffs must "allege specific facts that give rise to a 'strong inference' that defendants possessed the requisite intent." *Marra v. Tel-Save Holdings, Inc., 1999 U.S. Dist. LEXIS 7303, *21, CIV.A. No. 98-3145, 1999 WL 317103,* [*28] at *11 (May 18, 1999) (quoting *Burlington Coat Factory, 114 F.3d 1410 at 1418).* This standard can be satisfied either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud; or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Marra, 1999 WL 317103,* at *11 (quoting *Burlington Coat Factory, 114 F.3d 1410 at 1418).* Therefore, allegations that defendants had both motive and opportunity to commit fraud are sufficient to plead scienter under § 10(b). *Marra, 1999 WL 317103,*

at *11 (citing *In re Home Health Corp. of Am., Inc., 1999 U.S. Dist. LEXIS 1230, CIV.A. No. 98-834, 1999 WL 79057*, at *14 (E.D. Pa. Jan. 29, 1999). While the Reform Act clearly requires some precision in alleging facts, it does not require pleading all of the evidence and proof thereunder supporting a plaintiff's claim. *In re Cephalon Sec. Litig., 1997 U.S. Dist. LEXIS 13840, CIV.A. No. 96-0633, 1997 WL 570918* (E.D. Pa. Aug. 29, 1997).

## 3. LEGAL STANDARDS AND ELEMENTS OF PLAINTIFFS' CLAIMS

### a. SECTION 10(b) AND RULE 10b-5

To state a claim under § 10(b) and [*29] Rule 10b-5, a plaintiff must plead the following elements: (1) that a defendant made misstatements or omissions of material fact; (2) with scienter; (3) in connection with a purchase or sale of securities; (4)upon which the plaintiff relied; and (5) plaintiff's reliance was the proximate cause of plaintiff's injury. See *Kline v. First W. Gov't Sec., Inc., 24 F.3d 480, 487 (3d Cir. 1994)*.

### b. CONTROL PERSON LIABILITY UNDER § 20(a) Section 20(a) of the Exchange Act states in relevant part:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the acts constituting the violation or cause of action.

*15 U.S.C. § 78t*(a). To establish liability under § 20(a), a plaintiff must prove: (1) a primary violation occurred; (2) the defendant had control over the [*30] person responsible for the violation; and (3) the defendants acted culpably. See *In re Cephalon Sec. Litig., 1997 U.S. Dist. LEXIS 13840, CIV.A. No. 96-0633, 1997 WL 570918*, at *14 (E.D. Pa. Aug. 29, 1997).

In assessing a plaintiff's pleadings for § 20(a), Third Circuit precedent requires the court to give consideration to the powers inherent in the defendants' positions:

Substantial weight must be given to the authority, or rather the potential authority, inherent in such corporate positions, considered separately or in concert. Furthermore, prior to discovery, plaintiff can hardly be able to plead the precise culpable conduct of each individual defendant.

*Midlantic, 758 F. Supp. at 236.*

### c. NEGLIGENT MISREPRESENTATION

Under Pennsylvania law, liability for negligent misrepresentation will arise if: (1) the misrepresentation is of a material fact; (2) the representor knew of the misrepresentation, but (3) made the misrepresentation without knowledge of its truth or falsity or made it under such circumstances in which he ought to have known of its falsity; (4) the representor intended the representation to induce another to act on it; (5) the [*31] other person justifiably relied upon the misrepresentation; and (6) if in so relying, suffered damages or injury. *City of Rome v. Glanton, 958 F. Supp. 1026, 1039 (E.D. Pa.1997); Amoco Oil Co. v. McMahon, 1997 U.S. Dist. LEXIS 1303, 1997 WL 50448 (E.D. Pa. 1997)*.

## 4. ANALYSIS OF DEFENDANTS' MOTIONS TO DISMISS

In their extremely lengthy Complaint, plaintiffs set forth a detailed list of allegations, depicting a complex scheme of fraud and money laundering. Within this portrait of deception and misrepresentation, plaintiffs weave facts that each of the defendants were in a position to know of the scheme, and ultimately, through intentional and/or negligent actions, became liable because of their involvement.

### a. SECTION 10(b) AND RULE 10b-5

With regards to the § 10(b) and Rule 10(b)-5 claims, plaintiffs allege a myriad of misstatements and omissions of material fact. The misstatements and omissions include those stemming from YBM's Prospectuses, press releases, and annual reports concerning various representations of the company's business, income, and growth, as well as omissions concerning certain criminal connections and investigations made by the U.S. law [*32] enforcement authorities. Plaintiffs also allege that misstatements and omissions were made by the auditors in the form of unqualified, clean audit reports of YBM's finances, when in fact much of the company's financial information was false or nonexisting. Furthermore, despite defendants'

arguments to the contrary, plaintiffs sufficiently plead scienter through strong inferences that may be drawn from the factual allegations laid out in the Complaint. Plaintiffs' Complaint alleges facts that show inferences that defendants had both motive and opportunity to commit fraud as well as facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. When read in the light most favorable to them, plaintiffs' collective allegations strongly infer that each of the defendants was in a position to know of the company's true financial status, knowingly signed off on, or assented to many of the company's misrepresentations or omissions.

For instance, plaintiffs allege, inter alia: (1) defendant Bogatin finalized and signed YBM's 1995 Annual Report, which allegedly contained false information; (2) defendant Mitchell allegedly minimized "inconsistencies" in shareholder [*33] records and testimony, and misreported results of an investigation of the Special Committee; (3) defendant Antes joined Bogatin in finalizing and signing YBM's 1996 Annual Report which allegedly contained false information; (4) defendant Greenwald was allegedly involved in, and subsequently silent about, an Audit Committee meeting where Deloitte expressed concerns about first quarter 1998 earnings that might have been impacted by certain transactions questioned by Deloitte; (5) defendant Gatti, with others, provided numerous YBM documents and other information to Deloitte in 1997 while informing Deloitte that YBM's oil sales were flagged for particular attention by the Ontario Securities Commission, inferring that Gatti as a vice president knew of YBM's misrepresentations and assented to them; and (6) defendants Held, Scala, and Peterson allegedly made comments in various articles regarding YBM's financial status, when they were in positions to know that their statements were false and misrepresentative. The Court also finds that the aggregate of allegations against the outside auditors, Parente and Deloitte, raises strong inferences of their scienter. They were in positions to know [*34] YBM's true financial situation; and yet proceeded to make misrepresentations or omissions of material facts concerning those finances. With the aforementioned determinations, this Court feels that discovery is necessary to unearth the evidence, if any, to support plaintiffs' allegations of § 10(b) and Rule 10b-5 violations.

### b. SECTION 20(a)

Despite some of the Insider defendants' contentions that plaintiffs have failed to show they were in fact insiders, the Court finds that plaintiffs' allegations, if proven, are sufficient to show that the Insider defendants were in positions with authority and inherent powers to control YBM. Therefore, in conjunction with the

determination that a primary violation of § 10(b) and Rule 10b-5 have been sufficiently alleged against YBM, this Court finds that § 20(a) has also been adequately pleaded against the Insider defendants.

### c. NEGLIGENT MISREPRESENTATION

Because plaintiffs' Exchange Act claims will not be dismissed, this Court will exercise supplemental jurisdiction over plaintiffs' state law claim for negligent misrepresentation. As was the case for their other claims noted above, plaintiffs have adequately pleaded their causes [*35] of action for negligent misrepresentation against the individual Insider defendants as well as the outside auditors to withstand the instant motions to dismiss. The Court determines that plaintiffs' well-pleaded allegations warrant that this case move forward into discovery, after which time the parties may wish to file appropriate dispositive motions.

### d. CONCLUSION

Upon consideration of the Complaint, and when plaintiffs' allegations are read in the light most favorable to them, it does not appear to a certainty that no relief could be granted under any set of facts which could be proved.

Although these allegations in the Complaint lack absolute factual specificity, the Court is satisfied that at this early stage of the action plaintiffs' pleadings are sufficient to withstand the instant motions to dismiss. The Court finds the Complaint is adequate and sufficient to satisfy the purposes of heightened pleading requirements. n7 In particular, plaintiffs have adequately pleaded with enough particularity regarding the numerous elements of their claims to provide sufficient notice of the precise misconduct with which defendants are charged. The Court is also convinced by the pleadings [*36] that the instant allegations are not simply spurious charges of immoral and fraudulent behavior.

> n7 The Court notes that plaintiffs would have been granted leave to amend their Complaint further upon a dismissal at this early stage. Therefore, rather than have plaintiffs refile another amended complaint simply to satisfy stringent pleading requirements, the Court chooses to move this case forward into the discovery phase.

Moreover, many of the allegations pertaining to fraudulent conduct by the individual defendants refer to information that is largely within the defendants' control, and it would be inappropriate to penalize the plaintiffs at

this stage for their lack of specific information, given the general flexibility with which the Third Circuit instructs courts to apply Rule 9(b). Consequently, any dispositive issues should be kept until the summary judgment stage after substantial discovery has been completed.

### C. DEFENDANT BOGATIN'S MOTION TO STRIKE PARAGRAPHS FROM THE COMPLAINT

Defendant Bogatin [*37] seeks pursuant to Rule 12(f) to have this Court strike paragraphs 35, 151, 152, and 153 of the Complaint. A motion to strike under *Rule 12(f) of the Federal Rules of Civil Procedure* is the proper method to eliminate matters which are found to be redundant, immaterial, impertinent or scandalous. *Fed.R.Civ.P. 12(f)*. Motions to strike under 12(f) are viewed with disfavor. *Great West Life Assur. Co. v. Levithan, 834 F. Supp. 858, 864 (E.D. Pa. 1993)*. Even "allegations in a complaint which supply background or historical material or which are of an evidentiary quality will not be stricken unless unduly prejudicial to defendant." *South Side Drive-In Co. v. Warner Bros. Pictures Distrib. Corp., 30 F.R.D. 32, 34 (E.D. Pa. 1962)*.

Upon reading the Complaint and the paragraphs at issue here, the Court determines that they are used in the context of providing background on YBM and are of such evidentiary quality that they should not be stricken. The paragraphs are not unduly prejudicial to defendant Bogatin; nor are they redundant, immaterial, impertinent or scandalous to warrant this Court to strike them from the Complaint. Accordingly, defendant Bogatin's request [*38] to strike said paragraphs is denied.

### ORDER

AND NOW, this 28th day of March, 2000, upon consideration of the following defendants' Motions to Dismiss, plaintiffs' Response thereto, and defendants' Reply briefs thereto, it is hereby ORDERED as follows:

(1) Defendants Harry Antes and Frank Greenwald's Motion Joining in Defendant Parente, Randolph, Orlando, Carey & Associates' Motion to Dismiss Claims of Canadian Plaintiffs on the Grounds of Comity is GRANTED.

(2) Defendant Parente, Randolph, Orlando, Carey & Associates' Motion to Dismiss Claims of Canadian Plaintiffs on the Grounds of Comity is DENIED.

(3) Defendant Parente, Randolph, Orlando, Carey & Associates' Motion to Dismiss pursuant to the Private Securities Litigation Reform Act of 1995 ("Reform Act") and *Federal Rules of Civil Procedure 9(b)* and *12(b)(6)* is DENIED.

(4) Defendant R. Owen Mitchell's Motion to Dismiss Consolidated Amended Complaint pursuant to *Fed.R.Civ.P. 12(b)(6)* and *12(b)(1)* is DENIED.

(5) Defendant Deloitte & Touche LLP's Motion to Dismiss Plaintiff's Consolidated Amended Complaint pursuant to *Fed.R.Civ.P. 12(b)(6)* and the Reform Act is DENIED.

It is further ORDERED that defendant Deloitte [*39] & Touche's request for oral argument pursuant to Local Civil Rule 7.1(f) is DENIED.

(6) Defendant David R. Peterson's Motion to Dismiss Consolidated Amended Complaint pursuant to *Fed.R.Civ.P. 12(b)(6)* is DENIED.

(7) Defendants James J. Held's and Guy R. Scala's Motion to Dismiss Plaintiff's Consolidated Amended Complaint pursuant to Rule 12(b)(6) is DENIED.

(8) Defendants Harry Antes' and Frank Greenwald's Motion to Dismiss pursuant to *Fed.R.Civ.P. 12(b)(1)* and *12(b)(6)* DENIED.

(9) Defendant Jacob Bogatin's Motion to Dismiss Consolidated Amended Complaint pursuant to *Fed.R.Civ.P. 9(b)* and *12(b)(6)* is DENIED.

Defendant Bogatin's request to strike certain paragraphs from the consolidated Amended Complaint is DENIED.

(10) Defendant Daniel E. Gatti's Motion to Dismiss pursuant to *Fed.R.Civ.P. 12(b)(6)* and *12(b)(1)* is DENIED.

AND IT IS SO ORDERED.

Clarence C. Newcomer, S.J.