# TAB I

# (part 1 of 2)

LEXSEE 2005 US DIST LEXIS 5830

TRACINDA CORPORATION, a Nevada Corporation, Plaintiff, v.
DAIMLERCHRYSLER AG, a Federal Republic of Germany corporation;
DAIMLER-BENZ AG, a Federal Republic of Germany corporation; JUERGEN
SCHREMPP, a citizen of the Federal Republic of Germany; and MANFRED
GENTZ, a citizen of the Federal Republic of Germany, Defendants.

Civil Action No. 00-993-JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2005 U.S. Dist. LEXIS 5830

April 7, 2005, Decided

**SUBSEQUENT HISTORY:** Request granted, Costs and fees proceeding at *Tracinda Corp. v. Daimlerchrysler AG, 2005 U.S. Dist. LEXIS 6741 (D. Del., Apr. 20, 2005)*

**PRIOR HISTORY:** *Tracinda Corp. v. DaimlerChrysler AG, 2005 U.S. Dist. LEXIS 5096 (D. Del., Mar. 30, 2005)*

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] A. Glichrist Sparks, III, Esquire, Alan J. Stone, Esquire, and Natalie J. Watson, Esquire of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware.; Of Counsel: Terry N. Christensen, Esquire, Mark G. Krum, Esquire and Eric P. Early, Esquire of CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL & SHAPIRO, LLP, Los Angeles, California; William G. McGuinness, Esquire and Julie E. Kamps, Esquire of FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, New York, New York, for Plaintiff Tracinda Corporation.

Thomas J. Allingham II, Esquire, and Robert S. Saunders, Esquire, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware.; Of Counsel: Jonathan J. Lerner, Esquire, Lea Haber Kuck, Esquire and Joseph N. Sacca, Esquire of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York, for Defendants DaimlerChryler AG, Daimler-Benz AG, Jurgen Schrempp and Manfred Gentz.

**JUDGES:** Farnan, District Judge.

**OPINIONBY:** Joseph J. Farnan, Jr.

**OPINION:**

OPINION

April 7, 2005
Wilmington, Delaware.

**Farnan, District Judge.**

INTRODUCTION

This action was brought by Plaintiff, Tracinda Corporation, ("Tracinda") against Defendants, DaimlerChrysler AG, Daimler-Benz AG ("Daimler-Benz" [*2] or "Daimler"), Jurgen Schrempp and Manfred Gentz (collectively, "Defendants"), alleging violations of securities laws, common law fraud and conspiracy in connection with the November 1998 merger between Chrysler Corporation ("Chrysler") and Daimler-Benz AG ("Daimler-Benz"). A thirteen day bench trial was held on the claims and defenses raised by the parties. This Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law on the issues tried before the Court.

JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934, *15 U.S.C. § 78aa*, and the doctrine of supplemental jurisdiction. Additionally, the Court has

Case 1:04-cv-00331-JJF   Document 57-5   Filed 05/02/2005   Page 3 of 20

Page 2
2005 U.S. Dist. LEXIS 5830, *

subject matter jurisdiction pursuant to *28 U.S.C. § 1332(a)(2)*, because the amount in controversy exceeds $ 75,000, exclusive of interest and costs, and the matter arises between citizens of a State and citizens of a foreign state.

Venue in this judicial district is uncontested and is appropriate pursuant to Section 27 of the Exchange Act, *15 U.S.C. § 78aa*, and *28 U.S.C. § 1391* [*3] *(b)*, because the transactions giving rise to this action occurred in substantial part in the District of Delaware, and Defendants conduct or transact business in the District of Delaware. In addition, venue is appropriate in this district under the terms of the Stockholder Agreement dated May 7, 1998, between and among, Daimler-Benz, Chrysler and Tracinda, which provides that the parties consent "to the personal jurisdiction of any federal court located in the State of Delaware or any Delaware state court in the event any dispute arises out of or relates to this Agreement or any of the transactions contemplated by this Agreement." DX 108 at 5-6. The Stockholder Agreement also provides that the Agreement "shall be governed by and construed in accordance with the laws of the State of Delaware without regard to the principles of conflicts of law thereof." Id. at 6.

**PROCEDURAL BACKGROUND**

Tracinda filed its Complaint in this action on November 27, 2000, alleging claims for violations of *Sections 10(b)*, *14(a)* and *20(a)* of the Securities Exchange Act of 1934 (the "Exchange Act") and *Rules 10b-5* and *14a-9* of the rules promulgated thereunder, *Sections 11*, *12(a)(2)* and *15* of the Securities [*4] Act of 1933 (the "Securities Act") and claims for common law fraud and conspiracy. In addition to naming Defendants, Tracinda also sued Hilmar Kopper.

Separate motions to dismiss were filed by Defendants and Hilmar Kopper. The Court granted Defendants' motions on Tracinda's claim for civil conspiracy, but denied the motions, as they applied to Tracinda, in all other respects. *Tracinda Corporation v. DaimlerChrysler AG, 197 F. Supp. 2d 42 (D. Del. 2002)* ("Tracinda"). By separate Memorandum Opinion and Order, the Court denied Defendant Kopper's motion to dismiss for lack of personal jurisdiction with leave to renew. n1 *In re DaimlerChrysler AG Securities Litigation, 197 F. Supp. 2d 86 (D. Del. 2002)* ("In re DaimlerChrysler I"). After the parties engaged in discovery, Defendant Kopper renewed his motion to dismiss for lack of personal jurisdiction. Defendants and Hilmar Kopper also separately moved for summary judgment. The Court granted Defendant Kopper's motion to dismiss for lack of personal jurisdiction, *In re DaimlerChrysler AG Securities Litigation, 247 F. Supp. 2d 579 (D. Del. 2003)* ("In re DaimlerChrysler II"), and [*5] denied Defendants' Motions for Summary Judgment issuing two opinions, one on the question of whether the claims against Defendants were time-barred under the applicable statute of limitations and one on the remaining issues raised by Defendants. *In re DaimlerChrysler AG Sec. Litig., 269 F. Supp. 2d 508 (D. Del. 2003)* (discussing statute of limitations issue) ("In re DaimlerChrysler III"); *In re DaimlerChrysler AG Sec. Litig., 294 F. Supp. 2d 616 (D. Del. 2003)* ("In re DaimlerChrysler IV").

> n1 In both *Tracinda, 197 F. Supp. 2d 42*, and *In re DaimlerChrysler I, 197 F. Supp. 2d 86*, the Court made other rulings with regard to the Class Plaintiffs which are not relevant here, and therefore the Court will not reiterate those rulings. The Court also notes that Class Plaintiffs have since settled with Defendants.

Shortly before trial, Tracinda voluntarily dismissed its claims under *Sections 11*, *12* and *15* of the Securities Act, leaving for trial the common [*6] law fraud claim and the claims under the Exchange Act. Trial commenced on December 1, 2003, but was recessed due to a discovery production issue that arose near the end of the trial. Trial was completed in February 2004, and post-trial briefing was completed in May 2004. n2

> n2 The post-trial briefing was completed on May 24, 2004, and electronic formats were submitted as of June 30, 2004. Additionally, on August 3, 2004, Tracinda supplemented its submissions with materials previously omitted from its earlier filings. In sum, the record closed and was submitted for decision as of August 3, 2004.

**FINDINGS OF FACT**

The Court makes the following findings with regard to the factual background related to this action. The Court makes additional findings where necessary in the context of its legal analysis under the heading "Conclusions of Law."

**I. The Parties**

A. Tracinda Corporation

Tracinda is a holding company incorporated in Nevada with its principal place of business located in Beverly Hills, [*7] California. Tracinda is primarily engaged in the business of investing in other companies, particularly companies listed on the New York Stock

Case 1:04-cv-00331-JJF  Document 57-5  Filed 05/02/2005  Page 4 of 20

Page 3
2005 U.S. Dist. LEXIS 5830, *

Exchange. Kerkorian Tr. Vol. B. at 270:12-271:1; Mandekic Tr. Vol. A. 114:17-19. Kirk Kerkorian is the Chairman, Chief Executive Office and sole shareholder of Tracinda. Joint Pretrial Order, Ex. 1 at P 1; DX 1 at P 11. As of May 6, 1998, Tracinda was Chrysler's largest stockholder. Joint Pretrial Order, Ex. 1 at P 1. Based on its line of business and its experience, Tracinda is properly considered a sophisticated investor. *In re DaimlerChrysler AG IV, 294 F. Supp. 2d at 625.*

B. DaimlerChrysler AG

DaimlerChrysler AG ("DaimlerChrysler") was formed in 1998, as a result of the merger between Daimler-Benz and Chrysler (the "Merger"). DaimlerChrysler is a stock corporation organized under the laws of the Federal Republic of Germany. Joint Pretrial Order, Ex. 1 at P 2. Currently, DaimlerChrysler ordinary shares trade on the New York Stock Exchange under the trading symbol "DCX." Id. DaimlerChrysler shares are also traded on other domestic and foreign stock exchanges. Id. Since its formation and continuing to date, DaimlerChrysler [*8] has had two headquarters, one in Auburn Hills, Michigan and one in Stuttgart, Germany.

C. Daimler-Benz AG

Prior to the Merger, Daimler-Benz was a stock corporation organized and existing under the laws of the Federal Republic of Germany, with its principal place of business in Stuttgart, Germany, Id. at P 3. Until November 17, 1998, Daimler-Benz was the issuer of American Depository Shares trading on the New York Stock exchange under the trading symbol "DAI." Daimler-Benz also traded ordinary shares on the Frankfurt Stock Exchange. Id.

D. Chrysler Corporation

Prior to the Merger, Chrysler was a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Auburn Hills, Michigan. Until November 12, 1998, Chrysler common stock traded on the New York Stock Exchange under the trading symbol "C." Id. at P 4.

E. Jurgen Schrempp

Jurgen Schrempp is a citizen of the Federal Republic of Germany. Since November 1998, Schrempp has been a Chairman of the DaimlerChrysler Board of Management. Prior to that time, Schrempp served as Chairman of the Daimler-Benz Board of Management. Id. at P 5. Schrempp does [*9] not serve and has never served on the Supervisory Board of either DaimlerChrysler or Daimler-Benz.

F. Manfred Gentz

Manfred Gentz is a citizen of the Federal Republic of Germany. Since November 1998, Gentz has been a member of DaimlerChrysler's Management Board. In this capacity, Gentz is responsible for Finance and Controlling. Prior to the Merger, Gentz served in a similar position and capacity on Daimler-Benz's Board of Management. Id. at P 6. Gentz does not serve and has never served on the Supervisory Boards of either Daimler-Benz or DaimlerChrysler.

II. Tracinda's Historical Relationship With Chrysler

Tracinda's interest in Chrysler began when Kerkorian met Lee Iacocca, who was then Chairman of Chrysler, in 1990. Kerkorian Tr. Vol. B. 280:6-12, 314:13-21; DX 24 at 13. Shortly thereafter, Tracinda started investing in Chrysler, acquiring approximately 9.9% of Chrysler's outstanding stock in 1990. Kerkorian Tr. Vol. B. 281:15-17, DX 24 at 12. Two years later, Kerkorian sought representation for Tracinda on the Chrysler Board, and threatened a proxy fight to obtain such representation. DX 24 at 13-14; Kerkorian Tr. Vol. B. 315:8-318:1. In response, Iacocca, [*10] his designated successor Robert Eaton and the Chairman of the Nominating Committee of Chrysler's Board of Directors met with Kerkorian. As a result of these discussions, Kerkorian withdrew his request for board representation. DX 24 at 14.

During the next year and a half, Tracinda sought a possible stock split and dividend increase for Chrysler shareholders. To achieve these goals, Tracinda had several discussions with Chrysler, and Kerkorian met with Eaton personally to press for a stock repurchase program. DX 24 at 14; Kerkorian Tr. Vol. B. 319:5-320:5; DX 24 at 14. When Chrysler resisted Tracinda's proposals, Kerkorian issued an ultimatum stating: "If, by December 15, the Board has not taken action to redeem the poison pill and to initiate a stock buyback, a stock split and a dividend increase as proposed in this letter, I intend to take all appropriate legal steps to pursue these proposals, including legal action to invalidate the poison pill." DX 24 at 15-16; Kerkorian Tr. Vol. B. 322:2-19, 323:21-324:18. On December 1, 1994, Chrysler took the action requested by Kerkorian and announced a $ 1 billion share repurchase program and a common stock dividend increase of 60%.

Less [*11] than five months later, Kerkorian, assisted by former Chrysler Chairman Iacocca, launched a campaign to acquire all of the outstanding common stock of Chrysler for $ 55 per share in cash. DXs 96, 123, Kerkorian Tr. Vol. B. 330:3-13. Prior to making a public announcement of its buyout proposal, Tracinda had numerous meetings with Chrysler executives, including Eaton. DX 640, Kerkorian Tr. Vol. B. 345:4-6. The night before Tracinda publicly announced its tender

Case 1:04-cv-00331-JJF    Document 57-5    Filed 05/02/2005    Page 5 of 20

Page 4
2005 U.S. Dist. LEXIS 5830, *

offer, Kerkorian spoke with Eaton by phone. As a result of their conversation, Kerkorian believed that the Chrysler management would not oppose his buyout proposal. Mandekic Tr. Vol. A. 141:3-7; Kerkorian Tr. Vol. B 283:3-9, 345:4-22; 141:6-7. To Kerkorian's surprise, Chrysler publicly rejected the buyout proposal the same day it was announced. DX 22, Mandekic Tr. Vol. A 141:1-7, 19-23. Although Kerkorian relied on what he understood to be Eaton's oral assurance that he would not oppose the buyout, Kerkorian came to wish that he had obtained Eaton's assurance in writing. Kerkorian Tr. Vol. B. 345:25-346:13; Mandekic Tr. Vol. A. 143:15-20. After Chrysler rejected the buyout proposal, Tracinda sought to hire Chrysler's former Chief [*12] Financial Officer, Jerome York. DX 25, Kerkorian Tr. Vol. B. 348:23-25. On May 31, 1995, Tracinda abandoned its proposed buyout, because it failed to secure sufficient financing for its offer. Kerkorian Tr. Vol. B. 285:12-21, 362:11-15; DX 24 at 26.

After abandoning its buyout proposal, Tracinda continued to acquire Chrysler shares. Approximately one month later, on June 27, 1995, Tracinda commenced a tender offer to purchase 14,000,000 common shares of Chrysler stock for $ 50 per share in cash. DX 24. As part of its tender offer, Tracinda disclosed the possibility that it would replace the existing Board of Directors and name a new chairman. DX 24 at 27.

On September 1, 1995, York agreed to become Vice-Chairman of Tracinda. DX 25, 638, 639. During the negotiations leading to York's hiring, Kerkorian discussed with York the possibility that he might replace Eaton as Chairman of Chrysler. Kerkorian Dep. 126:10-12, 19-20; DX 24 at 27. York was hired by Tracinda because of his knowledge of Chrysler and for the experience he brought as former CFO of Chrysler and IBM. Kerkorian Tr. Vol. B. 369:16-370:13, 370:19-24, 373:12-18; Mandekic Tr. Vol. A. 153:9-154:4. As compensation for the services [*13] he was to provide to Tracinda, York received an approximately $ 26 million signing bonus, a salary of $ 1 million per year and a 6% share of any increases in the value of the Chrysler stock held by Tracinda. According to Tracinda, the estimated value of York's contract was almost $ 43 million, not including the $ 26 million signing bonus. DX 723, Mandekic Tr. Vol. A. 152:18-23. Although York is represented by Tracinda's attorneys, Tracinda did not produce York as a witness at trial.

In connection with its efforts to obtain additional share buy-backs and dividends, Tracinda also engaged in a media campaign which included criticism of Chrysler's management. Kerkorian Dep. 143:5-144:6; Kerkorian Tr. Vol. B. 382:2-12. To assist in its media efforts, Tracinda retained the public relations firm of Sard Verbinnen & Co. and allowed York to "lead the charge" against Chrysler. Kerkorian Tr. Vol. B. 390:24-391:9; DX 234; Aljian Dep. 59:10-19. Reporting on Tracinda's media campaign, an article in the October 16, 1995 edition of Business Week stated:

> As Kerkorian presses his campaign for control of Chrysler, he and his aides are making Eaton and his track record, management style, [*14] and strategic vision the central issue. In conversations with reporters and with the powerful institutional investors who will ultimately decide the battle's outcome, they are tarring Eaton as a man more lucky than smart.

DX 235; see also Kerkorian Tr. Vol. B. 395:15-397:7. Kerkorian characterized Tracinda's media comments with regard to Eaton and Chrysler's management as "trash talk," which did not reflect his personal feelings. Kerkorian Dep. 144:18-25; Kerkorian Tr. 287:2-12. By October 1995, Tracinda had acquired approximately 13% of Chrysler's common stock and pressed Chrysler to appoint York to its Board of Directors. DX 26. Two months later, on December 28, 1995, Tracinda filed a Proxy Statement with the SEC in connection with a possible insurgent proxy solicitation at Chrysler's annual meeting in 1996. DX 698.

On February 8, 1996, Kerkorian, Tracinda and Chrysler executed a series of agreements to settle the issues that had arisen among them. One of these agreements included the Standstill Agreement by which Chrysler agreed to nominate a Tracinda representative to its Board in exchange for Tracinda agreeing to maintain its level of ownership of Chrysler stock below [*15] 13.5%. DX 30; DX 28 at Ex. 1. In addition, Chrysler agreed to initiate stock buy-backs totaling over $ 2 billion in 1996 and $ 1 billion in 1997. DX 29, Kerkorian Tr. Vol. B. 385:2-14, 398:20-25. The Standstill Agreement also bound Tracinda to vote its Chrysler shares on all matters, including proposed mergers, in the same proportion as all other Chrysler shareholders. DX 30 at 5.

Consistent with the terms of the Standstill Agreement, Tracinda's designee, James Aljian, was elected to the Chrysler Board of Directors. Using confidential information obtained from his Board position that was not available to other shareholders, Aljian reported to Kerkorian and York about the goings on at Chrysler. Kerkorian Tr. Vol. B. 399:1-400:3; Kerkorian Dep. 173:2-8, 334:23-335:2; York Dep. 86:16-87:2, 103:12-18, 166:10-22, 240:4-8, 259:25-260:11; Aljian Dep. 31:9-17, 149:12-151:3, 212:8-214:2, 225:5-15, 293:10-300:13. As Kerkorian put it, "with

Aljian on the board, it's like Tracinda being on the board, as far as getting information." Kerkorian Dep. 173:6-8; Kerkorian Tr. Vol. B. 399:23-400:3. Indeed, Kerkorian expected Aljian to inform him of anything that was important at Chrysler, and according [*16] to Kerkorian, Aljian knew what Kerkorian considered to be important. Kerkorian Tr. Vol. B. 400:4-18; Kerkorian Dep. 335:3-5.

Using confidential information obtained from Aljian, York wrote a memorandum to Kerkorian in May 1997 which criticized Chrysler's spending and its management. Commenting on Chrysler's expenditures, York wrote that Chrysler's spending levels were "truly astronomical," and that its spending plans were a "dangerous way to run things." DX 31 at 2-3. As for Chrysler's management, York wrote that the data from Chrysler's board presentations was "flawed," and that "it is a dumb way to prepare a Business Plan." Id. (emphasis in original)

About a month after receiving York's memo, Tracinda began discussing the potential reduction of its investment in Chrysler. In a memo dated June 20, 1997, York noted that Kerkorian asked him to explore this possibility "three weeks ago." York advised Kerkorian that "large blocks of stock generally sell at a discount to market," DX 32 at 2, and Kerkorian understood that the sale of a large block of stock could adversely affect Chrysler's stock price. Kerkorian Dep. 185:7-10. With respect to the issue of providing a rationale [*17] for the sale, York wrote:

> In the case of Tracinda, I believe the only explanation that would stand a decent chance of not creating uncertainty in the market would be a statement to the effect that Tracinda is planning to expand its investment in the entertainment sector, and is selling Chrysler to generate liquidity in preparation for such an investment.

DX 32 at 1. Ultimately, Kerkorian decided not to sell a large block of Chrysler shares on the open market. Kerkorian Dep. 180:11-19. In fact, from the time it entered the Standstill Agreement until the Merger, Tracinda sold its Chrysler shares (1) when it was notified by its General Counsel, William O'Brien that the sale was necessary to keep Tracinda in compliance with the Standstill Agreement, PX 174, PX 237, PX 258, PX 950, Kerkorian Tr. Vol. B. 289:6-17, and (2) to reduce its holdings to below 5% prior to the closing of the Merger in order to avoid significant tax consequences. Mandekic Tr. Vol. A. 125:8-126:6.h

**III. Merger Discussions**

A. Tracinda's Views On A Business Combination For Chrysler

In addition to the aforementioned discussions concerning its investment in Chrysler, Tracinda also explored [*18] the possibility of finding a merger partner or acquiror for Chrysler. To this end, York testified that he had a "long standing" view that there had to be a consolidation in the automotive industry. York Dep. 135:14-25, 139:2-14. York prepared several analyses of candidates that might merge with or acquire Chrysler. However, Tracinda only produced one of these analyses in discovery, and York could not account for the other analyses he prepared. York Dep. 135:3-9, 142:2-22. In the one analysis produced, Tracinda concluded that a business combination between Chrysler and Daimler-Benz was "attractive" and that Daimler-Benz was the "best fit" to combine with Chrysler. Kerkorian Tr. Vol. B. 414:23-415:1; York Dep. 146:7-154:18, DX 33.

From the outset, Kerkorian was enthused about the possibility of a combination between Daimler-Benz and Chrysler, because Daimler-Benz was a world-wide company and the potential synergies could result in a combination where "two and two make five." Kerkorian Tr. Vol. B 417:21-418:2, 419:3-10; Kerkorian Dep. 194:18-195:4. Kerkorian approached Eaton to share his thoughts about a potential business combination between Daimler-Benz and Chrysler. At the time, Kerkorian [*19] had no idea whether the transaction should be a merger or an acquisition. Kerkorian Tr. Vol. B. 420:10-15, Kerkorian Dep. 192;10-194:4, 196:7-197:2. Upon raising the issue with Eaton, Kerkorian learned that Eaton had already spoken with Schrempp, Chairman of Daimler-Benz's Management Board, about a potential transaction between the companies. Kerkorian Dep. 196:13-16, 196:23-197:2. When Kerkorian returned to Tracinda, he instructed York and Aljian to "stay close" to the potential Chrysler Daimler-Benz combination. As a result, York began preparing further studies of a potential transaction. DXs 34-38.

As a member of the Chrysler Board of Directors, Aljian was briefed on the discussions between Schrempp and Eaton on February 5, 1998. DX 20 at 50. Like Kerkorian, Aljian was an enthusiastic supporter of the Merger, and Aljian kept Tracinda apprised of developments regarding the Merger. DX 42; Wilson Tr. Vol. H. 1714:20-1715:2; York Dep. 166:10-22.

Continuing his analysis of the combined value of Chrysler and Daimler-Benz, York prepared a memo on February 16, 1998. In that memo, York wrote, "the valuation potential [of a Chrysler Daimler-Benz combination] is so great that nothing should [*20] stand in the way of a complete board evaluation of this

Case 1:04-cv-00331-JJF    Document 57-5    Filed 05/02/2005    Page 7 of 20

Page 6
2005 U.S. Dist. LEXIS 5830, *

possible combination." York also wrote that "the key issue" to obtaining this value was the "P/E multiple of [the] combined entity." DX 34 at Y 58 (emphasis in original); York Dep. 173:2-9, 176:16-177:8. York advised Kerkorian that such a combination could result in immediate gains for Chrysler in the range of $ 646 million to $ 2.668 billion, depending on where the merged company's initial P/E ratio fell in a range between 12 and 18 billion, with an ultimate gain between $ 1.8 and $ 4.4 billion. At the time York wrote his memo, he had no information about the nature or structure of the transaction being considered. In fact, York's analysis assumed that the transaction would be in the nature of a purchase, which would be the case in an acquisition. DX 34 at Y 58.

Before any detailed proposals for the Merger were presented to the Chrysler Board, York prepared a memo on March 4, 1998, to Kerkorian and Aljian describing: (1) "the key points supporting the rationale for a merger," (2) "the strategic aspects concerning the combination," and (3) "the relevant numbers." DX 35 at cover page (T008812). Discussing the current posture [*21] of Chrysler, York first observed that there was "nothing to propel Chrysler stand-alone to higher level." York then summarized the problems and risks Chrysler faced:

> No opportunity for substantial cost reductions.
> No new minivan to invent.
> No new Jeep to purchase.
> No new pick-up opportunity.
>
> Auto industry cycle now mature.
> Incentive costs spiraling upward.
> Chrysler earnings under pressure.
> Chrysler international sales shrinking, not expanding.
>
> Institutional disinvesting in Chrysler on a net basis. Any economic or market decline likely to be worse for Chrysler:
> > Cyclical stock.
> > Risk to share repurchase.
> > Regional producer.
>
> Regulatory risks are huge for Chrysler:
> > Higher fuel economy for Jeeps, minivans, and pick-ups.
> > Safety standard for Jeeps, minivans, and pick-ups.

DX 35 at 1 (T00813). In conclusion, York stated, the "situation is compelling to do the merger," and "now is the time to do it, before the Chrysler-specific risks materialize." Id. (emphasis in original). In this regard, York testified, that the idea was to "sell the home before the termites attack the floor beams." York Dep. 193:9-14. York also wrote that "no conceivable [*22] Chrysler standalone plan can achieve the value of the synergies of a merger." DX 35 at 1 (T8813). During his deposition testimony, Aljian described this memo as "showing the basis of the benefit of the merger." Aljian Dep. 201:11-13. York also stated that the memo included all the reasons he could think of as to why the Merger could produce "huge value" for the shareholders. York Dep. 190:6-17. York also testified that he solicited advice from a friend at Deloitte & Touche during this time frame concerning the feasibility of a German company acquiring a United States corporation in a tax-free transaction. DX 104; York Dep. 200:4-18.

Two days later, York prepared another memo dated March 6, 1998, in response to Kerkorian's question about whether Eaton had enough incentives to make sure he accomplished the transaction with Daimler-Benz. York Dep. 197:20-199:7, DX 36. In his memo, York reported to Kerkorian that Eaton would receive "north of 110 million -- or a lot of incentive for him to get the deal done." DX 36; Kerkorian Tr. Vol. B. 444:21-445:7. As a director of Chrysler, Aljian was aware of Eaton's stake in the transaction, as well as the stakes of other members in senior management, [*23] and these interests were disclosed publicly to the Chrysler shareholders prior to their vote on the Merger. DX 20 at 68.

One week before Chrysler's Board of Directors approved the Merger, York created a three-page document entitled "Cleveland/Denver Key Issues." This document was dated April 30, 1998, and reflected the views of York, Aljian and Richard Sobelle, Tracinda's in-house general counsel, regarding the Merger. During his deposition testimony and on cross-examination at trial, Kerkorian stated that he could not recall any other merger-related issues that were important to him, other than the issues laid out in this memo. Kerkorian Dep. 233:21-235:21, Kerkorian Tr. Vol. C. 629:8-630:3. Specifically, those issues were (1) that Tracinda would have to sell shares down to a certain percentage, (2) the transaction would be tax-free, (3) the timing of the transaction, and (4) the price. Kerkorian Dep. 234:18-235:21.

As for governance structure, Kerkorian supported the Merger before he had any discussions with anyone about corporate governance. Kerkorian never expressed any interest in the composition of the DaimlerChrysler Management Board to Eaton, and none of Tracinda's analyses [*24] discuss the desire or need to preserve Chrysler's existing management. At his deposition, Kerkorian testified that he would not have been concerned if Schrempp named a management team for

the new company that left control firmly in the hands of the former Daimler executives. Kerkorian Dep. 349:18-22. York also testified at his deposition that he believed that the "high level strategic benefits to the shareholders" were more important to investors than the "internal plumbing and nuts and bolts" of who was on the company's new boards. York Dep. 269:12-24.

In a memo prepared by Aljian to Kerkorian referred to by Aljian as the "deal memo," Aljian noted that the Merger was to be a "merger of equals." Aljian also noted that the Supervisory Board of the new company would be "all outside directors -- 10 LABOR, 5C and 5D." DX 107 at T 1921. With respect to the Supervisory Board, Aljian stated, "They appoint management, set their composition, major transactions such as this deal and social issues." Id. Aljian and Kerkorian understood that the Supervisory Board was to be "the principal board" at DaimlerChrysler. Aljian Dep. 254:10-11, Kerkorian Dep. 49:25-50:5. Aljian also noted in his memo [*25] that an "Integration Board" is the board that would "act as an American board would perform but in an advisory way." DX 107 at T 001921. Aljian noted that this was the board that he was committed to be on. During his deposition testimony, Aljian said that he believed Tracinda was entitled to representation on the principal board of the Company, that being the Supervisory Board. Aljian also testified that he felt that it was an affront to a major shareholder that he was placed on the Integration Board, rather than the Supervisory Board. Aljian Dep. 253:11-13, 254:8-19.

By May 1998, Chrysler's Board, including Aljian, had met at least seven times to discuss the progress of the Merger negotiations. The Board received advice from its financial advisors, and its German and American attorneys. The Board also gave input regarding the further conduct of the negotiations. DX 20 at 47-49, Wilson Tr. Vol. H. 1711:5-1712:22, Lanigan Tr. Vol. I 2003:11-23, Schrempp Vol. K 2182:11-14, Valade Tr. Vol. L 2380:17-2381:12. Aljian was an active participant at these meetings and updated York whenever he got new information. York Dep. 166:10-22. As Tracinda stated in its press release materials, "We have [*26] been kept informed of the status [of the merger negotiations] by virtue of our board representation since February, and provided periodic input, including indicating our strong support." DX 42.

B. Kerkorian's Discussions With Eaton Concerning The Merger

During this time frame, Kerkorian also discussed the Merger with Eaton, but their discussions were on a general level. Kerkorian understood that the details about the Merger would eventually be incorporated into the Business Combination Agreement ("BCA") and that a detailed proposal for effectuating the merger of equals would be presented to the Chrysler Board in early May 1998. DX 1 at P 19, Kerkorian Tr. Vol. C. 647:24-648:4, 649:1-11. As for his conversations with Eaton, Kerkorian could not remember how many conversations he had with him prior to the Merger announcement, and couldn't recall any specifics of conversations he had with Eaton after his initial conversation with Eaton during which he raised the idea of a transaction between Daimler-Benz and Chrysler. Kerkorian Dep. 205:6-16, 218:21-25, 219:7-9. Kerkorian acknowledged that he and Eaton "didn't get into [the manner in which the Merger would be implemented] much. [*27] " Kerkorian Dep. 225:9-11. Eaton also testified that his conversations with Kerkorian were "reasonably general" and not on a very "deep level." Eaton Tr. Vol. D. 762:11-23. Eaton did not discuss with Kerkorian the different boards for a German company and how they worked. Kerkorian Tr. Vol. B. 294:21-24. Although Eaton advised Kerkorian that he intended to retire after three years of serving as co-chairman with Schrempp, Eaton did not represent that Daimler-Chrysler would name a replacement co-chairman after he left, and Eaton did not indicate that Holden would assume a co-chairmanship position. PX 538, Eaton Tr. Vol. D 859:7-860:4, Stallkamp Vol. 1 1981:19-24. During his deposition testimony, York stated that he understood that Schrempp would be the sole Chairman of DaimlerChrysler's Management Board once Eaton retired. York Dep. 251:22-24. York also stated that he "had long felt . . . that co-CEO arrangements in general don't tend to work out very well." York Dep. 253:17-25. None of what Eaton said to Kerkorian was said at the direction of Schrempp or anyone else at Daimler-Benz, and Eaton did not report to Schrempp the details of any conversations he had with Kerkorian. Eaton Tr. [*28] Vol. D. 861:5-11, Eaton Dep. 91:5-16; Schrempp. Dep. 237:9-240:24.

C. Tracinda Enters Into The Stockholder Agreement

Simultaneously with the execution of the BCA and well-before Chrysler issued the Proxy/Prospectus, Tracinda, Kerkorian, Chrysler and Daimler-Benz entered into the Stockholder Agreement on May 6, 1998, which obligated Tracinda to vote its shares in favor of the Merger. DX 108, DX 43 at T 248-249, § 1.1, Kerkorian Tr. Vol. B 298:8-10. Daimler-Benz's largest shareholder, Duetsche Bank, entered into a similar agreement to support the Merger. Eaton Tr. Vol. D. 881:23-882:7, Schrempp Tr. Vol. G. 1487:4-17. The Stockholder Agreement was negotiated at arm's length, and Tracinda was advised by its in-house counsel and by the law firm of Fried, Frank, Harris, Shriver & Jacobson. Aljian Dep. 245:18-247:9, York Dep. 223:19-224:18, 237:24, 238:4. Tracinda's lawyers and officers reviewed the BCA before signing the Stockholder Agreement to make sure that it

Case 1:04-cv-00331-JJF   Document 57-5   Filed 05/02/2005   Page 9 of 20

Page 8
2005 U.S. Dist. LEXIS 5830, *

reflected everything Tracinda wanted and expected from the Merger, and Tracinda's attorneys advised Kerkorian that the BCA was consistent with what Kerkorian told them he expected. Kerkorian Tr. C. 649:1-11, 652:10-15; Mandekic [*29] Tr. Vol. A. 120:15-121:1, 124:14-23, 160:9-29, 165:7-18; Aljian Dep. 245:18-246, DX 39.

Daimler-Benz wanted Tracinda's commitment to the Merger through the Stockholder Agreement; however, the Stockholder Agreement was not a prerequisite to the Chrysler Board's approval of the transaction. While Eaton and the Chrysler Board wanted Tracinda's approval, they did not tell Kerkorian that his approval was a prerequisite to the Board's approval of the Transaction, Eaton Tr. Vol. D. 765:8-10, 860:19-25; Wilson Tr. Vol. H. 1717:4-20, and members of the Chrysler Board of Directors testified that they would have approved the Merger even if Tracinda had not supported it. PX 967 at P 5, PX 968 at P 9, Wilson Vol. H. 1716:23-1717:3, Lanigan Tr. Vol. I. 2060:16-2061:16. Without the execution of the Stockholder Agreement, Tracinda would have been bound by the Standstill Agreement to vote its shares in the same proportion as that of other Chrysler shareholders. DX 30 at 5.

Substantively, the Stockholder Agreement did not use the term "merger of equals" and contained no representations concerning corporate governance. DX 43 at T 248-252, Kerkorian Dep. 260:2-261:3. However, the Stockholder Agreement [*30] did refer to the BCA. In addition, the Stockholder Agreement and the BCA both contained integration clauses indicating that the written agreements superseded all oral or other written understandings between the parties. DX 43 at T250, § 4.3, DX 20 at A-42, § 4.3. During his deposition, Kerkorian testified that he executed the Stockholder Agreement, because he believed the BCA fully reflected and effectuated the merger of equals. Kerkorian Dep. 226:2-12.

D. Daimler-Benz's Preliminary Views Regarding A Business Combination

At nearly the same time that Tracinda was analyzing the possibility of a merger partner or acquiror for Chrysler, Daimler-Benz was also analyzing the possibility of partnering with another company. Daimler-Benz rejected potential partnerships with General Motors, Ford and Toyota, because it was concerned that Daimler-Benz would take a junior partner role in such a combination. Schrempp Tr. Vol. H. 1574:12-21, 1575:9-11, 1575:21-25. Daimler-Benz considered a possible combination with Chrysler, because Chrysler had a good market position with strong earnings that would permit comprehensive global business expansion, while maintaining the brand identity of Mercedes-Benz. [*31] Schrempp Tr. Vol. H. 1575:12-10, 1576:1-8.

In August or September 1995, Schrempp and Eckhard Cordes, then head of strategic planning at Daimler-Benz, commissioned Alexander Dibelius of Goldman, Sachs & Co. oHG ("Goldman Sachs") to analyze a combination with Chrysler. PX 544 at P 2; Dibelius Dep. 29:3-21, 130:7-23. Goldman Sachs' 1995 study was code named "Project Blitz" and considered, among other things, a potential acquisition of Chrysler. PX 544 at 3-4.

During this time, Daimler-Benz was structured as a holding Company. Schrempp was Chairman of that holding company, and Mercedes-Benz was an AG with its own Management Board. The head of the Management Board of Mercedes-Benz AG contacted Chrysler about the possibility of a combination, but the idea was eventually abandoned as too complex. Schrempp Tr. Vol. F. 1223:12-1224:18

Defendants also consulted with others concerning the possibility of acquiring Chrysler. In the Spring of 1997, Defendants consulted with Ernst Stoeckl of TransAtlantic Consulting. The study prepared by TransAtlantic Consulting was code named "Project Dutch Boy" with Chrysler being referred to as "Christian" and Daimler-Benz being referred to as "Dutch Boys. [*32] " PX 27; PX 32; PX 34; Cordes Dep. 32:23-34:22. Daimler-Benz also spoke with Ruggero Maggnoni of Lehman Brothers about an acquisition of Chrysler. Schrempp Tr. Vol. G. 1482:10-20; Cordes Dep. 75:22-76:12; PX 37 at DCX 0183137. Project Blitz was also updated periodically, particularly after talks with Chrysler began. PX 45; PX 544 at P 8-9.

IV. The Daimler-Benz and Chrysler Negotiations

Discussions between Chrysler and Daimler-Benz began in the fall of 1997, at the Frankfurt Motor Show. At that time, Schrempp spoke to Bob Lutz, then president of Chrysler, about the possibility of Chrysler and Daimler-Benz talking again about a business combination. Schrempp Tr. Vol. F. 1233:19-1234:19. Lutz suggested that Schrempp speak with Eaton. Id. at 1234:20-22. Schrempp had his office arrange for a meeting with Eaton during the Detroit Motor Show. On January 12, 1998, Schrempp and Eaton met at Eaton's office in Auburn Hills. Schrempp Tr. Vol. F. 1237:2-7. The meeting was short and polite, and Schrempp discussed with Eaton his thoughts about the likelihood of a consolidation in the world-wide automotive industry. Joint Pretrial Order, Ex. 1 at P 7. Schrempp suggested that it might [*33] be beneficial if Daimler and Chrysler were to consider the possibility of a business combination. Id. At trial, Schrempp testified that he was

Case 1:04-cv-00331-JJF    Document 57-5    Filed 05/02/2005    Page 10 of 20

Page 9
2005 U.S. Dist. LEXIS 5830, *

personally against "unfriendly action" toward a company in terms of "attacking a company." Schrempp Tr. Vol. F. 1236:8-10. During the meeting, Eaton told Schrempp that Chrysler was also doing studies and watching the world-wide situation. Schrempp Tr. Vol. F. 1237:22-23. Eaton indicated that he needed some time to consider the idea and told Schrempp he would get back to him. Schrempp Tr. Vol. F. 1237:2-25. Eaton called Schrempp at the end of January of 1998 to further their discussions.

Schrempp and Eaton met again on February 12, 1998, in Geneva. Gary Valade, then CFO of Chrysler and Cordes who was responsible for Corporate planning and M&A at Daimler also attended the meeting. Schrempp Tr. Vol. F. 1238:10-14, Valade Tr. Vol. A. 176:19-177:1 (deposition excerpt); PX 277 at SC0000650. Valade's notes indicate that Schrempp said that "We only want to consider a true merger, one management, one team, one Board" and "One board--One Management is the key." PX 980 at DCX243217-243218; Schrempp Tr. Vol. K. 2129:10-25. According to Valade, the [*34] parties did not use the term "merger of equals," but the parties contemplated a significant role for both management teams in any combined entity. Valade Tr. Vol. A. 177:10-22 (deposition excerpt). Valade also testified that, in addition to "a significant or an appropriate role for [Chrysler's] management in the new company," Eaton was also interested in a premium for Chrysler shareholders. Id. at 177:10-13. The role of management was discussed at subsequent meetings, and eventually the term "merger of equals" was used to describe the transaction. See, e.g., PX 987 at 3; Valade Tr. Vol. L. 2557:1-2559:2; Schrempp Tr. Vol. K. 2186:3-2187:6. The parties' negotiations also included debate concerning the corporate form, i.e. whether the new company should be a German AG, a U.S. corporation or a third alternative. See, e.g., Schrempp Tr. Vol. K. 2138:24-2139:7, Vol. G. 1452:16-1453:2; Eaton Tr. Vol. D. 771:11-772:24; Wilson Tr. Vol. H. 1711:19-1712:3; Valade Tr. Vol. K. 2371:1-7. In addition, the parties discussed the exchange ratio for shareholders, and the compensation and stock options for Chrysler's management. See, e.g., Valade Tr. Vol. L. 2386:16-2397:16; PX 998 [*35] at DCX 243250-243251; Schrempp Tr. Vol. F. 1243:23-1244:22, 1246:19-1248:10, 1251:4-11; Cordes Dep. 142:4-143:22, 156:16-24; Eaton Dep. 69:3-70:21.

From January 1998 until May 7, 1998, when the BCA was signed, Chrysler and Daimler-Benz conducted extensive arm's length negotiations. Chrysler and Daimler-Benz were each assisted by their own independent lawyers, investment bankers and accountants. Eaton Tr. Vol. D. 771:19-772:1, Schrempp Vol. F. 1240:17-19, 1243:15-21, Vol. G. 1525:19-22, Wilson Tr. Vol. H. 1711:5-14, Lanigan Tr. Vol. I. 2003:11-22, Valade Tr. Vol. K. 2371:1-7. Gentz was not a participant in the Merger negotiations with Chrysler, Schrempp Tr. Vol. G. 1460:15-17, Gentz Tr. Vol. K. 2299:6-15 (deposition excerpt), and was not made aware of the negotiations until late April 1998. Cordes Dep. 172:23-173:6.

Both Chrysler and Daimler-Benz believed each was negotiating from a position of financial strength, and each made it a point to express this view in public interviews and meetings. Schrempp Tr. Vol. H. 1576:14-1577:7; Eaton Tr. Vol. D. 729:20-730:15; PX 157 at DCX 0157860, PX 177 at DCX 0001740, PX 316 at DCX 0036132-33. Schrempp and Eaton also believed, as York had independently [*36] concluded on behalf of Tracinda, that there was going to be a consolidation in the automotive industry leaving the strongest companies with the best chances for survival. Eaton Tr. Vol. D. 727:23-723:3; Schrempp Tr. Vol. H. 1573:6-16; Eaton Dep. 14:11-21.

**V. The Chrysler Board Approves The Merger**

As the merger negotiations between Chrysler and Daimler-Benz progressed, the Chrysler Board was regularly kept apprised. DX 20 at 47-49. Like Schrempp, Eaton and York, the Chrysler Board and other executives at Chrysler also believed that the automotive industry was moving toward a consolidation, Stallkamp Tr. Vol. I. 1987:13-15, 2001:1-10, 2075:20-2076:7, Wilson Dep. 13:16-14:21. Indeed, this commonly shared view eventually became one of the reasons Chrysler's directors recommended the transaction to Chrysler's shareholders. DX 20 at 50.

In addition to this factor, the Chrysler Board also considered other aspects of the Merger in making its decision, including but not limited to, the "merger of equals" structure and the value to their shareholders. Id. The Chrysler Board was advised by its outside attorneys, and was informed that as a result of the contemplated transaction [*37] "no one person or group of persons would control the combined company or be in a position by itself to block the sale of the combined company." DX 549 at T5846.

With respect to the value the Chrysler shareholders were to receive, the Chrysler Board received a fairness opinion by Credit Suisse First Boston ("CSFB"). CSFB analyzed the Merger as a strategic business combination not involving a sale or change in control and opined that the Merger was fair to Chrysler stockholders from a financial point of view. In making this determination, CSFB compared the Merger to sixteen announced or completed transactions which it viewed as comparable. PX 146 at T5845-5846, DX 20 at 57. For each precedent "merger of equals" transaction, CSFB listed one

Case 1:04-cv-00331-JJF   Document 57-5   Filed 05/02/2005   Page 11 of 20

Page 10
2005 U.S. Dist. LEXIS 5830, *

company as the "acquiror" and one company as the "target." DX 140 at DCX 26457. CSFB also noted that the distribution of seats on the combined company's boards was not always equal between the acquiror and the target. Id.

On May 6, 1998, the Chrysler Board of Directors unanimously approved the Merger and recommended that the Chrysler stockholders do the same. DX 550. Also on May 6, the Chrysler Board approved amending the employment agreements [*38] of Eaton, Valade and Stallkamp to add two events giving rise to "good reason" for those executives to terminate their employment. These additions were a breach or other failure of Daimler-Chrysler, Daimler-Benz, or Chrysler to perform any of the covenants or agreements set out in Article IV or VIII of the BCA or the May 7, 1998 letter agreement between Chrysler and Daimler-Benz with respect to corporate governance. PX 148 at T005857-58; PX 960.

Following the Chrysler Board's approval, Daimler-Benz, Chrysler and DaimlerChrysler signed the BCA which memorialized their agreements. DX 20 at 49. The BCA, dated May 7, 1998, was signed late in the evening of May 6, 1998, and filed with the SEC on May 8, 1998. Joint Pretrial Order, Ex. 1 at P 10. The BCA was later amended and restated as of July 31, 1998, and included in the Proxy/Prospectus filed with the SEC on August 6, 1998. Id.; DX 20 at 50, T 153.

In a televised trans-Atlantic press conference originating in London, Chrysler and Daimler-Benz formally announced the Merger on May 7, 1998. Joint Pretrial Order, Ex. 1 at P 11. During that press conference, Eaton publicly announced that he would retire before Schrempp. DXs 276, 280, [*39] 324. Also on May 7, 1998, Tracinda issued a press release announcing its support for the Merger. The Press Release said nothing about a "merger of equals" and it did not mention corporate governance or structure of the merged company. DX 47.

## VI. Shareholder Approval Is Sought; The Proxy/Prospectus

Following the Merger announcement, the Proxy/Prospectus was prepared and approved by Chrysler's directors. The Proxy/Prospectus was filed with the SEC on August 6, 1998, and mailed to Chrysler's shareholders with a cover letter from Eaton to seek their approval for the transactions contemplated by the BCA. DX 20; Joint Pretrial Order, Ex. 1 at P 13. The Proxy/Prospectus was also furnished to Daimler-Benz shareholders in the United States. DX 20 at 2 (T 000005), 8 (000017). The Proxy/Prospectus included four annexes: (1) the BCA, (2) the Opinion of CSFB, (3) an English translation of the opinion of Goldman, Sachs & Co. oHG, and (4) an English translation of the Articles of Association (Satzung) of DaimlerChrysler AG. Joint Pretrial Order, Ex. 1 at P 13, DX 20. In bold face type, the Proxy/Prospectus contained a clause disclaiming reliance on representations not contained in the [*40] Proxy/Prospectus Statement. DX 20 at 5 (bold type in original).

The Proxy/Prospectus described in detail the terms of the proposed transaction. It disclosed that upon consummation of the transaction, "Chrysler will become a wholly owned subsidiary of DaimlerChrysler AG and Daimler-Benz will be merged with and into DaimlerChrysler AG, with DaimlerChrysler AG remaining as the surviving entity." DX 20 at 11. The Proxy/Prospectus explained that DaimlerChrysler would have two "operational headquarters" one located in Auburn Hills, Michigan, and one in Stuttgart, Germany, and that the official language of DaimlerChrysler AG would be English. DX 20 at A-17, Schrempp Vol. F 1266:25-1267:9. The Proxy/Prospectus also disclosed that the merged entity would be formed under German law and governed by the laws of Germany. DX 20 at T 10, 139-151. To highlight the differences between a German AG and a United States corporation, the Proxy/Prospectus contained twelve pages detailing the differences between shareholder rights under Delaware law, which governed Chrysler, and shareholder rights under German law governing the new company. Id. at 130-141 (T139-150). The Proxy/Prospectus also disclosed [*41] that the parties considered three options for the place of incorporation of the merged entity, Germany, the United States, and Holland, but that Germany was eventually selected because of its tax advantages.

As for corporate governance, the Proxy/Prospectus reiterated the terms of the BCA, noting that the compositions for the Board were initial compositions which were to be recommended by Daimler-Benz and Chrysler and subject to the powers and rights of the DaimlerChrysler shareholders, Supervisory Board and Management Board. DX 20 at A-16. Specifically, the Proxy/Prospectus provided that Chrysler and Daimler-Benz would recommend that:

(1) for at least two years following consummation of the Merger, the current chairman of the Daimler-Benz Supervisory Board would continue as Chairman of the DaimlerChrysler Supervisory Board;

(2) upon consummation of the Merger, the DaimlerChrysler Supervisory Board would consist of twenty members with five shareholder representatives recommended by Daimler-Benz and five recommended by Chrysler along with ten labor representatives;

(3) upon consummation of the Merger, the "DaimlerChrysler Management Board shall initially consist of 18 members. [*42] In general, 50 percent of such members would be designated by Chrysler and 50 percent by Daimler-Benz, and there will be two additional members responsible for Daimler-Benz' non-automotive businesses." DX 20 at 16-17. In addition, the Proxy/Prospectus and the BCA disclosed the formation of the Integration Committee, which later became known as the Shareholder Committee. DX 20 at A-17, Schrempp Tr. 1402:8-18, Wilson Tr. 1700:8-11, 1700:16-19. The Integration Committee was described as having a "consultative function" and would consist of the Co-Chairmen, and 12 or more members (including the co-chairmen), "50% of which shall be designated by Chrysler and 50% of which shall be designated by Daimler-Benz." DX 20 at A-17. The Proxy/Prospectus also reiterated Eaton's previous public announcement that he intended to retire from his position as Co-CEO and Co-Chairman of DaimlerChrysler after three years. In a standalone paragraph under the heading "Governance of DaimlerChrysler AG Following the Chrysler Merger," the Proxy/Prospectus disclosed that the BCA "contains no provision that would bar governance changes after the [DaimlerChrysler] Transactions have been consummated." DX 20 at 16-17. [*43]

With respect to the term "merger of equals," the Proxy/Prospectus uses the term at least 13 times, but it is not expressly defined. The term "merger of equals" is first used as a broad description of the characteristics of the combination of the various constituencies of Daimler-Benz and Chrysler. This use of the term "merger of equals" is exemplified in Eaton's cover letter, which refers to "two companies of equal financial strength under joint leadership of both management groups with its common equity about evenly split between the two shareholder groups." DX 20 at T 1. The term "merger of equals" is next used to refer to the specific governance structure for DaimlerChrysler following the Merger. When used in this manner, the term "merger of equals" refers to that which is provided for in the BCA. Id. at 16, 51. This usage of the term appears for the first time under the caption "Governance of DaimlerChrysler AG Following The Chrysler Merger." As used here, the Proxy/Prospectus states that the governance structure "reflect[s] that the Transactions contemplate a 'merger of equals.'" Id. at 16; see also id. at 93. The next sentence elaborates on the referenced "merger [*44] of equals" by reciting almost verbatim the provisions of the BCA. Id. at 16-17; see also id. at 93-94. This description is followed by the cautionary language that the BCA does not bar governance changes after the Transactions. Id. at 17.

The term "merger of equals" is also used in the context of the CSFB fairness opinion. In this regard, the term is used not only to refer to the Transactions contemplated by the BCA, but also to refer to "a strategic business combination not involving a sale of control" which includes precedent "merger of equals" transactions some of which involved equal representation from the constituent companies in the combined company's post-merger governance, and some of which did not. Id. at 57.

After reviewing the draft Proxy/Prospectus, the SEC sought clarification of the meaning of the term "merger of equals." PX 227 at DCX 76402. In response, outside counsel for Chrysler and Daimler-Benz referred the SEC to the second paragraph in Eaton's cover letter to the Chrysler shareholders. PX 243 at T2454.

The Proxy/Prospectus also disclosed numerous risks related to the Merger, including "the difficulties inherent in integrating two large enterprises [*45] with geographically dispersed operations, incorporated in different countries." DX 20 at 52, 24. The Proxy/Prospectus pointed out that in these circumstances, "there can be no assurance that this integration, and the synergies expected from that integration, will be achieved as rapidly or to the extent currently anticipated." Id. at 24.

The Proxy/Prospectus and the BCA also disclosed the interests of Chrysler executives in the Transactions. These interests included the right to receive substantial sums of DaimlerChrysler stock upon closing worth millions of dollars and substantial cash payments. PX 277 at SC 0000671. The BCA also disclosed that "if the employment of Chrysler's executive officers were terminated within two years after the Chrysler Merger, such persons would receive an estimated lump sum severance payment in the amount of $ 24,435,997 for Mr. Eaton, $ 5,487,445 for Mr. Stallkamp, [and] $ 4,601,383 for Mr. Valade . . . ." PX 277 at SC 0000672.

At his deposition, which he confirmed at trial, Kerkorian testified that he did not get into the specifics of the Proxy/Prospectus because he had already approved the Merger. Kerkorian Dep. 279:8-14, Kerkorian Tr. Vol. C. [*46] 663:4-665:1. Kerkorian and York did not read much of the Proxy/Prospectus and testified that Mandekic was responsible for reviewing the document and briefing Kerkorian. Mandekic realized that the composition of the Management Board was an initial composition which could change, and was aware of the language on page 17 of the Proxy/Prospectus that the BCA did not bar changes to the corporate governance structure. However, Mandekic testified that he did not place significance on the provisions and did not bring them to Kerkorian's attention. Mandekic Tr. Vol. A. 126:7-11, 171:6-25, 172:1-13, 166:18-167:13. From the

Case 1:04-cv-00331-JJF Document 57-5 Filed 05/02/2005 Page 13 of 20

Page 12
2005 U.S. Dist. LEXIS 5830, *

time the Merger was announced until it closed in November, Aljian sent Kerkorian at least seven memos, none of which mentioned the post-merger management of the new company. DXs 84-90.

After the Proxy/Prospectus was issued to the shareholders, Eaton and Defendants engaged in a media campaign to promote the Merger that was disclosed in the BCA and the Proxy/Prospectus in an attempt to gain the support of Chrysler's shareholders. Press releases were issued, and Schrempp and Eaton held a series of press conferences. See, e.g., PX 159 at DCX 44763-64; PX 165; PX 156; PX 159; [*47] PX 338; Schrempp Tr. Vol. G. 1472:15-22, 1595:1-9; Eaton Tr. Vol. D. 816:24-817:17. Both Schrempp and Eaton were aware of the need to have the public understand that the Merger was a "merger of equals." Stallkamp Tr. Vol. I. 1905:15-1906:15; PX 186 at DCX0045679; PX 218 AT DCX 0058036. Outside consultants were also hired to assist in this effort. PX 265.

At the same time, Schrempp also engaged his shareholders in publicity efforts intended to foster their support for the Merger. For example, Schrempp gave a speech to Daimler-Benz shareholders in which he stated, "one thing is for certain: our proud company, Daimler-Benz, will not become the subject of decisions of others." PX 308 at DCX 0007501; Schrempp Tr. 1434:18-1439:11.

**VII. The Formation Of DaimlerChrysler**

On September 18, 1998, Chrysler held a special meeting of its shareholders to vote on the transaction. DX 20 at T1; Joint Pretrial Order, Ex. 1 at P 14. Chrysler shareholders voted overwhelmingly, by 97% of the votes cast, to approve the Merger. Id. at P 15; DX 1 at P 28.

The Merger closed on November 12, 1998, and DaimlerChrysler global shares were traded for the first time on November 17, 1998. Joint Pretrial [*48] Order, Ex. 1 at P 16. As a result of the Merger, all shareholders of Chrysler and all shareholders of Daimler-Benz became shareholders of the new company, DaimlerChrysler. Eaton Tr. Vol. D 863:21-864:2; DX 20 at T5. Chrysler's shareholders received approximately 42% of DaimlerChrysler's outstanding shares and Daimler-Benz shareholders received approximately 58% of those shares. DX 20 at T 5. The Merger closed consistent with the provisions in the BCA. Tracinda's Aljian and Kerkorian acknowledged that the provisions of the BCA were satisfied at closing. Kerkorian Dep. 226:2-12, 272:9-12; Aljian Dep. 326:5-330:5.

A. The Supervisory Board

In accord with German law and the provisions of the BCA and Proxy/Prospectus, DaimlerChrysler has a two tier system consisting of a Supervisory Board and a Management Board. The capital members of the Supervisory Board are elected by the shareholders. DX 20 at 132; Buxbaum Tr. Vol. H. 1619:25-1620:4. In addition to shareholder representatives, the Supervisory Board also has labor representatives. Id.; Buxbaum Tr. Vol. H. 1615:6-9. In the event of a tie between the shareholder and labor votes, the Chair of the Supervisory Board, who represents [*49] the shareholders, breaks the tie. Id.; Buxbaum Tr. Vol. H. 1694:18-1695:7. The Supervisory Board appoints and removes members of the Management Board, oversees the management of the company, and is ultimately responsible for significant corporate transactions like major asset sales and acquisitions. Buxbaum Tr. Vol. H. 1618:3-24, 1623:19-1624:8, 1615:10-1616:24.

From the time the Merger was completed, through and including November 27, 2000, half of the shareholder representatives on the DaimlerChrysler Supervisory Board were those originally designated by Chrysler and half of the shareholder representatives were those originally designated by Daimler-Benz. Schrempp Tr. Vol. F 1215:17-22; Wilson Tr. Vol. H. 1720:9-1721:12; Valade Tr. Vol. L 2459:6-10; PX 968 at P 8, 11. The Chrysler designees were five former outside directors of Chrysler: (1) Robert E. Allen, former Chairman/CEO of AT&T, (2) Robert J. Lanigan, former Chairman/CEO of Owens-Illinois, Inc., (3) Lynton R. Wilson, Chairman of BCE, Inc., (4) Peter A. Magowan, Chairman of Safeway, Inc. and President/Managing General Partner of the San Francisco Giants, and (5) G. Richard Thoman, COO of Xerox Corporation. DX 141.

B. [*50] The Board of Management

In contrast to the Supervisory Board, the Management Board manages the daily operations of the company. As stated in the BCA and the Proxy/Prospectus, the DaimlerChrysler Management Board initially consisted of 18 members, ten of whom were designated by Daimler-Benz, including two who were responsible for Daimler-Benz's non-automotive business, and eight of whom were designated by Chrysler. There were no "non-voting" members of the Management Board. Schrempp Tr. Vol. F. 5-13; Valade Tr. Vol. L. 2406:14-17. The Management Board did not take formal votes, but acted by consensus and then reported the results of their discussions and their suggestions to the Supervisory Board. Holden Tr. Vol. C. 576:23-577:5, 590:20-23; Valade Tr. Vol. L. 2406:5-13.

The Management Board functions as a board of equals with collective responsibility for the operations of the company. The operation responsibilities of Management Board members, as executives, were kept separate from the operations of the entire company.

Case 1:04-cv-00331-JJF   Document 57-5   Filed 05/02/2005   Page 14 of 20

Page 13
2005 U.S. Dist. LEXIS 5830, *

Stallkamp Vol. I 1852:15-23. In this way, Management Board members would report to other individuals in connection with their respective operational responsibilities. [*51] For example, Holden, in his role as Executive Vice President for Chrysler Sales and Marketing reported to Stallkamp, the President of DaimlerChrysler corporation. Holden Tr. Vol. C. 577:12-578:9. Holden also had responsibility for daily operations of Mercedes-Benz passenger cars in Canada, the U.S. and Mexico. Although Holden kept Stallkamp informed about these issues, he communicated more with Jurgen Hubbert and Dieter Zetsche.

The reporting structure used by DaimlerChrysler AG was similar to the one previously utilized by Chrysler. Holden Tr. Vol. C. 579:13-580:7. The fact that members of the Management Board reported to other individuals in their operational role did not diminish their responsibilities as Management Board members. Id. Former Chrysler executives who served on the DaimlerChrysler's Board of Management had the opportunity to provide their input into all the operations of DaimlerChrysler, including the former Daimler-Benz divisions such as Mercedes, Smart, DASA and the Commercial Vehicle Division. Holden Tr. Vol. C. 542:9-544:2; Eaton Tr. Vol. D. 877:2-8. Former Chrysler executives were free to participate in Management Board meetings and to bring issues before [*52] the Management Board, and their views and opinions were taken seriously by the members of the Board who previously worked for Daimler-Benz. Holden Tr. Vol. C 574:16-575:25; Stallkamp Tr. Vol. I 1864:12-15.

C. The Integration Committee/Shareholder Committee

The BCA also provided that the Management Board was to establish an Integration Committee that served a consultative function. With regard to the composition of the Integration Committee, the BCA provided that fifty percent of the members of the Integration Committee were to be designated by Chrysler and fifty percent were to be designated by Daimler-Benz. DX 20 at A-17. Upon consummation of the Merger, the Integration Committee was established in accordance with the requirements of the BCA; however, the Integration Committee was later renamed the Shareholder Committee. The Shareholder Committee functioned by taking business items from the agenda of the Supervisory Board for review and comment. Wilson Tr. Vol. H 1700:20-1701:2.

Aljian was a member of the Shareholder Committee from its inception. DX 141, Schrempp Vol. F. 1212:21-23. Between the closing of the Merger and the end of November 2000, Aljian attended at least twelve [*53] meetings of the shareholder Committee, including eight meetings in Germany. Aljian actively participated in these meetings. DX 559, 560, 699, 562, 564, 565, 567, 568, 569, 570, 571, 573. Aljian twice complimented management on the excellent job it was doing, praising them for realizing the announced synergies and realizing shareholder value by spinning off the aerospace activities. DX 569, 564. Aljian was present at the meetings discussing the post-merger governance changes and never voiced any objections. DXs 559-562, 564-565, 567-571, 573, 699, 701; PX 968 at P 4; Schrempp Tr. Vol. F. 122:20-1223:11; Wilson Tr. Vol. H. 1731:5-1732:10; Aljian Dep. 415:2-426:13. Aljian remained a member of the Shareholder Committee until November 24, 2000, when Kerkorian directed him to resign and announce that he did not want to be considered for a position on the DaimlerChrysler Supervisory Board. DX 78.

D. Operating Structure of DaimlerChrysler

Consistent with the BCA and the Proxy/Prospectus, Chrysler became a wholly owned subsidiary of DaimlerChrysler and Daimler-Benz merged with and into DaimlerChrysler. DX 20 at 11; Holden Tr. Vol. C. 586:9-10. DaimlerChrysler maintained two operational [*54] headquarters, one located at the former Chrysler headquarters in Auburn Hills, Michigan and the other at the former Daimler-Benz headquarters in Stuttgart, Germany, DX 20 at 8. The overlapping corporate functions of Daimler-Benz and Chrysler were combined.

As far as business operations were concerned, the Chrysler Brands were kept together in a separate, independent unit of DaimlerChrysler and the Daimler brands were similarly separated. Stallkamp Tr. Vol. I 1887:12-1888:6. Throughout 1999, Aljian received financial reports classifying Chrysler and Daimler (later, Mercedes-Benz) as separate divisions of DaimlerChrysler. Aljian testified at his deposition that he was not concerned about the references to Chrysler as a division. Aljian Dep. 379:21-392:9; 394:25-395:7; 396:24-25. In fact, Aljian prepared a memorandum for Kerkorian on July 20, 2000, describing Mercedes-Benz and Chrysler as divisions of Daimler-Chrysler. DX 74 at T 13343. Holden also testified that Chrysler was referred to as a division continually throughout shareholder meetings at which Aljian was present. Holden Tr. Vol. C 608:16-609:9. In addition, the September 24, 1999, press release which announced the stream-lining [*55] of the Board of Management referred to the brand divisions within DaimlerChrysler. DX 68 at T 9961. Also, Kerkorian testified at his deposition, that while he did not pay much attention to the structure within DaimlerChrysler, it was not significant to him that Chrysler was a division within DaimlerChrysler. Kerkorian Dep. 328:14-330:5.

VIII. Post-Merger Changes At Daimler-Benz

Case 1:04-cv-00331-JJF    Document 57-5    Filed 05/02/2005    Page 15 of 20

Page 14
2005 U.S. Dist. LEXIS 5830, *

A. The Management Board Changes

At the time of the Merger several people including, Eaton, Schrempp and Hilmar Kopper, the Chairman of DaimlerChrysler's Supervisory Board, were concerned that the eighteen member Management Board was too large to function efficiently. Wilson Tr. Vol. H. 1731:13-1732:3, Eaton Tr. Vol. D. 875:6-20, Holden Tr. Vol. C. 594:19-595:5. It was decided that over time, attrition would reduce the size of the Board. Kopper Vol. F. 1153:7-18, Stallkamp Tr. Vol. I 1859:12-20, Valade Tr. 2406:22-2407:1. However, no specific time was set for a reduction in size, until the September 24, 1999 press release. Kopper Tr. Vol. F. 1167:4-14 (deposition excerpt); Schrempp Tr. 1194:1-5, Stallkamp Tr. Vol. I 1859:17-23. In that press release, it was announced that, effective October 1, 1999, the [*56] size of the Management Board would be reduced from eighteen to fourteen members. DX 68. Of the fourteen members, five were former Chrysler executives. Id.

Both before and after the September 24, 1999 press release, there were several changes on the Management Board of DaimlerChrysler. These changes were approved by the Supervisory Board and unanimously supported by all of the former Chrysler directors who sat on the Supervisory Board. In making appointments to the Management Board, the Supervisory Board tried to find the best person possible to fit the open position and advance the shareholders' interests. Wilson Tr. Vol. H. 1728:16-21, Lanigan Tr. Vol. I 2010:1-11.

In addition, these changes were also discussed by the Shareholder Committee. During his tenure on the Shareholder Committee, Aljian did not voice any objections to the changes. In fact, Aljian supported the changes that were made. DX 573 at T 10214, Schrempp Tr. Vol. F. 1279:7-25. With regard to the 1999 streamlining of the Management Board in particular, Aljian testified at his deposition that he believed it was "smart" to reduce the size of this Board, because the eighteen member board was "cumbersome" and a smaller [*57] group would be "beneficial" to the company. Aljian Dep. 415:18-23. Aljian further testified that he was not concerned by the uneven balance that resulted on the Management Board as a result of the streamlining. Aljian Dep. 418:13-22.

During his deposition testimony, Kerkorian testified that if he saw the press release announcing the streamlining, he would not have thought there was a problem, as long as Eaton was still there. At trial, Kerkorian reiterated his view that, as long as Eaton was around, these changes didn't matter to him. Kerkorian Tr. 700:8-703:3.

Of the post-merger changes that occurred, many were at the suggestion of former Chrysler executives like Eaton and Holden. Others were the result of resignations for personal reasons. Holden Tr. Vol. C 593:12-595:5, Eaton Tr. Vol. D. 855:2-859:3, 874:2-5; Schrempp Tr. Vol. F. 1283:3-13, 1287:1-1288:6; Wilson Tr. Vol. I. 1824:2-7, Valade Tr. Vol. L 2412:5-2414:18.

1. Dennis Pawley

Since at least September 1998, Tracinda knew that Dennis Pawley was planning to retire. Pawley announced his retirement one month after the Merger closed. Pawley's retirement was completely voluntary, Eaton Tr. Vol. D 856:11-14, Stallkamp Tr. Vol. [*58] I 1881:25-1882:21; Valade Tr. Vol. L 2411-2412:10, and Schrempp tried to persuade Pawley to change his mind and stay on at DaimlerChrysler. Schrempp Tr. Vol. F. 1282:2-6; Stallkamp Tr. Vol. I 1862:14-1883:4. Eaton did not recommend a replacement for Pawley's position, even though he could have done so. Eaton did not believe his decision detracted from the Merger being a merger of equals. Eaton Tr. Vol. D. 870:18-871:4. Holden also believed that former Chrysler executives had "ample voice" on the Management Board such that it was unnecessary to replace Pawley. Holden Tr. Vol. C. 591:20-593:8. Further, both Holden and Eaton testified they did not want to take other executives away from their current positions. Id., Eaton Dep. 216:11-218:10.

2. Ted Cunningham

With regard to Ted Cunningham, Eaton testified that he was involved in the decision to ask Cunningham to step down from the DaimlerChrysler Management Board in September 1999. In this regard, Eaton explained that Cunningham was given additional operational responsibilities in his role as Managing Director, and as a result, Eaton believed "very strongly that with those new responsibilities he [Cunningham] should not be on [*59] the Supervisory Board." Eaton Tr. Vol. D. 857:10-12. In general, Eaton believed that members of the Management Board were spending too much of their time in meetings and needed to focus on their job responsibilities. Eaton Tr. Vol. D 857:13-859:1. Holden shared Eaton's views regarding Cunningham's departure from the Management Board. Holden Tr. Vol. C 594:17-595:5.

3. Thomas Stallkamp

As for the termination of Thomas Stallkamp, Eaton testified that he recommended that Stallkamp be replaced. According to Eaton, Stallkamp and Schrempp had personality conflicts, and Eaton believed Stallkamp was becoming cynical and was no longer the best person to continue on the Management Board. Eaton Tr. Vol. D. 7-24. Valade testified that he also thought that Stallkamp was not an effective leader. Valade Tr. Vol. L. 2412:13-21. Schrempp was not involved in the initiative for

Stallkamp to step down. Valade Tr. Vol. L. 2414:15-20. Tracinda was aware that Stallkamp was a problem at DaimlerChrysler, and Eaton discussed Stallkamp's termination, along with the 1999 streamlining that accompanied his termination, with Aljian and other former Chrysler directors on the Shareholder Committee. Wilson Tr. Vol. [*60] H. 1729:12-1731:12; Lanigan Tr. Vol. I. 2007:10-24; Valade Tr. Vol. L. 2413:25-2414:14. Aljian voiced no dissent to these decisions. Wilson Tr. Vol. H. 1731:8-12, Valade Tr. Vol. L. 2414:11-14.

### 4. Robert Eaton

On January 26, 2000, Eaton announced that his retirement would be effective March 31, 2000. As a result of Eaton's voluntary retirement, Holden became the top former Chrysler executive at DaimlerChrysler. DX 73; Eaton Tr. Vol. F. 1294:14-1295:5; Eaton Dep. 223:16-20. Eaton testified that he discussed his decision to retire with Kerkorian personally. Kerkorian Tr. Vol. B 310:7-9.

### 5. James Holden

In November 2000, Holden was terminated and replaced with Dieter Zetsche. In August or September 2000, Schrempp and Lanigan discussed the possible replacements for Holden if "something good happened for him or something bad happened." Lanigan Tr. Vol. I. 2014:4-12. Schrempp emphasized to Lanigan that he preferred to have an American and a Chrysler employee replace Holden if it became necessary. Lanigan disagreed with Schrempp's view, because he believed nationality should not matter as long as the best person to fill the position was picked. Lanigan Tr. Vol. I 2013:18-2014:12; Schrempp [*61] Tr. Vol. F. 1297:7-20.

Holden's departure was ultimately precipitated by the poor financial performance of the Chrysler Group. In late September 2000, DaimlerChrysler announced that the Chrysler Group would suffer a third quarter operating loss of approximately $ 500 million. There were problems with the minivan project which was being led by Holden and Cunningham. Wilson Tr. Vol. H. 1734:17-22. The new model minivan was going to be produced and several plants needed to be shut down and retooled. To ensure that the market had an adequate supply of minivans before the shutdown, Chrysler increased production of the old model. This production increase led to overcapacity in the marketplace. This overcapacity was coupled with a difficulty selling the old minivan because of the announcement that Chrysler was introducing a new model. As a result, the surplus of old minivans had to be sold at drastically reduced prices, which had a severe impact on the company's financial performance. Wilson Tr. Vol. H. 1733:22-1734:16; Lanigan Tr. Vol. I 2012:16-2013:10.

In early November 2000, Holden sent Schrempp a memo projecting operating losses at the Chrysler Group over the next three years of $ [*62] 6.9 billion. PX 614, DX 808; Schrempp Tr. Vol. F. 1298:9-25. Holden advised Schrempp that he would not be able to present a budget on time, that he had hired outside consultants to develop a "turnaround plan" and that the plan would not be available for 60-90 days. Individuals from both the former Daimler-Benz and Chrysler expressed concern that Chrysler was "sinking," and they were concerned that Holden had no experience restructuring companies in financial distress. Schrempp Vol. F. 1301:4-12; Lanigan Tr. Vol. I 2017:9-16. Lanigan testified that he was embarrassed by Chrysler's performance and concerned that Holden did not have a plan to respond to the situation. Wilson also agreed with Schrempp that Holden was not properly in control of the management at Chrysler Group. Wilson Tr. Vol. H. 1738:20-1739:4. For these reasons, it was agreed that Holden should be replaced. Wilson Tr. Vol. 1738:3-1739:6; Lanigan Tr. Vol. I 2017:9-16. The decision to replace Holden was supported by three former Chrysler executives still on the Management Board, Gary Valade, Tom Gale and Tom Sidilk. Schrempp Vol. F. 1307:18-1308:4; Schrempp Tr. Vol. H. 1591:9-21, 1594:9-18; Valade Tr. Vol. L 2417:21-2418: [*63] 16.

When Holden met with Schrempp on November 12, 2000, he realized that he was going to be fired. Holden had spoken with Lanigan, a member of the Supervisory Board, who informed Holden that his meeting with Schrempp would be "bad." Holden Tr. Vol. C. 561:20-562:9; Lanigan Vol. I 2019:25-2020:12. Holden realized from his discussion with Lanigan that Schrempp had "already previewed [his termination] with the Supervisory Board to get their approval." Holden Tr. Vol. C 560:9-17; Schrempp Tr. Vol. F 1301:13-1302:9; Wilson Tr. Vol. H. 1736:3-13.

As Holden acknowledged, "Chrysler didn't do a good job of training guys to be ready for those positions at that level." Holden Tr. Vol. K 2321:25-2322:6. As a result, Lanigan recommended that Holden be replaced by Dieter Zetsche. Lanigan's recommendation was supported by Wilson. DX 573 at T 10214. Indeed, even Holden testified that Zetsche was "the number one candidate" to replace him. Holden Tr. Vol. C 612:12-613:3. Both Lanigan and Wilson spoke at a meeting of the Shareholder's Committee to voice their support for Zetsche. Aljian was present at this meeting and supported the replacement of Holden by Zetsche. DX 573 at T010214; DX 77 at DCX [*64] 107447; Wilson Tr. Vol. H. 1744:2-8; Lanigan Tr. Vol. I. 2021:10-22.

### 6. Other Changes

Case 1:04-cv-00331-JJF   Document 57-5   Filed 05/02/2005   Page 17 of 20

Page 16
2005 U.S. Dist. LEXIS 5830, *

After Holden's termination, his seat on the Management Board was filled by former Daimler executive Wolfgang Bernhard. PX 635. In 2001, Rudiger Grube was added to the Board of Management, and effective January 1, 2003 Tomas Weber and Bodo Uebber became members of the Management Board. At the time of trial, one executive from Chrysler, Tom Sidilk, continued to sit on the Management Board, and four former Chrysler directors still served on the Supervisory Board.

B. Senior and Middle Level Manager Changes

In addition to the changes at the Management Board level, changes also occurred in senior and middle level managers. For example, new American executives were recruited to join DaimlerChrysler from other companies, Holden Tr. Vol. C. 595:5-598:7, and former Chrysler executives resigned to join other companies. See, e.g., Holden Tr. Vol. C. 596:13-20, Stallkamp Tr. Vol. I 1891:8-1892:11.

C. The Shareholder Committee Changes

After Aljian resigned in November 2000, the Shareholder Committee evolved into the Chairman's Council, which was comprised of three Americans, three Germans, and [*65] one person from each of Japan, Mexico, Switzerland and the Netherlands. Schrempp Vol. F. 1213:2-1214:1, Vol. H. 1598:11-1599:6; Wilson Tr. Vol. H. 1698:24-1699:2. The Chairman's Council was created at the suggestion of several individuals, including former Chrysler directors, Lanigan, Wilson and Allen, to more accurately reflect the diversity and geographic reach of DaimlerChrysler's business. Schrempp Vol. F. 1213:9-1214:6, Wilson Tr. Vol. H. 1699:3-25. Wilson testified that the Chairman's Council was believed to further the company's strategy of moving forward as a global automotive company by including senior business people from other regions of the world. The Chairman's Council was still in existence at the time of trial and was chaired by Schrempp, the Chairman of the Management Board. The Chairman's Council included several American members, Lanigan, Wilson and Lou Gerstner, former Chairman of IBM. Schrempp Tr. Vol. H. 1598:15-20; Wilson Tr. Vol. H. 1700:3-7.

D. The Creation Of The Automotive Council

In 1999, the Automotive Council was created. The Automotive Council was run by Tom Gale, a former Chrysler executive, and included the global business heads of the Chrysler [*66] Division, the Mercedes-Benz division and the Commercial Vehicles Division. These individuals met monthly with senior technical people. The objective of this Council was to explore opportunities for the three divisions to share equipment and plants. Holden Tr. Vol. C. 599:25-600:22; Schrempp Vol. G. 1331:1-3.

E. Press Reports Of The Changes

As the Management Board and other changes at DaimlerChrysler were made, they were widely reported in the press, along with speculation that the Merger was not a merger of equals. See, e.g., DX 521, 529, 532. To address the press speculation, DaimlerChrysler hired the public relations firm of Bell Pottinger, PX 880 at DCX 0052538, and Eaton and Schrempp publicly maintained that these changes did not undermine the merger of equals. See, e.g., PX 484; 425.

IX. Schrempp's Financial Times And Barron's Magazine Interviews

Before Holden's departure in November 2000, Schrempp agreed to an interview with the London Financial Times ("Financial Times"). On October 30, 2000, portions of that interview were published in an article in the Financial Times (the "October 30th Article"). In pertinent part, the October [*67] 30th Article read:

> In a wide-ranging interview ahead of this week's two-day meeting [of the DaimlerChrysler Management Board], he [Mr. Schrempp] delivered a passionate deference of both the merger and his ambition to create a global car maker.
>
> In doing so, however, he admitted that Chrysler had been relegated to a standalone division. Far from being a "merger of equals," as originally conceived, the deal has emerged as just one deal among several from the "executive war-room" of Daimler's Stuttgart headquarters.
>
> Now that most of Chrysler's old management board has resigned or retired, Mr. Schrempp sees no reason to maintain the fiction. "Me being a chess player, I don't normally talk about the second or third move. The structure we have now with Chrysler (as a standalone division) was always the structure I wanted," he says. "We had to go a roundabout way but it had to be done for psychological reasons. If I had gone and said Chrysler would be a division, everybody on their side would have said: "'There is no way we'll do a deal.'"

> But it's precisely what I wanted to do. From the start structure, we have moved to what we have today.
>
> What DaimlerChrysler [*68] has today is a US division where vehicle design, procurement, production and marketing are being overhauled. Mr. Schrempp maintains this was always the plan following the initial post-merger integration, which generated about $ 1.4 bn (Pounds 970M) in savings.

PX 601. Schrempp was also interviewed for an article in Barron's Magazine ("Barron's") which was published on November 4, 2000. The Barron's article quotes Schrempp as stating: "We said in spirit it was a merger of equals, but in our minds we knew how we wanted to structure the company, and today I have it. I have Daimler, and I have divisions." PX 615.

At trial, Schrempp did not deny any of the statements he made in the interviews, but contended that the interviewers misinterpreted his remarks. Schrempp Tr. Vol. G. 1325:22-1351:1. Although Schrempp's statements upset Eaton and Holden, and Schrempp maintained at trial that he was also upset by the Financial Times article, he never issued a correction or clarifying statement and did not demand a retraction. Schrempp also testified that he believed that a clarification or correction would draw more attention to the article and make more public controversy. [*69] Schrempp Tr. Vol. F. 1183:18-1184:9; 1355:24-1356:9. However, Schrempp did address the Chrysler Group's employees in a town hall meeting and apologized for any misunderstanding his remarks created. Schrempp also told Aljian that the Financial Times article misrepresented what he was trying to say, and Schrempp reiterated his past requests to set up a meeting with Kerkorian. Schrempp Tr. Vol. G. 1361:22-1362:10; Vol. H. 1596:11-1597:21; Valade Tr. Vol. L. 2430:4-10.

Kerkorian, Eaton and others testified that Schrempp's remarks to the press were upsetting. Eaton Tr. Vol. D 734:5-7, 737:19-738:4; Kerkorian Tr. Vol. B 312:16-313:4. However, ten former Chrysler directors reaffirmed that they would still vote in favor of the Merger, knowing what they know today, including what the Financial Times reported. PX 966 at P 12; PX 967 at P 8; PX 968 at P 20. Indeed, Eaton testified that without the Merger, there is a "high probability that Chrysler would be in bankruptcy today . . . ." Eaton Tr. Vol. D. 846:19-21.

## CONCLUSIONS OF LAW

### I. Applicable Legal Standards

#### A. Claims Under Section 10(b) And Rule 10b-5 of the Exchange Act

Section 10(b) of the Exchange Act prohibits [*70] the use "in connection with the purchase or sale of any security [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." *15 U.S.C. § 78j(b)*. *Rule 10b-5* was promulgated in connection with *Section 10(b)* and "provides the framework for a private cause of action for violations involving false statements or omissions of material fact." *Weiner v. Quaker Oats Co., 129 F.3d 310, 315 (3d Cir. 1997)*.

*Section 10(b)* claims are similar to common law fraud claims. To establish a violation of *Section 10(b)*, the plaintiff must prove by a preponderance of the evidence that the defendant made (1) a misstatement or omission; (2) of a material fact, (3) with scienter; (4) in connection with the purchase or sale of a security; (5) upon which the plaintiff reasonably relied; and (6) that reliance was the proximate cause of plaintiff's injury. *Herman & MacLean v. Huddleston, 459 U.S. 375, 390-391, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983)* (setting forth standard of proof in securities claim).

#### B. Claims Under Section 14(a) and Rule 14a-9 of the Exchange Act

*Rule 14a-9* prohibits the solicitation [*71] of a shareholder's vote by means of a proxy statement that "is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ." *17 C.F.R. § 240.14a-9*. To establish a violation of *Section 14(a)* and *Rule 14a-9*, the plaintiff must prove by a preponderance of the evidence that (1) that the defendant made a material misrepresentation or omission in a proxy statement; (2) which caused the plaintiff injury and (3) the proxy solicitation was an essential link in effecting the proposed corporate action. See *General Electric Co. v. Cathcart, 980 F.2d 927, 932 (3d Cir. 1992)*.

#### C. Controlling Persons Claims Under Section 20 of the Exchange Act

To establish control person liability under *Section 20 of the Exchange Act*, the plaintiff must prove by a preponderance of the evidence (1) a primary violation of the federal securities laws by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful way a culpable participant in the primary violation. See, e.g., [*72] *Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998)*.

#### D. Common Law Fraud

To establish common law fraud, the plaintiff must prove that (1) the defendant made a false and material representation; (2) the defendant knew the representation was false or made the representation with reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) the plaintiff suffered damage as a result of such reliance. *Stephenson v. Capano Development, Inc.*, 462 A.2d 1069, 1074 (Del. 1983) (citing *Nye Odorless Incinerator Corp. v. Felton*, 35 Del. 236, 5 W.W. Harr. 236, 162 A. 504, 510-11 (Del. Super. 1931)). The plaintiff must prove the elements of common law fraud by a preponderance of the evidence. See *Lord v. Peninsula United Methodist Homes, Inc.*, 2001 Del. Super. LEXIS 127, 2001 WL 392237, *5 (Del. Super. 2001) (citing *Nye*, 162 A. at 509).

## II. Whether The Court Has Personal Jurisdiction Over Defendant Manfred Gentz

Because Tracinda voluntarily dismissed its claims under *Section 11* and [*73] *12* of the Securities Act of 1933, Defendant Gentz now raises the defense of lack of personal jurisdiction. Tracinda has not challenged the timeliness of Defendant's assertion. The Court concludes that Defendant Gentz's challenge to the Court's personal jurisdiction is timely. It is not disputed that Defendant Gentz signed the Registration Statement on behalf of Daimler-Benz, and therefore, the Court concludes that Defendant Gentz could not, in good faith, raise the defense of lack of personal jurisdiction until Tracinda dismissed its claims under the Securities Act. See, e.g., *McIntyre's Mini Computer Sales Group, Inc. v. Creative Synergy Corp.*, 644 F. Supp. 580, 585-586 (E.D. Mich. 1986) (holding that defendant was not precluded from challenging personal jurisdiction when claims providing an unambiguous basis for personal jurisdiction were later dismissed); see also *Glater v. Eli Lilly & Co.*, 712 F.2d 735, 738 (1st Cir. 1983) (recognizing that defendants did not waive the defense of personal jurisdiction "if it was not available at the time they made their first defensive move").

For claims brought under the Exchange Act, personal jurisdiction is [*74] permitted to the full extent permitted by the Due Process Clause. *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990); *FS Photo, Inc. v. Picture Vision, Inc.*, 48 F. Supp. 2d 442, 445 (D. Del. 1999); *SEC v. Infinity Group Co.*, 27 F. Supp. 2d 559, 563 (E.D. Pa. 1998). Where, as here, jurisdiction is based on a statute that provides for nationwide service of process, two components must be established to satisfy the jurisdictional requirements of the *Due Process Clause*: (1) the defendant must have "minimum contacts" with the United States as a whole, and (2) the exercise of jurisdiction over the defendant must be "reasonable." *SEC v. Euro Security Fund, Coim SA*, 1999 U.S. Dist. LEXIS 1537, 1999 WL 76801 (S.D.N.Y. Feb. 17, 1999); *Infinity Group Co.*, 27 F. Supp. 2d at 563.

Two types of jurisdiction are implicated in the minimum contacts analysis, specific jurisdiction and general jurisdiction. General jurisdiction exists if the defendant's general business contacts with the United States have been "continuous and systematic," even though they are unrelated to the lawsuit. *SEC v. Gonzalez de Castilla*, 2001 U.S. Dist. LEXIS 12339, 2001 WL 940560, [*75] *3 n. 3 (S.D.N.Y. Aug.20, 2001) (citing *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 80 L. Ed. 2d 404, 104 S. Ct. 1868 (1984)). Specific jurisdiction exists when the defendant has purposefully directed his activities toward the forum, and the litigation arises out of or is related to the defendant's contacts with the forum. *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567-568 (2d Cir. 1996) (quoting *Helicopteros*, 466 U.S. at 414-416 & nn. 8-9).

If the defendant had sufficient minimum contacts with the forum, the Court must then determine whether it is reasonable for the Court to exercise jurisdiction over the defendant. In making this determination, courts weigh several factors, including:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interests in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Metropolitan Life Ins.*, 84 F.3d at 568 [*76] (citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 107, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987)). After a trial, the plaintiff bears the burden of proving, by a preponderance of the evidence, that the exercise of personal jurisdiction is appropriate. *Id. at 573*.

Tracinda contends that specific jurisdiction exists over Defendant Gentz. n3 As a basis for the exercise of jurisdiction, Tracinda contends that Defendant Gentz (1) signed the registration statement with regard to the shares of DaimlerChrysler common stock issued to Chrysler's stockholders; (2) served as Daimler-Benz's chief financial officer and a member of the Daimler Management Board; and (3) serves currently as a member of DaimlerChrysler's Management Board.

Case 1:04-cv-00331-JJF   Document 57-5   Filed 05/02/2005   Page 20 of 20

Page 19
2005 U.S. Dist. LEXIS 5830, *

n3 Tracinda does not specify in its briefing whether personal jurisdiction over Gentz should be based on specific jurisdiction or general jurisdiction. However, the Court understands Tracinda's argument to rest on specific jurisdiction because the contacts it advances to support the exercise of personal jurisdiction over Gentz are contacts specifically related to this litigation and not Gentz's general business contacts with the United States. D.I. 1051 at 56-58. In any event, the Court concludes that the contacts advanced by Tracinda are insufficient to support the exercise of general jurisdiction, because they were neither continuous nor systematic. See e.g. *William Rosenstein & Sons Co. v. BBI Produce, Inc., 123 F. Supp. 2d 268, 274 (M.D. Pa. 2000)* (recognizing that plaintiff must show "significantly more than minimum contacts to establish general jurisdiction").

[*77]

In response, Defendant Gentz contends that his position on these boards is insufficient to demonstrate that he purposefully directed his activity toward the United States, and that any actions he took in the United States were in his corporate capacity. Defendant Gentz also contends that he was not involved with any of the Merger negotiations, did not meet any Tracinda representatives, and did not authorize any changes to the Management Board since he was not a member of the Supervisory Board. Defendant Gentz contends that Tracinda's decision not to require him to appear at trial, even though it had obtained an order from the Court compelling him to appear, further highlights his position that any involvement he had with the Merger was minimal. As for his involvement in signing the registration statement, Defendant Gentz contends that his signature on that document is insufficient to establish personal jurisdiction, because Tracinda dismissed its Securities Act claims based on the filing of the Registration Statement.

Reviewing the conduct of Defendant Gentz in light of the applicable law, the Court concludes that Tracinda has not established by a preponderance of the evidence that [*78] the Court has personal jurisdiction over Defendant Gentz. Defendant Gentz signed the Registration Statement on behalf of Daimler-Benz, but Tracinda chose to voluntarily dismiss its claims related to the Registration Statement. Those cases to which Tracinda points to demonstrate that it is appropriate to exercise jurisdiction over a signatory to SEC documents are cases which involve claims directly predicated upon those documents. n4 See, e.g., *CINAR, 186 F. Supp. 2d at 304* (concluding personal jurisdiction existed over signatory to registration statement where claim was based on filing of false registration statement under Securities Act); *Itoba, 930 F. Supp. at 41*. In this case, however, Tracinda's claims are not directly predicated upon the Registration Statement. Rather, Tracinda's claims are predicated upon the Proxy/Prospectus attached to the Registration Statement. As discussed in greater detail in the context of whether Defendants may be liable under *Section 14(a)*, Tracinda's claims based on the Proxy/Prospectus are only actionable against Defendants Daimler-Benz, DaimlerChrysler and Schrempp, because the Court finds that Daimler-Benz, DaimlerChrysler [*79] and Schrempp participated in the filing and preparation of those documents and allowed their names to be used in connection with the solicitation of Chrysler proxies. Although Gentz testified that he may have read the Proxy/Prospectus, Tracinda has not established that Defendant Gentz was involved in the preparation of that document, that he approved that document or that his name was used in connection with the proxy solicitation. As for Defendant Gentz's role in the Merger, the Court cannot conclude that Tracinda has established sufficient minimum contacts with the United States to support personal jurisdiction. During his deposition, Gentz testified that he was involved in some of the valuation analyses related to the Merger premium, and Schrempp testified at trial that Gentz participated in a presentation before Standard and Poor's. Schrempp Tr. Vol. F. at 1273:12-1274:18. However, Tracinda has not shown that Gentz was involved in any final decision making or that the Standard and Poor's presentation in which Gentz participated was related to its claims. n5 In addition, the conduct alleged to have been taken by Defendant Gentz was taken entirely in his corporate capacity. See [*80] *In re DaimlerChrysler II, 247 F. Supp. 2d at 583-595* (dismissing claims against Defendant Kopper for lack of personal jurisdiction even though Defendant Kopper attended meetings related to the Merger in the United States and Germany, but conduct was taken in his corporate capacity, involved no final decisions and Tracinda failed to demonstrate a nexus between its claims and the conduct). As the Supreme Court has cautioned, "great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Indus. Co. v. Superior Court of California, 480 U.S. 102, 115, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987)*. On this record, the Court is not persuaded that the contacts alleged by Plaintiffs are sufficient to establish personal jurisdiction over Defendant Gentz. Accordingly, the Court concludes that Tracinda has not proven by a preponderance of the evidence that the Court has personal jurisdiction over Defendant Gentz.