# TAB I

# (part 2 of 2)

n4 The cases advanced by Tracinda have a different procedural posture than this case. Both Itoba and CINAR involve motions to dismiss, and the respective courts found that sufficient evidence was presented to make a prima facie showing of personal jurisdiction. At this juncture, however, Tracinda must prove personal jurisdiction by a preponderance of the evidence, and with the dismissal of its claims under the Securities Act, the Court is not persuaded that Tracinda has met that burden. [*81]

n5 Tracinda does not contend that Gentz made any misrepresentations during the Standard & Poor's presentation, and does not link that presentation to its claims. Tracinda does contend that Schrempp and Eaton wrote a letter to Harold McGraw III of the McGraw Hill Companies, Inc. in New York in connection with the pursuit of membership of DaimlerChrysler AG in the S&P 500 in order to correct a press release calling the Merger an acquisition. PX 345 at DCX 0011169. However, Tracinda does not allege that Gentz participated in that correction letter. Tracinda also contends that press materials were prepared for Daimler-Benz and Chrysler executives to respond to questions about the Merger, but again, Tracinda presents no evidence that Gentz used that material in any press statements or conferences.

## III. Whether Tracinda Can Assert A Section 14(a) Claim Against Defendants

Defendants also contend, as a threshold matter, that Tracinda cannot assert a *Section 14(a)* claim against them as a matter of law, because Defendants did not issue the Proxy Statement. n6 Citing to the decision of the Southern [*82] District of New York in *In re Vivendi Universal, S.A., 2003 U.S. Dist. LEXIS 19431, 2003 WL 22489764, *7 (S.D.N.Y. Nov. 3, 2003)*, Defendants contend that Tracinda cannot rely solely on the fact that Defendants filed a Registration statement with the SEC that included Chrysler's Proxy Statement. Defendants also contend that they are exempt as a matter of law from liability under *Section 14(a)*, because they are "foreign private issuers."

n6 Because the Court has concluded that personal jurisdiction does not exist over Defendant Gentz, Defendant Gentz is excluded

from the reference to "Defendants" in this context.

Tracinda contends that Defendants are liable under *Section 14(a)*, not only because Defendants signed the registration statement which included the Proxy/Prospectus, but because (1) the Proxy Statement was issued jointly by Chrysler and Daimler-Benz, (2) Defendants permitted the use of their names to solicit the proxies, and (3) Defendants made other communications directed at the Chrysler shareholders which were reasonably [*83] calculated to secure procurement of their proxies. Tracinda also contends that the exemption for "foreign private issuers" does not apply to Defendants, because the solicitation was not for their securities but the securities of a domestic corporation. Tracinda further contends that even if the alleged misstatements in the Proxy/Prospectus are attributable to Chrysler, rather than Daimler-Benz, DaimlerChrysler is liable under *Section 14(a)*, because liability is imputed to a successor corporation where there is continuity in shareholder interest.

A. Whether Defendants Jointly Issued The Proxy/Prospectus And/Or Permitted Their Names To Be Used In Connection With The Chrysler Proxy Solicitation

In full, *Section 14(a)* provides:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in [*84] respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

*15 U.S.C. § 78n* (emphasis added). Courts interpreting this section have recognized that a defendant who permits the use of his name in a manner substantially connected to the proxy solicitation may be held liable under *Section 14(a)* for misstatements and omissions contained in the proxy materials. *Freedman v. Value Health, Inc., 135 F. Supp. 2d 317, 339 (D. Conn. 2001)* (citations omitted) (holding that *Section 14(a)* encompassed defendants who issued a joint prospectus and proxy statement to the shareholders of the other company involved in the merger); see also *SEC v.*

*Falstaff Brewing Corp., 203 U.S. App. D.C. 28, 629 F.2d 62, 66-70 (D.C. Cir. 1980)* ("That the proxies nominally were sought by the [target's] management is not dispositive; in reality it was [the acquiror] who was seeking the shareholders' votes to approve his taking control. His connection with the transaction was more than substantial. It was pivotal.")

Reviewing the documents filed in this case in light of the applicable law, the Court concludes that Defendants [*85] permitted the use of their names in a manner substantially connected to the Chrysler proxy solicitation such that Defendants are properly subject to liability under *Section 14(a)*. In reaching this conclusion, the Court finds that Defendants had an interest in the Chrysler proxy solicitation by virtue of their desire to obtain the approval of Chrysler shareholders for the Merger, and that Defendants jointly participated in and allowed the use of their names to achieve the desired proxy solicitation. n7 The Court's finding in this regard is supported by language contained in both the BCA and the Proxy/Prospectus. The BCA provides that "Chrysler, Daimler-Benz and DaimlerChrysler AG shall prepare and file with the SEC the preliminary Proxy Statement/Prospectus." DX 20 at A-30. In addition, the Proxy Statement confirms Defendants' participation in the joint preparation of the Proxy/Prospectus stating that "all information contained in or incorporated by reference in this Proxy Statement/Prospectus relating to Daimler-Benz and DaimlerChrysler AG was provided by Daimler-Benz" and that DaimlerChrysler AG has conducted no business as of the date of the Proxy/Prospectus except that which is [*86] "incident to its formation, its execution of, and performance of its obligations under, the Combination Agreement and related agreements, and its participation in the preparation of this Proxy Statement/Prospectus." Id. at T 000012, T 000016 (emphasis added). That Defendants intended this to be a joint submission is also demonstrated by their use of the Proxy/Prospectus for Daimler-Benz shareholders in the United States. To this effect, the Proxy/Prospectus states:

> This Proxy/Statement Prospectus is also being furnished to "U.S. persons" (as defined in Rule 902(a) of Regulation S promulgated under the Securities Act of 1933, as amended) who own Daimler-Benz ADSs and Daimler-Benz Ordinary Shares in connection with the invitation by the Daimler-Benz Board of Management (Vorstand) for the Daimler Benz Special Meeting and constitutes the prospectus of DaimlerChrysler AG for use in connection with the offer and issuance of DaimlerChrysler Ordinary Shares

pursuant to the Chrysler Merger and the Daimler-Benz Merger.

DX 20 at 2 (T 000005), 8 (000017). The Proxy/Prospectus also points out that "Chrysler will bear the cost of the solicitation of proxies from its shareholders, [*87] except that Chrysler and Daimler-Benz will share equally the cost of printing and mailing this Proxy Statement/Prospectus." DX 20 at 44 (T 000053).

> n7 Defendants contend that Schrempp cannot be liable under *Section 14(a)*, because he did not sign the Proxy/Prospectus. However, a proxy is not required to be signed, and therefore, the inquiry does not end there for Schrempp as an individual defendant. Tracinda has demonstrated that Schrempp allowed his name to be used in connection with the proxy solicitation. Schrempp's name figures prominently into the Proxy/Prospectus by virtue of his role as Daimler-Benz's primary negotiator of the Merger. Further Tracinda has demonstrated that Schrempp was involved in numerous representations concerning the merger of equals, as well as in press releases, all of which constitute communications made in connection with the proxy solicitation. Accordingly, the Court concludes that Defendant Schrempp may be subject to liability under *Section 14(a)*.

Defendants point the Court [*88] to that portion of the BCA which provides that neither party is responsible for the statements of the other in the Proxy/Prospectus. However, the Court is not persuaded that this allocation of responsibility negates Defendants' interest in the proxy solicitation, their joint preparation and use of it for their shareholders, or the fact that they permitted their names to be used in substantial connection with the proxy, solicitation effort. Defendants also direct the Court to the Vivendi decision for the proposition that Chrysler's alleged misstatements should not be imputed to Defendants by virtue of Defendants' filing of the registration statement. However, the Vivendi court did not address the situation present here which involves joint preparation of the proxy materials, and did not comment on the degree to which, if any, Vivendi permitted its name to be used in connection with the proxy solicitation. Because Defendants participated in the joint filing of the Proxy/Prospectus and allowed the use of their names in substantial connection with the proxy solicitation, the Court concludes that they are subject to liability under *Section 14(a)* unless an exemption applies. [*89]

B. Whether Defendants Are Exempt From The Rule 14(a) Requirements Under The "Foreign Private Issuer" Exemption

To determine if Defendants are entitled to the private foreign issuer exemption, the Court turns first to the relevant statutory language. As quoted above, *Section 14(a)* refers to the solicitation "in respect of any security (other than an exempted security) registered pursuant to *section 78l* of this title." The exemption at issue is contained in *17 C.F.R. 240.3a12-3(b)*, which provides that "securities registered by a foreign private issuer . . . shall be exempt . . ." (emphasis added). The term "foreign private issuer" is further defined by reference to *17 C.F.R. 240.3b-4*. Under this section, a "foreign issuer" includes a corporation incorporated or organized under the laws of any foreign country, and defines a "foreign private issuer" as any foreign issuer other than a foreign government, except an issuer that meets the following criteria:

> (1) More than 50 percent of the issuer's outstanding voting securities are directly or indirectly held of record by residents of the United States; and

> (2) [*90] Any of the following:

>> (i) The majority of the executive officers or directors are United States citizens or residents;

>> (ii) more than 50 percent of the assets of the issuer are located in the United States; or

>> (iii) the business of the issuer is administered principally in the United States.

*17 C.F.R. § 240.3b-4(c).*

Tracinda does not contest that Defendants fit into the definition of a foreign private issuer; however, Tracinda contends that when read in conjunction with *Section 14(a)*, the exemption does not apply to the solicitation of shareholders of a domestic company. The Court agrees with Tracinda. By its express language, the exemption under *Rule 3a12-3(b)* pertains to securities registered by a foreign private issuer. In this case, the solicitation was aimed at inducing Chrysler shareholders to vote their shares of Chrysler, a non-exempt registered security, in favor of the Merger. The cases to which Defendants refer

do not address the circumstances present here. For example, in *Batchelder v. Kawamoto, 147 F.3d 915, 922 (9th Cir. 1998)*, the proxy statement was aimed at soliciting the holders of ADRs [*91] in Honda, a foreign private issuer. In Vivendi, the Court did not analyze this question in detail and held that Vivendi was organized under French law and therefore a "foreign private issuer." Further, as discussed above, *Vivendi* did not deal with the situation in which a proxy was jointly prepared. Accordingly, the Court is persuaded that Defendants may be held liable under *Section 14(a)*, if Tracinda can prove the elements required to establish such a claim.

IV. Whether Tracinda Has Established By A Preponderance Of The Evidence Its Claims For Common Law Fraud And Violations Of Sections 10b And 14(a) Of The Exchange Act And Rules 10b-5 And 14a-9 Promulgated Thereunder

A. Whether Tracinda Has Proven Actionable Oral Misrepresentations

In support of its claims for common law fraud and violations of the securities laws, Tracinda contends that Defendants made several oral, material misrepresentations through Robert Eaton for which Defendants should be liable. Specifically, Tracinda contends that Eaton told Kerkorian that the proposed transaction would be a "merger of equals," that the Board of Management of the new company would be evenly split, that Eaton [*92] and Schrempp would be co-chairmen of the combined company, that the Chrysler team was going to have a significant role in the new company and that the two companies would be equal partners.

1. Whether Defendants Should Be Held Liable For Oral Representations Made By Eaton

Tracinda does not advance any oral misrepresentations that were made directly by Defendants to Kerkorian or any other Tracinda representative. Rather, Tracinda's argument rests on Schrempp's alleged use of Eaton as a conduit to funnel allegedly false information to Kerkorian in order to gain his support for the Merger. Thus, as a threshold matter, the Court must first determine whether Defendants should be held liable for the statements made by Eaton to Kerkorian.

A defendant cannot be held liable for the independent representations of a third party, even where those representations are attributed to the defendant, unless the defendant "exercised the kind of control [over the third party's statements] that would render it liable for [those] statements." *Raab v. Gen. Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993)*. Without such control, "any statement[s] made by [the defendant] could be taken

[*93] out of context, incorrectly quoted, or stripped of important qualifiers." *Id. at 288.*

Reviewing the trial testimony elicited from Eaton, Kerkorian and Schrempp, the Court concludes that Tracinda has not proven its contention that Defendants used Eaton to communicate misrepresentations to Tracinda such that Defendants should be liable for any statements made by Eaton to Kerkorian. During the period of time when Tracinda alleges these misrepresentations were made, Daimler-Benz and Chrysler were separate, independent public companies engaged in arms-length negotiations. Defendants exercised no control over Eaton or the statements he made to Kerkorian. Eaton testified that he kept Kerkorian advised in only a general way regarding the progress of his discussions with Schrempp and did not report any details of his discussions with Kerkorian to Schrempp, Eaton Vol. D Tr. 861:5-11; Eaton Dep. 91:5-16; Schrempp Dep. 237:9-240:24. Eaton also denied saying anything to Kerkorian at Schrempp's direction:

> Q: Your discussions with Mr. Kerkorian. You weren't reporting the details to Mr. Schrempp, were you?
>
> A: No sir.
>
> Q: And he wasn't telling you what to say to Mr. [*94] Kerkorian, was he?
>
> A: Heavens no.
>
> Q: Heavens no.
>
> A: Likewise, I wasn't telling him what to say to Deutschbank or Quadies (phonetic), either.

Eaton Vol. D. Tr. 861:8-10. Eaton's testimony in this regard is also consistent with the testimony of Schrempp:

> Q: Did Mr. Eaton ever ask you to do or say anything or accept anything on account of Mr. Kerkorian?
>
> A: No, he never did.
>
> Q: Did you ever ask . . . Mr. Eaton to do anything or say anything or accept anything on account of Mr. Kerkorian?
>
> A: No I didn't.

Schrempp Tr. Vol. F. 1183:11-17.

Tracinda directs the Court to the statements the Court made in its summary judgment opinion that

> the record evidence suggests that Defendants made a concerted effort to gain Tracinda's support for the [transaction]. Defendants wanted Tracinda's full and unconditional support and knew that Eaton was communicating Defendants' intentions to Tracinda. Defendants also wanted Tracinda to enter into the Stockholder Agreement to ensure Tracinda's support for the [Transaction].

*In re DaimlerChrysler, 294 F. Supp. 2d at 625* (emphasis added). The Court's reference to this [*95] exchange of information from Defendants to Eaton to Tracinda does not mean the Court concluded that Eaton was providing information under the control and direction of Defendants. As the above testimony of both Eaton and Schrempp demonstrate the conversations were known to the parties, but the content of the conversations was not dictated by either of them. Further, the Court did not address on summary judgment the question of whether Eaton's representations were properly attributed to Defendants. The Court's language only addressed the question of whether Defendants could establish the lack of reasonable reliance by Tracinda as a matter of law in the context of a motion for summary judgment. Now a full trial has been held on the merits of Tracinda's claims, and the Court concludes that Tracinda has not proven by a preponderance of the evidence that Defendants are liable for the oral statements made by Eaton to Kerkorian. That Schrempp knew that Eaton was talking with Kerkorian at some point and that Schrempp wanted the support of Chrysler's shareholders for the Merger does not establish that Schrempp knew or controlled the substance of what Eaton was saying to Kerkorian. Schrempp Tr. [*96] Vol. G. 1485:16-23. Schrempp testified that both sides wanted the support of the others' major shareholders and that he was unaware of the extent to which Tracinda was apprised of the Merger negotiations. Schrempp Tr. Vol. G. 1487:24-1488:3, 1490:17-18, 1494:7-16. In this regard, Schrempp further testified that he never sought to communicate either directly or indirectly with Kerkorian to induce him to vote in favor of the transaction. Rather, as Schrempp put it, "I agreed with Bob Eaton that, so to speak, he would look after his constituency, including the most important shareholder of Chrysler, and obviously my duty was to do the same on the Daimler side." Schrempp Tr. Vol. F. at 1183:2-10. Schrempp's testimony is consistent in all regards with Eaton's testimony as it pertains to this issue. Eaton Tr. Vol. D. 861:5-13. Accordingly, the Court concludes that Tracinda has not established that

Defendants are liable to Tracinda for the oral statements made by Eaton to Kerkorian.

### 2. Whether Tracinda Has Proven That Eaton's Oral Statements Were Material Misrepresentations

In the alternative, even if the Court concludes that Defendants could be held liable for the statements made by Eaton, [*97] the Court concludes that Tracinda has not proven that actionable, oral misrepresentations were made to Kerkorian. To support a fraud action, "a representation must be definite; mere vague, general or indefinite statements are insufficient." *Pig Improvement Co. v. Middle States Holding Co., 943 F. Supp. 392, 406 (D. Del. 1996)*; see also *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1427-1428 (3d Cir. 1997)*. Reviewing the testimony of Kerkorian and Eaton, the Court concludes that the statements made by Eaton to Kerkorian were vague, indefinite and that type of general optimism which is insufficient to support a fraud or federal securities violation claim. n8 *In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3d Cir. 1999)* (holding that "vague and general statements of optimism . . . even if arguably misleading, do not give rise to a federal securities claim because they are not material"); see also *In re MCI Worldcom, Inc. Secs. Litig., 191 F. Supp. 2d 778, 784 (S.D. Miss. 2002)* (holding that statements concerning expected merger synergies were too vague to support a federal securities claim).

n8 See also *Grossman v. Novell, Inc., 120 F.3d 1112, 1117, 1121-1122 (10th Cir. 1997)* (holding that numerous statements, including among others, that the merger presented a "compelling set of opportunities" was not actionable because statements were "the sort of soft puffing statements, incapable of objective verification, that courts routinely dismiss as vague statements of corporate optimism"); *In re Newell Rubbermaid Inc. Sec. Litig., 2000 WL 1705279, *7 (N.D. Ill. Nov. 14, 2000)* (holding that statements that merger was "an exceptional strategic fit"; that the combined companies' products "will be attractive to consumers"; that merger was a "major development" in company's growth strategy; and references to synergies that management expected to result from the merger because they "contain[] no useful information upon which a reasonable investor would base a decision to invest"); *In re S1 Corp. Secs. Litig., 173 F. Supp. 2d 1334, 1335-1336 & n.15 & 17 (N.D. Ga. 2001)* (holding that several alleged misrepresentations regarding company's mergers and acquisition, including among others that companies were "complementary" and that

"combining forces . . . remains extremely strategic for us" were not actionable).

[*98]

In support of its claims of oral misrepresentations, Tracinda advances the testimony of Kerkorian. However, the Court is not fully persuaded by Kerkorian's testimony as it pertains to the specifics of his conversations with Eaton. On detailed points, the Court finds Kerkorian's testimony to be inconsistent with his prior deposition testimony. As such, the Court credits the testimony of Kerkorian only to the extent that it is consistent with the testimony of Eaton on this issue.

Eaton testified at trial that his conversations with Kerkorian were "reasonably general" and not on a very "deep level." Eaton Tr. Vol. D. 762:11-23. A review of Kerkorian's testimony at his deposition and during cross-examination at trial supports the finding that Eaton's description of his conversations with Kerkorian was accurate. Describing the substance of his conversations with Eaton, Kerkorian testified during his deposition as follows:

> Q: Can you tell us what Eaton told you about that transaction during that time period?
>
> A: Eaton was very enthused because it puts pressure worldwide. It puts Mercedes more domestically. He liked Jurgen Schrempp. He said, they will really make a great partner, [*99] and it's the only company he knew of like that, that, A, would be a good equal merger partners. They were two and two have a chance to go to the five.
>
> Q: Have you told me everything you recall about those conversations between the first conversation and the time it was publicly announced?
>
> A: Have I told you everything I recall?
>
> Q: That's all you can tell me, Mr. Kerkorian.
>
> A: He was very happy with Jurgen Schrempp. He thought he'd be a good partner. He kept telling me that.
>
> Q: What else did Mr. Eaton tell you?
>
> A: About what?

Q: About the merger.

A: About the merger?

Q: Yeah. We got off on a side tangent. I'm trying to get back.

A: I think I told you what it was. He thought that it would be a good growth company together.

Q: Okay. Have you now told me everything that Mr. Eaton told you about the merger?

A: To the best of my memory, yes.

Q: Do you have any way to refresh your recollection?

A: Anything outside of the things I just told you -- that's about it.

Kerkorian Tr. Vol. C 633:4-25, 634:1-11. In this vein, Kerkorian also admitted during his deposition testimony that Eaton "didn't get into [the manner [*100] in which the Merger would be implemented] much." Kerkorian Dep. 225:9-11. Kerkorian's trial testimony was similarly vague referring to Eaton's alleged statements that Chrysler and Daimler-Benz would be "good partners" and that a transaction between the two might result in beneficial synergies. n9 Kerkorian Tr. Vol. B. 294:13-16, 295:5-15, 297:18-23, 417:25-418:4; Kerkorian Tr. Vol. C. 633:4-634:7. Further, both Eaton and Kerkorian testified consistently that they did not discuss post-merger corporate governance or the way in which the Boards functioned under German corporate law. Eaton Tr. Vol. D 860:16-25; Kerkorian Tr. Vol. B. 294:21-24.

n9 The vague nature of these representations also defeats any claims by Tracinda of reasonable reliance. As one court has stated:

> Merging companies always predict that they will integrate their sales forces and management teams and that they will achieve 'synergies' from the combination. Reasonable investors know better than to rely on these statements, which are all too familiar to market observers.

Kane v. Madge Networks N.V., 2000 U.S. Dist. LEXIS 19984, 2000 WL 33208116, *3 (N.D. Cal.

May 26, 2000), aff'd, 32 Fed. Appx. 905, 2002 WL 506286 (9th Cir. Mar. 27, 2002).

[*101]

Although Kerkorian testified at trial that he remembered that Eaton told him there would be "equal members on management, Directors of the two companies together," Kerkorian testified during his counsel's follow up question, "I think it was senior management we're talking about. I don't recall that part too well." Kerkorian Tr. Vol. B. at 294:17-20. On this record, the Court concludes that the Eaton testimony relied upon by Tracinda to establish reliance is seriously lacking. Eaton did not discuss an "even split" or a "merger of equals" or even the word "partner" as Tracinda contends, but reiterated in a general way that the two management teams could be combined to form a new company. Eaton Tr. Vol. D. 762:24-763:7, 22-764:8. That Eaton's conversations with Kerkorian were on a general level is further confirmed by the impression Kerkorian's testimony conveyed concerning his understanding of the proposed transaction. Based on Kerkorian's testimony, the Court finds that his understanding of the transaction was premised on broad-based generalities, rather than detailed specifics. By way of example, Kerkorian insisted on direct examination that he recalled that the Management Board of [*102] the merged company was to have a 50/50 split of five Americans and five Germans. In actuality, the Supervisory Board was the body that was to have the five/five split. Although Kerkorian was prompted by his counsel to recall that this discussion referred to the Supervisory Board, Kerkorian maintained that the reference of a five/five or 50/50 split was to the Management Board. Kerkorian Tr. Vol. B at 306:25-307:1-25. In sum, the Court concludes that Tracinda has not established any misrepresentation based on the composition of the Management Board.

Further, to the extent that Tracinda contends that Eaton orally represented that he and Schrempp would be co-chairmen of the combined company, the Court concludes that this representation cannot be actionable because it was true. No time frame was given for the duration of the co-chairmanship in any oral representations, and once the companies merged, Eaton and Schrempp were co-chairmen of the Management Board until Eaton decided to retire. That Eaton intended to retire within three years of the merger was known to Kerkorian. As Eaton testified, "Through me and through Mr. Aljian, [Mr. Kerkorian] understood that I was going to stay until [*103] the merger was well along and that I would have a contract up to three years." Eaton Tr. Vol. D. 764:14-17. That Tracinda knew that Eaton would be retiring within three years was confirmed by the

testimony of Kerkorian. Kerkorian Tr. Vol. B. 295:18-23. While Kerkorian testified that he believed that Chrysler would have someone else in the chairmanship spot, Kerkorian's testimony was undermined by the testimony of both Eaton and York. Eaton publicly stated that there would be only one Chairman after he retired, and Eaton did not tell Kerkorian that Holden would become the chairman. Eaton Tr. Vol. D. 859:7-860:4; PX 538; Stallkamp Tr. Vol. I 1981:19-24. Further, York's testimony demonstrates that Tracinda understood that Schrempp would eventually be the sole chairman of DaimlerChrysler. York Dep. 251:22-24.

As for Kerkorian's representations that Eaton orally represented the transaction as a "merger of equals," Eaton also denied using that terminology with Kerkorian. Eaton Tr. Vol. D 763:8-14. However, even if Eaton referred to the transaction as a merger of equals, the Court is not persuaded that this oral reference, standing alone, is sufficient to form the basis of an actionable [*104] oral misrepresentation. While the Court will analyze the term "merger of equals" in greater detail with regard to the representations made in the BCA and the Proxy/Prospectus, the Court is persuaded that, without reference to these written materials, the term is so vague and general that it is insufficient to constitute an actionable oral misrepresentation. The Court's conclusion is consistent with the testimony of numerous witnesses, including Valade and Eaton, Chrysler's two principal negotiators for the Merger. When discussing the meaning of the term "merger of equals," Eaton continually referred to the written materials accompanying the transaction. Eaton Tr. Vol. D at 825:5-14, 827:21-25, 837:3-5, 846:19-22. Similarly, Valade also defined the term "merger of equals" by reference to the written materials, particularly for Valade, by reference to the BCA. Valade Tr. Vol. L at 2492:4-20, 2493:8-14. The two principal investment bankers involved in the Merger also testified that the term "merger of equals" is not limited to a single definition. Dibelius Dep. 228:6-17; Koch Dep. 148:3-4; DX 6. Indeed, Kerkorian himself referred to the Proxy/Prospectus in explaining the term "merger of [*105] equals," Kerkorian Tr. Vol. B. 293:17-19, and Kerkorian provided no testimony suggesting that Eaton represented or defined the term "merger of equals" in a manner differently from that which was contained in the written documentation. n10 Further, the Court finds that any understanding Kerkorian had of the term "merger of equals" apart from the written materials was not based on representations made by Eaton. Kerkorian Tr. Vol. C 649:1-11. In this regard, the Court also notes that Kerkorian himself did not offer specifics when he referred to the term "merger of equals" explaining that a "merger of equals . . . means that the two companies are looking at each other to form a company which would have synergism. And the best

way I can state that is where two and two make five. That would be my explanation." Kerkorian Tr. Vol. B 276:5-9, 297:14-20; 293:13-25. In the Court's view, this testimony further supports the finding that, standing alone and without reference to the written documentation pertaining to this transaction, the oral representation of the transaction as a "merger of equals" is the type of "promotional phrase" which is devoid of any substantive information, and thus, too [*106] vague to be actionable. See, e.g., *Searls v. Glasser, 64 F.3d 1061, 1066 (7th Cir. 1995)* (holding that term "recission-resistant" was not actionable because it, lacked the requisite specificity and contained no information on which a reasonable investor would base an investment decision).

> n10 Kerkorian also testified that he expected the details of what would constitute the merger of equals to be set forth in written documentation and presented to the Chrysler Board. Kerkorian Tr. Vol. C. 647:17-648:4; 648:16-649:11; 649:14-22; Kerkorian Dep. 226:2-12. Kerkorian's testimony in this regard also negates any assertion of reasonable reliance on any alleged oral representations by Eaton concerning the "merger of equals."

### 3. Whether Tracinda Has Demonstrated Reasonable Reliance On Any Oral Representations

Further, the Court concludes that Tracinda has failed to prove that it relied on any oral representations made by Eaton to Kerkorian, and therefore, Tracinda has failed to prove that it was fraudulently [*107] induced to enter into the Stockholder Agreement by such alleged oral misrepresentations. The Court also concludes that Defendants have affirmatively proven the absence of reasonable reliance by Tracinda.

To establish its claims of common law fraud and a violation of the securities laws under *Sections 10(b)* and *Rule 10b-5* of the Exchange Act, Tracinda must show that it reasonably relied on the alleged misrepresentations or omissions that form the basis of its claims. *Tracinda, 197 F. Supp. 2d at 64* (citing *Graham v. Taylor Capital Group, Inc. (In re Reliance Sec. Litig.), 91 F. Supp.2d 706, 720 (D. Del. 2000); Browne v. Robb, 583 A.2d 949, 955 (Del. 1990)).* In the context of *Rule 10b-5* claims, the Third Circuit has identified a list of factors for determining whether a plaintiff's reliance was reasonable including, but not limited to: (1) the existence of a fiduciary relationship; (2) the plaintiff's opportunity to detect the fraud; (3) the sophistication of the plaintiff; (4) the existence of a longstanding business or personal relationship; and (5) the plaintiff's access to the relevant information. *Straub v. Vaisman & Co., 540 F.2d 591,*

*598 (3d Cir. 1976).* [*108] In addition to these factors, the Third Circuit has also recognized that the presence of an integration/non-reliance clause in a written agreement is a factor which should be considered in determining whether the plaintiff's reliance was reasonable. *In re DaimlerChrysler IV, 294 F. Supp. 2d at 622-623.* Thus, the determination of reasonable reliance must "be made on a case-by-case basis based on all of the surrounding circumstances." *AES Corp. v. The Dow Chemical Co., 325 F.3d 174, 179 (3d Cir. 2003).* The Third Circuit has further recognized that the absence of reasonable reliance "is in the nature of an affirmative defense," and therefore, the defendant bears the burden of establishing that the plaintiff's reliance was unreasonable. *Straub, 540 F.2d at 598.*

Considering the totality of the circumstances, in light of the applicable law and the evidence adduced at trial, the Court concludes that Tracinda was not fraudulently induced to enter in to the Stockholder Agreement, did not rely on any oral representations allegedly made by Eaton, and that, even if Tracinda relied on such oral representations, its reliance was unreasonable under [*109] the circumstances. In reaching the latter conclusion, the Court has weighed the *Straub* and other relevant factors and finds that on balance, the circumstances demonstrate that Tracinda could not have reasonably relied on any oral representations allegedly made by Eaton. Kerkorian was kept apprised of the Merger negotiations not only by Eaton, but by numerous individuals representing Tracinda, including Jerry York, Richard Sobelle, Jim Aljian and Anthony Mandekic. Aljian Dep. 27:19-28:3. Although Kerkorian testified that he did not pay attention to the materials submitted by these individuals, the Court finds that the evidence suggests otherwise, and that in any event, it would have been unreasonable for Tracinda to rely on Eaton when it had its team of highly paid advisors working on its behalf. As the Court previously concluded, Eaton only generally apprised Kerkorian of the negotiations; however, the aforementioned Tracinda representatives were asked by Kerkorian to provide him with more detailed information and to make sure that the written agreements embodied the transaction that Tracinda expected. Mandekic Tr. Vol. A. 162:5-163:3, 165:7-14; Kerkorian Tr. Vol. C. 649:1-11, 652: [*110] 10-15. Aljian represented Tracinda on the Chrysler Board and was an active participant in the Board's meetings. Aljian updated York whenever he received information from Chrysler and York used the non-public information that Aljian received to prepare numerous detailed analyses for Kerkorian. DX 31, 37. As Tracinda stated in its press interview materials, "We have been kept informed of the status [of the negotiations] by virtue of our representation since February, and provided periodic input, including indicating our strong support." DX 42.

In addition to Tracinda's clear channel of access by virtue of its representation on the Chrysler Board, Tracinda was also a sophisticated investor with a business practice of requiring written documentation before entering into a major transaction. Mandekic Tr. Vol. A. 143:1-20. Indeed, the complexity and magnitude of this transaction as a multi-billion dollar cross-border transaction, the largest industrial merger of its kind at the time, and the first between a U.S. and German public company, weighs in favor of finding a lack of reasonable reliance on any oral representations. Cf. *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 551 (2d Cir. 1998)* [*111] (recognizing that million-dollar acquisition was "clearly . . . the type that ordinarily would be committed not only to a writing but to a formal contract complete with representations and warranties and other standard provisions usually found in sophisticated, formal contracts"); *Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 262-263 (2d Cir. 1984)* ("The magnitude and complexity of the deal as reflected in the numerous written contract drafts not only reinforce the parties' stated intent not to be bound until written contracts were signed, but also reflect a practical business need to record all the parties' commitments in definitive documents.").

Moreover, the written documents governing this transaction contradict the oral representations allegedly made by Eaton to Tracinda and contain integration clauses precluding the parties from incorporating any oral representations into the parties' agreements. n11 Specifically, the Stockholder Agreement by which Tracinda committed to vote its shares in favor of the Merger provides:

> This Agreement, the Standstill Agreement, and the other agreements executed and delivered by any of the parties hereto and the Stockholder [*112] in connection herewith constitute the entire subject matter hereof and supersede all other prior agreements and understandings, both written and oral, between the Stockholder and such other parties with respect to the subject matter hereof.

DX 108 at 250, § 4.3. The BCA contains a similar clause, and both the BCA and the Stockholder Agreement were negotiated at arms length and reviewed by in-house and outside counsel for Tracinda. DX 39, Aljian Dep. 245:18-246:18. Such clear language included in business agreements between sophisticated

business entities certainly weighs in favor of a conclusion that Tracinda's alleged reliance was unreasonable. See, e.g., *AES Corp. v. Dow Chem. Co., 325 F.3d 180-183 (3d Cir. 2003)*; *St. James Rec., LLC v. Rieger Opportunity Ptnrs, LLC, 2003 Del. Ch. LEXIS 126, 2003 WL 22659875, *3 & n.14 (Del. Ch. Nov. 5, 2003)*; *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co., 2002 Del. Ch. LEXIS 91, 2002 WL 1558382 at *7 (Del. Ch. July 9, 2002)*.

n11  The Court also notes that the Proxy/Prospectus contained a non-reliance clause for representations contained outside the Proxy/Prospectus. Specifically, the Proxy/Prospectus stated:

**No person has been authorized to give any information or make any representations not contained or incorporated by reference in this Proxy Statement/Prospectus and, if so given or made, such information must not be relied upon as having been authorized by DaimlerChrysler AG, Daimler-Benz, Chrysler or any other person.**

DX 20 at 5 (bold type in original). Although the Court has concluded that Tracinda was obligated to vote for the Merger prior to the issuance of the Proxy/Prospectus, the presence of this non-reliance clause further weighs against a finding of reasonable reliance on oral representations by Tracinda.

[*113]

In addition, the clear language of the BCA is at odds with the alleged statements that Tracinda attempts to attribute to Eaton. For example, the BCA did not provide for an "even" split on the Management Board. It provided for a Management Board comprised of eight former Chrysler members and ten former Daimler-Benz members. DX 20 at 65-66. Similarly, the BCA provided to Chrysler, before the Merger closed, the right to replace any Chrysler designee to the Management Board that ceased to be employed by Chrysler. However, there was no provision for Chrysler to make such replacements after the Merger closed. Thus, while not alone dispositive, the Court concludes that the presence of the integration clauses in the documents and the contradictions in the written agreements compared to the

alleged oral representations weigh against a conclusion of reasonable reliance by Tracinda. n12

n12 See *Poth v. Russey, 281 F. Supp. 2d 814, 822 (E.D. Va. 2003)* (finding no reasonable reliance on oral representations that contradicted written agreements that plaintiffs received, reviewed and discussed with lawyers where plaintiff was sophisticated investor), aff'd, *99 Fed. Appx. 446, 2004 WL 614623 (4th Cir. Mar. 20, 2004)*; BRLI No. *1 Acquisition Corp. v. Klafter, 2002 WL 31431469, *4 (D.N.J. Aug. 30, 2002)* (holding that plaintiff's reliance was not reasonable where plaintiff was sophisticated buyer, no fiduciary relationship existed between the parties and alleged misrepresentations conflicted with financial statements provided by defendant); see also *DeBakey Corporation v. Raytheon Service Co., 2000 Del. Ch. LEXIS 129, 2000 WL 1273317, *22 (Del. Ch. Aug. 25, 2000)* (holding that plaintiff could not reasonably rely on oral promise of defendant to provide more than $ 2 million in funding where written agreement expressly gave defendant discretion to terminate once $ 2 million limit was reached).

[*114]

Further, the Court finds that Defendants had no long-standing business or personal relationship with any of Defendants that would tip the scales in favor of finding reasonable reliance. See, e.g., *N.S.N. Int'l Indus., N.V. v. E.I DuPont de Nemours & Co., 1994 Del. Ch. LEXIS 46, 1994 WL 148271, *7-8 (Del. Ch. Mar. 31, 1994)* (finding that no fiduciary duty existed where parties' relationship existed as a result of contract negotiated at arm's length). Although Tracinda points to Kerkorian's relationship with Eaton, the Court has concluded that Defendants exercised no control over what Eaton communicated to Kerkorian, and therefore, Defendants have no liability for Eaton's statements. Indeed, after hearing Kerkorian's trial testimony regarding his relationship with Eaton, the Court is persuaded that it would have been unreasonable for Kerkorian to rely on the oral representations of Eaton. Kerkorian's trial testimony demonstrated that the two had experienced several periods of tense disagreement. For example, Tracinda, through Kerkorian and York, threatened Eaton with litigation n13, publicly questioned his management abilities n14, and thought about the possibility of replacing him if he [*115] left because of the difficulties between him and Kerkorian. n15 Additionally, a misunderstanding between Kerkorian and Eaton led Tracinda to attempt a hostile takeover of Chrysler. n16 Given the prior difficulties between Eaton

and Kerkorian, the personal financial stakes of the Chrysler executives in the deal, the presence of written documentation contradicting the alleged oral representations and containing integration clauses, the sophistication of Tracinda as an investor, its business practice of documenting transactions in writing, its access to the Board of Chrysler, and the magnitude and uniqueness of the Merger, the Court concludes that it would have been unreasonable for Tracinda to rely on the oral representations of Eaton.

> n13 Kerkorian Tr. Vol. B 323:21-324:18.
>
> n14 DX 234-235.
>
> n15 Kerkorian Dep. 126:10-127:2, DX 24 at 27.
>
> n16 DX 96, 123; Kerkorian Tr. Vol. B 330:3-13; 331:5-9; DX 698; Aljian Dep. 22-16-19.

Moreover, the Court finds that Tracinda's decision to enter into the Merger was [*116] not guided by corporate governance considerations or the "merger of equals" label, and therefore, as a factual matter, the Court is not persuaded that the record evidence can support a conclusion that Tracinda relied on any alleged oral representations concerning corporate governance. In this regard, Kerkorian's testimony on direct examination that he relied on Eaton's oral representations concerning corporate governance is contradicted by his testimony on cross-examination, as well as by his conduct during the relevant time, and several document exhibits admitted into the record. Taking this evidence as a whole and in context, the Court concludes that it demonstrates that Tracinda did not find corporate governance or the "merger of equals" label to be important at the time of the Merger. Kerkorian supported the Merger and thought there "would be a good value" in the transaction before he had any discussions about corporate governance. Kerkorian Tr. Vol. B. 423:4-12; 417:8-421:17. Kerkorian never expressed to Eaton that he was interested in corporate governance issues, Eaton Tr. Vol. D 860:16-18; PX 966 at P 3, he did not discuss such issues with Eaton, and he admitted during his deposition [*117] that he was not concerned with these management issues:

> Q: Would you have been concerned about Mr. Schrempp naming a management team for the new company that left control firmly in the hands of the former Daimler executives?
>
> A: No. I still felt it was all one company.

Kerkorian Dep. 349:18-22, 225:9-16. While Kerkorian maintained on direct that the "merger of equals" was important to him, on cross-examination, Kerkorian echoed his deposition testimony nearly verbatim as to what he found to be the important aspects of the Merger:

> Q: Am I correct that the issues that were of significance to you were the price?
>
> A: Yes.
>
> Q: Timing?
>
> A. Timing.
>
> Q: And whether it would be a good growth company?
>
> A: Yes.
>
> Q: And that is all the issues, isn't it?
>
> A: Probably. Could have been some others.
>
> Q: But that's what you recall?
>
> A: I will accept that.

Kerkorian Tr. Vol. C. 629:13-630:2, DX 47; 85; Kerkorian Tr. Vol. C. 668:24-669:7; Kerkorian Dep. 234:18-235:23. Testifying further at his deposition, Kerkorian admitted that if Eaton was still at Chrysler, he would not have felt that the Merger was a takeover, regardless of the [*118] number of members from Chrysler on the Management Board:

> Q: Well, if you had brought Eaton back and Eaton had come out of retirement, would you have felt it was a takeover by Mr. Schrempp?
>
> A: No.

Kerkorian Dep. 396:11-14. At trial, Kerkorian added that he only shared the view he expressed at his deposition if the constitution of the Management Board was the same as it was at the time of the Merger, but Kerkorian's assertion is belied by the fact that the Management Board was not the same when he made his remarks, but was a nine to four split. Kerkorian Tr. Vol. C 686:22-687:1. Kerkorian's testimony that he was primarily concerned about the composition of the Management Board n17, is further undermined by his deposition testimony that he

was focused on the "top group" of Eaton and Schrempp, and his trial testimony confusing the composition of the Management Board with the Supervisory Board. n18 Kerkorian Tr. Vol. B. 306:20-308:5; Kerkorian Dep. 341:21-24.

> n17 See Kerkorian Tr. Vol. B. 308:8-13; Vol. C. 644:7-9.

> n18 At trial, Kerkorian testified that he was concerned about the composition of the Management Board because he perceived that board to be the more important board. However, Kerkorian's testimony that he believed the Management Board to be the more important board is undermined by testimony of Aljian that it was an affront to a major shareholder to be passed up for a seat on the principal board of the company, the Supervisory Board. Aljian Dep. 253:11-13, 254:8-19. Further, at his deposition, Kerkorian himself indicated that he understood that the Supervisory Board was the more powerful board:

>> Q: Did Mr. Aljian express to you at any time the fact that the Supervisory Board held the power at DaimlerChrysler?

>> A: I don't recall him saying it, but I think we were all aware of it.

> Kerkorian Dep. 49:25-50:5.

[*119]

Kerkorian's assertion that he was troubled by the unequal management division is also challenged by the lack of attention he paid to articles circulated by York and Alijian concerning the changes in the Management Board. When asked about one of these articles at trial, Kerkorian confirmed his lack of interest at the time, and reiterated the point he made at his deposition that as long as Eaton was there, he was content:

> Q: You've told me about your concern and how much importance you placed on this equal division. Why were you not concerned?

> A: Because I had a lot of other things on my mind.

> Q: It wasn't important to you at the time?

> A: Listen, it was important that Robert Eaton was there and the synergism. They were picked up and the business was doing well. He was happy with it and made me happy with it.

> Q: So if Eaton was happy, you were happy?

> A: Yes.

Kerkorian Tr. Vol C. 690:24-691:9, 692:19-693:9. Kerkorian responded in similar fashion when presented with other articles, including articles that discussed Chrysler's operation as a division testifying:

> Q: The fact is, as long as Mr. Eaton was around, it didn't matter much, did it? [*120]

> A: That's mainly it.

Kerkorian Tr. Vol. B. 700:8-703:3.

The finding that Tracinda was not principally concerned about these corporate structure and governance issues is further supported by the testimony of Aljian. Aljian was present when the post-merger governance changes were discussed at the Shareholder Committee meetings and never voiced an objection to the proposed changes, and in fact, supported the changes. DXs 559-562, 567-571, 573, 699, 701; Schrempp Tr. Vol. F. 1222:20- 1223:11; Wilson Tr. Vol. H. 1731:5-1732:10; Aljian Dep. 415:2- 426:13. Aljian also referred to Chrysler as a division in the memos he shared with Kerkorian and testified that he was unconcerned about references to Chrysler as a division. Aljian Dep. 379:21-392:9, 394:25-395:7, 396:24-25; DX 74 at T 13343; Kerkorian Dep. 328:14-330:5.

Internal documents of Tracinda prepared by York and Aljian also demonstrate that Tracinda was not focused on corporate governance issues, but on the economics of the transaction. DXs 34-38. For example, York prepared an analysis dated February 16, 1998, of the combined value of Chrysler and Daimler-Benz which stated that "the key issue" was the "PE multiple of [the] [*121] combined entity." DX 34 at Y 58 (emphasis in original). York went on to state that "the valuation potential is so great that nothing should stand in the way of a complete board evaluation of this possible combination." At the time York prepared this memo, he had no information about corporate governance and the term "merger of equals" had not yet been used to describe the transaction. York Dep. 173:10-18, Kerkorian Tr. Vol. B 423:4-12.

In a March 4, 1998 Memorandum, which York described as including all the reasons he could think of that the Merger could produce "huge value," York did not include the term "merger of equals" and made no reference to corporate governance. York stated that the "situation is compelling to do the merger" and "now is the time to do it, before the Chrysler-specific risks materialize." DX 35 at T 8813. York went on to say that "no conceivable Chrysler standalone plan can achieve the value of the synergies of a merger." DX 35 at T 8813. Additionally, Aljian referred to this memo during his deposition testimony and described it as "showing the basis of the benefit of the merger." Aljian Dep. 201:11-13.

The Court further finds that Tracinda's view of the transaction [*122] did not change as discussions concerning the Merger progressed. Significantly absent from a memorandum entitled "Cleveland/Denver Key Issues" which was created a week before the Chrysler Board approved the Merger, is any mention of the term "merger of equals" or of the post-merger governance structure of the combined entity. Yet, York described this Memorandum as embodying his views, as well as the views of Aljian and Sobelle, concerning the key issues of the transaction, and Kerkorian could not identify any issues beyond those discussed in the Memorandum that were important to him. Kerkorian Dep. 233:21-235:21; Kerkorian Tr. Vol. C. at 629:8-630:3. Accordingly, the Court concludes that Tracinda has failed to demonstrate the reliance element necessary to sustain its claims. The Court further concludes that Defendants have proven that even if Tracinda relied on the statements of Eaton, such reliance would have been unreasonable under the circumstances of the Merger transaction.

**B. Whether Tracinda Has Proven Actionable Written Misrepresentations In The Stockholder Agreement, The BCA, Or The Proxy Prospectus**

Based on the arguments made by Tracinda in its post-trial briefing and [*123] at trial, it appears to the Court that the documents supporting its claims of written misrepresentation are the Proxy Statement, Eaton's letter transmitting the Proxy Statement n19 and the BCA. D.I. 1019 at 55-59; D.I. 1051 at 10-11. With this understanding, the Court will proceed to determine whether the statements made in the Proxy, Eaton's letter and the BCA are actionable misrepresentations for purposes of Tracinda's *Section 10* and *14* claims.

n19 While Eaton's statements are also not attributable to Defendants for the same reasons discussed in the context of the alleged oral misrepresentations, the Court includes them in

the discussion because they impact the definition of the term "merger of equals" and are contained in the joint Proxy/Prospectus for which Defendants have liability as discussed infra Section III. B.1.

1. Whether The Statements In The BCA, Eaton's Letter and the Proxy/Prospectus Were False

Tracinda contends that Defendants made five material misrepresentations based on the contents of the [*124] BCA, Eaton's letter and the Proxy/Prospectus. Specifically, Tracinda contends that (1) the transaction was represented to be a "merger of equals," but Defendants never intended the transaction to be equal; (2) the transaction was represented to entail joint management and control, but Defendants never intended to share management and control; (3) the Defendants falsely represented in the Proxy/Prospectus that two non-automotive members of the DaimlerChrysler Board were to be non-voting members; (4) the Proxy/Prospectus is false and misleading regarding the parties decision to use the corporate form of a German AG; and (5) the Risk Factors section of the Proxy/Prospectus omits any reference to management changes. D.I. 1018 at 1061-1066; D.I. 1019 at 52- 62.

a. The merger of equals and joint management and control representations

The Court begins its analysis of alleged written misrepresentations with the most prominent and controversial alleged misrepresentation, i.e. the characterization of the transaction in the Proxy/Prospectus, Eaton's letter and the BCA as a "merger of equals." The starting point for the Court's analysis is the relevant documents, beginning with the BCA. The [*125] BCA contains a lengthy definition section, but the term "merger of equals" is not defined in that section. Instead, the "Whereas" clauses of the Agreement state:

Whereas, Daimler-Benz and Chrysler desire to combine their respective businesses, stockholder groups, managements wand other constituencies in a merger of equals transaction upon the terms and subject to the conditions of this Restated Agreement;

Whereas Daimler-Benz, Chrysler and DaimlerChysler AG desire to make certain representations, warranties, covenants and agreements in connection with the transactions contemplated by this Restated Agreement

DX 20 at A-1 (emphasis added).

Based on these clauses, the Court finds that the contemplated "merger of equals" is first defined by reference to the representations contained in the BCA. With regard to issues of corporate governance, the BCA provides that "DaimlerChrysler AG shall have a corporate governance reflecting that the transactions contemplated herein are a merger of equals." DX 20 at A-16. The BCA specifies that after the Effective Time, the Supervisory Board shall consist of twenty members, five recommended by Daimler-Benz and five recommended [*126] by Chrysler. Id. For a period of not less than two years from the Effective Time, the BCA provides that the current Chairman of Daimler-Benz's Supervisory Board shall continue as Chairman of the DaimlerChrysler AG Supervisory Board. Id. With respect to the Management Board, the BCA provides:

> The Management Board (Vorstand) of DaimlerChrysler AG shall consist of 18 members. In general, 50% of such members shall be those designated by Chrysler and 50% of such members shall be those designated by Daimler- Benz and there will be two additional members with responsibility for Daimler-Benz's non-automotive businesses. For three years following the Effective Time, Jurgen E. Schrempp and Robert J. Eaton shall be the Co-CEO's and Co-Chairman of the Management Board of DaimlerChrysler AG and members of the Office of the Chairmen of DaimlerChrysler AG. If any person designated as a member of the Office of the Chairman or the Management Board of Daimler Chrysler AG ceases to be a full-time employee of either Chrysler or Daimler Benz at or before the Effective Time, Daimler-Benz, in the case of any such employee of Daimler-Benz on the date hereof or any such employee [*127] to be designated by Daimler-Benz, or Chrysler, in the case of any such employee of Chrysler on the date hereof or any such employee to be designated by Chrysler, shall designate another person to serve in such person's stead.

Id. (emphasis added).

Although the BCA provides for the right of Chrysler and Daimler-Benz to replace a designee to the Management Board if that individual ceased to be a full-time employee of the company prior to the effective date of the Merger, no such provision existed for the departure of executives after the Merger closed. Id. at A-16-17. Other than the time frames placed on the Chairmanship of the Supervisory Board and the Co-Chairmanship of the Management Board, no provision of the BCA specifies how long the composition of the respective Boards were to last. The BCA also provides that the post-merger governance structure is based on "recommendations" and is subject to the powers of the shareholders, the Supervisory Board and the Management Board. n20

> n20 Under German law, the Supervisory Board appoints the Management Board.

[*128]

The term "merger of equals" also appears in the Proxy Statement and in Robert Eaton's letter to the shareholders accompanying the Proxy Statement. With regard to the term "merger of equals," Eaton's letter states:

> The Chrysler Merger and the other transactions described in the attached Proxy Statement/Prospectus together will have the effect of combining the businesses, stockholder groups, managements and other constituencies of Chrysler and Daimler-Benz in a "merger of equals" transaction. DaimlerChrysler AG will bring together two companies with equal financial strength under the joint leadership of both management groups and with its common equity about evenly split between the two shareholder groups.

DX 20 at cover page (T 000001) (emphasis added).

The Proxy Statement refers to the transaction having a post- merger governance structure of a "merger of equals" and reiterates the governance provisions provided for in the BCA stating that "the Management Board (Vorstand) of DaimlerChrysler AG (the "DaimlerChrysler Management Board") shall initially consist of 18 members. . . ." DX 20 at 16. That this composition of the Management Board was [*129] an "initial" composition was further specified in the initial selection process for the Board members which is outlined in the Proxy/Prospectus and states:

> Ten of such members will be those initially designated by Daimler-Benz,

including two members with responsibility for Daimler-Benz' non-automotive business, and eight of such members will be those initially designated by Chrysler.

DX 20 at 66 (emphasis added). The Proxy/Prospectus goes on to state:

> The Combination Agreement contains no provision that would bar governance changes after the Transactions have been consummated.

DX 20 at 17 (emphasis added). Comparing the rights of stockholders in Chrysler and DaimlerChrysler AG in an effort to highlight the differences between ownership of an American corporation and a German AG, the Proxy goes on to explain:

> The members of the DaimlerChrysler Management Board may be removed prior to the expiration of their terms by the DaimlerChrysler Supervisory Board only for reasons amounting to good cause, such as gross breach of duty, inability to duly fulfill their responsibilities or revocation of confidence by the stockholders' meeting. In [*130] the case of vacancies, the DaimlerChrysler Supervisory Board may fill the vacancy by appointing a new member of the DaimlerChrysler Management Board. Members of the DaimlerChrysler Supervisory Board elected by the stockholders at the general meeting may be removed upon the affirmative vote of a majority of at least 75% of all votes cast at a stockholders' meeting. Any member of the DaimlerChrysler Supervisory Board can be removed for good cause, including gross breach of duty, by a court decision upon request of the DaimlerChrysler supervisory board. In such case, the DaimlerChrysler Supervisory Board's determination to take such action requires a simple majority vote with the member affected having no voting power. In the case of vacancies, the competent court upon a motion by the management board, by a member of the supervisory board, by a stockholder or by certain employee representatives, may fill the vacancy for the interim period until the next election

by the stockholders or the employees, as the case may be.

DX 20 at 133 (emphasis added).

The Proxy Statement also discusses the merger of equals in other sections, but does so by reference to the BCA. For example, [*131] in discussing those factors that led the Chrysler Board to approve the transaction, the Proxy states:

> The merger of equals corporate governance structure contemplated by the Combination Agreement, which, in the view of the Chrysler Board, means that Chrysler's directors and senior management will be in a position to help bring about the realization of the enhanced growth prospects and synergies expected from the combination of the two companies, for the benefit of stockholders of DaimlerChrysler AG (including former stockholders of Chrysler).

Id. at 51.

Reviewing the term "merger of equals" as it is used in these documents, the Court concludes that Tracinda has not established a misrepresentation based on the use of the term "merger of equals." Although the BCA and the Proxy/Prospectus set forth proposals concerning the numbers of individuals on the Management Board and the Supervisory Board from each side of the transaction, those documents do not require the proposed compositions to last for any specific period of time, reiterate that the proposed compositions are initial compositions, state that the proposed compositions are recommendations subject to the [*132] rights and approval of the shareholders and the Supervisory Board, and make clear that changes to the corporate governance structure are not barred after consummation of the transaction.

Further, the Court is persuaded that it should not read the BCA and the Proxy/Prospectus in the manner suggested by Tracinda which would require the continued appointment in the future of individuals from the Chrysler side and the Daimler-Benz side for several reasons. First, when the transaction closed, the companies merged into a new company, DaimlerChrysler. At that point, there was no longer two independent companies to make recommendations to the Management Board. Second, there is nothing in the BCA, or any other document, dictating the nationalities of the members of the Management Board or their one-time corporate affiliation. Further, the BCA and the Proxy/Prospectus make clear that the recommendations

to the Management Board are made subject to the powers of the Supervisory Board, and under German law, it is the Supervisory Board that is responsible for filling vacancies on the Management Board. DX 20 at A-16. Indeed, as Eaton observed, an interpretation which would bind the Management Board [*133] to a rigid quota systems could inhibit the Supervisory Board from carrying out its fiduciary responsibilities. Eaton Tr. Vol. D. 827;19-25. Such a result would not only be practically unworkable, it would be legally flawed. See, e.g., *Paramount Communications v. QVC Network, 637 A.2d 34, 51 (Del. 1994)* ("To the extent that a contract, or a provision thereof, purports to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable.")

As for Eaton's representations in his cover letter to the Proxy/Prospectus, the Court concludes that those representations do not constitute actionable misrepresentations. In reaching this conclusion, the Court finds that Tracinda has not proven by a preponderance of the evidence that Eaton's statements were false or misleading. Eaton's statements regarding the strength of Chrysler and Daimler-Benz and the split of common equity were indicative of that snapshot in time to which they referred, and Tracinda has not demonstrated that they were false. Indeed, it should have been obvious, particularly to a sophisticated investor like Tracinda, that the division [*134] of equity would change over time as shareholders in the new company from both constituencies would be free to buy and sell their shares of the new company. As for Eaton's other statements, Eaton did not promise "equal" management or control of DaimlerChrysler AG, but indicated that the newly formed DaimlerChrysler AG would "bring together two companies . . . under the joint leadership of both management groups . . . ." DX 20 at cover page (T 000001). In the Court's view, these representations describe the transaction consistently with the terms of the BCA and the Proxy/Prospectus. At the time of the Merger, the Supervisory Board contained an equal split in members n21, and the Management Board included seven former Chrysler executives and nine former Daimler-Benz executives. The Management Board was co-chaired by Eaton and Schrempp as provided for in the BCA and the Proxy/Prospectus. The Shareholders Committee also included Eaton and Schrempp plus at least six designees from each company. As such, the make-up of the merged company was consistent with the joint leadership envisioned by Eaton.

n21 The Supervisory Board also maintains an equal split in its membership to date.

[*135]

Tracinda suggests that the merger of equals representations and Eaton's representations in the cover letter were false, because the composition of the Management Board changed over time, and certain vacancies that were left open by former Chrysler executives were either not filled or filled by German former executives of Daimler-Benz. As the Court has already found, however, there was nothing in the written documents that required the composition of the Management Board to remain static or that dictated the nationality or former corporate affiliation of members. To the contrary, the Proxy Statement expressly noted that the composition of the Boards outlined in the Proxy/Prospectus was the initial composition and that governance changes could follow after the consummation of the transaction. The Proxy/Prospectus also explained that the Supervisory Board of the new company had the authority and discretion to appoint and remove members of the Management Board, and nothing in the Proxy/Prospectus or the BCA required vacancies to be filled, let alone filled by American individuals with a former affiliation with Chrysler. DX 20 at 133. Further, the Proxy/Prospectus and the BCA both disclosed [*136] that Eaton would retire after three years, and thus, a change in management was to be expected. Accordingly, the Court cannot conclude that the "merger of equals" representations in the relevant documents were false.

Tracinda also contends that Defendants never intended to honor their "merger of equals" promise or to share management and control of DaimlerChrysler AG. In support of its position, Tracinda directs the Court to Schrempp's now infamous interview with the Financial Times and Barron's, as well as to the numerous post-merger changes made to the DaimlerChrysler Management Board.

As a legal matter, however, Tracinda's argument is based on the Supreme Court's decision in *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588, 149 L. Ed. 2d 845, 121 S. Ct. 1776 (2001).* in Wharf, the Supreme Court recognized that the making of a promise with no intent to fulfill that promise, coupled with a later refusal actually to fulfill the promise, constitutes a misstatement. Key to Wharf's holding is that the promise which was made was not actually fulfilled. See *Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1096, 115 L. Ed. 2d 929, 111 S. Ct. 2749 (1991).* As the Third Circuit recognized [*137] in a slightly different context, "the unclean heart of a director is not actionable, whether or not it is 'disclosed,' unless the impurities are translated into actionable deeds or omissions both objective and external." *Lewis v. Chrysler Corp., 949 F.2d 644, 651 (3d Cir. 1991).* In analyzing the representations made in the BCA and other documents concerning the "merger of equals," the Court

has concluded that the representations which were made were not false. n22 Accordingly, Tracinda has failed to prove that the promises made were not actually fulfilled as required by *Wharf*, and therefore, Tracinda cannot establish a misrepresentation based on its allegations that Defendants never intended the Merger to be a "merger of equals" and never intended to share joint management.

> n22 Further, as the Court stated in its Findings of Fact, the changes to the Management Board were supported by all the Chrysler designees on the Supervisory Board, were suggested by Chrysler executives on many occasions and were precipitated by personal or other valid business reasons. For these additional reasons, the Court is not persuaded that the changes that occurred rendered the merger of equals representation to be false. Indeed, the fact that many of these changes were suggested by individuals on the Chrysler side demonstrates the influence of those Chrysler individuals and gives more credence to the verity of the "merger of equals" representations.

[*138]

b. Selection of the German AG form

In addition to the written statements concerning the "merger of equals" and Eaton's statements in his cover letter to the Proxy regarding joint leadership, Tracinda also contends that the Proxy Statement was false and misleading regarding the selection of a German AG as the new corporate form for the merged entity. In this regard, Tracinda states:

> The Proxy Statement represents that a German AG organizational form was selected by Chrysler and Daimler "because it best achieved both parties' objectives[,]" which were represented in the Proxy Statement to have included, at least from the perspective of Chrysler, "the post-merger governance structure of a 'merger of equals.'" The Proxy Statement reiterates that the Transaction "would be the best means to accomplish the parties' objectives . . . including implementing a 'merger of equals' . . . ."

D.I. 1019 at 55-56 (citations omitted). Tracinda goes on to state that the representations concerning the discussions about the German AG are falsely depicted as relatively abbreviated, not controversial, not heavily negotiated, and as having occurred principally, if not exclusively on March 2, 1998. [*139]

A review of the Proxy/Prospectus as it pertains to this issue leads the Court to conclude that Tracinda has not proven that the Proxy/Prospectus was false and misleading with respect to the parties' selection of the German AG form of business entity. In its characterization of the Proxy/Prospectus, D.I. 1019 at 55, Tracinda links the selection of the German AG form to the goal of creating a merger of equals. n23 However, the actual language of the Proxy/Prospectus makes no such connection. Although the Proxy/Prospectus generally indicates that the parties discussed the impact of the jurisdiction of incorporation on the combined company's corporate governance, the Proxy/Prospectus does not link the German AG form to the "merger of equals" concept. Instead, the Proxy/Prospectus goes on to point out that the primary concern of the parties in selecting the German AG form was the tax consequences, followed by the need to gain acceptance of the transaction by the German constituency. In relevant part, the Proxy/Prospectus provides:

> Over the course of their discussions, the parties considered various alternative transaction structures for the combination of the two enterprises, including [*140] through (1) a newly incorporated U.S. company, (2) a company incorporated in The Netherlands and (3) either a newly organized German Aktiengesellschaft or Daimler- Benz itself. The simplest structural solution, a direct merger of Daimler-Benz and Chrysler, was not possible under German law. The parties believed that the structure for the Transactions was the preferable alternative to a combination through a newly-incorporated U.S. company or a company incorporated in The Netherlands because this structure was believed to be the most tax efficient for the combined entity on an ongoing basis, could be tax-free to Chrysler's U.S. stockholders and to Daimler-Benz' German stockholders and was the only structure which would enable the elimination of all minority stockholders of Daimler- Benz and Chrysler thereby creating a parent corporation with one group of stockholders holding a single publicly traded equity security. The structure for the Transactions was therefore selected because it best achieved both parties' objectives.

DX 20 at 48 (emphasis added). Thus, as it pertains to the selection of the German AG form, the Proxy/Prospectus does not disclose, as Tracinda contends, [*141] that the parties believed the German AG form was relevant to the "merger of equals" concept. In addition, the Proxy/Prospectus also distinguishes between the reasons for the German incorporation of the new company, and the objectives of the "Transaction," a distinction which Tracinda blurs in its representation of the contents of the Proxy/Prospectus. The term Transactions is deliberately plural (and not the singular used by Tracinda) because it refers to all of the Transactions set forth in the BCA and Proxy/Prospectus for completing the Merger. In this regard, the Proxy/Prospectus recognizes that the German AG form was desirable for tax consequences and important to the Daimler-Benz constituencies and links the selection of the German AG to these factors, but goes on to say that the "Transactions", and not the selection of the German AG, are the "best means to accomplish the parties' objectives:"

> The parties recognize that acceptance of the Transactions by important constituencies of Daimler-Benz (including German stockholders, employees and management) would be enhanced if the combined parent company were a German stock corporation (Atkiengesellschaft) because such constituencies [*142] were familiar and comfortable with that form of organization. Consequently, the parties decided that a new company organized under the laws of the Federal Republic of Germany should be the new public parent company and that the Transactions would be the best means to accomplish the parties' objectives for a business combination transaction, including implementing a merger of equals combining both companies' businesses, stockholders groups, managements and other constituencies, and further that the governance structure that had been discussed would be an appropriate management structure for the combined company in the future.

DX 20 at 49 (emphasis added).

n23 Tracinda also argues that the selection of a German AG was important to Schrempp's alleged plan for a takeover of Chrysler. Based on the testimony adduced at trial, the Court is not persuaded by Tracinda's argument. The unequivocal testimony of Schrempp is consistent with the testimony of Chrysler executives that the selection of the German AG was primarily for tax reasons. Schrempp Tr. Vol. G. 1452:16-1453:2; Wilson Tr. Vol. H. 1711:12-1712:22; Valade Tr. Vol. K. 2369:10-2371:7; Koch Dep. 113:6-12. Schrempp testified that he personally preferred the structure of a U.S. corporation and would not rule out, despite the attempts of Tracinda's counsel to elicit contrary testimony, that a U.S. corporation could have been approved by German stockholders, if it had been the corporate form with the tax advantage. Schrempp Tr. Vol. D. 2236:3-2238:14.

[*143]

Further, the Court is not persuaded that the Proxy/Prospectus gives the erroneous impression that this issue was not debated much or that the discussions on this topic did not extend beyond March 2, 1998. The Background of the Transaction section refers to this issue in nearly half of its paragraphs, and the paragraph following the summary of the April 7 discussions indicates that the discussion on corporate structure extended "during that period and thereafter." DX 20 at 47-49.

c. Alleged omission of risk factors

Tracinda also contends that the Proxy/Prospectus contained material misrepresentations and omissions concerning certain risk factors which were testified to at trial by the former directors of Chrysler. Specifically, Tracinda contends that Chrysler shareholders were not warned that (1) absent a combination with Daimler (or some other company) Chrysler would not survive the next downturn in the automotive industry; (2) the Supervisory Board could remove all former Chrysler executives from the DaimlerChrysler Board of Management or eliminate the "merger of equals" and (3) the Supervisory Board could or would replace former Chrysler executives with former Daimler executives. [*144] Reviewing the Proxy/Prospectus in light of Tracinda's arguments, the Court concludes that the Risk Factors section was not false or misleading based on these alleged omissions. First, the Risk Factors section is geared toward identifying those risks accompanying a vote in favor of the Merger. As such, the risk of voting against the Merger, i.e. that Chrysler might not survive a downturn in the automotive industry, is not a risk that would be appropriately included in this section. DX 20 at 24; Item 503 of Regulation S-K. In any event, the Proxy/Prospectus does disclose that a factor the Board considered in agreeing to the Merger was the changes going on in the automotive industry, including "the

likelihood that the automotive industry will undergo significant consolidation, resulting in a smaller number of larger companies surviving as effective global competitors." DX 20 at 50 (emphasis added).

In addition, Tracinda contends that the Proxy/Prospectus failed to disclose possible changes to the corporate governance structure. However, the mere possibility of a future change is a speculative concern, and such speculation is not required to be disclosed to shareholders. See *Sable v. Southmark/Envicon Capital Corp., 819 F. Supp. 324, 334 (S.D.N.Y. 1993)*.. [*145] As the Sable court explained:

> A company is not required to speculate about future events which are unlikely to occur or which the company is convinced will not occur. Such speculation could easily mislead and confuse shareholders. Furthermore, 'corporations are not required to address their stockholders as if they were children in kindergarten' . . . . It is thus sufficient if the company provides information as to material facts in a format from which a reasonable investor could reach his own conclusions as to the risks of the transaction.

Id.

Further, the Proxy/Prospectus explicitly disclosed that (1) the Merger's governance provisions did not limit the Supervisory Board's duties and responsibilities under German law, DX 20 at A- 16; (2) that the Supervisory Board had the power to remove members of the Management Board (id. at 131) and (3) the BCA contained "no provisions that would bar governance changes after the [DaimlerChrysler] Transactions have been consummated." Id. at 17. In addition, the Proxy/Prospectus warned that:

> integration of two large companies, incorporated in different countries, with geographically dispersed operations, [*146] and with different business cultures and compensation structures, presents significant management challenges. There can be no assurance that this integration, and the synergies expected from that integration, will be achieved as rapidly or to the extent currently anticipated.

Id. at 24 (emphasis added). Accordingly, the Court is persuaded that sufficient information was provided to the investors in a reasonable format so as to enable investors to draw their own conclusions as to the risks of the transaction, including the risk of corporate governance changes.

d. Alleged non-voting members of the Management Board

Tracinda also alleges that the Proxy/Prospectus falsely represented that the two non-automotive members of the DaimlerChrysler Board of Management were non-voting members, when in fact these members were voting members just like the other sixteen members. The representation to which Tracinda refers appears in a May 6, 1998 press release issued by Chrysler which was attached to Chrysler's Form 8-K. With respect to the Form 8- K, the Proxy/Prospectus provides that "Chrysler's Current Reports on Form 8-K, dated February 6, 1998 and May 7, 1998" are incorporated [*147] by reference. The part in question appears in a chart on the last page of the press release entitled "Board of Management" and lists the individuals from Chrysler and Daimler- Benz who would be serving on the Board. The last two people on the Daimler-Benz side are designated as follows:

> EVP - DASA (Bischolf) - Non-Voting
>
> EVP - Debis (Mangold) - Non-Voting

PX 206 at DCX 0073146. However, with respect to documents incorporated by reference, the Proxy/Prospectus expressly provides:

> Any statements contained herein, or in a document incorporated or deemed to be incorporated by reference herein, shall be deemed to be modified or superseded for purposes of this Proxy Statement/Prospectus to the extent that a statement herein, or in any other subsequently filed document that is or is deemed to be incorporated by reference herein, modifies or supersedes such previous statement. Any statement so modified or superseded shall not be deemed to constitute a part hereof except as so modified or superseded.

DX 20 at 4. The Proxy/Prospectus goes on to discuss the composition of the DaimlerChrysler Management Board in numerous places, including the attached BCA, [*148] and includes its own charts listing the same members as contained in the press release, with no designation or reference that these members would not be voting. The DaimlerChrysler AG Memorandum and Articles of Association also makes no reference to non-voting

members of the Management Board. Because the Proxy/Prospectus controls as to any statement incorporated by reference and the Proxy/Prospectus contains no reference that any members of the Board of Management would be non-voting, the Court finds that Tracinda has failed to establish a misrepresentation based on the incorporation by reference into the Proxy of Chrysler's Form 8-K, which contained the press release in question.

2. Whether Tracinda Has Demonstrated Reliance, Materiality and Causation With Respect To The Alleged Written Misrepresentations

Even if the written representations raised by Tracinda are false, the Court concludes that Tracinda has not demonstrated the materiality and reliance elements necessary to prove its claims for violation of the securities laws. n24 In general, a misrepresentation or omission is considered material if "there is a substantial likelihood that a reasonable shareholder would consider [*149] it important in deciding how to vote." *TSC Indus. Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976).* The significance of any misrepresentation or omission is determined by examining the total mix of information available to a reasonable investor. *Tracinda, 197 F. Supp. 2d at 57* (citations omitted). Thus, a misrepresentation or omission may also be material if a reasonable investor would view it as "significantly altering the total mix of information available." *Id.* (citations omitted). Where a transaction involves a single purchaser and a single seller, however, courts have recognized that it may be appropriate to consider the question of materiality and reliance from a more subjective perspective. *See, e.g., Harnett v. Ryan Homes, Inc., 496 F.2d 832, 838 n. 20 (3d Cir. 1974); Ferdinand Drexel Investment Co., Inc. v. Alibert, 723 F. Supp. 313, 329-330 (E.D. Pa. 1989),* aff'd mem., *904 F.2d 694 (3d Cir. 1990).*

n24 Although reliance is not an element required to establish a *Section 14(a)* claim, materiality is required.

[*150]

Although the Chrysler/Daimler-Benz Merger was a transaction completed on the open market, then dealings of the companies with Tracinda occurred on a one-to-one level. In these circumstances, the Court cannot ignore the sophistication of Tracinda as an investor and its subjective views regarding the transaction in light of the information that was available to it, which was far more than that which is available to the average investor, both by virtue of its position on the Chrysler Board and by its

relationship with the individuals negotiating the transaction.

After considering the evidence adduced at trial, including the testimony of Kerkorian and other Tracinda representatives, the Court finds that the corporate governance issues, including the "merger of equals" label, the selection of the German AG form, and the voting status of members of the management, were not significant to Tracinda. First, and perhaps foremost, the evidence establishes that Tracinda entered into the Stockholder Agreement which obligated it to vote its shares in favor of the Merger prior to the preparation and filing of the Proxy/Prospectus, including the public release of the alleged misleading press release [*151] attached as an exhibit to the Chrysler 8-K and incorporated by reference into the Proxy/Prospectus. As the Court has previously concluded, Tracinda has not proven that it was fraudulently induced to enter into the Stockholder Agreement. The BCA, which recited that Tracinda had already entered into the Stockholder Agreement, was signed in the evening hours in London on May 6, 1998, well before the public release of the press release or the filing of the Form 8K and the Proxy/Prospectus. Because Tracinda was contractually bound to vote its shares in favor of the Merger prior to the filing of the Proxy/Prospectus and the issuance of the press release, and Tracinda has not established that it was fraudulently induced to enter the Stockholder Agreement, the Court concludes that Tracinda cannot establish that it relied on the Proxy/Prospectus or the press release accompanying the Form 8K filing in making its decision to vote its shares in favor of the Merger. n25

n25 Kerkorian confirmed at his deposition and at trial that, while the Proxy/Prospectus was reviewed by Mandekic, Kerkorian did not pay attention to the specifics contained in it, because Tracinda had already approved the Merger by virtue of its signing of the Stockholder Agreement. Kerkorian Dep. 279:8-14; Kerkorian Tr. Vol. C. 663:4-665:1.

[*152]

Moreover, much of the information contained in the Proxy/Prospectus was already known to Tracinda before it entered into the Stockholder Agreement, thereby undercutting Tracinda's assertions of reliance and materiality. *Milton v. Van Dorn Co., 961 F.2d 965, 972 (1st Cir. 1992)* (materiality not established where plaintiff knew about non-disclosed facts before making investment decision); *Miller v. Grigoli, 712 F. Supp. 1087, 1093- 1094 (S.D.N.Y. 1989).* For example,

Tracinda knew before it entered into the Stockholder Agreement that DaimlerChrysler would be incorporated as a German AG. This was included in Aljian's memo to Kerkorian, was disclosed on the first page of the BCA, and was known to Kerkorian since DaimlerChrysler's incorporation in Germany led Tracinda to sell a large number of its Chrysler shares before the Merger to insure receiving tax-free treatment of the shares it was to receive from DaimlerChrysler as a German AG. DX 107, DX 20 at A-1; Kerkorian Tr. Vol. C 667:11-668:12. Tracinda also knew before the Merger of the risks Chrysler faced if it did not merge with another company. York prepared a memo advising both Kerkorian and Aljian [*153] of the same risks that the Chrysler directors discussed at trial, which Tracinda now contends were omitted from the Proxy/Prospectus. DX 35 at T 8813.

In addition, the Court concludes that the materiality of the representation concerning the non-voting status of the two Daimler-Benz board members is undercut by Tracinda's failure to question that representation. See *Rowe v. Maremont Corp., 850 F.2d 1226, 1235, 1237 (7th Cir. 1998)*. Neither the BCA nor the Proxy/Prospectus mentioned anything about non-voting members of the Management Board, and therefore, Tracinda had information which called into question that representation but failed to take any action to confirm or question it.

Further, as the Court has previously concluded in the context of the oral representations concerning the merger of equals, Tracinda has not demonstrated that corporate governance issues were material to it or that it relied on any representations concerning corporate governance. See infra Section IV.A.3. of the Court's Conclusions of Law. As the documentary evidence and testimony demonstrate, Tracinda was focused on the economics of the transaction and corporate governance and structure [*154] issues were not given any real weight at the time of the transaction. Kerkorian Tr. Vol. B. 297:18-20. Tracinda's internal analyses, including memos prepared at the request of Kerkorian focused solely on the economics of the transaction, and Kerkorian himself supported the Merger before he spoke to anyone regarding the governance of the new corporation. Kerkorian Tr. Vol. B 423:4-12. Moreover, when corporate governance changes occurred, including replacements and downsizing of the Daimler-Chrysler Management Board, these changes were supported by Tracinda's representative Aljian, see, e.g., Aljian Dep. 415:13-23; DX 573 at T 10214; Schrempp Tr. Vol. F. 1279:7-25; DX 573; DX 77 at DCX 107447; Wilson Tr. Vol. H. 1744:2-8; Lanigan Tr. Vol. 1. 2021:10-22, and

either not brought to the attention of Kerkorian because they were deemed unimportant, or when brought to his attention were ignored. Kerkorian Tr. 689:10-691:2, 700:7-703:3, 400:8-14, 685:10-686:13; Kerkorian Dep. 349:18-22; Aljian Dep. 344:22-19, 416:21-418:17, 422:14-423:12. Accordingly, the Court concludes that Tracinda has not proven materiality or reliance on the alleged written misrepresentations.

## V. Whether Tracinda [*155] Has Established By A Preponderance Of The Evidence Its Claims For Control Person Liability Under Section 20 Of The Exchange Act

Control person liability under *Section 20 of the Exchange Act* is predicated upon establishing a primary violation of the federal securities laws by a controlled person. In this case, the Court has concluded that Tracinda has not proved a primary violation of the securities laws. Accordingly, the Court will enter judgment in favor of Defendants and against Tracinda on its claims of control person liability.

### CONCLUSION

For the reasons discussed, the Court concludes that Tracinda has failed to prove its claims of common law fraud and violations of the Exchange Act. Because the Court has concluded that Tracinda has not established the elements of its claims, specifically a material misrepresentation, and for its common law fraud and *Section 10* claims in particular, the element of reasonable reliance, the Court will not address the remaining questions of scienter and damages. In sum, the Court will enter final judgment in favor of Defendants and against Tracinda on all claims.

An appropriate Order will be entered.

### FINAL JUDGMENT ORDER

At Wilmington, [*156] this 7 day of April 2005, for the reasons set forth in the Opinion issued this date;

IT IS HEREBY ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants, DaimlerChrysler AG, Daimler-Benz AG, Juergen Schrempp, Manfred Gentz, and against Plaintiff, Tracinda Corporation, on Plaintiff's claims of common law fraud and violations of *Sections 10(b)*, *14(a)* and *20(a)* of the Securities Exchange Act of 1934 and Rules 10b-5 and 14a-9 of the rules promulgated thereunder.

Joseph J. Farnan, Jr.

UNITED STATES DISTRICT JUDGE