**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

-----------------------------------------------------------------x

MARKUS BLECHNER, Individually and on    :    Civil Action No. 04-331 (JJF)
Behalf of All Others Similarly Situated,    :

         :

       Plaintiff,    :

         :

    v.    :

         :

DAIMLER-BENZ AG, DAIMLERCHRYSLER    :
AG, JÜRGEN SCHREMPP, ECKHARD    :
CORDES, MANFRED GENTZ, JÜRGEN    :
HUBBERT, MANFRED BISCHOFF, KURT    :
LAUK, KLAUS MANGOLD, HEINER    :
TROPITZSCH, KLAUS-DIETER    :
VOHRINGER, DIETER ZETSCHE and    :
THOMAS SONNENBERG,    :

         :

       Defendants.    :

-----------------------------------------------------------------x

**COMPENDIUM OF UNREPORTED AUTHORITIES CITED IN THE
REPLY BRIEF OF DAIMLERCHRYSLER AG AND DAIMLER-BENZ AG IN
FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT**

OF COUNSEL:
Jonathan J. Lerner
Lea Haber Kuck
Joseph N. Sacca
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

Dated: June 2, 2005

Thomas J. Allingham II (#0476)
Robert S. Saunders (#3027)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Rodney Square, P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

Attorneys for Defendants DaimlerChrysler
AG and Daimler-Benz AG

# INDEX

CASE                                                                                     TAB NO.

Davis v. Social Security Admin.,
        C.A. No. 02-1595, 2003 WL 21219821 (D. Del. May 20, 2003) . . . . . . . . . . . . . 1

Froese v. Staff,
        C.A. No. 02 CV 5744, 2003 WL 21523979 (S.D.N.Y. July 7, 2003) . . . . . . . . . 2

N.A.I.F., Inc. v. Snyder,
        C.A. No. 03-506, 2005 WL 735554 (D. Del. Mar. 30, 2005) . . . . . . . . . . . . . . . 3

Nasser v. Anderson Worldwide Societe Coop.,
        No. 02 Civ. 6832, 2003 WL 22179008 (S.D.N.Y. Sept. 23, 2003) . . . . . . . . . . . 4

Paraschos v. YBM Magnex Int'l, Inc,
        C.A. No. 98-6444, 2000 WL 325945 (E.D. Pa. Mar. 29, 2000) . . . . . . . . . . . . . 5

In re Quarterdeck Office Sys., Inc. Sec. Litig.,
        C.A. No. CV-92-3970, 1994 WL 374452 (C.D. Cal. Mar. 24, 1994) . . . . . . . . . 6

Shields v. Wash. Bancorporation,
        C.A. No. 90-1101, 1992 WL 88004 (D.D.C. Apr. 7, 1992) . . . . . . . . . . . . . . . . 7

In re Vivendi Universal, S.A. Sec. Litig.,
        No. 02 Civ. 557, 2003 WL 22489764 (S.D.N.Y. Nov. 3, 2003) . . . . . . . . . . . . . 8

Brief of the Federal Republic of Germany as Amicus Curiae in Support of Petition
        for Writ of Certiorari, F. Hoffman-La Roche Ltd. v. Empagran, S.A.,
        124 S. Ct. 2359 (No. 03-724) (2004), available at 2003 WL 22896686 . . . . . . . . 9

# TAB  9

No. 03-724

Supreme Court, U.S.
FILED

DEC 1 - 2003

OFFICE OF THE CLERK

IN THE

## Supreme Court of the United States

———

F. HOFFMANN-LA ROCHE LTD, ET AL.,
*Petitioners,*

v.

EMPAGRAN, S.A., ET AL.,
*Respondents.*

———

**On Petition for a Writ of Certiorari
to the United States Court of Appeals
for the District of Columbia Circuit**

———

**BRIEF OF THE FEDERAL REPUBLIC OF GERMANY
AS *AMICUS CURIAE* IN SUPPORT OF
PETITION FOR A WRIT OF CERTIORARI**

———

DAVID C. FREDERICK
*Counsel of Record*
KEVIN J. MILLER
KELLOGG, HUBER, HANSEN,
  TODD & EVANS, P.L.L.C.
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for Amicus Curiae*

December 1, 2003

## QUESTION PRESENTED

Whether plaintiffs may pursue Sherman Act claims seeking recovery for injuries sustained in transactions occurring entirely outside U.S. commerce.

ii

# TABLE OF CONTENTS

Page

QUESTION PRESENTED.................................................i

TABLE OF AUTHORITIES .............................................iv

INTEREST OF *AMICUS CURIAE* ....................................1

STATEMENT ...................................................................2

REASONS FOR GRANTING THE PETITION .................4

I.  THE COURT OF APPEALS' DECISION IN-
    TERFERES WITH FUNDAMENTAL SOV-
    EREIGN CHOICES THAT OTHER NATIONS
    HAVE MADE ABOUT THE REGULA-
    TION OF THEIR OWN INDUSTRIES AND
    COMMERCE...........................................................5

    A.  United States Legal Principles Respect
        The Jurisdiction Of Other States ....................5

    B.  Proper Application Of The "Effects"
        Test Respects International Sovereignty
        Interests ..........................................................5

    C.  The Decision Below Intrudes On Foreign
        Sovereignty Interests That Reject Aspects
        Of U.S. Antitrust Law.......................................7

II. THE COURT OF APPEALS' DECISION
    THREATENS TO UNDERMINE INTERNA-
    TIONAL ANTITRUST ENFORCEMENT.............11

    A.  Foreign Concerns About U.S. Exercises
        Of Extraterritorial Jurisdiction Have Pro-
        duced Statutory Counter-Reactions ..............11

iii

    B.   The Decision Below Impinges On Governmental Leniency Policies ........................... 14

III. BECAUSE OTHER COUNTRIES FOLLOW THE EFFECTS DOCTRINE AND VIGOROUSLY APPLY THEIR COMPETITION LAWS, THERE IS NO NEED FOR U.S. ANTITRUST LAWS TO APPLY EXTRATERRITORIALLY TO PLAINTIFFS INJURED ONLY IN FOREIGN COMMERCE ........................ 16

    A.   Other Countries Vigorously Enforce Against Antitrust Abuses ............................... 16

    B.   Adherence To The Effects Doctrine By Other Countries Produces Sound International Antitrust Enforcement ..................... 18

CONCLUSION .................................................................. 20

iv

# TABLE OF AUTHORITIES

Page

## CASES

### *United States*

*Goss Graphic Sys., Inc. v. Man Roland Druckmaschinen Aktiengesellschaft*, 139 F. Supp. 2d 1040 (N.D. Iowa 2001) ..................................................................... 14

*Lauritzen v. Larsen*, 345 U.S. 571 (1953) ........................... 6

*Pfizer, Inc. v. Government of India*, 434 U.S. 308 (1978) ............................................................................... 3

*United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945) ...................................................................... 6

### *European Union*

*Gencor Ltd. v. Commission* (Case T-102/96, 25.3.1999, E.C.R. 1999, Page II-00753) ........................................... 17

## TREATIES AND AGREEMENTS

Agreement Between the European Communities and the Government of the United States of America on the Application of Positive Comity Principles in the Enforcement of Their Competition Laws, June 4, 1998, *reprinted at* 37 I.L.M. 1070 (1998) ...................... 18

Agreement Relating to Cooperation on Antitrust Matters, June 29, 1982, United States-Australia, 34 U.S.T. 388, T.I.A.S. No. 10365 .................................. 11

v

Agreement Relating to Mutual Cooperation Regarding Restrictive Business Practices, June 23, 1976, United States-Federal Republic of Germany, 27 U.S.T. 1956, T.I.A.S. No. 8291 ...................................... 11

Memorandum of Understanding as to Notification, Consultation, and Cooperation with Respect to the Application of National Antitrust Laws, March 9, 1984, United States-Canada, *reprinted at* 4 Trade Reg. Rep. ¶ 13,503 ......................................................... 11

## STATUTES AND RULES

### *United States*

Anti-Dumping Act of 1916, 15 U.S.C. § 72 ....................... 14

Clayton Act:

§ 4, 15 U.S.C. § 15............................................................. 2

§ 16, 15 U.S.C. § 26........................................................... 2

Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a .............................................................. 2, 3

Jones Act, 46 U.S.C. § 688 .................................................. 6

Sherman Act, § 1, 15 U.S.C. § 1 ............................. 2, 3, 9, 13

Sup. Ct. R. 37.6................................................................... 1

vi

*Canada*

Foreign Extraterritorial Measures Act, R.S.C., ch.
F-29 (1985), as amended by Act to Amend the
Foreign Extraterritorial Measures Act, R.S.C., ch.
28, 56 (1997) ................................................................ 13


*Germany*

Act Against Restraints of Competition, *available at*
http://www.bundeskartellamt.de/competition_act.
html............................................................ 1, 8, 9, 10, 17


OTHER MATERIALS

IA Phillip E. Areeda & Herbert Hovenkamp, *Antitrust
Law* (2d ed. 2000) ........................................... 6, 7, 11, 12

Hannah L. Buxbaum, *The Private Attorney General in
a Global Age: Public Interests in Private Interna-
tional Antitrust Litigation*, 26 Yale J. Int'l L. 219
(2001) ................................................................... 7-8, 12

Ronald W. Davis, *International Cartel and Monop-
olization Cases Expose a Gap in Foreign Trade
Antitrust Improvements Act*, 15 Antitrust 53 (Sum.
2001) ............................................................................ 20

Makan Delrahim, Department of Justice Perspectives
on International Antitrust Enforcement:  Recent
Legal  Developments  and  Policy  Implications,
Speech Before the American Bar Association Sec-
tion of Antitrust Law, Washington, D.C. (Nov. 18,
2003), *available at* http://www.usdoj.gov/atr/public/
speeches/201509.htm......................................... 10, 12, 18

vii

Dorsey D. Ellis, *Projecting the Long Arm of the Law: Extraterritorial Criminal Enforcement of U.S. Antitrust Laws in the Global Economy*, 1 Wash. U. Global Stud. L. Rev. 477 (2002) ..................................... 17

European Comm'n, *Competition Policy in Europe and the Citizen* (2000), *available at* http://europa.eu.int/comm/competition/publications/competition_policy_and_the_citizen/en.pdf.................................................... 19

European Union Press Release, *EU seeks retaliatory and protective measures in US 1916 Anti-Dumping Act dispute, available at* http://europa.eu.int/rapid/start/cgi/guesten.ksh?p_action.gettxt=gt&doc=IP/03/1274|0|RAPID&lg=EN&display=............................ 14

Federal Cartel Office, *Biennial Activity Report 2001/2002* (June 27, 2003), *available at* http://dip.bundestag.de/btd/15/012/1501226.pdf (German version only) ....................................................... 15-16, 19

Eleanor M. Fox, *International Antitrust and the DOHA Dome*, 43 Va. J. Int'l L. 911 (2003).................... 17

Wilbur L. Fugate, *Foreign Commerce and the Antitrust Laws* (5th ed. 1996):

Vol. I.......................................................................... 6, 13

Vol. II......................................................................... 9, 19

Joseph P. Griffin, *Extraterritoriality in U.S. and EU Antitrust Enforcement*, 67 Antitrust L.J. 159 (1999) ............................................................... 6, 8, 18, 19

H. Stephen Harris, *Competition Laws Outside the United States*, 2001 A.B.A. Sec. Antitrust L. 13........... 19

viii

Jason Hoerner, *Competition Law in the European Union: A Dual Enforcement System, available at* http://www.antitrust.de/kartellrecht.htm ........................ 9

International Competition Policy Advisory Comm., *Final Report* (2000), *available at* http://www.usdoj.gov/atr/icpac/finalreport.htm ........................................... 15

Mark R. Joelson, *An International Antitrust Primer* (2d ed. 2001) ....................................................... 5-6, 8, 13

Roderick Lambert, *Parallel Antitrust Investigations: The Long Arm of the DOJ from the Perspective of an E.U. Defense Counsel,* 14 Loy. Consumer L. Rev. 509 (2002) ....................................................................... 8

Otto Graf Lambsdorff, Antitrust Law as a Regulatory Factor in a Globalized Market Economy, Lecture at the XI International Cartel Conference of the Federal Cartel Office, Bonn, Germany (June 19, 2003) ................................................................. 12, 16, 17

A.V. Lowe, *Blocking Extraterritorial Jurisdiction: The British Protection of Trading Interests Act, 1980,* 75 Am. J. Int'l L. 257 (1981) ............................... 13

Official Journal of the European Communities, *Commission notice on immunity from fines and reduction of fines in cartel cases* (2002/C 45/03) ........... 15

Organization for Economic Cooperation and Development, Committee on Int'l Investment and Multinat'l Enters., *The 1984 Review of 1976 OECD Declaration and Decisions on International Investment and Multinational Enterprises,* approved May 18, 1984, OECD Doc. Press/A(84) ......................................... 5

*Rating Enforcement Survey,* Global Competition Review, June 2003 ............................................................ 1

ix

*Restatement (Third) of Foreign Relations Law of the
United States* (1987) ................................ 4, 5, 6, 7, 12, 17

Joachim Rudo, *The 1999 Amendments to the German
Act Against Restraints of Competition, available at*
http://www.antitrust.de/gwb-amendment.htm ............... 9

J.S. Stanford, *The Application of the Sherman Act to
Conduct Outside the United States: A View from
Abroad,* 11 Cornell Int'l L.J. 195 (1978) ........................ 13

*The Fight Against Cartels: Statistics, available at*
http://europa.eu.int/comm/competition/citizen/cartel
_stats.html ........................................................................ 2

Spencer W. Waller, *The United States as Antitrust
Courtroom to the World: Jurisdiction and Stand-
ing Issues in Transnational Litigation,* 14 Loy.
Consumer L. Rev. 523 (2002) .......................................... 8

*l*

## INTEREST OF *AMICUS CURIAE*[1]

The Federal Republic of Germany has one of the world's most advanced and extensive legal regimes to protect against economic competition abuses.    Under its Act Against Restraints of Competition (*Gesetz gegen Wettbewerbsbeschränkungen* or *GWB*),[2] Germany prohibits "[a]greements between competing undertakings, decisions by associations of undertakings and concerted practices which have as their object or effect the prevention, restriction or distortion of competition." GWB § 1. That law "shall apply to all restraints on competition having an effect within the area of application of this Act, also if they were caused outside the area of application of this Act." GWB § 130, ¶ 2.   Germany's enforcement efforts and merger review procedures have been evaluated as being "at the top of the European rankings" and "second overall behind the US." *Rating Enforcement Survey*, Global Competition Review, June 2003, at 22. In 2002 alone, German competition authorities conducted a dozen investigations into significant cartels, raided some 170 companies and homes of executives in the course of its investigations, and reviewed more than 1,500 mergers. *Id.* at 22-23. Since the beginning of 2003, the Federal Cartel Office (*Bundeskartellamt*) has levied more than €660 million in fines against companies and executives involved in cartels. Such efforts have been recognized by the Organization for Economic Cooperation and Development ("OECD") as sending a clear message about the importance of competition while permitting efficient cooperation.

---

[1] Pursuant to Supreme Court Rule 37.6, counsel for *amicus* represents that it authored this brief and that no entity other than *amicus* made a monetary contribution to its preparation or submission. All parties have consented to the filing of this *amicus* brief, and letters reflecting their consent have been filed with the Clerk.

[2] Both the original German version and the English translation of the GWB are available at http://www.bundeskartellamt.de/competition_act.html.

2

As a Member State in the European Union ("EU"), Germany also provides political, economic, and enforcement support for the EU's competition laws, which, in conjunction with Member States' national competition laws, operate as a dual enforcement system in Europe.  Like Germany, the EU vigorously pursues cartels, levying more than €1.839 billion in fines during 2001 and €950 million during 2002.  *See The Fight Against Cartels: Statistics, available at* http://europa.eu.int/comm/competition/citizen/cartel_stats.html.

Petitioners in this case include German companies that are alleged to have participated in an international cartel to fix prices and allocate markets for bulk vitamin sales.  *See* Pet. 5.  Germany participated in EU enforcement efforts that produced €855 million (approximately US$1 billion) in fines against companies petitioning for certiorari in this case.  Germany has significant economic and political interests in ensuring that companies based in Germany comply with German and EU competition laws, and in protecting against the encroachment of other countries' laws on those enforcement efforts.  Germany also has an interest in seeing that German companies are not subject to the extraterritorial reach of the United States' antitrust laws by private foreign plaintiffs seeking treble damages in private lawsuits against German companies.  Accordingly, Germany has a substantial interest in the proper construction of the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), 15 U.S.C. § 6a.

## STATEMENT

Petitioners are foreign and domestic manufacturers and distributors of vitamins.  Respondents are foreign corporations domiciled in foreign countries that purchased vitamins from petitioners in foreign markets.  Respondents' class action alleges that petitioners conspired to fix prices and allocate market share in violation of the Sherman Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. §§ 15 and 26.

The district court dismissed respondents' federal antitrust claims for lack of subject matter jurisdiction.  Pet.

3

App. 46a. The court noted that the "critical question in this case is whether allegations of a global price fixing conspiracy that affects commerce both in the United States and in other countries gives persons injured abroad in transactions otherwise unconnected with the United States a remedy under our antitrust laws." *Id.* at 48a. That question required the court to consider a provision of the FTAIA, 15 U.S.C. § 6a, which provides that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless . . . such conduct has a direct, substantial, and reasonably foreseeable effect . . . on trade or commerce," and "such effect gives rise to a claim under the provisions of sections 1 to 7 of this title." Pet. App. 48a (quoting 15 U.S.C. § 6a). The district court concluded that, because respondents had purchased vitamins solely in foreign markets, they had "not alleged that the precise injuries for which they seek redress here have the requisite domestic effects necessary to provide subject matter jurisdiction over this case." *Id.* at 49a.

Respondents appealed. They contended that the FTAIA does not restrict jurisdiction to the same claim on which the jurisdictional effects are based. In respondents' view, the claims of foreign plaintiffs did not need to arise out of the alleged conspiracy's effects on the United States so long as some claims by injured persons exist that would arise from such domestic effects. *Id.* at 2a-3a. The court of appeals agreed and reversed, holding that, "where the anticompetitive conduct has the requisite harm on United States commerce, FTAIA permits suits by foreign plaintiffs who are injured solely by that conduct's effect on foreign commerce." *Id.* at 4a. The court opined that it is sufficient for jurisdiction if the conduct "give[s] rise to 'a claim' by someone, even if not the foreign plaintiff who is before the court." *Id.* In so ruling, the court relied on a "literal reading of the statute," as well as the FTAIA's legislative history and "underlying policies of deterrence" that it gleaned from *Pfizer, Inc. v. Government of India*, 434 U.S. 308 (1978). Pet. App. 4a.

4

## REASONS FOR GRANTING THE PETITION

The court of appeals' decision incorrectly interprets the FTAIA in a manner that does grave harm to the antitrust enforcement efforts of other countries. The court's interpretation drastically expands the extraterritorial reach of the United States' antitrust laws to situations in which the conduct and the alleged anticompetitive effects suffered by foreign plaintiffs occur only in foreign countries. Yet, in those situations, other nations have jurisdiction to regulate or prohibit that conduct. The court's holding thus directly conflicts with the well-established principle that United States statutes are to be construed to avoid conflict with other nations' laws and to avoid unreasonableness in the exercise of U.S. courts' jurisdiction. *See Restatement (Third) of Foreign Relations Law of the United States* § 403 cmt. g, at 248 (1987) ("*Restatement (Third)*").

This Court's review is warranted to prevent foreign civil litigants from using United States lawsuits to interfere with the policy choices made by foreign governments about the most appropriate means of bringing foreign companies into compliance with foreign competition laws. The court of appeals' interpretation of the FTAIA threatens to undermine international antitrust cooperation and enforcement. Foreign governments use leniency programs to obtain information about violations that then leads to deterrence of other abuses. Yet private suits, such as respondents', create strong disincentives for companies to participate in such programs because to do so increases the risk that the information they disclose to governments will subject them to private civil liability and treble damages. The question whether Congress intended in the passage of the FTAIA to extend federal court jurisdiction in such a significant way is of enormous importance to international commerce and diplomacy.

5

## I. THE COURT OF APPEALS' DECISION INTERFERES WITH FUNDAMENTAL SOVEREIGN CHOICES THAT OTHER NATIONS HAVE MADE ABOUT THE REGULATION OF THEIR OWN INDUSTRIES AND COMMERCE

### A. United States Legal Principles Respect The Jurisdiction Of Other States

Principles of both United States and international law require that nations respect the sovereign interests of other nations before exercising their jurisdiction extraterritorially. United States law recognizes that, "[w]here regulation of transnational activity is based on its effects in the territory of the regulating state, the principle of reasonableness calls for limiting the exercise of jurisdiction so as to minimize conflict with the jurisdiction of other states, particularly with the state where the act takes place." *Restatement (Third)* § 403 reporter's note, at 250. International law is to the same effect. For example, the OECD urges its members to "take fully into account the sovereignty and legitimate economic, law enforcement and other interests of other Member countries," and calls for "cooperation as an alternative to unilateral action." OECD, Comm. on Int'l Investment and Multinat'l Enters., *The 1984 Review of 1976 OECD Declaration and Decisions on International Investment and Multinational Enterprises*, approved May 18, 1984, OECD Doc. Press/A(84).

### B. Proper Application Of The "Effects" Test Respects International Sovereignty Interests

Those general principles of law apply to antitrust regulation. Countries such as Germany are in general accord with United States law in limiting enforcement of competition laws only to those foreign actions that have "effects" in Germany. Rulings by United States courts that expand the effects doctrine and thereby apply the United States' antitrust laws to foreign nationals and foreign conduct have rightly been criticized "on grounds of foreign relations, international law or comity, often by the U.S.'s closest allies." Mark R. Joelson, *An International Antitrust*

6

*Primer* 54 (2d ed. 2001). *See also* I Wilbur L. Fugate, *Foreign Commerce and the Antitrust Laws* § 2.16, at 126-27 & n.2 (5th ed. 1996) (cataloguing cases where foreign governments have protested and disputed "the jurisdiction of United States courts over their nationals or over the activities of their nationals outside of the territorial boundaries of the United States"); Joseph P. Griffin, *Extraterritoriality in U.S. and EU Antitrust Enforcement*, 67 Antitrust L.J. 159, 159 (1999) ("aggressive unilateral enforcement continues to provoke conflicts among close trading partners and to create uncertainty for transnational firms").

In applying the effects test, United States courts have properly exercised discretion when an expansive application of U.S. law would intrude on the interests of foreign sovereigns that also are seeking to enforce their own competition laws against the very same companies. *See* IA Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 272d, at 353 (2d ed. 2000). When the requisite effects of a foreign defendant's action on American commerce are negligible, "the court may wish for reasons of prudence, policy, comity, or economy not to proceed further." *Id.* ¶ 273c, at 374. That type of judicial restraint is critical to the comity that should be afforded between nation-states. As Judge Learned Hand counseled, United States jurisdiction should be invoked with "regard to the limitations customarily observed by nations upon the exercise of their powers." *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 443 (2d Cir. 1945). *See also Lauritzen v. Larsen*, 345 U.S. 571, 577 (1953) (construing Jones Act "to apply only to areas and transactions in which American law would be considered operative under prevalent doctrines of international law").

That type of judicial restraint is well recognized under United States law. The *Restatement (Third)* observes that, "[e]ven when one of the bases for jurisdiction . . . is present, a state may not exercise jurisdiction to prescribe law with respect to a person or activity having connections with another state when the exercise of such jurisdiction

7

is unreasonable." *Restatement (Third)* § 403(1), at 244. Among the factors bearing upon the reasonableness of the exercise of jurisdiction are "the extent to which other states regulate such activities," § 403(2)(c); "the extent to which another state may have an interest in regulating the activity," § 403(2)(g); and "the likelihood of conflict with regulation by another state," § 403(2)(h).

These factors counsel against an exercise of U.S. jurisdiction in this case based on a notion of "reasonableness." The most important factors – primacy over a given transaction, the locus of the conduct, the locus of that conduct's effects, and the strength of the foreign state's policies that bear on the problem – all point to countries *other than* the United States. *See* IA Areeda & Hovenkamp, *supra*, ¶ 276, at 413. The foreign respondents' purchases of vitamins in foreign commerce do not give the U.S. primacy over those transactions.

### C. The Decision Below Intrudes On Foreign Sovereignty Interests That Reject Aspects Of U.S. Antitrust Law

The court of appeals' application of the United States' antitrust laws to foreign plaintiffs that purchased vitamins exclusively in foreign commerce interferes with the sovereign interests of other nations. The court failed to give proper consideration to the legitimate choices those nations have made concerning the regulation of their own commerce and competition in their own industries. It failed to recognize, too, that there often are "important differences between domestic and international markets in . . . the environmental circumstances bearing upon the 'reasonableness' of a given restraint" on trade. IA Areeda & Hovenkamp, *supra*, ¶ 273, at 372.

Some of those differences between the U.S. and German legal systems are well known. Like many other countries, for example, Germany does not provide for trebling of private antitrust damages awards. *See* Hannah L. Buxbaum, *The Private Attorney General in a Global Age: Public Interests in Private International Antitrust Litigation,* 26

8

Yale J. Int'l L. 219, 251 (2001) (treble damages are "one of the most unacceptable aspects of U.S. regulatory law"); *see also* Pet. 23. Indeed, the fact that the court of appeals' decision opens the door to foreign plaintiffs who seek treble damages is especially troublesome. Private plaintiffs rarely exercise the type of self-restraint or demonstrate the requisite sensitivity to the concerns of foreign governments that mark actions brought by the United States government. *See* Griffin, *supra*, 67 Antitrust L.J. at 194.[3]

Other controversial features of the U.S. legal system include extensive discovery, jury trials, class actions, contingent fees, and punitive damages. *See* Spencer W. Waller, *The United States as Antitrust Courtroom to the World: Jurisdiction and Standing Issues in Transnational Litigation*, 14 Loy. Consumer L. Rev. 523, 532 (2002); Joelson, *supra*, at 6 ("treble damage awards, contingency fees, and class action procedures . . . have little support elsewhere"). Furthermore, the "Court of Justice has emphasized that [EU competition law] is not the same as the Sherman Act in that there are no per se violations" under EU law. Lambert, *supra*, 14 Loy. Consumer L. Rev. at 519.

In addition to the foregoing characteristics that differentiate the United States legal system from those of other countries, Germany approaches competition law in certain respects in a manner quite different from the United States. Although Germany allows private parties to enforce aspects of its competition law in certain circumstances through claims for damages, *see* GWB § 33, a fundamental difference between our two systems is that German antitrust law is applied principally through adminis-

---

[3] "If the U.S. courts permit forum-shopping by foreign entities where the dispute has little causal connection with the U.S., then that can only operate to the detriment of other antitrust enforcement systems which may take a different view on matters such as treble damages and contingency fees." Roderick Lambert, *Parallel Antitrust Investigations: The Long Arm of the DOJ from the Perspective of an E.U. Defense Counsel*, 14 Loy. Consumer L. Rev. 509, 512 (2002).

9

trative bodies, whereas the courts play the primary role in the United States. *See* Jason Hoerner, *Competition Law in the European Union: A Dual Enforcement System, available at* http://www.antitrust.de/kartellrecht.htm. Moreover, although petitioners' activities in this case clearly were prohibited under both EU and German competition laws and were severely punished by the EU authorities, Germany exempts certain other cartels from enforcement altogether – *e.g.*, "rationalisation cartels" (*Rationalisierungskartelle*, GWB § 5) and "structural crisis cartels" (*Strukturkrisenkartelle*, GWB § 6). *See* II Fugate, *supra*, § 16.9, at 566 ("There are broad exemptions provided . . . for particular types of cartels such as rationalization cartels organized to take advantage of technical improvements in an industry.").

Likewise, certain agreements "which contribute to improving the development, production, distribution, procurement, recycling or waste disposal of goods, while allowing consumers a fair share of the resulting benefit, can be exempted from § 1 GWB." Joachim Rudo, *The 1999 Amendments to the German Act Against Restraints of Competition, available at* http://www.antitrust.de/gwb-amendment.htm. The United States' antitrust laws do not recognize similar exemptions from criminal prosecution under the Sherman Act, let alone from suits by private plaintiffs who allege that they were injured by the foreign anticompetitive effects of such cartels. Allowing such suits to go forward in U.S. courts undermines Germany's sovereign choice to encourage these agreements. By applying the United States' antitrust laws in cases where neither the plaintiff nor the alleged harm has direct effects on United States commerce, the court of appeals' decision fails to respect the fundamental right of foreign sovereigns to regulate their own markets and industries.

Our point is not that German enforcement is any less vigorous than American efforts. In some ways, German competition law is stricter than United States law; in other ways, less strict. Hard-core cartels like the one

10

charged in the vitamin case are illegal and subject to vig-
orous prosecution in both countries. However, the struc-
ture of the competition laws of Germany and the U.S. dif-
fers. For example, in the U.S., agency practice and courts
decide whether certain agreements restraining competi-
tion are illegal by applying a "rule of reason" analysis. By
contrast, the German system contains a basic prohibition
against cartels (GWB § 1), with enumerated exceptions
(GWB §§ 2-8). Irrespective of whether a different outcome
may result under the two systems, U.S. law should not
trump Germany's sovereign decision to make its own
choices about how to structure and apply its competition
laws in determining liability and imposing remedies.

Accordingly, the U.S. Deputy Assistant Attorney Gen-
eral for Antitrust has recognized that "the United States
is not alone in today's antitrust world; we are joined by
nearly 100 other jurisdictions, many of them with effective
court systems, and as they have considered their system of
enforcement, some have found it fit, as a matter of domes-
tic policy, to provide for certain private rights of action
and some have not." Makan Delrahim, Department of
Justice Perspectives on International Antitrust Enforce-
ment:  Recent Legal Developments and Policy Implica-
tions, Speech Before the American Bar Association Section
of Antitrust Law, Washington, D.C. (Nov. 18, 2003), at 7,
*available    at*    http://www.usdoj.gov/atr/public/speeches/
201509.htm.  Permitting suits such as respondents' en-
croaches directly on contrary sovereign choices made by
Germany, particularly where, as here, the German au-
thorities are treating the vitamin case as a hard-core car-
tel that would not be subject to an individual exemption
but which may entail different remedies than those that
would be imposed under the U.S. system.[4]

---

[4] Under the German system, administration agency officials make
individualized factual and legal determinations about the compliance of
companies with German law. The pertinent competition authority ana-
lyzes requests for individual exemptions. That difference in approach is

11

## II. THE COURT OF APPEALS' DECISION THREATENS TO UNDERMINE INTERNATIONAL ANTITRUST ENFORCEMENT

The investigation and prosecution of global conspiracies in restraint of trade often depends upon the cooperation and coordination of countries where the offenders might be domiciled or located.  For that reason, the United States has entered into cooperative treaties or agreements with other nations, including the Agreement Relating to Mutual Cooperation Regarding Restrictive Business Practices, June 23, 1976, United States-Federal Republic of Germany, 27 U.S.T. 1956, T.I.A.S. No. 8291.  *See also* Agreement Relating to Cooperation on Antitrust Matters, June 29, 1982, United States-Australia, 34 U.S.T. 388, T.I.A.S. No. 10365; Memorandum of Understanding as to Notification, Consultation, and Cooperation with Respect to the Application of National Antitrust Laws, March 9, 1984, United States-Canada, *reprinted at* 4 Trade Reg. Rep. ¶ 13,503.  *See generally* IA Areeda & Hovenkamp, *supra*, ¶ 275, at 411 n.6. Left unchecked, the court of appeals' decision threatens to undermine those efforts.

### A. Foreign Concerns About U.S. Exercises Of Extraterritorial Jurisdiction Have Produced Statutory Counter-Reactions

Respondents argue that "petitioners are simply not correct in asserting that the D.C. Circuit's decision will undermine this nation's relationships with its trading partners," and that there will be no ill effects on international antitrust enforcement.  Opp. 24-25.  History and common sense teach that this is not so.  As Deputy Assistant Attorney General Delrahim has stated, "the more that the conduct of foreign businesses in foreign countries becomes subject to the regulatory effect of decisions by United States courts, the more our antitrust laws risk impinging inappropriately on the economic policies and sovereignties

---

also markedly different – with respect to the rights of German companies – than the U.S. system's primary reliance on judicial enforcement.

12

of foreign countries." Delrahim, *supra*, at 8. Such en-croachments by U.S. courts invariably will alter the rela-tionships between nations. The effectiveness of interna-tional treaties and arrangements is threatened when other nations conclude that the U.S. has overreached in the application of its domestic laws to foreign conduct. *See* Buxbaum, *supra*, 26 Yale J. Int'l L. at 252.

German officials already have expressed concern about the court of appeals' expansive application of U.S. jurisdic-tion in this case. In a recent lecture given at an antitrust conference in Bonn and attended by United States and EU officials, former German Economic Minister (and recent chief German negotiator of the German-U.S. forced labor settlement) Otto Graf Lambsdorff commented on the *Em-pagran* decision. Mr. Lambsdorff opined that "American antitrust laws were created to protect the American con-sumer and not to regulate the competitive conditions in foreign countries," and observed that "[a] German court – as well as every other European – would obviously deny jurisdiction" were the roles reversed, because "[a]ny other decision would rightly provoke protest by both US compa-nies and the US government." Antitrust Law as a Regula-tory Factor in a Globalized Market Economy, Lecture at the XI International Cartel Conference of the Federal Car-tel Office, Bonn, Germany, at 3 (June 19, 2003) (herein-after "Bonn Lecture").

A realistic consequence of foreign disapproval with U.S. encroachments on other nation-state's antitrust enforce-ment efforts will be a refusal to enforce judgments ob-tained in U.S. lawsuits. "States have long maintained the right to refuse to give effect to judgments of other states that are based on assertions of jurisdiction that are con-sidered extravagant." *Restatement (Third)* intro. note, at 304; IA Areeda & Hovenkamp, *supra*, ¶ 275, at 410 (noting "impediment to effective remedies is that foreign law and foreign courts may assert priority with respect to behavior abroad, regardless of an American court's decree").

13

In addition to refusing to enforce U.S. judgments, nations have enacted "blocking statutes" to protest U.S. transnational assertions of jurisdiction. *See* Joelson, *supra*, at 58. These statutes have taken several forms. For instance, "the Provinces of Ontario and Quebec have long had statutes prohibiting the removal of documents of Ontario and Quebec corporations pursuant to a foreign court order." 1 Fugate, *supra*, § 3.11, at 279. The United Kingdom, France, and Australia have similar laws. *See id.* at 279-80. Canadian officials have explained their objection to the United States' expansion of its antitrust jurisdiction: "For one government to seek to resolve [a policy] conflict in its favor by invoking its national law before its domestic tribunals is not the rule of law but an application, in judicial guise, of the principle that economic might is right." J.S. Stanford, *The Application of the Sherman Act to Conduct Outside the United States: A View from Abroad*, 11 Cornell Int'l L.J. 195, 213 n.46 (1978).

Some countries have gone even further to "block" the extraterritorial reach of U.S. antitrust laws. In response to the treble damages allowed in private Sherman Act suits, for example, the United Kingdom enacted "a prohibition on the enforcement by United Kingdom courts of foreign judgments involving the award of multiple damages and of certain other judgments touching upon the control of restrictive practices." A.V. Lowe, *Blocking Extraterritorial Jurisdiction: The British Protection of Trading Interests Act, 1980*, 75 Am. J. Int'l L. 257, 257 (1981). That statute also provides a right of "claw-back" — *i.e.*, "a right for British citizens or businesses against whom foreign courts have awarded multiple damages to recover the noncompensatory element from the original plaintiff by an action in a United Kingdom court." *Id.* Canada has enacted similar legislation. *See* I Fugate, *supra*, § 3.17, at 309 (discussing Foreign Extraterritorial Measure Act in Canada and noting that such statutes demonstrate "that foreign countries, including those with very close commercial ties to the United States, are determined that U.S. anti-

14

trust decrees shall not be enforced within their borders, at least without their governments' assent").[5]

We highlight these various features of law from other nations to emphasize the high stakes of this case. If the court of appeals' unprecedented expansion of U.S. antitrust jurisdiction stands, more nations are likely to enact similar statutes in response to concerns about their nationals being subjected ever more frequently to the threat of treble damages and the burdens of U.S. court litigation. As a result, and although the court of appeals viewed its decision as necessary to further the interests of deterring international cartels, *see* Pet. App. 31a-33a, that judgment is likely to have just the opposite effect by jeopardizing international cooperation in the battle against cartels.

## B. The Decision Below Impinges On Governmental Leniency Policies

The court of appeals' decision already threatens to undermine the corporate leniency program of the Department of Justice ("DOJ") as described by petitioners and the Solicitor General. *See* Pet. 8; Pet. App. 78a. It also could have detrimental consequences for similar programs in Germany, the EU, and other parts of the world. First, the investigation, prosecution, and deterrence of illegal international cartels through the DOJ's leniency policy is far less offensive to principles of international law and for-

---

[5] In the trade area, EU institutions are drafting a regulation against the Anti-Dumping Act of 1916, 15 U.S.C. § 72, which prohibits the selling at below cost of products with the intent of destroying or injuring a United States industry. Application of that law can have significant extraterritorial effects. *See, e.g., Goss Graphic Sys., Inc. v. Man Roland Druckmaschinen Aktiengesellschaft*, 139 F. Supp. 2d 1040 (N.D. Iowa 2001). For that reason, the EU has taken strong exception and announced that it will pass a regulation seeking retaliatory and protective measures against the United States for failing to repeal the 1916 law that has been held to violate international trade law by the WTO. *See* EU Press Release, *EU seeks retaliatory and protective measures in US 1916 Anti-Dumping Act dispute*, *available at* http://europa.eu.int/rapid/start/cgi/guesten.ksh?p_action.gettxt=gt&doc=IP/03/1274|0|RAPID&lg=EN&display=.

15

eign sovereignty than are private antitrust suits in U.S. courts. As the International Competition Policy Advisory Committee ("ICPAC") reported in 2000 to the Attorney General and Assistant Attorney General for Antitrust, international enforcement through these policies "has occurred without offending the sovereign interests of other jurisdictions to the same degree that can arise in the context of extraterritorial enforcement. Some of the persistent concerns associated with international enforcement are sidestepped when a firm or an individual cooperates pursuant to a leniency policy, including issues of personal jurisdiction, service of process, and access to foreign-located evidence and individuals." ICPAC, *Final Report* 184-85 (2000), *available at* http://www.usdoj.gov/atr/icpac/finalreport.htm.

Second, as it concerns the EU's Corporate Leniency Program, the European Commission ("EC") has noted that "certain undertakings involved in . . . illegal agreements are willing to put an end to their participation and inform [the Commission] of the existence of such agreements, but are dissuaded from doing so by the high fines to which they are potentially exposed." Official Journal of the European Communities, *Commission notice on immunity from fines and reduction of fines in cartel cases* ¶ 3 (2002/C 45/03). Because the "Commission considered that it is in the Community interest to grant favourable treatment to undertakings which cooperate with it," and similarly was of the view "that the collaboration of an undertaking in the detection of the existence of a cartel has an intrinsic value," it determined to "grant an undertaking immunity from any fine which would otherwise have been imposed" if certain conditions were met. *Id.* ¶¶ 4-8.

Germany, likewise, considers its leniency policies to be an important part of its enforcement efforts, and it already has enjoyed success with its program. In June 2003, the Federal Cartel Office reported to the German Parliament on its activities in 2001 and 2002 in the battle against cartels. That report noted that the leniency rule announced

16

in April 2000 has "showed significant [positive] effect in the prosecution of cartels." Federal Cartel Office, *Biennial Activity Report 2001/2002* (June 27, 2003), *available at* http://dip.bundestag.de/btd/15/012/1501226.pdf    (German version only) ("June 2003 Federal Cartel Report").

The leniency policy seeks to balance the interests of disclosure, deterrence, and punishment. By contrast, the interests in disclosure and reform are greatly hindered when a company risks the imposition of treble damages in a U.S. court for confessing to participating in an international conspiracy.    These disincentives become overwhelming when treble damages are made available not only to U.S. consumers, but also to all consumers around the world. At that point, the prospect of ruinous civil liability in U.S. courts far outweighs the benefits most companies would receive from participating in an amnesty program. As Mr. Lambsdorff observed, although this program had been "expressly welcomed by the US antitrust authorities[,] [n]ow the Empagran decision jeopardizes the success of the corporate leniency program in Europe since the incentive to disclose information to the authorities voluntarily will be reduced if companies must fear private class actions in the United States brought by plaintiffs from all over the world." Bonn Lecture, *supra*, at 4.

III. **BECAUSE OTHER COUNTRIES FOLLOW THE EFFECTS DOCTRINE AND VIGOROUSLY APPLY THEIR COMPETITION LAWS, THERE IS NO NEED FOR U.S. ANTITRUST LAWS TO APPLY EXTRATERRITORIALLY TO PLAINTIFFS INJURED ONLY IN FOREIGN COMMERCE**

A. **Other Countries Vigorously Enforce Against Antitrust Abuses**

The court of appeals justified its decision on the ground that "[d]isallowing suits by foreign purchasers injured by a global conspiracy because they themselves were not injured by the conspiracy's U.S. effects runs the risk of inadequately deterring global conspiracies that harm U.S. commerce." Pet. App. 32a.  We respectfully submit that

17

the court is gravely mistaken. Not only will the court's decision likely produce *less* effective deterrence of global conspiracies by hindering international cooperation, *see* Part II, *supra*, but it also fails properly to recognize that other nations already have in place effective competition regulations and laws that adequately prohibit and deter global conspiracies affecting those nations' own commerce.

Those other nations share common ground with the United States in applying the effects doctrine, which has been accepted in "most of the world." Eleanor M. Fox, *International Antitrust and the DOHA Dome*, 43 Va. J. Int'l L. 911, 916 (2003). *See also Restatement (Third)* § 403 reporter's note, at 250 (observing that "[m]ost other states of Western Europe . . . have accepted the effects doctrine as applied to economic effects, either in their legislation or in political decisions"). Germany's competition law, for example, provides that it "shall apply to all restraints on competition having an effect within the area of application of this Act, also if they were caused outside the area of application of this Act." GWB § 130, ¶ 2. Indeed, "Germany appears to have been foremost among the member states of the [European Commission] to embrace extraterritoriality." Dorsey D. Ellis, *Projecting the Long Arm of the Law: Extraterritorial Criminal Enforcement of U.S. Antitrust Laws in the Global Economy*, 1 Wash. U. Global Stud. L. Rev. 477, 501 (2002). The EU, too, has adopted the effects doctrine, as "both the Commission and the Court of Justice of the European Community have applied Community law to enterprises not engaged in business in the Community, on the basis of the effect of restrictive practices within the Community." *Restatement (Third)* § 415 reporter's note, at 294. *See also Gencor Ltd. v. Commission* (Case T-102/96, 25.3.1999, E.C.R. 1999, Page II-00753) (EC's regulation of competition "is justified under public international law when it is foreseeable that a proposed concentration will have an immediate and substantial effect in the Community").

18

## B. Adherence To The Effects Doctrine By Other Countries Produces Sound International Antitrust Enforcement

The near-universal acceptance of an effects test means that rarely, if ever, will a global conspiracy go unregulated and unpunished under other countries' competition laws. Similarly, the existence of such laws reflects the seriousness with which other nations take their responsibility to police activities that form the basis for an alleged worldwide conspiracy. This fact has been recognized on both sides of the Atlantic. The DOJ has attributed the increase in the number of international cartel cases to the efforts of the Antitrust Division and "other antitrust agencies in recent years." Delrahim, *supra*, at 9 (citation omitted).

Many of those cases are investigated by utilizing "positive comity" agreements, pursuant to which "the affected authority may request that the other initiate enforcement activities." Griffin, *supra*, 67 Antitrust L.J. at 183. Because it relies on diplomacy and not unilateral expansion of one nation's laws, "[p]ositive comity is intended to eliminate the long-running dispute concerning the propriety under international law of assertions of extraterritorial jurisdiction." *Id.* The United States and the EU have had a formal positive comity agreement in place since 1991, and in 1998 the two parties built upon that agreement with the Agreement Between the European Communities and the Government of the United States of America on the Application of Positive Comity Principles in the Enforcement of Their Competition Laws, June 4, 1998, *reprinted at* 37 I.L.M. 1070 (1998). The Agreement states that among its purposes is to "[e]stablish cooperative procedures to achieve the most effective and efficient enforcement of competition law, whereby the competition authorities of each Party will normally avoid allocating enforcement resources to dealing with anticompetitive activities that occur principally in and are directed principally towards the other Party's territory." *Id.* at 1071. In the years since the 1991 Agreement was signed,

19

"[e]nforcement officials on both sides of the Atlantic have confirmed that the flow of information between them has increased significantly." Griffin, *supra*, 67 Antitrust L.J. at 181 (noting, for example, that in 1997 alone "the U.S. antitrust agencies sent thirty-six notifications to Brussels and received forty-two from the Commission").

The efficacy of those joint governmental efforts is evident in the investigation and punishment of the very vitamin cartel involved in this case. As petitioners note, substantial penalties already have been assessed against the vitamin companies by countries outside of the United States, and there are pending private civil suits and class actions in a number of other countries. *See* Pet. 5. In Germany, suits are pending against petitioners Hoffmann-LaRoche and BASF based on the vitamin cartel at issue in this case. Such efforts are only part of a larger trend. Today, more than 100 countries have competition laws, marking a significant increase in the regulation of global antitrust issues. *See* H. Stephen Harris, *Competition Laws Outside the United States*, 2001 A.B.A. Sec. Antitrust L. 13. Germany's Federal Cartel Office alone investigated some 164 cartel or price-fixing cases in 2001 and 204 cases in 2002 – and those figures do not even include the numerous investigations the States of the German Federation conducted in those years. *See* June 2003 Federal Cartel Report at 274; *see also* II Fugate, *supra*, § 16.9, at 566 (commenting that "[t]he German Cartel Authority, with a large staff, vigorously enforces the statute"). Moreover, in 1999, the European Commission carried out investigations in 226 cases arising either from customer or competitor complaints, or from investigations raised on its own initiative. *See* European Comm'n, *Competition Policy in Europe and the Citizen* 13 (2000), *available at* http://europa.eu. int/comm/competition/publications/competition_policy_and _the_citizen/en.pdf.

Those efforts have produced a significant level of deterrence of competition law abuses. Subjecting companies to treble damages actions is unnecessary to achieve the nec-

20

essary deterrence and will, in fact, be counterproductive to ongoing enforcement efforts. *See* Ronald W. Davis, *International Cartel and Monopolization Cases Expose a Gap in Foreign Trade Antitrust Improvements Act*, 15 Antitrust 53, 54 (Sum. 2001) ("in view of the spectacular growth of antitrust in Europe and elsewhere, international cartels are sufficiently deterred without the need to extend U.S. treble damage protection to all victims around the world"). The court of appeals, however, adopted the mistaken view that international cartels can be sufficiently deterred only through expansion of U.S. extraterritorial jurisdiction to foreign plaintiffs who were affected only in foreign commerce. That erroneous judgment should be corrected by this Court.

### CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted,

DAVID C. FREDERICK
  *Counsel of Record*
KEVIN J. MILLER
KELLOGG, HUBER, HANSEN,
  TODD & EVANS, P.L.L.C.
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for Amicus Curiae*

December 1, 2003