# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

MARKUS BLECHNER, Individually and on
Behalf of All Others Similarly Situated,

               Plaintiff,

     v.

DAIMLER-BENZ AG, DAIMLERCHRYSLER
AG, JÜRGEN SCHREMPP, ECKHARD
CORDES, MANFRED GENTZ, JÜRGEN
HUBBERT, MANFRED BISCHOFF, KURT
LAUK, KLAUS MANGOLD, HEINER
TROPITZSCH, KLAUS-DIETER
VOHRINGER, DIETER ZETSCHE and
THOMAS SONNENBERG,

               Defendants.

-------------------------------------------------------------x

:    Civil Action No. 04-331 (JJF)

## COMPENDIUM OF UNREPORTED AUTHORITIES CITED IN THE REPLY BRIEF OF DAIMLERCHRYSLER AG AND DAIMLER-BENZ AG IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

OF COUNSEL:
Jonathan J. Lerner
Lea Haber Kuck
Joseph N. Sacca
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

Dated: June 2, 2005

Thomas J. Allingham II (#0476)
Robert S. Saunders (#3027)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Rodney Square, P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

Attorneys for Defendants DaimlerChrysler
AG and Daimler-Benz AG

# INDEX

CASE                                                                                                TAB NO.

Davis v. Social Security Admin.,
     C.A. No. 02-1595, 2003 WL 21219821 (D. Del. May 20, 2003) . . . . . . . . . . . . . 1

Froese v. Staff,
     C.A. No. 02 CV 5744, 2003 WL 21523979 (S.D.N.Y. July 7, 2003) . . . . . . . . . . 2

N.A.I.F., Inc. v. Snyder,
     C.A. No. 03-506, 2005 WL 735554 (D. Del. Mar. 30, 2005) . . . . . . . . . . . . . . . 3

Nasser v. Anderson Worldwide Societe Coop.,
     No. 02 Civ. 6832, 2003 WL 22179008 (S.D.N.Y. Sept. 23, 2003) . . . . . . . . . . . 4

Paraschos v. YBM Magnex Int'l, Inc,
     C.A. No. 98-6444, 2000 WL 325945 (E.D. Pa. Mar. 29, 2000) . . . . . . . . . . . . . 5

In re Quarterdeck Office Sys., Inc. Sec. Litig.,
     C.A. No. CV-92-3970, 1994 WL 374452 (C.D. Cal. Mar. 24, 1994) . . . . . . . . . 6

Shields v. Wash. Bancorporation,
     C.A. No. 90-1101, 1992 WL 88004 (D.D.C. Apr. 7, 1992) . . . . . . . . . . . . . . . . 7

In re Vivendi Universal, S.A. Sec. Litig.,
     No. 02 Civ. 557, 2003 WL 22489764 (S.D.N.Y. Nov. 3, 2003) . . . . . . . . . . . . . 8

Brief of the Federal Republic of Germany as Amicus Curiae in Support of Petition
     for Writ of Certiorari, F. Hoffman-La Roche Ltd. v. Empagran, S.A.,
     124 S. Ct. 2359 (No. 03-724) (2004), available at 2003 WL 22896686 . . . . . . . 9

# TAB 1

Not Reported in F.Supp.2d
2003 WL 21219821 (D.Del.)
(Cite as: 2003 WL 21219821 (D.Del.))
C

**Page   1**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
**William T. DAVIS, Plaintiff,**
v.
**SOCIAL SECURITY ADMINISTRATION,**
**Defendant.**
**No. Civ.A. 02-1595-SLR.**

May 20, 2003.
William T. Davis, Wilmington, DE, Plaintiff, pro se.

Colm F. Connolly, United States Attorney and Leonard P. Stark, Assistant United States Attorney, United States Attorney's Office, Wilmington, Delaware, for Defendant.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

**\*1** Plaintiff William T. Davis filed this action against defendant Social Security Administration on November 1, 2002. (D.I.1) Plaintiff seeks increased social security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Currently before the court is defendant's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1). (D.I.10) For the reasons that follow, the court shall grant defendant's motion.

II. BACKGROUND

According to defendant, "[t]he plaintiff has been in pay status for receipt of supplemental security income benefits since May 2000, and the amount of his check has increased in January of each year, in accordance with cost-of living increases. There is no record that he has ever filed a request for hearing or request for Appeals Council review." (D.I. 9 at 3) Plaintiff has not disputed this fact and has made no allegation that he has attempted to pursue relief through the administrative procedures of the Social Security Administration.

III. STANDARD OF REVIEW

Not only may the lack of subject matter jurisdiction be raised at any time, it cannot be waived and the court is obliged to address the issue on its own motion. *See Moodie v. Fed. Reserve Bank of NY,* 58 F.3d 879, 882 (2d Cir.1995). Once jurisdiction is challenged, the party asserting subject matter jurisdiction has the burden of proving its existence. *See Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.,* 227 F.3d 62, 69 (3d Cir.2000).

Under Rule 12(b)(1), the court's jurisdiction may be challenged either facially (based on the legal sufficiency of the claim) or factually (based on the sufficiency of jurisdictional fact). *See* 2 James W. Moore, Moore's Federal Practice § 12.30[4] (3d ed.1997). Under a facial challenge to jurisdiction, the court must accept as true the allegations contained in the complaint. *See id.* Dismissal for a facial challenge to jurisdiction is "proper only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or ... is wholly insubstantial and frivolous." ' *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1408-1409 (3d Cir.1991) (quoting *Bell v. Hood,* 327 U.S. 678, 682 (1946)).

Under a factual attack, however, the court is not "confine[d] to allegations in the ... complaint, but [can] consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction." *Gotha v. United States,* 115 F.3d 176, 179 (3d Cir.1997). *See also Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891-892 (3d Cir.1977). In such a situation, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Carpet Group,* 227 F.3d at 69 (quoting *Mortensen,* 549 F.2d at 891). Although the court should determine subject matter jurisdiction at the outset of a case, "the truth of jurisdictional allegations need not always be determined with finality at the threshold of litigation." Moore at § 12.30[1]. Rather, a party may first establish jurisdiction "by means of a nonfrivolous assertion of jurisdictional elements and any litigation of a contested subject-matter jurisdictional fact issue occurs in comparatively

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d

**(Cite as: 2003 WL 21219821, \*1 (D.Del.))**

summary procedure before a judge alone (as distinct from litigation of the same fact issue as an element of the cause of action, if the claim survives the jurisdictional objection)." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 537-38 (1995) (citations omitted).

## IV. DISCUSSION

**\*2** Defendant argues that plaintiff's claim must be dismissed because plaintiff has failed to exhaust his administrative appeal remedies prior to filing this action.

The Social Security Act authorizes judicial review of a claimant's request for benefits only when the Commissioner renders a "final decision" after an administrative hearing before an ALJ. [FN1]

> FN1. Under the regulations, a claimant must complete a four step process in order to obtain a final decision and qualify for judicial review. The steps are:
> (1) Initial determination. This is a determination we make about your entitlement or your continuing entitlement to benefits or about any other matter, as discussed in Sec. 404.902, that gives you a right to further review.
> (2) Reconsideration. If you are dissatisfied with an initial determination, you may ask us to reconsider it.
> (3) Hearing before an administrative law judge. If you are dissatisfied with the reconsideration determination, you may request a hearing before an administrative law judge.
> (4) Appeals Council review. If you are dissatisfied with the decision of the administrative law judge, you may request that the Appeals Council review the decision.
> (5) Federal Court Review. When you have completed the steps of the administrative review process listed in paragraphs (a)(1) through (a)(4) of this section, we will have made our final decision. If you are dissatisfied with our final decision, you may request judicial review by filing an action in Federal district court.
> 20 C.F.R. § 404.900(a) (emphasis added).

Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of

such decision by a civil action commenced within 60 days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42 U.S.C. § 405(g) (emphasis added). Section 405(g) is the exclusive jurisdictional basis for judicial review of cases arising under Title II of the Social Security Act. *See* 42 U.S.C. § 405(h). An exception to the "final decision" rule applies when a claimant is presenting a constitutional claim or a claim that is wholly collateral to the claim for benefits. *See Califano v. Sanders,* 430 U.S. 99, 108-09 (1977).

In the instant case, plaintiff is requesting that the court review a claim for increased benefits that has not been presented to the Social Security Administration. Plaintiff has failed to obtain a "final decision" that permits judicial review of the merits of his claim. Thus, the court lacks jurisdiction over the merits of plaintiff's claim for increased social security benefits.

## V. CONCLUSION

For the reasons stated, defendant's motion to dismiss for lack of subject matter jurisdiction is granted. An appropriate order shall issue.

### ORDER

At Wilmington this 20th day of May, 2003, consistent with the memorandum opinion issued this same day;

IT IS ORDERED that defendant's motion to dismiss the complaint (D .I. 10) is granted.

2003 WL 21219821 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

.      1:02CV01595      **(Docket)** **(Nov. 01, 2002)**

**END OF DOCUMENT**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# TAB 2

Not Reported in F.Supp.2d                                                                                               **Page 1**
2003 WL 21523979 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,507
**(Cite as: 2003 WL 21523979 (S.D.N.Y.))**
Ͱ

**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
**Hasko FROESE, individually and on behalf of all
other similarly situated
Plaintiff,
v.
Marty STAFF, Vincent Ottomanelli and Hugo
Boss AG, Defendants.
No. 02 CV 5744(RO).**

July 7, 2003.

German owner of shares in German corporation
brought putative class action against corporation and
both former chief executive officer (CEO) and
former chief financial officer (CFO) of United States
subsidiary of corporation's foreign subsidiary,
alleging that German corporation misrepresented its
financial results through "channel stuffing" that
occurred at United States subsidiary. Defendants
moved to dismiss. The District Court, Owen, J.,
held that: (1) subject matter jurisdiction did not exist
over action under control test, and (2) subject matter
jurisdiction did not exist over action under effects
test.

Motion granted.

West Headnotes

**[1] Federal Courts** ⬅ **82**
170Bk82 Most Cited Cases

**[1] Federal Courts** ⬅ **86**
170Bk86 Most Cited Cases
Under control test, which required showing that
defendants' United States-based activities directly
caused securities fraud plaintiffs' financial losses,
federal district court did not have subject matter
jurisdiction in putative class action in which German
owner of shares in German corporation asserted that
corporation misrepresented its financial results
through "channel stuffing" that allegedly occurred at
United States subsidiary of German corporation's
foreign subsidiary, inasmuch as any fraud occurred
when allegedly fraudulent financial statements were
conceived, engineered, and published in Germany,
in that purported misstatements, and not any activity

leading to those misstatements, was direct cause of
investors' financial losses.

**[2] Federal Courts** ⬅ **82**
170Bk82 Most Cited Cases

**[2] Federal Courts** ⬅ **86**
170Bk86 Most Cited Cases
Under effects test, which permitted federal district
court to assert subject matter jurisdiction over
securities claim asserted by aliens when illegal
activity abroad caused substantial effect within
United States, subject matter jurisdiction did not
exist over putative class action in which German
owner of shares in German corporation asserted that
corporation misrepresented its financial results
through "channel stuffing" that allegedly occurred at
United States subsidiary, given that plaintiff was foreign,
corporation's stock was sold on German exchange,
and United States investors, who were not plaintiffs
in action, made up exceptionally small percentage of
total number of investors and their shares likely
were bought on foreign exchange.

*MEMORANDUM AND ORDER*

OWEN, J.

**\*1** Lead plaintiff Froese is a citizen and resident of
Germany who alleges injury as an owner of Hugo
Boss AG ("HBAG") shares, which were purchased
on German exchanges through German brokerage
houses. While it appears that there are American
investors in HBAG stock, none of these purported
investors is a plaintiff in this action. Defendant
HBAG is a German corporation with its principal
place of business in Germany. It has no office,
employees, bank account, or property in the United
States. HBAG's stock is issued in Germany and is
traded on German stock exchanges. Hugo Boss U.S.
("HBUS") is a wholly-owned subsidiary of Hugo
Boss Int'l BV (a Netherlands corporation) which is a
wholly-owned subsidiary of HBAG. It is a Delaware
corporation with its principal place of business in
New York City. Defendant Staff is the former
President and CEO of HBUS and its subsidiaries.
Defendant Ottomanelli is the former CFO of HBUS
and its subsidiaries. They have never held any
position with or been compensated by HBAG.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Plaintiffs claim that HBAG--the German parent--misrepresented its financial results during the class period by a practice known as "channel stuffing" which occurred at HBUS. Channel stuffing is a practice by which revenues were overstated by including amounts for products that the company delivered to and endeavored to force their retail network to accept despite no demand, with perhaps secret assurances that the goods, if unsold, could be returned. The allegations in the complaint are essentially that HBAG prepared and issued, from Germany, press releases and an annual report, which were materially false or misleading because of the channel stuffing. For the following reasons I grant defendants' motion to dismiss for lack of jurisdiction.

[1] "When, as here, a court is confronted with transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have wished the precious resources of the United States courts ... to be devoted to them rather than leave the problem to foreign countries." *Bersch v. Drexel Firestone, Inc.* 519 F.2d 974, 985 (2d Cir.1975). To do so, courts apply two different tests: the conduct test and the effects test. Under the conduct test, subject matter jurisdiction exists in a securities claim asserted by aliens
  only where there has been in the United States: (1) conduct material to the completion of the fraud; (2) perpetration of the fraudulent acts themselves; or (3) the final steps in the fraudulent scheme.
*Societe Nationale d'Exploitation Industrielle des Tabacs et Allumettes v. Salomon Brothers Int'l Ltd.,* 928 F.Supp. 398, 403 (S.D.N.Y.1996). Only (1) above applies here and the *Societe Nationale* case even excludes for jurisdictional purposes, such United States conduct if it is "relatively small in comparison to those abroad...." *Id.* "In sum, to satisfy the conduct test; [plaintiff] must demonstrate that the defendants' United States-based activities directly caused its financial losses." *Id* .

*2 The plaintiffs argue that this test has been met because the underlying accounting problems that lead HBAG to overstate its earnings occurred in the United States. I find, however, that the fraud itself occurred, if at all, when the allegedly fraudulent statements were conceived, engineered, and published in Germany. It is these misstatements and not any activity which lead to the alleged misrepresentations which "directly caused" the

financial losses.

[2] Under the effects test, "a federal court has jurisdiction ... where illegal activity abroad causes a substantial effect within the United States." *Euro Trade & Forfaiting, Inc. v. Vowell,* 2002 WL 500672, at *6 (S.D.N.Y.2002), citing *Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir.1991). The plaintiffs here are all foreign, HBAG is a German corporation, and the stock was sold on a German exchange. While plaintiffs argue that there is a substantial effect on the United States because there were investors in the United States, any such investors made up an exceptionally small percentage of the total number of investors, the shares were likely purchased on a foreign exchange, and these investors are not plaintiffs in this case. I find that applying both the conduct and effects tests leads to the conclusion that subject matter jurisdiction does not exist and accordingly the motion to dismiss is granted.

So Ordered.

2003 WL 21523979 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,507

**Motions, Pleadings and Filings (Back to top)**

.          1:02CV05744          (Docket)
(Jul. 23, 2002)

**END OF DOCUMENT**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# **TAB 3**

Slip Copy
2005 WL 735554 (D.Del.)
(Cite as: 2005 WL 735554 (D.Del.))
**H**

Page   1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
**N.A.I.F. INC., Friend of Abdullah T. Hameen;
Ismaa'Eel H. Hackett; and Shakirah
Hameen, Plaintiffs,
v.
Robert SNYDER, Betty Burris, Larry
McGuigan, Charles Cunningham, Ron G.
Hostermen, Frank Pennell, Stanley W. Taylor,
Jr., Carl C. Danberg, and Paul
Howard, Defendants.
No. Civ.A. 03-506 JJF.**

March 30, 2005.
N.A.I.F., Inc., Wilmington, Delaware, Plaintiff,
pro se.

Ismaa'eel H. Hackett, Wilmington, Delaware,
Plaintiff, pro se.

Shakirah Hameen, Philadelphia, Pennsylvania,
Plaintiff, pro se.

Stuart B. Drowos, of the Department of Justice for
the State of Delaware, Wilmington, Delaware, for
Defendants Robert Snyder, Betty Burris, Larry
McGuigan, Charles Cunningham, Ron G.
Hostermen, Frank Pennell, Stanley w. Taylor, Jr.,
Carl C. Danberg, and Paul Howard.

*MEMORANDUM OPINION*

FARNAN, J.

**\*1** Presently before the Court is the Motion To
Reconsider The Court's Order Granting Plaintiff's
Motion To Amend The Complaint (D.I.27) filed by
State Defendants Robert Snyder, Larry McGuigan,
Betty Burris, Charles Cunningham, Ron Hosterman,
Frank Pennell, Stan Taylor, Carl C. Danberg, and
Paul Howard. For the reasons discussed, the motion
will be denied.

**BACKGROUND**
Plaintiff Ismaa'eel Hackett is the Director and Iman
of the North American Islamic Foundation, Inc.

("NAIF"), a national not-for-profit organization
located in Wilmington, Delaware. Mr. Hackett and
NAIF filed this lawsuit pursuant to 42 U.S.C. §
1983 as next friend of Abdullah T. Hameen, a
former death row inmate who was executed in May
2001. Mr. Hackett volunteered his services as a
religious advisor to Muslim inmates at the DCC. In
their First Amended Complaint (D.I.3), Plaintiffs
Hackett and NAIF allege that Defendants violated
Mr. Hameen's First Amendment right to freedom of
religion when they failed to allow Mr. Hackett to
act as Mr. Hameen's religious advisor at the time of
his execution.

On October 24, 2003, Defendants filed a Motion
For Summary Judgment (D.I.14). On January 27,
2004, Plaintiffs Hackett and NAIF filed a Motion
For Leave To File Second Amended Complaint
(D.I.23), in which they added Shakirah Hameen,
Mr. Hameen's widow, as a plaintiff and added a
claim pursuant to the Religious Land Use And
Institutionalized Person Act ("RLUIPA"), 42
U.S.C. § 2000cc-1. On February 9, 2004, the Court
entered an Order (D.I.26) granting the Motion For
Leave To File Second Amended Complaint. On
February 23, 2004, Defendants filed the instant
motion for reconsideration of the Court's February 9
Order.

**PARTIES' CONTENTIONS**
By their motion, Defendants contend that Plaintiffs'
Motion For Leave To File Second Amended
Complaint (D.I.23) should be denied for three
reasons: 1) Plaintiffs' motion is the product of
undue delay; 2) Plaintiffs' amendment adding Ms.
Hameen violates the applicable statute of limitations,
and 3) the constitutionality of RLUIPA is
questionable.

Plaintiffs respond that, because they are acting *pro
se,* they did not have knowledge of RLUIPA at the
times they filed the original Complaint and the First
Amended Complaint. Plaintiffs further contend that
RLUIPA is constitutional.

**LEGAL STANDARD**
"As a general rule, motions for reconsideration
should be granted 'sparingly." ' *Stafford v.
Noramco of Delaware, Inc.,* 2001 WL 65738 at *1
(D.Del. Jan. 10, 2001) (quoting *Karr v. Castle,* 768

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
**(Cite as: 2005 WL 735554, \*1 (D.Del.))**

F.Supp. 1087, 1090 (D.Del.1991)). The purpose of granting motions for reconsideration is to correct manifest errors of law or fact, present newly discovered evidence, or to prevent manifest injustice. *Harsco Corp. v. Zlotnicky,* 176 F.3d 669, 677 (3d Cir.1999) (citing *Keene Corp. v. Int'l Fid. Ins. Co.,* 561 F.Supp. 656, 665 (N.D.Ill.1983); *North River Ins. Co. v. CIGNA Reins.,* 52 F.3d 1194, 1218 (3d Cir.1995) (citations omitted). Parties should remain mindful that a motion for reconsideration is not merely an opportunity to "accomplish [the] repetition of arguments that were or should have been presented to the court previously." *Karr v. Castle,* 768 F.Supp. 1087, 1093 (D.Del.1991) (citing *Brambles U.S.A., Inc. v. Blocker,* 735 F.Supp. 1239, 1240-41 (D.Del.1990)). However, a court should reconsider a prior decision if it overlooked facts or precedent that reasonably would have altered the result. *Id.* (citing *Weissman v. Fruchtman,* 124 F.R.D. 559, 560 (S.D.N.Y.1989)).

### DISCUSSION

\*2 For the reasons discussed, the Court concludes that State Defendants have not identified errors of law or fact, newly discovered evidence, or manifest injustice sufficient to allow the Court to grant the motion for reconsideration.

I. Whether Plaintiffs' Motion For Leave To Amend Should Be Denied As The Product Of Undue Delay

Defendants first contend that Plaintiffs' motion is the product of undue delay. Defendants specifically contend that Mr. Hackett possessed the information he added to his Second Amended Complaint at the time he filed his First Amended Complaint and, therefore, he acted in a dilatory manner. Defendants further contend that it was only after Mr. Hackett received Defendants' Motion For Summary Judgment (D.I.27), wherein Defendants argued that Mr. Hackett lacked standing, that Mr. Hackett filed the Second Amended Complaint adding Shakeerah Hameen, Mr. Hameen's widow, as a plaintiff.

Federal Rule of Civil Procedure 15(a) declares that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). In the absence of substantial or undue prejudice, denial of a motion for leave to amend a pleading "must be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by

amendments previously allowed, or futility of amendment." *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1414 (3d Cir.1993).

The Court concludes that, although the amendment was made after Defendants filed a motion for summary judgment, Defendants have not shown they are substantially or unduly prejudiced by the amendment. The Court finds that Plaintiffs have not acted in bad faith or had dilatory motives in failing to add Ms. Hameen or file the RLUIPA claim in the original Complaint. Further, the Court finds no undue or unexplained delay on the Plaintiffs' part, particularly because they are acting *pro se.*

II. Whether Plaintiffs' Motion For Leave To Amend Should Be Denied With Regard To Ms. Hameen On Statute Of Limitation Grounds

Defendants contend that Plaintiffs' amendment adding Ms. Hameen should be denied on statute of limitation grounds.

The Supreme Court has held that the state statute of limitations for personal injury actions applies to § 1983 claims. See *Owens v. Okure,* 488 U.S. 235, 239 (1989); *Wilson v. Garcia,* 471 U.S. 261, 269 (1985); *Smith v. City of Pittsburgh,* 764 F.2d 188, 194 (3d Cir). In Delaware, the limitations period for a personal injury claim is two years. Del.Code Ann. tit. 10, § 8119 (1974); *McDowell v. Delaware State Police,* 88 F.3d 188, 190 (3d Cir.1996).

Federal Rule of Civil Procedure 15(c) allows amendments that add a party despite the running of an applicable state statute of limitations in certain circumstances. Fed. R. Civ P. 15(c)(3). To ameliorate the running of the statute of limitations, Rule 15(c)(3) imposes three conditions, all of which must be met for a party to successfully relate back an amended complaint adding a new plaintiff. See *Singletary v. Pennsylvania Depot of Corrections,* 266 F.3d 186, 193-94 (3d Cir.2001) (describing the three elements of Rule 15(c)(3)); *see also Nelson v. County of Allegheny,* 60 F.3d 1010, 1014 n. 7 (3d Cir.1995) (noting that the relation back of amendments applies equally to amendments changing and adding plaintiffs). The three elements of Rule 15(c)(3) are whether 1) the claim arose out of the same conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, 2) whether the defendant had notice of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



filing of the action within the period provided by Rule 4(m) and will not be prejudiced in maintaining a defense, and 3) the newly named plaintiffs failed to add their names to the complaint because of a mistake. Fed.R.Civ.P. 15(c)(3); *Nelson,* 60 F.3d at 1015.

*\*3* The Court finds that, in the circumstances of this case, Defendants had notice of and will not be prejudiced in maintaining a defense to the § 1983 claim. With respect to the third element, the Court finds that the facts in the instant case demonstrate that but for Mr. Hackett's mistake, Ms. Hameen would have been named in the Complaint. Fed.R.Civ.P. 15(c)(3)(B).

For these reasons, the Court concludes that under Rule 15(c)(3) Plaintiff's amendment adding Ms. Hameen as a plaintiff is entitled to relate back to the filing of the Complaint.

III. Whether Plaintiffs' Motion For Leave To Amend Should Be Denied With Regard To The RLUIPA Claim

Defendants contend that Plaintiffs' motion to amend adding a RLUIPA claim should be denied because the U.S. Supreme Court has yet to consider the constitutionality of RLUIPA.

Federal Rule of Civil Procedure 15(c)(2) allows an amendment stating a different claim than the original Complaint to relate back to the date of the original Complaint if the new claim is within the Court's jurisdiction and arises out of the conduct, transaction, or occurrence set forth in the original Complaint. Fed.R.Civ.P. 15(c)(2).

The Court concludes that the RLUIPA claim is within the Court's federal question jurisdiction and arises from the conduct set forth in the original Complaint. Thus, the Court concludes that Defendants' Motion To Reconsider (D.I.27) should be denied with respect to the addition of the RLUIPA claim.

### CONCLUSION
In sum, the Court concludes that State Defendants have not identified errors of law or fact, newly discovered evidence, or manifest injustice sufficient to allow the Court to grant the motion for reconsideration.

An appropriate Order will be entered.

### *ORDER*
At Wilmington, this *30* day of March 2005, for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that the Motion To Reconsider The Court's Order Granting Plaintiff's Motion To Amend The Complaint (D.I.27) filed by State Defendants is *DENIED.*

2005 WL 735554 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

.         **1:03CV00506**         (Docket) (May. 23, 2003)

**END OF DOCUMENT**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# TAB 4

Not Reported in F.Supp.2d
2003 WL 22179008 (S.D.N.Y.)
**(Cite as: 2003 WL 22179008 (S.D.N.Y.))**
**c**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
**Ezequiel Edmond NASSER et al., Plaintiffs,**
**v.**
**ANDERSEN WORLDWIDE SOCIETE**
**COOPERATIVE a/k/a Andersen Worldwide,**
**Defendant.**
**No. 02 Civ. 6832(DC).**

Sept. 23, 2003.

Brazilian investors brought action against Swiss cooperative, under Racketeering Influenced and Corrupt Organizations Act (RICO), alleging investors were coerced and defrauded into selling shares for a price far below their value. Defendants moved to dismiss. The District Court, Chin, J., held that U.S. courts lacked subject matter jurisdiction.

Motion granted.

West Headnotes

**[1] Racketeer Influenced and Corrupt Organizations ⊘⟶ 55**
319Hk55 Most Cited Cases
Evidence that member entities of defendant, a Swiss cooperative, had offices in the United States, could not be imputed to establish that cooperative had a presence in the U.S. sufficient to confer subject matter jurisdiction, in Brazilian investors' action, under Racketeering Influenced and Corrupt Organizations Act (RICO). Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. § 1961 et seq.; Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[2] Racketeer Influenced and Corrupt Organizations ⊘⟶ 55**
319Hk55 Most Cited Cases
Any presence in United States of offices, of defendant Swiss cooperative, was insufficient to establish that cooperative's U.S. presence was sufficient to confer subject matter jurisdiction, in Brazilian investors' action, under Racketeering Influenced and Corrupt Organizations Act (RICO),

absent any U.S. conduct or effects. Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. § 1961 et seq.; Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[3] Racketeer Influenced and Corrupt Organizations ⊘⟶ 55**
319Hk55 Most Cited Cases
Racketeering Influenced and Corrupt Organizations Act (RICO) did not confer subject matter jurisdiction extraterritorially, in Brazilian investors' action alleging fraud by Swiss cooperative; complaint did not allege specific conduct in the U.S. material to completion of the fraud, allegations as to the effects of the alleged fraud in the U.S. were vague and conclusory, and use of U.S. judicial resources was inappropriate given the exclusively foreign nature of the transactions at issue. Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. § 1961 et seq.; Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.
Srour Fischer & Mandell, LLP, By Barry R. Fischer, Esq., Audrey I. Dursht, Esq., Mitchell G. Mandell, Esq., New York, NY, for Plaintiffs.

Sidley Austin Brown & Wood LLP, By James J. Sabella, Esq., Steven E. Klein, Esq., New York, NY, for Defendant.

CHIN, D.J.

*1 In this case, plaintiffs sue defendant for damages under the Racketeering Influenced and Corrupt Organizations Act ("RICO"). None of the relevant contacts, however, were in the United States. Rather, all the key events occurred in Brazil, Spain, or Switzerland. Hence, defendants move to dismiss, *inter alia,* for lack of subject matter jurisdiction, arguing that RICO does not apply to wholly foreign transactions. For the reasons that follow, the motion is granted.

*STATEMENT OF THE CASE*
**A.** *The Facts*

As alleged in the complaint, the facts are as follows:

Plaintiffs were controlling shareholders in Banco Excel Economico S.A. ("Excel"), a Brazilian bank

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2003 WL 22179008, *1 (S.D.N.Y.))

subject to regulation by Banco Central of Brazil (the "Central Bank"). (Compl.¶¶ 3-7, 31). Plaintiffs are Brazilian, comprised of individuals who are citizens and residents of Brazil and one Brazilian corporation. (*Id.* ¶¶ 3-7). Banco Bilboa Viscaya Argentaria S/A ("BBVA"), not named as a defendant in this case but with whom defendant is alleged to have conspired, is a Spanish bank. (*Id.* ¶ 26).

The complaint is confusing as to the identity of the defendant. The caption identifies the defendant as "Andersen Worldwide Societe Cooperative a/k/a Andersen Worldwide." The introduction, however, refers to wrongful conduct by "Arthur Andersen, at the time, the world's preeminent accounting and auditing firm." Paragraph 9 of the complaint alleges that "[d]efendant Andersen Worldwide was, at the time of the events alleged herein, a Swiss cooperative entity with a principal place of business and worldwide executive offices in the United States in both New York and Chicago." Paragraph 11 defines the term "Andersen" as meaning "Andersen Worldwide." Paragraph 13 alleges that "Anderson [sic] is comprised of Arthur Andersen & Co. Societe Cooperative ("AWSC"), a Swiss cooperative created as an administrative coordinating entity that operates as an umbrella organization for the partners of AWSC, Andersen member firms ("Member Firms"), the individual partners of Andersen and Andersen's offices around the world." (Parentheses in original). In this memorandum decision, the Court's references to "AWSC" are to defendant "Andersen Worldwide Societe Cooperative," and not "Arthur Andersen & Co. Societe Cooperative" or any other entity. [FN1]

> FN1. As AWSC's evidentiary materials make clear, AWSC was created in 1977 and originally was named Arthur Andersen & Co. Societe Cooperative ("Andersen SC"). (*See* Ekdahl Aff. ¶ 5 (attached to Sabella Reply Aff. as Ex. A.); *see also* Sabella Reply Aff. ¶¶ 4, 5). Andersen SC was created to coordinate the professional practices of the separate national practice entities that were affiliates of Arthur Andersen & Co. Each national practice was to be kept separate and autonomous, and Andersen SC did not earn net income, nor did it engage in professional practice. (Ekdahl Aff. ¶¶ 5, 6).

In the first quarter of 1998, BBVA decided to purchase plaintiffs' controlling shares of Excel. (*Id.*

¶ 26). On April 29, 1998, BBVA entered into a Letter of Intent ("LOI") with Excel to purchase plaintiffs' shares of Excel. (*Id.* ¶ 29). The purchase price was to be determined based on the value of Excel, after due diligence and valuation by defendant, BBVA's auditors. (*Id.* ¶ 30).

In the end, plaintiffs sold their shares for R$1, [FN2] far below their value. [FN3] (*Id.* ¶ 54). Plaintiffs contend that they were coerced and defrauded into selling their shares for such a low price. According to plaintiffs, AWSC agreed, at BBVA's request, to create a fraudulent financial report to "drastically devalue Excel so that Plaintiffs could be coerced by threat of Central Bank intervention to sell their Shares for nothing." (*Id.* ¶ 58).

> FN2. "R" represents the Brazilian currency--the "real." Plaintiffs allege that on June 28, 1998 US$1.00 equaled R$1.15. (Compl. ¶ 27 n. 1).

> FN3. Excel's net asset value on June 30, 1998, as determined by its auditors, was R$686,885,000. (*Id.* ¶ 62).

**\*2** Plaintiffs allege that defendant's conduct was part of a pattern of racketeering activity, including eleven other "conspiracies" that were "directed, controlled, supervised, monitored, or acquiesced in by Andersen senior partners in New York and/or Chicago ." (*Id.* ¶¶ 76, 79). In addition, the profits "derived by [defendant], either directly or indirectly" from its conduct were "shared in and distributed to Andersen partners worldwide, including in the United States." (*Id.* ¶ 76). In these "criminal conspiracies throughout the world," defendant's partners acted to increase their fees and enrich themselves. (*Id.* ¶¶ 79, 80). Plaintiffs allege that defendant's "pattern of racketeering activity" has had a "profound and negative effect and impact upon financial markets throughout the world and especially in the United States." (*Id.* ¶ 82). United States equity markets, plaintiffs allege, have experienced "dramatic declines ... as a result of the loss of investor confidence in the credibility of reports of corporate earnings based upon" defendant's accounting and audit services. (*Id.*).

These are the only contacts alleged in the United States. All the key players are foreign and all the critical facts--the meetings, the execution of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2003 WL 22179008, *2 (S.D.N.Y.))

LOI, the valuation and due diligence, and the sale of the shares--took place outside the United States.

**B. Procedural History**

Plaintiffs filed their complaint on August 27, 2002. Defendant moves to dismiss, arguing lack of subject matter jurisdiction, lack of personal jurisdiction, forum non conveniens, and failure to state a claim against defendant and under RICO. As I conclude that defendant's motion to dismiss should be granted based on lack of subject matter jurisdiction, I do not address the remaining grounds.

*DISCUSSION*
**A. Applicable Law**

**1. Subject Matter Jurisdiction**

In considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), federal courts "need not accept as true contested jurisdictional allegations." *Jarvis v. Cardillo,* No. 98 Civ. 5793(RWS), 1999 U.S. Dist. LEXIS 4310, at *7 (S.D.N.Y. Apr. 5, 1999). Rather, a court may resolve disputed jurisdictional facts by referring to evidence outside the pleadings, including affidavits. *See Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000); *Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 932 (2d Cir.1998). As the party "seeking to invoke the subject matter jurisdiction of the district court," the plaintiff bears the burden of demonstrating that there is subject matter jurisdiction in the case. *Scelsa v. City Univ. of New York,* 76 F.3d 37, 40 (2d Cir.1996).

**2. RICO**

The Second Circuit has noted that "[t]he RICO statute is silent as to any extraterritorial application." *North South Fin. Corp. v.. Al-Turki,* 100 F.3d 1046, 1051 (2d Cir.1996). Although "a corporate defendant that is a foreign entity is not for that reason alone shielded from the reach of RICO," the Second Circuit has acknowledged ambiguity as to the "character and amount of activity in the United States that will justify RICO subject matter jurisdiction over a foreign entity." *Id.* at 1052 (citing *Alfadda v. Fenn,* 935 F.2d 475, 479 (2d Cir.1991)). The Second Circuit has noted that "guidance [regarding the extraterritorial application

of RICO] is furnished by precedents concerning subject matter jurisdiction for international securities transactions and antitrust matters." *North South Fin.,* 100 F.3d at 1052.

*3 The Second Circuit, however, has not specified the test for extraterritorial applications of RICO. In dicta in *North South Fin .,* the court expressed ambivalence about the relevance to RICO of securities--or antitrust-based standards, in light of differing congressional intent behind the various statutes involved. *Id.* at 1052. "The ultimate inquiry is ... whether 'Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to [foreign transactions] rather than leave the problem to foreign countries.' " *Id.* at 1052 (quoting *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 985 (2d Cir.1975)).

Although the Second Circuit has not specified a precise standard, in RICO extraterritoriality cases courts in this circuit have generally applied two alternative tests derived from transnational and antitrust cases--the "conduct" and "effects" tests. *See North South Fin.,* 100 F.3d at 1051-52 (affirming district court's dismissal of RICO action for lack of subject matter jurisdiction for absence of U.S. conduct material to fraud); *Wiwa v. Royal Dutch Petroleum Co.,* No. 96 Civ. 8386(KMW), 2002 WL 319887, at *21 (S.D.N.Y. Feb.28, 2002); *Giro v. Banco Espanol De Credito, S.A.,* No. 98 CIV.6195(WHP), 1999 WL 440462, at *2 (S.D.N.Y. June 28, 1999), aff'd, 208 F.3d 203 (2d Cir.2000); *Madanes v. Madanes,* 981 F.Supp. 241, 250 (S.D.N.Y.1997).

Under the conduct test, subject matter jurisdiction exists "only where conduct material to the completion of the fraud occurred in the United States." *Giro,* 1999 WL 440462, at *3 (citing *Alfadda,* 935 F.2d at 479); *see also Madanes,* 981 F.Supp. at 251; *but see C.A. Westel de Venezuela v. Am. Tel. & Tel. Co.,* No. 90 Civ. 6665(PKL), 1993 WL 497971, at *4 (S.D.N.Y.1993) (rejecting conduct and effects tests in RICO context but asserting jurisdiction because predicate acts occurred in U.S.). The conduct in the United States must have "directly caused" the loss for subject matter jurisdiction to exist. *North South Fin.,* 100 F.3d at 1050 (citing *Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041, 1046 (2d Cir.1983) (quoting *Bersch,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2003 WL 22179008, *3 (S.D.N.Y.))

Page   4

519 F.2d at 993)). "Mere preparatory activities, and conduct far removed from the consummation of the fraud, will not suffice to establish jurisdiction." *North South Fin.,* 100 F.3d at 1051 (quoting *Psimenos,* 722 F.2d at 1046)). As for the effects test, two versions exist--one in the securities and the other in the antitrust context. *North South Fin.,* 100 F.3d at 1051-52. Under the effects test borrowed from securities cases, jurisdiction exists over a predominantly foreign transaction when it has "substantial effects within the United States." *North South Fin.,* 100 F.3d at 1051; *see also Giro,* 1999 WL 440462, at *3; *Madanes,* 981 F.Supp. at 250 (quoting *Consol. Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 261-62 (2d Cir.1989)). "Remote and indirect effects" do not qualify as substantial. *North South Fin.,* 100 F.3d at 1052. The "effect" must be a "direct and foreseeable result" of the conduct alleged. *Consol. Gold Fields,* 871 F.2d at 261-62. In antitrust cases, liability may attach when the extraterritorial conduct is "intended to and actually does have an effect on United States imports or exports which the state reprehends." *North South Fin.,* 100 F.3d at 1052. Under both versions of the effects test, "the reasoning behind the test is 'to protect ... domestic markets from corrupt foreign influences.' " *Wiwa,* 2002 WL 319887, at *21 (quoting *Madanes,* 981 F.Supp. at 250)).

**B. *Application***

*4 AWSC contends that RICO does not confer subject matter jurisdiction, as alleged by plaintiffs, because it is a foreign entity that has allegedly engaged in conduct violating RICO on foreign soil against foreign victims. (Def.Mem.6). AWSC argues that plaintiffs have failed to allege sufficient U.S conduct or effects to justify extraterritorial application of RICO against a foreign party. (*Id.* 6-9).

Plaintiffs maintain, however, that this case does not involve the extraterritorial application of RICO, arguing that, in fact, AWSC is a not a foreign entity but a worldwide organization based in the U.S. (Pl.Mem.8-10). Plaintiffs argue, alternatively, that even if AWSC were treated as a foreign entity, they have made sufficient allegations of U.S. conduct and effects to confer subject matter jurisdiction. (*Id.* 10-12).

For the reasons stated below, I conclude that plaintiffs have failed to establish subject matter jurisdiction.

**1. *Is Defendant a Foreign Entity?***

As a preliminary matter, I consider whether AWSC is a foreign or domestic entity. Plaintiffs concede that AWSC is a Swiss cooperative. (Compl.¶ 9). Nonetheless, plaintiffs maintain that this case does not involve the extraterritorial application of RICO because defendant is a worldwide, unified entity that includes Andersen-Brazil and has U.S. offices. (Pl. Mem. 8; Compl. ¶ 9; Fischer Decl. ¶¶ 52-56; PX 25; PX 26). [FN4] Plaintiffs allege that AWSC or "Andersen Worldwide," as they also refer to defendant, is comprised of AWSC and "Andersen member firms, the individual partners of Andersen and Andersen's offices around the world." (Compl.¶ 13). These offices around the world include those of U.S. member firms. (*Id.* ¶ 15). In addition, plaintiffs allege that AWSC and its U.S. member firms are "closely intertwined." (*Id.* ¶ 18).

> FN4. "PX" refers to plaintiffs' exhibits to the Declaration of Barry R. Fischer accompanying Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss.

Plaintiffs rely on a 1995 Chicago Tribune article discussing a recent shift in office space for "Arthur Andersen & Co." and "Andersen Worldwide" within the Chicago area. (Pl. Mem. 9; Fischer Decl. ¶¶ 8, 52-57; PX 25). Plaintiffs additionally refer to a 1998 Client Service Directory of "Andersen Worldwide" (PX 26) to establish that AWSC professionals, partners, and officers worked out of AWSC offices in Chicago and New York. (Pl. Mem. 8; Fisher Decl. ¶¶ 8, 52- 57).

[1] Plaintiffs' evidence fails to establish that AWSC itself has a U.S. presence. The 1995 article and the 1998 Client Services Directory refer not to the AWSC, but to "Andersen Worldwide" or "Arthur Andersen & Co." (PX 25, 26). Any assertion that "Arthur Andersen & Co." has U.S. offices is irrelevant to determining whether AWSC has a U.S. presence. Furthermore, references to the offices of "Andersen Worldwide" does not establish AWSC's presence in the U.S., for the complaint alleges that "Andersen Worldwide" refers to entities beyond AWSC. (Compl.¶ 13).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Moreover, to the extent plaintiffs rely on assertions that other "Andersen" entities, i.e., Andersen member firms, may be linked to AWSC to establish AWSC's domestic presence for subject matter jurisdiction purposes, these assertions are refuted by the evidentiary materials presented. AWSC was created to coordinate administratively the separate and autonomous national practice entities affiliated with Arthur Andersen & Co. (Ekdahl Aff. ¶ 5, 6; Sabella Reply Aff. ¶¶ 4, 5). AWSC does not engage in professional practice, nor does it earn net income. (Ekdahl Aff. ¶¶ 5). Accordingly, any alleged U.S. presence of Andersen member firms may not be imputed to AWSC to establish AWSC's domestic connection. Hence, I conclude that AWSC is a foreign entity.

**\*5** [2] Even assuming arguendo that AWSC has U.S. offices, such contacts would not confer subject matter jurisdiction automatically. *See IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1016 (2d Cir.1975); *Bersch,* 519 F.2d at 985; *Fidenas AG v. Honeywell, Inc.,* 501 F.Supp. 1029, 1041 (S.D.N.Y.1980). In the transnational securities context, from which courts have sought guidance for the extraterritorial application of RICO, a defendant's U.S. citizenship or U.S. presence alone has been deemed insufficient to confer subject matter jurisdiction without additional connections, such as U.S. conduct or effects. *IIT,* 519 F.2d at 1016 (deeming control over other defendants by U.S. citizen defendant insufficient to establish subject matter jurisdiction: "It is simply unimaginable that Congress would have wished the anti-fraud provisions of the securities laws to apply if, for example, [a U.S. citizen defendant] while in London had done all the acts here charged and had defrauded only European investors."); *Bersch,* 519 F.2d at 985, 986-90 (examining U.S. conduct and effects, even where defendants included U.S. citizens); *Fidenas,* 501 F.Supp. at 1041 (holding lack of subject matter jurisdiction in absence of U.S. conduct or effects by U.S.-based defendants). Accordingly, even accepting plaintiffs' allegations of AWSC's U.S. presence as true, such connections would be insufficient to confer subject matter jurisdiction without U.S. conduct or effects.

### 2. *Does RICO Apply Here?*

[3] In light of the predominantly foreign nature of this action, this Court must determine whether

RICO confers subject matter jurisdiction extraterritorially. I hold that it does not, for plaintiffs fail to satisfy the conduct test or either version of the effects test.

Plaintiffs do not allege any facts of U.S. conduct "material to the completion of the fraud." *Giro,* 1999 WL 440462, at \*3. The complaint contains allegations about defendant's U.S. conduct in only one paragraph. (Compl.¶ 76). Plaintiffs allege that defendant engaged in a "pattern of racketeering activity ... which, upon information and belief, was either directed, controlled, supervised, monitored, or acquiesced in by Andersen senior partners in New York and/or Chicago." (*Id.* ¶ 76). Plaintiffs' conclusory allegation, however, is strikingly devoid of any specific, supporting facts. Plaintiffs do not identify what conduct material to the fraud occurred in the United States. In fact, all the material conduct is alleged to have occurred outside the United States.

Furthermore, plaintiffs fail sufficiently to allege effects in the United States resulting from defendant's conduct. Plaintiffs allege that U.S. effects arose in two ways: (1) profits derived "either directly or indirectly" from defendant's acquisition of Excel were shared with defendant's partners, including those in the United States, "upon information and belief"; or (2) defendant's conduct has had "a profound and negative effect and impact upon the financial markets throughout the world and especially in the United States," manifested in the "recent dramatic declines in United States equity markets as a result of the loss of investor confidence in the credibility of reports of corporate earnings based on [defendant's] accounting and audit services." (*Id.* ¶¶ 76, 82).

**\*6** Plaintiffs fail both variations of the effects test. Plaintiffs' allegations of profit-sharing and market effect are insufficient to meet the securities-based requirement for "substantial effects." *North South Fin.,* 100 F.3d at 1051. First, plaintiffs again offer only a vague, conclusory statement regarding profit-sharing without any specific, factual allegations. Moreover, as pled by plaintiffs, the profits allegedly shared in the United States are far from direct effects of defendant's conduct, allegedly derived "either directly or indirectly." (Compl.¶ 76). *See North South Fin.,* 100 F.3d at 1051. Second, the allegedly "generalized effects" on the U.S. market are

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2003 WL 22179008, *6 (S.D.N.Y.))

insufficient to meet the requirement for "substantial effects." *Bersch,* 519 F.2d at 987-88 (holding that allegations of market decline both in U.S. and abroad, resulting from "deterioration of investor confidence" due to securities fraud, were insufficient to confer subject matter jurisdiction over suit by foreign plaintiff).

Moreover, plaintiffs' allegations fall far short of the antitrust-based effects test, which requires that the defendant's conduct be intended to and actually have an effect in the United States. *North South Fin.,* 100 F.3d at 1052; *Wiwa,* 2002 WL 319887, at *21. Plaintiffs fail to allege anywhere in the complaint that AWSC intended, through its alleged conduct, to create in the U.S. the partner profits or market effects alleged. *See Wiwa,* 2002 WL 319887, at *22 (holding that plaintiffs met effects test based, *inter alia,* on allegations that defendants "had the 'intention to gain significant competitive advantage' in the United States through their racketeering activities"). Nor have plaintiffs alleged or shown any actual material effects in the United States.

In addition to plaintiffs' failure to satisfy either the conduct or effects tests, this Court lacks subject matter jurisdiction because this matter is not one to which U.S. resources should be devoted, given the exclusively foreign nature of the transactions in question. *North South Fin.,* 100 F.3d at 1052. *North South Fin.* involved criminal RICO allegations based on facts strikingly similar to those in this case. There, the foreign plaintiffs were holding companies and their stockholders who eventually sold their ownership stake in a French bank to two French investment banking groups. *Id.* at 1048- 49. The defendants allegedly forced the sale of the bank at a fraudulently undervalued price. *Id.* The plaintiffs alleged that the defendants "artificially depressed the sale price of [the French bank] by corrupting the bank's general manager in Paris, who then understated the bank's liquidity for financial and regulatory purposes and misused information drawn from company sources (including a New York office)." *Id.* at 1048. Arthur Andersen & Co., not named as a defendant, prepared an audit report for the defendants that "falsely understated" the French bank's net worth. *Id.* at 1049. The defendants then used the audit report to create "regulatory pressure in France that was calculated to force the sale of [the bank] and to drive down the purchase price." *Id.* The plaintiffs further alleged

that the defendants manipulated post-sale transactions, some in New York, so that contingent payments of the purchase price on high risk loans were not apportioned to the plaintiffs and were instead fraudulently reduced or eliminated. *Id.* at 1048- 49.

*7 While affirming the district court's holding that it did not have subject matter jurisdiction due to a dearth of U.S. conduct material to the fraud's completion, the Second Circuit noted that subject matter jurisdiction was also lacking in light of the policy concerns implicated in cases involving the extraterritorial application of RICO. *Id.* at 1052. Specifically, the court highlighted the inquiry into "whether 'Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to [foreign transactions] rather than leave the problem to foreign countries.' " *Id.* at 1052. The court concluded, "we have no doubt that the district court was without jurisdiction over a controversy involving foreign victims who sold a foreign entity to foreign defrauders in a foreign transaction lacking significant and material contact with the United States." *Id.*

This reasoning applies with equal--if not more-- force here. As in *North South Fin.,* the parties and key non-parties in this case are all foreign. Furthermore, while the transaction in *North South Fin.* was connected in part to the United States, plaintiffs in the case at bar have failed to allege with any sufficiency any wrongful domestic conduct. Accordingly, the policy considerations raised in *North South Fin.* further support the conclusion that this Court lacks subject matter jurisdiction over the instant matter.

Because I have concluded that this Court does not have subject matter jurisdiction over this case, I do not address defendant's remaining proposed grounds for dismissal. *Rhulen Agency v. Alabama Ins. Guar. Ass'n,* 896 F.2d 674, 678 (2d Cir.1990).

### CONCLUSION

For the reasons set forth above, defendant's motion is granted and the complaint is dismissed for lack of subject matter jurisdiction. The Clerk of the Court shall enter judgment accordingly and this case shall be closed.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    Page   7
**(Cite as: 2003 WL 22179008, \*7 (S.D.N.Y.))**

  SO ORDERED.

  2003 WL 22179008 (S.D.N.Y.)

   **Motions, Pleadings and Filings (Back to top)**

  .              **1:02CV06832**              (Docket)
**(Aug. 27, 2002)**

**END OF DOCUMENT**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# TAB 5

Not Reported in F.Supp.2d                                                                          **Page   1**
2000 WL 325945 (E.D.Pa.), Fed. Sec. L. Rep. P 90,923
**(Cite as: 2000 WL 325945 (E.D.Pa.))**
▷

United States District Court, E.D. Pennsylvania.
**John PARASCHOS, et al., Plaintiffs,**
v.
**YBM MAGNEX INTERNATIONAL, INC., et
al., Defendants.**
**No. CIV A 98-6444.**

March 29, 2000.

*MEMORANDUM*

NEWCOMER.

**\*1** Presently before this Court are the following
slew of motions filed by ten of the eleven defendants
[FN1] in this action:

> FN1. All actions, including the instant proceedings,
> against YBM have been stayed and enjoined due to
> bankruptcy proceedings in the Bankruptcy Court.
> YBM, therefore, has not filed a motion to dismiss
> here.

(1) Defendant Parente, Randolph, Orlando, Carey
& Associates' Motion to Dismiss Claims of
Canadian Plaintiffs on the Grounds of Comity;

(2) Defendant Parente, Randolph, Orlando, Carey
& Associates' Motion to Dismiss pursuant to the
Private Securities Litigation Reform Act of 1995
("Reform Act") and Federal Rules of Civil
Procedure 9(b) and 12(b)(6);

(3) Defendant R. Owen Mitchell's Motion to
Dismiss Consolidated Amended Complaint pursuant
to Fed.R.Civ.P. 12(b)(6) and 12(b)(1);

(4) Defendant Deloitte & Touche LLP's Motion to
Dismiss    Plaintiff's    Consolidated    Amended
Complaint pursuant to Fed.R.Civ.P. 12(b)(6) and
the Reform Act;

(5) Defendant David R. Peterson's Motion to
Dismiss Consolidated Amended Complaint pursuant
to Fed.R.Civ.P. 12(b)(6);

(6) Defendants James J. Held's and Guy R. Scala's
Motion    to    Dismiss    Plaintiff's    Consolidated
Amended Complaint pursuant to Rule 12(b)(6);

(7)    Defendants    Harry    Antes'    and    Frank
Greenwald's    Motion    to    Dismiss    pursuant    to
Fed.R.Civ.P. 12(b)(1) and 12(b)(6) [FN2];

> FN2. Defendants Harry Antes and Frank Greenwald
> have also filed a Motion Joining in Defendant
> Parente, Randolph, Orlando, Carey & Associates'
> Motion to Dismiss Claims of Canadian Plaintiffs on
> the Grounds of Comity.

(8) Defendant Jacob Bogatin's Motion to Dismiss
Consolidated    Amended    Complaint    pursuant    to
Fed.R.Civ.P. 9(b) and 12(b)(6) [FN3]; and

> FN3. Defendant Bogatin moves, in the alternative, to
> dismiss strike portions of the consolidated Amended
> Complaint pursuant to Fed.R.Civ .P. 12(f).

(9) Defendant Daniel E. Gatti's Motion to Dismiss
pursuant to Fed .R.Civ.P. 12(b)(6) and 12(b)(1).

For the reasons discussed below, the motions to
dismiss are DENIED and the case shall go forth so
that the parties may begin discovery.

**I. BACKGROUND**

Plaintiffs bring this consolidated class action on
behalf of persons who purchased the common stock
of defendant YBM Magnex International Inc.
("YBM") between January 19, 1996 and May 14,
1998 [FN4] alleging: (1) violations of section 10(b)
of the Securities Exchange Act of 1934 ("Exchange
Act") and Rule 10b 5; (2) violations of section 20(a)
of the Exchange Act; and (3) state law claims of
negligent misrepresentation. Plaintiffs have named
as defendants: (1) YBM; (2) Parente, Randolph,
Orlando, Carey & Associates ("Parente"), a firm of
certified public accountants; (3) Deloitte & Touche,
LLP ("Deloitte"); (4) Jacob G. Bogatin, former
President, Chief Executive Officer, and member of
the Board of Directors of YBM; (5) Harry W.
Antes, former Chairman of the Board of YBM; (6)
R. Owen Mitchell, former member of the Board of
YBM and Chairman of several Special Committees
of the Board; (7) Frank Greenwald, former member
of the Board of YBM; (8) David R. Peterson,
former member of the Board of YBM and former
Premier of the Province of Ontario; (9) Daniel E.
Gatti, former Vice President of Finance and Chief

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2000 WL 325945, *1 (E.D.Pa.))

Financial Officer of YBM; (10) James J. Held, former Vice President of Business Development and Investor Relations of YBM; and (11) Guy R. Scala, former Vice President of Sales and Marketing of YBM.

> FN4. Any persons who may qualify as members of the class shall hereinafter be referred to collectively as "the Class".

In sum, plaintiffs allege that defendants engaged in an elaborate fraud over the course of several years, during which time YBM allegedly held itself out as a manufacturer of magnets and a participant in several other businesses, when in fact YBM was a front for the laundering of money obtained by Russian organized crime. Plaintiffs aver that their claims arise from a scheme to launder the proceeds of organized crime activities in Eastern Europe, to convert the criminal revenue to clean money through lawful sales of the common stock of YBM, and to defraud purchasers of YBM's common stock.

*2 With regard to the § 10(b) and Rule 10b-5 claims, plaintiffs contend that defendants carried out a course of conduct which was intended to and did deceive the investing public, artificially inflate and maintain the market price of YBM common stock, and cause plaintiffs and other members of the Class to purchase YBM common stock at artificially inflated prices. The plaintiffs allege that the defendants who were insiders of YBM ("Insider defendants") are liable because each was a high-level executive and/or director of YBM during the Class period and/or was a member of the company's senior management; each was privy to and participated in the preparation of YBM's financial statements and reporting of the company's financial condition, operations, and performance; each enjoyed significant personal contact and familiarity with other Insider defendants and was advised of and had access to other members of YBM's management team, internal reports, and other data and information about the company's resources at all relevant times; and each was aware of YBM's dissemination of information to the investing public which each knew or recklessly disregarded as materially false and misleading.

Plaintiffs contend that the auditors violated § 10(b) of the Exchange Act and Rule 10b-5 because they rendered unqualified opinions on the company's

financial statements despite knowing or recklessly disregarding that YBM's financial statements contained materially false representations, including representations of revenue, earnings, and business operations. Plaintiffs assert that these actions were an extreme departure from a standard of ordinary care.

The second claim for violation of § 20 of the Exchange Act applies only to the Insider defendants, who allegedly acted as controlling persons of YBM, and had the power to, and did, influence and control the decision-making of the company. Plaintiffs assert that the Insider defendants' decisions included the content and dissemination of various public statements that plaintiffs contend are false and misleading. Plaintiffs claim that pursuant to § 20(a), the Insider defendants are liable jointly and severally with and to the same extent as the company for its violations of § 10(b) and Rule 10b-5.

The third claim for negligent misrepresentation is brought against all defendants for their alleged failures to state material facts necessary: (1) in order to make the statements, in light of the circumstances under which they were made, not misleading, and (2) in order that prospective investors in YBM common stock would have all the material facts necessary for an informed decision.

Defendants' instant motions to dismiss, filed in response to plaintiffs' consolidated Amended Complaint ("Complaint"), fall into 3 general categories: (1) dismissal based on a lack of subject matter pursuant to 12(b)(1), or alternatively, dismissal based on concerns of international comity; (2) dismissal based on plaintiffs' failure to plead fraud with particularity pursuant to Rule 9(b) and the Reform Act; and (3) dismissal based on the failure to state a claim pursuant to Rule 12(b)(6). The Court will now discuss these issues in turn.

## II. DISCUSSION

### A.   DISMISSAL:   SUBJECT   MATTER JURISDICTION AND COMITY

*3 Defendant Parente, Randolph, Orlando, Carey & Associates ("Parente") filed a Motion to Dismiss Claims of Canadian Plaintiffs on the Grounds of Comity ("Comity Motion"), which was joined by defendants Harry W. Antes and Frank Greenwald

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2000 WL 325945, *3 (E.D.Pa.))

Page 3

through their Motion to Join in Motion to Dismiss Claims of Canadian plaintiffs. Defendants Mitchell, Held, Scala, Bogatin, and Gatti also joined in Parente's Comity Motion through their respective motions to dismiss. [FN5]

> FN5. This Court notes that these 5 defendants join in Parente's Comity Motion, but mislabel said Comity Motion as a motion to dismiss based on lack of subject matter jurisdiction pursuant to Rule 12(b)(1). As pointed out in both Parente's Comity Motion (note 12, page 13) and Parente's Reply Brief (page 1), Parente's argument is *not* that this Court lacks subject matter jurisdiction under the federal securities laws, but rather that this Court should exercise its *discretion* and dismiss the claims of the Canadian plaintiffs as a matter of comity. As a preliminary matter, this Court will address its subject matter jurisdiction over this matter under the federal securities laws.

Defendants contend that YBM was a Canadian corporation, was offered by Canadian underwriters, was traded solely on Canadian stock exchanges and never on any U.S. exchanges, and was a "reporting issuer" with the Canadian provincial securities commissions in Ontario, Alberta, Quebec and British Columbia. In essence, defendants argue that as a matter of comity this Court should exercise its discretion and dismiss the claims of the Canadian plaintiffs in order that they may be adjudicated under Canadian law in a Canadian court because of the underlying Canadian nature of this action and the circumstances that give rise to it.

Defendants argue that the Canadian plaintiffs are taking advantage of a U.S. forum to apply the U.S. securities laws to determine their rights and remedies with respect to a foreign corporation: (1) whose securities the plaintiffs purchased in their own country; (2) which was incorporated in plaintiffs' own country; (3) whose shares traded solely on a stock exchange in plaintiffs' own country; (4) whose financial statements were prepared in accordance with the GAAP of the plaintiffs' own country; and (5) whose securities were regulated by the securities authorities of the plaintiffs' own country. Moreover, defendants posit that Canada has a judicial forum and a fully articulated body of law available to the plaintiff. Defendants point to two separate shareholder class actions that were filed in Canada: one class covering

plaintiffs who made open market purchases, and of which the Canadian plaintiffs here would be members; and another class covering a proposed class of Canadian investors who bought in YBM's November 17, 1997 public offering.

Plaintiffs respond to defendants' arguments by arguing that this Court does in fact have jurisdiction over this action, and that relevant policy considerations and caselaw provide reasons for this Court not to dismiss the Canadian plaintiffs on grounds of comity.

### 1. EXTRATERRITORIAL SUBJECT MATTER JURISDICTION OF THE EXCHANGE ACT

As a preliminary matter, and to address any arguments that this Court may not have subject matter jurisdiction over this action, the Court will begin by discussing its extraterritorial subject matter jurisdiction under the federal securities laws.

Section 27 of the Exchange Act vests federal courts with exclusive jurisdiction over actions involving violations of the Exchange Act, as well as rules and regulations adopted thereunder. However, neither the Exchange Act nor the Rules promulgated thereunder provide specific guidance as to the extraterritorial application of the Act. "Although the preamble to the [Exchange] Act expressly contemplates its application to transactions in 'interstate and foreign commerce,' ... thereby suggesting Congress intended a broad jurisdictional scope, ... the specific provisions of the statute itself are silent with respect to its extraterritorial reach. *Starlight Int'l, Inc. v. Herlihy,* 13 F.Supp.2d 1178, 1182 (D.Kan.1998) (citations omitted).

*4 In the absence of clear statutory guidance, the Second Circuit has extensively considered the application and extraterritorial jurisdiction of the federal securities laws to transnational transactions and fraud. The Second Circuit has developed two alternative tests for determining when federal securities laws apply extraterritorially: the "conduct test," which in essence asks whether the fraudulent conduct that forms the alleged violation occurred in this country; and the "effects test," which asks whether conduct outside the United States resulted in substantial adverse effects on American investors or securities markets. *See Robinson v. TCI/US West Communications,* 117 F.3d 900, 905 (5th Cir



Not Reported in F.Supp.2d
(Cite as: 2000 WL 325945, *4 (E.D.Pa.))

.1997). It has been held that satisfaction of either test is enough to confer subject matter jurisdiction on the court. *See Id.*

In the instant case, plaintiffs' briefs appear to rely on the "conduct test" to satisfy jurisdictional requirements. They argue that defendants' fraudulent conduct and misrepresentations took place in the United States, and therefore defendants should be held liable under U.S. securities law. The courts of appeals however, have not agreed on the type of activities required to satisfy the conduct test, although all agree that essentially, the test is based "on the idea that Congress did not want the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." *Id.* (citations omitted). The Second, Fifth, and District of Columbia Circuits have held that the domestic conduct be "of material importance" to, or "have directly caused" the alleged fraud. *Id.* at 905-06. The Third Circuit, however, along with the Eighth and Ninth Circuits, requires only that the domestic conduct be significant to the fraud rather than a direct cause of it. *Id.* at 906 (citing *SEC v. Kasser,* 548 F.2d 109, 114 (3d Cir .1977)).

The facts of the instant action meet the criteria of the conduct test, and the defendants' conduct in the United States was of such significance that subjecting them to the jurisdiction of this Court is proper. Most, if not all, of defendants' conduct allegedly took place in the United States. The misrepresentations concerning YBM, as well as the audits of the company, which plaintiffs contend constitute the fraud, occurred domestically. Furthermore, if plaintiffs' allegations are proven, defendants' conduct would easily be found to have been significant to the alleged fraud and plaintiffs' subsequent reliance on said fraud.

Even under the stricter reading of the conduct test, plaintiffs have sufficiently pleaded that defendants' alleged domestic conduct: (1) was more than "merely preparatory," and (2) directly caused their injury and losses. *See Bersche v. Drexel Firestone, Inc.,* 519 F.2d 974, 987 (2d Cir.1975), cert. denied, 423 U.S. 1018 (1975). Plaintiffs claim that the misrepresentations and fraud that occurred in the U.S. were part of an elaborate scheme, which indicates that defendants' conduct was more than mere preparation. Furthermore, there is little doubt

that if plaintiffs allegations are proven, the misrepresentations and fraud, upon which plaintiffs allegedly relied, directly led to and caused plaintiffs' injuries. Therefore, this Court finds that it has proper extraterritorial subject matter jurisdiction over this matter under U.S. securities laws; and plaintiffs can properly bring this action under the Exchange Act.

2. INTERNATIONAL COMITY

**\*5** This Court now turns to the brunt of defendants' motions to dismiss based on comity. The principle of international comity, also known as the "comity of nations doctrine," permits the "recognition of foreign proceedings to the extent that such proceedings are determined to be orderly, fair and not detrimental to the nation's interests." *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru,* 165 B.R. 379, 384 (S.D.N.Y.1994). The Supreme Court in *Hilton v. Guyot,* 159 U.S. 113, 164 (1895) defined international comity as:
"the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."
When the extraterritorial enforcement of United States law creates an actual or potential conflict with the laws or policies of the nations, it is appropriate for the enforcing court to consider whether, in light of considerations of comity, it should decline to exercise jurisdiction and to enforce the United States law. *See Westel de Venezuela v. American Telephone and Telegraph Co.,* CIV.A. No. 6665, 1992 WL 209641, at \*19 (S.D.N.Y. Aug. 17, 1992) (citing *Timberlane Lumber Co. v. Bank of America National Trust & Savings Association,* 749 F.2d 1378, 1384 (9th Cir.1984), cert. denied, 472 U.S. 1032 (1985)).

Under the principle of comity between sovereign nations, a district court should decline to exercise jurisdiction under certain circumstances in deference to the laws and interests of another foreign country. *Basic v. Fitzroy Engineering, Ltd.,* 1997 WL 753336, at \*8 (7th Cir.1997) (citing *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa,* 482 U.S. 522, 543 n. 27 (1987). "United States courts ordinarily ... defer to proceedings taking place in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



foreign countries, allowing those ... proceedings to have extraterritorial effect in the United States." *Pravin Bank Assocs.,* 109 F.3d at 854 (citations omitted).

Many federal courts have dismissed cases solely on the basis of comity. *See Fleeger v. Clarkson Co. Limited,* 86 F.R.D. 388, 392 (N.D.Tex.1980) (citing *Cornfeld v. Investors Overseas Services, Ltd.,* 471 F.Supp. 1255 (E.D.N.Y.1979), and pointing to cases cited therein at 1262). The rationale for dismissals based on comity is not based simply on a lack of familiarity with the particular foreign law, but rather is in deference to the foreign country's legal, judicial, legislative, and administrative system of handling disputes over which it has jurisdiction, in a spirit of international cooperation. *Id.* (citing *Cornfeld,* 471 F.Supp. at 1262). However, comity is not extended to foreign proceedings when doing so would be contrary to the public policy of the U.S. *Pravin,* 109 F.3d at 854.

In a situation such as the instant one, a district court is also empowered, in the interests of international comity, to dismiss a federal suit whenever it is duplicative of a parallel action pending in courts in a foreign country. *Ingersoll Mill. Mach. Co. v. Granger,* 833 F.2d 680, 685 (7th Cir.1987). An action is parallel to another action when "substantially the same parties are contemporaneously litigating substantially the same issues in another forum." *Caminiti & Iaarola, Ltd. v. Behnke Warehousing, Inc.,* 962 F.2d 698, 700 (7th Cir.1992). The two actions may be parallel when the parties share some legal identity of interest such that they are "substantially the same." *Id.* at 700-01. Though the actions do not have to be identical, the issues must be sufficiently similar, in that there must be a "substantial likelihood that the [foreign] litigation will dispose of all claims presented in the federal case." *Lumen Constr., Inc. v. Brant Constr. Co.,* 780 F.2d 691, 695 (7th Cir.1985).

*6 Even when two suits are parallel, however, a district court should exercise jurisdiction over an action even where identical subject matter is concurrently before a foreign court. *See Ingersoll,* 833 F.2d at 684. The court should look to extraordinary circumstances that necessitate dismissal, including the desirability of avoiding duplicative litigation, the inconvenience of the

domestic forum, the governing law, the order in which jurisdiction was obtained in each forum, the relative progress of each proceeding, and the contrived nature of the domestic claim. *See Balcom v. Rosenthal & Co.,* CIV.A. No. 96-6310, 1998 WL 2835 (N.D.Ill. Jan. 2, 1998) (citing *Ludgate Ins. Co. v. Becker,* 906 F.Supp. 1233, 1242 (N.D.Ill.1995).

Defendants have pointed to extensive policy reasons supporting dismissal of the present claims of the Canadian plaintiffs; and in general, this Court agrees with many of them. Defendants' arguments are very persuasive. It is true that the Canadian courts serve as a reliable alternative to this Court and can be trusted to be orderly, fair, and not detrimental to this country's interests. Defendants have also successfully shown that many of the legal issues in this case arise from circumstances that are transnational (Canadian) in nature. In addition, the interests of international duty as well as judicial economy and convenience are very legitimate issues in this case.

However, the reasons for maintaining jurisdiction of this case are more compelling. To the extent that subject matter jurisdiction over this case is proper, plaintiffs, even foreign plaintiffs, should be permitted to bring their claims in the forum of their choice. More importantly, the deciding factor for this Court is plaintiffs' clear choice of law. The Canadian plaintiffs bring their claims under *U.S.* securities law, not Canadian law. Plaintiffs have specifically chosen to utilize the jurisdiction afforded to them to have their claims brought under the Exchange Act and have them adjudicated in a United States district court.

That being the case, this Court acknowledges the absence from this case some of the more important factors of comity dismissal. First, the pending cases in the Canadian courts involve different legal issues. As defendants point out, the Canadian courts will not be applying U.S. securities law. Therefore, while defendants claim that there are conflict of law issues, there appear to be no actual or potential conflicts of law. The claims under the Exchange Act, as well as the state law claims for negligent misrepresentation, are not in conflict with Canadian law or the cases presently pending in the Canadian courts. Consequently, those issues being tried in Canada do not preclude the instant action; and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conversely, the issues in this case should not estop any of the issues being tried in the Canadian proceedings. The claims brought here are distinct from those other claims in the foreign court, and this Court chooses to allow plaintiffs to bring their claims here.

*7 Second, this Court feels that dismissal of this action would not be out of a spirit of international cooperation in deference to Canada's legal, judicial, legislative, and administrative system of handling disputes. Rather, dismissal of plaintiffs' claims would turn out to be an outright dismissal of plaintiffs' legitimate U.S. securities law claims. Plaintiffs would lose out on the protections of U.S. law that are available to them under the extraterritorial applications of the Exchange Act. If this action were brought under Canadian law, or if this Court was being asked to apply Canadian law, it would be an entirely different matter and a different holding may very well result. However, since this Courts is the only forum in which the Canadian plaintiffs have brought their legitimate U.S. securities law claims, they will not be prevented from doing so.

B. DISMISSAL: FAILURE TO STATE A CLAIM AND FAILURE TO PLEAD WITH PARTICULARITY

Each of the defendants has also moved this Court to dismiss for plaintiffs' failure to state a cause of action pursuant to Rule 12(b)(6). In conjunction with their motions defendants argue that plaintiffs have failed to satisfy heightened pleading requirements that apply to their § 10(b) and Rule 10b-5 claims.

1. LEGAL STANDARD: MOTION TO DISMISS

Under Rule 12(b)(6), a court should dismiss a claim for failure to state a cause of action only if it appears to a certainty that no relief could be granted under any set of facts which could be proved. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). Because granting such a motion results in a determination on the merits at such an early stage of a plaintiffs' case, the district court "must take all the well pleaded allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief."

*Colburn v. Upper Darby Township,* 838 F.2d 663, 664-65 (3d Cir.1988), *cert. denied,* 489 U.S. 1065 (1989) (quoting *Estate of Bailey by Oare v. County of York,* 768 F.2d 503, 506 (3d Cir.1985)). "To withstand the motion, 'it is not necessary to plead facts upon which the claim is based.' " *In re Meridian Sec. Litig.,* 772 F.Supp. 223, 226 (E.D.Pa.1991) (quoting *In re Midlantic Corp. Shareholder Litig.,* 758 F.Supp. 226, 230 (D.N.J.1990) in the context of assessing Rule 12(b)(6) motions to dismiss § 10(b) claims).

2. LEGAL STANDARD: PLEADING REQUIREMENT UNDER FED.R.CIV.P. 9(b) AND THE REFORM ACT

Federal Rule of Civil Procedure 9(b) and the Reform Act require that a securities fraud claim be subject to heightened pleading requirements. Because § 10(b) and Rule 10b-5 are anti-fraud provisions, plaintiffs must plead them with the particularity required by Rule 9(b) and the Reform Act. [FN6] *See In re Burlington Coat Factory, Sec. Litig.,* 114 F.3d 1410, 1417 (3d Cir.1997).

FN6. However, Rule 9(b) and the Reform Act do not apply to claims grounded in negligence, so plaintiffs are not required to satisfy the heightened pleading requirements for their negligence misrepresentation claims against defendants. *See Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 288 (3d Cir.), cert. denied, 113 S.Ct. 365 (1992).

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituted fraud or mistake shall be stated with particularity." The purposes of Rule 9(b) are to provide notice of the precise misconduct with which defendants are charged and to "safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. v. Southmost Mach.,* 742 F.2d 786, 791 (3d Cir.1984); *See Rolo v. City Investing Co.,* 155 F.3d 644, 658 (3d Cir.1998) (citations omitted).

*8 "As long as the allegations of fraud reflect precision and some measure of substantiation, the complaint is adequate." *Meridian,* 772 F.Supp. at 229 (citing *Seville,* 742 F.2d at 791). While allegations of time, place, and date certainly meet this requirement, *see Rolo,* 155 F.3d at 658, allegations that set forth the details of the alleged

fraud may also meet these requirements, and plaintiffs "are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville,* 742 F.2d 791 (finding that plaintiff had met burden when it incorporated into the complaint a list of the pieces of machinery allegedly subject to fraud and otherwise described the "nature and subject" of the supposed misrepresentations); *Saporito v. Combustion Eng'g, Inc.,* 843 F.2d 666, 675 (3d Cir.1988), judgment vac'd on other grounds, 489 U.S. 1049, 109 (1989) (stating that plaintiff did not meet burden when it pled in very general terms, and did not allege who made or received fraudulent statements). As to scienter, plaintiffs must allege specific facts that give rise to a 'strong inference' that defendants possessed the requisite intent. *Burlington Coat Factory,* 114 F.3d at 1418.

The Third Circuit has repeatedly cautioned that courts should apply this rule flexibly, particularly when the information at issue may be in the defendants' control. *See Seville,* 742 F.2d at 791. In fact, the Third Circuit has held that:

> [c]ourts must be sensitive to the fact that application of Rule 9(b) prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.' Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs.... Thus, courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control.

*In re Craftmatic Sec. Litig.,* 890 F.2d 628, 645 (3d Cir.1989) (citations omitted). In addition, the *Craftmatic* Court "expressly declined to adhere to the rigid enforcement of Rule 9(b) in securities fraud cases." *In re Midlantic Corp. Shareholder Litig.,* 758 F.Supp. 226, 232 (D.N.J.1990) (citing *Craftmatic,* 890 F.2d at 645-46).

The Reform Act requires that a plaintiff alleging that a defendant has made misleading statements must:

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

To establish scienter under the Reform Act, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. S 78u-4(b)(2). The Third Circuit has held that under the requirement, plaintiffs must "allege specific facts that give rise to a 'strong inference' that defendants possessed the requisite intent." *Marra v. Tel-Save Holdings, Inc.,* CIV.A. No. 98-3145, 1999 WL 317103, at \*11 (May 18, 1999) (quoting *Burlington Coat Factory,* 114 F.3d 1418). This standard can be satisfied either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud; or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Marra,* 1999 WL 317103, at \*11 (quoting *Burlington Coat Factory,* 114 F.3d 1418). Therefore, allegations that defendants had both motive and opportunity to commit fraud are sufficient to plead scienter under § 10(b). *Marra,* 1999 WL 317103, at \*11 (citing *In re Home Health Corp. of Am., Inc.,* CIV .A. No. 98-834, 1999 WL 79057, at \*14 (E.D.Pa. Jan. 29, 1999). While the Reform Act clearly requires some precision in alleging facts, it does not require pleading all of the evidence and proof thereunder supporting a plaintiff's claim. *In re Cephalon Sec. Litig.,* CIV . A. No. 96-0633, 1997 WL 570918 (E.D.Pa. Aug. 29, 1997).

### 3. LEGAL STANDARDS AND ELEMENTS OF PLAINTIFFS' CLAIMS

#### a. SECTION 10(b) AND RULE 10b-5

**\*9** To state a claim under § 10(b) and Rule 10b-5, a plaintiff must plead the following elements: (1) that a defendant made misstatements or omissions of material fact; (2) with scienter; (3) in connection with a purchase or sale of securities; (4) upon which the plaintiff relied; and (5) plaintiff's reliance was the proximate cause of plaintiff's injury. *See Kline v. First W. Gov't Sec., Inc.,* 24 F.3d 480, 487 (3d Cir.1994).

#### b. CONTROL PERSON LIABILITY UNDER § 20(a)

Section 20(a) of the Exchange Act states in relevant part:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
**(Cite as: 2000 WL 325945, \*9 (E.D.Pa.))**

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To establish liability under § 20(a), a plaintiff must prove: (1) a primary violation occurred; (2) the defendant had control over the person responsible for the violation; and (3) the defendants acted culpably. *See In re Cephalon Sec. Litig.*, CIV.A. No. 96-0633, 1997 WL 570918, at \*14 (E.D.Pa. Aug. 29, 1997).

In assessing a plaintiff's pleadings for § 20(a), Third Circuit precedent requires the court to give consideration to the powers inherent in the defendants' positions:

Substantial weight must be given to the authority, or rather the potential authority, inherent in such corporate positions, considered separately or in concert. Furthermore, prior to discovery, plaintiff can hardly be able to plead the precise culpable conduct of each individual defendant.

*Midlantic*, 758 F.Supp. at 236.

c. NEGLIGENT MISREPRESENTATION

Under Pennsylvania law, liability for negligent misrepresentation will arise if: (1) the misrepresentation is of a material fact; (2) the representor knew of the misrepresentation, but (3) made the misrepresentation without knowledge of its truth or falsity or made it under such circumstances in which he ought to have known of its falsity; (4) the representor intended the representation to induce another to act on it; (5) the other person justifiably relied upon the misrepresentation; and (6) if in so relying, suffered damages or injury. *City of Rome v. Glanton*, 958 F.Supp. 1026, 1039 (E.D.Pa .1997); *Amoco Oil Co. v. McMahon*, 1997 WL 50448 (E.D.Pa.1997).

4. ANALYSIS OF DEFENDANTS' MOTIONS TO DISMISS

In their extremely lengthy Complaint, plaintiffs set forth a detailed list of allegations, depicting a complex scheme of fraud and money laundering.

Within this portrait of deception and misrepresentation, plaintiffs weave facts that each of the defendants were in a position to know of the scheme, and ultimately, through intentional and/or negligent actions, became liable because of their involvement.

a. SECTION 10(b) AND RULE 10b-5

\*10 With regards to the § 10(b) and Rule 10(b)-5 claims, plaintiffs allege a myriad of misstatements and omissions of material fact. The misstatements and omissions include those stemming from YBM's Prospectuses, press releases, and annual reports concerning various representations of the company's business, income, and growth, as well as omissions concerning certain criminal connections and investigations made by the U.S. law enforcement authorities. Plaintiffs also allege that misstatements and omissions were made by the auditors in the form of unqualified, clean audit reports of YBM's finances, when in fact much of the company's financial information was false or nonexisting. Furthermore, despite defendants' arguments to the contrary, plaintiffs sufficiently plead scienter through strong inferences that may be drawn from the factual allegations laid out in the Complaint. Plaintiffs' Complaint alleges facts that show inferences that defendants had both motive and opportunity to commit fraud as well as facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. When read in the light most favorable to them, plaintiffs' collective allegations strongly infer that each of the defendants was in a position to know of the company's true financial status, knowingly signed off on, or assented to many of the company's misrepresentations or omissions.

For instance, plaintiffs allege, *inter alia:* (1) defendant Bogatin finalized and signed YBM's 1995 Annual Report, which allegedly contained false information; (2) defendant Mitchell allegedly minimized "inconsistencies" in shareholder records and testimony, and misreported results of an investigation of the Special Committee; (3) defendant Antes joined Bogatin in finalizing and signing YBM's 1996 Annual Report which allegedly contained false information; (4) defendant Greenwald was allegedly involved in, and subsequently silent about, an Audit Committee meeting where Deloitte expressed concerns about



Not Reported in F.Supp.2d
(Cite as: 2000 WL 325945, *10 (E.D.Pa.))

Page 9

first quarter 1998 earnings that might have been impacted by certain transactions questioned by Deloitte; (5) defendant Gatti, with others, provided numerous YBM documents and other information to Deloitte in 1997 while informing Deloitte that YBM's oil sales were flagged for particular attention by the Ontario Securities Commission, inferring that Gatti as a vice president knew of YBM's misrepresentations and assented to them; and (6) defendants Held, Scala, and Peterson allegedly made comments in various articles regarding YBM's financial status, when they were in positions to know that their statements were false and misrepresentative. The Court also finds that the aggregate of allegations against the outside auditors, Parente and Deloitte, raises strong inferences of their scienter. They were in positions to know YBM's true financial situation; and yet proceeded to make misrepresentations or omissions of material facts concerning those finances. With the aforementioned determinations, this Court feels that discovery is necessary to unearth the evidence, if any, to support plaintiffs' allegations of § 10(b) and Rule 10b-5 violations.

b. SECTION 20(a)

**\*11** Despite some of the Insider defendants' contentions that plaintiffs have failed to show they were in fact insiders, the Court finds that plaintiffs' allegations, if proven, are sufficient to show that the Insider defendants were in positions with authority and inherent powers to control YBM. Therefore, in conjunction with the determination that a primary violation of § 10(b) and Rule 10b-5 have been sufficiently alleged against YBM, this Court finds that § 20(a) has also been adequately pleaded against the Insider defendants.

c. NEGLIGENT MISREPRESENTATION

Because plaintiffs' Exchange Act claims will not be dismissed, this Court will exercise supplemental jurisdiction over plaintiffs' state law claim for negligent misrepresentation. As was the case for their other claims noted above, plaintiffs have adequately pleaded their causes of action for negligent misrepresentation against the individual Insider defendants as well as the outside auditors to withstand the instant motions to dismiss. The Court determines that plaintiffs' well-pleaded allegations warrant that this case move forward into discovery,

after which time the parties may wish to file appropriate dispositive motions.

d. CONCLUSION

Upon consideration of the Complaint, and when plaintiffs' allegations are read in the light most favorable to them, it does not appear to a certainty that no relief could be granted under any set of facts which could be proved.

Although these allegations in the Complaint lack absolute factual specificity, the Court is satisfied that at this early stage of the action plaintiffs' pleadings are sufficient to withstand the instant motions to dismiss. The Court finds the Complaint is adequate and sufficient to satisfy the purposes of heightened pleading requirements. [FN7] In particular, plaintiffs have adequately pleaded with enough particularity regarding the numerous elements of their claims to provide sufficient notice of the precise misconduct with which defendants are charged. The Court is also convinced by the pleadings that the instant allegations are not simply spurious charges of immoral and fraudulent behavior.

> FN7. The Court notes that plaintiffs would have been granted leave to amend their Complaint further upon a dismissal at this early stage. Therefore, rather than have plaintiffs refile another amended complaint simply to satisfy stringent pleading requirements, the Court chooses to move this case forward into the discovery phase.

Moreover, many of the allegations pertaining to fraudulent conduct by the individual defendants refer to information that is largely within the defendants' control, and it would be inappropriate to penalize the plaintiffs at this stage for their lack of specific information, given the general flexibility with which the Third Circuit instructs courts to apply Rule 9(b). Consequently, any dispositive issues should be kept until the summary judgment stage after substantial discovery has been completed.

C. DEFENDANT BOGATIN'S MOTION TO STRIKE PARAGRAPHS FROM THE COMPLAINT

Defendant Bogatin seeks pursuant to Rule 12(f) to have this Court strike paragraphs 35, 151, 152, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
**(Cite as: 2000 WL 325945, \*11 (E.D.Pa.))**

153 of the Complaint. A motion to strike under Rule 12(f) of the Federal Rules of Civil Procedure is the proper method to eliminate matters which are found to be redundant, immaterial, impertinent or scandalous. Fed.R.Civ.P. 12(f). Motions to strike under 12(f) are viewed with disfavor. *Great West Life Assur. Co. v. Levithan,* 834 F.Supp. 858, 864 (E .D.Pa.1993). Even "[a]llegations in a complaint which supply background or historical material or which are of an evidentiary quality will not be stricken unless unduly prejudicial to defendant." *South Side Drive-In Co. v. Warner Bros. Pictures Distrib. Corp.,* 30 F.R.D. 32, 34 (E.D.Pa.1962).

**\*12** Upon reading the Complaint and the paragraphs at issue here, the Court determines that they are used in the context of providing background on YBM and are of such evidentiary quality that they should not be stricken. The paragraphs are not unduly prejudicial to defendant Bogatin; nor are they redundant, immaterial, impertinent or scandalous to warrant this Court to strike them from the Complaint. Accordingly, defendant Bogatin's request to strike said paragraphs is denied.

### *ORDER*

AND NOW, this day of March, 2000, upon consideration of the following defendants' Motions to Dismiss, plaintiffs' Response thereto, and defendants' Reply briefs thereto, it is hereby ORDERED as follows:

(1) Defendants Harry Antes and Frank Greenwald's Motion Joining in Defendant Parente, Randolph, Orlando, Carey & Associates' Motion to Dismiss Claims of Canadian Plaintiffs on the Grounds of Comity is GRANTED.

(2) Defendant Parente, Randolph, Orlando, Carey & Associates' Motion to Dismiss Claims of Canadian Plaintiffs on the Grounds of Comity is DENIED.

(3) Defendant Parente, Randolph, Orlando, Carey & Associates' Motion to Dismiss pursuant to the Private Securities Litigation Reform Act of 1995 ("Reform Act") and Federal Rules of Civil Procedure 9(b) and 12(b)(6) is DENIED.

(4) Defendant R. Owen Mitchell's Motion to Dismiss Consolidated Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) and 12(b)(1) is DENIED.

(5) Defendant Deloitte & Touche LLP's Motion to Dismiss Plaintiff's Consolidated Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) and the Reform Act is DENIED.

It is further ORDERED that defendant Deloitte & Touche's request for oral argument pursuant to Local Civil Rule 7.1(f) is DENIED.

(6) Defendant David R. Peterson's Motion to Dismiss Consolidated Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) is DENIED.

(7) Defendants James J. Held's and Guy R. Scala's Motion to Dismiss Plaintiff's Consolidated Amended Complaint pursuant to Rule 12(b)(6) is DENIED.

(8) Defendants Harry Antes' and Frank Greenwald's Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) DENIED.

(9) Defendant Jacob Bogatin's Motion to Dismiss Consolidated Amended Complaint pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) is DENIED.

Defendant Bogatin's request to strike certain paragraphs from the consolidated Amended Complaint is DENIED.

(10) Defendant Daniel E. Gatti's Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 12(b)(1) is DENIED.

AND IT IS SO ORDERED.

2000 WL 325945 (E.D.Pa.), Fed. Sec. L. Rep. P 90,923

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**TAB 6**

Not Reported in F.Supp.
1994 WL 374452 (C.D.Cal.), Fed. Sec. L. Rep. P 98,190
**(Cite as: 1994 WL 374452 (C.D.Cal.))**
▷

**Motions, Pleadings and Filings**

United States District Court, C.D. California.
**In re QUARTERDECK OFFICE SYSTEMS,
INC. SECURITIES LITIGATION.
This document relates to ALL ACTIONS.
No. CV-92-3970-DWW(GHKx).**

March 24, 1994.
**This document relates to ALL ACTIONS.**

ORDER GRANTING PLAINTIFFS-IN-
INTERVENTION'S MOTION TO INTERVENE
NATURE OF THE ACTION

DAVID W. WILLIAMS, District Judge.

**\*1** Plaintiffs in this action, Harriet Roth ("Roth")
and Abraham S. Elias ("Elias"), purchased common
stock from Quarterdeck Office Systems, Inc.
("Quarterdeck") on October 4, 1991 and September
26, 1991, respectively. Defendants are Quarterdeck,
its officers and directors, including outside directors
Casilli, LaHaye and Morgan and three venture
capital firms, Genesis Capital, Peregrine Ventures
and Firebird Partners which own 17%, 17.1% and
4% of Quarterdeck's stock, respectively.

Quarterdeck develops, markets and supports
software products designed to enhance the
performance of personal computer hardware and
software that use the Disk Operating System
("DOS"). International Business Machines, Inc.
("IBM"), introduced DOS in its personal computers
in 1981. Since 1981, other computer companies
have introduced their own versions of DOS, making
personal computers running DOS the largest
segment of the personal computer market.
Quarterdeck's products are designed to enable
owners of DOS-based computer systems to run
several software applications simultaneously and to
transfer data between them, as well as to increase
the available application memory so that programs
run more efficiently.

On June 1, 1991, Quarterdeck offered securities to
the public for the first time in its Initial Public
Offering ("IPO"). In the four quarters following
the IPO, Quarterdeck experienced positive results in
the form of increased net sales and earning per

share. On July 1, 1992, Quarterdeck issued a press
release stating that it anticipated that net sales and
earnings would decline and that revenues and
earnings would be below analyst expectations for the
quarter. The stock market reacted to this press
release and the price of Quarterdeck's stock dropped
57%.

The next day, July 2, 1992, plaintiffs filed a
securities fraud action against defendants asserting
two claims for relief. Plaintiffs' first claim,
brought under § 11 of the Securities Act of 1933, 15
U.S.C. § 77k, alleges that the prospectus and
registration statement that defendants filed before
the IPO, contained material misstatements and
omissions. Plaintiffs' second claim, brought under
§ 10(b) and § 20 of the Securities and Exchange Act
of 1934, 15 U.S.C. § 78j and § 78t, and SEC Rule
10b-5, 17 C.F.R. § 240.10b-5, alleges that
defendants misrepresented and concealed
Quarterdeck's current and future financial condition
throughout the class period.

NATURE OF THE MOTION
On October 4, 1993, this court denied plaintiffs'
motion for class certification and dismissed the
action, *sua sponte*. On November 30, 1993, this
court issued an order vacating its judgment with
regard to the dismissal of the action, and permitted
the named plaintiffs to pursue litigation as
individuals.

This order addresses the motion brought by James
J. Toczek, Betsy Howard, Marvin I. Kushner,
Robert E. Buckley, Jr., William H. Burrell, Patrick
O. Bevers, Robert E. Buckley, and Nancy Buckley
(collectively, "intervenors"), who seek leave to
intervene in this action pursuant to Fed.R.Civ.P.
24(a)(2) and 24(b)(2).

**\*2** Defendant Quarterdeck has filed an opposition
to this motion, in which all defendants join, which
stipulates non-opposition to the intervenors being
granted permissive intervention as individuals only,
but opposes these new plaintiffs being named as
representatives for any future class action.

DISCUSSION
A. *Intervention*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
**(Cite as: 1994 WL 374452, \*2 (C.D.Cal.))**

Page 2

Plaintiffs seek intervention under both Rule 24(a)(2) (intervention by right) and 24(b)(2) (permissive intervention). Under Rule 24(a)(2), a party may intervene as a matter of right if he or she satisfies the four-part test: (1) the party's motion is timely; (2) the party asserts an interest relating to the property or transaction which is the subject of the action; (3) the party is so situated that without intervention the disposition of the action may impair or impede his or her ability to protect that interest; (4) the party's interest is not adequately represented by existing parties. Fed.R.Civ.P. 24(a)(2); *County of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir.1980).

This court denies the intervenors' motion for intervention by right because they fail the third prong of the test under Rule 24(a)(2). The movants' argument with regard to the third prong is that their interests will be "seriously impaired unless they are allowed to intervene and pursue this litigation for themselves and all others similarly situated." *Motion* at 7. Essentially, their argument stresses that they have a right to intervene because they are the necessary representatives for the class action. However, this is no longer a class action; their argument in favor of protecting the rights of the "class members" should not, therefore, be given any weight. Because the movants would not be prejudiced if they had to bring their own action, the court denies their motion for intervention by right.

However, the intervenors have established that they satisfy the requirements for permissive intervention under Rule 24(b)(2). Permissive intervention is allowed when: (1) application is timely; (2) the proposed intervenor and the existing parties present common questions of law or fact; and (3) intervention will neither unduly delay nor prejudice the rights of the original plaintiffs or defendants. Fed.R.Civ.P. 24(b); *Stallworth v. Monsanto Co.*, 558 F.2d 257, 269 (5th Cir.1977).

Whether a motion is timely is determined by analyzing three factors: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *County of Orange v. Air California*, 799 F.2d 535, 537 (9th Cir.1986), *cert denied*, 480 U.S. 946 (1987). The focus of the inquiry is on the date the person attempting to intervene could or should have been aware that his

interests would no longer be adequately protected by the existing parties. *Officers for Justice v. Civil Service Com'n*, 934 F.2d 1092, 1095 (9th Cir.1991) . The intervenors could not have attempted to intervene until November 30, 1993, the date that this court allowed the individually named plaintiffs to proceed with this action. The delay in filing this motion was not undue and defendants would not be prejudiced by these plaintiffs being brought into the action because the allegations they raise in their Complaint in Intervention are substantially the same as those raised by the original plaintiffs. For these reasons the second and third prongs of the Rule 24(b)(2) test are also satisfied. Since the requirements of Rule 24(b) are satisfied, the court grants the intervenors' motion for permissive intervention.

### B. *Statute of Limitations*

**\*3** There is, however, another issue implicitly raised by this motion: whether the intervenors should be allowed to represent a class of plaintiffs in this action. Quarterdeck argues that these new plaintiffs may not raise class action allegations in their complaint, nor attempt to name themselves as class representatives, because the statute of limitations has run.

The intervenors' complaint raises the same claims that plaintiffs Roth and Elias raised in the original complaint: alleged violations of § 11 of the Securities Act of 1933, and of § 10(b) and § 20 of the Securities and Exchange Act of 1934. The statute of limitations for each is one year. 15 U.S.C. § 77m (regarding § 11); *Lampf, et. al. v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773 (1991) (regarding § 10(b) and Rule 10b-5). The statute began running on July 2, 1992, the date the original class action was filed, and expired on July 2, 1993.

In *American Pipe and Constr. Co. v. Utah*, the Supreme Court established that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. 538, 554, 94 S.Ct. 756, 766 (1974). After *American Pipe*, a split of opinion developed among the Circuit Courts as to whether tolling applied only to putative class members who sought intervention after class certification was denied, or whether it

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1994 WL 374452, *3 (C.D.Cal.))

applied to any class member who later filed an individual action. *Robbin v. Fluor Corp.,* 835 F.2d 213, 214 (9th Cir.1987). In *Crown, Cork and Seal Co. v. Parker,* the Supreme Court resolved this controversy by holding that the filing of a class action tolled the statute for all asserted members of the class, not just for intervenors. 462 U.S. 345, 353-54, 103 S.Ct. 2392, 2397 (1983).

The issue raised through this motion, whether the filing of a class action tolls the statute of limitations for subsequently filed class actions, has not yet been resolved by the Supreme Court. However, the issue has been litigated in the lower courts with varying results. There is one class of decisions which holds that the statute is not tolled for later class actions, and another group of decisions which holds that the statute is tolled. However, these cases are not conflicting; they merely deal with two different scenarios.

A number of Circuit Court decisions have used the rationale announced by the Supreme Court in *American Pipe* and *Crown, Cork* to hold that the statute is not tolled for later class actions. This was the Ninth Circuit's conclusion in *Robbin v. Fluor.* In *Robbin* a class action based on securities fraud claims was originally filed in New York district court on May 12, 1981. The district court dismissed for failure to state a claim, but the Second Circuit reversed and remanded. On remand, the district court denied class certification on July 14, 1983, and the action was voluntarily dismissed. More than two years later, on January 14, 1986, Robbin filed a second complaint alleging individual and class claims regarding the same alleged fraud in the Central District of California. District Court Judge Ideman dismissed on statute of limitations grounds, and the Ninth Circuit affirmed, citing to *Korwek v. Hunt,* which held that to extend tolling to class actions "tests the outer limits of the *American Pipe* doctrine and ... falls beyond its carefully crafted parameters into the range of abusive options." *Robbin,* 835 F.2d at 214 (citing *Korwek,* 827 F.2d 874, 879 (2nd Cir.1987)). In *Smith v. Flagship Int'l,* the district court summarized the rationale behind such a holding:
*4 The rule advanced by Smith [that the statute was tolled for later class actions] would allow the attorney for a class to revive the class claims upon denial of certification by simply refiling a new class action using a different putative class member

as representative. The attorney would be able to bring a potentially endless succession of class actions, each tolling the [statute of limitations] for its successor. Such a rule would frustrate "[t]he principle purpose of the class action procedure-- promotion of efficiency and economy of litigation ..." *Crown, Cork & Seal Co. v. Parker,* 462 U.S. at 347.
 *Smith v. Flagship Int'l,* 609 F.Supp. 58 (D.C.Tex.1985). However, all of the cases in which the court held that the statute was not tolled for later class actions involved either an attempt to file an entirely separate class action lawsuit after the dismissal of an earlier action, or an attempt to bring a later class action after the court had determined that proceeding as a class action was an inappropriate method of resolving the lawsuit.

There are, however, a number of district court opinions which hold that the statute of limitations is tolled to allow an intervening plaintiff to perpetuate the class action. The difference in these holdings is explained by the difference in the facts in the particular cases. In these cases, the later class action is brought in an attempt to find a more appropriate class representative, not after the court dismissed a class action or determined that the action cannot properly be brought as a class action.

In *Shields v. Washington Bancorporation,* the district court was faced with facts very similar to the instant case. Rodney Shields ("Shields") filed the original complaint, attempting to represent a class of plaintiffs consisting of the shareholders of the Washington Bancorporation ("WBC"). The court denied plaintiff's motion for class certification on the grounds that Shields was an inadequate representative. *Shields v. WBC,* 1992 WL 88004, 1992 U.S.Dist. LEXIS 4177, Fed.Sec.L.Rep. (CCH) ¶ 97,310 (D.D.C.1992). More than one year after the original complaint had been filed, James D. Moffet ("Moffet") filed a motion to intervene as the class representative. In opposition to this motion, WBC contended that Moffet's class claims were time-barred because the statute of limitations was not tolled for class claims. In arriving at a decision, the court looked at the same cases that Quarterdeck has cited in their opposition to the instant motion, see supra, *Korwek* and *Robbin,* which hold that the statute of limitations is not tolled for later class actions. In *Shields v. WBC,* the court distinguished the case it was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
**(Cite as: 1994 WL 374452, *4 (C.D.Cal.))**

considering from *Korwek* and *Robbin,* holding that in those cases, "the first court to rule on certification had found that a class action was not an appropriate mechanism for resolving the plaintiffs' claims, generally because the class failed to satisfy the typicality or numerosity requirements of Rule 23. [citations omitted]." *Shields v. WBC,* at *2, 1992 U.S.Dist. LEXIS 4177 at *5. The court goes on to say that "[i]n a sense, these plaintiffs were filing new suits in order to seek reconsideration of the prior denial of class certification. In this posture, plaintiffs likely do not deserve the benefits of equitable tolling." *Id.* at *2, 1992 U.S.Dist. LEXIS 4177 at *6. In contrast, the court recognized the *Shields v. WBC* lawsuit as being appropriate for resolution through a class action suit. The court noted that, "[u]nlike the original court in *Korwek,* this court has not made a "definitive determination of the inappropriateness of class certification." *Korwek,* 827 F.2d at 879." *Shields v. WBC,* at *2, 1992 U.S.Dist. LEXIS 4177 at *6-7. The court went on to discuss the policy considerations of flexibility, notice and efficiency, and concluded that the defendants would not be prejudiced, and judicial economy would be served if Moffet were allowed to intervene as a class representative. In holding that Moffet was entitled to intervene as a class representative, the court noted that a contrary ruling would force intervenors to determine the adequacy of a class representative for themselves, thus frustrating the principles the Supreme Court sought to protect in *American Pipe. Shields v. WBC,* at *3, 1992 U.S.Dist. LEXIS 4177 at * 10. [FN1]

*5 The instant action is very similar to *Shields v. WBC.* This court has not determined that proceeding as a class action is inappropriate, merely that Roth and Elias are not proper class representatives. Therefore, if this court were to hold that the statute is not tolled for these intervening plaintiffs to raise class allegations, it would create new law, extending the holdings of *Korwek* and *Robbin* to cases in which a proper class representative is being sought within the originally filed lawsuit.

In their reply, the intervenors contend that *United Airlines, Inc. v. McDonald* is a case similar to this action in which the court held that the statute was not tolled. 432 U.S. 385 (1977). However, *United Airlines* is actually a case in which the district court denied class certification, the order was not

appealed, a settlement was reached and the case was dismissed. *Id.* After the case was dismissed, McDonald, an individual who was in a position similar to that of the original plaintiffs, filed a motion to intervene for the purpose of appealing the adverse class certification order. *Id.* The district court denied intervention, an appeal was taken, and the Court of Appeals reversed on the intervention issue and on the denial of certification. *Id.* This case does not go as far as plaintiffs need it to reach. The issue in the case was whether McDonald's motion to intervene was "timely" under Fed.R.Civ.P. 24, not whether the statute of limitations was tolled. If McDonald had sought to intervene to litigate a class action, the case would support plaintiffs' position. However, she was intervening for the limited purpose of seeking appellate review of the district court's denial of class certification, and the case must be interpreted according to the Supreme Court's limited holding.

CONCLUSION

This court holds that the intervenors are permitted to intervene in this action, and are not limited to suing as individual plaintiffs, but may seek to represent a class of plaintiffs.

IT IS SO ORDERED.

> FN1. A similar case is *Shields v. Smith,* 1992 WL 295179, 1992 U.S. LEXIS 15718, Fed.Sec.L.Rep. (CCH) ¶ 97,001 (N.D.Cal.). In that case, the court distinguished *Korwek* and *Robbin* as cases involving an attempt to file new suits in order to seek reconsideration of a prior denial of class certification. *Id.* at *2, 1992 U.S. LEXIS 15718 at *7. In facts very similar to those in *Shields v. WBC,* the court held that *Shields v. Smith* presented a different case. The court held that the motion to intervene was not seeking reconsideration of a denial a class certification because the court did not find that a class action was inappropriate, only that Shields was an inadequate representative. The court held that the intervenor was not time-barred from suing as a class representative. *Id.* at *3, 1992 U.S.Dist. LEXIS 15718 at *10.

1994 WL 374452 (C.D.Cal.), Fed. Sec. L. Rep. P 98,190

**Motions, Pleadings and Filings (Back to top)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
**(Cite as: 1994 WL 374452, \*5 (C.D.Cal.))**

.            **2:92CV03970**          **(Docket)**
**(Jul. 02, 1992)**

**END OF DOCUMENT**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.